PETER C. MEIER (NSB No. 9123)
petermeier@paulhastings.com
DANIEL PRINCE*
danielprince@paulhastings.com
ADAM J. FEE*
adamfee@paulhastings.com
D. SCOTT CARLTON*
scottcarlton@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

TAMARA B. PETERSON (NSB No. 5218)
tpeterson@petersonbaker.com
PETERSON BAKER, PLLC
701 S. 7th Street
Las Vegas, NV  89101
Telephone:  (702) 786-1001
Facsimile:  (702) 786-1002

Attorneys for Plaintiff
MIRAE ASSET SECURITIES CO., LTD.
*will comply with LR IA 11-2 within 14
days

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MIRAE ASSET SECURITIES CO., LTD., a Republic of Korea company,<br><br>Plaintiff,<br><br>v.<br><br>RYZE RENEWABLES HOLDINGS, LLC, a Nevada limited liability company, and RYZE RENEWABLES NEVADA, LLC, a Nevada limited liability company,<br><br>Defendants. | Case Number:<br><br>*Plaintiff Mirae Asset Securities Co., Ltd.'s Appendix of Exhibits to Complaint for Declaratory Relief* |

APPENDIX OF EXHIBITS TO COMPLAINT FOR DECLARATORY RELIEF

Plaintiff Mirae Asset Securities Co., Ltd. ("Mirae Asset"), by and through its counsel, hereby submits its Appendix of Exhibits to Plaintiff's Complaint:

| Exhibit No. | Description | Pages |
|---|---|---|
| 1 | Demand for Arbitration, *Ryze Renewables Holdings, LLC, et al. v. Mirae Asset Securities Co., LTD*, JAMS Ref. No. 5260000299 ("Demand for Arbitration") | 1 – 22 |
| 1A | Convertible Loan Agreement, dated January 27, 2021 (Exhibit A to the Demand for Arbitration) | 1 – 107 |
| 1B | Second Loan Agreement, dated November 29, 2021 (Exhibit B to the Demand for Arbitration) | 1 - 133 |
| 2 | First Amended Complaint *Ryze Renewables Holdings, LLC, et al. v. Snell & Wilmer, LLP, et al.*, Case No. A-23-863908-B, filed in Clark County, Nevada | 1 – 29 |

1

1    Dated:  September 22, 2023         Respectfully submitted,

2

3                                       By:  /s/ Peter C. Meier
                                             PETER C. MEIER
4
                                        PETER C. MEIER (NSB No. 9123)
5                                       petermeier@paulhastings.com
                                        DANIEL PRINCE*
6                                       danielprince@paulhastings.com
                                        ADAM J. FEE*
7                                       adamfee@paulhastings.com
                                        D. SCOTT CARLTON*
8                                       scottcarlton@paulhastings.com
                                        PAUL HASTINGS LLP
9                                       515 South Flower Street, 25th Floor
                                        Los Angeles, CA  90071
10                                      Telephone:  (213) 683-6000
                                        Facsimile:  (213) 627-0705
11
                                        TAMARA B. PETERSON (NSB No. 5218)
12                                      tpeterson@petersonbaker.com
                                        PETERSON BAKER, PLLC
13                                      701 S. 7th Street
                                        Las Vegas, NV  89101
14                                      Telephone:  (702) 786-1001
                                        Facsimile:  (702) 786-1002
15
                                        Attorneys for Plaintiff
16                                      MIRAE ASSET SECURITIES CO., LTD.
                                        *will comply with LR IA 11-2 within 14 days
17

18

19

20

21

22

23

24

25

26

27

28

APPENDIX OF EXHIBITS TO COMPLAINT FOR DECLARATORY RELIEF

# EXHIBIT 1 –

Demand for Arbitration,

*Ryze Renewables Holdings, LLC, et al. v. Mirae Asset Securities Co., LTD*, JAMS Ref. No. 5260000299

**Judicial Arbitration and Mediation Services ("JAMS")**
_____, Arbitrator

| | | |
|---|---|---|
| RYZE RENEWABLES HOLDINGS, LLC, | ) | |
| and RYZE RENEWABLES NEVADA, LLC, | ) | |
| | ) | |
| Claimants, | ) | JAMS Ref. No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| MIRAE ASSET SECURITIES CO., LTD., a | ) | |
| Republic of Korea Company, | ) | |
| | ) | |
| Respondents. | ) | |

## DEMAND FOR ARBITRATION

Claimants Ryze Renewables Holdings LLC and Ryze Renewables Nevada LLC (collectively, "Ryze" or "Claimant") bring this demand for arbitration ("Demand") to recover damages resulting from the contractual breaches, abuse of process, misrepresentations and other deceptive and bad-faith conduct undertaken by Respondent Mirae Asset Securities Co., Ltd. ("Respondent" or "Mirae"). In support of this Demand, Ryze states and alleges the following:

## INTRODUCTION

1.      Ryze had embarked on the construction of a renewable diesel facility in Las Vegas, Nevada. The aim of this project was to convert an existing biodiesel refinery into a state-of-the-art renewable diesel facility, harnessing innovative and proprietary refining methods. The Project was unique in that it was being built by an independent company not owned or operated by one of the major petroleum companies, one of the first of its kind to be built in the United States.

2.      On top of ensuring the facility's competitiveness technologically, Ryze had secured input and purchase and supply commitments.

3.      Specifically, Ryze managed to secure a 15-year supply and offtake agreement with Phillips 66—an arrangement that provides for a continuous and stable feedstock supply, guaranteed sales, and transportation of offtake under an industry-unique netting arrangement. In other words, the procurement of input for the facility and the profitable sale of its output were both guaranteed by enforceable contractual commitments with one of the largest energy companies in the world.

Exhibit 1 - 000001

4.      Ryze was not the only one optimistic about the financial future of the venture. Reputable firms like Duff & Phelps (now Kroll) and Stancil & Co. provided credible third-party assessments, valuing the enterprise at approximately $1.3 billion, net of debt. Notably, Mirae itself agreed to and endorsed this valuation when setting the price for its equity option in the convertible loan agreement it signed with Ryze.

5.      What would transpire over the ensuing two years, however, was a striking sequence of commercial sabotage, replete with broken promises, misrepresentations, extortionate litigation, and other bad faith inexplicable conduct by Mirae. Some of Mirae's more notable conduct included:

(a) promising funding during the second quarter of 2020 (a representation that was uniquely impactful amidst the cloud of uncertainty cast by the emerging Covid-19 pandemic) but requiring nearly a year to due diligence the deal and finalize terms barely recognizable from the parties' offering memorandum; and

(b) after finally executing a $210 million Convertible Loan Agreement, simply ignoring its obligation to fund it; then, declaring in writing that the deal was "terminated" and Mirae was "withdrawing from it"; then

(c) suing Ryze to compel specific performance of the very deal it withdrew from just months earlier (in reality a ploy to thwart the substitute funding Ryze had arranged); then

(d) using that lawsuit to extort Ryze's agreement to a smaller $52 million proposal; then

(e) pulling the $52 million dollar proposal and replacing it with an even smaller $21 million deal; then

(f) having successfully strongarmed Ryze into accepting the $21 million deal on extortionate and non-market terms, failing to fund that deal as well.

Exhibit 1 - 000002

6.    Mirae's underhanded dealings, contractual breaches and abusive conduct brought about the complete and total loss of a once-promising enterprise. Today, the Project is notable only for the ruinous financial loss left in its wake of its demise.[1]

7.    Ryze finds itself insolvent; its partially converted refinery sold to an unaffiliated third party through a bankruptcy proceeding initiated by two of Ryze's subsidiaries.[2] Mirae's conduct brought about a total and complete enterprise loss.

## PARTIES AND ARABITRABILITY OF CLAIMS

8.    Claimant Ryze Renewables Holdings, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 11280 Granite Ridge Drive, Suite 1102, Las Vegas, Nevada 89135.

9.    Claimant Ryze Renewables Nevada, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 11280 Granite Ridge Drive, Suite 1102, Las Vegas, Nevada 89135. Ryze Renewables Nevada, LLC is a wholly owned subsidiary of Plaintiff Ryze Renewables Holdings, LLC.

10.    Respondent Mirae Asset Securities Co., Ltd. is an investment banking and asset management corporation organized and existing under the laws of the Republic of Korea, with its principal place of business located in Seoul, South Korea.

11.    Section 10.08 of the Convertible Loan Agreement between Ryze and Mirae, dated January 27, 2021, contains a binding arbitration clause requiring all disputes related to that

---

[1] *See, e.g., Alexander Saeedy, Nevada Biodiesel Refinery Files for Bankruptcy After Taxpayer-Backed Loan Default*, Wall St. Journal Pro (Mar. 9, 2023, 8:47 PM), https://www.wsj.com/articles/nevada-biodiesel-refinery-files-for-bankruptcy-after-taxpayer-back ed-loan-default-7dcda740; *see also* Amelia Pollard, *Biofuel-Focused Ryze Renewables Files for Chapter 11*, Bloomberg Law (Mar. 9, 2023, 9:06 AM), https://news.bloomberglaw.com/bankruptcy-law/biofuel-focused-ryze-renewables-files-for-chapter-11; Rick Archer, Las Vegas *Biofuel Plant Hits Ch. 11 with $186M Debt*, Law360 (March 10, 2023, 8:04 PM), https://www.law360.com/articles/1584134/las-vegas-biofuel-plant-hits-ch-11-with-186m-debt; Rick Archer, *Biofuel Co. Plans June Auction For Las Vegas Refinery*, Law360 (March 10, 2023, 8:04 PM), https://www.law360.com/articles/1584575/biofuel-co-plans-june-auction-for-las-vegas-refinery.

[2] *See In re Ryze Renewables II, LLC*, No. 1:23-bk-10289 (Bankr. D. Del., Mar. 9, 2023); *In re Ryze Renewables Las Vegas, LLC*, No. 1:23-bk-10290 (Bankr. D. Del., Mar. 9, 2023).

Exhibit 1 - 000003

agreement be resolved under JAMS Comprehensive Arbitration Rules and Procedures, by a single

arbitrator seated in Las Vegas, Nevada, with the arbitral proceedings conducted in English:

**SECTION 10.08** <u>Arbitration</u>.

Any dispute, claim or controversy, including tort claims, arising out of or relating to this Agreement or to the breach, termination, enforcement, interpretation, or validity hereof, including the determination of the scope or applicability of this arbitration provision, shall be determined by arbitration in accordance with the JAMS Comprehensive Arbitration Rules and Procedures (the "Rules"). In the event of a conflict between such Rules and this Agreement, the provisions of this Agreement will control. The tribunal will consist of one arbitrator. The place of arbitration shall be Las Vegas, Nevada. The language to be used in the arbitral proceedings will be English. The arbitrator shall be appointed pursuant to the Rules. The arbitrator shall, in the award, allocate all the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party or parties. The arbitrator may not award punitive, exemplary, incidental or consequential damages, and the parties hereby irrevocably waive any claim(s) to such damages in disputes that are subject to this arbitration provision. The result of the arbitration will be final and binding on the parties, and judgment upon any award rendered by the arbitrator may be entered by any court having jurisdiction. The parties hereby agree not to appeal the result of the arbitration. The procedures set forth herein shall not preclude a party from seeking injunctive relief or other provisional remedies in aid of arbitration from a court of appropriate jurisdiction. The interpretation and enforceability of this section shall be governed exclusively by the Federal Arbitration Act, 9 U.S.C. Section 1, *et seq*.

<u>CLA</u> (Exhibit A), Section 10.08.

12.     Section 10.05 of the of the Second Loan Agreement, dated November 29, 2021,

contains a nearly identical arbitration clause, which provides in full:

**10.5 <u>Arbitration</u>.**  Any dispute, claim or controversy, including tort claims, arising out of or relating to this Agreement or to the breach, termination, enforcement, interpretation or validity hereof, including the determination of the scope or applicability of this arbitration provision, shall be determined by arbitration in accordance with the JAMS Comprehensive Arbitration Rules and Procedures (the "Rules"). In the event of a conflict between such Rules and this Agreement, the provisions of this Agreement will control. The tribunal will consist of one arbitrator. The place of arbitration will be Las Vegas, Nevada. The language to be used in the arbitral proceedings will be English. The arbitrator shall be appointed pursuant to the Rules. The arbitrator shall, in the award, allocate all the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party or parties.  The result of the arbitration will be final and binding on the parties, and judgment upon any award rendered by the arbitrator may be entered by any court having jurisdiction. The parties hereby agree not to appeal the result of the arbitration. The procedures set forth herein shall not preclude a party from seeking injunctive relief or other provisional remedies

Exhibit 1 - 000004

in aid of arbitration from a court of appropriate jurisdiction. The interpretation and enforceability of this section shall be governed exclusively by the Federal Arbitration Act, 9 U.S.C. Section 1, *et seq.*

SLA (Exhibit B), Section 10.05.

13.     Section 10.01 of the Convertible Loan Agreement designates Kyunghyun Lee as Mirae's agent for receiving notices under the CLA and requires Ryze to deliver such notice by electronic mail to kyunghyun.lee@miraeasset.com. *See* CLA Section 10.01 ("Notices"), at p. 62 (specifying that that "Notices and other communications to the Lenders hereunder" be delivered electronically to "kyunghyun.lee@miraeasset.com"); *see also* Section 1.01 ("Defined Terms"), at p. 10 (defining "Lenders" to "mean Mirae and [its successors and assigns]").

14.     Section 6 of the SLA likewise designates Mr. Lee as agent of Mirae (and its special purpose affiliate, LV Renewables A, LLC) for purposes for receiving notice under the Second Loan Agreement and provides that such notice be delivered by registered or certified mail to 26, Eulji-ro 5 gil Jung-gu Seoul, South Korea.

15.     Ryze's claims asserted here fall within the scope of the binding arbitration clauses contained in the Convertible Loan Agreement and the Second Loan Agreement because each of them arises out of or relates to one or both of those agreements, or to the breach, termination, enforcement, interpretation, or validity thereof.

### FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

16.     Ryze obtained initial funding for the Project via a $198 million loan from Georgia's Own Credit Union. The loan was backed by the USDA as part of an initiative to promote emerging environmental technologies.

17.     After construction began, the development plans with the USDA were adapted to encompass previously deployed and proven technology. This prompted Ryze to plan a mid-construction transition to this commercially proven technology.

Exhibit 1 - 000005

A. Mirae Induces Ryze to Abandon its Pending Bond Offering in Favor of a Prompt and Direct Funding Deal with Mirae

18.     The relevant USDA Guaranty Program encouraged borrowers to license non-commercially deployed technology. Ryze agreed to comply with this guideline in its loan agreement with Georgia's Own.

19.     After construction began, development plans with the USDA were amended to permit the use of previously deployed and proven technology. Ryze immediately began working on the possible mid-construction transition to commercially proven technology.

20.     Ryze devised a workable plan to reconstitute the Project around a proven technology. This was a major undertaking by Ryze but did not threaten the viability of the Project. Implementing it, however, would require additional funding.

21.     To that end, Ryze had retained B.C. Ziegler and Company, a well-respected and established investment bank, to sell a $600 million bond in the marketplace in early 2020 to raise the additional financing for the project.

22.     But then Mirae entered the picture. Ryze's fortunes would change dramatically, and for the worse.

B. Mirae Leads Ryze Down a Tedious Year-Long Due Diligence and Negotiation Process, Eventually Resulting in the Execution of a $210 Million Convertible Loan Agreement

23.     Ryze was introduced to Mirae through one of its consultants.

24.     Mirae induced Ryze to abandon the pending bond offering in favor of pursuing a direct funding deal with Mirae, based on assurances that a deal could be funded within eight weeks following the execution of an offering memorandum.

25.     Accordingly, Ryze requested that Ziegler cease work on bond offering and, ultimately, abandoned it altogether to pursue a direct deal with Mirae.

26.     A senior Mirae employee named Kyunghyun Lee lead the transaction for Mirae. Mr. Lee does not speak English. His communication with Ryze and other participants were translated by an individual named Sunghee Han.

Exhibit 1 - 000006

27.     Mr. Han is not a Mirae employee and instead worked for Berkeley Research Group. Nevertheless, Mirae granted Mr. Han special privileges with respect to sourcing investments. Mr. Han was authorized to act as Mirae's agent, including, for example, by appearing as Mirae's representative at a settlement conference with authority to compromise litigation on Mirae's behalf.

28.     Mr. Han attributed this special status to, along with his self-described track record as a deal guru, the wealth and prominence of his family in South Korea (one of Mirae's largest depositors, in Mr. Han's telling).

29.     Together, Mr. Lee and Mr. Han were the face of Mirae's dealing with Ryze.

30.     Mirae and Ryze executed an offering memorandum on April 22, 2020. The offering memorandum incorporated Mirae's promise to fund the transaction by June 17, 2020.

31.     Rather than cooperate to advance the due diligence process and positioning the parties to close the loan in accordance with the agreed-upon timeframe, Mirae instead lobbed endless demands to renegotiate previously agreed-upon terms.

32.     This process played out month after month. The "prompt" funding assurances that induced Ryze to forgo its pending bond offering and negotiate with Mirae had proved false.

33.     Although Mirae had prolonged the closing and funding timeline substantially, Ryze persisted.

34.     Its patience would appear to pay off when, almost a year after their first agreement— and some seven months after the June 17th funding deadline—the parties reached a consensus on the terms of a Convertible Loan Agreement (or "CLA") that would extend $210 million to Ryze.

35.     The parties executed the CLA on January 27, 2021. A true and accurate copy of the executed CLA is attached **Exhibit A**.

C.  Mirae Simply Ignores Its Contractual Commitment to Fund the CLA

36.     For the moment, the execution of the CLA with Mirae appeared to place Ryze well on track to securing the additional funding needed to complete the facility conversion and bring the plant operational with proven technology.

Exhibit 1 - 000007

37.     The parties agreed to specific and detailed terms in the CLA that set forth their respective obligations regarding to the funding of the loan and associated deadlines for completing the same.

38.     Section 4.02 of the CLA required that the Funding Date "shall occur no later than ten (10) days . . . following the date of the Final Mirae Committee Approval."

39.     Schedule 4.02A of the CLA set forth the Conditions Precedent (or "CPs") to funding, *i.e*, the items that, if completed prior to the Funding Date, would trigger Mirae's funding obligation.

40.     The 15th and final Condition Precedent required that "Final Mirae Committee Approval [be] obtained."

41.     The CLA required that Mirae "hold its final internal committee meeting whether to approve or disapprove its participation in the Loan" within 14 business days after completing "[e]ach condition precedent set forth on Schedule 4.02A (other than the Final Mirae Committee Approval)."

42.     By February 10, 2021, Ryze had delivered all Conditions Precedent items as outlined in Schedule 4.02A to Mirae. This included hosting Mr. Lee for an onsite visit in Las Vegas on February 1 and 2, 2021, and delivering all required documentation to Mirae and its counsel through a DropBox link emailed sent by Ryze's Manager, Matthew Pearson.

43.     At first, Ryze's February 10th email was met with silence from Mirae. Ryze sent a follow-up email on February 23, 2021, requesting an update on the status of investment committee approval.

44.     Mirae responded through Mr. Lee, acknowledging receipt of Ryze's CP documentation. But instead of acknowledging the contractual obligation this triggered, Mr. Lee proposed a new, "staged" funding process, in which Berkeley Research Group, a purported investor in the deal, would fund the initial $30 million, followed by Mirae's contribution of $130 million, followed by an unspecified investor's contribution for the balance of the commitment.

45.     Ryze replied to this entirely new funding proposal on March 1, 2021. It noted, among other concerns, that the executed CLA does not contemplate staged funding. The parties set a teleconference for later that evening to discuss the matter further.

Exhibit 1 - 000008

46.     During that ensuing teleconference, Mr. Lee conveyed on behalf of Mirae that final investment committee approval by Mirae had indeed been obtained.

47.     After the teleconference, Mr. Pearson sent Mr. Lee a confirmatory email, expressing that Ryze was "pleased to hear that the Final Mirae Committee Approval has been received[,]" that "we will accept your verbal confirmation, as documented by this email, and move forward with the steps for closing set forth on Schedule 4.02B.

48.     Because Section 4.02 of the CLA obligated Mirae to fund the CLA within ten days following Final Mirae Committee Approval ("The Lenders hereby agree that the Funding Date shall occur no later than ten (10) days . . . following the date of the Final Mirae Committee Approval (the "Funding Date")), Mirae was obligated to fund the loan on or before March 11, 2021.

49.     So on March 11, 2021, Mr. Pearson transmitted on behalf of Ryze an email to Mr. Lee advising that "[i]t has been 10 days since you informed us on March 1st, 2021 that the Final Mirae Investment Committee Approval had been received[,]" transmitting via DropBox link the final documentation required by Section 4.02B ("Items to be Completed on the Funding Date"), and confirming that "Ryze has completed all CPs in the loan agreement and [is] ready for Funding."

50.     On March 15, 2021, Mr. Lee sent an email on behalf of Mirae confirming that "[t]he CPs required for [Ryze] have been received" but that there are other extracontractual "internal requirements . . . ", which are not necessarily reflected in the CLA."

51.     Remarkably, Mr. Lee described "[t]he Investment Committee approval" as an "ongoing function[,] . . . not just one single event"—despite the CLA's obvious treatment of Mirae Investment Committee Approval as a discrete occurrence, one that must be met by a date certain (and which triggers definite future deadlines).

D.    After Failed Attempts to Unilaterally Renegotiate the Deal, Mirae Declares the CLA "Terminated"

52.     What followed in the weeks and months after the Funding Date defied reasonable explanation. Mirae continued attempting to renegotiate the CLA as if it were a non-binding memorandum instead of a fully executed and enforceable contractual commitment.

Exhibit 1 - 000009

53.     On May 11th, 2021, having endured a nearly three-week silence from Mirae—despite circulating a proposal to accommodate Mirae's stated preference for a "staged" funding approach—Ryze sent a letter to Mirae advising it that the CLA had been terminated.

54.     Mirae, for its part, sent its own series of communications in which it purported to "terminate" the CLA.

55.     On May 20, 2021, Mr. Lee advised that "[a]s Ryze isn't willing to accept our new [renegotiated] solution, **we will now officially withdraw and terminate**. We hope your future is prosperous and **wish you good luck**" (emphasis added).

56.     On May 25, 2021, Mr. Lee emailed Michael Brown, an outside consultant for Ryze, confirming that Mirae has "restructured our deal with our investment committee and our co-investors, thus previous 210MM CLA won't be viable for us. **We have decided to withdraw from the Ryze so that Ryze can move forward and succeed without our participation**" (emphasis added).

57.     Yet at the very same time he acknowledged Mirae's purported "termination" of the CLA, Mr. Lee proposed a new transaction, essentially inviting Ryze to scrap the CLA and start negotiations entirely anew.

E.     Mirae Files Suit Seeking "Specific Performance" of the Deal It Declared "Terminated" Just Months Before—All for the Transparent Purpose of Thwarting Ryze's Substitute Funding Deal

58.     By this time, however, Ryze has determined that its funding needs were far too urgent to waste any more time negotiating with Mirae, which had proven itself hopelessly unable to follow through on its commitments. Ryze decided then to return to the market to raise the required funding from a different source.

59.     Ryze was cautioned that Mirae might "do something crazy" if Ryze walked away from Mirae's new proposal. But having received an email from Mirae specifically declaring its intention to "terminate" or "withdraw" from the CLA (and wishing Ryze "good luck"), Ryze reasonably concluded that it was appropriate to move on.

Exhibit 1 - 000010

60.     In short order, Ryze managed to locate an interested funding source, a Chicago-based hedge fund (the "Substitute Funder").

61.     Ryze executed a term sheet with the Substitute Funder that contemplated a closing date of July 30, 2021. It now had a clear path toward completing the construction of the Project and making it an operational and profit-generating facility.

62.     This hopeful trajectory would change abruptly, however, as Mirae ratcheted up its bad faith from frustrating to egregious.

63.     Unbeknownst to Ryze, Mirae had concocted a scheme to force Ryze back to the negotiating table.

64.     On July 23, 2021, Mirae filed suit against Ryze in the District Court of Clark, County Nevada (the "Lawsuit").

65.     The transparent purpose of the lawsuit was to thwart the imminent deal Ryze had secured with the Substitute Funder and force Ryze to resume negotiations with Mirae.

66.     The Lawsuit purported to assert claims for "specific performance" and monetary damages premised on Ryze's supposed breach of the CLA.

67.     This, recall, is the very same CLA that Mirae executed, then tried to renegotiate; then obtained final committee approval but failed to fund; then declared in writing that Mirae had "officially withdr[e]w from," and "terminate[d]" because the deal "won't be viable for Mirae."

68.     Indeed, the CLA that Mirae was now asking a court to compel Ryze to perform was the very same CLA that Ryze was pleading Mirae for months to perform.

69.     The suit was, of course, a complete farce. The allegations in the Lawsuit contained a myriad of frivolous allegations, including, without limitation:

> (a) that Ryze misrepresented the Project as being in its "final stages," when in fact, Ryze had provided Mirae with comprehensive independent engineer reports and even allowed Mirae's preferred construction company, Sys-Con LLC, to assess the Project's status directly, empowering Mirae to make an informed judgment about the Project's status before signing the CLA.

Exhibit 1 - 000011

(b) Ryze misrepresented the estimated cost of the pretreatment facility as $95 Million, when in fact, this representation was entirely accurate at the time it was made, and Ryze even had a matching bid from its construction company, MMC. Increases in costs were largely due to COVID and delays—issues caused by the defendants and Mirae themselves—which could have been mitigated if Mirae had upheld its commitment to expedite the transaction.

(c) that Ryze concealed the relationship between NC Industries, Inc., and MMC, the initial EPC contractor, when in fact, Ryze had clearly disclosed the ties through the provision of loan documents and by identifying the common owner. This disclosure precipitated extensive discussions about the construction company that should be used for the Project.

(d) that Ryze did not disclose ongoing and threatened litigation, particularly those from RB Products, Inc., concerning project technology changes, when in fact all such claims were settled well before the execution of the CLA. Indeed, the same law firm representing Mirae in the suit, Snell & Wilmer LLP, was also representing RB Products, Inc., and knew these claims were settled and no longer "ongoing."

(e) that Ryze failed to fulfill its "due diligence" obligations under Sections 4.01, 4.02, and Schedule 4.02A of the CLA, when in fact, these sections of the CLA neither mention due diligence nor obligate Ryze to provide any. Given that Mirae even acknowledged receipt of all the distinct deliverables outlined in Schedule 4.02A in March, the allegation is baseless.

70.     Notably, and as detailed above, the CLA that Mirae supposedly sought to enforce mandated that any disputes at law be resolved exclusively in arbitration. Private arbitration, however, would not serve Mirae's primary goal of publicly damaging Ryze in the eyes of other putative funders as placing a lawsuit in the public record. So Mirae simply disregarded the arbitration clause.

71.     In reality, the Lawsuit was a transparent tool to thwart the deal in progress with the Substitute Funder (or any other potential alternative financing), force Ryze to resume negotiations

Exhibit 1 - 000012

with Mirae, and extort Ryze into accepting wildly non-market terms for a $21 million financing deal—a mere 1/10 the funding commitment originally contemplated under the CLA.

72.     It worked. Promptly upon learning of the lawsuit, the Substitute Funder ordered pencils down on the Ryze deal.

F.   Mirae Uses the July 23, 2021 Lawsuit to Coerce Ryze's Agreement to a More Onerous Second Loan Agreement

73.     In an effort to expeditiously resolve the dispute and salvage the additional funding from the Substitute Funder, Ryze arranged for the parties to conduct a settlement conference.

74.     The settlement conference took place on August 12, 2021, at Snell's office in Orange Co., California.

75.     The ordinary purpose of such a conference would be to explore potential resolutions of the dispute underlying the litigation. The typical case, however, assumes the underlying lawsuit was initiated as a good-faith resort to civil process to resolve a *bona fide* dispute. That was not the case here.

76.     Mirae instead used the settlement conference opportunity to threaten Ryze into accepting its latest slate of renegotiated and extortionate terms.

77.     Mirae refused to discuss the lawsuit it filed, stating that if Ryze even attempted to discuss its merits, the conference would summarily be terminated. Mirae also admitted that it had no intention of funding the loan under the CLA—despite having filed a lawsuit some 20 days prior that requested a declaration that "the CLA has not automatically terminated" and demanding equitable relief requiring the Ryze Defendants to "specifically perform" the very same CLA.

78.     Mirae did not bother pretending that the suit served legitimate ends. Indeed, Mirae's representative at the "settlement conference" was entirely candid (if vulgar) in summarizing their side's expectations: Ryze, in their view, should just "*bend over and take it in the a[**]*."

79.     Mirae admitted that transaction was unfavorable to Ryze but insisted that Ryze's only option was to accept the terms demanded or go bankrupt. Mirae stated in no uncertain terms that if Ryze did not sign a deal with Mirae by midnight that there would be an even bigger lawsuit against Ryze—this time by Clifford Chance LLP, supposedly, which would ensure Ryze's destruction.

13

Exhibit 1 - 000013

80.     Having endured for some 18 months of Mirae's and Han's seemingly endless capacity for malicious, unscrupulous, and extortionate conduct, Ryze had every reason to take Mirae at its word when it threatened to "destroy" Ryze through "years" of vexatious litigation if they did not sign the deal at the settlement conference.

G.   Left with No Other Choice, Ryze Acquiesces to Mirae's Threats and Executes the SLA

81.     As the sham settlement conference dragged on into the early morning hours of August 13, 2021, Ryze concluded it had no choice but to acquiesce to Mirae's relentless extortion to avoid imminent default on the USDA Guaranteed Loan.

82.     Shortly before 2:00 a.m. on August 13, 2021, Ryze signed a binding term sheet, which eventually led to the execution of the parties' "Second Loan Agreement" (the "SLA").

83.     The binding term sheet provided that Ryze would receive a $52 million loan from Mirae to be allocated as follows: $28 million for construction; $2 million for working capital; $1 million for project contingency; $10 million for interest reserve for the USDA Guaranteed Loan; $4.5 million for Mirae's interest reserve; $6.5 million for fees payable to Mirae and certain consultants and attorneys. Mirae would also receive:  20% of all outstanding membership interests in Ryze (the "Equity Award"); 12% interest repayment of principal and accrued interest after 5 years; and two seats on the five-member board.

84.     The term sheet further provided that the parties would execute the definitive agreements within 80 calendar days of execution, and that Mirae fund the deal by or before November 4, 2021.

85.     Under the term sheet, failure to meet that deadline would result in the termination of the term sheet and an obligation on the part of Mirae to promptly dismiss the Lawsuit with prejudice; otherwise, Mirae was required to pay a penalty to Ryze of $50,000 per day (the "**November 4 Penalty**") in order to extend the deadline to execute definitive agreements.

86.     To avoid prior experiences with Mirae, Ryze negotiated provisions of the term sheet that specified discrete and limited deliverables from Ryze (similar to those under the CLA), omitted any additional due diligence requirements, and enabled Ryze to terminate the deal and elect to

Exhibit 1 - 000014

require Mirae to dismiss the Lawsuit with prejudice should Mirae attempt to renegotiate the term sheet.

87.     Yet Mirae proceeded to demand due diligence beyond the specified deliverables anyway. Though initially resistant, Ryze ultimately tolerated Mirae's requests to ensure that its own good faith during this process could not reasonably be questioned.

88.     Mirae, for its part, refused to provide basic information about the identity of the nominal counterparty to the loan or the Mirae-affiliate that would hold the 20% equity award, the related Know Your Customer ("KYC") documentation required by Ryze's senior lender, the person or entity that would be joining Ryze's board, among other information critical to the documentation and consummation of the deal.

89.     The November 4, 2021, deadline came and passed without execution of any definitive agreements. Ten days later, Ryze demanded in writing that Mirae either (a) pay the November 4 Penalty; or (b) alternatively, acknowledge termination of the term sheet and proceed with dismissing the Lawsuit with prejudice. But Mirae refused to even discuss the matter.

90.     After almost 21 months of endless delays from Mirae, Ryze was teetering on the brink of insolvency. Without time to pursue recourse against Mirae's extortionate conduct, Ryze was forced to continue negotiations.

91.     Ultimately, the parties agreed on the definitive terms of the Second Loan Agreement and executed the final documentation.

92.     Ryze would receive a $21 million loan from a "to be determined lender"—supposedly, a newly-formed special purpose entity controlled by Mirae. This grossly inadequate sum represented a mere 1/10th of the gross proceeds contemplated under the CLA, which Mirae's farcical and bad-faith lawsuit purported to enforce.

93.     The SLA required the $21 million in proceeds to be allocated as follows: $3 million for working capital to be held by Mirae in a controlled account; $1 million for specified business expenses, $10 million for interest reserve for the USDA Guaranteed Loan; and—tellingly—*$7 million for fees payable to Mirae*, its attorneys, and consultants (somehow, Mirae's gross fee allocation increased over the succeeding iterations of the deal, even as principal value of the deal plunged).

Exhibit 1 - 000015

94.     With Ryze lacking any reasonable alternatives to simply paying the extortion ransom to clear the path toward seeking legitimate funding sources, the Parties executed the Second Loan Agreement on November 29, 2021. The agreed-upon funding deadline would fall on December 15, 2021. Ryze began working to complete the closing conditions.

H.   Mirae Fails to Fund the SLA that It Coerced Ryze into Accepting and Ceases All Communications with Ryze

95.     But the precise terms of the SLA would turn out to be of little consequence.

96.     As with the CLA's funding deadline in March of 2021, Mirae's December 15, 2021, deadline for funding SLA came and passed. As a final insult, the second loan deal too was never funded, and—predictably—Ryze defaulted on its USDA Guaranteed Loan.

97.     The excuses for Mirae's inability to fund were wide-ranging, but Defendants largely blamed Korean regulators, whom Mirae claimed were reviewing the transaction. According to Mirae, the loan would be funded only upon approval by the Korean regulators.

98.     Curiously, the possibility of a hold-up by Korean regulators was never mentioned in negotiations over the $210 million CLA, or in connection with the later proposed $52 million dollar deal. But, in Mirae's telling, a $21 million dollar transaction drew the careful and plodding scrutiny of those same regulators.

99.     Essential to Korean regulatory approval in Korea, Mirae claimed (but never explained or substantiated), was Ryze committing to substantially cut employee salaries and direct those funds into a segregated account controlled by non-employee Mirae representative Sunghee Han.

100.    Ryze asked to speak with these alleged regulators, but Mirae would not identify them. Ryze requested copies of the pertinent regulation. Mirae refused.

101.    As of the date of this demand, Mirae has never followed up with Ryze regarding the status of the loan's approval by the "Korean regulators."

102.    Eventually, Mirae and its representatives simply ceased responding to Ryze's communications.

103.    When all deadlines under the Second Loan Agreement had expired, Ryze demanded that Mirae's counsel at Snell & Wilmer proceed to dismiss the dismiss the Lawsuit with prejudice.

16

Exhibit 1 - 000016

104.    The scope of damages Ryze has sustained because of Mirae's scheme is difficult to overstate.

105.    They include, without limitation, the total loss of an enterprise once valued by credible third-party appraisals in excess of $1 billion, valuations Mirae itself endorsed several times.

### FIRST CLAIM FOR RELIEF
**Breach of Contract**
*Convertible Loan Agreement, dated January 27, 2021*

106.    Ryze incorporates all prior allegations of this Demand by reference as if set forth fully herein.

107.    On or about January 27, 2021, Ryze and Mirae executed the Convertible Loan Agreement.

108.    The Convertible Loan Agreement is an enforceable contract supported by valid consideration. Ryze performed all obligations, covenants, and conditions required under the CLA on its part to be performed, including, but not limited to, the satisfaction of all Conditions Precedent outlined in Schedule 4.02A, the receipt of which was expressly acknowledged by Mirae.

109.    Mirae received Final Committee Approval on March 1, 2021. Confirmation of the same was communicated by Mr. Lee to Ryze that same day.

110.    Under Section 4.02 of the Convertible Loan Agreement, the occurrence of Final Committee Approval triggered Mirae's obligation to fund the loan within ten days—*i.e.*, on or before March 11, 2021.

111.    Mirae failed to meet their funding obligation by the deadline of March 11, 2021. Instead, it sought to introduce new, extraneous conditions, attempted to renegotiate the agreed terms of the deal, and ultimately to self-declare the CLA "terminated." To date, Mirae refused to fund the CLA despite its plain and unambiguous contractual obligation to do so.

112.    Mirae's refusal to fund the loan is a material breach of the CLA.

113.    As a direct and proximate result of Mirae's breach, Ryze has suffered and continues to suffer substantial damages, including a total and complete enterprise loss, the amount of which will be proven in these proceedings.

Exhibit 1 - 000017

114.    Mirae is vicariously liable for the conduct of its agents, employees, and attorneys, because they undertook the actions and omissions described herein in the course and scope of their actual (express and implied) and/or apparent agency.

## SECOND CLAIM FOR RELIEF
### Abuse of Process

115.    Ryze incorporates all prior allegations of this Demand by reference as if set forth fully herein.

116.    Mirae abused legal process for wrongful purposes when it filed and commenced the July 23 Lawsuit against Ryze in the District Court of Clark County, Nevada.

117.    The Lawsuit, while purporting to seek specific performance and damages for breaches of the CLA executed on January 27, 2021, in fact, was motivated by and intended to further ulterior purposes and/or motives of Mirae.

118.    Mirae's ulterior purposes and/or motives include (without limitation):

(a) thwarting Ryze's lawful pursuit of alternative financing, and thereby coercing Ryze's agreement to the SLA, a much smaller $21 million funding deal entirely distinct from the defunct $210 million CLA used by Mirae as pretext for its abusive and bad-faith Lawsuit;

(b) enriching or attempting to enrich itself and/or its agents with millions of dollars in fee compensation, which were unlawfully and unethically tied to Mirae's success in extorting Ryze's agreement to the SLA;

(c) coercing Ryze into accepting oppressive and non-market terms under the SLA to make the deal more marketable to third-party funders to whom Mirae intended to "flip" the loan, and/or (i) concealing its fraudulent misrepresentations about its capacity and/or intention to fund the loan commitments it purported to make; and/or (ii) enriching itself with additional commissions and fees in the process;

(d) securing Ryze's release of potential claims against it and other participants in the scheme;

Exhibit 1 - 000018

(e) other such other ulterior purposes and motives described herein and/or that discovery may reveal.

119.    The foregoing ulterior purposes are unrelated to the resolution of any legal dispute, are wholly collateral to the Lawsuit's stated purpose of enforcing the CLA and are unintended by law.

120.    Mirae engaged in one or more willful acts improper in the regular conduct of the proceeding, including (without limitation):

(a) orchestrating and filing a verifiably groundless, bad-faith, and fraudulent Lawsuit for the improper purposes of forcing Ryze to acquiesce to an unfavorable—and, as it turns out, illusory—loan agreement under the threat of further fraudulent litigation and imminent insolvency; and

(b) admitting at the outset of the supposed "settlement conference" of that same Lawsuit that it had no intention of seeking specific performance demanded in its Lawsuit; and

(c) threatening Ryze that it would promptly terminate the settlement conference and ratchet up its litigation efforts if Ryze attempted to discuss the actual Lawsuit or its merits; and

(d) threatening that Ryze's failure to agree to new loan terms by midnight the day of the settlement conference would result in the filing of an even bigger and more protracted lawsuit against it, calculated to ensure Ryze's destruction; and

(e) threatening the same result if Ryze attempted to seek the advice of outside counsel regarding the SLA's terms; and

(f) other such conduct that was willful and improper in the regular conduct of the proceeding that discovery may reveal.

121.    As a direct and proximate result of Mirae's breach, Ryze has suffered and continues to suffer substantial damages, including a total and complete enterprise loss, the amount of which will be proven in these proceedings.

Exhibit 1 - 000019

122.   The foregoing acts and omissions by Mirae were undertaken intentionally, maliciously, and/or recklessly, such that Ryze is entitled to an award of punitive damages sufficient to punish and deter like conduct.

123.   Mirae is vicariously liable for the conduct of its agents, employees, and attorneys, because they undertook the actions and omissions described herein in the course and scope of their actual and/or apparent agency.

### THIRD CLAIM FOR RELIEF
**Breach of Contract**
*Second Loan Agreement dated November 29, 2021*

124.   Ryze incorporates all prior allegations of this Demand by reference as if set forth fully herein.

125.   On or about November 29, 2021, Ryze and Mirae executed the Second Loan Agreement ("SLA").

126.   The Second Loan Agreement is an enforceable contract supported by valid consideration. Ryze performed all of the obligations, covenants, and conditions required under the SLA.

127.   Under the SLA, Mirae was obligated to fund the loan by December 15, 2021.

128.   Mirae failed to meet their funding obligation by the deadline of December 15, 2021. Instead, it advanced various excuses, including a purported review by unnamed Korean regulators, and ultimately ceased all communication with Ryze.

129.   To date, Mirae has refused to fund the SLA despite its plain and unambiguous contractual obligation to do so.

130.   Mirae's failure to fund the loan constitutes a material breach of the SLA.

131.   In further breach of the SLA, Mirae has failed to tender payment of the November 4 Penalty and has simply ignored Ryze's repeated demands for satisfy its obligations under the same.

132.   As a direct and proximate result of Mirae's breach, Ryze has suffered and continues to suffer substantial damages, including a total and complete enterprise loss, the amount of which will be proven in this proceeding.

Exhibit 1 - 000020

133.    Mirae is vicariously liable for the conduct of its agents, employees, and attorneys, because they undertook the actions and omissions described herein in the course and scope of their actual and/or apparent agency.

*      *      *

## PRAYER FOR RELIEF

WHEREFORE, Ryze respectfully requests that the Arbitrator find in its favor and against Mirae on each cause of action asserted herein and further award:

(a)  damages in an amount to be determined; and

(b)  reasonable attorneys' fees, arbitration costs, and other disbursements incurred in relation this proceeding; and

(c)  all other relief deemed just and appropriate under the circumstances.

Dated this 21st day of July, 2023.

Respectfully Submitted,

**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**

/s/  G. Mark Albright
Mark Albright #001394
Daniel R. Ormsby, Esq., #014595
801 South Rancho Drive, Ste. D-4
Las Vegas, Nevada 89106
Telephone: (702) 384-7111
Facsimile:  (702) 384-0605
gma@albrightstoddard.com
dormsby@albrightstoddard.com

**EDGAR LAW FIRM LLC**

John M. Edgar
John F. Edgar
Michael R. Owens
2600 Grand Boulevard, Ste. 440
Kansas City, Missouri 64108
Telephone: (816) 531-0033
Facsimile: (816) 531-3322
jme@edgarlawfirm.com
jfe@edgarlawfirm.com
mro@edgarlawfirm.com

*Counsel for Claimants Ryze Renewables Holdings LLC
and Ryze Renewables Nevada LLC*

Exhibit 1 - 000021

**EXHIBIT 1A –**

Convertible Loan Agreement, dated January 27, 2021

(Exhibit A to Ryze Renewable Holdings, LLC's Demand
for Arbitration)

# Exhibit A

*Convertible Loan Agreement ("CLA"), dated January 27, 2021*

CONVERTIBLE LOAN AGREEMENT

dated as of January 27, 2021,

among

**RYZE RENEWABLES NEVADA, LLC**
as Borrower,

**MIRAE ASSET DAEWOO CO., LTD.**
**AND THE OTHER LENDERS PARTY HERETO FROM TIME TO TIME,**

and

**RYZE RENEWABLES HOLDINGS, LLC**
as Guarantor

Ex. A
(CLA dated Jan. 27. 2021)

# TABLE OF CONTENTS

Section                                                                    Page

## ARTICLE I

### DEFINITIONS

SECTION 1.01    Defined Terms..................................................................1
SECTION 1.02    Terms Generally...............................................................17
SECTION 1.03    Accounting Terms; GAAP. ...............................................17
SECTION 1.04    Resolution of Drafting Ambiguities. ................................17

## ARTICLE II

### THE CREDITS

SECTION 2.01    Loan...................................................................................17
SECTION 2.02    Borrowing Procedure. ......................................................18
SECTION 2.03    Evidence of Debt; Repayment of Loan. ...........................18
SECTION 2.04    Interest on Loan................................................................19
SECTION 2.05    Termination of Commitment.............................................19
SECTION 2.06    Optional Prepayments of Loan..........................................19
SECTION 2.07    Mandatory Prepayments of Loan. .....................................20
SECTION 2.08    Conversion Option. ...........................................................21
SECTION 2.09    Taxes. ................................................................................24

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES

SECTION 3.01    Organization; Powers. .......................................................30
SECTION 3.02    Authorization; Enforceability............................................31
SECTION 3.03    No Conflicts. .....................................................................31
SECTION 3.04    Financial Statements..........................................................31
SECTION 3.05    Properties...........................................................................31
SECTION 3.06    Equity Interests and Subsidiaries. ....................................31
SECTION 3.07    Environmental Matters. .....................................................32
SECTION 3.08    Litigation. ..........................................................................32
SECTION 3.09    Investment Company Act. ..................................................33
SECTION 3.10    Use of Proceeds..................................................................33
SECTION 3.11    Permits................................................................................33

Exhibit 1A - 000003

SECTION 3.12    Taxes. ...............................................................................................33
SECTION 3.13    No Material Misstatements. ..............................................................33
SECTION 3.14    Insurance. .........................................................................................34
SECTION 3.15    Material Contracts. ...........................................................................34
SECTION 3.16    Security Documents. .........................................................................35
SECTION 3.17    Sanctions, Etc. ..................................................................................35
SECTION 3.18    TID Business; CFIUS Filing. ...........................................................35
SECTION 3.19    HSR Act. ...........................................................................................36
SECTION 3.20    Credit Rating Report. ........................................................................36
SECTION 3.21    Project Company Debt Documents. ..................................................36

## ARTICLE IV

### CONDITIONS TO THE EFFECTIVE DATE AND THE FUNDING DATE

SECTION 4.01    Conditions to Effectiveness of this Agreement. .......................................37
SECTION 4.02    Conditions to Funding of the Loan. ........................................................37

## ARTICLE V

### AFFIRMATIVE COVENANTS

SECTION 5.01    Financial Statements, Reports, etc. ...................................................38
SECTION 5.02    Financial Covenants. .........................................................................39
SECTION 5.03    Rating. ...............................................................................................40
SECTION 5.04    Progress Update. ...............................................................................40
SECTION 5.05    Litigation and Other Notices. ............................................................41
SECTION 5.06    Existence. ..........................................................................................41
SECTION 5.07    Insurance. ..........................................................................................41
SECTION 5.08    Obligations and Taxes. ......................................................................41
SECTION 5.09    Maintaining Records; Access to Properties and Inspections. ...................42
SECTION 5.10    Completion Certificate. .....................................................................42
SECTION 5.11    Use of Proceeds. ...............................................................................42
SECTION 5.12    CFIUS. ...............................................................................................42
SECTION 5.13    Off-Take Agreement. .........................................................................42
SECTION 5.14    Executive Team. ................................................................................42
SECTION 5.15    Additional Collateral. ........................................................................43
SECTION 5.16    Payment and Performance Bonds. ....................................................43

## ARTICLE VI

### NEGATIVE COVENANTS

SECTION 6.01    Indebtedness. .....................................................................................45
SECTION 6.02    Liens. .................................................................................................45

Exhibit 1A - 000004

SECTION 6.03    Investment, Loan, Advances and Acquisition.............................................45
SECTION 6.04    Mergers and Consolidations; Fundamental Changes. .................................46
SECTION 6.05    Business Activities. ....................................................................................46
SECTION 6.06    Asset Sales...................................................................................................46
SECTION 6.07    Dividends / Distributions. ...........................................................................46
SECTION 6.08    Transactions with Affiliates. ......................................................................46
SECTION 6.09    Modifications of Organizational Documents and Material Agreements...................47
SECTION 6.10    Limitation on Changes to Holding Company Status....................................47
SECTION 6.11    Limitations on Budget Management. ...........................................................48
SECTION 6.12    Sanctions, Etc. ............................................................................................48

ARTICLE VII

ACCOUNTS

SECTION 7.01    Creation of Accounts....................................................................................49
SECTION 7.02    Collections Account. ...................................................................................50
SECTION 7.04    Funding Date Interest Reserve Account. .....................................................51
SECTION 7.05    Interest Payment Account. ..........................................................................51
SECTION 7.06    Debt Service Reserve Account. ...................................................................51
SECTION 7.07    Cash Reserve Account. ................................................................................52
SECTION 7.08    Principal Reserve Account. ..........................................................................52
SECTION 7.09    EPC Retention Account. ..............................................................................53
SECTION 7.10    Working Capital Reserve Account. ..............................................................53
SECTION 7.11    Conditional Distributions Account................................................................54

ARTICLE VIII

EVENTS OF DEFAULT

SECTION 8.01    Events of Default..........................................................................................55
SECTION 8.02    Application of Proceeds. ..............................................................................57
SECTION 8.03    Project Company Debt Documents Refinancing..........................................57

ARTICLE IX

SECTION 9.01    Appointment and Authority...........................................................................57
SECTION 9.02    Rights as a Lender. ......................................................................................58
SECTION 9.03    Exculpatory Provisions.................................................................................58
SECTION 9.04    Reliance by Administrative Agent ................................................................59
SECTION 9.05    Delegation of Duties.....................................................................................59
SECTION 9.06    Resignation of Administrative Agent. ...........................................................59
SECTION 9.07    Non-Reliance on Administrative Agent and other Lenders ..........................60
SECTION 9.08    No Other Duties, Etc ....................................................................................60
SECTION 9.09    Administrative Agent May File Proofs of Claim ...........................................60
SECTION 9.10    Collateral and Guaranty Matters .................................................................61

-iv-

ARTICLE X

MISCELLANEOUS

SECTION 10.01    Notices..................................................................................62
SECTION 10.02    Waivers; Amendment...........................................................62
SECTION 10.03    Expenses................................................................................63
SECTION 10.04    Successors and Assigns.........................................................63
SECTION 10.05    Counterparts; Integration; Effectiveness. ...........................64
SECTION 10.06    Severability............................................................................64
SECTION 10.07    Guarantee of Holdings..........................................................64
SECTION 10.08    Arbitration.............................................................................65
SECTION 10.09    Governing Law......................................................................65
SECTION 10.10    Specific Performance. ..........................................................65
SECTION 10.11    Headings................................................................................65
SECTION 10.12    Treatment of Certain Information; Confidentiality. .............67
SECTION 10.13    Interest Rate Limitation........................................................67

SCHEDULES

Schedule 1.01        Commitments
Schedule 3.01        Organizational Structure
Schedule 3.06        Equity Interests and Subsidiaries
Schedule 3.07(b)     Environmental Permits
Schedule 3.08        Litigation
Schedule 3.11        Permits
Schedule 3.14        Insurance
Schedule 3.15        Material Contracts
Schedule 4.02A     Conditions to Funding Date (Items to be completed prior to Funding Date)
Schedule 4.02B     Conditions to Funding Date (Items to be completed on the Funding Date)

EXHIBITS

Exhibit A           Form of Borrowing Request
Exhibit B           Form of Note
Exhibit C           Form of Security Agreement
Exhibit D           Sources and Uses
Exhibit E           Form of Borrower Operating Agreement
Exhibit F-1         Form of U.S. Tax Compliance Certificate
Exhibit F-2         Form of U.S. Tax Compliance Certificate
Exhibit F-3         Form of U.S. Tax Compliance Certificate
Exhibit F-4         Form of U.S. Tax Compliance Certificate
Exhibit G           Form of Account Control Agreement
Exhibit H           Form of Prepayment Notice

Ex. A
(CLA dated Jan. 27. 2021)

## CONVERTIBLE LOAN AGREEMENT

This CONVERTIBLE LOAN AGREEMENT (this "**Agreement**") dated as of January 27ᵗʰ, 2021, among Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "**Borrower**"), Mirae Asset Daewoo Co., Ltd., an entity organized under the laws of the Republic of Korea ("**Mirae**"), and Ryze Renewables Holdings, LLC, a Delaware limited liability company ("**Holdings**"), solely for the limited purposes set forth in Sections 2.08 and 9.07 hereof.

### WITNESSETH:

WHEREAS, the Borrower has requested the Lenders to extend credit in the form of a Loan to be made on the Funding Date, in an aggregate principal amount equal to two hundred and ten million dollars ($210,000,000).

WHEREAS, the proceeds of the Loan are to be used in accordance with Section 3.10.

NOW, THEREFORE, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

**SECTION 1.01**     Defined Terms.

As used in this Agreement, the following terms shall have the meanings specified below:

"**Accounts**" shall have the meaning assigned to such term in Section 7.01.

"**Account Control Agreement**" shall mean the agreement, substantially in the form and substance attached hereto as Exhibit G.

"**Ad Hoc FMV Report**" shall have the meaning assigned to such term in Section 5.01(e)(ii).

"**Administrative Agent**" shall have the meaning assigned to such term in Section 9.01.

"**Affiliate**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by, or is under common Control with the person specified.

"**Agreement**" shall have the meaning assigned to such term in the preamble hereto.

"**Annual FMV Report**" shall have the meaning assigned to such term in Section 5.01(a)(i).

"**Approved Budget**" shall have the meaning assigned to such term in Section 5.01(a)(iv).

"**Asset Sale**" shall mean any conveyance, sale, lease, sublease, swap, liquidation, assignment, transfer or other disposition (including by way of merger or consolidation and including any Sale and Leaseback Transaction) of any property excluding sales of inventory and dispositions of cash and cash equivalents, in each case, in the ordinary course of business, by the Borrower or any of its Subsidiaries.

-1-

Exhibit 1A - 000007

"**Bi-Weekly Report**" shall have the meaning assigned to such term in <u>Section 5.04(b)</u>.

"**Borrower**" shall have the meaning assigned to such term in the preamble hereto.

"**Borrower Operating Agreement**" shall mean the Amended and Restated Operating Agreement of the Borrower, to be dated and as in effect on or about the Funding Date  in the form of <u>Exhibit E</u>, and as may be further amended, amended and restated, supplemented or otherwise modified from time to time.

"**Borrowing Request**" shall mean a request by the Borrower in accordance with the terms of <u>Section 2.02</u> and substantially in the form of <u>Exhibit A</u>, or such other form as shall be approved by the Administrative Agent.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City and Seoul are authorized or required by law to close.

"**Cash Equivalents**" shall mean, as to any person, (a) securities issued, or directly, unconditionally and fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such person; (b) time deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500.0 million and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such person; (c) repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid and perfected security interest in the underlying securities; (d) commercial paper issued by any person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Group or at least P-1 or the equivalent thereof by Moody's Investors Service Inc., and in each case maturing not more than one year after the date of acquisition by such person; (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above; and (f) demand deposit accounts maintained in the ordinary course of business.

"**Cash Reserve Account**" shall have the meaning assigned to such term in <u>Section 7.01</u>.

"**Cash Reserve Account Requirement**" shall have the meaning assigned to such term in <u>Section 7.07</u>.

"**Change in Control**" shall mean the occurrence or consummation of any transaction or series of related transactions (including without limitation any sale, transfer, merger or consolidation) which results in either of the following: (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), in each case other than by any Permitted Investor of Equity Interests representing more than 50% of the aggregate voting power represented by the issued and outstanding Equity Interests of Holdings, (b) Holdings (together with the Permitted Investors and the Lenders (or their respective permitted successors and assigns)) ceases to directly own, beneficially or of record, Equity Interests representing 100% of the aggregate voting power represented by the issued and outstanding Equity Interests of the Borrower, (c) the Borrower ceases to directly own, beneficially or of record, Equity Interests representing 100% of the aggregate voting power represented by the issued and outstanding Equity Interests of the Project Company Holdco or (d) the Project

Exhibit 1A - 000008

Company Holdco ceases to directly own, beneficially or of record, Equity Interests representing 100% of the aggregate voting power represented by the issued and outstanding Equity Interests of the Project Company (excluding for purposes of this clause (d), the New-Com Warrant).

"**Change Order EPC Contract**" shall mean the Engineering, Procurement and Construction Services Contract, by and between the Project Company and Sys-Con, LLC, dated as of October 14, 2020, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Charges**" shall have the meaning assigned to such term in Section 10.11.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"**CFIUS**" shall mean the Committee on Foreign Investment in the United States.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" shall mean, collectively, all of the Security Agreement Collateral and all other property of whatever kind and nature subject or purported to be subject from time to time to a Lien under any Security Document.

"**Collections Account**" shall have the meaning assigned to such term in Section 7.01.

"**Commercial Operation Date**" shall mean the last day of the first full month after the Completion Date in which an independent third-party engineering contractor has certified that the Project Company is operating and has achieved full production.

"**Commitment**" shall mean each of the Lender's commitments to make a Loan hereunder in the aggregate principal amount not to exceed the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule 1.01. The aggregate principal amount of Commitments on the Effective Date is two hundred and ten million dollars ($210,000,000).

"**Completion Certificate**" shall have the meaning assigned to such term in Section 5.10.

"**Completion Date**" shall mean the date of delivery of the Completion Certificate by the Borrower to the Administrative Agent.

"**Common Membership Units**" shall mean Common Membership Units of the Borrower, as defined in the Borrower Operating Agreement.

"**Conditional Distributions Account**" shall have the meaning assigned to such term in Section 7.01.

"**Contracts**" shall mean all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Contract Party**" shall have the meaning assigned to such term in Section 3.15(a).

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Conversion Date**" shall have the meaning assigned to such term in Section 2.08(c).

"**Conversion Option**" shall have the meaning assigned to such term in Section 2.08(a).

"**Conversion Shares**" shall have the meaning assigned to such term in Section 2.08(a).

"**Debtor Relief Laws**" shall mean Title 11 of the United States Code, as now and hereafter in effect, or any successor statute, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**Debt Service**" shall mean, with respect to any period, the sum of (a) all cash interest and principal payments made or required to be made by the Project Company to the Project Company Lender pursuant to the Project Company Loan Agreement during such period plus (b) all cash interest paid or required to be paid by the Borrower to the Lenders pursuant to this Agreement for such period.

"**Debt Service Coverage Ratio**" shall mean, with respect to any period, the ratio of (a) EBITDA of the Project Company for such period to (b) Debt Service for such period.

"**Debt Service Reserve Account**" shall have the meaning assigned to such term in Section 7.01.

"**Debt Service Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.06(c).

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Defaulting Lender**" shall mean any Lender that:

(a)      has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent, and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any Lender any other amount required to be paid by it hereunder within two Business Days of the date when due,

(b)      has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied),

(c)      has failed, within three Business Days after written request by the Administrative Agent, or the Borrower, to confirm in writing to the Administrative Agent  and the Borrower that it will comply

Exhibit 1A - 000010

with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c)  upon receipt of such written confirmation by the Administrative Agent and the Borrower) or

(d)      has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each Lender.

"**Depository Bank**" shall means for a particular Account, the depository bank named pursuant to the related Account Control Agreement from time to time.

"**Disqualified Institution**" means, on any date, (a) any person designated by the Borrower as a "Disqualified Institution" by written notice to the Administrative Agent on or prior to the date hereof and (b) any other person that is a competitor of the Borrower or any of its Subsidiaries that is designated by the Borrower as a "Disqualified Institution" at any time, but no later than five (5) Business Days after written notice is provided to the Administrative Agent and the Borrower by any Lender of its intent to transfer all or any portion of, or a participation in, its interest in the Loan to any person duly designated as such competitor; provided that any person that the Borrower designates as no longer being a "Disqualified Institution" by written notice to the Administrative Agent from time to time shall be excluded from such definition.

"**Distributions Condition**" shall mean, as of any date of determination, that (i) the Borrower has complied with each of the financial covenants set forth in Sections 5.02(a) and 5.02(b) for the twelve month period ending as of the fiscal month most recently ended prior to such date, (ii) the Borrower has complied with the covenant set forth in Section 5.03 on or prior to such date, (iii) the Borrower has complied with all of the provisions of Sections 7.01, 7.02, 7.03, 7.04, 7.05, 7.06, 7.07, 7.08, 7.09 and 7.10 as of such date (including, for the avoidance of doubt, satisfaction of the Interest Payment Account Requirement, the Debt Service Reserve Account Requirement, any then applicable Cash Reserve Account Requirement, the Principal Reserve Account Requirement and the Working Capital Reserve Account Requirement, in each case, as of such date) and (iv) no Default or Event of Default shall have occurred that is continuing as of such date (or would result as a result of any Dividend or other distribution to be made by the Borrower on such date).

"**Dividend**" with respect to any person shall mean that such person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property or cash to the holders of its or any of its parent companies' Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such person or any of its parent companies with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes.  Without limiting the foregoing, "Dividends" with respect to any person shall also

Exhibit 1A - 000011

include all payments made or required to be made by such person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**dollars**" or "**$**" shall mean lawful money of the United States.

"**EBITDA**" shall mean, with respect to any period, for the Project Company, the sum of, in each case, determined in accordance with GAAP, (a) the net income (or loss) for such period, plus (b) the sum (in each case without duplication and to the extent the respective amounts described in this clause (b) otherwise reduced such net income for the respective period for which EBITDA is being determined): (i) any provision for (less any benefit, including income tax credits, from) federal, state, local or other income and franchise taxes, and other foreign, provincial and excise taxes, foreign withholding taxes and foreign unreimbursed value added taxes (including penalties and interest related to any such tax or arising from any tax examination); (ii) interest expense (and to the extent not included in interest expense, costs of surety bonds in connection with financing activities and any bank and letter of credit, letter of guaranty, ratings agency and bankers' acceptance fees (including amounts charged as expense to interest rate hedging obligations) for such period (net of interest income for such period to the extent included in the calculation of net income for such period); (iii) depreciation and amortization costs or expenses for such period; (iv) any expenses or charges (other than depreciation or amortization expense as described in the preceding clause (iii)) paid or accrued related to the transactions contemplated by the Project Company Loan Agreement; (v) any other non-cash losses, expenses and charges and impairment charges; provided, that for purposes of this subclause (v) of this clause (b), any non-cash charges or losses shall be treated as cash charges or losses in any subsequent period during which cash disbursements attributable thereto are made (but excluding, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period); and (vi) any extraordinary, unusual or non-recurring cash expenses; minus (c) the sum of (without duplication and to the extent the amounts described in this clause (c) increased net income for the respective period for which EBITDA is being determined), non-cash items increasing net income for such period (but excluding the recognition of deferred revenue or any such items (A) in respect of which cash was received in a prior period or will be received in a future period or (B) which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period).

"**Effective Date**" shall have the meaning assigned to such term in <u>Section 4.01</u>.

"**Electing Lender**" shall have the meaning assigned to such term in <u>Section 2.08(a)</u>.

"**Eligible Assignee**" shall have the meaning assigned to such term in <u>Section 10.04</u>.

"**Environmental Claim**" shall mean any action, suit, claim, investigation or other legal proceeding by any person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable law, and any order of a Governmental Authority or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production,

disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Notice**" shall mean any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" shall mean any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**EPC Contract**" shall mean the Engineering, Procurement and Construction Services Contract, by and between the Project Company and MMC, Inc., dated as of January 23, 2018, as may be amended, amended and restated, supplemented or otherwise modified from time to time, and

"**EPC Retention Account**" shall have the meaning assigned to such term in <u>Section 7.01</u>.

"**Equity Interest**" shall mean, with respect to any person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such person, including, if such person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued after the Effective Date, but excluding warrants or debt securities convertible or exchangeable into such equity.

"**Event of Default**" shall have the meaning assigned to such term in <u>Section 8.01</u>.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, any U.S. federal withholding Taxes imposed pursuant to a law in effect on the date on which such Lender acquires an interest in the Loan or Commitment or changes its Lending Office, except in each case to the extent that, pursuant to <u>Section 2.09(a)</u>, additional amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with <u>Section 2.09(a)(vii)</u> and (d) any Taxes imposed under FATCA.

Exhibit 1A - 000013

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantially comparable and not materially more onerous to comply with), any current or future Treasury Regulations or official administrative interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code (or any amended or successor version described above), any intergovernmental agreement, treaty or convention among Governmental Authorities implementing the foregoing and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreement, treaty or convention.

"**FCPA**" shall have the meaning assigned to such term in Section 3.17.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Final Mirae Committee Approval**" shall have the meaning assigned to such term in Section 4.01.

"**First Cash Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.07.

"**First Test Date**" shall have the meaning assigned to such term in Section 5.02(a).

"**Fourth Cash Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.07.

"**Funding Date**" shall have the meaning assigned to such term in Section 4.02.

"**Funding Date Interest Reserve Account**" shall have the meaning assigned to such term in Section 7.01.

"**GAAP**" shall mean generally accepted accounting principles in the United States applied on a consistent basis.

"**Guarantor**" shall have the meaning assigned to such term in Section 10.07.

"**Governing Board**" shall mean, with respect to any person, (i) in the case of any corporation, the board of directors of such person, (ii) in the case of any limited liability company, the board of managers or governors of such person or if there is none, the board of directors of the managing member of such person, (iii) in the case of any partnership, the board of directors of the general partner of such person and (iv) in any other case, the functional equivalent of the foregoing.

"**Governmental Authority**" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union, the European Central Bank or the Organisation for Economic Co-operation and Development).

"**Hazardous Materials**" shall mean: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or man-made, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Holdings**" shall mean Ryze Renewables Holdings, LLC, a Delaware limited liability company, which, as of immediately prior to the Effective Date, is the owner, beneficially and of record, of 100% of the Equity Interests of the Borrower.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Indebtedness**" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money; (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments; (c)  all obligations of such person under conditional sale or other title retention agreements relating to property purchased by such person to the extent of the value of such property if the rights and remedies of seller or lender under such agreement in the event of default are limited solely to repossession or sale of such property (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business); and (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than ninety (90) days or that are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided for on the books of such person).  The Indebtedness of any person shall include the Indebtedness of any other entity (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such person is not liable therefor.

"**Indemnified Taxes**" means (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), all Other Taxes.

"**Intellectual Property**" means any and all intellectual property, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how, and processes, all rights therein, and all rights to sue at law or in equity for any past, present, or future infringement, violation, misuse, misappropriation, or other impairment thereof, whether arising under United States, multinational, or foreign laws, or otherwise, including the right to receive injunctive relief and all proceeds and damages therefrom.

"**Interest Payment Account**" shall have the meaning assigned to such term in Section 7.01.

"**Interest Payment Account Requirement**" shall have the meaning assigned to such term in Section 7.05.

"**Interest Payment Date**" shall mean the last day of the applicable Interest Period.

"**Interest Period**" shall mean each quarterly period during which the Loan is outstanding, it being understood and agreed that the first such Interest Period hereunder shall commence on the Funding Date and end on the numerically corresponding day (or, if there is no numerically corresponding day, on the last

day) in the calendar month that is three months from the Funding Date (and, for iterative example, the second Interest Period hereunder shall commence on the last day of the first such Interest Period and end on the numerically corresponding day in the calendar month that is three months therefrom); *provided* that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day (unless such next following Business Day is in a different calendar month, in which case such Interest Period shall end on the preceding Business Day) and the following Interest Period shall begin on the last day of the preceding Interest Period. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"**Interest Rate**" shall have the meaning assigned to such term in Section 2.04(a).

"**Interest Payment Account**" shall have the meaning assigned to such term in Section 7.01.

"**Investments**" shall have the meaning assigned to such term in Section 6.03.

"**Lenders**" shall mean Mirae and any other banks and financial institutions or entities from time to time who become lenders hereunder through assignment or otherwise.

"**Lending Office**" means, as to any Lender, the office or offices or branch of such Lender or any of its Affiliates as a Lender or any of its Affiliates may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, claim, charge, assignment, hypothecation, security interest or encumbrance of any kind or any arrangement to provide priority or preference or any filing of any financing statement under the UCC or any other similar notice of lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan**" shall have the meaning assigned to such term in Section 2.01.

"**Loan Documents**" shall mean this Agreement, the Notes (if any) and the Security Documents.

"**Loan Parties**" shall mean Holdings and the Borrower.

"**Management Services Agreement**" shall mean that certain Management Services Agreement, dated as of the Effective Date, by and between the Borrower and Holdings, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on the business, properties, operations or financial condition of the Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the ability of Borrower to fully and timely perform any of its obligations under any Loan Document; (c) a material impairment of the rights of or benefits or remedies available to the Administrative Agent or the Lenders under any Loan Document; or (d) a material adverse effect on the Collateral or the Liens (including the priority thereof) in favor of the Administrative Agent acting on behalf of itself and the Lenders on the Collateral.

Exhibit 1A - 000016

"**Material Contracts**" shall have the meaning assigned to such term in Section 3.15(a).

"**Maturity Date**" shall mean the earliest to occur of (a) the Scheduled Maturity Date or (b) the date on which the Commitment is terminated and the Loan becomes due in accordance with Section 8.01, and in each case, if such date is not a Business Day, the first Business Day thereafter.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.11.

"**Minimum Operating Amount**" shall have the meaning assigned to such term in Section 7.02(a).

"**Minimum Percentage**" shall mean a percentage equal to: (i) the sum of (a) twenty-three and 86/100 percent (23.86%) and (b) the product of the PIK Interest that has been added to the principal amount of the Loan multiplied by 0.000000113636,  *minus* (ii) the product of (x) the aggregate principal amount of all Voluntary Prepayments, the Specified Prepayments and  the amount of the mandatory prepayments made pursuant to Section 2.07(a) multiplied by (y) 0.000000113636.

"**Mirae**" shall mean Mirae Asset Daewoo Co., Ltd., organized under the Laws of the Republic of Korea.

"**New-Com Warrant**" shall mean that certain Warrant, dated February 20, 2018, by the Project Company in favor of New-Com, Inc., or its registered assigns, as the holder.

"**Non-Consenting Lender**" shall have the meaning assigned to such term in Section 2.09(d).

"**Non-U.S. Lender**" means a lender that is not a U.S. person.

"**Notes**" shall mean any notes evidencing the Loan issued pursuant to this Agreement substantially in the form of Exhibit B.

"**Obligations**" shall mean obligations of Borrower from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any proceeding commenced under any Debtor Relief Law, regardless of whether allowed or allowable in such proceeding) on the Loan, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any proceeding commenced under any Debtor Relief Law, regardless of whether allowed or allowable in such proceeding), of Borrower under this Agreement and the other Loan Documents.

"**OFAC**" shall have the meaning assigned to such term in Section 3.17.

"**Off-Take Agreement**" shall mean that certain Supply and Offtake Agreement between Ryze Renewables Las Vegas, LLC and Phillips 66 Company dated June 15, 2017, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Organizational Documents**" shall mean, with respect to any person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (iv) in the case of any general

Exhibit 1A - 000017

partnership, the partnership agreement (or similar document) of such person and (v) in any other case, the functional equivalent of the foregoing.

"**Other Connection Taxes**" shall mean, with respect to the Administrative Agent and the Lenders or any other recipient of any payment to be made by or on account of any obligation of Borrower hereunder, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" shall mean all present or future stamp or documentary Taxes or any other property or similar Taxes, charges or levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Parent**" shall mean any direct or indirect parent company of Holdings.

"**Participant**" shall have the meaning assigned to such term in Section 10.04.

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04.

"**Permits**" shall mean all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Permitted Indebtedness**" shall mean, collectively:

(a)      in the case of the Borrower, Indebtedness incurred under this Agreement and the other Loan Documents;

(b)      in the case of the Project Company, (i) "Permitted Indebtedness" as such term is defined in the Project Company Loan Agreement (as in effect on the date hereof) and any Permitted Refinancing thereof and (ii) to the extent constituting Indebtedness, amounts owing by the Project Company to the Borrower as a result of proceeds of the Loans made by the Lenders to the Borrower under this Agreement having been contributed, or otherwise provided to, the Project Company in an aggregate principal amount not to exceed $115,000,000, which is identified in Exhibit D; and

(c)      in the case of the Project Company Holdco, a guarantee of the Indebtedness described in clause (b) of this definition.

"**Permitted Investors**" shall mean (i) the members of Borrower and/or Holdings as of the Effective Date, (ii) advisory board members of the Borrower and/or Holdings as of the Effective Date, (iii) key employees of the Borrower and Holdings and (iv) trusts for the benefit of any of the foregoing.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Permitted Refinancing**" means Indebtedness ("**Refinancing Indebtedness**") issued or incurred (including by means of the extension or renewal of existing Indebtedness) to refinance, refund, extend, renew or replace Indebtedness existing at any time ("**Refinanced Indebtedness**"); provided that (a) the

Exhibit 1A - 000018

principal amount of such Refinancing Indebtedness is not greater than the principal amount of such Refinanced Indebtedness plus the amount of any premiums or penalties and accrued, capitalized or unpaid interest  paid thereon and reasonable fees  and expenses, in each case associated with such Refinancing Indebtedness, (b) the obligors in respect of such Refinanced Indebtedness immediately prior to such refinancing, refunding, extending, renewing or replacing are the only obligors on such Refinancing Indebtedness and (c) such Refinancing Indebtedness shall not be secured by any Collateral except that such Refinancing Indebtedness may be secured with the same (or less) assets, if any, that constituted collateral for the applicable Refinanced Indebtedness immediately prior to such refinancing, refunding, extending, renewing or replacing.

"**person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**PIK Interest**" shall have the meaning assigned to such term in Section 2.04(c).

"**Prepayment Amount**" shall mean, (i) with respect to any prepayment date occurring on or after the 24-month anniversary of the Funding Date but prior to the 36-month anniversary of the Funding Date, the amount equal to six percent (6%) of the amount of the Loan repaid or prepaid, (ii) with respect to any prepayment date occurring on or after the 36-month anniversary of the Funding Date but prior to the 48-month anniversary of the Funding Date, the amount equal to four percent (4%) of the amount of the Loan repaid or prepaid and (iii) with respect to any prepayment date occurring thereafter and prior to the Maturity Date, the amount equal to two percent (2%) of the amount of the Loan repaid or prepaid.

"**Prepayment Notice**" shall have the meaning assigned to such term in Section 2.06(f).

"**Principal Reserve Account**" shall have the meaning assigned to such term in Section 7.01.

"**Principal Reserve Account Requirement**"  shall have the meaning assigned to such term in Section 7.08.

"**Project**" shall have the meaning assigned to such term in the Project Company Loan Agreement (as in effect on the date hereof).

"**property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property.

"**Project Company**" shall mean Ryze Renewables Las Vegas, LLC.

"**Project Company Debt Documents**" shall mean the Project Company Loan Agreement and the "Loan Documents" (as defined the Project Company Loan Agreement), in each case, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Project Company Holdco**" shall mean Ryze Renewables II, LLC.

"**Project Company Holdco Operating Agreement**" shall mean the Operating Agreement of the Project Company Holdco, dated September 8, 2017 and as in effect on the Effective Date, and as may be further amended, amended and restated, supplemented or otherwise modified from time to time.

"**Project Company Lender**" shall mean Georgia's Own Credit Union.

Exhibit 1A - 000019

"**Project Company Loan Agreement**" shall mean that certain Loan Agreement dated as of June 25, 2018 among the Project Company Lender, Project Company and Project Company Holdco, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Project Company Operating Agreement**" shall mean the Operating Agreement of the Project Company, dated September 8, 2017 and as in effect on the Effective Date, and as may be further amended, amended and restated, supplemented or otherwise modified from time to time.

"**Recipient**" means the Administrative Agent and any Lender.

"**Release**" shall mean any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Register**" shall have the meaning assigned to such term in Section 10.04.

"**Replaceable Lender**" shall have the meaning assigned to such term in Section 2.09(d).

"**Required Lenders**" shall mean, at any time, all Lenders (other than any Defaulting Lender at such time).

"**Requirements of Law**" shall mean, collectively, any and all applicable requirements of any Governmental Authority including any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes or case law.

"**Resignation Effective Date**" shall have the meaning assigned to such term in Section 10.06.

"**Sale and Leaseback Transaction**" shall mean any arrangement, whether entered into directly or indirectly, whereby a person sells or transfers any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rents or leases such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"**Sanctions**" shall have the meaning assigned to such term in Section 3.17.

"**Scheduled Maturity Date**" shall mean the date that is sixty (60) months following the Funding Date.

"**Second Cash Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.07.

"**Securities Act**" shall mean the Securities Act of 1933.

-14-

"**Security Agreement**" shall mean the Pledge and Security Agreement substantially in the form of Exhibit C among the Borrower, Holdings and the Administrative Agent acting on behalf of itself and the Lenders.

"**Security Agreement Collateral**" shall mean all property pledged or granted as collateral pursuant to the Security Agreement.

"**Security Documents**" shall mean the Security Agreement and each other security document or pledge agreement required to be delivered hereunder in accordance with applicable local or foreign law to grant a valid, perfected security interest in the Collateral and any other such security document or pledge agreement to be filed with respect to the security interests in property and any other document or instrument utilized to pledge or grant or purport to pledge or grant a security interest or Lien on the Collateral.

"**Solvent**" shall mean, with respect to the subject person where such person: (i) owns property, real, personal, and mixed, whose aggregate fair saleable value is greater than the amount required to pay all of such person's Indebtedness (including contingent debt (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability)); ii) is able to pay all of its Indebtedness as such Indebtedness matures; and (iii) has capital sufficient to carry on its business and transactions and all business and transactions in which it is about to engage..

"**Sources and Uses**" shall mean the "Sources and Uses" attached hereto as Exhibit D.

"**Specified Conversion Date**" shall have the meaning assigned to such term in Section 2.08(i).

"**Specified Converted Shares**" shall have the meaning assigned to such term in Section 2.08(i).

"**Specified Prepayment**" shall have the meaning assigned to such term in Section 2.06(c).

"**Subsidiary**" shall mean, with respect to any person (the "**parent**") at any date, (i) any person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date and (ii) any other corporation, limited liability company, partnership, association or other business entity of which securities or other ownership interests representing more than fifty percent (50%) of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Governing Board thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent.

"**Subsequent Test Date**" shall have the meaning assigned to such term in Section 5.02(a).

"**Sys-Con Contract**" shall mean, collectively the (i) Standard Form of Agreement Between Owner and Contractor where the basis of payment is the Firm Fixed Price  between Sys-Con, LLC and Ryze Renewables Las Vegas, LLC and (ii) General Conditions of the Contract for Construction for the Ryze Renewables Pre-Treatment Facility between Sys-Con, LLC and Ryze Renewables Las Vegas, LLC.

"**Tax Distributions**" shall mean, for any calendar year or portion thereof during which the Borrower is a pass-through entity for U.S. federal income tax purposes, payments, directly or indirectly, to any direct or indirect equity holder of the Borrower, on or prior to each estimated tax payment date as well as each other applicable due date, in an amount up to the product of (i) the total aggregate taxable income of the Borrower and its Subsidiaries (or estimates thereof) which is allocable to the direct or indirect equity

Exhibit 1A - 000021

holders of the Borrower during the relevant period multiplied by (ii) the highest combined marginal federal, state and local income tax rates applicable to any direct or indirect equity holder of the Borrower determined by taking into account the character of the income and loss allocable to the direct or indirect equity holders of the Borrower as it affects the applicable tax rate; provided that, for the avoidance of doubt, taxable income of the Borrower and its Subsidiaries for any period shall include any increases thereto as a result of any tax examination, audit or adjustment, whether for taxable periods ending prior to or after the date of this Agreement.

"**Tax Return**" shall mean all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Third Cash Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.07.

"**Total Credit Exposure**" shall mean, as to any Lender at any time, the unused Commitment and outstanding Loan of such Lender at such time.

"**Transfer Date**" shall have the meaning assigned to such term in Section 7.02.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"**United States**" shall mean the United States of America.

"**Unlimited Distributions Condition**" shall mean, as of any date of determination, that (i) the sum of all amounts on deposit in the Accounts is not less than the aggregate outstanding amount of the Obligations (other than contingent indemnification obligations for which no claim has been made) as of such date, determined on a pro forma basis after giving effect to any Dividends or other distributions that are made by the Borrower on such date and (ii) the Distributions Condition shall have been satisfied as of such date.

"**U.S. Person**" means any person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"**Voluntary Prepayment**" shall have the meaning assigned to such term in Section 2.06(b).

"**Withholding Agent**" means any Loan Party and the Administrative Agent.

"**Working Capital Reserve Account**" shall have the meaning assigned to such term in Section 7.01.

"**Working Capital Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.10(b).

-16-

**SECTION 1.02**         Terms Generally.

(a)       The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.

(b)       Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(c)       The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

(d)       The word "will" shall be construed to have the same meaning and effect as the word "shall."

(e)       Unless the context requires otherwise (i) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in the other Loan Documents), (ii) any reference herein to any person shall be construed to include such person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (v) any reference to any law or regulation herein shall refer to such law or regulation as amended, amended and restated, supplemented or otherwise modified from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**SECTION 1.03**    Accounting Terms; GAAP.

Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the date hereof unless otherwise agreed to by the Borrower and the Administrative Agent.

**SECTION 1.04**       Resolution of Drafting Ambiguities.

The Borrower acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

**ARTICLE II**

**THE CREDITS**

**SECTION 2.01**    Loan.

(a)       Subject to the terms and conditions hereof and relying upon the representations and warranties herein set forth, each  Lender agrees, severally and not jointly, to make a term loan (the "**Loan**")

to the Borrower on the Funding Date in an aggregate principal amount equal its Commitment on the Effective Date.  Once borrowed, amounts repaid or prepaid in respect of the Loan may not be reborrowed.

(b)      The Borrower shall pay to each Lender a non-refundable facility fee in an amount equal to 2% of such Lender's respective principal amount funded by such Lender (the "**Facility Fee**"), which shall be due and payable in full on the Funding Date (and netted from the proceeds of the Loan).

(c)      The Borrower shall, in addition to the fees payable to each Lender set out in paragraph (b) above, pay a fee to Mirae in a separate letter agreement to be executed between the Borrower and Mirae.

**SECTION 2.02**     Borrowing Procedure.

(a)      To request the Loan, the Borrower shall deliver, by hand delivery, e-mail through a "pdf" copy or telecopier, a duly completed and executed Borrowing Request to the Administrative Agent not later than 11:00 a.m., New York City time, on the Funding Date.  The Borrowing Request shall specify the following information:

(i)      the aggregate amount of the proposed Loan;

(ii)      the loan disbursement instructions; and

(iii)      that the conditions set forth in Section 4.02 have been satisfied as of the date of the notice.

(b)      Upon satisfaction (or waiver by the Required Lenders) of the conditions set forth in Section 4.02, each Lender shall make its portion of the Loan available to the Administrative Agent not later than 12:00 p.m. (New York City time) on the applicable borrowing date by wire transfer of same day funds in Dollars, at the principal office designated by the Administrative Agent.  The Administrative Agent shall make the proceeds of the Loan available to the Borrower on the Funding Date by causing an amount of same day funds in Dollars equal to the proceeds of the Loan received by Administrative Agent from the Lenders in accordance with clause (c) below.

(c)      The Borrower hereby authorizes the Administrative Agent to disburse the proceeds of the Loan as specified in the Borrowing Request by wire transfer of immediately available funds in accordance with the wire transaction instructions included in the Borrowing Request.  The Borrower acknowledges and agrees that the Administrative Agent may rely solely on any bank routing number or identifying bank account number or name provided by the Borrower to effect a wire or funds transfer even if the information provided by the Borrower identifies a different bank or account holder than named by the Borrower.  The Administrative Agent is not obligated or required in any way to take any actions to detect errors in information provided by the Borrower.

**SECTION 2.03**          Evidence of Debt; Repayment of Loan.

(a)      Promise to Repay.  The Borrower hereby unconditionally promises to pay to the Lenders the aggregate unpaid principal amount of the Loan, together with all accrued and unpaid interest and all other amounts payable under this Agreement on the Maturity Date, subject only to Lenders' Conversion Option.

(b)      Promissory Note.  The Loan may be evidenced by one or more promissory notes.  If requested by a Lender, the Borrower shall prepare, execute and deliver to such Lender a promissory note

Exhibit 1A - 000024

payable to such Lender (or its registered assigns) in the form of Exhibit B evidencing the aggregate principal amount of such Lender's Loan due hereunder.  Thereafter, the Loan evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more promissory notes in such form payable to the payee named therein (or its registered assigns).

**SECTION 2.04**          Interest on Loan.

(a)          Interest.  Subject to the provisions of Section 2.04(b), the Loan shall bear interest from the date made at a rate per annum equal to 14% (the "**Interest Rate**").

(b)          Default Rate.  Notwithstanding the foregoing, if there is an Event of Default or if any principal of or interest on the Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, the Administrative Agent at the request of the Required Lenders may elect, by written notice delivered to the Borrower, that the Obligations, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a rate per annum equal to two percent (2%) *plus* the Interest Rate.

(c)          Interest Payment Dates.  Accrued interest on the Loan shall be payable in arrears on each Interest Payment Date; *provided* that (i) for each Interest Payment Date occurring after the Funding Date through and including the date that is the 15-month anniversary of the Funding Date, (x) 50% of the accrued interest in respect of the Loan shall be paid in cash from the proceeds of the Funding Date Interest Reserve Account, and (y) 50% of the accrued interest in respect of the Loan payable on such Interest Payment Date, shall, in lieu of cash, automatically and without any action by the Borrower or any other person, be paid-in-kind (the "**PIK Interest**") and all such PIK Interest shall (A) be capitalized on each such applicable Interest Payment Date, (B) be added to the then outstanding principal amount of the Loan and (C) constitute outstanding principal in respect of the Loan thereafter for all purposes hereof (including the accrual of interest thereon), (ii) for each Interest Payment Date occurring after the 15-month anniversary of the Funding Date, 100% of the accrued interest in respect of the Loan shall be paid in cash and shall be payable *first*, from cash available in the Interest Payment Account (if available), *second*, from cash available in the Debt Service Reserve Account (if available), *third*, from cash available in the Cash Reserve Account (if available), *fourth*, from cash available in the Principal Reserve Account (if available), *fifth*, from cash available in the Working Capital Reserve Account (if available), *sixth*, from cash available in the Conditional Distributions Account (if available) and *finally*, from any other source available to the Borrower, (iii) interest accrued pursuant to Section 2.04(b) shall be payable on demand and, (iv) in the event of any repayment or prepayment of any principal amount of the Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)          Interest Calculation.  All interest hereunder shall be computed on the basis of a year of three hundred sixty (360) days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

**SECTION 2.05**   Termination of Commitment.

The Commitment of each Lender shall automatically terminate upon the funding by each Lender of its portion of the Loan on the Funding Date.

**SECTION 2.06**   Optional Prepayments of Loan.

(a)          Prohibited Prepayments.  Except as otherwise set forth in Section 2.06(c), the Borrower may not, without the prior written consent of the Lenders, prepay or repay the Loan on or before the 24-month anniversary of the Funding Date.  For the avoidance of doubt, the terms of this Section 2.06 shall

Exhibit 1A - 000025

not apply to any mandatory prepayment of the Loan pursuant to <u>Section 2.07</u> or to any prepayment of the Loan of any Replaceable Lender pursuant to <u>Section 2.09(d)</u>.

(b)　　　<u>Permissible Prepayments</u>.  Following the 24-month anniversary of the Funding Date and absent the exercise by the Lenders of its Conversion Option, the Borrower may prepay all or any portion of the Loan at any time (each, a "**Voluntary Prepayment**") upon the terms set forth in this <u>Section 2.06</u>.  Any Voluntary Prepayment shall be made together with the Prepayment Amount.

(c)　　　<u>Specified Prepayments</u>.  Solely to the extent there is available cash in the Collections Account in accordance with the distribution waterfall contained in <u>Section 7.03</u>, no earlier than (i) the first Transfer Date to occur after the Funding Date and (ii) if applicable, any Transfer Date thereafter, the Borrower may, but shall not be obligated to, make additional prepayments of the Loan in an aggregate principal amount for all such prepayments under this clause (c) not to exceed $10,000,000, in each case solely to the extent of cash on deposit in the Collection Account on any Transfer Date after giving effect to the payments and transfers required pursuant to clauses (a), (b), (c) and (d) of <u>Section 7.03</u> on such Transfer Date (each, a "**Specified Prepayment**").  Notwithstanding anything to the contrary contained herein, in no event shall any Prepayment Amount or any other fee or premium be required to be paid by the Borrower or any other person with respect to any Specified Prepayment.

(d)　　　<u>Application of Prepayments</u>.  Any prepayments of the Loan pursuant to <u>Section 2.06</u> shall be applied in accordance with <u>Section 8.02</u>.

(e)　　　<u>Interest</u>.  Any Voluntary Prepayments shall be accompanied by accrued interest to the extent required by <u>Section 2.04(c)(iv)</u>.

(f)　　　<u>Prepayment Notice</u>. In the event of any prepayment by the Borrower contemplated by <u>Section 2.06(b)</u>, the Borrower shall submit a prepayment notice, to the Administrative Agent ("**Prepayment Notice**"), the form of which is attached here as  Exhibit H.  Each Lender shall have up to ninety (90) days from receipt of the Prepayment Notice to exercise its Conversion Option.  Upon the earlier of (i) receipt of written notice from all Lenders of their decision as to whether or not they will exercise their Conversion Option, or (ii) the expiration of the ninety (90) day period, Borrower shall have up to ninety (90) days to make such Voluntary Prepayment together with the Prepayment Amount. In any event, making of such Voluntary Prepayment shall require at least thirty (30) days' prior written notice to the Administrative Agent before the date on which such Voluntary Prepayment is made.

**SECTION 2.07**　<u>Mandatory Prepayments of Loan.</u>

(a)　　　No later than the fifth (5th) Business Days following (i) the first Transfer Date to occur after the Funding Date and (ii) if applicable, any Transfer Date thereafter, the Borrower shall make a partial prepayment of the principal amount of the Loan in an aggregate amount for all such prepayments under this clause (a) equal to the PIK Interest which was capitalized and added to the principal amount of the Loan on each of the first five (5) Interest Payment Dates occurring after the Funding Date, in each case, solely to the extent of available funds in the Funding Date Interest Reserve Account; it being understood and agreed that no prepayment of principal under this <u>Section 2.07(a)</u> shall be required in excess of the amount of PIK Interest which was capitalized and added to the principal amount of the Loan in accordance with <u>Section 2.04(c)</u>.  Notwithstanding anything to the contrary contained herein, in no event shall any Prepayment Amount or any other fee or premium be required to be paid by the Borrower or any other person with respect to any prepayment made pursuant to this <u>Section 2.07(a)</u>.

(b)　　　The Borrower shall repay the Loan in full to the extent required by Section 8.03.  Notwithstanding anything to the contrary contained herein, in no event shall any Prepayment Amount or

Exhibit 1A - 000026

any other fee or premium be required to be paid by the Borrower or any other person with respect to any prepayment made pursuant to this Section 2.07(b).

(c)    The Borrower shall prepay the Loan in full to the extent required by Section 5.03.  If the Borrower is required to repay the Loan pursuant to Section 5.03 at any time prior to the Maturity Date, such repayment shall be accompanied by a repayment premium that is equal to fourteen percent (14%) of the amount of the Loan repaid, and the Prepayment Amount shall not apply in such circumstance.

(d)    Any prepayments pursuant to this Section 2.07 shall be accompanied by accrued interest to the extent required by Section 2.04(c)(iv).

**SECTION 2.08**   Conversion Option.

(a)    Conversion Option.  Each Lender shall have the option but not the obligation (the "**Conversion Option**", and any such electing Lender, the "**Electing Lender**"), exercisable after the Funding Date and prior to the date of repayment or prepayment of the Loan in full as described below, to convert the then outstanding amount of the Loan owing to such Electing Lender, in whole or in part, into Common Membership Units (the "**Conversion Shares**").  For purposes of this Section 2.08, all references to the Loan shall include any portion of the Loan that constitutes PIK Interest.

(b)    Conversion Rate.  The conversion rate shall be two dollars and twenty cents ($2.20) per Common Membership Unit, such that the Borrower shall issue one Common Membership Unit to the Electing Lender for every two dollars and twenty cents ($2.20) of the Loan then owing to the Electing Lender hereunder that is converted pursuant the Conversion Option, subject, in any event, to the requirements of Section 2.08(j).

(c)    Exercise of Conversion Rights.  To exercise its right to convert the Loan into Common Membership Units, the Electing Lender shall give written notice to each of Holdings and the Borrower (i) in the event no Prepayment Notice has been provided by the Borrower, not fewer than three (3) Business Days prior to the date on which such Electing Lender elects to effect such conversion, (ii) in the event a Prepayment Notice has been provided by the Borrower, not more than ninety (90) days following the delivery of Borrower's Prepayment Notice to the Administrative Agent, or (iii) in the event of any Mandatory Prepayment pursuant to Section 2.07(c), at least ninety (90) days prior to any required repayment, in each case setting forth (1) the portion of the then outstanding amount of the Loan owing to such Lender to be converted into Common Membership Units and (2) the effective date of such conversion (the "**Conversion Date**").  Once such written notice is delivered, the Electing Lender's conversion election is final.

(d)    Delivery of Conversion Shares Upon Conversion. Upon any Electing Lender's election to convert any portion of the then outstanding amount of the Loan owing to such Electing Lender into Conversion Shares as provided above the Borrower shall deliver to such Electing Lender an amendment to the Borrower Operating Agreement, designating such Electing Lender as a member and owner of the Conversion Shares and a conversion agreement, with customary representations and warranties and transfer restrictions. Upon such  Electing Lender's acceptance of and execution of such amendment,  such Electing Lender shall be a member of the Borrower, with all the rights and protections associated therewith. The Borrower shall not be obligated to issue any Conversion Shares to such Electing Lender unless any relevant Note that has been issued to such Electing Lender is delivered to the Borrower or such Electing Lender notifies the Borrower that the Note has been lost, stolen or destroyed and executes an agreement satisfactory to the Borrower to indemnify the Borrower from any loss incurred by it in connection with such Note.

Exhibit 1A - 000027

(e)        Obligation of Borrower to Deliver Conversion Shares. The Borrower will, as soon as practicable after the Conversion Date but in no event later than ten (10) Business Days after the Conversion Date, issue and deliver to the Electing Lender, at the office of the Electing Lender set forth in Section 4.2 below, a certificate for the number of Conversion Shares to which such Electing Lender is entitled upon conversion of the Loan.  The Electing Lender shall be deemed to be the holder of record of the Conversion Shares issuable upon any conversion described above, and, unless the Borrower defaults on its obligations under this Section 2.08, all rights of such Electing Lender with respect to the portion of the Loan under this Agreement that are being so converted shall forthwith terminate, except the right of the Electing Lender to receive the Conversion Shares or other securities, cash or other assets, as herein provided, in respect of such conversion. The Borrower's obligation to issue and deliver the Conversion Shares to such Electing Lender shall be absolute and unconditional, irrespective of the absence of any action by such Electing Lender to enforce the same.

(f)        Holdings.  Substantially concurrent with any conversion of the Loan into Conversion Shares as provided above and the issuance and delivery by the Borrower of a certificate to the Electing Lender in respect of such Conversion Shares, Holdings, subject in all cases to Section 2.08(j), shall either (i) enter into an assignment or other transfer agreement with the Electing Lender, reasonably acceptable to the Electing Lender and without payment of any additional consideration by the Electing Lender, evidencing the assignment or other transfer, free and clear of all Liens, of an amount of Common Membership Units held by Holdings that is equal to the amount of the Loan so converted into Conversion Shares, or (ii) enter into an agreement with the Borrower, reasonably acceptable to the Electing Lender, in respect of the cancellation of an amount of Common Membership Units held by Holdings that is equal to the amount of the Loan so converted into Conversion Shares and issuable to the Electing Lender.  For the avoidance of doubt, Holdings shall have the sole and absolute discretion to elect which of the foregoing clauses (i) or (ii) in the immediately preceding sentence to comply with.

(g)        No Fractional Units.  No fractional units shall be issued upon exercise of the Conversion Option. In lieu of such fractional units, the Electing Lender shall pay to the Borrower in cash the amount equal to the fraction of a Common Membership Unit that is not so converted at $2.20 per Common Membership Unit.

(h)        No Member Rights.  Except to the extent provided herein, this Agreement shall not confer upon any Electing Lender any rights as a member of the Borrower, including, without limitation, the right to vote, consent or receive notice as a member in respect of actions or meetings of members, or the right to receive distributions, until the Conversion Date.

(i)        Accounts.  For the avoidance of doubt, to the extent all or any portion of the Loan are converted into Conversion Shares on a Conversion Date (any such date, a "**Specified Conversion Date**" and any such converted portion as of such Specified Conversion Date, the "**Specified Converted Shares**"), the Electing Lender, solely in its capacity as a member of the Borrower in respect of such Specified Converted Shares (and not, for the avoidance of doubt, the Electing Lender in respect of any Conversion Shares that are held by the Electing Lender immediately prior to such Specified Conversion Date), shall have no rights of distribution from, or otherwise any interest in, any cash, monies or other property contained in the Accounts or any other depositary, collection, securities and/or other accounts of the Borrower, the Project Company Holdco or the Project Company as of such Specified Conversion Date (it being understood and agreed that such amounts shall inure to the pro rata benefit of the holders of the Common Membership Units (including, for the avoidance of doubt, the Electing Lender in respect of any Conversion Shares held by it prior to such Specified Conversion Date) immediately prior to giving effect to the exercise of the applicable Conversion Option on such Specified Conversion Date).

(j)     Minimum Equity Interest Percentage. Notwithstanding anything in this Agreement to the contrary, if a Lender fully exercises the Conversion Option in respect of the Loan owing to such Lender (i.e. electing to convert the entirety of its pro rata share of the then outstanding amount of the Loan), such Lender shall be entitled to receive the greater of (i) the number of Common Membership Units equal to its pro rata share of the Minimum Percentage of the Equity Interests of the Borrower and (ii) in the event there are less than 400,000,000 Common Membership Units then issued and outstanding, the number of Common Membership Units equal to the quotient of (x) the Loan then outstanding owing to such Lender divided by (y) $2.20.

(k)     Representations and Warranties of the Lenders.  Each Lender hereby represents and warrants to the Borrower that:

(i)     Purchase Entirely for Own Account.   The Conversion Shares to be acquired by such Lender will be acquired for investment for such Lender's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and such Lender has no present intention of selling, granting any participation in, or otherwise distributing the same.

(ii)     Knowledge.  Such Lender is aware of the Borrower's business affairs and financial condition and has acquired sufficient information about the Borrower to reach an informed and knowledgeable decision to acquire the Conversion Shares.

(iii)     Restricted Securities.   Such Lender understands that the Conversion Shares have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Lender's representations as expressed herein. Such Lender understands that the Conversion Shares  are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, such Lender must hold the Conversion Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Such Lender further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Conversion Shares, and on requirements relating to the Borrower which are outside of such Lender's control, and which the Borrower is under no obligation and may not be able to satisfy.

(iv)     No Public Market.  Such Lender understands that no public market now exists for any of the securities issued by the Borrower and that the Borrower  has made no assurances that a public market will ever exist for the Conversion Shares.

(v)     Legends.  Such Lender understands that the Conversion Shares, and any securities issued in respect thereof or exchange therefor, may bear one or all of the following legends (if certificated):

1.   "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."

2.   Any legend required by the Blue-Sky laws of any state to the extent such laws are applicable to the securities so legended.

(vi)    Accredited Investor.  Such Lender is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(vii)    Foreign Investors. Such Lender has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Conversion Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Conversion Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Conversion Shares.  Such Lender's subscription and payment for, and such Lender's continued beneficial ownership of the Conversion Shares, will not violate any applicable securities or other laws of the Lender's jurisdiction.

**SECTION 2.09**    Taxes; Increased Costs Protection; Illegality.

(a)    Taxes.

(i)    Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from or in respect of any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, the sum payable by the applicable Loan Party shall be increased as necessary so that after all such deductions or withholdings for Indemnified Taxes have been made (including such deductions and withholdings for Indemnified Taxes applicable to additional sums payable under this Section 2.09(a)) the Administrative Agent (for amounts paid to the Administrative Agent in its own right) or Lender receives an amount equal to the sum it would have received had no such deduction or withholding for Indemnified Taxes been made.

(ii)    Without duplication of Section 2.09(a)(i), the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(iii)    Without duplication of amounts paid pursuant to Section 2.09(a)(i) or Section 2.09(a)(ii), the Loan Parties shall jointly and severally indemnify each Recipient, within 30 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.09(a)) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. The relevant Recipient shall notify the Borrower of the imposition of any Indemnified Tax reasonably promptly after becoming aware of the imposition of such Tax. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(iv)    Each Lender shall severally indemnify the Administrative Agent, within ten days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only

to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.04 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this clause (iv).

(v)     Within 30 days after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.09(a), such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(vi)     If any Recipient determines, in its sole reasonable discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.09(a) (including by the payment of additional amounts pursuant to this Section 2.09(a)), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.09(a) with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall promptly repay to such indemnified party the amount paid over pursuant to this clause (vi) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Such indemnified party shall, at the indemnifying party's request, provide such indemnifying party with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Government Authority (provided that such Recipient may delete any information therein that such Recipient deems confidential). Notwithstanding anything to the contrary in this clause (vi), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this clause (vi) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This clause (vi) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other person.

(vii)     --

(A)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to any payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made

-25-

without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.09(a)(vii)(B)(1), 2.09(a)(vii)(B)(2), 2.09(a)(vii)(B)(4) and 2.09(a)(vii)(B)(5) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(B)      Without limiting the generality of the foregoing,

(1)      any Lender that is a U.S. person shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) copies of a properly completed and duly executed IRS Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding;

(2)      any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(a)      in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party, (x) with respect to payments of interest under any Loan Document, copies of a properly completed and duly executed IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, copies of a properly completed and duly executed IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(b)      copies of a properly completed and duly executed IRS Form W-8ECI (or any successor form);

(c)      in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and that no payments in connection with any Loan Document are effectively connected with such Lender's conduct of a U.S. trade or business and (y) copies of a properly

-26-

completed and duly executed IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or any successor form); or

(d)     to the extent a Non-U.S. Lender is not the beneficial owner (*e.g.*, where the Non-U.S. Lender is a partnership or a participating Lender), copies of a properly completed and duly executed IRS Form W-8IMY, accompanied by a properly completed and duly executed IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Non-U.S. Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender shall provide a certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(3)     any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), properly completed and duly executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

(4)     each Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to (i) comply with their obligations under FATCA and (ii) determine whether such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (4), "FATCA" shall include any amendments made to FATCA after the date of this Agreement; and

(5)     the Administrative Agent, and any successor or supplemental Administrative Agent, shall deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or prior to the date on which the Administrative Agent becomes the administrative agent hereunder or under any other Loan Document (and from time to time thereafter upon the reasonable request of the Borrower) properly completed and duly executed copies of either (i) if it is a U.S. person IRS Form W-9 (or any successor form) or (ii) if it is not a U.S. person a U.S. branch withholding certificate on IRS Form W-8IMY (or any successor form), together with required accompanying documentation, evidencing its agreement with the Borrower to be treated as a U.S. person (with respect to amounts received on account of any Lender) and IRS Form W-8ECI (with respect to amounts received on its own account), together with required accompanying documentation, with the effect that, in either case, the

-27-

Exhibit 1A - 000033

Borrower will be entitled to make payments hereunder to the Administrative Agent without withholding or deduction on account of U.S. federal withholding Tax.

Each Recipient agrees that if any documentation it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly update and deliver such form or certification to the Borrower and the Administrative Agent or promptly notify the Borrower and the Administrative Agent in writing of its legal ineligibility to do so.

Each Lender hereby authorizes the Administrative Agent to deliver to the Loan Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to Section 2.09(a)(vii).

(C)     The agreements in this Section 2.09(a) shall survive the resignation of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

(D)     For the avoidance of doubt, the term "applicable law" includes FATCA.

(b)     Increased Cost and Reduced Return; Capital Adequacy and Liquidity Requirements.

(i)     If any Lender reasonably determines that the introduction of any law regarding capital adequacy and liquidity requirements or any change therein or in the interpretation thereof, in each case after the date hereof, or compliance by such Lender therewith, has the effect of materially reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and liquidity and such Lender's desired return on capital), then within 15 days after demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 2.09(c)), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction.

(ii)     For purposes of this Section 2.09(b), (A) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, guidelines or directives thereunder or issued in connection therewith and (B) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities (other than foreign regulatory authorities in Switzerland), in each case pursuant to Basel III, shall, in each case, be deemed to have gone into effect after the date hereof, regardless of the date enacted, adopted or issued.

(iii)     This Section 2.09(b) shall not apply to Indemnified Taxes or Excluded Taxes.

(c)     Matters Applicable to All Requests for Compensation.

(i)     A certificate of the Administrative Agent or any Lender claiming compensation under this Section 2.09 and setting forth in reasonable detail a calculation of the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of

manifest error. In determining such amount, the Administrative Agent or such Lender may use any reasonable averaging and attribution methods. With respect to any Recipient's claim for compensation under Section 2.09(b), the Loan Parties shall not be required to compensate such Recipient for any amount incurred more than 180 days prior to the date that such Recipient notifies the Borrower of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(ii)     If any Lender requests compensation under Section 2.09(b), or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.09(a), then such Lender will, if requested by the Borrower and at the Borrower's expense, use commercially reasonable efforts to designate another Lending Office for any Loan affected by such event; *provided* that such efforts (A) would eliminate or reduce amounts payable pursuant to Section 2.09(a) or Section 2.09(b), as applicable, in the future and (B) would not, in the reasonable judgment of such Lender be disadvantageous in any material legal, economic or regulatory respect to such Lender or its Lending Office. The provisions of this clause (ii) shall not affect or postpone any Obligations of the Borrower or rights of such Lender pursuant to Sections 2.09(a) and Section 2.09(b).

(iii)     A Lender shall not be entitled to any compensation pursuant to the foregoing sections to the extent such Lender is not imposing such charges or requesting such compensation from borrowers (similarly situated to the Borrower hereunder) under comparable syndicated credit facilities.

(d)     Replacement of Lenders Under Certain Circumstances.

(i)     If at any time (A) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 2.09(a) or Section 2.09(b) as a result of any condition described in such Sections, (B) any Lender becomes a Defaulting Lender or (C) any Lender becomes a Non-Consenting Lender (as defined below in this Section 2.09(d)) (collectively, a "**Replaceable Lender**"), then the Borrower may, on three Business Days' prior written notice from the Borrower to the Administrative Agent and such Lender (for the avoidance of doubt, such notice shall be deemed provided on the same day that an amendment or waiver is posted to the Lenders for consent), either (x) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.04 all of its rights and obligations under this Agreement to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such person or (y) so long as no Default or Event of Default shall have occurred and be continuing and notwithstanding anything in this Agreement to the contrary (including Section 2.06 of this Agreement), terminate the Commitment of such Lender and repay all Obligations of the Borrower owing (and the amount of all accrued interest in respect thereof) to such Lender relating to the Loans and participations held by such Lender as of such termination date at par and without payment of any Prepayment Amount, other prepayment premium or other similar amounts, if any, that would otherwise be due and payable under this Agreement as a result of any such repayment; *provided* that (I) in the case of any such replacement of, or termination of Commitments with respect to a Non-Consenting Lender such replacement or termination shall be sufficient (together with all other consenting Lenders including any other replacement Lender) to cause the adoption of the applicable modification, waiver or amendment of the Loan Documents and (II) in the case of any such replacement as a result of the Borrower having become obligated to pay amounts described in Section 2.09(a) or Section 2.09(b), such replacement would eliminate or reduce payments pursuant to Section 2.09(a) or Section 2.09(b), as applicable, in the future. Any Lender

-29-

being replaced pursuant to this Section 2.09(d)(i) shall (x) execute and deliver an assignment agreement with respect to such Lender's Commitment and outstanding Loans and (y) deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent (for return to the Borrower). Pursuant to such assignment agreement, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitment and outstanding Loans, (B) all Obligations relating to the Loans and participations (and the amount of all accrued interest in respect thereof) so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with the effectiveness of such assignment agreement and (C) upon such payment and, if so requested by the assignee Lender, the assigning Lender shall deliver to the assignee Lender the applicable Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender. In connection with any such replacement, if any such Replaceable Lender does not execute and deliver to the Administrative Agent and the Borrower a duly executed assignment agreement reflecting such replacement within two (2) Business Days of the date on which the assignee Lender executes and delivers such assignment agreement to such Replaceable Lender, then such Replaceable Lender shall be deemed to have executed and delivered such assignment agreement without any action on the part of the Replaceable Lender.

(ii)     In the event that (A) the Borrower or the Administrative Agent has requested the Lenders to consent to a waiver of any provisions of the Loan Documents or to agree to any amendment or other modification thereto, (B) the waiver, amendment or modification in question requires the agreement of all Lenders and (C) Lenders in the aggregate having Total Credit Exposure representing more than 50% of the Total Credit Exposures of all Lenders (excluding for purposes of this calculation all Defaulting Lenders) have agreed to such waiver, amendment or modification, then any Lender who does not agree to such waiver, amendment or modification, in each case, shall be deemed a "**Non-Consenting Lender**".

(iii)     All of the Loan Parties' obligations under this Section 2.09 shall survive termination of the Commitments and repayment of all other Obligations hereunder, any assignment by or replacement of a Lender and any resignation of the Administrative Agent.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders that, as of the Effective Date:

### SECTION 3.01   Organization; Powers.

The Borrower (i) is duly organized and validly existing under the laws of the jurisdiction of its organization, (ii) has all requisite power and authority to carry on its business as now conducted and to own and lease its property and (iii) is qualified and in good standing to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  There is no existing default under any of its Organizational Documents or any event which, with the giving of notice or passage of time or both, would constitute a default by any party thereunder. Schedule 3.01 sets forth the organizational structure of the Borrower, its parent and each of its Subsidiaries as of the date of this Agreement.

Exhibit 1A - 000036

**SECTION 3.02**   Authorization; Enforceability.

The execution, delivery and performance of this Agreement by the Borrower are within its powers and have been duly authorized by all necessary action on the part of the Borrower.  This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document to which the Borrower is to be a party, when executed and delivered by the Borrower, will constitute, a legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**SECTION 3.03**   No Conflicts.

The execution, delivery and performance of this Agreement (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect and (ii) filings necessary to perfect Liens created by the Loan Documents, (b) do not require any consent or approvals under the Project Company Debt Documents which have not been made or obtained, (c) will not violate the Organizational Documents of the Borrower, (d) will not violate any Requirements of Law, (e) will not violate or result in a default or require any consent or approval under any indenture, contract, agreement or other instrument binding upon any of Holdings, the Borrower, any Subsidiary thereof or any of their respective property, or give rise to a right thereunder to require any payment to be made by the Borrower and (f) will not result in the creation or imposition of any Lien on any property of the Borrower or any direct or indirect subsidiary thereof, except Permitted Liens.

**SECTION 3.04**   Financial Statements.

The Borrower has furnished to the Administrative Agent (i) its consolidated balance sheet and statements of income, members equity and cash flows as of (and for the portion of such year through) September 30, 2020; (ii) audited consolidated financial statements of the Project Company Holdco from inception to the year ended December 31, 2019; (iii) separate unaudited monthly, quarterly and annual financial statements of the Borrower and each of the Borrower's Subsidiaries from inception to the fiscal quarter ended September 30, 2020; and (iv) a statement of cash flows of the Borrower as of the date of this Agreement. Such financial statements have been prepared in accordance with GAAP and present fairly and accurately in all material respects the financial condition and results of operations and cash flows of the Borrower and each of the Borrower's Subsidiaries on a consolidated basis, as of the dates and for the periods to which they relate, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in this Section 3.04.

**SECTION 3.05**   Properties.

The Borrower and its Subsidiaries, to the extent they own any property, have good title to, or valid leasehold interests in, all their respective properties, free and clear of all Liens except for, Permitted Liens and minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere with their ability to conduct its business as currently conducted or to utilize such property for its intended purpose.

**SECTION 3.06**   Equity Interests and Subsidiaries.

(a)      Set forth on Schedule 3.06 is a list for the Borrower of (i) its jurisdiction of organization, (ii) each person holding ownership interest in the Borrower, and (iii) the nature and percentage of such

ownership interest.  Schedule 3.06 also sets forth a complete and correct list of all Subsidiaries of the Borrower as of the date hereof.

(b)      The Borrower has as of the date hereof, and shall have as of the Effective Date, 400,000,000 Common Membership Units. There are no other Equity Interests of the Borrower outstanding and no person has the right to acquire, or could upon election or the occurrence of any event acquire or obtain the right to acquire, any Equity Interests of Borrower. There are no subscriptions, warrants, options, calls, commitments, rights or agreements by which the Borrower or any of its Affiliates is bound relating to the issuance, transfer, voting or redemption of shares of Equity Interests of the Borrower or any pre-emptive rights held by any person with respect to the Equity Interests of the Borrower. The Borrower has not issued any securities convertible into or exchangeable for shares of its Equity Interests or any options, warrants or other rights to acquire such shares or securities convertible into or exchangeable for such Equity Interests.

**SECTION 3.07**   Environmental Matters.

(a)      The Borrower and each of its Subsidiaries is in compliance with all Environmental Laws and has not received from any person any (i) Environmental Notice or Environmental Claim, or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements.

(b)      The Borrower and each of its Subsidiaries have obtained and is in material compliance with all Environmental Permits (each of which is disclosed in Schedule 3.07(b)) necessary for the ownership, lease, operation or use of the business or assets of the Company as of the date hereof.

(c)      No real property currently owned, operated or leased by the Borrower or any of its Subsidiaries is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d)      There has been no Release of Hazardous Materials in contravention of Environmental Laws with respect to the business or assets of the Borrower or any of its Subsidiaries or any Real Property currently owned, operated or leased by the Borrower or any of its Subsidiaries, and neither the Borrower nor any Subsidiary has received an Environmental Notice that any Real Property currently owned, operated or leased in connection with the business of the Borrower or any Subsidiary (including soils, groundwater, surface water, buildings and other structure located on any such real property) has been contaminated with any Hazardous Material which would reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Laws or term of any Environmental Permit by, the Borrower or any of its Subsidiaries.

(e)      The Borrower has previously delivered to the Administrative Agent any and all environmental reports, studies, audits, records, sampling data, site assessments and other similar documents with respect to the business or assets of the Borrower and each of its Subsidiaries or any currently owned, operated or leased Real Property which are in the possession or control of the Borrower or any of its Subsidiaries.

**SECTION 3.08**   Litigation.

Except as set forth on Schedule 3.08, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any of its Subsidiaries or any business, property or rights of the

Exhibit 1A - 000038

Borrower or any of its Subsidiaries (i) that involve any Loan Document or (ii) that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

**SECTION 3.09**    Investment Company Act.

The Borrower is not an "investment company" or a company "controlled" by an "investment company," as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

**SECTION 3.10**    Use of Proceeds.

The Borrower will use the proceeds of the Loan solely as set forth in the Sources and Uses attached hereto as Exhibit D.

**SECTION 3.11**    Permits.

(a)    The Borrower and each of its Subsidiaries has complied, and is now complying, in all material respects with all laws applicable to it or its business, properties or assets.

(b)    All Permits required for the Borrower and each of its Subsidiaries to conduct its business in the manner conducted as of the date hereof have been obtained by it and are valid and in full force and effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full. Schedule 3.11 lists all current Permits issued to the Borrower and each of its Subsidiaries. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in Schedule 3.11.

**SECTION 3.12**    Taxes.

The Borrower and each of its Subsidiaries timely filed or caused to be timely filed all federal Tax Returns and all material state, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, and (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes due and payable.  The Borrower is not aware of any proposed or pending tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.

**SECTION 3.13**    No Material Misstatements.

No information, report (including those studies, reports or documents specified in Section 3.26), financial statement, certificate, Borrowing Request, exhibit or schedule furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Borrower represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

**SECTION 3.14**    Insurance.

Schedule 3.14 sets forth a true, complete and correct description of all insurance maintained by, or which it is an insured under, the Borrower as of the Effective Date (which, for the avoidance of doubt, includes customary course of construction insurance that will continue until construction of the Project has been completed at which time it will automatically convert at such time into a customary operating stage policy, including business interruption insurance).  All insurance maintained by the Borrower is in full force and effect, all premiums have been duly paid, and the Borrower has not received notice of violation or cancellation thereof.  The Borrower has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

**SECTION 3.15**    Material Contracts.

(a)    Schedule 3.15 sets forth each of the following Contracts (such contracts, being "**Material Contracts**") of the Borrower, Project Company Holdco, and the Project Company (each, a "**Contract Party**," and collectively, the "**Contract Parties**"):

(i)    each Contract involving aggregate consideration in excess of $10,000 and which, in each case, cannot be cancelled by a Contract Party without penalty or without more than 90 days' notice;

(ii)    all Contracts that provide for the indemnification by a Contract Party of any person or the assumption of any Taxes, environmental or other liability of any person;

(iii)    all Contracts that relate to the acquisition or disposition of any business, a material amount of stock or assets of any other person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(iv)    all employment Contracts with independent contractors or consultants (or similar arrangements) to which a Contract Party is a party and which are not cancellable without material penalty or without more than 90 days' notice;

(v)    except for Contracts relating to trade receivables, all Contracts relating to Indebtedness (including, without limitation, guarantees) of a Contract Party;

(vi)    all Contracts with any Governmental Authority to which a Contract Party is a party;

(vii)    all Contracts that limit or purport to limit the ability of the Project Company to compete in any line of business or with any person or in any geographic area or during any period of time;

(viii)    any Contracts to which the Project Company is a party that provide for any joint venture, partnership or similar arrangement by the Project Company; and

(ix)    any other Contract that is material to the Project Company and not otherwise described in clauses (i) through (viii) above.

(c)    Each Material Contract is valid and binding on the respective Contract Party in accordance with its terms and is in full force and effect. No Contract Party nor, to the knowledge of any Contract Party,

any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Material Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any material right or obligation or the loss of any material benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to the Administrative Agent.

(d)  Off-Take Agreement. As of the date hereof, the Commencement Date Deadline (as defined in the Off-Take Agreement) is the same date as the guaranteed commercial operation date as set forth in the EPC Contract.

**SECTION 3.16**  Security Documents.

The Security Agreement is effective to create, in favor of the Administrative Agent acting on behalf of itself and each of the Lenders, a legal, valid and enforceable Lien on and security interest in all of the Collateral purported to be covered thereby.  In the case of (i) any pledged Equity Interests represented by certificates, when such certificates are delivered to the Administrative Agent acting on behalf of itself and each of the Lenders and (ii) in the case of any other Collateral described in the Security Agreement, when all necessary recordings and filings have been made (or arrangements satisfactory to the Administrative Agent to make any necessary recordings or filings on or immediately following the Funding Date have been made) in all necessary public offices, and all other necessary and appropriate action has been taken, the security interest created by the Security Agreement shall constitute a perfected Lien on and security interest in all right, title and interest of the Borrower in the Collateral purported to be covered thereby and that can be perfected by filing, possession or control (but, with respect to any and all Accounts, subject in all respects to Section 7.01), prior and superior to all other Liens.  The descriptions of the Collateral set forth in each Security Document are true, complete, and correct in all material respects and are adequate for the purpose of creating, attaching and perfecting the Liens in the Collateral granted or purported to be granted in favor of the Administrative Agent acting on behalf of itself and each of the Lenders.

**SECTION 3.17**  Sanctions, Etc.

None of the Borrower, any of its Subsidiaries or, to the knowledge of the Borrower, any director, officer, employee, agent, or affiliate of the Borrower or any of its Subsidiaries is an individual or entity that is, or is owned or controlled by persons that are:  (i) the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of State, or other relevant sanctions authority (collectively, "**Sanctions**"), or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions.  The Borrower, its Subsidiaries and their respective directors, officers and employees and, to the knowledge of the Borrower, the agents of the Borrower and its Subsidiaries, are in compliance, in all material respects, with all applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "**FCPA**") and any other applicable anti-corruption law.  The Borrower and its Subsidiaries have instituted and maintain policies and procedures designed to promote and achieve continued compliance with applicable Sanctions, the FCPA and any other applicable anti-corruption laws.

**SECTION 3.18**  TID Business; CFIUS Filing.

Neither the Borrower nor any of its Affiliates is considered, nor has Borrower or any of its Affiliates at any point owned, managed or possessed any critical technologies, critical infrastructure or personal data that could reasonably be expected to classify Borrower or its Affiliates as a "TID U.S. Business," as such term is defined in 31 CFR § 800 or as such term is interpreted and/or applied by CFIUS.  The transactions

-35-

contemplated by the Loan Documents will not trigger a mandatory filing by Borrower and/or any Lender with CFIUS.

**SECTION 3.19**   HSR Act.

The Project does not constitute a "turnkey" facility within the meaning of 16 CFR §802.2, and neither any Lender nor the Borrower is required to provide any pre-merger notification filing with or to any Governmental Authority regarding the transactions contemplated by this Agreement.

**SECTION 3.20**   Credit Rating Report.

The Borrower has delivered a ratings report from Egan-Jones Ratings Company with a rating of the Loan of BBB+.

**SECTION 3.21**   Intellectual Property.

The Borrower (and each of its Subsidiaries) owns or has the right to use all Intellectual Property rights which are necessary for the ownership and operation of the Project, in each case, except where the failure of the Borrower (or such Subsidiary) to so own or have the right to use would reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrower, no material product, process, method, substance, part, or other material presently contemplated, as of the date hereof, to be sold or used by the Borrower (or any of its Subsidiaries) in connection with its ownership and operation of the Project infringes any Intellectual Property right owned by any other person in a manner that, in each case, could reasonably be expected to have a Material Adverse Effect.

**SECTION 3.22**   No Material Adverse Effect; No Event of Default.

There has been no occurrence, development, change, event, or loss which has resulted in or would reasonably be expected to result in, individually or in the aggregate, any Material Adverse Effect. No Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**SECTION 3.23**   Senior Ranking.

The payment obligations under each of the Loan Documents rank and will at all times rank first in right and priority of payment, in each case, with all other present and future secured and unsubordinated indebtedness (actual or contingent) of such Loan Parties, except for Permitted Liens, which by operation of law would rank senior in right of priority.

**SECTION 3.24**   Indebtedness and Other Liabilities.

None of the Loan Parties has any Indebtedness or other obligations or liabilities, direct, or contingent (other than (i) obligations arising under the Loan Documents, (ii) liabilities incurred in the

ordinary course of business, and (iii) liabilities disclosed in the financial statements delivered pursuant to Section 3.04).

**SECTION 3.25**    Solvency.

Each Loan Party is, and after giving effect to the incurrence of all Indebtedness and Obligations incurred in connection herewith will be, Solvent.

**SECTION 3.26**    Project Company Debt Documents.

As of the date hereof, the Project Company Debt Documents are in full force and effect.

**ARTICLE IV**

**CONDITIONS TO THE EFFECTIVE DATE AND THE FUNDING DATE**

**SECTION 4.01**    Conditions to Effectiveness of this Agreement.

This Agreement shall become effective and binding on the parties hereto on the date that each of the Borrower and Mirae shall have executed this Agreement (such date the "**Effective Date**"). Notwithstanding anything to the contrary contained in this Agreement, if Mirae does not, for any reason, obtain the final approval from its internal committee (such final approval, hereinafter referred to as the "**Final Mirae Committee Approval**") by the fourteenth (14th) Business Day set forth in Section 4.02, then this Agreement shall be automatically terminated on the earlier of such failure to obtain the Final Mirae Committee Approval, or the expiration of the fourteen (14) Business Day period without the occurrence of the Final Mirae Committee Approval, in either case with immediate effect. No party hereto shall be liable to any other party hereto as a result of a termination of this Agreement by reason of Mirae not having been able to obtain the Final Mirae Committee Approval or Ryze failing to complete the conditions precedent set forth on Schedule 4.02A or Schedule 4.02B and each party hereby waives, releases and discharges the other party and agrees not to sue in connection with, any liabilities and claims however arising (including, without limitation, those arising from any special, indirect, incidental, consequential, punitive, or any potentially acknowledgeable legal damages suffered or incurred in connection with, arising out of, or in any way related to, terminations and matters in connection with the Final Mirae Committee Approval or conditions precedent set forth on Schedule 4.02A or Schedule 4.02B).

**SECTION 4.02**    Conditions to Funding of the Loan.

The obligation of the Lenders to fund the Loan requested to be made on the Funding Date shall be subject to the satisfaction (or waiver) of each of the conditions precedent set forth on Schedule 4.02A (Items to be Completed prior to the Funding Date) and Schedule 4.02B (Items to be Completed on the Funding Date). The Lenders hereby agree that the Funding Date shall occur no later than ten (10) days (or such later date as may be mutually agreed to in writing by the Borrower and the Lenders) following the date of the Final Mirae Committee Approval (the "**Funding Date**"). Each condition precedent set forth on Schedule 4.02A (other than the Final Mirae Committee Approval) shall be completed and satisfied (or waived) no more than forty-five (45) days from the Signing Date, failing which this Agreement shall automatically be terminated with immediate effect, as set forth in Section 4.01. Upon completion and satisfaction (or waiver) of such condition precedents set forth on Schedule 4.02A, Mirae shall, within fourteen (14) Business Days therefrom, hold its final internal committee meeting whether to approve or disapprove its participation in the Loan contemplated in this Agreement. If Mirae does not, for any reason, obtain the Final Mirae

Committee Approval within such fourteen (14) Business Day period, this Agreement shall be automatically terminated with immediate effect, as set forth in <u>Section 4.01</u>.

**ARTICLE V**

**AFFIRMATIVE COVENANTS**

The Borrower warrants, covenants and agrees that so long as this Agreement shall remain in effect and until the Commitment has been terminated and the principal of and interest on the Loan and all other expenses or amounts payable under any Loan Document shall have been paid in full (other than contingent indemnification obligations for which no claim has been made) unless the Required Lenders shall otherwise consent in writing, the Borrower shall and shall cause its Subsidiaries to:

**SECTION 5.01**   <u>Financial Statements, Reports, etc</u>.

Furnish to the Administrative Agent:

(a)   <u>Financial Statements; Annual Budget</u>.

(i)   As soon as available, but in any event within one hundred and twenty (120) days after the end of each fiscal year of the Borrower, a copy of the annual audit report of the Project Company for such year and unaudited financial statements of Holdings, the Borrower and its Subsidiaries as of the end of and for such fiscal year. Such statements shall be accompanied by (A) a fair market value report for the Project Company (the "**Annual FMV Report**") by Stancil & Company, or such other third party independent appraiser selected by the Borrower (at the sole cost and expense of the Borrower), approved by the Administrative Agent, (B) an insurance summary prepared by an independent third-party insurance company selected by the Borrower and approved by the Lender (such approval not to be unreasonably withheld, conditioned or delayed) and (C) a report of the results of penalties and incentives arising under the Off-Take Agreement, O&M Agreement or any other applicable Material Contract.

(ii)   As soon as available, but in any event within thirty (30) days after the last day of June of each calendar year, unaudited financial statements of Holdings as of the end of June of such calendar year and for the six (6) month period ending on such date.

(iii)   As soon as available, but in any event within thirty (30) days after the last day of each month of each calendar year, unaudited financial statement of the Borrower and unaudited consolidated financial statement of the Project Company Holdco and the Project Company, as of the end of such fiscal month and for the period of the calendar year ending as of the last day of such fiscal month.

(iv)   As soon as available, but in any event within thirty (30) days after the beginning of each fiscal year of the Borrower (commencing with the fiscal year ending December 31, 2022), an annual business plan or budget of the Borrower, the Project Company Holdco and the Project Company, for such fiscal year that has been approved by the Governing Body of the Borrower (together with the initial annual plan or budget delivered to the Lenders prior to the Effective Date, each an "**Approved Budget**").

(v)   Together with the delivery of the financial statements referred to in clause (iii) above for the month ending on the First Test Date and each month thereafter ending on a Subsequent Test Date, a certificate of an officer of the Borrower certifying and demonstrating compliance with the financial covenants set forth in <u>Section 5.02(a)</u> and <u>Section 5.02(b)</u>.

(b)      Organizational Documents.  Promptly, copies of any Organizational Documents of the Borrower or any of its Subsidiaries that have been amended or modified in accordance with the terms hereof and deliver a copy of any notice of default given or received by the Borrower or any Subsidiary under any of its Organizational Document within ten (10) Business Days after the Borrower or such Subsidiary gives or receives such notice.

(c)      Material Contract Notices.  Promptly, upon receipt of the same, copies of all notices, correspondence, communications, requests and other documents received by the Borrower or any of its Subsidiaries relating to an Event of Default under any Project Company Debt Document.

(d)      Project Company Reports.  No later than five (5) Business Days after delivery of the same by the Borrower or the Project Company to the Project Company Lender, each report, notice or other item required to be delivered by the Project Company to the Project Company Lender pursuant to Sections 4.1(b), 4.1(h) and 4.4 of the Project Company Loan Agreement.

(e)      Other Information; Ad Hoc Fair Market Reports.  Promptly, from time to time, following request therefor:

(i)      such other information regarding the operations, business affairs and financial condition of the Borrower, or compliance with the terms of any Loan Document, as the Lenders may reasonably request or information and documentation reasonably requested by the Lenders for purposes of compliance with applicable "know your customer" requirements under applicable anti-money laundering laws; and

(ii)      to the extent requested by the Administrative Agent, fair market value reports (which shall be in addition to the fair market value reports referred to in Section 5.01(a)(i) above) from two third party independent appraisers selected by the Borrower (each, an "**Ad Hoc FMV Report**"); provided that the Administrative Agent shall not request delivery of (and the Borrower shall not be required to deliver) Ad Hoc FMV Reports more than one time during the term of this Agreement.

**SECTION 5.02**   Financial Covenants.

(a)      Commencing no later than the last day of the fifteenth full fiscal month ending after the Commercial Operation Date (the "**First Test Date**") and on the last day of each three consecutive fiscal month period ending after the First Test Date (a "**Subsequent Test Date**"), Borrower shall achieve a Debt Service Coverage Ratio of not less than 1.50:1.00 (in each case, determined for the period of twelve months then ended).

(b)      Commencing on the First Test Date and on each Subsequent Test Date thereafter, Borrower shall ensure that the Project Company achieves EBITDA of not less than $75,000,000 (in each case, determined for the period of twelve months then ended).

(c)      The Borrower shall cause the Project Company to comply with each Financial Covenant (as defined in the Project Company Loan Agreement) as and when required under and pursuant to the Project Company Loan Agreement (in each case, after giving effect to any grace period, cures, waivers and/or consents applicable thereto).

**SECTION 5.03**     Rating.

No later than the date that is nine (9) months after the Commercial Operation Date, Borrower shall obtain a ratings report from Standard & Poor's, Moody's Investors Service, or Fitch Ratings with an expected rating of BBB+ or higher (in the case of Standard & Poor and Fitch Ratings) and Baa1 (in the case of Moody's Investors Service); provided that such nine (9) month period shall be automatically extended without any required consents hereunder if any such rating agency requires longer operating history to provide such rating (in which case, the obtaining of such rating shall be required no later than ninety (90) days after the date of delivery of the latest dated financial operating history deliverable so-required); provided further that, in the event the Borrower fails to procure "Investment Grade" rating from one of the aforementioned agencies, then the Borrower will refinance the Project to pay off the Loan within ninety (90) days following the end of such nine (9) month period from the Commercial Operation Date (as such nine (9) month period may be extended in accordance with the immediately preceding proviso).

**SECTION 5.04**     Progress Update.

(a)     While the Loan remains outstanding, within fifteen (15) days of the end of each month, the Borrower shall deliver to the Administrative Agent a written progress report (the "**Monthly Report**") with respect to the Project for such month. The Monthly Report shall include the following items:

(i)     Variance report of financial and, after the Completion Date, commercial operation;

(ii)     Cash balance separated by accounts;

(iii)     Construction, commissioning and test status results;

(iv)     Cost management updates;

(v)     Construction update and progress/schedule management related thereto;

(vi)     Technical/engineering results;

(vii)     Health, safety & environmental review results and environmental, social & governance review results;

(viii)     Summary of required insurance renewals, extensions and updates;

(ix)     Organizational structure and staffing updates;

(x)     Material revisions to or variances in Approved Budget;

(xi)     Results of penalties and incentives arising under, and the status of any activities under, the Off-Take Agreement, O&M Agreement or any other applicable Material Contract; and

(xii)     Following the Completion Date, feedstock, logistics and end-product management updates.

(b)     While the Loan remains outstanding, within thirty (30) days of the beginning of each month occurring prior to the Completion Date, the Borrower shall deliver to the Administrative Agent a written progress report (the "**Bi-Weekly Report**") with respect to the Project for the first two weeks of such month. The Bi-Weekly Report shall include the items described in clauses (a)(i) through (a)(x) above.

(c)     While the Loan remains outstanding, the Borrower shall deliver to the Administrative Agent evidence of all required insurance renewals, extensions and updates promptly following the date that the Borrower receives such renewals, extensions and updates.

**SECTION 5.05**   Litigation and Other Notices.

Furnish to the Administrative Agent written notice of the following promptly (and, in any event, within five (5) Business Days of the occurrence thereof):

(a)     any Default or Event of Default;

(b)     the filing or commencement of, or any threat or notice of intention of any person to assert a claim against the Borrower or any of its Subsidiaries or to file or commence, any action, suit, litigation claim or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against the Borrower or any of its Subsidiaries that could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document;

(c)     any development that has resulted in, or could reasonably be expected to result in a Material Adverse Effect; and

(d)     (i) the incurrence of any material Lien (other than Permitted Liens) on, or claim asserted against any of the Collateral or (ii) the occurrence of any other event which could materially affect the value of the Collateral.

**SECTION 5.06**   Existence.

Do or cause to be done all things necessary to preserve, renew and maintain in full force and effect the legal existence of the Borrower and its Subsidiaries.

**SECTION 5.07**   Insurance.

Keep its insurable property adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations in such amounts as is customary in the case of similar businesses operating in the same or similar locations.

**SECTION 5.08**   Obligations and Taxes.

(a)     Payment of Obligations.  Pay its Indebtedness and other obligations promptly and in accordance with their terms and pay and discharge promptly when due all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default; *provided* that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as (x)(i) the validity or amount thereof shall be contested in good faith by appropriate proceedings timely instituted and diligently conducted and the Borrower shall have set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP and (ii) such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien or (y) the failure to pay could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.

(b)      Filing of Returns.  Timely and correctly file all material Tax Returns required to be filed by it and withhold, collect and remit all Taxes that it is required to collect, withhold or remit.

**SECTION 5.09**      Maintaining Records; Access to Properties and Inspections.

Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law are made of all dealings and transactions in relation to its business and activities.  The Borrower will permit any representatives designated by the Administrative Agent to visit and inspect the financial records and the property of the Borrower and its Subsidiaries at reasonable times and upon prior reasonable notice and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent to discuss the affairs, finances, accounts and condition of the Borrower and its Subsidiaries with the officers and employees thereof and advisors therefor (including independent accountants); *provided* that the Administrative Agent and the Lenders shall not exercise such right to visit and inspect the financial records and the property of  the Borrower and its Subsidiaries more than two (2) times during any calendar year other than during the continuation of an Event of Default.

**SECTION 5.10**      Completion Certificate.

 The Borrower shall deliver to the Administrative Agent a certificate signed by an authorized officer of the Borrower, stating that the (i) construction of the Project has been completed in accordance with the requirements of the Project Company Debt Documents and (ii) startup of the Project has occurred (the "**Completion Certificate**").

**SECTION 5.11**      Use of Proceeds.

Use the proceeds of the Loan only for the purposes set forth or referenced in Section 3.10.

**SECTION 5.12**      CFIUS.

At the election of the Administrative Agent at the direction of the Required Lenders, each of the Lenders and the Borrower, and each party's Affiliates as necessary, shall use their reasonable best efforts to make a voluntary filing with CFIUS within ninety (90) days following the Funding Date, relating to the transactions contemplated by this Agreement, and promptly take all actions and steps necessary to obtain any clearance or approval from CFIUS that the Lenders or its counsel deems necessary or advisable.

**SECTION 5.13**      Off-Take Agreement.

At all times while the Loan remains outstanding, the Borrower shall cause the Project Company, either directly or indirectly, to comply with commercially reasonable market practices with respect to the Project Company's feedstock procurement and supply price setting mechanisms.

**SECTION 5.14**      Executive Team.

The Borrower shall  appoint  a Chief Executive Officer and Chief Operating Officer of the Borrower no later four (4) months after the Funding Date, the identity of which has been consented to by the Administrative Agent (such consent not be unreasonably withheld, conditioned or delayed).

**SECTION 5.15**   Additional Collateral.

Following payment in full of the Project Company's obligations under the Project Company Debt Documents, upon the request of the Administrative Agent (acting at the direction of the Required Lenders), the Borrower shall cause the Project Company to take such actions as the Administrative Agent may reasonably request in order to create, grant and perfect Liens over the Project Company's properties, assets, rights and interests that are encumbered by the Project Company Debt Documents as of the date hereof. For the avoidance of doubt, a Permitted Refinancing of the Project Company's obligations under the Project Company Debt Documents shall not constitute payment in full of the Project Company's obligations under the Project Company Debt Documents for purposes of this Section 5.15.

**SECTION 5.16**   Payment and Performance Bonds.

No later than the date that is thirty (30) days following the Funding Date, the Borrower shall deliver or cause to be delivered to the Administrative Agent a fully executed copy of the payment and performance bonds that are to be issued to the Borrower by Liberty Mutual in connection with the Change Order EPC Contract, together with an endorsement or assignment thereof in favor of the Administrative Agent as an additional insured or loss payee, the amounts of which bonds shall be equal to or greater than 100% of the contract amount of the Sys-Con Contract.

**SECTION 5.17**   Environmental Matters.

The Borrower will reasonably promptly notify the Administrative Agent in writing of any (i) threatened action, investigation, notice of potential responsibility (including potentially responsible party notices), or other inquiry by any Governmental Authority, (ii) threatened demand or lawsuit by any person against the Borrower (or any of its Subsidiaries) or their real property of which the Loan Parties have knowledge, or (iii) material Release of Hazardous Material as a result of the Loan Parties' operations, and in each case of (i), (ii), and (iii) in connection with any Environmental Laws and if the Loan Parties reasonably anticipate that such action is reasonably likely to result in a Material Adverse Effect.

**SECTION 5.18**   Compliance with Laws.

The Borrower shall comply with all laws, rules, regulations and orders of any Governmental Authority (including Environmental Laws) applicable to it or its property (owned or leased), except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

**SECTION 5.19**   Maintenance of Corporate Separateness.

The Borrower shall (and shall cause its Subsidiaries to) satisfy customary corporate formalities, including the holding of regular board of directors' and shareholders' or members', managers' or partners' meetings, if applicable, and the maintenance of corporate or company offices and records. Neither the Borrower (nor any of its Subsidiaries) shall take any action, or conduct their affairs in a manner, which is likely to result in the separate existence of a Loan Party from any non-Loan Party being ignored by any court of competent jurisdiction.  The Borrower (and shall cause its Subsidiaries to) comply in all material respects with the covenants set forth in its Organizational Documents to maintain its separate and distinct existence from any other person.

**SECTION 5.20**   Material Contracts.

The Borrower shall, and shall cause the Project Holdco and the Project Company to, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms.

**SECTION 5.21**   Further Assurances.

From time to time, at the reasonable request of the Administrative Agent, the Borrower shall execute and deliver to the Administrative Agent such documents and take such other action as the Administrative Agent may reasonably request in order to consummate the transactions contemplated hereby.

**SECTION 5.22**   Distribution by the Project Company

The Borrower shall, on or prior to each Transfer Date, cause the Project Company to make distributions to the Borrower of all available cash to extent not prohibited under the Project Company Loan Agreement.

(a)        Industrial Waste Water Discharge Permit;

(b)        NOI Confirmation Letters and receipt/evidence of payment of the annual Stormwater Permit fees;

(c)        evidence that SWPPP has been updated;

(d)        evidence that current Air Quality Synthetic Minor Permit is in place;

(e)        evidence of the payment of the annual fee for Weights and Measures Permit;

(f)        evidence that the Stationary Source Permit has been obtained from the Clark County Department of Air Quality;

(g)        evidence that a Permit to Operate Solid Waste Management Facility has been obtained from the Southern Nevada Health District;

(h)        evidence that the Spill Prevention Control and Countermeasure Plan is in place and has been updated;

(i)        evidence that MSDS reporting and related requirements are current under the Emergency Planning and Community Right-to-Know Act;

(j)        evidence confirming appropriate permitting has been obtained for the RCRA *Hazardous Waste Generator*; and

(k)        all sub-contractors of Sys-Con Contract, including the Alfa Laval contract including, inter alia, performance bonds, insurances.

-44-

## ARTICLE VI

## NEGATIVE COVENANTS

The Borrower warrants, covenants and agrees that, so long as this Agreement shall remain in effect and until the Commitment has been terminated and the principal of and interest on each Loan and all other expenses or amounts payable under any Loan Document have been paid in full (other than contingent indemnification obligations for which no claim has been made), unless the Required Lenders shall otherwise consent in writing, neither the Borrower nor any of its Subsidiaries will:

**SECTION 6.01**    Indebtedness.

Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness other than Permitted Indebtedness.

**SECTION 6.02**    Liens.

Create, incur, assume or permit to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it, or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a)        inchoate Liens for Taxes, assessments or governmental charges or levies not yet due and payable or delinquent and Liens for Taxes, assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(b)        Liens granted pursuant to the Security Documents to secure the Obligations;

(c)        (i) Liens that are contractual or common law right of set-off relating to (A) the establishment of depository relations in the ordinary course of business with banks not give in connection with the issuance of Indebtedness or (B) pooled deposit or sweep accounts of the Borrower and any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business and (ii) other Liens securing cash management obligations (not constituting Indebtedness for borrowed money) in the ordinary course; and

(d)        in the case of the Project Company, any Liens granted pursuant to or permitted by the Project Company Debt Documents or the definitive documents in respect of any Permitted Refinancing thereof.

**SECTION 6.03**    Investment, Loan, Advances and Acquisition.

Directly or indirectly, lend money or credit (by way of guarantee or otherwise) or make advances to any other person, or purchase or acquire any Equity Interests, bonds, notes, margin stock, debentures, guarantees or other obligations or securities of, or any other interest in, or make any capital contribution to, any other person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or purchase or acquire (in one transaction or a series of transactions) any assets (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a)        the Borrower and its Subsidiaries may invest in, acquire and hold cash and Cash Equivalents;

(b)        purchases and other acquisitions of materials, equipment and tangible property in the ordinary course of business;

(c)        Investments made by the Borrower, directly or indirectly, in the Project Company with the proceeds of the Loan in accordance with Exhibit D;

(d)        in the case of the Project Company, Investments permitted under the Project Company Loan Agreement (as in effect on the date hereof); and

(e)        to the extent constituting an Investment, any of the activities permitted by Section 6.10.

**SECTION 6.04**    Mergers and Consolidations; Fundamental Changes.

Wind up, liquidate or dissolve its affairs or enter into any transaction of merger, amalgamation or consolidation (or agree to do any of the foregoing at any future time), spin-off or fundamentally alter the character of the business of the Loan Parties from the business conducted by, contemplated to be conducted by, or proposed to be conducted by, the Loan Parties as of the date hereof.

**SECTION 6.05**    Business Activities.

Directly or indirectly, use the proceeds of the Loan, or lend, contribute or otherwise make available such proceeds available for the purpose of investing in any joint venture.

**SECTION 6.06**    Asset Sales.

Effect any Asset Sale, or agree to effect any Asset Sale, except (i) dispositions of used, worn out, obsolete or surplus property by the Borrower in the ordinary course of business and (ii) in the case of the Project Company, Asset Sales permitted under Section 4.2(d) of the Project Company Loan Agreement (as in effect on the date hereof); provided, however, in the case of clause (ii), the Borrower shall first obtain prior written consent from the Required Lenders.

**SECTION 6.07**    Dividends / Distributions.

Authorize, declare or pay, directly or indirectly, any Dividends or make any other distributions from the Borrower, the Project Company Holdco or the Project Company except (i) with respect to the Borrower, to make Tax Distributions and other payments (including payment of compensation to employees of the Parent, Holdings and the Borrower and its Subsidiaries) (provided that the aggregate amount of such other payments shall not exceed $500,000, in any fiscal year), (ii) Dividends or other distributions permitted under Section 7.11 hereof, (iii) with respect to the Project Company Holdco, to the extent required pursuant to the terms of the Project Company Holdco Operating Agreement (in each case to the extent otherwise in compliance with this Agreement) and (iv) with respect to the Project Company, distributions to the Borrower of all available cash to extent not prohibited under the Project Company Loan Agreement.

**SECTION 6.08**    Transactions with Affiliates.

Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of Borrower or its Subsidiaries, other than (i) pursuant

Exhibit 1A - 000052

to the Management Services Agreement or (ii) upon the prior approval of the Super Majority of the Board of Managers (as such term is defined in the Borrower Operating Agreement), any transaction or series of related transactions in the ordinary course of business on terms and conditions at least as favorable to the Borrower and its Subsidiaries as would reasonably be obtained by the Borrower and its Subsidiaries at that time in a comparable arm's-length transaction with a person other than an Affiliate of Borrower or its Subsidiaries.

**SECTION 6.09** <u>Modifications of Organizational Documents and Material Agreements.</u>

Directly or indirectly terminate, amend or modify any of its Organizational Documents (which shall, for the avoidance of doubt, include the Borrower Operating Agreement) or any agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement) or any other material agreement, or enter into any new agreement with respect to its Equity Interests.

**SECTION 6.10**   <u>Limitation on Changes to Holding Company Status.</u>

(a)       In the case of the Project Company Holdco, engage in any business or activity other than:

(i)       the ownership of all outstanding Equity Interests in the Project Company;

(ii)      maintaining its existence;

(iii)     participating in tax, accounting and other administrative activities as the parent of the Project Company;

(iv)      the performance of obligations under the Loan Documents or the Project Company Debt Documents to which it is a party;

(v)       the making and receipt of payments, Dividends and other distributions to the extent permitted under Section 7.03 or the Project Company Holdco Operating Agreement;

(vi)      maintaining accounts and monies on deposit therein; and

(vii)     activities incidental to the businesses or activities described in subsections (a)(i) through (a)(vi) above.

(b)       In the case of the Borrower, engage in any business or activity other than:

(i)       the ownership of all outstanding Equity Interests in the Project Company Holdco;

(ii)      maintaining its existence;

(iii)     participating in tax, accounting and other administrative activities as the parent of the Project Company Holdco and the Project Company (including payment of compensation to employees of the Parent, Holdings and the Borrower and its Subsidiaries);

(iv)      the performance of obligations under the Loan Documents to which it is a party;

Exhibit 1A - 000053

(v)      the making of Tax Distributions and the making and receipt of payments, Dividends and other distributions to the extent permitted under Section 7.03 hereof or the Borrower Operating Agreement;

(vi)      maintaining accounts (including the Accounts) and monies on deposit therein; and

(vii)      activities incidental to the businesses or activities described in subsections (b)(i) through (b)(vi) above.

## SECTION 6.11   Limitations on Budget Management.

Except as otherwise contemplated under Section 3.10 or pursuant to any Material Contract, in the case of the Borrower, approve, authorize or effect any of the following without prior written consent from the Required Lenders:

(i)      Any employee or management bonus, incentive, or other compensation based, in part, upon the satisfaction of specified criteria or performance metrics;

(ii)      Any management service fee equal to or greater than, individually or in the aggregate, (A) prior to the Completion Date, $100,000 per month and (B) from and after the Completion Date, $250,000 per month;

(iii)      Any travel or travel related expenses equal to or greater than, individually or in the aggregate, $100,000 per year;

(iv)      Any entertainment, hospitality or similar expenses equal to or greater than, individually or in the aggregate, $100,000 per year;

(v)      Any miscellaneous selling, general or administrative expenses equal to or greater than, individually or in the aggregate, $100,000 per year; or

(vi)      Any expenditures variance in any fiscal year in respect of the items set forth under the heading "Non-COGS Expenditures" in the Approved Budget for such fiscal year that, when taken together in the aggregate for all expenditures in respect of such items for such fiscal year, is greater than 5% of the aggregate expenditures amount in respect of the items set forth under the heading "Non-COGS Expenditures" in the Approved Budget for such fiscal year unless such expenditures variance is funded with proceeds that have been distributed from the Conditional Distributions Account in accordance with Section 7.11.

## SECTION 6.12   Sanctions, Etc.

Directly or indirectly, use the proceeds of the Loan, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any person in violation of the FCPA or any other applicable anti-corruption law, or (ii) (A) to fund any activities or business of or with any person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (B) in any other manner that would result in a violation of Sanctions by any person.

**SECTION 6.13**  Accounting and Budget Changes.

Make any (i) change (and the Borrower shall cause its Subsidiaries to not make any change) in accounting policies or reporting policies, except as required by GAAP, or (ii) change of its fiscal year, or (iii) without prior written consent from the Administrative Agent, which shall not be unreasonably withheld, materially vary or revise any Approved Budget.

**SECTION 6.14**  Subsidiaries.

Create any Subsidiary or cause, in any manner, any person to become its Subsidiary other than those Subsidiaries held by the Borrower as of the date hereof.

**SECTION 6.15**  Disregarded Entity.

Without the written consent of the Required Lenders, take any action, nor permit any other person to take any action on the Borrower's behalf, that would have the effect of causing the Borrower to be treated as other than an entity whose separate existence is disregarded from that of its sole regarded owner for U.S. federal income tax purposes.

**SECTION 6.16**  Material Contracts.

Directly or indirectly terminate, amend or modify the financial terms, schedule, or any other material terms of any of the Material Contracts unless agreed to by the Lenders or Administrative Agent, not to be unreasonably withheld.  Lenders agree that as a normal course of business, minor, non-material administrative changes may be made without the consent of the Lenders from time to time, to properly manage the completion of construction and/or the day to day operations of the completed Project.

**ARTICLE VII**

**ACCOUNTS**

**SECTION 7.01**  Creation of Accounts.  The Borrower shall create and establish and maintain the following separate and segregated accounts in each case with a Depository Bank:

(a)  the Collections Account (the "**Collections Account**");

(b)  the Funding Date Interest Reserve Account (the "**Funding Date Interest Reserve Account**");

(c)  the Interest Payment Account (the "**Interest Payment Account**");

(d)  the Debt Service Reserve Account (the "**Debt Service Reserve Account**");

(e)  the Cash Reserve Account (the "**Cash Reserve Account**");

(f)  the Principal Reserve Account (the "**Principal Reserve Account**");

(g)  the EPC Retention Account (the "**EPC Retention Account**");

(h)  the Working Capital Reserve Account (the "**Working Capital Reserve Account**"); and

Exhibit 1A - 000055

(i)      the Conditional Distributions Account (the "**Conditional Distributions Account**", together with the Collections Account, the Funding Date Interest Reserve Account, the Interest Payment Account, the Debt Service Reserve Account, the Cash Reserve Account, the Principal Reserve Account, the EPC Retention Account and the Working Capital Reserve Account, the "**Accounts**").

Each Account shall be maintained by the applicable Depository Bank as a separate and distinct fund to be held, managed, invested, disbursed and administered as provided in this Agreement and subject to an Account Control Agreement.  All moneys deposited in the Accounts shall be used solely for the purposes set forth in this Agreement.

**SECTION 7.02**   Collections Account.

(a)      The Borrower shall establish and maintain a Collections Account with a Depository Bank and enter into an Account Control Agreement with respect thereto in accordance with Section 7.01.  Upon the occurrence of the Completion Date, the Borrower shall deposit or cause to be deposited in the Collections Account no later than the fifth Business Day after receipt of any distributions (net of any required tax payments required to be made by the Borrower on account of its ownership interest in the Project Company or the Project Company Holdco, as applicable) received by the Borrower from the Project Company and/or the Project Company Holdco, in each case, to the extent such distribution (i) was required to be distributed to the Borrower pursuant to the terms of the Project Company Operating Agreement or the Project Company Holdco Operating Agreement, as applicable, and (ii) was distributed to the Borrower in compliance with the Project Company Loan Agreement.

(b)      The Borrower shall cause all amounts that remain on deposit in the Collections Account on any Transfer Date to be applied in accordance with the distribution instructions set forth in Section 7.03 on the 15th day of each fiscal month of the Borrower, commencing with the first full fiscal month ending after the Commercial Operation Date (each such date, a "**Transfer Date**").

(c)      The Borrower may at its option at any time designate a new Depository Bank with which it shall maintain the Collections Account, provided (i) such new Depository Bank is a bank the deposits of which are insured by the Federal Deposit Insurance Corporation and (ii) such new Depository Bank has entered into an Account Control Agreement with the Administrative Agent acting on behalf of itself and the Lenders in substantially the same form as the previous Account Control Agreement or in such other form as may be approved by the Administrative Agent in its reasonable discretion (such consent not to be unreasonably withheld, conditioned or delayed).

**SECTION 7.03**   Application of Proceeds.  On each Transfer Date, the Borrower shall apply amounts on deposit in the Collections Account, if and to the extent available, as follows (in the following order of priority):

(a)      *First*, to make Tax Distributions;

(b)      *Second*, to the Interest Payment Account in an amount (if any) sufficient to comply with the Interest Payment Account Requirement;

(c)      *Third*, to the Debt Service Reserve Account in an amount (if any) sufficient to comply with the Debt Service Reserve Account Requirement;

(d)      *Fourth*, to the payment in cash of the principal amount of the Loan in accordance with Section 2.07(a) up to an amount equal to the capitalized PIK Interest;

Exhibit 1A - 000056

(e)      *Fifth*, at the option of the Borrower, to the payment in cash of the principal amount of the Loan in accordance with Section 2.06(b) in an aggregate amount not to exceed, for all such payments, $10,000,000;

(f)      *Sixth*, to the Cash Reserve Account in an amount (if any) sufficient to comply with the Cash Reserve Account Requirement;

(g)      *Seventh*, to the Principle Reserve Account in an amount (if any) sufficient to comply with the applicable Principal Reserve Account Requirement;

(h)      *Eighth*, to the Working Capital Reserve Account in an amount (if any) sufficient to comply with the Working Capital Reserve Account Requirement or, at the election of the Borrower, such greater amount as it may deem appropriate in its sole discretion;

(i)      *Ninth*, to the Conditional Distributions Account; and

(j)      *Tenth*, the balance, if any, to the person or persons lawfully entitled thereto (including the Borrower or its successors or assigns).

**SECTION 7.04**    Funding Date Interest Reserve Account.   On the Funding Date, an aggregate amount of cash equal to $15,305,520 shall be funded from the net proceeds of the Loans into the Funding Date Interest Reserve Account, which amount shall be applied by the Borrower to make cash interest payments on the Loan with respect to the first five (5) Interest Periods hereunder occurring after the Funding Date in accordance with Section 2.04(c).

**SECTION 7.05**    Interest Payment Account.  On each Transfer Date, solely to the extent of available cash in the Collections Account, the Borrower shall cause to be deposited into the Interest Payment Account an amount sufficient to fund any accrued but unpaid cash interest on such date and any additional interest required to be paid on the immediately succeeding Interest Payment Date (the "**Interest Payment Account Requirement**"); provided that there shall be no such Interest Payment Account Requirement for any Transfer Date occurring prior to the one year anniversary of the Funding Date.  Amounts on deposit in the Interest Payment Account shall be applied by the Borrower on each Interest Payment Date in accordance with Section 2.04(c) to pay accrued interest that is due and payable on the Loan on such Interest Payment Date. If on any Interest Payment Date, the amount in the Interest Payment Account is greater than the amount required to be paid on such date pursuant to Section 2.04(c), such excess may be transferred to the Collections Account for further application pursuant to Section 7.03.

**SECTION 7.06**    Debt Service Reserve Account.

(a)      On the Funding Date, an aggregate amount of cash equal to $3,865,578.10 shall be funded from the net proceeds of the Loans into the Debt Service Reserve Account.

(b)      In the event insufficient funds exist in the Interest Payment Account to fund any required interest payment on any Interest Payment Date, such interest payment (to the extent of unavailability in the Interest Payment Account) shall be made with funds contained in the Debt Service Reserve Account.

(c)      In the event that, as of any Transfer Date the amount on deposit in the Debt Service Reserve Account is less than $15,000,000 as a result of cash being withdrawn from the Debt Service Reserve Account to fund interest payments in accordance with Section 2.04(c) or otherwise, the Borrower shall deposit or cause to be deposited cash on such Transfer Date into the Debt Service Reserve Account (solely to the extent available pursuant to the distribution waterfall in Section 7.03), in an amount equal to the

Exhibit 1A - 000057

amount necessary to return the amount on deposit in the Debt Service Reserve Account to $15,000,000 (the "**Debt Service Reserve Account Requirement**").

(d)     For the avoidance of doubt, the final balance of the Debt Service Reserve Account on the first Transfer Date occurring after the twelve month anniversary of the Commercial Operation Date shall be required to be $15,000,000.  A failure by the Borrower to satisfy such minimum amount requirement shall be an Event of Default.

(e)     Upon the occurrence of an Event of Default, the Administrative Agent at the instruction of the Required Lenders may apply proceeds of the Debt Service Reserve Account to payment of the Obligations in accordance with Section 8.02.

**SECTION 7.07**     Cash Reserve Account.

(a)     On each Transfer Date, solely to the extent required by this Section 7.07 and solely to the extent in accordance with the distribution waterfall contained in Section 7.03, the Borrower shall transfer cash from the Collections Account to the Cash Reserve Account (i) in an aggregate amount not to exceed $5,000,000 on or prior to the 12-month anniversary of the Commercial Operation Date (the "**First Cash Reserve Account Requirement**"), (ii) in an additional aggregate amount not to exceed $5,000,000 after the 12-month anniversary of the Commercial Operation Date and on or prior to the 24-month anniversary of the Commercial Operation Date (the "**Second Cash Reserve Account Requirement**"), (iii) in an additional aggregate amount not to exceed $5,000,000 after the 24-month anniversary of the Commercial Operation Date and on or prior to the 36-month anniversary of the Commercial Operation Date (the "**Third Cash Reserve Account Requirement**") and (iv) in an additional aggregate amount not to exceed $5,000,000 after the 36-month anniversary of the Commercial Operation Date and on or prior to the 48-month anniversary of the Commercial Operation Date (the "**Fourth Cash Reserve Account Requirement**," together with the First Cash Reserve Account Requirement, the Second Cash Reserve Account Requirement and the Third Cash Reserve Account Requirement, the "**Cash Reserve Account Requirement**"); it being understood and agreed that once the applicable Cash Reserve Account Requirement is met in the applicable period described above, no additional amounts shall be required or otherwise permitted to be deposited by the Borrower into such account during such period.

(b)     In the event insufficient funds exist in the Interest Payment Account and/or the Debt Service Reserve Account to fund any required interest payment on any Interest Payment Date, such interest payment (to the extent of unavailability in the Interest Payment Account and the Debt Service Reserve Account and solely to the extent available pursuant to the distribution waterfall in Section 7.03) shall be made with funds contained in the Cash Reserve Account.

(c)     Upon the occurrence of an Event of Default, the Administrative Agent at the instruction of the Required Lenders may apply proceeds of the Cash Reserve Account to payment of the Obligations in accordance with Section 8.02.

**SECTION 7.08**     Principal Reserve Account.

(a)     On each Transfer Date, solely to the extent required pursuant to this Section 7.08 and solely to the extent in accordance with the distribution waterfall contained in Section 7.03, the Borrower shall transfer cash from the Collections Account to the Principal Reserve Account such that an amount equal to $2,500,000 *multiplied* by the number of quarterly anniversaries, commencing with the first quarterly anniversary of the Funding Date, that has occurred after the Funding Date and on or prior to such Transfer Date (the "**Principal Reserve Account Requirement**") is maintained in such account; it being understood and agreed that the failure to meet the Principal Reserve Account Requirement on any Transfer Date shall

not constitute a default for any purposes hereunder or under any other Loan Document unless specifically in violation of this Section 7.08 after giving effect to Section 7.03 (i.e., the Borrower shall only be required to satisfy the Principal Account Reserve Requirement on any applicable Transfer Date to the extent sufficient cash exists to satisfy such requirement after giving effect to all required distributions pursuant to Section 7.03).

(b)     For the avoidance of doubt, the final balance of the Principal Reserve Account on the first Transfer Date occurring after the twentieth-quarterly anniversary of the Funding Date shall be required to be $50,000,000.  A failure by the Borrower to satisfy such minimum amount requirement shall be an Event of Default.

(c)     In the event insufficient funds exist in the Interest Payment Account, the Debt Service Reserve Account and/or the Cash Reserve Account to fund any required interest payment on any Interest Payment Date, such interest payment (to the extent of unavailability in the Interest Payment Account, the Debt Service Reserve Account and the Cash Reserve Account and solely to the extent available pursuant to the distribution waterfall in Section 7.03) shall be made with funds contained in the Principal Reserve Account.

(d)     Upon the occurrence of an Event of Default, the Administrative Agent acting at the instruction of the Required Lenders may apply proceeds of the Principal Reserve Account to payment of the Obligations in accordance with Section 8.02.

**SECTION 7.09**   EPC Retention Account.

(a)     On the Funding Date, an aggregate amount of cash equal to $14,250,000 shall be funded from the net proceeds of the Loan into the EPC Retention Account.

(b)     Upon delivery by the Borrower of a certificate to the Administrative Agent certifying that Project Completion (as defined in the EPC Contract) has occurred, all funds contained in the EPC Retention Account may be distributed by the Borrower, directly or indirectly, to the Project Company.

(c)     Upon the occurrence of an Event of Default, the Administrative Agent acting at the instruction of the Required Lenders may apply proceeds of the EPC Retention Account to payment of the Obligations in accordance with Section 8.02.

**SECTION 7.10**   Working Capital Reserve Account.

(a)     On the Funding Date, an aggregate amount of cash equal to $15,445,038.69 shall be funded from the net proceeds of the Loan into the Working Capital Reserve Account.

(b)     On each Transfer Date, solely to the extent in accordance with the distribution waterfall contained in Section 7.03, the Borrower shall transfer cash from the Collections Account to the Working Capital Reserve Account such that an amount not less than $1,000,000 is maintained in such account as of such Transfer Date (the "**Working Capital Reserve Account Requirement**"); it being understood and agreed that the failure to meet the Working Capital Account Reserve Requirement on any Transfer Date shall not constitute a default for any purposes hereunder or under any other Loan Document unless specifically in violation of this Section 7.10 after giving effect to Section 7.03 (i.e., the Borrower shall only be required to satisfy the Working Capital Reserve Account Requirement on any applicable Transfer Date to the extent sufficient cash exists to satisfy such requirement after giving effect to all required distributions pursuant to Section 7.03).

(c)      The Borrower shall be permitted to withdraw and use funds on deposit in the Working Capital Reserve Account at any time for purposes of paying ordinary course operating expenses of the Borrower and its Subsidiaries and for other purposes not prohibited by the terms of this Agreement to the extent in compliance with the limitations set forth in this Agreement (including Sections 3.10 and 6.10).

(d)      In the event insufficient funds exist in the Interest Payment Account, the Debt Service Reserve Account, the Cash Reserve Account and/or the Principal Reserve Account to fund any required interest payment on any Interest Payment Date, such interest payment (to the extent of unavailability in the Interest Payment Account, the Debt Service Reserve Account, the Cash Reserve Account and the Principal Reserve Account and solely to the extent available pursuant to the distribution waterfall in Section 7.03) shall be made with funds contained in the Working Capital Reserve Account up to an amount such that the Working Capital Reserve Account Requirement remains satisfied after giving effect to such payment.

(e)      Upon the occurrence of an Event of Default, the Administrative Agent acting at the instruction of the Required Lenders may apply proceeds of the Working Capital Reserve Account to payment of the Obligations in accordance with Section 8.02.

**SECTION 7.11**   Conditional Distributions Account.

(a)      On each Transfer Date, subject to (i) full compliance with the distribution waterfall contained in Section 7.03, (ii) satisfaction of the financial covenant set forth in Section 5.02, (iii) procurement of the credit rating in accordance with Section 5.03, and (iv) no Event of Default having occurred or would occur as a result of making any such Conditional Distribution transfer, the Borrower shall transfer all remaining cash from the Collections Account to the Conditional Distributions Account.

(b)      The Borrower shall be permitted to withdraw and use funds on deposit in the Conditional Distributions Account on any Transfer Date for purposes of funding Dividends and/or other distributions from the Borrower:

(i)      in an aggregate amount not to exceed $22,000,000 (which shall, for the avoidance of doubt, include all bonuses and incentives) in any twelve month period, when taken together with all other Dividends and other distributions by the Borrower that have been funded from proceeds in the Conditional Distributions Account in such twelve month period, so long as (x) EBITDA (determined for the twelve month period ending as of the fiscal month most recently ended prior to such Transfer Date) is greater than or equal to $100,000,000 but less than $150,000,000, (y) the Debt Service Coverage Ratio (determined for the twelve month period ending as of the fiscal month most recently ended prior to such Transfer Date) is greater than or equal to 2.00:1.00 but less than 3.00:1.00 and (z) the Distributions Condition has been satisfied as of such date;

(ii)      in an aggregate amount not to exceed $34,000,000 (which shall, for the avoidance of doubt, include all bonuses and incentives) in any twelve month period, when taken together with all other Dividends and other distributions by the Borrower that have been funded from proceeds in the Conditional Distributions Account in such twelve month period, so long as (x) EBITDA (determined for the twelve month period ending as of the fiscal month most recently ended prior to such Transfer Date) is greater than or equal to $150,000,000 but less than $200,000,000, (y) the Debt Service Coverage Ratio (determined for the twelve month period ending as of the fiscal month most recently ended prior to such Transfer Date) is greater than or equal to 3.00:1.00 but less than 4.00:1.00 and (z) the Distributions Condition has been satisfied as of such date;

(iii)      in an aggregate amount not to exceed $58,000,000 (which shall, for the avoidance of doubt, include all bonuses and incentives) in any twelve month period, when taken together with

all other Dividends and other distributions by the Borrower that have been funded from proceeds in the Conditional Distributions Account in such twelve month period, so long as (x) EBITDA (determined for the twelve month period ending as of the fiscal month most recently ended prior to such Transfer Date) is greater than or equal to $200,000,000, (y) the Debt Service Coverage Ratio (determined for the twelve month period ending as of the fiscal month most recently ended prior to such Transfer Date) is greater than or equal to 4.00:1.00 and (z) the Distributions Condition has been satisfied as of such date; and

(iv)     in an unlimited amount if the Unlimited Distributions Condition has been satisfied as of such date.

(c)     In the event insufficient funds exist in the Interest Payment Account, the Debt Service Reserve Account, the Cash Reserve Account, the Principal Reserve Account and/or the Working Capital Reserve Account (after giving effect to the minimum amount restrictions set forth in Section 7.10) to fund any required interest payment on any Interest Payment Date, such interest payment (to the extent of unavailability in the Interest Payment Account, the Debt Service Reserve Account, the Cash Reserve Account, the Principal Reserve Account and the Working Capital Reserve Account (after giving effect to the minimum amount restrictions set forth in Section 7.10) and solely to the extent available pursuant to the distribution waterfall in Section 7.03) shall be made with funds contained in the Conditional Distributions Account.

(d)     Upon the occurrence of an Event of Default, the Administrative Agent acting at the instruction of the Required Lenders may apply proceeds of the Conditional Distributions Account to payment of the Obligations in accordance with Section 8.02.

## ARTICLE VIII

## EVENTS OF DEFAULT

**SECTION 8.01**   Events of Default.

Upon the occurrence and during the continuance of the following events ("**Events of Default**"):

(a)     default shall be made in the payment of (i) any principal of the Loan when and as the same shall become due and payable, or (ii) any interest on the Loan or any other amount due under any Loan Document, in each case when and as the same shall become due and payable, and such default shall continue for a period of five (5) days;

(b)     default shall be made in the due observance or performance by the Borrower of any material covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a) above or otherwise specifically excluded or provided for in this Agreement) and such default shall continue unremedied or shall not be waived for a period of thirty (30) days after written notice thereof from the Administrative Agent to the Borrower;

(c)     a failure to perform the covenants set forth or referred to in Section 5.02;

(d)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i)  relief in respect of the Borrower, or of a substantial part of the property of the Borrower or any its Subsidiaries, under any Debtor Relief Law; (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any of the Borrower or any its Subsidiaries or for a substantial part of the property of the Borrower; and such proceeding or petition shall

Exhibit 1A - 000061

continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(e)     any Event of Default (as such term is defined in the Project Company Loan Agreement) occurs under the Project Company Loan Agreement (after expiration of any available grace or cure periods), if the effect of such event is to entitle the Project Company Lender to accelerate the obligations thereunder;

(f)     the Borrower or any its Subsidiaries shall (i) voluntarily commence any proceeding or file any petition seeking relief under any Debtor Relief Law; (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (c) above; (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any its Subsidiaries or for a substantial part of the property of the Borrower or any its Subsidiaries; (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding; (v) make a general assignment for the benefit of creditors; or (vi) take any action for the purpose of effecting any of the foregoing;

(g)     (i) any security interest and Lien purported to be created by any Security Document shall cease to be in full force and effect (other than in accordance with its terms), or shall cease to give the Administrative Agent (acting on behalf of itself and the Lenders), the Liens, rights, powers and privileges purported to be created and granted under such Security Document in favor of the Administrative Agent (acting on behalf of itself and the Lenders), in each case, for any reason other than (x) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or (y) as a result of the Administrative Agent's failure to maintain possession of any stock certificates or other instruments delivered to it under the Security Documents or (ii) shall be asserted by Borrower not to be a valid, perfected, first priority (except as otherwise expressly provided in this Agreement, or such Security Document) security interest in or Lien on the Collateral covered thereby and such default shall continue unremedied or shall not be waived for a period of thirty (30) days after the occurrence thereof;

(h)     any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or Borrower shall repudiate or deny any material portion of its liability or obligation for the Obligations;

(i)     any Material Contract, including but not limited to the Off-Take Agreement, is terminated and such Material Contract is not replaced within a period of 90 days in such manner to allow the Project Company to attain the Completion Date as required in this Agreement or to continue operations;

(j)     any Change in Control occurs;

(k)     the Completion Date is not achieved on or prior to the fifteen month anniversary of the Funding Date;

(l)     any judgment or order for the payment of money, individually, or in the aggregate, in excess of $10,000,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover such judgment or order) or for injunctive relief that could reasonably be expected to result in a Material Adverse Effect shall be rendered against the Borrower (or any of its Subsidiaries) and such judgment shall not have been vacated or discharged or stayed or bonded pending appeal within 60 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order; or

(m)     any failure to pay any principal or interest when due in respect of any Indebtedness (other than Indebtedness outstanding under this Agreement), which exceeds in the aggregate $10,000,000, and

such failure continues after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness;

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent, at the request of the Required Lenders, may, by notice to Borrower, take either or both of the following actions, at the same or different times:  (i) terminate forthwith the Commitment and (ii) declare the Loan then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loan so declared to be due and payable, together with accrued interest thereon and all other Obligations of Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrower.

**SECTION 8.02**   Application of Proceeds.

The proceeds received by the Administrative Agent  in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Administrative Agent (at the request of the Lender) of its remedies shall be applied, in full or in part, together with any other sums then held by the Administrative Agent pursuant to this Agreement, promptly by the Administrative Agent as follows, and in the case of clauses (b) and (c), for the application pro rata among Lenders according to the amounts of the Obligations then due and owing and remaining unpaid to each such Lender:

(a)   *First*, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent and its agents and counsel;

(b)   *Second*, to the indefeasible payment in full in cash of interest on the Loan and any interest accrued thereon;

(c)   *Third*, to the indefeasible payment in full in cash of principal amount of the Loan; and

(d)   *Fourth*, the balance, if any, to the person lawfully entitled thereto (including the Borrower or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (d) of this Section 8.02, the Borrower shall remain liable for any deficiency.

**SECTION 8.03**      Project Company Debt Documents Refinancing.

The Borrower shall provide prior written notice to the Administrative Agent of any refinancing, restructuring, recapitalization or early repayment of the Project Company Debt Documents, and the Administrative Agent, acting at the direction of the Required Lenders, shall have the right to cause the Loan to be refinanced, restructured, recapitalized or repaid at the same time.

**ARTICLE IX**

**ADMINISTRATIVE AGENT**

**SECTION 9.01**      Appointment and Authority.

The Lenders shall appoint an administrative agent to act on its behalf hereunder and under the other Loan Documents (the "**Administrative Agent**") prior to the Funding Date, with the consent of the

Borrower, not to be unreasonably withheld.  Prior to the appointment of the Administrative Agent, any deliverables or approvals, including the items Schedule 4.02A, shall instead be delivered to and made by Mirae or their designee, if any.  The Lenders authorize the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article IX  (other than as expressly provided herein) are solely for the benefit of the Administrative Agent and the Lenders and neither the Borrower nor Holdings or any other person shall have any rights as a third-party beneficiary of any such provisions (other than as expressly provided herein).  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable requirements of law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**SECTION 9.02**   Rights as a Lender.

Any person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include any person serving as the Administrative Agent hereunder in its capacity as a Lender.  Such person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Subsidiary or other Affiliate thereof as if such person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**SECTION 9.03**   Exculpatory Provisions.

(a)    The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable requirements of law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by any person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b)      The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided herein or under the other Loan Documents), or (ii) in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by the Borrower or a Lender.

(c)      The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

**SECTION 9.04**    Reliance by Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender , the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**SECTION 9.05**    Delegation of Duties.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent or the.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that the Administrative acted with gross negligence or willful misconduct in the selection of such sub-agents as determined by a court of competent jurisdiction in a final and non-appealable judgment.

**SECTION 9.06**    Resignation of Administrative Agent .

(a)      The Administrative Agent may resign as Administrative Agent upon 10 days' notice to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a financial institution with an office in the United States of America, or an Affiliate of any such financial institution with an office in the United States of America.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives

Exhibit 1A - 000065

notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; *provided* that in no event shall any such successor Administrative Agent be a Defaulting Lender.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)      With effect from the Resignation Effective Date (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments owed to the retiring Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.   Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Administrative Agent (other than any rights to indemnity payments owed to the retiring Administrative Agent), and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents.   The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.   After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX  shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

**SECTION 9.07**     Non-Reliance on Administrative Agent and other Lenders.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent  or any other Lender or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**SECTION 9.08**     No Other Duties, Etc.

Anything herein to the contrary notwithstanding, the Administrative Agent Shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder or thereunder.

**SECTION 9.09**     Administrative Agent May File Proofs of Claim.

In case of the pendency of any proceeding under any Debtor Relief Law,  the Administrative Agent (irrespective of whether the principal of any Loan  shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

-60-

(a)       to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 10.03) allowed in such judicial proceeding; and

(b)       to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 10.03.

**SECTION 9.10**   Collateral and Guaranty Matters.

(a)       Each of the Lenders irrevocably authorizes the Administrative Agent to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (x) upon payment in full of the Loans, (y) that is sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted under the Loan Documents or (z) subject to Section 10.02, if approved, authorized or ratified in writing by the Required Lenders or such other number or percentage of Lenders required hereby;

(b)       The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by the Borrower in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

(c)       Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent, and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the  Security Documents, it being understood and agreed that all powers, rights and remedies under any of the Security Documents may be exercised solely by the Administrative Agent for the benefit of itself and the Lenders in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of Title 11 of the United States Code), the Administrative Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of Title 11 of the United States Code) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Administrative Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from the Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale or other disposition.

Ex. A
(CLA dated Jan. 27. 2021)

# ARTICLE X

## MISCELLANEOUS

**SECTION 10.01**  Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service or mailed by certified or registered mail as follows:

(i)     if to the Borrower, to it at:

6600 Amelia Earhart Court, Suite A
Las Vegas, NV 89119
Attn: Matthew G. Pearson

(ii)     if to the Administrative Agent, to it at:

Mirae Asset Center One Building
East Tower, 26, Euljiro-5-gil
Jung-gu, Seoul 100-210

with a copy to (such delivery shall not constitute notice):

Kutak Rock LLP
One South Wacker Drive, Suite 3910
Chicago, Illinois 60606-4635
Attn: Michael J. Tobak III

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including electronic mail and Internet or intranet websites) at kyunghyun.lee@miraeasset.com.  Notices or communications posted to an Internet or intranet website shall be deemed received upon the posting thereof and notice of such posting by electronic mail.

(c)     Any party hereto may change its address or other contact information for notices and other communications hereunder by notice to the other parties hereto.

**SECTION 10.02**  Waivers; Amendment.

No failure or delay by the Administrative Agent or the Lenders in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent  and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by Borrower therefrom shall be effective only in the specific instance and for the purpose for which given.  Without limiting the

Exhibit 1A - 000068

generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent and the Lenders may have had notice or knowledge of such Default at the time.  If the Administrative Agent or Lenders' consent is requested, in writing, by the Borrower in accordance with any provision of this Agreement, such consent will be deemed given if not specifically withheld, in writing, within ten (10) Business Day of receipt of such request.  This Agreement may not be waived, amended, supplemented or modified except pursuant to an agreement or agreements in writing entered into by the Borrower, the Administrative Agent and the Lenders (except for as otherwise set forth herein).

**SECTION 10.03**  Expenses.

Unless separately agreed to in writing by the Borrower, each party hereto shall pay  its own expenses incurred by such party (including the reasonable fees, charges and disbursements of its counsel) in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including in connection with post-closing searches to confirm that security filings and recordations have been properly made; provided that, notwithstanding the foregoing, the Borrower shall be required to pay for (i) the reasonable and documented expenses incurred by the Administrative Agent and the Lenders to obtain any Ad Hoc FMV Report that the Borrower is required to deliver pursuant to Section 5.01(e)(ii) of this Agreement, not to exceed $50,000 in the aggregate for all such expenses during the term of this Agreement, (ii) the reasonable and documented expenses of counsel to the Lenders that are incurred in connection with the exercise by such Lenders of the Conversion Option, not to exceed $50,000 in the aggregate for all such expenses during the term of this Agreement and (iii) the reasonable and documented expenses of a single independent third party engineer for the Administrative Agent and the Lenders in connection with the transactions contemplated by this Agreement, not to exceed $20,000 per fiscal month during the term of this Agreement. The Borrower shall pay the reasonable and documented expenses incurred by the Administrative Agent and the Lenders (including the reasonable and documented fees, charges and disbursements of its counsel) in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.03.

**SECTION 10.04**  Successors and Assigns.

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lenders. Each Lender may assign this Agreement and its rights and obligations hereunder to any person (each of the foregoing, an "**Eligible Assignee**") other than (a) a natural person, (b) a Defaulting Lender or (c) a Disqualified Institution.  Each Lender reserves the right, from and after the funding of the Loan on the Funding Date, to sell, assign, transfer, negotiate or grant participation interests in all or any part of, or any interest in such Lender's rights and benefits hereunder to any Eligible Assignee (each, a "**Participant**"); provided that a Participant shall not be entitled to receive any greater payment under Sections 2.09(a) or 2.09(b) than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except if the sale of the participation to such Participant is made with the Borrower's prior written consent.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement. The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each assignment or participation and a register for the recordation of the names and addresses of the assignees and participants, and the Commitments of, and principal amounts (and stated interest) of the Loans owing

to, each assignee and participant pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice.  The applicable Lender, acting solely for this purpose as a non-fiduciary agent of the Borrower (solely for tax purposes), shall maintain a register on which it enters the name and address of each Participant, and the principal amounts (and stated interest) of each Participant's interest in such Lender's rights and/or obligations under this Agreement or any other Loan Document complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the United States Treasury Regulations (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury Regulations (or any amended or successor versions). The entries in the Participant Register shall be conclusive absent manifest error, and the Borrower and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement, notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility to maintain the Participant Register.

**SECTION 10.05**  Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single Contract.  This Agreement and the other Loan Documents constitute the entire Contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by each of the Borrower, the Administrative Agent and the Lenders.  Delivery of an executed counterpart of a signature page of this Agreement by telecopier or other electronic transmission (i.e. a "pdf" or "tif" document) shall be effective as delivery of a manually executed counterpart of this Agreement.

**SECTION 10.06**  Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**SECTION 10.07**  Guarantee of Holdings.

By entering into this Agreement, Holdings (in its capacity as guarantor, the "**Guarantor**") hereby unconditionally and irrevocably guarantees the full performance by the Borrower of its obligations under this Agreement and the Security Documents, including but not limited to the full and timely payment and performance and timely payment of the Obligations. The Guarantor unconditionally waives any demand, proof or notice of nonpayment or of default by the Borrower in performing its payment obligations under this Agreement or the Security Documents.  This guaranty will remain in full force and effect until payment in full of the Obligations made in accordance with the applicable terms of this Agreement and the Security Documents.

Exhibit 1A - 000070

**SECTION 10.08**  Arbitration.

Any dispute, claim or controversy, including tort claims, arising out of or relating to this Agreement or to the breach, termination, enforcement, interpretation or validity hereof, including the determination of the scope or applicability of this arbitration provision, shall be determined by arbitration in accordance with the JAMS Comprehensive Arbitration Rules and Procedures (the "***Rules***").  In the event of a conflict between such Rules and this Agreement, the provisions of this Agreement will control.  The tribunal will consist of one arbitrator.  The place of arbitration will be Las Vegas, Nevada.  The language to be used in the arbitral proceedings will be English.  The arbitrator shall be appointed pursuant to the Rules.   The arbitrator shall, in the award, allocate all the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party or parties.  The arbitrator may not award punitive, exemplary, incidental or consequential damages, and the parties hereby irrevocably waive any claim(s) to such damages in disputes that are subject to this arbitration provision.  The result of the arbitration will be final and binding on the parties, and judgment upon any award rendered by the arbitrator may be entered by any court having jurisdiction.  The parties hereby agree not to appeal the result of the arbitration.  The procedures set forth herein shall not preclude a party from seeking injunctive relief or other provisional remedies in aid of arbitration from a court of appropriate jurisdiction. The interpretation and enforceability of this section shall be governed exclusively by the Federal Arbitration Act, 9 U.S.C. Section 1, et seq.

**SECTION 10.09**  Governing Law.

This Agreement shall be governed by the Laws of the State of New York, (i) excluding choice of law principles that would require the application of the Laws of a jurisdiction other than the State of New York and (ii) excluding any change after the date hereof in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority.

**SECTION 10.10**  Specific Performance.

The Parties hereby acknowledge and agree that the failure of either Party to perform its agreements and covenants hereunder will cause irreparable injury to the other Party for which monetary damages, even if available, will not be an adequate remedy.  Accordingly, each Party hereby consents to the granting of equitable relief (including specific performance and injunctive relief) by any court of competent jurisdiction to enforce either Party's obligations hereunder.  The Parties further agree to waive any requirement for the securing or posting of any bond in connection with the obtaining of any such equitable relief and that this Section 10.09 is without prejudice to any other rights that the Parties may have for any failure to perform this Agreement.

**SECTION 10.11**  Right of Set-Off.

If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Lender to or for the credit or the account of the Loan Parties against any and all obligations of the Loan Parties, now or hereafter existing under this Agreement or any other Loan Document held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured.

**SECTION 10.12**  U.S.A Patriot Act and Similar Legislation.

Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the U.S.A. PATRIOT Act and similar legislation (including applicable anti-money laundering laws), as applicable, it

is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow the Lenders to identify such person in accordance with such legislation.  Each of the Loan Parties agrees to furnish such information promptly upon request of a Lender. Each Lender shall be responsible for satisfying its own requirements in respect of obtaining all such information.

**SECTION 10.13**  No Fiduciary Duty.

Each Lender and the Administrative Agent and their respective Affiliates (collectively, solely for purposes of this paragraph, the "**Lenders**"), may have economic interests that conflict with those of the Borrower.  The Borrower hereby agrees that subject to applicable law, nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Lenders and the Borrower, its equityholders or Affiliates.  The Loan Parties hereby acknowledge and agree that (a) the transactions contemplated by the Loan Documents are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, (b) in connection therewith and with the process leading to such transaction none of the Lenders is acting as the agent or fiduciary of the Borrower, its management, equityholders, Affiliates or creditors, (c) no Lender has assumed an advisory or fiduciary responsibility in favor of the Borrower with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether any Lender or any of its Affiliates has advised or is currently advising the Borrower on other matters) or any other obligation to the Borrower except the obligations expressly set forth in the Loan Documents, (d) the Loan Parties have consulted their legal and financial advisors to the extent it has deemed appropriate and (e) the Lenders may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their Affiliates and no Lender has an obligation to disclose any such interests to the Loan Parties or their Affiliates.  The Loan Parties further acknowledge and agree that they are responsible for making their own independent judgment with respect to such transactions and the process leading thereto.

**SECTION 10.14**  Survival of Representation and Warranties.

All representations and warranties made by the Borrower in the Loan Documents and in the certificates delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loan and the execution and delivery of the Loan Documents, regardless of any investigation made by such persons or on their behalf, and shall continue in full force and effect until payment in full of the Obligations.  Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein shall survive payment in full of the Obligations.

**SECTION 10.15**  Severability.

In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavour in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

**SECTION 10.16**  Binding Effect.

This Agreement shall become effective when it shall have been executed by the Borrower and the Lenders and when the Administrative Agent shall have received copies hereof which, when taken together,

bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the Borrower and each Lender and their respective permitted successors and assigns.

SECTION 10.17   Headings.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 10.18   Treatment of Certain Information; Confidentiality.

Each of the Administrative Agent, the Lenders, and the Borrower agree to maintain the confidentiality of any confidential information disclosed or received by any of them in connection with this Agreement; *provided*, that, such confidential information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority or regulatory authority (including any self-regulatory authority), (c) to the extent required by applicable Requirements of Law or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 10.11, to any assignee of or participant in, or any prospective assignee of or participant in, a Lender's rights or obligations under this Agreement, (f) with the consent of the other party or (g) to the extent such information becomes publicly available other than as a result of a breach of this Section 10.11.  Any person required to maintain the confidentiality of information as provided in this Section 10.11 shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such information as such person would accord to its own confidential information.

SECTION 10.19   Interest Rate Limitation.

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loan, together with all fees, charges and other amounts which are treated as interest on the Loan under applicable Requirements of Law (collectively, the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lenders holding the Loan in accordance with applicable Requirements of Law, the rate of interest payable in respect of the Loan, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 10.12 shall be cumulated and the interest and Charges payable to the Lenders in respect of other Loan or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by the Lenders.

[Signature Pages Follow]

Exhibit 1A - 000073

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

RYZE RENEWABLES NEVADA, LLC, as Borrower

By: _____
     Name:  Matthew G. Pearson
     Title:  Manager

RYZE RENEWABLES HOLDINGS, LLC, as Guarantor (solely with respect to Section 10.07) and as Member of Ryze Renewables Nevada, LLC (solely with respect to Section 2.08)

By: _____
     Name:  Matthew G. Pearson
     Title:  Manager

**MIRAE ASSET DAEWOO CO., LTD.,** as a Lender

By: _____
     Name:  Kyung Hyun Lee
     Title:  Head of Multi Structured Finance Team

SIGNATURE PAGE TO CONVERTIBLE LOAN AGREEMENT

Schedule 1.01   Commitments

| Name of Lender | Commitment |
|---|---|
| Mirae Asset Daewoo Co., Ltd. | $210,000,000 |
| **Total** | **$210,000,000** |

Ex. A
(CLA dated Jan. 27. 2021)

Schedule 3.01   Organizational Structure



Ex. A
(CLA dated Jan. 27. 2021)

Schedule 3.06   Equity Interests and Subsidiaries

| Ryze Renewables Nevada, LLC Jurisdiction of Organization: Delaware | | | |
|---|---|---|---|
| Owner | Nature of Ownership | Percentage Ownership | Subsidiaries |
| Ryze Renewables Holdings, LLC | Common Ownership | 100% | Ryze Renewables II, LLC |
| | | | Ryze Renewables Las Vegas, LLC |
| | | | |

Ex. A
(CLA dated Jan. 27. 2021)

Schedule 3.07(b)          Environmental Permits

|   | Permit | Date of Issuance | Description |
|---|--------|------------------|-------------|
| 1 | USDA Environmental Impact "Findings of No Significant Impact" Approval | | Environmental Impact per National Environmental Quality Regulations |
| 2 | Synthetic Minor Source (Air Quality) Permit | | Clark County Department of Air Quality Approval |
| 3 | Southern Nevada Health District ("SNHD") Permit to Operate a Solid Waste Management Facility | | Storage of Hazardous Materials |
| 4 | Stormwater Industrial (Multi-Sector) Permit | | Storm Water Pollution Prevention Plan |
| 5 | USDOT Hazardous Materials Certificate of Registration No. 071420550096C | | Per U.S. Department of Transportation regulations, the Project (HM Company ID: 149489) holds its Certificate of Registration |
| 6 | Dust Control Operating Permit for Construction Activities | | |

Ex. A
(CLA dated Jan. 27. 2021)

Schedule 3.08    Litigation

None

Ex. A
(CLA dated Jan. 27. 2021)

Schedule 3.11   Permits

| | Permit | Date of Issuance | Description |
|---|---|---|---|
| 1 | Zoning | | M2, General Industrial |
| 2 | Land Use | | Heavy Industrial |
| 3 | Special Use Permit | | Storage of Hazardous Materials |
| 4 | Special Use Permit | | Expanded Hazardous Materials Storage |
| 5 | Annex 117 | | Property was annexed into the C of NLV from Clark County |
| 6 | Nevada State Business License | | Ryze is a properly registered entity, is current with its filings, and exhibits certain information per the Nevada Secretary of State website |
| 7 | City of North Las Vegas Business Licenses | | Junkyard License |
| 8 | Special Use Permit | | Gross Sales – Miscellaneous Sale/Service License |
| 9 | Department of Agriculture Consumer Equitability – Weights and Measures | | Per Nevada statute, Ryze pays an annual licensing fee to maintain its on-site commercial truck weighing and measuring devices |
| 10 | Nevada Department of Motor Vehicles Fuel Supplier License | | Allows Ryze to manufacture and resell its Renewable Diesel fuel within the State of Nevada |
| 11 | Fire Protection Review Approval | | |
| 12 | Onsite Grading Construction Permit | | Allows for on-site grading to commence |
| 13 | Onsite Civil Permit | | This permit allowed for onsite sewer, water, fire lines and storm drain construction to begin. |
| 14 | Electrical Permit | | For the demolition of the existing transformer and installation of new wiring and a new transformer |
| 15 | Building Permit | | This permit allowed for constructing exterior foundations for the Project's future manufacturing equipment. |

Ex. A
(CLA dated Jan. 27. 2021)

| 16 | Stormwater Construction General Permit | | Per Nevada Division of Environmental Protection-Bureau of Water Pollution Control, while under construction an annual permit is required to be in place. |
|---|---|---|---|
| 17 | FAA Determination of No Hazard to Air Navigation (and Extension) | | Due to the Project Property's location adjacent to Nellis Air Force Base, applications were made to the FAA to approve Project development heights, both temporary (crane usage) and permanent (equipment structures). |
| 18 | City of North Las Vegas Utility Easement | | C of NLV requirement prior to issuing construction permits executed by Ryze |
| 19 | City of North Las Vegas Drainage Easement | | C of NLV requirement prior to issuing construction permits executed by Ryze on July 1, 2019 |
| 20 | Nevada Energy Temporary Construction Easement | | Nevada Energy requirement prior to beginning temporary power construction executed by Ryze |
| 21 | State of Nevada Sales Tax Permit | | This account is also utilized to receive Sales and Use Tax Abatements on its purchases of eligible manufacturing equipment, as granted by the State of Nevada Governor's Office of Economic Development |
| 22 | Registration Under Code of Federal Regulations ("CFR") Title 40-Chapter I-Subchapter C-Part 79 | | Ryze has completed its part 79 company and facility registration for a Renewable Identification Number ("RIN") |

Exhibit 1A - 000081

Ex. A
(CLA dated Jan. 27. 2021)

Schedule 3.14   Insurance

| Permit | Description | | Status |
|---|---|---|---|
| Builders Risk & Business Interruption | Loss or damage to the existing property and the property under construction – fire, lightning, collapse, collision, windstorm, flood, earthquake, etc. | Starr Surplus Lines Insurance Company  #SLSTCON11451118 | Active |
| Contingent Delay in Completion | Loss of income or incurring additional expenses that result from a delay in the completion of a construction project beyond the expected completion date as a result of covered property damage at a supplier's/ fabricator's location | Starr Surplus Lines Insurance Company  #SLSTCON11451118 | Active |
| Delay in Completion - Biz Income | Loss of income or incurring additional expenses that result from a delay in the completion of a construction project beyond the expected completion date as a result of covered property damage – impaired P&L and Cash Flow from a covered property loss. | Starr Surplus Lines Insurance Company  #SLSTCON11451118 | Active |
| Contingent Delay in Completion | Loss of income or incurring additional expenses that result from a delay in the completion of a construction project beyond the expected completion date as a result of covered property damage at a supplier's/ fabricator's location | Starr Surplus Lines Insurance Company  #SLSTCON11451118 | Active |
| General Liability | Liability claims for bodily injury & property damage arising out of premises, operations, products, and completed operations –exposures outside construction operations – claim goes thru the EPC's limits. | Westchester Surplus Lines, Inc.  #G71172818001 | Active |
| Excess Liability | Catastrophic bodily injury/property damage liability losses related to the construction operations to which all of Ryze Las Vegas' assets are at risk - Ryze to have $140M at closing and $128M at Year 1 in total assets at risk. | Liberty Insurance Underwriters  #100028938601 | Active |
| Pollution Liability | Real estate has ultimate responsibility for environmental issues – for clean-up, bodily injury/property damage on-site or off-site. | Illinois Union Insurance Company  #PPLG7117296A002 | Active |

| Office Property - General Liability | Liability claims for bodily injury & property damage arising out of premises, operations, products, and completed operations –exposures outside construction operations – claim goes thru the EPC's limits | Ohio Security Insurance Company BZS (22) 60128411 | Active |
|---|---|---|---|
| Workers Comp & Employers' Liability | Project policies exclude liability claims related to office exposures, auto operations (hired & non-owned) and employees of owner – this is vehicle to address these exposures | Provided by PEO | Active |

Exhibit 1A - 000083

Schedule 3.15   Material Contracts

1.  Loan Agreement,  among Georgia's Own Credit Union, Ryze Renewables Las Vegas, LLC and Ryze Renewables II, LLC, dated June 25, 2018 (the "**Loan Agreement**")

2.  Construction Financing Rider, among Georgia's Own Credit Union, Ryze Renewables Las Vegas, and MMC, Inc., dated as of June 25, 2018

3.  Loan Note Guarantees executed by the United States Department of Agriculture in favor of Georgia's Own Credit Union, dated as of June 25, 2018

4.  Note 1A, Note 1B, Note 2A and Note 2B, each by  Ryze Renewables Las Vegas, LLC and Ryze Renewables II, LLC in favor of Georgia's Own Credit Union, as described in the Loan Agreement dated as of June 25, 2018

5.  Engineering, Procurement and Construction Services Contract, by and between Ryze Renewables Las Vegas, LLC and MMC, Inc. dated as of January 23, 2018

6.  Management Services Agreement, to be entered into by and between Ryze Renewables Holdings, LLC and Ryze Renewables Nevada, LLC

7.  Operation and Maintenance Agreement, entered into by and between Plant Process Operating, LLC and Ryze Renewables Las Vegas, LLC dated as of September 11, 2020

8.  Supply and Offtake Agreement, by and between Ryze Renewables Las Vegas, LLC and Phillips 66 Company, dated as of June 15, 2017, as modified

9.  Promissory Note by Ryze Renewables Las Vegas in favor of NC Industries, LLC in the original principal amount of $26,581,741.00, dated March 12, 2018, as amended and including any demand for payment

10. Secured Promissory Note by The Ryze Corporation in favor of The Olds Family Trust 2002 Trust u/d/t June 3, 2002 in the original principal amount of $2,000,000 dated July 11, 2018 and including any demand for payment

11. Secured Promissory Note by The Ryze Corporation in favor of The Olds Family Trust 2002 Trust u/d/t June 3, 2002 in the original principal amount of $4,300,000 dated July 11, 2018 and including any demand for payment

12. Title Commitment Report by Fidelity National Title Insurance Company (order number 42045119-420-MS6-BB1, effective date 8/4/2020) in respect of the real property commonly known as 5225 and 5233 East El Campo Grande Avenue, Las Vegas, Clark County, Nevada

13. Amended and Restated Operating Agreement of Ryze Renewables II, LLC

14. Amended and Restated Operating Agreement of Ryze Renewables Las Vegas, LLC

15. Amended and Restated Operating Agreement of Ryze Renewables Nevada, LLC

16. Tax Abatement Agreement by and between the State of Nevada Acting by and through the Nevada Governor's Office of Economic Development and Ryze Renewables Las Vegas, LLC dated June 30, 2018, as amended

17. License Agreement by and between Ryze Renewables Las Vegas, LLC and Haldor Topsoe A/S dated October 4, 2019

18. Standard Form of Agreement Between Owner and Contractor where the basis of payment is the Cost of Work Plus at a Firm Fixed Price Engineering Procurement and Construction between Sys-Con, LLC and Ryze Renewables Las Vegas, LLC

19. General Conditions of the Contract for Construction for the Ryze Renewables Pre-Treatment Facility between Sys-Con, LLC and Ryze Renewables Las Vegas, LLC

20. Engineering Agreement between Haldor Topsoe, Inc. and Ryze Renewables Las Vegas, LLC dated as of October 4, 2019

21. Guarantee Agreement between Haldor Topsoe A/S and Ryze Renewables Las Vegas, LLC dated as of October 4, 2019

22. Intellectual Property License Agreement between Ryze Renewables Holdings, LLC and Ryze Renewables Las Vegas LLC dated October 29, 2020

23. A demand for payment in respect of the Preferred Member of Ryze Renewables Holdings, LLC in the amount of $1,360,092.70

24. Ryze Renewables Las Vegas, LLC Warrant issued to New-Com, Inc. for 2.5% of the aggregate amount of shares of Ryze Renewables Las Vegas, LLC dated February 20, 2018

Schedule 4.02A – Conditions to Funding Date
(Items to be Completed prior to the Funding Date)

| | | Deliverable | Status |
|---|---|---|---|
| 1 | | The Account Control Agreement shall have been executed and delivered by the Borrower, the Administrative Agent and JPMorgan Chase Bank, N.A. on or prior to the Funding Date. | Form agreed; to be delivered by the Borrower prior to the Funding Date |
| 2 | | The Security Agreement shall have been executed and delivered by the Borrower, Holdings and the Administrative Agent on or prior to the Funding Date. | Form agreed; to be delivered by the Borrower prior to the Funding Date |
| 3 | | All authorizations, approvals, consents, waivers, filings, notices, certifications or other actions of any person or of any Governmental Authority required for the due execution and delivery by the Borrower of the Loan Documents required to be executed on the Funding Date have been obtained. | To be provided, if any. |
| 4 | | Each Account described in Section 7.01 of the Agreement shall have been created pursuant to the terms thereof on or prior to the Funding Date and, substantially concurrently with the funding of the Loan on the Funding Date (from proceeds thereof) an amount not less than (i) $3,863,578.10 shall have been deposited in the Debt Service Reserve Fund, (ii) $15,305,520 shall have been deposited in the Funding Date Interest Reserve Account, (iii) $14,250,000 shall have been deposited in the EPC Retention Account and (iv) $15,445,038.69 shall have been deposited in the Working Capital Reserve Account. | All Accounts have already been created; such Accounts to be funded on the Funding Date from the proceeds of the Loan |
| 5 | | The EPC Contract shall remain in full force and effect as of the Funding Date and any amendment or modification to the EPC Contract after the Effective Date but prior to the Funding Date shall have been consented to by the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed). | Agreed. |
| 6 | | The Change Order EPC Contract shall remain in full force and effect as of the Funding Date and any amendment or modification to the Change Order EPC Contract after the Effective Date but prior to the Funding Date shall | Agreed. |

|   | | |
|---|---|---|
|   | have been consented to by the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed). | |
| 7 | All insurance maintained by, or which it is an insured under, the Borrower that is described on Schedule 3.14 to the Agreement (which, for the avoidance of doubt, includes customary course of construction insurance that will continue until construction of the Project has been completed at which time it will automatically convert at such time into a customary operating stage policy, including business interruption insurance) shall remain in full force and effect as of the Funding Date, without any modifications thereto. | Agreed. |
| 8 | A representative of Mirae shall have performed at least one (1) Project site visit subsequent to the Effective Date. If such site visit is not performed by January 31, 2021, such visit shall be performed via videoconferencing or other electronic means. | Site visit scheduled for January 2021 |
| 9 | The Administrative Agent shall have received an updated financial model from the Borrower on or prior to the Funding Date. | To be delivered by the Borrower prior to the Funding Date |
| 10 | The Administrative Agent shall have received unaudited financial statements of the Borrower and the Project Company for the fiscal month ended October 30, 2020 and the period of ten (10) months then ended on or prior to the Funding Date. | To be delivered by the Borrower prior to the Funding Date |
| 11 | The Administrative Agent shall have received (i) all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, and (ii) to the extent the Borrower qualifies as a "legal entity customer" under 31 C.F.R. § 1010.230, a customary FinCEN beneficial ownership certification in relation to the Borrower, in each case requested at least ten (10) Business Days prior to the Funding Date. | To be ordered no later than ten (10) Business Days prior to the Funding Date and delivered no later than one (3) Business Day prior to the Funding Date |
| 12 | The Borrower shall deliver to the Administrative Agent an Approved Budget of the Borrower, Project Company Holdco, and the Project Company for the year ended December 31, 2021 | To be delivered by the Borrower |

| | | |
|---|---|---|
| 13 | The Borrower shall deliver to the Administrative Agent an amendment to the Offtake Agreement evidencing the Commercial Date Deadline (as defined therein) has been extended to be equal to or beyond the date of the deadline set forth in <u>Section 8.01(j)</u>. | To be delivered by the Borrower |
| 14 | The Administrative Agent shall have received payoff letters from Olds Family Trust in respect of the Secured Promissory Notes dated July 11, 2018 | Borrower has submitted to the virtual data room |
| 15 | The Final Mirae Committee Approval shall have been obtained. | |

Exhibit 1A - 000088

Schedule 4.02B – Conditions to Funding Date
(Items to be Completed on the Funding Date)

| | Deliverable | Status |
|---|---|---|
| 1 | All filings, registrations, recordings and other actions required to be taken by the Borrower as of the Funding Date (including filing UCC-1 financing statements), and all filing and other similar fees and all recording, stamp and Other Taxes and expenses related to such filings, registrations and recordings required to be paid, for the consummation of the transactions contemplated by the Loan Documents (or arrangements satisfactory to the Administrative Agent make any such filings, registrations, recordings or other actions or to make any such payment on or immediately following the Funding Date) shall have been taken and paid, respectively (to the extent that the obligation to make payment then exists), by the Borrower. | UCC-1 financing statements to be filed on the Funding Date |
| 2 | The Administrative Agent shall have received: a certificate of the secretary of each of Holdings and the Borrower dated the Funding Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of Holdings or the Borrower, as applicable, and with respect to the certificate of formation, certified as of a recent date by the relevant Governmental Authority, (B) that attached thereto is a true and complete copy of written consent of the Governing Board of Holdings or the Borrower, as applicable, authorizing the execution, delivery and performance by Holdings or the Borrower, as applicable, of the Loan Documents and, in the case of the Borrower, the borrowing of the Loan under the Agreement, and the granting of liens by Holdings or the Borrower, as applicable, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) as to the incumbency and specimen signature of each officer or manager executing any Loan Document or any other document delivered in connection herewith on behalf of Holdings or the Borrower, as applicable (together with a certification of a manager as to the incumbency and specimen signature of the secretary executing the certificate in this item 5) and (D) a certificate as to the good standing of Holdings or the Borrower, as applicable, in its state of organization as of a recent date, from the relevant Governmental Authority. | To be delivered by the Borrower on the Funding Date |
| 3 | The Administrative Agent shall have received a certificate, dated the Funding Date and signed by a manager of the Borrower, confirming that (i) immediately prior to and immediately after giving effect to the borrowing of the Loan and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing on such date and (ii) each of the representations and warranties made by the Borrower set forth in Article III of the Agreement or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the Funding Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date). | To be delivered by the Borrower on the Funding Date |

| 4 | The Administrative Agent shall have received a Borrowing Request as required by Section 2.02 of the Agreement on or prior to the Funding Date in the form of Exhibit A to the Agreement. | To be delivered by the Borrower on the Funding Date |
|---|---|---|
| 5 | The Administrative Agent shall have received a legal opinion (addressed to the Administrative Agent and each of the Lenders) of Latham & Watkins LLP, as special counsel to the Borrower dated as of the Funding Date. | To be delivered by the Borrower on the Funding Date |
| 6 | Mirae and the Lenders shall have received all fees payable to this Agreement and separate written agreement between the Borrower and Mirae as of the Funding Date (which fees shall be netted from the proceeds of the Loan made to the Borrower on the Funding Date). | Such amounts to be funded on the Funding Date from the proceeds of the Loan |
| 7 | The Administrative Agent shall have received a fully executed and effective copy of the Borrower Operating Agreement as of the Funding Date in the form of Exhibit E to the Agreement. | To be delivered by the Borrower on the Funding Date |
| 8 | The Administrative Agent shall have received satisfactory results of lien, tax and litigation searches with respect to Holdings, the Borrower, the Project Company Holdco and the Project Company on or prior to the Funding Date. | To be delivered by the Borrower on the Funding Date |

Exhibit 1A - 000090

Ex. A
(CLA dated Jan. 27. 2021)

Exhibit A

**[FORM OF] BORROWING REQUEST**

Date: [_____], 2021

To: [_____], organized under the Laws of [_____], as Administrative Agent

Ladies and Gentlemen:

1.      Reference is made to that certain Convertible Loan Agreement dated as of January 6, 2021 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"; terms defined therein, unless otherwise defined herein, being used herein as therein defined), among Ryze Renewables Nevada, LLC, as borrower ("**Borrower**"), the several banks and other financial institution or entities from time to time parties thereto as lenders, [_____], organized under the Laws of [_____], as the Administrative Agent, and Ryze Renewables Holdings, LLC, a Delaware limited liability company, solely for the limited purposes set forth in <u>Sections 2.08</u> and <u>9.07</u> thereof.

2.      The undersigned hereby requests a borrowing of Loans under the Loan Agreement ("**Borrowing**") and in connection therewith specifies the following information in accordance with Section 2.02 of the Loan Agreement:

  (a)      The aggregate amount of the Borrowing: $210,000,000

  (b)      The date of the Borrowing: [_____], 2021

  (c)      The proceeds of the Borrowing shall be used for the uses specified in the Sources and Uses and disbursed as set forth in the loan disbursement instructions attached as <u>Exhibit A</u> hereto.

3.      In connection with the Borrowing requested herein, Borrower hereby represents and warrants to the Lender that the conditions set forth in <u>Section 4.02</u> of the Loan Agreement have been satisfied as of the date of this Borrowing Request.

[Signature Page Follows]

Very truly yours,

RYZE RENEWABLES NEVADA, LLC

By: _____
Name:
Title:

Exhibit A to
Borrowing Request

## BORROWER PAYMENT INSTRUCTIONS

**RYZE RENEWABLES NEVADA, LLC**
**WIRE TRANSFER INSTRUCTIONS**

**Bank:**        [BANK NAME]
                 [BANK ADDRESS]
                 Contact: [        ]
                 Telephone Number: [        ]

**Routing:**     [        ]

**For Credit to:**   Ryze Renewables Nevada, LLC
                     6600 Amelia Earhart Court, Suite A
                     Las Vegas, Nevada  89119

**Account #:**   [        ]

Exhibit 1A - 000093

<u>Exhibit B</u>

**[FORM OF] CONVERTIBLE NOTE**

$[_____]                                                              [_____], 20[__]

THIS CONVERTIBLE NOTE (THIS "**NOTE**") AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

THIS NOTE HAS BEEN ISSUED WITH "ORIGINAL ISSUE DISCOUNT" (WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED). UPON WRITTEN REQUEST, THE BORROWER WILL PROMPTLY MAKE AVAILABLE TO ANY HOLDER OF THIS NOTE THE FOLLOWING INFORMATION: (1) THE ISSUE PRICE AND ISSUE DATE OF THE NOTE, (2) THE AMOUNT OF ORIGINAL ISSUE DISCOUNT ON THE NOTE AND (3) THE YIELD TO MATURITY OF THE NOTE. HOLDERS OF THIS NOTE SHOULD CONTACT RZYE RENEWABLES NEVADA, LLC AT 6600 AMELIA EARHART COURT, SUITE A LAS VEGAS, NV 89119.

FOR VALUE RECEIVED, the undersigned, RZYE RENEWABLES NEVADA, LLC (the "**Borrower**"), hereby promises to pay to [_____] or its registered assigns (the "**Lender**") the principal amount of [_____] DOLLARS ($[_____]) or, if less, the aggregate unpaid principal amount of all Loans of the Lender outstanding from time to time in accordance with the provisions of the Convertible Loan Agreement, dated as of January 6, 2021, among the Borrower, the Lender, the other banks and other financial institution or entities from time to time parties thereto as lenders, [_____], organized under the Laws of [_____], as the Administrative Agent, and Ryze Renewables Holdings, LLC, a Delaware limited liability company solely for the limited purposes set forth in <u>Sections 2.08</u> and <u>9.07</u> thereof (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "**Loan Agreement**"), which sum shall be due and payable in such amounts and on such dates as are set forth in the Loan Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Loan Agreement.

The Borrower promises to pay interest on the unpaid principal amount hereof, from the date hereof until paid in full, at the interest rates and at the times provided in the Loan Agreement, or the Loan is converted as provided in the Loan Agreement. The principal and accrued interest under this Note may be prepaid in accordance with Section 2.06 of the Loan Agreement and, for the avoidance of doubt, interest will cease to accrue on any prepaid principal amounts from and after the date of any such prepayment. All payments of principal and interest shall be made to the

Lender in Dollars in immediately available funds (other than as set forth in Section 2.04(c) of the Loan Agreement).

This Note and any amounts due hereunder shall be convertible into Conversion Shares in accordance with, and subject to the terms and conditions of, Section 2.08 of the Loan Agreement.

This Note is one of the Notes referred to in the Loan Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. This Note is secured by the Collateral.  Upon the occurrence and continuation of any Event of Default under the Loan Agreement, all principal and all accrued interest then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided in the Loan Agreement.

The Loan made by the Lender shall be evidenced by one or more records or accounts maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Loan and all payments made on the Loan; *provided* that any failure of the Lender to make any such recordation (or any error in such recordation) or endorsement shall not affect the obligations of the Borrower under this Note or the Loan Agreement.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive diligence, presentment, demand, protest, notice of intent to accelerate, notice of acceleration, and any other notice of any kind.  No failure on the part of the holder hereof to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof or a consent thereto; nor shall a single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

THIS NOTE AND THE OBLIGATIONS OF THE BORROWER HEREUNDER SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

This Note applies to, inures to the benefit of and binds the successors and assigns of the parties hereto.  Notwithstanding the foregoing, any transfer of this Note may be effected only in accordance with the Loan  Agreement. This Note may be transferred only upon its surrender to the Borrower for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Borrower.  Thereupon, a new Note (or new Notes) for the same aggregate principal amount and interest shall be issued to, and registered in the name of, the transferee(s).  Interest and principal are payable only to the registered holder of this Note. The Lender and any subsequent holder of this Note receive this Note subject to the foregoing terms and conditions, as well as all other terms and conditions contained in this Note and in the Loan Agreement, and each agrees to comply with all such terms and conditions.

Ex. A
(CLA dated Jan. 27. 2021)

[*Signature page to follow*]

Exhibit 1A - 000096

IN WITNESS WHEREOF, the undersigned has caused this Note to be duly executed by its authorized officer as of the day and year first above written.

**RYZE RENEWABLES NEVADA, LLC**

By:_____

Name:

Title:

**Ex. A**
**(CLA dated Jan. 27. 2021)**

Exhibit C

Security Agreement

[See attached]

Exhibit D

Sources and Uses

| | | |
|---|---|---|
| Change Order EPC Contract - Progress Payments | $ | 80,750,000.00 |
| EPC Retention Account | $ | 14,250,000.00 |
| **Total Change Order EPC Budget** | **$** | **95,000,000.00** |
| | | |
| Project Company Working Capital | $ | 6,000,000.00 |
| Borrower Operating Capital | $ | 6,500,000.00 |
| Project Contingency | | $2,945,038.69 |
| **Total Operating Capital** | **$** | **15,445,038.69** |
| | | |
| NC industries, Inc. Note Payoff | $ | 26,435,048.00 |
| Olds Family Trust Note Payoff | $ | 8,202,542.25 |
| RQMNK, LLC Note Payoff | $ | 1,381,183.45 |
| **Total Private Note Repayments** | **$** | **36,018,773.70** |
| | | |
| Debt Service Reserve Account | $ | 3,863,578.10 |
| Funding Date Interest Reserve Account | $ | 15,305,520.00 |
| Replenish Project Company DSRA | $ | 10,214,744.76 |
| Project Company Debt Service Account | $ | 17,382,344.76 |
| **Total Reserves** | **$** | **46,766,187.61** |
| | | |
| Borrower Closing Costs Reimbursement | $ | 1,470,000.00 |
| Lender Closing Costs Reimbursement | $ | 600,000.00 |
| Facility Fee | $ | 4,200,000.00 |
| Lender Fee | $ | 4,200,000.00 |
| Paragon Placement Fee | $ | 6,300,000.00 |
| **Total Closing Costs** | **$** | **16,770,000.00** |
| | | |
| **Total Uses of Funds** | **$** | **210,000,000.00** |

Exhibit 1A - 000099

<u>Exhibit E</u>

Form of Borrower Operating Agreement

[See attached]

Exhibit F-1

Form of Tax Compliance Certificate

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Convertible Loan Agreement, dated as of January __, 2021 (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "Borrower"), Ryze Renewables Holdings, LLC, a Delaware limited liability company solely for the limited purposes set forth in Sections 2.08 and 9.07 thereof, [_____], organized under the Laws of [_____], as the administrative agent (together with its successors and assigns in such capacity, the "Administrative Agent"), and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.09 of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF LENDER]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

Exhibit F-2

Form of Tax Compliance Certificate

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Convertible Loan Agreement, dated as of January __, 2021 (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "Borrower"), Ryze Renewables Holdings, LLC, a Delaware limited liability company solely for the limited purposes set forth in Sections 2.08 and 9.07 thereof, [_____], organized under the Laws of [_____], as the administrative agent (together with its successors and assigns in such capacity, the "Administrative Agent"), and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.09 of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF PARTICIPANT]

By:_____
Name:
Title:

Date: _____ __, 20[  ]

Exhibit F-3

Form of Tax Compliance Certificate

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Convertible Loan Agreement, dated as of January __ 2021 (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "Borrower"), Ryze Renewables Holdings, LLC, a Delaware limited liability company solely for the limited purposes set forth in Sections 2.08 and 9.07 thereof, [_____], organized under the Laws of [_____[, as the administrative agent (together with its successors and assigns in such capacity, the "Administrative Agent"), and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.09 of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption:  (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF PARTICIPANT]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

Exhibit F-4

Form of Tax Compliance Certificate

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Convertible Loan Agreement, dated as of January ___, 2021 (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "Borrower"), Ryze Renewables Holdings, LLC, a Delaware limited liability company solely for the limited purposes set forth in Sections 2.08 and 9.07 thereof, [_____], organized under the Laws of [_____], as the administrative agent (together with its successors and assigns in such capacity, the "Administrative Agent"), and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.09 of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Loan Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF LENDER]


By:_____
Name:
Title:

Date: _____ __, 20[  ]

Exhibit G – Form of Account Control Agreement

Exhibit H – Form of Prepayment Notice

**EXHIBIT 1B –**

Second Loan Agreement, dated November 29, 2021

(Exhibit B to Ryze Renewable Holdings, LLC's Demand
for Arbitration)

# Exhibit B

*Second Loan Agreement ("SLA"),*
*dated November 29, 2021*

Ex. B
(SLA dated Nov. 29. 2021)

LOAN AGREEMENT
Dated as of November 29, 2021
Between
RYZE RENEWABLES NEVADA, LLC,
as Borrower
And
LV RENEWABLES A, LLC,
as Lender

78454552.11
4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

# TABLE OF CONTENTS

**Page**

1. DEFINITIONS; PRINCIPLES OF CONSTRUCTION ..................................................... 1

   1.1 Specific Definitions .................................................. 1

   1.2 Principles of Construction .................................................. 10

2. GENERAL LOAN TERMS .................................................. 10

   2.1 The Loan .................................................. 10

   2.2 Interest .................................................. 12

      2.2.1 Generally .................................................. 12

      2.2.2 Default Rate .................................................. 12

      2.2.3 Taxes .................................................. 12

      2.2.4 Requirements of Law .................................................. 14

   2.3 Loan Repayment .................................................. 15

      2.3.1 Optional Prepayments .................................................. 15

   2.4 Release of Property .................................................. 15

   2.5 Payments and Computations .................................................. 15

      2.5.1 Making of Payments .................................................. 15

      2.5.2 Computations .................................................. 16

   2.6 Fees .................................................. 16

      2.6.1 [Intentionally omitted.] .................................................. 16

      2.6.2 [Intentionally omitted.] .................................................. 16

      2.6.3 Reallocations .................................................. 16

3. DEBT SERVICE RESERVE ACCOUNT .................................................. 16

4. REPRESENTATIONS AND WARRANTIES .................................................. 16

   4.1 Title .................................................. 16

   4.2 Physical Condition .................................................. 16

   4.3 Survey/Boundaries .................................................. 17

   4.4 Separate Lots .................................................. 17

   4.5 Easements; Utilities and Public Access .................................................. 17

   4.6 Assessments .................................................. 17

   4.7 Purchase Options .................................................. 17

   4.8 Condemnation .................................................. 17

   4.9 Compliance .................................................. 17

-i-

Exhibit 1B - 000003

Ex. B
(SLA dated Nov. 29. 2021)

## TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|

| 4.10 | Valid and Second Lien | 18 |
| 4.11 | Filing, Recording and Other Taxes | 18 |
| 4.12 | Tax Filings | 19 |
| 4.13 | Proceedings; Enforceability | 19 |
| 4.14 | No Conflicts | 19 |
| 4.15 | Organization; Special Purpose | 20 |
| 4.16 | Other Debt | 20 |
| 4.17 | Ownership | 20 |
| 4.18 | Name; Principal Place of Business | 21 |
| 4.19 | No Bankruptcy Filing | 21 |
| 4.20 | Fraudulent Transfer | 21 |
| 4.21 | ERISA; No Plan Assets; WARN Act | 21 |
| 4.22 | Litigation | 21 |
| 4.23 | Agreements | 22 |
| 4.24 | Full and Accurate Disclosure | 22 |
| 4.25 | Leases | 22 |
| 4.26 | Contracts; Major Contracts | 22 |
| 4.27 | Critical Technologies and Infrastructure | 23 |
| 4.28 | Operations Agreements | 23 |
| 4.29 | Hazardous Substances | 23 |
| 4.30 | Embargoed Person | 24 |
| 4.31 | Anti-Money Laundering | 24 |
| 4.32 | Federal Reserve Regulations; Investment Company Act; Bank Holding Company | 24 |
| 4.33 | Union Contracts | 24 |
| 4.34 | Lender's Knowledge of Breach | 25 |
| 5. | COVENANTS | 25 |
| 5.1 | Warranty of Title | 25 |
| 5.2 | Existence | 25 |
| 5.3 | Dissolution | 25 |

4838-9883-6219.21

## TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|
| 5.4 | Change of Name, Identity or Structure | 25 |
| 5.5 | Principal Place of Business | 26 |
| 5.6 | Additional Debt; Material Change | 26 |
| 5.7 | [Intentionally omitted.] | 26 |
| 5.8 | Change in Business or Operation of Property | 26 |
| 5.9 | Prohibited Transfers | 26 |
| 5.10 | Liens | 27 |
| 5.11 | Taxes and Other Charges | 27 |
| 5.12 | No Joint Assessment | 27 |
| 5.13 | Repairs; Maintenance and Compliance; Alterations Repairs; Maintenance and Compliance | 27 |
| | 5.13.1 Alterations | 28 |
| 5.14 | Access to Property | 29 |
| 5.15 | Environmental Matters | 29 |
| | 5.15.1 Hazardous Substances | 29 |
| | 5.15.2 Environmental Monitoring | 29 |
| | 5.15.3 O & M Program | 30 |
| 5.16 | Leases | 30 |
| 5.17 | Approval of Major Contracts; Change Order Contract | 30 |
| 5.18 | Zoning | 30 |
| 5.19 | Licenses | 31 |
| 5.20 | Compliance with Restrictive Covenants, Etc. | 31 |
| 5.21 | Performance of Other Agreements | 31 |
| 5.22 | ERISA | 31 |
| 5.23 | Expenses | 32 |
| 5.24 | Indemnity | 32 |
| 5.25 | Cooperate in Legal Proceedings | 33 |
| 5.26 | Further Assurances | 33 |
| 5.27 | Patriot Act; Embargoed Person | 33 |
| 5.28 | Anti-Money Laundering | 33 |

4838-9883-6219.21

Exhibit 1B - 000005

Ex. B
(SLA dated Nov. 29. 2021)

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---:|
| 5.29 | Cash Flow Sweep | 33 |
| 6. | NOTICES AND REPORTING | 34 |
| 6.1 | Notices | 34 |
| 6.2 | Borrower Notices and Deliveries | 35 |
| 6.3 | Financial Reporting | 35 |
| | 6.3.1 Bookkeeping | 35 |
| | 6.3.2 Annual Reports | 35 |
| | 6.3.3 Monthly/Quarterly Reports | 36 |
| | 6.3.4 Other Financial Information | 36 |
| | 6.3.5 Annual Budget and Fair Market Value Report | 36 |
| | 6.3.6 Breach | 37 |
| 6.4 | Estoppel Statements | 37 |
| 7. | INSURANCE; CASUALTY; AND CONDEMNATION | 37 |
| 7.1 | Insurance Coverage | 37 |
| | 7.1.1 Policies | 37 |
| | 7.1.2 Transfers | 38 |
| 7.2 | Casualty Notice; Restoration | 38 |
| | 7.2.1 Settlement of Proceeds | 39 |
| | 7.2.2 Condemnation | 39 |
| | 7.2.3 Collection of Award | 39 |
| | 7.2.4 Application to Debt | 39 |
| 8. | DEFAULTS | 39 |
| 8.1 | Events of Default | 39 |
| 8.2 | Remedies | 42 |
| | 8.2.1 Remedies Cumulative | 42 |
| | 8.2.2 Severance/Partial Foreclosure | 42 |
| | 8.2.3 Delay | 43 |
| | 8.2.4 Lender's Right to Perform | 43 |
| 9. | [INTENTIONALLY OMITTED.] | 43 |
| 10. | MISCELLANEOUS | 43 |

-iv-

4838-9883-6219.21

Exhibit 1B - 000006

Ex. B
(SLA dated Nov. 29. 2021)

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| 10.1 | [Intentionally omitted.] | 43 |
| 10.2 | Brokers and Advisors | 44 |
| 10.3 | Survival | 45 |
| 10.4 | Governing Law | 45 |
| 10.5 | Arbitration | 45 |
| 10.6 | Modification, Waiver in Writing | 46 |
| 10.7 | Headings/Schedules | 46 |
| 10.8 | Severability | 46 |
| 10.9 | Prior Agreements | 46 |
| 10.10 | Preferences | 46 |
| 10.11 | [Intentionally omitted.] | 47 |
| 10.12 | [Intentionally omitted.] | 47 |
| 10.13 | Publicity | 47 |
| 10.14 | No Usury | 47 |
| 10.15 | Conflict; Construction of Documents; Reliance | 47 |
| 10.16 | No Joint Venture or Partnership; No Third Party Beneficiaries | 48 |
| 10.17 | [Intentionally omitted.] | 48 |
| 10.18 | Assignment | 49 |
| 10.19 | Counterparts | 49 |
| 10.20 | Additional Funds | 49 |

4838-9883-6219.21

Exhibit 1B - 000007

Ex. B
(SLA dated Nov. 29. 2021)

## LOAN AGREEMENT

**LOAN AGREEMENT** dated as of November 29, 2021 (as the same may be modified, supplemented, amended or otherwise changed, this "**Agreement**") between **RYZE RENEWABLES NEVADA, LLC**, a Delaware limited liability company (together with its permitted successors and assigns, "**Borrower**"), and **LV RENEWABLES A, LLC**, a Nevada limited liability company (together with its successors and assigns, "**Lender**") with acknowledgement and agreement by **RYZE RENEWABLES LAS VEGAS, LLC**, a Delaware limited liability company, solely with respect to certain representations and warranties in Article 4 hereof and certain covenants made herein in furtherance of its obligations with respect to the Security Instrument (as hereinafter defined) and with acknowledgement and agreement by **MIRAE ASSET SECURITIES CO., LTD.**, an entity organized under the laws of the Republic of Korea ("**Mirae**"), solely with respect to the indemnity set forth in <u>Section 13.2</u> hereof.

1.  **DEFINITIONS; PRINCIPLES OF CONSTRUCTION**

    1.1   **Specific Definitions**.  The following terms have the meanings set forth below:

    **Affiliate**:  as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

    **Bankruptcy Code**: Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

    **Business Day**:  any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York and/or Los Angeles, California are authorized or required to close.

    **Capital Expenses**:  expenses that are capital in nature or required under GAAP to be capitalized.

    **Change Order Contract**: "Change Order Contract: the Engineering, Procurement and Construction Services Contract to be entered into by and between Borrower and MMC, Inc. to modify and amend that certain Engineering, Procurement and Construction Services Contract by and between Borrower and MMC, Inc. dated as of January 23, 2018 (the "**General Contract**") to include an Alfa Laval feedstock pretreatment unit, pretreatment infrastructure upgrades and a change of hydrotreating technology to Haldor Topsoe HydroFlex consistent with submissions to the United States Department of Agriculture (as to the scope of the changes but not as to the source or amount of the payment, cost or expense) prior to the date hereof.

    **Code**:  the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

Exhibit 1B - 000008

**Commonly Controlled Entity**: an entity, whether or not incorporated, that is under common control with Borrower within the meaning of Section 4001(a)(14) of ERISA or is part of a group that includes Borrower and that is treated as a single employer under Section 414(b) or (c) of the Code.

**Control**:  with respect to any Person, either (i) ownership directly or indirectly of fifty percent (50%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise, and the terms Controlled, Controlling and common Control shall have correlative meanings.

**Debt**:  the unpaid Principal, all interest accrued and unpaid thereon, all other sums then due to Lender in respect of the Loan pursuant to the Loan Documents.

**Debt Service**:  with respect to any particular period, the scheduled principal and interest payments due under the Note in such period.

**Default**:  the occurrence of any breach of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

**Default Rate**:  a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law or (ii) two percent (2%) above the Interest Rate, compounded monthly.

**ERISA**:  the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

**ERISA Affiliate**:  all members of a controlled group of corporations and all trades and business (whether or not incorporated) under common control and all other entities which, together with Borrower, are treated as a single employer under any or all of Section 414(b), (c), (m) or (o) of the Code.

**Excluded Taxes**: any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of (a) Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (b) a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or any Loan Document), (ii) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in the Loan pursuant to a law in effect on the date on which Lender acquires such interest in the Loan, except to the extent that, pursuant to Section 2.2.3 hereof, amounts with respect to such Taxes were payable to such Lender's assignor immediately before such Lender became a party hereto, (iii) Taxes attributable to Lender's failure to comply with Section 2.2.3(b) hereof, (iv) any U.S. federal withholding Taxes imposed under FATCA and (v)

-2-

any interest, additions to taxes and penalties with respect to any taxes described in clauses (i) through (iv) of this definition.

**FATCA**:  Sections 1471 through 1474 of the Code, as of the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

**Funding Date**:  the date on which all of the conditions set forth in Section 2.1 hereof have been satisfied, but in no event later than December 15, 2021 on which the Loan proceeds are disbursed by Lender.

**GAAP**:  generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

**Governmental Authority**:  any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) now or hereafter in existence.

**Guarantor**:  Ryze Renewables Holdings, LLC, a Delaware limited liability company, or any other Person that now or hereafter guarantees any of Borrower's obligations hereunder or any other Loan Document.

**Indemnified Taxes**:  (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (ii) to the extent not otherwise described in clause (i), Other Taxes.

**Intercreditor Agreement**:  that certain Intercreditor and Subordination Agreement dated as of the date hereof between Lender and Senior Lender.

**Improvements**: has the meaning set forth in the Security Instrument.

**Interest Rate**:  twelve percent (12%) per annum.

**Lease or Leases**:  as applicable, all leases and other agreements or arrangements entered into (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use, enjoy or occupy all or any portion of any space at the Property (i.e. the collateral for the Loan) or the Improvements, including any guarantees, extensions, renewals, modifications or amendments thereof.

**Legal Requirements**:  statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities (including those regarding fire, health, handicapped access, sanitation, ecological, historic, zoning, environmental protection, wetlands and building laws and the Americans with Disabilities Act of 1990, Pub. L. No. 89-670, 104 Stat. 327 (1990), as amended, and all regulations promulgated pursuant thereto) affecting Borrower, any Loan Document or all or part of the Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto.

Ex. B
(SLA dated Nov. 29. 2021)

**Lien**:  any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct or indirect interest in Borrower or Majority Member, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

**Loan Documents**:  this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or executed by Borrower and/or Guarantor and delivered to Lender in connection with the Loan, including, but not limited to, the following, each of which is dated as of the date hereof :  (i) the Promissory Note made by Borrower to Lender (the "**Promissory Note**" or the "**Note**"), (ii) the Construction/Term Loan Deed of Trust, Security Agreement, Assignment of Leases and Rents, and Fixture Filing made by OpCo to a trustee in favor of Lender (the "**Security Instrument**"), (iii) the Security Agreement between Borrower and Lender (the "**Security Agreement**"), (iv) the Pledge of Membership Interest executed by Majority Member encumbering its membership interests in the Borrower (the "**Pledge**"), and (v) the Guaranty Agreement made by Guarantor (the "**Guaranty**"), as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, supplemented or otherwise modified from time to time.

**Major Contract**: (i) each contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Property of a material nature (materiality for these purposes to include, any contract which has a term that extends beyond one year (unless cancelable on thirty (30) days or less notice without requiring the payment of termination fees or payments of any kind), or requires payments by Borrower greater than $250,000 per year), (ii) relates solely or primarily to environmental remediation or other environmental matters, or (iii) is with an Affiliate of Borrower, OpCo  or Guarantor.

**Majority Member**:  Ryze Renewables Holdings, LLC, a Delaware limited liability company, previously the sole member of Borrower.

**Material Adverse Effect**:  a material adverse effect on (i) the use, value or condition or ownership of the Property, (ii) the business, profits, prospects, management, operations or condition (financial or otherwise) of Borrower or the Property, (iii) the enforceability, validity, perfection or priority of the lien of the Security Instrument or the other Loan Documents, or (iv) the ability of Borrower to timely perform its obligations under this Agreement or the other Loan Documents.

**Material Alteration**: any (i) individual alteration affecting (A) structural elements of the Property, (B) a roof of the Property or (C) any alteration that otherwise requires Lender's consent pursuant to <u>Section 5.17</u>, or (ii) non-structural alteration the cost of which exceeds $250,000 and for which there are not undisbursed Loan proceeds budgeted to pay for such alterations; provided, however, that in no event shall any of the following constitute a Material Alteration: (a) any alteration described in (i) or (ii) above that is made in accordance with the

-4-

Exhibit 1B - 000011

Change Order Contract scope of work, (b) any Required Repairs (c) alterations performed as part of a Restoration, or (d) any alteration paid for with the Additional Funds, as approved by the Person providing such Additional Funds except the extent the same requires Lender's consent pursuant to <u>Section 5.17</u> as the result of a Change Order Alteration (as hereinafter defined).

**Maturity Date**:  the date on which the final payment of Principal becomes due and payable pursuant to the Note or this Agreement, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

**Officer's Certificate**:  a certificate delivered to Lender which is signed by an authorized senior officer, manager or authorized representative of the Person on behalf of whom the certificate is delivered, which officer, manager or representative is most knowledgeable with respect to the subject matter set forth in the applicable Officer's Certificate.

**Operations Agreements**: any covenants, restrictions, easements, declarations or agreements of record relating to the construction, operation or use of the Property, together with all amendments, modifications or supplements thereto.

**Other Charges**:  all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

**Other Taxes**:  all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

**Patriot Act**:  collectively, all laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), as the same was restored and amended by Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act (USA FREEDOM Act) of 2015 and as the same may be further amended, extended, replaced or otherwise modified from time to time, and any corresponding provisions of future laws.

**Patriot Act Offense**:  (i) any violation of the laws of the United States of America or of any of the several states, or any act or omission that would constitute a violation of such laws if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or money laundering, including any offense under (a) the laws against terrorism; (b) the laws against money laundering, (c) the Bank Secrecy Act, as amended, (d) the Money Laundering Control Act of 1986, as amended, or (e) the Patriot Act, or (ii) the conspiracy to commit, or aiding and abetting another to commit, any violation of any such laws.

**Permitted Easements**: easements, rights of way and other similar encumbrances and construction access agreements in connection with the development, renovation or operation of the Property entered into by Borrower in the ordinary course of business for use, access, water

-5-

and sewer, telephone or electric lines, or other utilities or for other similar purposes, provided that such easement or other similar encumbrance shall neither secure any monetary obligations nor have a Material Adverse Effect on the Property or Borrower.

**Permitted Encumbrances**:  shall mean, collectively, (i) the Liens created by the Loan Documents, (ii) all Liens and other matters disclosed in the Title Insurance Policy, (iii) Liens, if any, for Taxes or Other Charges not yet due or delinquent or are being contested in accordance with the terms of the Loan Documents, (iv) Permitted Easements, (v) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within twenty (20) days after Borrower first receives notice of such Lien, (vi) such other title and survey exceptions as Lender approves in writing in Lender's sole and absolute discretion, (vii) the Senior Loan Liens and (viii) Liens associated with the Additional Funds from the Second Priority Lender.

**Permitted Indebtedness**: shall mean the Senior Loan, any amount owed to the Second Priority Lender, or other indebtedness associated with the Permitted Encumbrances.

**Permitted Transfers**:

(i)      a Permitted Encumbrance;

(ii)      any Transfer in respect of, or of a direct or indirect interest in, any Person listed on a nationally or internationally recognized stock exchange or stock quotation system;

(iii)      any direct or indirect Transfer of membership interests in Borrower to the Second Priority Lender in connection with the raising of Additional Funds; and

(iv)      any direct or indirect Transfer of membership interests in Borrower among the members of Borrower or any parent company of Borrower.

**Person**:  any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

**Plan**:  (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is subject to Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

**Prepayment Premium**:   with respect to any prepayment of Principal (or acceleration of the Loan) an amount equal to six percent (6%) of the Principal to be prepaid.

**Principal**: the outstanding principal balance of the Loan at any given time with a maximum principal amount of $21,000,000.

**Project**:  a renewable diesel refinery plant to be situated wholly on the Property and capable of producing no less than 100 million gallons per year of renewable diesel fuel.

-6-

**Property**:  the parcel of real property and Improvements thereon owned by OpCo and encumbered by the Security Instrument; together with all rights pertaining to such real property and Improvements, and all other collateral for the Loan as more particularly described in the Security Instrument.

**Property Taxes**:  all (i) real estate Taxes, assessments, water rates or sewer rents, maintenance charges, impositions, mortgage recording taxes, vault charges and license fees ("**Real Estate Taxes**"), or (ii) personal property Taxes, in each case, now or hereafter levied or assessed or imposed against all or part of the Property.

**Regulatory Change**:  any change effective after the date of this Agreement in any statute, treaty, rule, regulation, ordinance, executive order or administrative or judicial precedents or authorities (including without limitation, Regulation D of the Board of Governors of the Federal Reserve System of the United States (or any successor)) or the adoption or making after such date of any interpretation, directive or request applying to a class of banks, including any Lender, of or under any statute, treaty, rule, regulation, ordinance, executive order or administrative or judicial precedents or authorities (whether or not having the force of law and whether or not failure to comply therewith would be unlawful) by any Governmental Authority or monetary authority charged with the interpretation or administration thereof or compliance by Lender with any request or directive regarding capital adequacy.  Notwithstanding anything herein to the contrary, (a) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (b) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "**Regulatory Change**", regardless of the date enacted, adopted or issued.

**Rents**:  all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, economic stimulus, incentive or other similar payments received directly or indirectly from any Governmental Authority or quasi-Governmental Authority, whether in the form of aide, money, relief, or another compensation scheme (including any of the foregoing initiated in connection with the COVID-19 virus or any other pandemic or epidemic), deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of OpCo or any of its agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including receipts, deposits, accounts receivable and other receivables and benefits from the operation of the Project on the Property and all other income of every nature of and from the Property and otherwise, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of any sale, lease, sublease, license, concession or other grant of the right of the possession, use or occupancy of all or any portion of the Property, or personalty located thereon, or rendering of services by OpCo, Borrower or any operator or manager of the Project or acquired from others including, without limitation, from the provision or sale of other goods and services, service charges, from business interruption

-7-

Exhibit 1B - 000014

or other loss of income insurance relating to the use, enjoyment or occupancy of the Property, and any other items of revenue, receipts or other income related to the use or occupancy of the Property.

**Sanctions**: means any sanctions administered by (a) the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC") or the U.S. Department of State, (b) the United Nations Security Council, the European Union or its Member States or Her Majesty's Treasury of the United Kingdom or (c) any other Governmental Authority with jurisdiction over any of the parties hereto.

**Second Priority Lender**: a bona fide third-party lender who makes a loan or equity contribution of the Additional Funds within 150 days from the Funding Date on terms and conditions acceptable to the Board of Managers of Borrower.

**Senior Lender**:  Georgia's Own Credit Union, and any subsequent holder of the Senior Loan to whom the Senior Loan has been assigned pursuant to the terms of the Intercreditor Agreement.

**Senior Loan**: that certain senior loan in the original principal amount of up to $198,000,000 made on or about June 25, 2018 by Senior Lender to Borrower and evidenced and secured by the Senior Loan Documents.

**Senior Loan Documents**: (i) that certain Loan Agreement (the "**Senior Loan Agreement**") dated as of June 25, 2018 between Senior Lender and Senior Loan Borrower, (ii) those certain promissory notes in the original principal amount of the Senior Loan made by Senior Loan Borrower and payable to Senior Lender, (iii) any other "Loan Document", as defined in the Senior Loan Agreement referred to in clause (i) above, as each of the foregoing may be modified, amended and restated from time to time in accordance with the terms and provisions of the Intercreditor Agreement.

**Senior Loan Liens**: the Liens in favor of Senior Lender created pursuant to the Senior Loan Documents.

**State**:  the state in which the Property is located.

**Stated Maturity Date**:  November 30, 2023.

**Survey**:  a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

**Taxes**:  all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

**Term**:  the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

-8-

Ex. B
(SLA dated Nov. 29. 2021)

**Title Insurance Policy**:  the ALTA mortgagee title insurance policy in the form acceptable to Lender issued with respect to the Property and insuring the Lien of the Security Instrument.

**Transfer**:  (i) any direct or indirect sale, conveyance, transfer, encumbrance, pledge, lease, or assignment, or the entry into any agreement to sell, convey, transfer, encumber, pledge, lease or assign (other than an agreement for which Borrower has provided at least thirty (30) days' prior written notice to Lender, to sell the Property that will result in payment in full of the Debt in accordance with this Agreement), whether voluntary or involuntary by law or otherwise, whether or not for consideration or of record, of, on, in or affecting (a) all or part of the Property (including any legal or beneficial direct or indirect interest therein) or (b) any direct or indirect interest in Borrower, OpCo or Ryze II (including any profit interest), at any tier of ownership, (ii) with respect to Borrower, OpCo, Ryze II or any Person that has a direct or indirect interest in Borrower, OpCo, or Ryze II, the division of any assets and liabilities of such entity amongst one or more new or existing entities, or (iii) any change of Control of Borrower, OpCo or Ryze II.

**UCC**:  the Uniform Commercial Code as in effect in the State, or any other State applicable to any collateral for the Loan, as the case may be.

**Working Capital**:  Funds used to pay general operating expenditures and other amounts for general company purposes of Borrower or distributed to the Majority Member for such purposes so long as such expenditures were set forth in the Operating Budget attached hereto as <u>Exhibit A</u>.

**1.2**   **Principles of Construction**.   Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP.

**2.**   GENERAL LOAN TERMS

**2.1**   **The Loan**.  Subject to and upon the terms and conditions of this Agreement, Lender agrees to make a loan to Borrower (the "Loan") in the maximum principal amount of up to $21,000,000.  On the Funding Date, Lender will disburse the full amount of the Loan proceeds to be used (i) to pay $4,000,000 of Working Capital expenses set forth in the Operating Budget attached hereto as <u>Exhibit A</u>, and $3,000,000 of such Working Capital will be deposited into a bank account which will be subject to a deposit account control agreement with the depository institution for the benefit of Lender (the "**DACA**") and the remaining $1,000,000 will be used to pay for the items described in <u>Exhibit A-1</u> within ninety (90) days of the Funding Date (ii) to provide $10,000,000 to Senior Lender to replenish its debt service reserve for the Senior Loan, (iv) to pay the fees set forth in Section 2.6 hereof in the amount of $7,000,000 and certain expenses of Lender so long as:

-9-

4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

(a)      Lender shall have received an ALTA extended coverage Lender's Title Insurance Policy, at Lender's sole cost and expense;

(b)      there is no Default or Event of Default as confirmed in a Bring Down Certificate in the form attached hereto as <u>Exhibit B</u> (the "**Bring Down Certificate**");

(c)      Lender will have received an updated valuation from Stancil & Co. showing a valuation for the Property and the Project upon completion of the Project of not less than $1,250,000,000.  Lender acknowledges the receipt of the valuation prior to the date hereof and satisfaction of this requirement.

(d)      Lender will have received Borrower's updated pro forma model.   Lender acknowledges the receipt of the pro forma model and satisfaction of this requirement.

(e)      Lender will have performed lien searches perform within 48 hours of the Funding Date verifying that Borrower, OpCo, and Ryze Renewables II, LLC, a Delaware limited liability company ("**Ryze II**") are unencumbered other than the Senior Loan Liens and that there is no default under any debts owed by Borrower, OpCo, or Ryze II.

(f)      Receipt of a fully executed Intercreditor Agreement.

(g)      Receipt by Lender, Borrower and OpCo of all necessary and appropriate approvals of any governmental or quasi-governmental bodies with respect to the transactions contemplated herein and in the other Loan Documents.  As of the date hereof, Lender does not anticipate the need for any such approvals subject to such approvals that may be required as a result of a change in law, regulations, rule or facts from those existing on the date hereof.

(h)      All of the representations and warranties contained herein remain true and correct in all material respects.

(i)      The Board of Managers of Borrower will be expanded to include three (3) members with one of the voting members appointed by Mirae Asset Securities Co., Ltd. subject to the background check and insurance provisions consistent with the operating agreement in the form attached hereto as <u>Exhibit C</u> (the "**Operating Agreement**").  Mirae Asset Securities Co., Ltd. has appointed Seung-Hwan Oh to the Board of Managers, and Junghan Kim to an observer seat on the Board of Managers (as provided in the Operating Agreement), which appointments are undergoing approval as provided in the preceding sentence.

(j)      Lender's receipt of the fully executed Operating Agreement.

(k)      Receipt of the fully executed Loan Documents, evidence of the due authority of Lender, Borrower, Guarantor and OpCo to enter into the Loan Documents, the fully executed Option Agreement in the form attached hereto as <u>Exhibit D</u> and the fully executed Grant of Membership Interests attached hereto as <u>Exhibit E</u>.

(l)      Lender shall have received the monthly construction report from Stancil & Co. for September 2021. Lender acknowledges the receipt of the construction report and satisfaction of this requirement.

-10-

Exhibit 1B - 000017

Ex. B
(SLA dated Nov. 29. 2021)

(m)     Lender shall have received confirmation that any amounts required to be held by OpCo for any retainage required pursuant to the Senior Loan Documents and/or the General Contract are held in segregated accounts for such purpose pursuant to the Bring Down Certificate confirming no changes from the financial statements provided to Lender by Borrower for the period ending September 30, 2021; provided that interest on the Senior Loan, for the months of May and June of 2021, in the amount of $2,415,600, was paid out of such retainage pursuant to the Senior Lender's rights of Set Off.  Borrower warrants that all necessary consents were obtained for the foregoing offset and there is no ongoing default in any contract as a result thereof.

(n)     Borrower has provided appropriate notice regarding any errors in the USDA consent letter dated as of September 29, 2021 to the Senior Loan's servicer and Senior Lender as evidenced by the Bring Down Certificate.

(o)     Lender's receipt of the fully-executed Waiver of Right of First Refusal in form and substance mutually agreed between Lender and P66 (the "**P66 Subordination**").

(p)     Borrower's receipt of deferral for the debt service payment due November 25, 2021 on the Senior Loan through December 15, 2021 or a forbearance agreement from Senior Lender through December 15, 2021.

(q)     Lender's receipt of a fully-executed original of the DACA.

No amount repaid in respect of the Loan may be reborrowed.  The Loan shall mature on the Stated Maturity Date.  Any excess proceeds may be used for any lawful purpose.

**2.2     Interest**.

**2.2.1     Generally**.  From and after the date hereof, interest on the outstanding Principal shall accrue at the Interest Rate.  All accrued and unpaid interest and principal, shall be due and payable on the Maturity Date.

**2.2.2     Default Rate**.  After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, calculated from the date such payment was due or such underlying Default shall have occurred without regard to any grace or cure periods contained herein, and shall be payable upon demand from time to time, to the extent permitted by applicable law.

**2.2.3     Taxes**.  (a) Any and all payments by or on account of any obligation of Borrower hereunder and under the other Loan Documents shall be made free and clear of, and without deduction or withholding for, any Taxes, except as required by applicable law.  If Borrower shall be required by applicable law (as determined in good faith discretion by Borrower or Lender) to deduct or withhold any Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply:  (i) if such Tax is an Indemnified Tax, the sum payable shall be increased as may be necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.2.3), Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made; (ii) Borrower shall make such deduction or withholding; and (iii) Borrower shall timely pay the full amount deducted or withheld to the relevant Governmental

-11-

4838-9883-6219.21

Authority in accordance with applicable law.  Borrower shall pay to Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.2.3</u>) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.  As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority pursuant to this <u>Section 2.2.3</u>, Borrower shall deliver to Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(b)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrower, at the time or times reasonably requested by Borrower, such properly completed and executed documentation reasonably requested by Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation shall not be required if in Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. Without limiting the generality of the foregoing, (i) any Lender that is a "United States Person" (as defined in Section 7701(a)(30) of the Code) shall deliver to Borrower on or prior to the date on which such Lender becomes a Lender under this Agreement, executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax and (ii) any Lender that is not a "United States Person" (as defined in Section 7701(a)(30) of the Code) shall, to the extent it is legally entitled to do so, deliver to Borrower on or prior to the date on which such Lender becomes a Lender under this Agreement, executed copies of whichever of the following is applicable: IRS Form W-8BEN, IRS Form W-8BEN-E, IRS Form W-8ECI, IRS Form W-8EXP, and IRS Form W-8IMY, and, in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, a certificate to the effect that such Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code.

(c)     If a payment made to Lender under any Loan Document would be subject to Tax imposed by FATCA if Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), Lender shall deliver to Borrower at the time or times prescribed by applicable Law and at such time or times reasonably requested by Borrower such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with its obligations under FATCA and to determine that Lender has complied with

-12-

Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph, the term "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

2.2.4 **Requirements of Law**. (a) If any Regulatory Change or change in the interpretation or application of any requirement of law, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority:

(i) shall subject Lender to any tax of any kind whatsoever with respect to this Agreement, the Note or the Loan (excluding net income taxes) or change the basis of taxation of payments to Lender in respect thereof;

(ii) shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances or other extensions of credit by, or any other acquisition of funds by, any office of Lender;

(iii) shall impose on Lender any other condition;

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender deems to be material, of making or maintaining the Loan or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall, from time to time, upon receipt of prior written notice of not less than ten (10) Business Days of such fact and a reasonably detailed description of the circumstances, promptly pay Lender such additional amount or amounts as will compensate Lender for such increased cost or reduced amount receivable (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally and are not prohibited by such Regulatory Change to be charged back to Borrower); provided that no cost or expense related to any requirement for Lender to engage any clerical, administrative, supervisory, asset manager or other third party cost or expense shall be charged to Borrower in connection with the foregoing.

(b) If Lender shall have determined that any Regulatory Change regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on Lender's or such corporation's capital as a consequence of its obligations hereunder by an amount deemed by Lender to be material (taking into consideration Lender's or such corporation's policies with respect to capital adequacy), then from time to time, Borrower shall within ten (10) Business Days after written notice from Lender, pay to Lender such additional amount or amounts as will compensate Lender for such reduction (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally and are not prohibited by such Regulatory Change to be charged back to Borrower).

If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.4, it shall promptly notify Borrower of the event by reason of which it has become so entitled. A certificate

-13-

as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error or the provision of irrefutable proof by Borrower to the contrary.

      **2.3**    **Loan Repayment**.  Borrower shall repay the Principal in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents.  Except during the continuance of an Event of Default, all proceeds of any repayment, including any prepayments of the Loan, shall be applied by Lender as follows in the following order of priority:  *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal; and *Third*, to any other amounts then due and owing under the Loan Documents, including the Prepayment Premium, if any.  During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on the Property (whether through foreclosure, deed-in-lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's sole and absolute discretion.

      **2.3.1**    **Optional Prepayments**.  Borrower shall have the right to prepay all or any portion of the Principal on any Business Day provided that Borrower gives Lender at least thirty (30) days prior written notice thereof, and such prepayment is accompanied by the Prepayment Premium applicable thereto.  Borrower may modify, revoke or cancel any such prepayment notice so long as Borrower pays all out-of-pocket costs and expenses actually incurred by Lender as a result of the original notice of prepayments and as a result of such revocation, cancellation or modification.

      **2.4**    **Release of Property**.  Lender shall, upon the written request of Borrower, upon payment in full of the Debt in accordance herewith, release or, if requested by Borrower, assign to Borrower's designee (without any representation or warranty by and without any recourse against Lender whatsoever) the Lien of the Loan Documents if not theretofore released.  In connection with the release of the Lien, Borrower shall submit to Lender, not less than fifteen (15) days prior to the date of repayment (or such shorter time as is acceptable to Lender in its sole discretion), a release of Lien, in a form appropriate in the jurisdiction in which the Property is located (and related Loan Documents) for execution by Lender substantially concurrent with the repayment of the Loan.

      **2.5**    **Payments and Computations**.

      **2.5.1**    **Making of Payments**.  Each payment by Borrower shall be made to Lender not later than 4:00 p.m., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or at such other place as Lender shall from time to time designate, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.  All such payments shall be made irrespective of, and without any deduction, set-off or counterclaim whatsoever, and with all costs and charges incurred in the collection or enforcement thereof, including attorneys' fees and court costs.

4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

2.5.2   **Computations**.   Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over the actual number of days in the year.

2.6   **Fees**.  On the Funding Date, Borrower shall pay to Lender (i) a facility fee, (ii) a lender fee and (iii) an advisor arrangement fee to be disbursed to its advisors and consultants from Loan proceeds in a total amount of $7,000,000 to be allocated in the sole and absolute discretion of Lender.  The foregoing fees will be fully earned on the Funding Date.

2.6.1   **Reallocations**.  Amounts may be reallocated within line items of the budget for the Project so long as (1) the total amount of such budget does not exceed the amount of the General Contract as modified by the Change Order Contract unless there are other funds sufficient to cover the unpaid portions of such budget, provided that (i) such reallocation is not in contravention of the provisions of any Applicable Law, the documents related to the Senior Loan, and (ii) no Event of Default shall then exist hereunder.

3.   **DEBT SERVICE RESERVE ACCOUNT**.  On the Funding Date, Lender will advance a portion of the Loan proceeds to Senior Lender to be held by Senior Lender to pay interest on the Senior Loan in the amount of $10,000,000.

4.   **REPRESENTATIONS AND WARRANTIES**.  Borrower represents and warrants to Lender (or with respect to Section 4.15(b), Section 4.17(b), Section 4.33, Lender represents and warrants to Borrower) as of the date hereof that, except to the extent (if any) disclosed on Schedule 3 with reference to a specific Section of this Article 4:

4.1   **Title**.  OpCo has good, marketable and insurable fee simple title in fee to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances.

4.2   **Physical Condition**.  To the Borrower and OpCo's best knowledge the Property, including all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects, and there exists no structural or other material defects or damages to the Property, whether latent or otherwise.  Neither OpCo nor Borrower has received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or any termination or threatened termination of any policy of insurance or bond.  No portion of the Property is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards, or, if so located, the flood insurance required pursuant to Section 7.1.1 hereof is in full force and effect with respect to that portion of the Property.  The Improvements have suffered no material casualty or damage which has not been fully repaired and the cost thereof fully paid.

4.3   **Survey/Boundaries**.  To Borrower's and OpCo's knowledge, the Survey does not fail to reflect any material matter affecting the Property or the title thereto.  To Borrower's and OpCo's knowledge, all of the Improvements which were included in determining the appraised

-15-

value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property, except those which are set forth on the Survey and insured against by the Title Insurance Policy.

**4.4** **Separate Lots**. Each parcel comprising the Property is a separate tax lot and is not a portion of any other tax lot that is not a part of the Property.

**4.5** **Easements; Utilities and Public Access**. All easements, cross easements, licenses, air rights and rights-of-way or other similar property interests (collectively, "**Easements**"), if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are described in the Title Insurance Policy and, to Borrower's and OpCo's knowledge, are in full force and effect without default thereunder. The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service it for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid easement. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

**4.6** **Assessments**. Other than as set forth on Schedule 3, there are no pending or, to Borrower's and OpCo's knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

**4.7** **Purchase Options**. Except for the rights of Phillips 66 Company, a Delaware corporation ("**P66**") pursuant to the Supply and Offtake Agreement between P66 and OpCo dated as of June 15, 2017 as modified and amended by certain addenda including, but not limited to that certain Addendum 4 dated as of January 29, 2021, the Property nor any part thereof is subject to any purchase options, rights of first refusal, rights of first offer or other similar rights in favor of third parties.

**4.8** **Condemnation**. No Condemnation or other proceeding has been commenced or, to Borrower's and OpCo's best knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

**4.9** **Compliance**. To Borrower's and OpCo's knowledge, Borrower and the Property (including the Improvements) and the use thereof comply in all material respects with all applicable Legal Requirements (including with respect to parking, building and applicable zoning and land use laws, codes, regulations and ordinances) and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower or OpCo, at any time in force affecting all or any portion of the Property. Neither Borrower nor OpCo received any written notice of any default or violation by Borrower or OpCo of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might have a Material Adverse Effect, and neither Borrower nor OpCo is otherwise aware of any such default or violation. Neither Borrower nor OpCo has committed any act which may give any

-16-

Governmental Authority the right to cause OpCo to forfeit the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  The Property is used exclusively for construction and operation of the Project and other appurtenant and related uses.  All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits, and all rights to all trademark, trade names, patents and fictitious names required of Borrower and OpCo for the legal use, occupancy and operation of the Property and the Project, upon completion thereof (collectively, the "**Licenses**"), have been or will be obtained and in full force and effect prior to the commencement of operation of the Project. The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.  In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  To Borrower's and OpCo's knowledge, no legal proceedings are pending or, to the knowledge of Borrower and OpCo, threatened with respect to the zoning of the Property.  Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property, except for utilities and provided that Borrower represents and warrants that it has or will have all necessary public utility service for operation of the Project.

        **4.10    Valid and Second Lien**.  The Security Instrument when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (i) a valid and perfected second priority lien on OpCo's interest in the Property and (ii) valid and perfected second priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances.  There are no mechanics', materialman's or other similar Liens or claims which have been filed for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal or coordinate priority with, the Liens created by the Loan Documents.  The Permitted Encumbrances, individually or in the aggregate, do not (a) materially interfere with the benefits of the security intended to be provided by the Security Instrument and this Agreement, (b) materially and adversely affect the value, operation or use of the Property, or (c) impair Borrower's ability to repay the Loan.

        **4.11    Filing, Recording and Other Taxes**.  All transfer Taxes, deed stamps, intangible Taxes or other amounts in the nature of transfer Taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to OpCo have been paid or are being paid simultaneously herewith.  All mortgage, mortgage recording, stamp, intangible or other similar Taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid or are being paid simultaneously herewith.  All Taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the Title Insurance Policy, or are being contested in accordance with Section 5.11.

-17-

**4.12    Tax Filings**.  To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state, commonwealth, district and local Tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state, commonwealth, district and local Taxes, charges and assessments payable by Borrower. Borrower's Tax returns (if any) properly reflect the income and Taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable Tax authority upon audit.

**4.13    Proceedings; Enforceability**.  Borrower has the power and authority to execute, deliver and perform its obligations under the Loan Documents to which it is a party and all the transactions contemplated thereby.  OpCo has the power and authority to execute, deliver and perform its obligations under the Loan Documents to which it is a party and all the transactions contemplated thereby. The Loan Documents to which Borrower and/or OpCo is a party have been duly authorized, executed and delivered by Borrower and/or OpCo and constitute legal, valid and binding obligations of Borrower and/or OpCo, as applicable, enforceable against Borrower and/or OpCo in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, OpCo or Guarantor including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and none of Borrower, OpCo or Guarantor have asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

**4.14    No Conflicts**.  The execution, delivery and performance of the Loan Documents by Borrower and/or OpCo and the transactions contemplated hereby will not conflict with any provision of any law or regulation to which Borrower and OpCo are subject, or conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower or OpCo pursuant to the terms of, any agreement or instrument or organizational document to which Borrower or OpCo is a party or by which it or its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower, OpCo or any of their properties.  Borrower's or OpCo's rights under the Licenses will not be adversely affected by the execution and delivery of the Loan Documents, Borrower's and OpCo's performance thereunder, the recordation of the Security Instrument, or the exercise of any remedies by Lender. Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority or any other Person required for the execution, delivery and performance by Borrower and OpCo of, or compliance by Borrower and OpCo with, the Loan Documents or the consummation of the transactions contemplated hereby, including, but not limited to, any consent from Senior Lender or the United States Department of Agriculture, has been obtained and is in full force and effect.

**4.15    Organization; Special Purpose**.

-18-

(a)     With Respect to Borrower.  Each of Borrower, OpCo and Guarantor has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged or proposes to be engaged in upon completion of the Project.  Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations.

(b)     With Respect to Lender.  Lender has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to make the Loan.  Lender is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations.

**4.16   Other Debt**.  There is no indebtedness with respect to the Property or any indebtedness secured by excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

**4.17   Ownership**.

(a)     **Of Borrower; Borrower's Indirect Ownership of OpCo.**  Borrower's exact legal name is: Ryze Renewables Nevada, LLC.  Borrower is of the following organizational type (e.g., corporation, limited liability company): a limited liability company, and the jurisdiction in which Borrower is organized is: Delaware.  Borrower's U.S. federal tax I.D. number is 84-5006058 and Borrower's Delaware Organizational I.D. number is 7852527.  Prior to the date hereof, Majority Member was Borrower's sole member.  Except as otherwise stated in Schedule 4.17, the membership interests in Majority Member, Borrower and Ryze II and OpCo, are owned free and clear of all Liens, warrants, options and rights to purchase.  Borrower has no obligation to any Person to purchase, repurchase or issue any ownership interest in it.  At all times that the Loan is outstanding, Borrower will hold 100% of the ownership interests in Ryze II and Ryze II will hold 100% of the ownership interests in OpCo.  Except as otherwise stated in Schedule 4.17, neither Ryze II nor OpCo have an obligation to any Person to purchase, repurchase or issue any ownership interest in it. The organizational chart attached hereto as <u>Schedule 4a</u> is complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Borrower on the date of this Agreement; provided that Borrower will update <u>Schedule 4a</u> prior to the Funding Date if there are any changes.

(b)     **Of Lender; Affiliation with Mirae.**  Lender's exact legal name is: LV Renewables A, LLC, a Nevada limited liability company.  Lender is of the following organizational type (e.g., corporation, limited liability company): a limited liability company, and the jurisdiction in which Lender is organized is: Nevada.  Lender's Nevada Organizational I.D. number is NV20212270771.  The organizational structure described in <u>Schedule 4b</u> is complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Lender on the date of this Agreement; provided that Lender will update <u>Schedule 4b</u> prior to the Funding Date if there are any changes.

-19-

**4.18** **Name; Principal Place of Business**.  Borrower does not use and will not use any trade name and has not done and will not do business under any name other than its actual name set forth herein.  The principal place of business of Borrower is its primary address for notices as set forth in Section 6.1, and Borrower has no other place of business, other than the Property.

**4.19** **No Bankruptcy Filing**.  None of Borrower, OpCo, Guarantor, Majority Member nor any Person that directly or indirectly Controls Borrower is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of Borrower's assets or properties (a "**Bankruptcy Proceeding**"), and Borrower has no actual knowledge of any Person contemplating the filing of any such petition against it, Ryze II, OpCo or any constituent Persons.

**4.20** **Fraudulent Transfer**.  Neither Borrower nor OpCo entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents.

**4.21** **ERISA; No Plan Assets; WARN Act**.

(a)      As of the date hereof and throughout the Term (i) neither Borrower, Guarantor nor any of the Commonly Controlled Entities sponsor, are obligated to contribute to, or are themselves an "employee benefit plan," as defined in Section 3(3) of ERISA or a "plan" as defined in Section 4975 of the Code, (ii) none of the assets of Borrower or Guarantor constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, as modified in operation by Section 3(42) of ERISA, (iii) neither Borrower nor Guarantor is or will be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with Borrower or Guarantor are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans.  As of the date hereof, none of Borrower, Guarantor nor any ERISA Affiliate maintains, sponsors or contributes to or has any obligation with respect to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA).  Neither Borrower nor Guarantor has engaged in any transaction in connection with which it could be subject to either a civil penalty assessed pursuant to the provisions of Section 502 of ERISA or a Tax imposed under the provisions of Section 4975 of the Code, in either case, that could reasonably be expected to result in a Material Adverse Effect.

(a)      Neither Borrower nor an Affiliate has effectuated or will (without any and all necessary notices and disclosures) effectuate a "plant closing" (as defined in the Worker Adjustment and Retraining Notification Act, or any similar state or local law (the "**WARN Act**")) or a "mass layoff" (as defined in the WARN Act) involving employees working at the Property or on the Project that could reasonably be expected to result in a Material Adverse Effect.

**4.22** **Litigation**.  There are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or, to Borrower's knowledge, threatened against or affecting Borrower, Majority Member, OpCo, Guarantor, the Project or the Property, which, if adversely determined, might have a Material Adverse Effect or otherwise prevent Borrower from performing the transactions contemplated herein.  An action that is dismissed without prejudice is not considered to be "pending" or "threatened against or affecting" Borrower.

-20-

**4.23** <u>**Agreements**</u>. Borrower is not a party to any agreement or instrument or subject to any restriction which might have a Material Adverse Effect. Neither Borrower nor OpCo is in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default might have consequences that would have a Material Adverse Effect. OpCo is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound, and to Borrower's and OpCo's knowledge, there are no material defaults under any such agreement by any other party thereto. OpCo has received certain extensions related to the Senior Loan, which have been provided to the Lender.

**4.24** <u>**Full and Accurate Disclosure**</u>. No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading. There is no material fact presently known to Borrower or OpCo that has not been disclosed to Lender which adversely affects, or, as far as Borrower can foresee, might have a Material Adverse Effect. All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower, OpCo, Guarantor, the Project and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower, OpCo, Guarantor, the Project and the Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP (or such other accounting basis consistently applied and reasonably acceptable to Lender) throughout the periods covered, except as disclosed therein. Borrower has no contingent liabilities, liabilities for Taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower, OpCo, Guarantor, the Project or the Property from that set forth in said financial statements.

**4.25** <u>**Leases**</u>. The Property is not subject to any Leases. The parties hereto acknowledge and agree that Borrower may lease certain pieces of equipment located on the Property that are necessary for the construction or operation of the Project.

**4.26** <u>**Contracts; Major Contracts**</u>.

(a) There are no service, maintenance or repair contracts affecting the Property that are not terminable on one month's notice or less without cause and without penalty or premium except as set forth in <u>Schedule 4.25</u> hereof. Except as otherwise disclosed to Lender on <u>Schedule 3</u> hereof, all service, maintenance, construction or repair contracts affecting the Property have been entered into an arms-length in the ordinary course of Borrower's and/or OpCo's business. Each of such agreements is in full force and effect, there are no monetary or other material defaults by Borrower or OpCo, as appropriate, thereunder and, to the best knowledge of Borrower and OpCo, there are no monetary or other material defaults thereunder by any other party thereto. No agreement or instrument to which Borrower or OpCo is a party or is subject, or to which the Property is subject, provides any Person with the right to obtain, a Lien on the Property superior to the Lien of the Security Instrument other than the Senior Loan Liens on the Property, or upon the receipt of the Additional Funds, the liens of the Second Priority Lender.

-21-

4838-9883-6219.21

(b)      Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender.  Borrower has not entered into, and is not bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender.  None of Borrower or any other Person acting on Borrower's behalf has given or received any notice of default under any Major Contract that remains uncured or in dispute.  Except as disclosed to Lender prior to the Funding Date, no Major Contract has as a party an Affiliate of Borrower.

**4.27   Critical Technologies and Infrastructure**.   None of Borrower, OpCo, or Guarantor is considered, nor has Borrower or Guarantor at any point owned, managed or possessed critical technologies, critical infrastructure or personal data that could reasonably be expected to classify Borrower or Guarantor or any of their Affiliates a "TID U.S. Business" as that term is defined in 31 CFR Section 800 or as such term is interpreted and/or applied by the Committee on Foreign Investment in the United States.

**4.28   Operations Agreements**.  Each Operations Agreement is in full force and effect and none of Borrower, OpCo, or, to Borrower's and OpCo's knowledge, any other party to any Operations Agreement, is in default thereunder, and to the best of Borrower's and OpCo's knowledge, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder.

**4.29   Hazardous Substances**.  (i) To OpCo's knowledge, except as otherwise disclosed by the Phase I environmental report with respect to the Property delivered to Lender and OpCo in connection with origination of the Loan, the Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right-to-Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any state super-lien and environmental clean-up statutes, any local law requiring related permits and licenses, any common law relating to Hazardous Substances, and all amendments to and regulations in respect of the foregoing laws (collectively, "**Environmental Laws**"); (ii) to OpCo's knowledge, the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic and/or dangerous substances, or any other substances or materials which are included under or regulated by Environmental Laws (collectively, "**Hazardous Substances**"); (iii) to the best of OpCo's knowledge, no Hazardous Substances are or have been (including the period prior to OpCo's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) to the best of OpCo's knowledge, no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; (v) to the best of OpCo's knowledge, no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vi) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of OpCo which have not been provided to Lender.

-22-

Ex. B
(SLA dated Nov. 29. 2021)

**4.30** **Embargoed Person**. None of the funds or assets of Guarantor, OpCo or of Borrower constitute property of, or are beneficially owned directly or, to Borrower's best knowledge, indirectly, by any Embargoed Person (as hereinafter defined), (b) no Embargoed Person has any direct interest, and to Borrower's best knowledge, as of the date hereof, based upon reasonable inquiry by Borrower, indirect interest, of any nature whatsoever in Borrower, OpCo or Guarantor, as applicable, with the result that the investment in Borrower, OpCo or Guarantor, as applicable (whether directly or indirectly), is prohibited by any Legal Requirement or the Loan is in violation of any Legal Requirement and (c) none of Borrower, OpCo or any constituent member of Borrower or OpCo has been previously indicted for or convicted of any Patriot Act Offense, or is currently under investigation by any Governmental Authority with respect to any alleged Patriot Act Offense.

**4.31** **Anti-Money Laundering**. None of the funds of Borrower, OpCo, Majority Member or Guarantor, as applicable, that are used to consummate this transaction or to operate the Property are derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, OpCo, Majority Member or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure. Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower (other than the Loan) and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

**4.32** **Federal Reserve Regulations; Investment Company Act; Bank Holding Company**. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (ii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money. Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**4.33** **Union Contracts**. Except as set forth on Schedule 3, there are no: (i) collective bargaining agreements and/or other labor agreements to which Borrower or the Property, or any portion thereof, is a party or by which either is or may be bound; (ii) employment, profit sharing, deferred compensation, bonus, stock option, stock purchase, pension, retainer, consulting, retirement, health, welfare, or incentive plans and/or contracts to which Borrower or the Property, or any portion thereof is a party, or by which either is or may be bound; or (iii) plans and/or agreements under which "fringe benefits" (including, but not limited to, vacation plans or programs, and related or similar dental or medical plans or programs, and related or similar benefits) are afforded to employees of Borrower or the Property, or any portion thereof. Borrower has not violated any applicable laws, rules and regulations relating to the employment of labor, including those relating to wages, hours, collective bargaining and the payment and withholding of taxes and other sums as required by appropriate Governmental Authorities.

-23-

Ex. B
(SLA dated Nov. 29. 2021)

**4.34** **Lender's Knowledge of Breach**. Except as set forth on Schedule 4.33, Lender has no actual knowledge of any breach of Borrower's representations and warranties as of the date hereof. Lender has disclosed on Schedule 4.33 all information in Lender's possession related to any suspected breach of Borrower's representations and warranties. Lender's actual knowledge is limited to the knowledge of Sung Hee Han, Kyunghyun Lee, and any attorneys from Snell & Wilmer L.L.P. who have worked on this Loan or any preceding litigation between Mirae Asset Securities Co. Ltd. Lender has no current intention to declare an Event of Default or exercise remedies pursuant to the Loan Documents.

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender except to the extent of Lender's actual knowledge of any breach of representations and warranties as of the date hereof as set forth on Schedule 4.33, provided, however, that the representations, warranties and covenants set forth in Section 4.29 shall survive in perpetuity.

## 5. COVENANTS

Until the end of the Term, Borrower (and, where designated, Lender) hereby covenants and agrees that:

**5.1** **Warranty of Title**. Borrower will cause OpCo to warrant and defend the title to the Property, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, against the claims of all Persons.

**5.2** **Existence**. Each of Borrower, OpCo, Majority Member and Guarantor shall (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises; (ii) continue to engage in the business presently conducted by it; (iii) obtain and maintain all Licenses and all applicable governmental authorizations including, but not limited to, those necessary to construct and operate the Project; and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Property and the Project.

**5.3** **Dissolution**. Borrower shall not (i) engage in any dissolution, liquidation or consolidation, division or merger with or into any one or more other business entities or (ii) cause, permit or suffer Majority Member, OpCo or Guarantor to dissolve, divide, wind up or liquidate or take any action, or omit to take any action, as a result of which Majority Member, OpCo or Guarantor would be dissolved, divided, wound up or liquidated in whole or in part; provided that Borrower or Guarantor may engage in a special purchase acquisition company ("**SPAC**") transaction that would result in a merger of Borrower into the SPAC so long as such transaction would satisfy any requirements of the Option Agreement and Lender agrees to cooperate with Borrower in concluding such transaction, if possible, at no expense to Lender.

**5.4** **Change of Name, Identity or Structure**. Borrower shall not change its name, identity (including its trade name or names) or Borrower's corporate, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective

-24-

date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender, which consent may be conditioned upon receipt of opinions of counsel reasonably requested by Lender, including an updated substantive non-consolidation opinion (if Lender determines in its reasonable discretion that the same is necessary as a result of Borrower's new structure).   Borrower hereby authorizes Lender to file, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement amendment required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.  At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower or OpCo intends to operate the Property and the Project, and representing and warranting that Borrower and OpCo do business under no other trade names with respect to the Property and/or the Project.  Borrower shall and shall cause OpCo at all times maintain, preserve and protect all trade names.

     **5.5**    <u>**Principal Place of Business**</u>.  Borrower shall not change its principal place of business or chief executive office without first giving Lender thirty (30) days' prior notice.

     **5.6**    <u>**Additional Debt; Material Change**</u>.  None of Borrower, Ryze II nor OpCo will incur additional indebtedness without the consent of Borrower's Board of Managers.  All such additional indebtedness, except with respect to the Additional Funds, will be subordinate to the Loan.  No material change to the Project or the Property will be made without the consent of the Board of Managers.  Unless the Borrower's Board of Managers agrees in writing from and after the date hereof, none of Borrower, Ryze II nor OpCo will participate in any joint venture, disposition, divestitures, dissolution, carve-out, transfers, creation of liens, pledges or other encumbrances or swaps of any assets or shares of Borrower, Ryze II or OpCo.

     **5.7**    **[Intentionally omitted.].**

     **5.8**    <u>**Change in Business or Operation of Property**</u>.  Borrower shall not and Borrower shall not cause or permit OpCo to (i) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower and/or OpCo except to the extent expressly permitted by the Loan Documents or (ii) make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business, or the operation of the Project upon its completion or otherwise cease to construct or operate the Project or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property contemplated herein) or pending the receipt of the Additional Funds.

     **5.9**    <u>**Prohibited Transfers**</u>.  Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer.  Borrower shall provide Lender with copies of all organizational documents (if any) relating to any Permitted Transfer. Borrower shall pay on demand all of the reasonable costs and expenses incurred by Lender, including reasonable attorneys' fees and expenses in connection with considering any proposed Transfer, whether or not the same is permitted or occurs.

     **5.10**    <u>**Liens**</u>.  Without Lender's prior written consent, which may be withheld, granted or conditioned in the sole and absolute discretion of Lender, OpCo shall not create, incur, assume,

-25-

permit or suffer to exist any Lien on all or any portion of the Property or any direct or indirect legal or beneficial ownership interest in Borrower, Ryze II or OpCo, except Liens in favor of Lender or Second Priority Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien.

**5.11    Taxes and Other Charges**.  Except as provided in this Section, Borrower shall pay or cause OpCo to pay all Property Taxes and Other Charges as the same become due and payable, and to the extent requested by Lender, deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Property Taxes and the Other Charges have been so paid before they would be delinquent if not paid.  Borrower shall promptly pay or cause OpCo to pay, for all utility services provided to the Property.  After prior notice to Lender, OpCo, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Property Taxes or Other Charges, provided that (i) no Event of Default has occurred and is continuing, (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances, (iii) such proceeding shall suspend the collection of the Property Taxes or such Other Charges, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or OpCo is subject and shall not constitute a default thereunder, (v) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost, (vi) OpCo shall have furnished such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure the payment of any such Property Taxes or Other Charges, together with all interest and penalties thereon, which shall not be less than one hundred percent (100%) of the Property Taxes and Other Charges being contested, (vii) Borrower shall promptly upon final determination thereof cause OpCo to pay the amount of such Property Taxes or Other Charges, together with all costs, interest and penalties, (viii) such contest shall not affect the ownership, use or occupancy of the Property, and (ix) Borrower shall, upon request by Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth in clauses (i) through (viii) of this Section 5.11.  Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

**5.12    No Joint Assessment**.  Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, or (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**5.13    Repairs; Maintenance and Compliance; Alterations Repairs;  Maintenance and Compliance**.  Borrower shall or shall cause OpCo to: (i) keep the Project and all its properties, including, without limitation, the Property, in good repair and in good working order and condition, reasonable wear and tear excepted, and from time to time make all needed and proper repairs, renewals, replacements, additions, and improvements thereto; (ii) comply with the provisions of all leases to which OpCo is a party or under which it occupies property so as to prevent any loss or forfeiture thereof or thereunder; and (iii) preserve and maintain all licenses,

-26-

4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

trademarks, privileges, permits, franchises, certificates and the like necessary for the operation of the Project at nameplate capacity. Borrower shall and shall cause OpCo to promptly comply with all Legal Requirements and promptly cure any violation of a Legal Requirement. Borrower shall notify Lender and shall cause OpCo to notify Lender in writing within three Business Days after Borrower and/or OpCo first receives notice of any such non-compliance.

        **5.13.1 Alterations**. Borrower and/or OpCo may, without Lender's consent, perform alterations to the Improvements and Equipment other than the construction of the Project in accordance with plans and specifications approved by Lender prior to the date hereof, which (i) do not constitute a Material Alteration, (ii) do not materially and adversely affect Borrower's or OpCo's financial condition or the value or net operating income of the Property and (iii) are in the ordinary course of Borrower's and/or OpCo's business. Neither Borrower nor OpCo shall perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed; provided, that it will not be unreasonable to withhold consent if Borrower does not provide evidence of the availability of necessary funds to complete such Material Alteration. Lender may, as a condition to giving its consent to a Material Alteration, unless such Material Alteration is funded with the Additional Funds or funds deposited with Second Priority Lender, require that Borrower deliver or cause to be delivered to Lender security for payment of the cost of such Material Alteration in an amount equal to one hundred percent (100%) of the cost of the Material Alteration as estimated by Lender, which amount shall periodically be disbursed to Borrower during the course of such Material Alteration subject to commercially reasonable construction draw procedures. Upon substantial completion of the Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in accordance with applicable Legal Requirements and substantially in accordance with the plans and specifications approved by Lender, if applicable; (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of lien; and (iii) all material Licenses necessary for the use, operation and occupancy of the portion of the Property that is the subject of the Material Alteration have been issued. Borrower shall reimburse Lender upon demand for all out-of-pocket costs and expenses (including the reasonable fees of any construction consultant and any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.13.2. Lender shall provide a response to any request to perform a Material Alteration within ten (10) Business Days or such request shall be deemed approved.

        **5.14 Access to Property**. Borrower shall permit agents, representatives, consultants and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice to Borrower and such party being bound by the provisions of Section 10.15 hereof.

        **5.15 Environmental Matters**.

        **5.15.1 Hazardous Substances**. So long as OpCo owns or is in possession of the Property, Borrower shall cause OpCo to (i) use commercially reasonable efforts to keep the Property free from Hazardous Substances (except where such Hazardous Substances are contained in accordance with Environmental Laws and in such quantities permitted by Environmental Laws

-27-

4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

and otherwise in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower or OpCo shall become aware that (A) any Hazardous Substance is on or near the Property, (B) the Property is in violation of any Environmental Laws or (C) any condition on or near the Property shall pose a threat to the health, safety or welfare of humans and (iii) as required by law, remove such Hazardous Substances and/or cure such violations and/or remove such threats, as applicable, promptly after Borrower or OpCo becomes aware of same, at Borrower's sole expense.

### 5.15.2  Environmental Monitoring.

(a)      Borrower shall give prompt written notice to Lender of (i) any proceeding or written inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened in writing by any third party (including any Governmental Authority) against Borrower, OpCo or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's or OpCo's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could reasonably be expected to cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law.  Borrower shall permit or cause OpCo to permit Lender to join and participate in, as a party if Lender so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance.

(b)      If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law ("**Remedial Work**"), Borrower shall commence or cause OpCo to commence all such Remedial Work within thirty (30) days after becoming aware of the same (including by way of notice from Lender) and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law.  If OpCo does not timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense. Notwithstanding the foregoing, OpCo shall not be required to commence such Remedial Work within the above specified time period:  (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in OpCo or such Remedial Work violating any Environmental Law, or (z) if OpCo, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work. OpCo shall have the right to contest the need to perform such Remedial Work, provided that, (1) OpCo is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, and (2) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited or lost if OpCo fails to promptly perform the Remedial Work being contested, and if OpCo fails to prevail in such contest, OpCo would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of civil liability, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien unless Borrower provides any commercially reasonable security.

-28-

4838-9883-6219.21

Exhibit 1B - 000035

Ex. B
(SLA dated Nov. 29. 2021)

**5.15.3 O & M Program**.  In the event any environmental report delivered to Lender in connection with the Loan (including in connection with any inspection or audit provided pursuant to Section 5.15.2) recommends the development of or continued compliance with an operation and maintenance program for the Property (including with respect to the presence of asbestos and/or lead-based paint) ("**O & M Program**"), Borrower or OpCo shall develop (or continue to comply with, as the case may be) such O & M Program and shall, during the Term, comply in all material respects with the terms and conditions of the O & M Program.

**5.16   Leases**.  Upon request, Borrower shall furnish or cause OpCo to furnish Lender with executed copies of all Leases then in effect.  OpCo shall not enter into any new Lease or a proposed renewal, extension or modification of an existing Lease without the prior written consent of Lender, which may be withheld or conditioned in Lender's sole and absolute discretion.

**5.17   Approval of Major Contracts; Change Order Contract**.  Neither Borrower nor OpCo, without Lender's prior consent, which consent is provided in writing by Lender's manager or another officer of Lender, which consent shall not be unreasonably delayed or withheld: (a) enter into, surrender or terminate any Major Contract to which it is a party or to which Borrower, OpCo or the Property is subject (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Major Contract to which it is a party or to which Borrower, OpCo or the Property is subject, except as provided therein or on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Major Contract to which it is a party or to which Borrower, OpCo or the Property is subject in any material respect, except on an arm's-length basis and commercially reasonable terms. Once the same is executed, neither Borrower nor OpCo will modify, amend, supplement, restate, replace or terminate the Change Order Contract or enter into any other agreement with respect to the construction of the Project that would require the consent of the Senior Lender or the United States Department of Agriculture or that materially modifies the plans and specifications of the Project from those provided to Lender on or before the date hereof (the foregoing constituting a "**Change Order Alteration**") without the written consent of Lender, in its sole and absolute discretion.  For purposes of this paragraph, Lender shall respond to any request for consent no later than ten (10) Business Days from the date of such request.

**5.18   Zoning**.  OpCo shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender. For purposes of this paragraph, Lender shall respond to any request for consent no later than ten (10) Business Days from the date of such request.

**5.19   Licenses**.  Borrower shall not cause or permit OpCo to Transfer any License required for the construction or operation of the Property or the Project.

**5.20   Compliance with Restrictive Covenants, Etc.**  Borrower and OpCo shall at all times comply in all material respects with all Operations Agreements.  Neither Borrower nor OpCo will enter into, modify, waive in any material respect or release any Easements, Operations

-29-

Ex. B
(SLA dated Nov. 29. 2021)

Agreements or other Permitted Encumbrances, or suffer, consent to or permit the foregoing, without Lender's prior written consent in its commercially reasonable discretion. For purposes of this paragraph, Lender shall respond to any request for consent no later than ten (10) Business Days from the date of such request.

**5.21** **Performance of Other Agreements**.  Borrower and OpCo shall observe and perform each and every material term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property sufficient to prevent any liens on the Property.

**5.22** **ERISA**.

(a)    Neither Borrower nor Guarantor shall engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender or any assignee of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code.

(b)    Borrower's and Guarantor's covenant in clause (a) above is based on the assumption that no portion of the assets used by Lender in connection with the transactions contemplated under this Agreement and the other Loan Documents constitutes assets of a "benefit plan investor" as defined in Section 3(42) of ERISA and with respect to which Borrower or Guarantor is a party in interest (as defined in Section 3(14) of ERISA) or a disqualified person (as defined in Section 4975 of the Code) unless the conditions of an available prohibited transaction exemption are satisfied.

(c)    Neither Borrower nor Guarantor shall maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or permit the assets of Borrower or Guarantor to become "plan assets," within the meaning of 29 C.F.R. 2510.3-101, as modified in application by Section 3(42) of ERISA.

(d)    Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender, that:  (i) Borrower and Guarantors are in compliance with ERISA; and (ii) neither the assets of Borrower nor Guarantor constitute "plan assets" within the meaning of 29 C.F.R. Section 2510.3-101, as modified in application by Section 3(42) of ERISA of any "benefit plan investor" as defined in Section 3(42) of ERISA.

**5.23** **Expenses**.  Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Borrower or required of Borrower under the terms of any Loan Document; (ii) Borrower's intangibles Taxes and personal property Taxes and, upon an during the continuance an Event of Default, appraisals (iii) the protection of Lender's Liens in the Property; (iv) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any

-30-

action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan; and (v) enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Property or in connection with any refinancing or restructuring of the Loan in the nature of a "work-out", or any insolvency or bankruptcy proceedings to the extent such fees exceed $5,000 in the aggregate.  The obligations and liabilities of Borrower under this Section 5.22 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.  Notwithstanding the foregoing, Borrower shall have no obligation to pay or reimburse Lender for any costs or expenses to the extent such costs or expenses arose due to any breach, or misconduct of Lender.

   **5.24**    **Indemnity**.  Borrower shall defend, indemnify and hold harmless Lender (and for purposes of this Section 5.23, Lender shall include Lender, its Affiliates, successors and assigns, and their respective officers and directors) and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "**Indemnified Party**"), from and against any and all actual out-of-pocket liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "**Indemnified Liabilities**" provided that Indemnified Liabilities shall not include any consequential damages, punitive damages or other special or exemplary damages, unless actually paid by Lender to a third party) in any manner, relating to or arising out of or by reason of the Property (or any part thereof), the Loan, the Loan Documents or any of the rights and remedies granted to Lender under the Loan Documents, limited to:  (i) the use or intended use of the proceeds of the Loan; (ii) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (iii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (iv) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (v) any lawsuit brought or threatened, settlement reached, or governmental order relating to such Hazardous Substance; (vi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work (vii) any failure of Borrower or the Property to comply with any Legal Requirement; and (viii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof other than related to this Loan or the transactions contemplated in this Agreement, or any liability asserted against Lender with respect thereto and any claims of Doonbeg Partners LLC related to its fee equal to 1% of the Loan amount due from Borrower.  Any amounts payable to any Indemnified Party by reason of the application of this paragraph shall be payable within ten (10) Business Days after written notice and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid.  The obligations and

-31-

liabilities of Borrower under this Section 5.24 shall survive the Term, the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure and the termination of the Loan Documents. This Section 5.24 shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

**5.25    Cooperate in Legal Proceedings**.  Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which may in any way affect the rights of Lender under any Loan Document at Lender's sole cost and expense.

**5.26    Further Assurances**.  Borrower shall, at Lender's sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or appropriate, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Debt and/or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may require in its reasonable discretion from time to time; (ii) provide all such information as Lender may require in its reasonable discretion to ensure Borrower's ongoing compliance with Sections 5.9, 5.27 and 5.28, including ensuring compliance with all "know your customer" procedures necessary or appropriate to apply with applicable law.  Lender shall provide all such information as Borrower may require in its reasonable discretion to ensure compliance with all "know your customer" procedures of Senior Lender or otherwise as required to comply with applicable law, including information related to any party Lender nominates to serve as a Manager of Borrower.

**5.27    Patriot Act; Embargoed Person**.  Lender hereby notifies the Borrower that pursuant to the requirements of the U.S.A. PATRIOT Act and similar legislation (including applicable anti-money laundering laws and 31 C.F.R. § 1010.230 (the "**Beneficial Ownership Regulation**")), as applicable, it is required to obtain, verify and record information that identifies the Borrower and certain related entities, which information includes the name and address of the Borrower and other information that will allow the Lenders to identify such person in accordance with such legislation and the Beneficial Ownership Regulation.  Each of the Borrower, OpCo and Guarantor agrees to furnish such information promptly upon request of a Lender.

**5.28    Anti-Money Laundering**.  No proceeds of the Loan will be used by the Borrower or any subsidiary of Borrower directly or, to the knowledge of the Borrower, indirectly, for the purpose of financing activities of or with any Person, or in any country, that, at the time of such financing, is the subject of any Sanctions, except to the extent licensed or otherwise approved by OFAC.

**5.29    Cash Flow Sweep**.  At all times through the Term, on the twenty-fifth day of each March, June, September and December, Borrower will cause OpCo to distribute all of its remaining funds, less a reserve amount necessary to maintain a balance sufficient to cover two months of operating expenses, to Ryze II and Ryze II shall thereafter disburse such amount to Borrower, after payment of all amounts then due and owing pursuant to Senior Loan Documents and to fulfill all other payment requirements and reserve requirements set forth therein, and payments, if any to the Second Priority Lender.

-32-

Exhibit 1B - 000039

Ex. B
(SLA dated Nov. 29. 2021)

**5.30**   **CFIUS**.  Each of Lender, Borrower and their Affiliates, as necessary, shall use their best efforts to make a voluntary filing with Committee on Foreign Investment in the United States ("**CFIUS**") within ninety (90) days following the Funding Date, relating to the transactions contemplated by this Agreement, and promptly take all actions and steps necessary to obtain any clearance or approval from CFIUS that the Lender or its counsel deems necessary or advisable, at Lender's sole cost and expense.

**5.31**   **Covenants Related to Additional Funds**.  Prior to obtaining the Additional Funds, Borrower will provide Lender with:

(a)   an updated technical report from Stancil & Co. including an assessment on the commercial operations date on which the Project is estimated to be operating and capable of achieving full production (the "**COD**") with and without the completion of the pretreatment facility component of the Project (the "**Pretreatment Facility**");

(b)   a construction schedule for the Project with and without the Pretreatment Facility; and

(c)   verification from Stancil & Co. that MMC, Inc. is credit worthy for purposes of the Senior Loan and as further evidenced by the existence of payment and performance bonds for the construction work related to the Senior Loan and the Additional Funds

## 6.   NOTICES AND REPORTING

**6.1**   **Notices**.  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "**Notice**") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by written notice to the other party):

If to Lender:

LV Renewables A, LLC
c/o Mirae Asset Securities Co. Ltd.
26, Eulji-ro 5 gil
Jung-gu
Seoul, South Korea
Attention:  Kyunghyun Lee

with a copy to:

Snell & Wilmer L.L.P.
City National 2CAL
350 South Grand Avenue
Suite 3100

-33-

4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

Los Angeles, CA 90071-3420
Attention:  Victor J. Roehm III

If to Borrower:

Ryze Renewables Nevada, LLC
6600 Amelia Earhart Court
Suite A
Las Vegas, Nevada. 89119
Attention: Matthew G. Pearson

A notice shall be deemed to have been given:  in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or in the case of overnight delivery, upon the first attempted delivery on a Business Day.

**6.2**    **Borrower Notices and Deliveries**.  Borrower shall (a) give prompt written notice to Lender of:  (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower or an Guarantor which might materially adversely affect Borrower's, OpCo's or Guarantor's condition (financial or otherwise) or business or the Property or the Project; (ii) any material adverse change in Borrower's, OpCo's or Guarantor's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and provide to Lender:  (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, OpCo, Guarantor, or any Affiliate of any of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, in Borrower's or OpCo's possession or control, reasonably requested, from time to time, by Lender in its reasonable discretion.

**6.3**    **Financial Reporting**.

**6.3.1**    **Bookkeeping**.  Borrower shall keep on a calendar year basis, in accordance with GAAP, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property, whether such income or expense is realized by Borrower, or any Affiliate of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall desire.  After an Event of Default, Borrower shall pay any costs actually incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

**6.3.2**    **Annual Reports**.  Borrower shall furnish to Lender annually, (i) within ninety (90) days after each calendar year, unaudited financial statements of Borrower and OpCo, and (ii) within one hundred twenty (120) days after (A) calendar year 2021, a complete copy of Borrower and OpCo's consolidated annual financial statements audited by DesRoches promptly

-34-

Exhibit 1B - 000041

when available and (B) each calendar year during the Term commencing with calendar year 2022, a complete copy of Borrower and OpCo's audited consolidated annual financial statements for the period ending on December 31 of such calendar year, certified by Deloitte and Touche, in each instance certified as true and correct in all material respects as of the date of such financial statements by the officer responsible for the preparation of such financial statements, each in accordance with GAAP (or such other accounting basis consistently applied) and containing balance sheets and statements of profit and loss for Borrower and the Property in such detail as Lender may request. Borrower shall furnish audited consolidated annual financial statements for Borrower and OpCo certified by Deloitte and Touche, for the calendar year ending December 31, 2021 as soon as such financial statements are available and Borrower will diligently proceed at all times to cause such audited financial statements to be completed, and will certify that such statements are true and correct. Each such statement (x) shall be in form and substance compliant with GAAP and, after the initial audited financial statements are prepared, consistent with past practices, (y) shall set forth the financial condition and the income and expenses for the Property for the immediately preceding calendar year, including statements of annual net operating income and (z) shall be accompanied by an Officer's Certificate certifying that such statement is true, correct, complete and accurate and presents fairly the financial condition of the Property and has been prepared in accordance with GAAP (or such other recognized accounting basis consistently applied).

6.3.3   **Monthly/Quarterly Reports**.  Borrower shall furnish to Lender within thirty (30) days after the end of each calendar month for review by an asset manager approved by Lender the following items:   (i)  monthly and year-to-date operating statements, noting net operating income and other information necessary and sufficient under GAAP to fairly represent the financial position and results of operation of Borrower, OpCo, the Property and the Project during such calendar month, all in form satisfactory to Lender; (ii) a balance sheet for such calendar month; (iii) a comparison of the budgeted income and expenses of Borrower and OpCo (including expenses related to the completion of the Project prior to COD) and the actual income and expenses for each month and year-to-date for the Property, together with a detailed explanation of any variances of ten percent (10%) or more between budgeted and actual amounts for such period and year-to-date; (iv) a statement of the actual Capital Expenses made by OpCo and Borrower during each calendar quarter as of the last day of such calendar quarter; (v) a statement that neither OpCo nor Borrower has incurred any indebtedness other than Permitted Indebtedness; (vi) an aged receivables report; (vii) monthly capital expenditure reports for the Property; (viii) a technical advisory report in form and substance satisfactory to Lender prior to COD. Each such statement shall be accompanied by an Officer's Certificate certifying (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower, OpCo and the Property in accordance with GAAP, (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it and (3) that as of the date of such Officer's Certificate, no litigation exists involving Borrower or the Property in which the amount involved is $100,000 (in the aggregate) or more or in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taking in relation thereto. Lender's asset manager will review the financial and operating reports.

6.3.4   **Other Financial Information**.  Borrower shall furnish to Lender, within ten (10) Business Days after request or such longer period as may be reasonably required, such

-35-

further detailed information with respect to the operation of the Property, the construction of the Project and the financial affairs of Borrower, OpCo, or Ryze II as may be reasonably requested by Lender (i) so long as such information is readily available to Borrower or (ii) which can reasonably be prepared by or for Borrower at a cost of less than $5,000 in the aggregate upon the occurrence and during the continuance of an Event of Default. Notwithstanding the foregoing, Borrower shall only be required to furnish further detailed information of the financial affairs of Majority Member during the occurrence of an Event of Default (i) so long as such information is readily available to Majority Member or (ii) can reasonably be prepared at a cost of less than $5,000 in the aggregate.

**6.3.5** **Annual Budget and Fair Market Value Report**.  Borrower shall prepare and submit to Lender by December 1st of each year beginning in 2022 during the Term (i) a proposed pro forma operating expense budget for the Property for the succeeding calendar year showing, on a month-by-month basis, in reasonable detail, each line item of anticipated operating income and operating expenses (on a cash and accrual basis), including amounts required to establish, maintain and/or increase any monthly payments required hereunder and (ii) promptly after preparation thereof, any revisions to such annual operating budget.  Each annual operating budget submitted by Borrower shall have been approved by Borrower's Board of Managers and Borrower will cause such operating budget to be approved by the manager(s) of OpCo.  Borrower will provide an annual report from Stancil & Co. or a third party reasonably satisfactory to Lender and Borrower confirming the fair market value of the Property and the Project.

**6.3.6** **Breach**.  If Borrower or Guarantor fails to provide to Lender any of the financial statements, certificates, reports or information (the "**Required Records**") required by this Article 6 (with respect to Borrower) or the Guaranty (with respect to Guarantor) within fifteen (15) days after the date upon which such Required Record is due, Lender shall have the option, to gain access to Borrower's or Guarantor's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower or Guarantor.

**6.4** **Estoppel Statements**.  After request by Lender (which request shall not be made more than twice in any twelve (12) month period, other than if an Event of Default is continuing), Borrower shall within ten days furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal, (ii) the Interest Rate, (iii) the date installments of interest and/or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, (v) whether there exists a Default or Event of Default, and (vi) reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes and (vii) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

**7.** **INSURANCE; CASUALTY; AND CONDEMNATION**

**7.1** **Insurance Coverage**.  Borrower shall obtain and maintain or cause OpCo to obtain and maintain, for the mutual benefit of Borrower, Senior Lender, Lender and Second Priority Lender, if applicable, during the Term the following policies of insurance: (a)  Commercial liability insurance, to be written on an occurrence basis with deductible or self-insured retention less than $50,000 on the general liability in the amounts reasonably comparable to those usually

-36-

carried by similar entities and individuals and sufficient to avoid the application of any co-insurance provisions.

(b)     Worker's compensation and disability insurance with respect to any employees of Borrower, as required by any Legal Requirement.

(c)     Such insurance as required by the Security Instrument.

(d)     Such other insurance, higher limits, replacements or substitutions thereof (including environmental liability insurance, pollution liability insurance, sinkhole, mine subsidence, and earthquake insurance) in the amounts and types reasonably comparable to those usually carried by similar entities and individuals.

   **7.1.1   Policies**.   Unless otherwise approved by Lender in writing in advance of placement, all policies of insurance (the "**Policies**") required pursuant to <u>Section 7.1.1</u> above shall (i) name Lender and its successors and/or assigns as their interest may appear as the mortgagee and lender's loss payable (in the case of property insurance and in the case of business personal property/business interruption/loss of rents coverage) and an additional insured (in the case of liability insurance); (ii) contain (in the case of property insurance) a Non-Contributory Standard Mortgagee Clause and a Lender's Loss Payable Endorsement, or their equivalents, naming Lender as the person to which all payments made by such insurance company shall be paid; (iii) contain a waiver of subrogation on both the Property and Public Liability Policies in favor of Lender; (v) be assigned and the carrier-certified copies thereof delivered to Lender; (vi) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer under the Policies, (B) that Lender shall receive at least ten (10) days' prior written notice of cancellation and ten (10) days' notice for nonpayment of premium) of any of the property Policies. Such notice shall also be provided for, liability policies when available from the carrier (provided, however, that if such notice provisions are not available in any of the liability Policies, Borrower shall provide the required notice to Lender) (C) an agreement whereby the insurer waives any right to claim any premiums and commissions against Lender, provided that the policy need not waive the requirement that the premium be paid in order for a claim to be paid to the insured and (D) providing that Lender is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums; (vii) in the event any insurance policy (except for general public and other liability and workers compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (viii) be  in form and substance as to amounts, form, risk coverage, deductibles, loss payees and insureds comparable to those usually carried by similar entities and individuals.  Borrower shall pay the premiums for such Policies (the "**Insurance Premiums**") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Lender pursuant to <u>Section 3.3</u> hereof) receipts for or other evidence of the payment of the Insurance Premiums satisfactory to Lender in its reasonable discretion.  If Borrower

-37-

Ex. B
(SLA dated Nov. 29. 2021)

does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate.  Borrower shall deliver to Lender a certified copy of each Policy within thirty (30) days after its effective date.  Within forty-five (45) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be requested by Lender in its reasonable discretion, such that the coverage remains comparable to those usually carried by similar entities and individuals.

 7.1.2 **Transfers**.  In the event of foreclosure of the Security Instrument or other transfer of title to the Property and Improvements in extinguishment in whole or in part of the Debt, and regardless of whether Lender shall have sought a deficiency judgment with respect thereto, all right, title and interest of Borrower or OpCo, as appropriate, in and to the Policies that are not blanket policies then in force concerning the Property and Improvements and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or its designee in the event of such other transfer of title.

 7.2 **Casualty Notice; Restoration**.  If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice thereof to Lender.  Following the occurrence of a Casualty, Borrower, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

 7.2.1 **Settlement of Proceeds**.  If an Event of Default has occurred and is continuing, Lender may, in its sole discretion, settle and adjust any insurance claim related to a Casualty without the consent of Borrower and agree with the insurer(s) on the amount to be paid on the loss, and the proceeds shall be due and payable solely to Lender and held by Lender to be applied to the Loan or to restore the Property, in its sole and absolute discretion, except to the extent of any prior claim of the Senior Lender or Second Priority Lender, if any.  The expenses incurred by Lender in the settlement, adjustment and collection of the insurance proceeds shall become part of the Debt and shall be reimbursed by Borrower to Lender upon demand.

 7.2.2 **Condemnation. Notice; Restoration**.  Borrower shall cause OpCo to promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "**Condemnation**") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation.  Following the occurrence of a Condemnation, Borrower will cause OpCo to promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character and utility as contemplated herein to operate the Project.

 7.2.3 **Collection of Award**.  After payments to the Senior Lender in accordance with the Senior Loan Documents and the Second Priority Lender in accordance with the documentation of the Additional Funds, any remaining portions of an award or payment in respect

-38-

Ex. B
(SLA dated Nov. 29. 2021)

of a Condemnation (an "**Award**"), shall be paid to Lender, up to the balance of the Loan, and thereafter to Borrower, to be held and disbursed in accordance with the terms hereof.

      **7.2.4**   **Application to Debt**.  Upon the occurrence and during the continuance of any Event of Default, any insurance proceeds and/or Award will be applied first to amounts owed to the Senior Lender, second to amounts owed to the Second Priority Lender and third to the payment of the Debt and subject to the payment of Prepayment Premium.

## 8.   **DEFAULTS**

      **8.1**   **Events of Default**.  An "**Event of Default**" shall exist with respect to the Loan if any of the following shall occur:

         (a)    any portion of the Debt is not paid within ten (10) Business Days of the date on which such payment is due or Borrower shall fail to pay when due (including extensions and accommodations) any payment required hereunder other than Property Taxes;

         (b)    any of the Property Taxes are not paid when due (including extensions and accommodations), subject to OpCo's right to contest Property Taxes in accordance with <u>Section 5.11</u> hereof

         (c)    the Policies are not kept in full force and effect, or are not delivered to Lender upon request, and Borrower fails to correct such failure to deliver the Policies within ten (10) Business Days of a notice from Lender;

         (d)    a Transfer other than a Permitted Transfer occurs;

         (e)    any certification, representation or warranty made by Borrower or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower, OpCo or Guarantor in connection with any Loan Document, shall be knowingly false or misleading in any material respect as of the date the representation or warranty was made, and to the extent Borrower becomes aware of such false or misleading statement Borrower shall promptly inform Lender;

         (f)    Borrower, OpCo or Guarantor shall make an assignment for the benefit of creditors, or shall generally not be paying its debts as they become due (including extension and accommodations);

         (g)    a receiver, liquidator or trustee shall be appointed for Borrower, or Guarantor; or Borrower or Guarantor shall be adjudicated as bankrupt or insolvent; or any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Guarantor, as the case may be; or any proceeding for the dissolution or liquidation of Borrower or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within 60 days;

-39-

Exhibit 1B - 000046

(h)  Borrower or OpCo breaches any covenant contained in <u>Sections 5.3, 5.8, or 5.22</u>; provided, however, any such breach shall not constitute an Event of Default (i) if such breach was inadvertent, immaterial and non-recurring, and (ii) if such breach is curable, Borrower cures such breach within ten (10) Business Days of written notice from Lender;

(i)  except as expressly permitted hereunder, the alteration, improvement, demolition or removal of all or any portion of the Improvements without the prior written consent of Lender;

(j)  a default (beyond applicable notice and cure periods) under any agreement creating a Lien or encumbrance on the Property (including any reciprocal easement agreement or other covenants, restrictions, easements, declarations or agreements of record relating to the construction, operation or use of the Property);

(k)  the forfeiture of the Property, or any portion thereof;

(l)  there shall have been rendered against Borrower a final non-appealable judgment and order for the payment of money in an aggregate amount exceeding $500,000 (to the extent not paid or covered by insurance or indemnities as to which the insurer or indemnifying party has not denied coverage thereof), and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of ninety-three (93) consecutive days;

(m)  an Event of Default (beyond all applicable notice and cure periods) or Default as defined or described elsewhere in any other Loan Document occurs;

(n)  [Intentionally omitted.]

(o)  any breach, default or event of default occurs, and is continuing, with respect to the Senior Loan Documents after giving effect to any cure or grace periods provided therein; provided that, to the extent any such defaults or events of default are cured or otherwise waived or extended, such defaults or events of default shall automatically cure any Event of Default arising under this clause (o) as a result of such default or event of default;

(p)  any breach, default or event of default occurs, and is continuing, with respect to any loan documents related to the Additional Funds after giving effect to any cure or grace periods provided therein; provided that, to the extent any such defaults or events of default are cured or otherwise waived or extended, such defaults or events of default shall automatically cure any Event of Default arising under this clause (p) as a result of such default or event of default;

(q)  Borrower fails to secure a loan for the Additional Funds from a Second Priority Lender on or before the date that is 150 days after the Funding Date; provided the Lender and Lender's appointment to the Board of Managers worked in good faith to accommodate and facilitate the Borrower in securing the Additional Funds. If Borrower fails to satisfy the foregoing sentence, Borrower and OpCo will seek approval from the United States Department of Agriculture and Senior Lender as necessary to confirm that the Project may be completed without necessity of the Change Order Contract in accordance with the terms of the General Contract, if

-40-

requested by Lender based on Lender's determination that the Project may be completed without necessity of the Change Order;

(r)     COD does not occur on the date that is twenty-five (25) months after the Funding Date; provided the Lender and Lender's appointment to the Board of Managers Of Borrower worked in good faith to accommodate and facilitate the Borrower in securing the Additional Funds; and

(s)     a default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this Section 8.1, for ten (10) Business Days after notice to Borrower (and OpCo or Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default; provided, however, that if such non-monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period, and Borrower (or OpCo or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for an additional period of time as is reasonably necessary for Borrower (or OpCo or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed ninety -three (93) days.

Notwithstanding anything to the contrary herein, Lender may not commence remedies with respect to any Event of Default prior to the Funding Date.  If an Event of Default exists that would cause the Funding Date to occur on a date after December 15, 2021 Lender or Borrower may terminate this Agreement in its sole and absolute discretion and if funding does not occur for any reason on or before December 15, 2021, Borrower may terminate this Agreement.  If the Funding Date does not occur on or before December 15, 2021 other than as the result of an Event of Default or other failure of the conditions set forth in Section 2.1, Mirae will dismiss with prejudice Case No. A-21-838382-B in the District Court of Clark County. Nevada.

**8.2     Remedies. Acceleration.**  Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in paragraph (f) or (g) of Section 8.1) and at any time and from time to time thereafter during the continuance of such Event of Default, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, upon notice of an Event of Default (after expiration of grace and cure periods) to Borrower, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property; including declaring the Debt to be immediately due and payable (including unpaid interest, Default Rate interest, Prepayment Premium, and any other amounts owing by Borrower); and upon any Event of Default described in paragraph (f) or (g) of Section 8.1, the Debt (including unpaid interest, Default Rate interest, Prepayment Premium, and any other amounts owing by Borrower) shall immediately and automatically become due and payable, in accordance with the Note subject to Borrower's applicable cure rights at law.

**8.2.1     Remedies Cumulative.**  Upon the occurrence and continuation of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law, equity or contract may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared,

-41-

or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole and absolute discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Security Instrument has been foreclosed, the Property has been sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full. To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its sole and absolute discretion.

### 8.2.2   Severance/Partial Foreclosure.

(a)      During the continuance of an Event of Default: (i) Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (and, in connection therewith, to bifurcate or otherwise modify the nature of the collateral that secures such notes) in such denominations and priorities of payment and liens as Lender shall determine in its sole and absolute discretion for purposes of evidencing and enforcing its rights and remedies; and (ii) Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance satisfactory to Lender (provided that this clause (ii) shall not obligate Borrower to provide additional collateral to secure obligations under the Note and the other Loan Documents). Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance provided for in the immediately preceding sentence, Borrower ratifying all that such attorney shall do by virtue thereof.

(b)      During the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender, including the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of Principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments; or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of the sums secured by the Security Instrument and not previously recovered.

-42-

4838-9883-6219.21

**8.2.3   Delay**.   No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed necessary or advisable by Lender.   A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power arising from or related thereto.   Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Security Instrument to the extent necessary to foreclose on all or any portion of the Property, or any other collateral.

**8.2.4   Lender's Right to Perform**.   If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of ten (10) Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Security Instrument and other Loan Documents) and shall bear interest thereafter at the Default Rate.

**9.      [INTENTIONALLY OMITTED.]**

**10.     MISCELLANEOUS**

**10.1    [Intentionally omitted.].**

**10.2    Brokers and Advisors**.   Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loan other than (i) Mirae Asset Daewoo Co., Ltd., or its successors, (ii) Paragon Construction Consulting, Inc., including Jeff Hall and Sung Hee Han, (iii) Doonbeg Partners LLC and (iv) Sung Hee Han ("**Borrower Brokers**").   Lender hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loan other than Sung Hee Han ("**Lender Broker**").   Each of Borrower and Lender represents and warrants that no other third party is being paid in connection with this Loan.   Except for a fee equal to 1% of the loan amount to be paid by Borrower to Doonbeg Partners LLC, the full amount of Borrower's fee to be paid to Doonbeg Partners LLC, all of Borrower Brokers and Lender Broker shall be paid by Lender out of the amounts allocated to the fees set forth in Section 2.6; provided that if any of Borrower Brokers other than Doonbeg Partners LLC refuses payment of such fees or contests the amount of such fees or makes any other claims against a Lender Indemnified Party (defined below), Lender will thereafter indemnify Borrower as set forth herein.   Lender shall provide Borrower with a statement setting forth an allocation of fees under this Section disclosing all United States Persons receiving any portion of the fees set forth in Section 2.6, directly or indirectly through payments from, by or under the direction of Lender Broker.   Lender and Mirae Asset Securities Co., Ltd. hereby agree to indemnify and hold harmless Borrower and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners,

-43-

members, shareholders, participants, employees, professionals and agents of any of the foregoing and each other Person, if any, who Controls Borrower, its Affiliates or any of the foregoing (each, an "**Lender Indemnified Party**"), from and against any and all actual out-of-pocket liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "**Lender Indemnified Liabilities**") with respect to (A) any amounts owed to Borrower Brokers or Lender Broker other than Borrower's 1% fee payable by Borrower to Doonbeg Partners LLC and (B) any breach by Lender of its obligations pursuant hereto and the other Loan Documents.  So long as Lender is defending all actions and paying all Lender Indemnified Liabilities on behalf of each Lender Indemnified Party, Borrower will not enter into any settlement agreement with any Borrower Brokers or Lender Broker or stipulate as to judgement in a brought by Borrower Brokers or Lender Broker without the consent of Lender and to the extent Borrower does so notwithstanding this sentence, Lender will have no obligation hereunder with respect to the amounts set forth in such settlement or related to such judgement.  Any amounts payable to any Lender Indemnified Party by reason of the application of this paragraph shall be payable within ten (10) Business Days after written notice and shall bear interest at the Default Rate from the date loss or damage is sustained by any Lender Indemnified Party until paid.  The provisions of this <u>Section 10.2</u> shall survive the expiration and termination of this Agreement and the repayment of the Debt.  At Borrower's sole option, in the event Lender does not pay amounts due under this paragraph within the ten (10) Business Day period, Borrower may use such amounts to offset amounts due under the Loan, without any application of a prepayment penalty.

     **10.3**  <u>Survival</u>.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement.  All Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

     **10.4**  <u>Governing Law</u>.  THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEVADA, AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEVADA, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEVADA, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS

4838-9883-6219.21

CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED ACCORDING TO, THE LAW OF THE STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, THE LAW OF THE STATE OF NEVADA SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND THE DEBT. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA.

      **10.5**   <u>**Arbitration**</u>. Any dispute, claim or controversy, including tort claims, arising out of or relating to this Agreement or to the breach, termination, enforcement, interpretation or validity hereof, including the determination of the scope or applicability of this arbitration provision, shall be determined by arbitration in accordance with the JAMS Comprehensive Arbitration Rules and Procedures (the "**Rules**"). In the event of a conflict between such Rules and this Agreement, the provisions of this Agreement will control. The tribunal will consist of one arbitrator. The place of arbitration will be Las Vegas, Nevada. The language to be used in the arbitral proceedings will be English. The arbitrator shall be appointed pursuant to the Rules. The arbitrator shall, in the award, allocate all the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party or parties. The result of the arbitration will be final and binding on the parties, and judgment upon any award rendered by the arbitrator may be entered by any court having jurisdiction. The parties hereby agree not to appeal the result of the arbitration. The procedures set forth herein shall not preclude a party from seeking injunctive relief or other provisional remedies in aid of arbitration from a court of appropriate jurisdiction. The interpretation and enforceability of this section shall be governed exclusively by the Federal Arbitration Act, 9 U.S.C. Section 1, et seq.

      **10.6**   <u>**Modification, Waiver in Writing**</u>. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances. Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount. Lender shall have the right to

-45-

Ex. B
(SLA dated Nov. 29. 2021)

waive or reduce any time periods that Lender is entitled to under the Loan Documents in its sole and absolute discretion.

**10.7** **Headings/Schedules**.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The Schedules attached hereto, are hereby incorporated by reference as a part of this Agreement with the same force and effect as if set forth in the body hereof.

**10.8** **Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**10.9** **Prior Agreements**.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**10.10** **Preferences**.  Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Debt.  To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or in part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.  This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**10.11** **[Intentionally omitted.]**

**10.12** **[Intentionally omitted.]**

**10.13** **Publicity**.  All news releases, publicity or advertising through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender or any member of the Lender Group, or a Loan purchaser, shall be subject to the prior written approval of Borrower and Lender except to the extent disclosure is required to comply with applicable laws.

**10.14** **No Usury**.  Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 10.17 shall control every other agreement in the Loan Documents.  If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or

-46-

Exhibit 1B - 000053

any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**10.15   Conflict; Construction of Documents; Reliance**.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation, drafting, execution and delivery of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan, without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or affiliate of Lender of any equity interest any of them may acquire in Borrower.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.  Lender agrees, on behalf of itself, its brokers, employees, advisors, managers or others it has shared Confidential Information with (including but not limited to, specifically Sung Hee Han), to maintain the confidentiality of all information and documentation related to Borrower or the Project that constitutes Confidential Information and that such information will not be used or disclosed by Lender except in connection with (A) enforcement of Lender's rights and remedies hereunder and pursuant to the Loan Documents, (B) permitted participation or assignments of Lender's interest in the Loan, (C) disclosures to Mirae Asset Securities Co., Ltd. or an Affiliate thereof (subject to such party agreeing to similar confidentiality provisions as set forth in this Section), or (D) disclosures to third parties to the extent required by law or order of a court of competent jurisdiction, provided that Borrower shall be given immediate notice and an opportunity to contest such disclosure, unless prohibited by law.  "Confidential Information" means any and all information that is disclosed to, or learned by, the Lender, from or pursuant to discussions with management or employees of, or advisors to, the Borrower in connection with this Agreement and the Loan Documents that relates to the technology, assets, financial condition and prospects of the Borrower.  Confidential Information includes financial statements, designs, drawings, prototypes, techniques, systems, formulae, research, research developments, inventions, discoveries,

-47-

4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

engineering concepts, methods, trade secrets and processes, as well as technical, operating, cost, know-how, financial information, and all record-bearing media disclosing such information and techniques.  Confidential Information does not include information that Lender can demonstrate (i) is or becomes publicly available through no wrongful act or breach of obligation of confidentiality by Lender; (ii) that was known by Lender prior to disclosure in connection with the Loan Documents; (iii) was developed by Lender independent of the disclosure made, and without breach by the Lender of its obligations, under this Section; or (iv) was rightfully received by Lender, without restriction on disclosure, from a third party that represents that it has a lawful right to disclose such information.  Lender's duty of confidentiality shall survive termination of this Agreement.

**10.16** **No Joint Venture or Partnership; No Third Party Beneficiaries**.

(a)     Borrower and Lender intend that the relationships created under the Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)     The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than the Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**10.17** **[Intentionally omitted.]**.

**10.18** **Assignment**.  The Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may be pledged or participated by Lender and any of its successors and assigns to any Person without Borrower's or Guarantor's consent at any time in its discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise.  The Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may not be assigned (other than with respect to the pledge described in the preceding sentence) or syndicated without Borrower's consent, which consent may not be unreasonably withheld or delayed; provided however the Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may be wholly-assigned to Mirae Asset Securities Co., Ltd., an entity organized under the laws of the Republic of Korea or any subsidiary thereof without the consent of Borrower or Guarantor.  Upon any assignment consented to or otherwise permitted by this Section, all references to Lender in this Loan Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender. Borrower may not assign and/or delegate, as applicable, its rights, title, interests or obligations under this Loan Agreement or under any of the Loan Documents.

**10.19** **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

-48-

4838-9883-6219.21

**10.20  Additional Funds**.  Borrower and Lender acknowledge that the Loan constitutes bridge financing and that additional funding will be necessary to fully complete the Project. Lender will cooperate with all commercially reasonable requests to assist Borrower in obtaining the Additional Funds from third parties, including providing a reasonable, accurate and truthful estoppel regarding the Loan, at no cost or expense to Lender. Lender further agrees to consider, in a commercially reasonable manner, requests of the Second Priority Lender in the negotiation of the Additional Funds, including amendments to the terms of the Loan (including, but not limited to the terms of the subordination set forth below) and related agreements in connection with the receipt of the Additional Funds provided that such amendments do not change the financial return, tax consequences, collateral, or other material terms of the Loan; provided, however, that Lender will subordinate its liens to those of Second Priority Lender upon funding of the loan for the Additional Funds and will enter into an intercreditor agreement in form and substance reasonably acceptable to Lender, in connection therewith.  Lender's subordination is subject to the following terms with respect to a loan of the Additional Funds:

(1)    Maximum principal amount of $200,000,000;

(2)    Maximum interest rate of 16%; and

(3)    Minimum repayment term of 5 years from the funding date.

Borrower will use commercially reasonable efforts to cause Second Priority Lender to syndicate or assign a portion of the loan of the Additional Funds to Lender, Mirae Asset Securities Co., Ltd. or an Affiliate thereof in an amount not less than $20,000,000.

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

-49-

**IN WITNESS WHEREOF**, the parties hereto have caused this Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**
**RYZE RENEWABLES NEVADA, LLC**,
a Delaware limited liability company,

By:
Name:   Matthew G. Pearson
Title:     Manager

Acknowledged and agreed:

**OPCO:**
**RYZE RENEWABLES LAS VEGAS, LLC**,
a Delaware limited liability company,

By:
Name:   Matthew G. Pearson
Title:     Manager

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

[Signature Page to Loan Agreement]

78454552.11
4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

**LENDER:**

**LV RENEWABLES A, LLC,**
a Nevada limited liability company

By:  Mirae Asset Securities Co., Ltd.,
an entity organized under the laws of the
Republic of Korea, its Manager

By:_____ 1 December, 21
    Kyunghyun Lee, Director

    Acknowledged and agreed solely with respect to the indemnity set forth in Section 13.2
hereof:

**MIRAE ASSET SECURITIES CO., LTD.,**
an entity organized under the laws of the Republic
of Korea

By:_____ 1 December, 21
    Kyunghyun Lee, Director

[Signature Page to Loan Agreement]

78454552.11
4838-9883-6219.21

**EXHIBIT A**
**Operating Budget**

[See attached.]

A-1

Ex. B
(SLA dated Nov. 29. 2021)

## 2022 Projected Operating Budget

| | | 2022 | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Q1 | | | Q2 | | | Q3 | | | Q4 | | |
| | | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 |
| 1. | All Staff Salaries | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) |
| 2. | All Staff Health Insurance and Benefits | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) |
| 3. | All Staff 401K | - | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Rent / Utilities | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) |
| 5. | Other Overhead | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) |
| 6. | Ryze Normal T&E | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) |
| 7. | Normal Legal Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| 8. | Normal Accounting/Audit | (35,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| 9. | Deloitte Audit | (118,333) | (118,333) | (118,333) | - | - | - | - | - | - | - | - | - |
| 10. | Stancil Report | (65,000) | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Legal Fees Lender B | (83,333) | (83,333) | (83,333) | - | - | - | - | - | - | - | - | - |
| 12. | SPAC/IPO Legal Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| 13. | Normal Consulting Fees | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) |
| 14. | Engineering Consulting Fees | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) |
| 15. | Other Transaction Consulting Fees | (228,000) | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Board Fees | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) |
| 17. | D&O Insurance | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) |
| 18. | Filing Fees / Local Taxes etc. | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) |
| 19. | Accounts Payable Paydown | (80,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) |
| 20. | General Insurance | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) |
| 21. | Plant Maintenance / Repairs | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) |
| | **TOTAL** | **(848,458)** | **(490,458)** | **(490,458)** | **(288,792)** | **(288,792)** | **(288,792)** | **(288,792)** | **(288,792)** | **(288,792)** | **(288,792)** | **(288,792)** | **(288,792)** |

**NOTES:**

Note 1: Item 10 on the budget (Stancil Report) is subject to requests for information by the Senior Lender.  If the Senior Lender requests additional reports or information from Stancil, the Senior Lender's independent engineer, this budget item shall be adjusted accordingly to cover any related cost or expense.

Note 2: Item 19 on the budget (Accounts Payable Paydown) relates to various accounts payable owed by the Company.  The Company is in discussions regarding the reduction and/or extension of amounts due.  This entry is subject to such discussions and the deferral shown above has not been approved.  The largest payable includes $1,083,000 owed to Latham & Watkins.  If Latham & Watkins will not agree to the proposed reduction / extension of amounts due, this budget item shall be adjusted.

Note 3: The loan agreement contains various obligations for the Company to make payments, maintain property, acquire insurance, and cover certain other costs and expenses.  To the extent not already accounted for in the above, the budget shall be adjusted to cover such payments, costs and expenses as and when they arise.

Exhibit 1B - 000060

Ex. B
(SLA dated Nov. 29. 2021)

## Exhibit A-1

|  | Jan-22 | Feb-22 | Mar-22 | Total |
|---|---|---|---|---|
|  |  |  |  |  |
| Rent / Utilities | (15,417) | (15,417) | (15,417) | (46,250) |
| Other Overhead | (11,250) | (11,250) | (11,250) | (33,750) |
| Ryze Normal T&E | (8,333) | (8,333) | (8,333) | (25,000) |
| Normal Accounting/Audit | (35,000) | (5,000) | (5,000) | (45,000) |
| Deloitte Audit | (118,333) | (118,333) | (118,333) | (355,000) |
| Legal Fees Lender B | (83,333) | (83,333) | (83,333) | (250,000) |
| Accounts Payable Paydown | (80,125) | (45,125) | (45,125) | (170,375) |
| General Insurance | (8,333) | (8,333) | (8,333) | (25,000) |
| Plant Maintenance / Repairs | (17,333) | (17,333) | (14,958) | (49,625) |
| TOTAL | (377,458) | (312,458) | (310,083) | (1,000,000) |

A1-1

Exhibit 1B - 000061

Ex. B
(SLA dated Nov. 29. 2021)

**EXHIBIT B**
**Bring Down Certificate**

**MANAGER CERTIFICATE**
**OF**
**RYZE RENEWABLES NEVADA, LLC**

The undersigned, being all of the members of the Board of Managers (the "Board") of Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "Company"), hereby consent to, authorize, and approve, the following resolutions, effective as of the _____ day of December, 2021:

**WHEREAS,** a Loan Agreement in the aggregate principal amount of $21,000,000, by and between the Company (as the borrower) LV Renewables A, LLC, a Nevada limited liability company (as the lender), Ryze Renewables Las Vegas, LLC, a Delaware limited liability company and Mirae Asset Securities Co., Ltd., an entity organized under the laws of the Republic of Korea (the "Loan Agreement"), was executed on November 29, 2021. All capitalized but undefined terms used herein shall have the meaning given in the Loan Agreement.

**WHEREAS**, the Loan Agreement requires a manager of the Company to provide a certificate, dated the Funding Date, confirming that (i) no Default or Event of Default shall have occurred and be continuing on such date, (ii) there has been no change from the financial statements provided to Lender by the Company for the period ending September 30, 2021, and (iii) the Company has provided appropriate notice regarding any errors in the USDA consent letter dated as of September 29, 2021 to the Senior Loan's servicer and Senior Lender.

**WHEREAS**, the Funding Date under the Loan Agreement is December ____, 2021.

**NOW, THEREFORE, BE IT RESOLVED**, that, Matthew G. Pearson, the sole member of the Board of Managers as of the Funding Date, solely in his capacity as manager, hereby certifies (i) no Default or Event of Default shall have occurred and be continuing on such date, (ii) there has been no change from the financial statements provided to Lender by the Company for the period ending September 30, 2021, and (iii) the Company has provided appropriate notice regarding any errors in the USDA consent letter dated as of September 29, 2021 to the Senior Loan's servicer and Senior Lender..

[Remainder of Page Intentionally Blank]

78454552.11
4838-9883-6219.21

Exhibit 1B - 000062

**IN WITNESS WHEREOF**, the undersigned have executed this Manager Certificate as of the date first written above.

**MANAGER:**

By: _____
Name:  Matthew G. Pearson
Title:   Manager

B-2

78454552.11
4838-9883-6219.21

Exhibit 1B - 000063

Ex. B
(SLA dated Nov. 29. 2021)

**EXHIBIT C**
**Operating Agreement**
**[See attached.]**

Ex. B
(SLA dated Nov. 29. 2021)

**AMENDED AND RESTATED**

**OPERATING AGREEMENT**

**OF**

**RYZE RENEWABLES NEVADA, LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

**Dated as of November 29, 2021**

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

\4842-5277-7983

Ex. B
(SLA dated Nov. 29. 2021)

# AMENDED AND RESTATED
# OPERATING AGREEMENT
## OF
# RYZE RENEWABLES NEVADA, LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (as it may be amended and/or restated from time to time, this "Agreement") of RYZE RENEWABLES NEVADA, LLC, a Delaware limited liability company (the "Company"), is entered into and made effective as of January 1, 2021 (the "Effective Date") by and among the Company, and each of the undersigned members (the "Members"), each of whom owns a membership interest denominated in units in the proportions and representing a percentage interest in the Company as reflected on **Exhibit A** attached hereto and incorporated by reference herein.

<u>Recitals</u>

WHEREAS, on February 14, 2020, the Company was formed as a limited liability company under the Delaware Limited Liability Company Act, 6 Del. C. Section 18-101, et seq. (as amended from time to time, the "Delaware Act" or "Act") by filing a Certificate of Formation with respect thereto with the Secretary of State of the State of Delaware (the "Certificate of Formation"); and

WHEREAS, the Members desire to enter into this Agreement to state and restate the terms and conditions governing the relationship among the Members and the Company as set forth herein. and this Agreement amends, restates and replaces the Company's prior operating agreement dated January 1, 2021.

<u>Agreement</u>

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein made and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Members and the Company hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01   <u>Definitions</u>.  The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided in this Agreement):

"<u>Additional Funds</u>" means an amount not less than $97,000,000.00 raised from one or more bona fide third party lenders (collectively, the "<u>Second Priority Lender</u>"), whether such funds come in the form of debt or equity.

"<u>Affiliate</u>" of a specified Person means any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person. For purposes of this definition, "control" (and its derivatives) means the possession,

\4842-5277-7983

Exhibit 1B - 000066

Ex. B
(SLA dated Nov. 29. 2021)

directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of equity interests, contract or otherwise.

"Available Cash" shall means, with respect to any fiscal period, the amount of cash or marketable securities on hand, less a reserve amount necessary to maintain a balance sufficient to cover one calendar quarter of operating expenses of Borrower.

"Bankruptcy" means, with respect to a Member, that (i) such Member  has (A) made an assignment for the benefit of creditors; (B) filed a voluntary petition in bankruptcy; (C) been adjudged bankrupt or insolvent, or had entered  against  such Member  an order of relief  in any bankruptcy or insolvency proceeding; (D) filed a petition or an answer seeking for such. Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation or filed an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Member in any proceeding of such nature; or (E) sought, consented to, or acquiesced in the appointment of a trustee, receiver or liquidator of such Member or of all or any substantial part of such Member's properties; (ii) one hundred twenty (120) days have elapsed after the commencement of any proceeding against such Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation and such proceeding has not been dismissed; or (iii) ninety (90) days have elapsed since the appointment without such Member's consent or acquiescence of a trustee, receiver or liquidator of such Member or of all or any substantial part of such Member's properties and such appointment has not been vacated or stayed or the appointment is not vacated within ninety (90) days after the expiration of such stay. A Member shall be deemed to be Bankrupt upon the occurrence of any of the foregoing events as to its parent or ultimate parent enterprise or its controlling person or persons.

"Board of Managers" or "Board" means the Board of Managers of the Company, organized and acting pursuant to Article IV.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks in Las Vegas, Nevada are closed.

"Capital Contributions" shall mean for any Member at the particular time in question the aggregate of the dollar amounts of any cash, or the Fair Market Value of any property, contributed to the capital of the Company, or, if the context in which such term is used so indicates, the dollar amounts of cash or the Fair Market Value of any property agreed to be contributed, or requested to be contributed, by such Member to the capital of the Company, including those made prior to the date hereof and as reflected as Initial Capital on Exhibit A.

"Cause" shall mean any of the following, as reasonably determined by the Board of Managers: (i) the prosecution via indictment of, or if a Manager has waived any requirement of prosecution by indictment, the charge of, a Manager for a felony; (ii) the theft, conversion, embezzlement or misappropriation by a Manager of funds or other assets of the Company or any of its Affiliates or any other act of fraud with respect to the Company or any of its Affiliates (including acceptance of any bribes or kickbacks or other acts of self-dealing); (iii) the violation by a Manager of any law regarding employment discrimination or sexual harassment; provided,

\4842-5277-7983

that any determination under this clause (iii) may only be made after a reasonable investigation of the alleged violation, which shall include an interview of such Manager; (iv) the failure by a Manager to comply with any material written policy generally applicable to the employees of the Company and its Affiliates, which failure, if reasonably susceptible to cure, is not cured within 30 days after written notice to such Manager; (v) the repeated failure by a Manager to follow the express directives the Board of Managers, which failure, if reasonably susceptible to cure, is not cured within 30 days after written notice to such Manager; or (vi) the Company's discovery that, prior to a Manager's employment with the Company or any of its Affiliates, such Manager engaged in conduct of the type described in clauses (i) through (iii) above.  Notwithstanding the foregoing, with respect to clauses (iv) and (v), the Board of Managers shall not be obligated to provide more than one notice and opportunity to cure with respect to repeated or substantially similar circumstances.  Notwithstanding the foregoing, if the Manager is party to an employment, severance-benefit, change in control or similar agreement with the Company or Affiliate of the Company that contains a definition of "Cause" (or a similar term), such definition will apply in lieu of the definition set forth above for so long as such agreement remains in effect.

"Chief Executive Officer" means the chief executive officer of the Company (or other person acting in such capacity) as appointed by the Board of Managers from time to time.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time, or the successor law of similar import in effect from time to time.

"Dispute" means any disagreement between the Members relating to this Agreement or the Company which they are unable to resolve through good faith efforts to reach a resolution lasting no less than ten (10) days following commencement of such dispute.

"Fair Market Value" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's-length transaction, as determined in good faith by the Board of Managers based on such factors as the Board of Managers, in the exercise of its reasonable business judgment, considers relevant.

"Fiscal Year" means the Company's Taxable Year.

"Loan Agreement" has the meaning set forth in Section 4.07(n).

"LV Renewables" has the meaning set forth in Section 4.01(b).

"Manager" means a voting member of the Board of Managers as described in Section 4.01.

"Majority Vote of the Managers" means the approval of more than fifty percent (50%) of the Managers.

"Majority Vote of the Members" means the approval of Members holding more than fifty percent (50%) of the then outstanding Membership Units.

\4842-5277-7983

Ex. B
(SLA dated Nov. 29. 2021)

"Member" means each Person identified on Exhibit A hereto as of the Effective Date who is a party to or is otherwise bound by this Agreement and each Person who may hereafter be admitted as a Member in accordance with the terms of this Agreement. The Members shall constitute the "members" of the Company.

"Membership Unit" means a unit representing a limited liability company interest in the Company, including the right of the holder thereof to any and all benefits to which a Member may be entitled pursuant to this Agreement (based on the class and/or series of such Membership Unit), together with the obligations of a Member to comply with all of the terms and provisions of this Agreement.

"Mirae Manager" has the meaning set forth in Section 4.01(b).

"Net Income or Net Loss" means, for any taxable year or month of the Company, the taxable income or loss, respectively, of the Company for Federal income tax purposes, except that (i) any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing taxable income or loss shall be added to such taxable income or subtracted from such loss, (ii) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treas. Reg. Section 1.704-l(b)(2)(iv)(i) and not otherwise taken into account under this definition shall be subtracted from such taxable income or added to such loss, (iii) any amount of gain or loss that would have been recognized by the Company if property distributed by the Company to the Members had instead been sold in a taxable disposition for its Fair Market Value at the time of distribution shall be taken into account, and (iv) items of income, gain, loss, and deduction (including depreciation, cost recovery, and amortization deductions) relating to property contributed to the Company by a Member, shall be computed in the manner prescribed by Treasury Regulation Section 1.704-1(b)(2)(iv)(g)(3). Except as otherwise provided in the regulations issued under Section 704(b) of the Code, such amounts shall be computed without regard to any basis adjustment for federal income tax purposes under Sections 732, 734 and 743 of the Code resulting from an election under Section 754 of the Code.

"Percentage Interest" means the percentage of the Membership Units held by a Member over the Membership Units held by all the Members.

"Permitted Transferee" means (i) any Person who is a Member of the Company, and any member, shareholder, officer, director, employee, trustee, beneficiary or other Affiliate of such Person, (ii) a consultant, employee or group of employees or Manager of the Company, (iii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company, (iv) an entity owned directly or indirectly by the Members of the Company in substantially the same proportion as their interests in the Company, or (v) any transferee of a Member for estate planning purposes.

"Person" means any individual, corporation, partnership, limited liability company, trust, joint venture, governmental entity or other unincorporated entity, association or group.

\4842-5277-7983

Ex. B
(SLA dated Nov. 29. 2021)

"Second Priority Lender" the bona fide third party lender that provides the Additional Funds.

"Super Majority Vote of the Managers" means the approval of at least seventy- five percent (75%) of the Managers.

"Taxable Year" means the Company's taxable year ending on December 31 (or part thereof in the case of the Company's first and last taxable year), or such other year as is required by section 706 of the Code or (ii) determined by the Board of Managers (if no year is so required by section 706 of the Code). The Board of Managers shall provide notice to each Member of any change to the Company's Taxable Year.

"Transfer" means any direct or indirect sale, transfer, conveyance, assignment, pledge, hypothecation, gift, delivery or other disposition.

"Treasury Regulations" means the final or temporary regulations that have been issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

Section 1.02   Interpretation.  In construing this Agreement: (a) general words shall not be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words; (b) words importing the singular include the plural and vice versa, words importing a gender include every gender and references to persons include bodies corporate or unincorporated; (c) unless the context shall otherwise require, words using the singular or plural number shall also include the plural or singular number, respectively; (d) the words "include," "includes," "including" and words of similar import shall be deemed to be followed by the phrase "without limitation"; (e) unless the context shall otherwise require, any reference herein to any agreement or other instrument or statute or regulation is to such agreement, instrument, statute or regulation as amended and supplemented from time to time (and, in the case of a statute or regulation, to any successor provision); (f) unless the context otherwise provides, all pronouns used herein shall be deemed to refer to the masculine, feminine or neuter gender as the context requires; (g) all references in this Agreement to Section or Exhibit (or similar references) shall be deemed to be references to sections of, or exhibits to, this Agreement unless the context otherwise requires; and (h) the table of contents and the captions and other headings contained in this Agreement have been included for convenience of reference only and shall not, in any way, be construed as part of this Agreement or as limitations on the scope of the particular sections, clauses, paragraphs or other subdivisions to which they refer and shall not affect the interpretation or meaning of this Agreement.

## ARTICLE II

## ORGANIZATION OF THE COMPANY

Section 2.01   Formation.

(a)       The Certificate of Formation was prepared, executed and filed with the Secretary of State of the State of Delaware on February 14, 2020, all of which is hereby authorized and ratified in all

\4842-5277-7983

Ex. B
(SLA dated Nov. 29. 2021)

respects. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision under the Delaware Act, this Agreement shall, to the extent permitted by the Delaware Act, control.

(b)      The Company shall, to the extent permissible, elect to be treated as a partnership for United States federal, state and local income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Company shall not be deemed a partnership or joint venture for any other purpose.

Section 2.02    Name.  The name of the Company is "RYZE RENEWABLES NEVADA, LLC" or such other name or names as the Board of Managers may from time to time designate; provided that the name shall always contain the words "Limited Liability Company," "LLC" or "L.L.C."

Section 2.03    Registered Office and Registered Agent; Places of Business.

(a)      The Company shall maintain a registered office in the State of Delaware at Cogency Global, Inc., 850 New Burton Road, Suite 201, Dover, Delaware 19904, or such other office within the State of Delaware as determined by the Board of Managers. The Company's registered agent at such address shall be Cogency Global, Inc. or such other agent as determined by the Board of Managers.

(b)      The Company shall maintain an office and principal place of business at such place inside or outside the State of Delaware as may from time to time be determined by the Board of Managers. The Company may also conduct business at such other places as the Board of Managers may from time to time determine to be required by the operations of the Company.

Section 2.04    Term.  The term of existence of the Company shall be perpetual from the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware, unless the Company is dissolved, wound up and terminated in accordance with the provisions of this Agreement.

## ARTICLE III

## PURPOSE AND POWERS OF THE COMPANY

Section 3.01    Purpose and Powers of the Company.

(a)      The Company is formed for the purpose of, and the nature of the business to be conducted by the Company is, any lawful business activity whatsoever (except the insurance or banking business), and engaging in any activities necessary, appropriate, desirable, advisable, ancillary, convenient or incidental thereto.

(b)      In furtherance of its purposes, the Company shall have all powers necessary, suitable or convenient for the accomplishment of its purposes, alone or with others, including the ability to incur and guaranty indebtedness.

\4842-5277-7983

(c)     The Company shall comply with any and all governmental requirements applicable to it, including the making of any and all necessary or advisable governmental registrations. No Member shall take, or cause any of its Affiliates to take, any action that would, or otherwise cause the Company to, violate any governmental requirements or registrations applicable to the Company.

(d)     Upon a breach of this Agreement by, or the Bankruptcy of, a Member, or in the case of any indebtedness of any Member to the Company, the Company shall, subject to applicable law, have the right to set off the amount that such Member owes to the Company under this Agreement or otherwise and the amount of any losses, cost or expenses incurred or projected to be incurred by the Company in connection with a breach or Bankruptcy (including, without limitation, attorneys' fees and expenses and any diminution in value of any Company asset and including in each case both monetary obligations and the Fair Market Value of any non-cash item and amounts not yet due or incurred) against any amounts that it owes to such Member under this Agreement or otherwise, or to reduce the distributions (quarterly or otherwise) of such Member by any such amount.

## ARTICLE IV

## MANAGEMENT AND OPERATION OF THE COMPANY

Section 4.01    Board of Managers.

(a)     The business and affairs of the Company shall be managed by or under the direction of the Board of Managers. Each member of the Board of Managers shall be deemed to be a "manager" for purposes of the Delaware Act and the Board of Managers shall take all actions for and on behalf of the Company not otherwise provided for elsewhere in this Agreement. No Member shall have any rights or powers beyond the rights and powers granted to such Member in this Agreement. Members need not be residents of the State of Delaware.

(b)     The Board of Managers from and after the date hereof shall consist of three (3) managers to be appointed by a Majority Vote of the Members.  Notwithstanding the foregoing, so long as any amounts are due and outstanding under the Loan Agreement , Mirae Asset Securities Co., Ltd., an entity organized under the laws of Republic of Korea ("Mirae Manager"), the manager of LV Renewables A, LLC, a Nevada limited liability company (together with its permitted successors and assigns pursuant to the Loan Agreement, "Mirae") shall have the right to appoint one (1) manager to the Board and the right to appoint an individual who is permitted to attend and participate in meetings of the Board and who shall receive information provided to the Board, but such individual is not entitled to vote on matters submitted to the Board for a vote (an "Observer"); provided, that as soon as the Additional Funds are contributed (as debt or equity), the Second Priority Lender shall have the right to remove and replace the Manager appointed by Mirae Manager, or if the Second Priority Lender fails to exercise this right, a Majority Vote of the Members shall have the right to remove and replace the Manager appointed by Mirae Manager. The number of Managers serving on the Board of Managers may be increased at any time by a unanimous vote of the Members and such positions may be filled by a Majority Vote of the Members. Each Manager shall serve until a replacement Manager is elected.  The initial Board of Managers shall be:

| Name | Appointment |
| --- | --- |
| Matthew G. Pearson | Manager appointed by Ryze Holdings |

\4842-5277-7983

Ex. B
(SLA dated Nov. 29. 2021)

| Kevin McDonough | Manager appointed by Ryze Holdings |
|---|---|
| Seung-Hwan Oh (subject to completion of background check as provided in (c) below) | Manager appointed by Mirae Manager |
| Junghan Kim (subject to completion of background check as provided in (c) below) | Observer Seat Appointed by Mirae Manager |

(c)     Each Manager may be removed and replaced by the party responsible for appointing such Manager or by a Majority Vote of the Members for Cause; provided that upon payment of all amounts due and outstanding under the Loan Agreement, the Manager and Observer appointed by Mirae Manager may be removed by a Majority Vote of the Members without Cause. Any Manager may resign from his or her position on the Board of Managers at any time by notice to the Board of Managers. Such resignation shall be effective as set forth in such notice, but not earlier than the date of delivery of such notice. The successor to any resigning Manager shall be named by the party who appointed such resigning Manager; provided that after payment of all amounts due and outstanding under the Loan Agreement, such successor shall be appointed by a Majority Vote of the Members.  Any replacement Manager or Observer must (A) submit to a background check by a qualified and reputable background check company to confirm that such replacement has not previously committed an act that would constitute Cause under subsection (i) of the definition thereof or an action in connection with a prior employment or managerial position that would constitute Cause if it had been done while managing or employed by the Company and (B) otherwise not be rejected for coverage by the Company's insurance provider  with respect to the Company's directors and officers insurance policy, to ensure the replacement Manager/Observer is qualified to serve and does not pose a risk to the business of the Company.

(d)     <u>Chairman of the Board of Managers</u>. A Chairman of the Board of Managers (the "Chairman") may be appointed by the Board of Managers. The Chairman may be removed from his/her position as Chairman by vote of the Board of Managers. The Chairman shall preside at all meetings of the Board of Managers and at all meetings of the Members at which he/she is present.

(e)     <u>Fiduciary Duties and Liability of Managers</u>. No Manager, in his capacity as such, shall owe any fiduciary duty to the Company or its Members (other than any duty to act as specified in the following sentence of this Section 4.0l(f)). Managers shall owe a duty of care and loyalty to the Company  to the limited  extent  that no Manager  may undertake any action that would be willfully intended to damage the business or assets of the Company, engage in bad faith in connection with the Company's efforts to secure the Additional Funds, or without the approval of the Super Majority of the Managers, that involves self-dealing that is not  in the best interest of the Company  and  intended  to  effect  a  benefit  not ratably shared  among  the  Members  as contemplated herein as to any assets or business of the Company.

Section 4.02     <u>Meetings of the Board of Managers</u>.

(a)     <u>Time and Place; Notice</u>.  Regular meetings of the Board of Managers shall be held at such times and places as shall be agreed by the Board of Managers. Notice of and agendas for all regular meetings shall be provided to all members of the Board of Managers at least three (3) Business Days prior to the date of such meetings. Special meetings of the Board of Managers may be called at such times and places, and in such manner and for such purpose, as

\4842-5277-7983

Ex. B
(SLA dated Nov. 29. 2021)

any two (2) Managers deem necessary by notice to all remaining Managers of the date, location, purpose and agenda for such meeting at least three (3) Business Days prior to the date of such meeting, unless circumstances warrant shorter notice being given; provided that all meetings will provide an option for Managers to participate via teleconference or equivalent means as set forth in Section 4.02(c) hereof to the extent such Manager cannot appear in person. In the event that one of the members of the Board of Managers is not able to attend a regular meeting or special meeting of the Board of Managers, such member may designate a representative to attend such meeting on his/her behalf, who, for the purpose of such meeting and such meeting only, shall act solely as an observer with respect to the proceedings of such meeting. For a meeting called for the purpose of discussing additional capital contributions to the Company, the notice of such meeting shall state that it is being called for that purpose.

(b)     Quorum.   A majority of the Managers then in office shall constitute a quorum for purposes of transacting business at any meeting of the Board of Managers. If, however, such quorum shall not be present at any meeting of the Board of Managers, the Managers present at such meeting shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.

(c)     Electronic Communications. Managers may participate in any meeting of the Board of Managers by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other and such participation in a meeting shall constitute presence in person at the meeting.

(d)     Action by Written Consent.   Any action required or permitted to be taken at a meeting of the Board of Managers may be taken without a meeting if a consent in writing, setting forth the action so taken, shall have first been sent to all Managers in advance for review and is thereafter signed by all of the Managers then in office.

Section 4.03     Manner of Acting; Power to Bind the Company.   Except as required by the Delaware Act or as otherwise required by this Agreement, all actions of the Board of Managers shall require the Majority Vote of the Managers unless such action requires a Super Majority Vote of the Managers or unanimous vote of the Managers as specifically set forth in this Agreement. Each Manager shall be entitled to one (1) vote on all matters submitted to the Board of Managers. Except as otherwise required by this Agreement, no Manager (acting in his capacity as such) shall have any authority to bind the Company to any third party with respect to any matter, except pursuant to a resolution expressly authorizing such action, which resolution is duly adopted by the Board of Managers by the affirmative vote of the majority of the Managers then in office.

Section 4.04     Officers of the Company.

(a)     Appointment of Officers.   The Board of Managers may appoint individuals as officers ("officers") of the Company, which may include a Chief Executive Officer and such other officers as the Board of Managers deems advisable. No officer need be a Member. An individual may be appointed to more than one office. No officer of the Company shall have any rights or powers beyond the rights and powers granted to such officer in this Agreement or by resolution of the Board of Managers adopted in accordance with this Agreement.

9

Ex. B
(SLA dated Nov. 29. 2021)

(b)     Duties of Officers Generally.  The Board of Manager by resolution may delegate to the officers the power to manage and control and  make  all decisions  affecting the day-to-day business, operations and affairs of the Company to take all such actions as they deem necessary or appropriate to accomplish the foregoing; provided, however, that unless such power is specifically delegated to the officer in question either for a specific transaction or generally, no such officer shall have the power to lease or acquire real property, to borrow money, to issue notes, debentures, securities, equity or other interests of or in the Company, to make investments in (other than the investment of surplus cash in the ordinary course of business) or to acquire securities of any Person, to give guarantees or indemnities, to merge, liquidate or dissolve the Company, to sell or lease all or any substantial portion of the assets of the Company, to contractually commit the Company to financial commitments that are material to the Company or to establish or to adopt the annual budget and operating plan of the Company and provided further that no such delegation by the Board of Managers will cause the Persons constituting the Board of Managers to cease to be a "manager" of the Company within the meaning of the Act. In addition, the officers shall have such other powers and duties as may be prescribed by the Board of Managers from time to time or by this Agreement.

(c)     Authority of Officers.  Subject to Section 4.04(b), any officer of the Company shall have the right, power and authority to transact business in the name of the Company or to act for or on behalf of or to bind the Company. With respect  to all  matters within the ordinary course of business of the Company,  third  parties dealing  with  the  Company  may rely conclusively upon any certificate of a Manager (other than the officer in question) to the effect that such officer is acting on behalf of the Company.

(d)     Removal, Resignation and Filling of Vacancy of Officers.  The Board of Managers may remove any officer, for any reason or for no reason, at any time. Any officer may resign at any time by giving written notice to the Board of Managers, and such resignation shall take effect at the date of the receipt of that notice or any later time specified in that notice; provided that unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. A vacancy in any office because of death, resignation, removal or otherwise shall be filled in the manner prescribed in this Agreement for regular appointments to that office.

(e)     Chief Executive Officer Powers and Duties.  The Chief Executive Officer, if one is elected, shall have general supervision over the day-to-day business, operations and affairs of the Company and shall perform such duties and exercise such powers, and shall have such duties to the Company, as are incident to the office of chief executive officer of a corporation organized under the General Corporation Law of the State of Delaware; provided, that the Chief Executive Officer may not take, or authorize any officer to take, any action that conflicts with this Agreement or any resolution of the Board of Managers or requires the vote of a Super Majority of the Board of Managers or unanimous vote of the Board of Managers. The Chief Executive Officer shall have such other powers and perform such other duties as may from time to time be prescribed by the Board of Managers. The Chief Executive Officer shall devote sufficient time to carry out the management and the affairs of the Company. If there is no Chief Executive Officer, these powers described in this paragraph shall be exercised by the Board of Managers.  The Chief Executive Officer of the Company as of the date hereof is Matthew G. Pearson.

\4842-5277-7983

Ex. B
(SLA dated Nov. 29. 2021)

(f)    Other Officers.  All other officers of the Company shall have such powers and perform such duties and shall have such duties to the Company as may from time to time be prescribed by the Board of Managers and such other officers shall be entitled to receive compensation from the Company as determined by the Board of Managers; provided, that no such officer may take, or authorize any other officer to take, any action that conflicts with this Agreement or any resolution of the Board of Managers or requires the vote of a Super Majority of the Board of Managers or unanimous vote of the Board of Managers.

Section 4.05    Performance of Duties: Liability of Managers and Officers.  In performing his duties, each of the Managers and the officers shall be entitled to rely in good faith on the provisions of this Agreement and on information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Company or any facts pertinent to the existence and amount of assets from which distributions to Members may properly be paid), of the following other Persons or groups: (a) one or more officers or employees of the Company; (b) any attorney, independent accountant, or other Person employed or engaged by the Company; or (c) any other Person who has been selected with reasonable care by or on behalf of the Company, in each case, as to matters which the Company reasonably believes to be within such Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Delaware Act. Except in the case of fraud, gross negligence or willful misconduct, no individual who is a Manager or an officer of the Company, shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise, solely by reason of being a Manager or an officer of the Company, as applicable.

Section 4.06    Actions Requiring a Super Majority Vote of the Managers.  Each of the actions set forth below shall require a Super Majority Vote of the Managers.

(a)    To merge or consolidate the Company with any Person, agree to an exchange of interests with any other Person or cause the Company to make any other fundamental change, subject to any tag along rights contained herein;

(b)    To issue additional Membership Units or admit new or substitute Members of the Company;

(c)    To approve a Transfer of Membership Units, other than to a Permitted Transferee;

(d)    To borrow or loan any amounts in excess of $10,000,000.00 except as specifically otherwise provided herein; or

(e)    To cause the Company to dissolve or liquidate.

Section 4.07    Actions Requiring the Consent of all of the Managers.  Each of the actions set forth below shall require the consent of all of the Managers.

(a)    To amend or modify this Agreement of the Company, including any such amendment or modification that would (i) increase any obligations or liabilities of any Member,

11

Ex. B
(SLA dated Nov. 29. 2021)

(ii) expand or reduce the rights of any Member thereunder, (iii) alter the voting and approval mechanics and thresholds set forth therein or (iv) remove the new unit issuance right of first offer in favor of existing Members.

(b)     To approve or otherwise reject any action that involves self-dealing

(c)     To enter into any transaction with a Member or Affiliate of a Member;

(d)     To make any distribution to a Member not in accordance with Section 8.01.

(e)     To amend or modify the Certificate of Formation or change the name of the Company.

(f)     To approve the sale of Membership Interests without offering each Member a right of first refusal.

(g)     To approve a sale of the majority of Membership Interests without offering each Member tag along rights.

(h)     To approve a sale of all of the Membership Interests or substantially all of the assets of the Company of any of its Affiliates including, but not limited to Ryze Renewables II, LLC, a Delaware limited liability company and Ryze Renewables Las Vegas, LLC, a Delaware limited liability company.

(i)     To amend the liquidation or dissolution proceedings of the Company.

(j)     To change the Governing Law, or the purpose and powers, of the Company.

(k)     To guarantee indebtedness of another Person.

(l)     To approve a subsidiary (including but not limited to Ryze Renewables II, LLC, a Delaware limited liability company ("Ryze II") and Ryze Renewables Las Vegas, LLC, a Delaware limited liability company ("Ryze LV")) to obtain a loan, except as permitted in subparagraph (p), below.

(m)     To approve the Operating Budget (as that term is defined in that certain Loan Agreement between the Company and LV Renewables (the "Loan Agreement")).

(n)     To approve any material change to the Project (as that term is defined in the Loan Agreement).

(o)     To approve any change orders with respect to the Project, additional indebtedness, or liens (on the assets of the Company or the assets of the Company's subsidiaries); provided, that the Managers agree that the Additional Funds are required to be obtained through a loan or otherwise and the Managers shall seek the loan that is best for the Company in the business judgement of the Managers.  In the event Mirae or any Affiliate of Mirae Manager seeks to make a loan of the Additional Funds, the Manager appointed by Mirae Manager shall not have the ability to vote on the approval of such loan due to conflicts of interest and a vote of the remaining

\4842-5277-7983

Managers will be sufficient to approve such loan.  If the Manager appointed by Mirae Manager acts in bad faith with respect to requests for Manager to consent to a loan or loans of the Additional Funds, such Manager may be removed from the Board of Managers by a Majority Vote of the Members; provided, that until Mirae Manager replaces such Manager as provided herein any subsequent vote regarding a loan of the Additional Funds will require a vote of the Observer as if the Observer were appointed as Manager by Mirae Manager.  If the Observer appointed by Mirae Manager acts in bad faith with respect to requests for Observer to consent to a loan or loans of the Additional Funds, such Observer may be removed from the Board of Managers by a Majority Vote of the Members, and, if a replacement Mirae Manager has not been approved within ten (10) Business Days after notice of such removal, the remaining Managers may approve  such loan or loans of the Additional Funds.

(p)     To change the Tax Matters Member.

Section 4.08   4.08     Actions Requiring a Majority Vote of the Managers.  Each of the actions set forth below shall require a Majority Vote of the Managers.

(a)     All actions not specifically requiring a Super-Majority Vote of the Managers or the unanimous vote of the Managers, including but not limited to each of the following:

(i)     To appoint and replace Managers of the Board of Managers who resigned and were not replace by the appointing party, if applicable and if an only if, such appointing party has not replaced a Manager within sixty (60) days after such Manager's date of resignation.

(ii)     To appoint the Chairman of the Board.

(iii)     To appoint and remove officer of the Company and delegate day-to-day decision making of such persons.

Section 4.09   Outside Investments and Activities.  No member of the Board of Managers may engage or invest in other businesses or activities that violate or infringe on any intellectual property licensed by the Company. Nothing contained herein shall restrict any member of the Board of Managers from engaging in outside activities; provided that any such activities do not detract from the member's duty owed to the Company or cause any damage or harm to the Company's name and reputation.

**ARTICLE V**

**MEMBERS; VOTING RIGHTS**

Section 5.01   Meetings of the Members.

(a)     Generally.  Meetings of the Members may be called by any Member. All meetings of the Members shall be held telephonically or in person at the principal office of the Company or at such other place as may be determined by the Member calling the meeting and set

13

forth in the respective notice of such meeting. A record shall be maintained by the Company of each meeting of the Members.

(b)  Notice of Meetings of the Members.  Notice of meetings of the Members briefly stating the purpose, time and place of the meeting shall be delivered not less than fourteen (14) days, but not more than sixty (60) days, before the date of the meeting to each Member (with a copy to the Company) by or at the direction of the Member calling the meeting. Any Member may waive such notice requirement as to itself. Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. All Members meetings will provide an option for Members to participate via teleconference or equivalent means as set forth in Section 5.01(f) hereof to the extent such Manager cannot appear in person

(c)  Quorum.  Except as otherwise provided herein or by applicable law, at any time, the presence of all Members, represented in person or by proxy, shall constitute a quorum at a meeting of the Members for purposes of conducting business. Once a quorum is present at the meeting of the Members, the subsequent withdrawal from the meeting of any Member prior to adjournment or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting. If, however, such quorum shall not be present at any meeting of the Members, the Members entitled to vote at such meeting shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. Any adjourned meeting may be reconvened with at least five (5) Business Days' notice to the Members. Except as otherwise required by applicable law, resolutions of the Members at any meeting of Members shall be adopted by the affirmative vote of the majority of the Members.

(d)  Actions without a Meeting.  Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting and without a vote if a consent or consents in writing (including by email), setting forth the action so taken, shall be signed by those Members able to approve such action if the vote were taken at a meeting of the Members; provided, that for such purposes an electronic signature shall be valid. A record shall be maintained by the Company of each such action taken by written consent of the Members.

(e)  Voting.  Each Member shall have the right to vote its Membership Units at regular or special meetings of the Members and to give written consent with respect to such Membership Units, in each case, in accordance with the provisions of this Agreement, including the provisions for establishing the Board of Managers and electing Managers, with each Membership Unit entitled to one (1) vote.

(f)  Electronic Communications. Members may participate in any meeting of the Members by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other and such participation in a meeting shall constitute presence in person at the meeting

Section 5.02   Registered Members.  The Company shall be entitled to treat the owner of record of any Membership Units as the owner in fact of such Membership Unit for all purposes,

14

and accordingly shall not be bound to (although it may if it chooses to do so) recognize any equitable or other claim to or interest in such Membership Unit on the part of any other Person, whether or not it shall have notice of such claim or interest, except as expressly provided by this Agreement or the laws of the State of Delaware.

Section 5.03   Limitation of Liability.  No Member shall be obligated personally for any debt, obligation or liability of the Company or other Members by reason of being a Member, whether arising in contract, tort or otherwise. Except as otherwise provided in the Delaware Act, by applicable law or in this Agreement, no Member shall have any fiduciary or other duty to another Member with respect to the business and affairs of the Company. No Member shall have any responsibility to contribute to or in respect of the liabilities or obligations of the Company or return distributions made by the Company.

Section 5.04   Withdrawal; Resignation.  No Member may withdraw or resign from the Company. A Member shall cease to be a member of the Company as a result of a permitted Transfer of all of such Member's Membership Units in accordance with this Agreement and the transferee(s) of such Membership Units being admitted to the Company as substituted Members. Following such cessation, a Member shall, except as expressly provided in this Agreement, have no rights or obligations under this Agreement.

Section 5.05   Authority.  Except as otherwise provided in this Agreement, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind the Company.

Section 5.06   Outside Investments and Activities.  No Member may engage or invest in other businesses or activities that violate or infringe on any intellectual property licensed by the Company. Nothing contained herein shall restrict any Member from engaging in any outside activities; provided that any such activities do not cause any damage or harm to the Company's name and reputation.

Section 5.07   Confidentiality.

(a)   Each Member recognizes that Confidential Information has been and shall be disclosed to such Member by the Company and its Affiliates. Each Member agrees not to (whether or not at the time, a Member of the Company or providing services to the Company and/or any of its subsidiaries) (i) disclose such Confidential Information to any third party without the prior written consent of the Company except as, and to the extent, required by applicable laws and regulations and (ii) use such Confidential Information other than for the purpose of the Company's business or evaluating and monitoring such Member's affiliation with, or investment in, the Company or in connection with the discharge of any duties to the Company or to any of its Affiliates such Member may have in its capacity as such; provided, however, that Ryze LV licenses certain intellectual property from Ryze Holdings and nothing contained herein shall restrict Ryze Holdings' ability to use such intellectual property. Notwithstanding any other provision herein to the contrary, each Member agrees that money damages may not be a sufficient remedy for any breach of this Section 5.07 by such Member, and that in addition to all other remedies, the Company shall be entitled to seek injunctive or other equitable relief as a remedy for any such breach. Each Member agrees to waive any requirement for the securing or posting of any bond in connection with such remedy. As used herein "Confidential Information" means all information,

knowledge, systems or data relating to the business, operations, clients or finances of the Company or any of its subsidiaries including any of the terms of this Agreement or similar document obtained from the Company or any person acting on behalf of the Company, except for information which at the time of disclosure was in the public domain, unless such information was placed into the public domain by such Member in violation of any non-disclosure obligation owed to the Company, including this Section 5.07, information that was known to or developed by the party independent of his association with the Company, or information that was known by or in the possession of the party prior to such information being received from the Company.

(b)      In the event that any third party requests Confidential Information from a Member (whether during the period he, she or it is a Member or during the one-year period following the date that such Member ceases for any reason to be a Member) regarding any matter related to such Member's affiliation with the Company or with respect to his, her or its role as a Member, he, she or it shall, to the extent permitted by applicable Law, contact and notify the Company before providing any such Confidential Information, so that the Company may take appropriate action to protect its interest. However, a Member shall have no obligation to contact and notify the Company prior to any such discussions between the Member and such Member's legal counsel or his or her certified public accountant. Notwithstanding anything to the contrary contained herein, a Member may, without notice to or consent from the Company, any of its Affiliates or any Member disclose (i) such information if requested by any governmental, regulatory or self-regulatory agency or authority having jurisdiction over the Member or any of its Affiliates, and (ii) the legal and economic terms of the Member's affiliation with the Company, provided that the recipient is a current or potential advisor, investment banker, investor, joint venture partner, lender, equity owner or managerial employee or director, officer or manager of the Member that is under a contractual or other obligation of confidentiality to the Member.

In the event that a Member is subpoenaed, or asked, to testify as a witness or to produce documents in any legal or administrative or other proceeding related to the Company (whether during the period he, she or it is a Member or during the one-year period following the date that such Member ceases for any reason to be a Member), he, she or it shall, to the extent permitted by applicable Law, notify the Company of such subpoena or request.

## ARTICLE VI

## MEMBERSHIP UNITS; MEMBERSHIP

Section 6.01   <u>Membership Units Generally</u>.  The limited liability membership interests of the Members shall be represented by issued and outstanding Membership Units.

Notwithstanding the foregoing, no additional members are contemplated to be admitted to the Company and any additional membership interests shall only be created by the Board of Managers, subject to the restrictions set forth herein. As of the date hereof, the Company shall have one class of Membership Units outstanding, all of which are issued to the Members in the denominations set forth on Exhibit A. The Company shall maintain a schedule of all Members from time to time, their respective mailing addresses and the Membership Units held by them (the "Member Schedule"), a copy of which as of the date hereof is attached hereto as Exhibit A. The Board of Managers shall update the Member Schedule as required by the Delaware Act and ensure

16

Exhibit 1B - 000081

that it accurately reflects the information to be provided for therein. Any amendment or revision to the Member Schedule made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Any reference to the Member Schedule shall be deemed to be a reference to the Member Schedule as amended and in effect from time to time. Ownership of a Membership Unit (or fraction thereof) shall not entitle a Member to call for a partition or division of any property of the Company or for any accounting.

Section 6.02    Authorization and Issuance of Membership Units.  The Company is hereby authorized to issue up to a maximum of 500,000,000 Membership Units, of which 415,800,416 Membership Units shall be and hereby are issued to those Members, in those numbers and in exchange for those Capital Contributions set forth opposite each Member's name on the Member Schedule attached hereto as Exhibit A (as in effect on the Effective Date). The Membership Units are voting units.

Section 6.03    Authorization and Issuance of Other Membership Units.   No other membership units are authorized unless such authority is unanimously approved by the Board of Managers, in which case this Agreement shall be amended to authorize such units and to designate the rights, preferences and obligations associated with such additional membership interests.

Section 6.04    Issuance of Additional Membership Units.   Subject to the limitations contained in this Article VI and Section 12.05(a), the Company with the approval of a Super Majority Vote of the Board of Managers shall have the right to issue any authorized, but unissued Membership Units; provided, that the Company shall not issue any Membership Units to any Person unless such Person has executed and delivered to the Company the document described in Section 6.05, and provided further that no additional Membership Units may be issued with voting rights unless this Agreement is amended to accommodate the additional voting rights. Moreover, no Membership Units may be issued unless the subject Membership Units are first offered to all Members, pro rata in proportion to their relative Percentage Interest, on the terms proposed for issuance to any third party or other Member, and the Members have at least ten (10) Business Days to accept and pay for said Membership Units on the same terms.

Section 6.05    New Members from the Issuance of Membership Units.   In order for a Person to be admitted as a Member of the Company  pursuant  to the issuance  of  Membership Units to such Person, such Person shall have executed and delivered to the Company a written undertaking to be bound by the terms and conditions of this Agreement substantially in the form approved by the Managers. Upon the amendment of the Member Schedule by an officer of the Company and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Membership Units, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his or its Membership Units.

Section 6.06    Certification of Membership Units.  The Company may but is not required to issue certificates to the Members representing the Membership Units held by any such Member.

# ARTICLE VII

# CAPITAL CONTRIBUTIONS

Section 7.01    Capital Contributions.

(a)    The Members have made Capital Contributions to the Company in exchange for the issuance by the Company of the number of Membership Units set forth on Exhibit A opposite their respective names. The Members shall not be required at any time to make additional Capital Contributions to the Company; provided, however, that the Members hereby acknowledge that the Company may offer additional membership interests for sale and the failure of a Member to purchase and pay for additional Membership Interests, whether pursuant to the terms of Section 6.04 of this Agreement, or otherwise, may result in the dilution of the Member's Percentage Interest.

(b)    The provisions of this Section 7.01 are not for the benefit of any creditor or other Person other than the Company and the Members, and no creditor or other Person shall obtain any rights under this Section 7.01 or by reason of this Section 7.01, or shall be able to make any claim in respect of any debts, liabilities or obligations against the Company or any Member.

Section 7.02    Loans from Members.    The amount of any loans by Members to the Company shall not be considered Capital Contributions.

Section 7.03    Status of Capital Contributions.

(a)    No Member shall receive any interest, salary or drawing with respect to its Capital Contributions, except as otherwise specifically provided in this Agreement.

(b)    Except as otherwise provided herein, no Member shall be required to lend any funds to the Company or to make any additional Capital Contributions to the Company, and no Member shall have any personal liability for the repayment of any Capital Contribution of any other Member.

# ARTICLE VIII

# DISTRIBUTIONS

Section 8.01    Generally.

(a)    No Member shall be entitled to receive any distributions from the Company except as expressly provided in this Agreement.

(b)    Notwithstanding anything herein to the contrary, the Board of Managers shall cause the Company to make annual tax distributions to the Members based upon Net Income for the Taxable Year and an assumed tax rate equal to the maximum marginal combined federal and State income tax rate (calculated taking into account the deductibility of state and local taxes for Federal income tax purposes).  Such distributions shall be made to all of the Members simultaneously and in proportion to their relative shares of taxable income for such period.

Exhibit 1B - 000083

(c)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distributions to Members if such distributions would violate the Delaware Act or other applicable law.

Section 8.02   <u>Mandatory Distributions</u>.  Subject to distributions pursuant to Section 8.0l(b) above, Available Cash shall be distributed in the following order:

(a)     First, to pay debt service or other amounts due and payable to the Second Priority Lender  in connection with the Additional Funds;

(b)     Second, to pay debt service due with respect to the Loan (as that term is defined in the Loan Agreement) and to pay all other amounts to be paid in accordance with the Loan Documents (as defined in the Loan Agreement) .

(c)     Third, to pay any Second LV Renewables Put Option Deferred Amount (as that term is defined in the Option Agreement);

(d)     Fourth, the remaining amounts of Available Cash shall be reserved or distributed at such times and in such amounts as the Board of Managers determines in its sole discretion, to the Members, pro rata in proportion to their relative Percentage Interest.

Section 8.03   <u>Indemnification and Reimbursement for Payments on Behalf of a Member</u>.

(a)     Except as otherwise provided in this Agreement, if the Company is required by law (as determined by the Board of Managers based on the advice of legal or tax counsel to the Company) to make any payment on behalf of a Member in its capacity as such (including in respect of withholding taxes, personal property taxes, and unincorporated business taxes, etc.), then such Member (the "Indemnifying Member") shall indemnify the Company in full for the entire amount paid, including interest, penalties and expenses associated with such payment. At the option of the Board of Managers:

(i)      promptly upon notification of an obligation to indemnify the Company, the Indemnifying Member shall make a cash payment to the Company in an amount equal to the full amount to be indemnified, or

(ii)     the Company shall reduce distributions which would otherwise be made to the Indemnifying Member until the Company has recovered the amount to be indemnified.

(b)     A Member's obligation to make payments to the Company under this Section 8.03 shall survive the termination, dissolution, liquidation and winding up of the Company, and for purposes of this Section 8.03, the Company shall be treated as continuing in existence. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 8.03, including instituting a lawsuit to collect such contribution with interest calculated at a rate equal to the Company's and its subsidiaries' effective cost of borrowed funds.

## ARTICLE IX

## ALLOCATIONS

Section 9.01   Tax Provisions.  The allocation and capital account maintenance provisions of Treasury Regulations under section 704 of the Code are hereby incorporated by reference, including a "qualified income offset" within the meaning of Treasury Regulations section I. 704-1(b)(2)(ii)(d), the rules regarding allocation of "partner nonrecourse deductions" under Treasury Regulations section I. 704-2(i)(1 ), "minimum gain chargeback" under Treasury Regulations section 1.704-2(±), and "partner nonrecourse debt minimum gain chargeback" under Treasury Regulations section 1.704-2(i)(4), and the limitation on allocation of losses to any Member that would cause a deficit capital account in excess of such Member's capital contribution obligations and share of minimum gain and partner nonrecourse debt minimum gain under Treasury Regulations section 1.704-1(b)(2)(ii)(d) as modified by Treasury Regulation sections 1.704-2(g)(l) and 1.704-2(i)(5). Notwithstanding the above, nothing in this Section 9.01 shall apply to override the economic terms of this Agreement as reflected in Section 9.03.

Section 9.02   Contributed Property.  To the extent contributed property has a Fair Market Value at the time of contribution that differs from the contributing Member's basis in the property, and to the extent the carrying value of property of the Company for capital account purposes otherwise differs from the Company's basis in such property, depreciation, gain and loss for capital account purposes shall be computed by reference to such carrying value rather than such tax basis. In accordance with section 704(c) of the Code, income, gain, loss, and deduction with respect to such property shall, solely for United States federal income tax purposes, be shared among the Members so as to take account of the variation between the basis of the property to the Company and its Fair Market Value at the time of contribution, or at the time that the carrying value of such prope1iy is adjusted under Treasury Regulations section 1.704-1(b)(2)(iv)(f), as the case may be.

Section 9.03   Profits and Losses.  At all times while there is more than one Member, items of income, gain, loss, deduction and credit shall be allocated to the holders of Membership Units, pro rata based on their respective Percentage Interest, except as otherwise provided in Sections 9.01 and 9.02; provided, that,

(a)     Except as provided in clause (b) below, no losses shall be allocated to a Member with a negative balance in its capital account or to the extent that such allocation would cause a partner to have a negative balance in its capital account;

(b)     If there is no Member with a positive balance in its capital account, all losses shall be allocated to the Members in accordance with the Percentage Interests.

## ARTICLE X

## ELECTIONS AND REPORTS

Section 10.01  Books of Account.

(a)     Complete and accurate records and books of account shall be kept by the Company at the principal office of the Company, including all books and records necessary to

20

provide any information, lists and copies of documents required to be provided pursuant to Section 10.02. The books of account shall be kept for tax and accounting purposes on either a cash or accrual basis as the Company, in consultation with the Company's accountants, shall determine. The determination of the Company with respect to the treatment of any item or its allocation for United States federal, state or local tax purposes shall be binding upon all Members so long as that determination is not inconsistent with any express provision of this Agreement.

(b) All books of account and records maintained by the Company hereunder shall be the property of the Company, and shall be made available for inspection by the Members (including employees of the respective Members and the legal counsel and the independent auditors for the respective Members) at such reasonable times as the Company shall determine.

Section 10.02 <u>Reports</u>. The Company shall deliver or cause to be delivered, by March 31 of each year, to each Person who was a Member at any time during the previous Taxable Year, all information necessary for the preparation of such person's United States federal income tax returns and any state, local and foreign income tax returns that such Person is required to file as a result of the Company being engaged in a trade or business within such state, local or foreign jurisdiction, including a statement showing such Person's share of income, gains, losses, deductions and credits for such year for United States federal income tax purposes (and, if applicable, state, local or foreign income tax purposes).

Section 10.03 <u>Tax Matters Member</u>.

(a) Ryze Holdings shall be the "tax matters partner" of the Company for United States federal income tax purposes (the "Tax Matters Member").

(b) The Tax Matters Member shall, at the request of any Member, cause the Company to elect, pursuant to section 754 of the Code, to adjust the basis of the Company's property.

(c) Notwithstanding anything herein to the contrary, the Tax Matters Member shall reasonably consult with the Members and their representatives (including their legal counsel and accountants) with respect to all tax matters. The Tax Matters Member shall keep the Members fully advised of the progress of any audit or other tax proceeding and shall, within five (5) Business Days of receipt, supply the Members with copies of any written communications and notice of any oral communications received from the Internal Revenue Service, or other taxing authority, and shall, at least five (5) Business Days prior to submitting any materials to the Internal Revenue Service, or other taxing authority, provide such materials to the Members for their approval, which approval shall not be unreasonably withheld. The Tax Matters Member shall also give notice to the Members of its intention to meet with any representative of the Internal Revenue Service at least ten (I 0) days prior to such meeting (or promptly upon arranging such meeting if such meeting is arranged fewer than ten (10) days prior to such meeting), and shall provide the Members or their agents, legal counsel, employees or accountants with an opportunity to participate in such meeting (and shall inform any Members who do not participate in the meeting of the results of the meeting within five (5) Business Days after such meeting). Nothing in this Section 10.03 shall be construed to restrict or otherwise limit the other Members' rights to participate in any administrative or judicial proceeding in connection with any tax matters relating to the Company.

\4842-5277-7983

# ARTICLE XI

# DISSOLUTION AND LIQUIDATION

Section 11.01  Dissolution.

(a)     The Company shall be dissolved and its affairs wound up only upon the happening of any of the following events:

(i)      upon the election to dissolve the Company by the consent of a Super Majority of the Board of Managers;

(ii)     upon the election to dissolve the Company by the consent of all of the Members; or

(iii)     the entry of a decree of judicial dissolution under the Delaware Act.

(b)     Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 11.02 and the Certificate of Formation shall have been canceled.

Section 11.02  Liquidation.

(a)     The Liquidator.  Upon dissolution of the Company, the Board of Managers (or in the event of a judicial dissolution and the failure of the Board of Managers to appoint a liquidator, then upon the terms set forth in the court's orders) shall appoint a non-adverse party within the meaning of section 672 of the Code to act as the "Liquidator," and such person shall act as the Liquidator unless and until a successor Liquidator is appointed as provided in this Section 11.02. The Liquidator shall agree not to resign at any time without thirty (30) days' prior written notice to the Board of Managers. The Liquidator may be removed at any time, with or without cause, by notice of removal and appointment of a successor Liquidator approved by the Board of Managers. Any successor Liquidator shall succeed to all rights, powers and duties of the former Liquidator. The right to appoint a successor or substitute Liquidator in the manner provided in this Section 11.02 shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions of this Agreement, and every reference in this Agreement to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided in this Section 11.02. The Liquidator shall receive as compensation for its services (i) no additional compensation, if the Liquidator is an employee of the Company or any of its subsidiaries, or (ii) if the Liquidator is not such an employee, such compensation as the Board of Managers may approve, plus, in either case, reimbursement of the Liquidator's reasonable out-of-pocket expenses incurred in performing its duties.

(b)     Liquidating Actions.  The Liquidator shall liquidate the assets of the Company and apply and distribute the proceeds of such liquidation, in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

\4842-5277-7983

Exhibit 1B - 000087

(i)     First, to the payment of the Company's debts and obligations to its creditors (including Members), including sales commissions and other expenses incident to any sale of the assets of the Company, in order of the priority provided by law.

(ii)     Second to the payment of the Company's unexpired obligations pursuant to the Option Agreement as if the Second Option Triggering Event has occurred.

(iii)     Third, to the establishment of and additions to such reserves as the Board of Managers deem necessary or appropriate.

(iv)     Fourth, to the Members pro rata in accordance with Section 8.02.

(c)     Reserves.  The reserves established pursuant to Section 11.02(b)(ii) above shall be paid over by the Liquidator to a bank or other financial institution, to be held in escrow for the purpose of paying any contingent or unforeseen liabilities or obligations and, at the expiration of such period as the Board of Managers deems advisable, any such reserves that have not been paid in pursuant to Section 11.02(b)(i) shall be distributed to the Members in accordance with Section 8.02 in the manner provided in Section 11.02(b).

(d)     Distribution in Kind.  Notwithstanding the provisions of Section 11.02(b) which require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 11.02(b), if upon dissolution of the Company the Board of Managers determines by Super Majority Vote of the Managers that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Board of Managers by Super Majority Vote of the Managers may, in its sole discretion, defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may by Super Majority Vote of the Managers, in its absolute discretion, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 11.02(b), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such distribution, any property to be distributed shall be valued at its Fair Market Value.

(e)     Reasonable Time for Winding Up.  A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to Section 11.02(b) in order to minimize any losses otherwise attendant upon such winding up. Distributions upon liquidation of the Company (or any Member's interest in the Company) and related adjustments shall be made by the end of the Fiscal Year of the liquidation (or, if later, within ninety (90) days after the date of such liquidation) or as otherwise permitted by Treasury Regulations section 1.704-1(b)(2)(ii)(b).

(f)     Termination.  Upon completion of the distribution of the assets of the Company as provided in Section 11.02(b), the Company shall be terminated  and the Liquidator shall cause the cancellation of the Certificate of Formation in the State of Delaware and of all qualifications and registrations of the Company as a foreign limited liability company in

Ex. B
(SLA dated Nov. 29. 2021)

jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE XII

## TRANSFER OF MEMBERSHIP UNITS

Section 12.01  <u>General Transfer Restrictions</u>.  No Member, nor any representative or agent of any Member, may Transfer, directly or indirectly through the transfer of interests in such Member or other upstream entity, to any Person (other than a Permitted Transferee), all or any portion of such Member's Membership Units except as specifically provided below. In the case of a Transfer, other than a sale or a Transfer to a Permitted Transferee, such Transfer must be approved by the Super Majority Vote of the Managers in advance, which approval may not be unreasonably withheld, delayed and conditioned and which consent will be deemed to have been given if not denied, in writing, within 10 Business Days after notice thereof is provided to the Board of Managers. In the case of a Transfer that is a sale, such Transfer must comply with the right of first refusal and tag along rights described below. Any attempted Transfer in violation of this Section 12.01 shall be deemed null and void for all purposes, and the Company shall not record any such Transfer on its books or treat any purported transferee as the owner of such Membership Units for any purpose. Notwithstanding anything contained herein to the contrary, no Transfer shall be permitted if it would be reasonably likely to cause the Company to become a "publicly traded partnership," as such term is defined in section 7704(b) of the Code

Section 12.02  <u>Conditions to Transfer Membership Units</u>.

(a)      Notwithstanding anything to the contrary in this Agreement, no otherwise authorized transferee of any Membership Unit(s) received pursuant to a Transfer (but excluding transferees that were Members immediately prior to such a Transfer, who shall automatically become a Member with respect to any additional Membership Units they so acquire) shall become a Member in respect of or be deemed to have any ownership rights in the Membership Unit(s) so Transferred unless the purported transferee is admitted as a Member as set forth in Section 12.03.

(b)      Following a Transfer of any Membership Unit(s) that is permitted under this Article XII, the transferee of such Membership Unit(s) shall receive allocations and distributions under Articles VII, VIII, IX and XI in respect of such Membership Unit(s) if such Membership Unit(s) so Transferred are entitled to allocations and distributions.

(c)      Notwithstanding anything in this Agreement to the contrary, no issuance or Transfer of Membership Units otherwise permitted or required by this Agreement shall be made unless issuance or Transfer is in compliance with United States and other federal, foreign, state or provincial securities or other similar laws, including the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder, and the Delaware Act.

Section 12.03  <u>Procedures for Transfer</u>.  Subject in all events to the general restrictions on Transfers contained in Sections 12.01, 12.02, 12.05, 12.06 and 12.07, no Transfer of Membership Unit(s) may be completed until the prospective transferee is admitted as a Member of the Company by executing and delivering to the Company a written undertaking to be bound by the terms and

Exhibit 1B - 000089

conditions of this Agreement.  Upon the execution and delivery of such a written undertaking, the Member Schedule shall be automatically amended and such prospective transferee shall be admitted as a Member and deemed listed as such on the books and records of the Company.  The provisions of this Section 12.03 shall not apply with respect to the Transfer of any Membership Unit(s) to a transferee that is a Member immediately prior to such Transfer.

Section 12.04  <u>Legend</u>.  Any certificates or instruments representing the Membership Units, if any, shall bear the following legend:

"THE MEMBER'S MEMBERSHIP UNITS REPRESENTED BY THIS CERTIFICATE OR INSTRUMENT MAY NOT BE SOLD, ASSIGNED OR OTHERWISE TRANSFERRED EXCEPT AS PROVIDED IN THE OPERATING AGREEMENT OF THE COMPANY, COPIES OF WHICH ARE ON FILE IN THE PRINCIPAL OFFICE OF THE COMPANY AND WILL BE FURNISHED UPON REQUEST AND WITHOUT CHARGE TO ANY HOLDER OF THIS CERTIFICATE OF MEMBERSHIP UNITS."

Section 12.05  <u>Right of First Refusal</u>.

(a)     Each Member shall have the right to purchase on a pro-rata basis up to its Percentage Interest any Membership Units offered by the Company in any subsequent offering (the "Follow-On Financing") upon the same terms as offered to all other offerees. The Members shall be given not less than ten (10) Business Days prior written notice (the "Notice of Sale") of any proposed Follow-On Financing and shall have the right during the ten (10) Business Days following receipt of the Notice of Sale to purchase the Membership Units offered in the Follow-On Financing.

(b)     If any one or more Members (the "Selling Members") desires to sell all or any part of their respective Membership Units, to any Person other than a Permitted Transferee, such Selling Member(s) shall first deliver to each other Member (collectively, the "Non-Selling Members") at the same time a written notice of the proposed sale (the "Sale Notice"), the Membership Units proposed to be sold (the "Sold Membership Units"), setting forth the name and address of the proposed purchaser, the purchase price (which must be an amount specified in dollars, but which may be paid either in a lump sum or in installments over an extended period of time), and all other material terms of the proposed sale. Each Non-Selling Member shall be entitled to purchase a percentage of the Sold Membership Units equal to the percentage that such Non-Selling Member's Percentage Interest represents to all the Non-Selling Member's Percentage Interests on substantially the same terms and conditions as are included in the proposed sale. A Non-Selling Member shall exercise his right to purchase such Sold Membership Units by delivering to the Selling Member a written notice of exercise no later than twenty (20) days after delivery of the Sale Notice to such Non-Selling Member. A Non-Selling Member may also indicate in such notice, if he so elects, his desire to purchase any additional Sold Membership Units owned by the Selling Members if any other Non-Selling Member does not exercise his right to purchase his part of the Sold Membership Units. If more than one Non-Selling Member so elects, the additional Sold Membership Units shall be allocated pro rata to such electing Non-Selling Members based upon the Percentage Interests of such electing Non-Selling Members. If the Non-

25

Selling Members do not exercise such right during such twenty (20) day period to purchase all of the Sold Membership Units available for purchase after taking into account any other rights of first refusal related to such interests, the Selling Members may sell the entire amount of the Sold Membership Units to the person named  as purchaser  in the Sale Notice substantially upon the terms and conditions set forth in the Sale Notice and the purchaser shall be admitted as a Member, with all the rights associated with the Membership Units being sold by the Selling Members, without the consent of any other Member. If the Selling Members fail to sell the Sold Membership Units substantially upon the terms and conditions set forth in the Sale Notice within ninety (90) days after delivery of the Sale Notice, the right shall terminate, and the Member shall not thereafter sell any Membership Units without again complying with the foregoing procedure. Notwithstanding anything to the contrary set forth in this Agreement, any purchaser of Membership Units in connection with a sale effected in compliance with this Section 12.05(b) shall be admitted as a Member (and this Agreement shall (and may) be amended by the Selling Member to effect such admission and the sale of the Sold Membership Units, with all the rights associated with the Membership Units being sold by the Selling Member, without the consent of any other Member.

Section 12.06  <u>Tag Along Rights</u>.  In addition to the right of first refusal granted above, in the event 50% or more of the Membership Units (the "Majority Shares") are being sold in a single or series of related sales, the holders of any remaining shares shall have the right to join in such transaction and sell such minority interests in the Company on a pro rata basis and on the same terms as the sale of the Majority Shares.

Section 12.07  <u>Drag Along Rights</u>.  In addition to the tag along rights described in Section 12.06, in the event a sale of all of the Membership Units of the Company is approved by a unanimous vote of the Managers, all Members shall be required to join in the sale of the Company and shall receive a pro- rata share of any sale proceeds, without any discount or differing terms for minority ownership.

Section 12.08  <u>Limitations</u>.

(a)  In order to permit the Company to qualify for the benefit of a "safe harbor" under Code section 7704, notwithstanding anything to the contrary in this Agreement, no Transfer of any Membership Unit shall be permitted or recognized by the Company (within the meaning of Treasury Regulations section 1.7704-1(d)) and the Company shall not issue any Membership Units if and to the extent that such Transfer or issuance would cause the Company to have more than one hundred (I 00) partners (within the meaning of Treasury Regulations section 1.7704-1(h), including the look-through rule in Treasury Regulations section 1.7704-1(h)(3)).

(b)  Notwithstanding anything to the contrary in this Agreement, no Membership Unit may be Transferred and the Company may not issue any Membership Unit unless (i) such Transfer or issuance, as the case may be, shall not affect the Company's existence or qualification as a limited liability company under the Delaware Act, (ii) such Transfer or issuance, as the case may be, shall not cause the Company to be classified other than as a partnership for United States federal income tax purposes, and (iii) such Transfer or issuance, as the case may be, shall not result in a termination of the Company under Code section 708, unless

26

Ex. B
(SLA dated Nov. 29. 2021)

the Board of Managers determines that any such termination will not have a material adverse impact on the Members.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

Section 13.01 <u>Expenses</u>. All fees and expenses incurred by any Member in connection with the negotiations of this Agreement and the formation of the Company shall be paid by the Member incurring such fees or expenses.

Section 13.02 <u>Notices</u>.

(a) All notices, requests and other communications hereunder must be in writing and shall be deemed to have been duly given only if delivered personally or by facsimile transmission or mailed by internationally recognized overnight courier prepaid or by e- mail communication, to (i) any Member, at such Member's address set forth on the Member Schedule, and (ii) the Company, at the Company's principal place of business (or in any case to such other address as the addressee may from time to time designate in writing to the sender).

(b) All such notices, requests and other communications shall (i) if delivered personally to the address as provided in Section 13.02(a), be deemed given upon delivery, (ii) if delivered by facsimile transmission to the facsimile number as provided for in Section 13.02(a), be deemed given upon facsimile confirmation, (iii) if delivered by such internationally recognized overnight courier to the address as provided in Section 13.02(a), be deemed given on the earlier of the first Business Day following the date sent by such overnight courier or upon receipt and (iv) if sent to an e-mail address as provided for in Section 13.02(a), be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient (in each case, regardless of whether such notice, request or other communication is received by any other Person to whom a copy of such notice is to be delivered pursuant to this Section 13.02).

Section 13.03 <u>Dispute Resolution</u>.

(a) Any Dispute arising hereunder shall be resolved by the Members according to this Section 13.03. Prior to taking any other action, the Members shall try to resolve any Dispute through a formal mediation process. The mediation shall be led by a qualified mediator experienced in mediating the kind of Dispute at issue. The mediator shall be paid by the Company.

(b) In the event a Dispute is not resolved through mediation, such Dispute shall be resolved through binding arbitration administered by and in accordance with the General Commercial Rules of the American Arbitration Association (the "AAA"). Any Member may submit a Dispute for resolution by arbitration pursuant to the procedures provided herein, and to the extent not provided herein, pursuant to the General Commercial Rules of the AAA.

\4842-5277-7983

Exhibit 1B - 000092

(c)     The arbitral tribunal that shall decide such a submitted Dispute shall be composed of one (1) arbitrator selected by agreement  of the Members,  or in the absence of such agreement, the AAA shall appoint an arbitrator within thirty (30) days after either Party submits such Dispute for arbitration. The arbitrator shall be generally familiar with operating agreements for commercial enterprises. The arbitrator shall have the absolute power and authority to resolve the Dispute and all other issues between the Members relating to or arising out of the Dispute or this Agreement. The arbitration shall be conducted in Las Vegas, Nevada. Each Member shall present its case, witnesses and evidence, if any, in the presence of the other Member. The arbitrator shall determine any Dispute in accordance with the laws of the State of Nevada and federal statutes governing copyright and other intellectual property rights, without giving effect to any conflict of law rules or other rules that might render such law inapplicable or unavailable, and shall apply this Agreement according to its terms.

(d)     The Members shall be bound by any award or order resulting from any arbitration conducted hereunder and hereby agree that: (x) any monetary award shall include pre-award interest, to the extent appropriate, and shall be made and payable in dollars through a bank selected by the recipient of such award, free of any withholding tax or other deduction, together with interest thereon at 0.75% per month, from  the date the award  is granted  to  the date it is paid in full; (y) in the context of an attempt by either Member to enforce an arbitral award or order, the Members waive any defenses relating to such Member's capacity or the validity of this Agreement or any related agreement under any law; and (z) judgment on any award or order resulting from an arbitration conducted under this Section 13.03 may be entered and enforced  in any court and in any country having jurisdiction  thereof or having jurisdiction  over the Members or any of their assets.

(e)     Except as expressly permitted by this Agreement, neither Member shall commence or voluntarily participate in any court action or proceeding concerning a Dispute except for enforcement of any award or order issued pursuant to this provision or for equitable relief as provided in Section 13.03(e). For purposes of the foregoing or enforcement of any undisputed obligation, each of the Members hereby irrevocably submits to the exclusive jurisdiction of any Nevada State or Federal court sitting in the County of Washoe and any appellate court from any thereof.

(f)     In addition to the authority otherwise conferred on the arbitral tribunal, such tribunal hereunder shall have the authority to make such orders for interim relief, including, without limitation, injunctive relief and specific performance, as it may deem just and equitable. If such tribunal shall not have been appointed, either Member may seek such interim relief from a court having jurisdiction.

(g)     The prevailing Member in any arbitration conducted under this Section 13.03 shall recover from the other Member (as part of the arbitral award or order) such prevailing Member's reasonable attorneys' fees and the other costs of the arbitration.

(h)     Insofar as it is within the control of each of the Members, and notwithstanding anything to the contrary in the applicable arbitration rules: (v) the arbitrator of a Dispute shall be selected within thirty (30) days after such Dispute is submitted to arbitration hereunder; (w) any discovery that may be permitted shall be completed ,within 120 days from the

28

Ex. B
(SLA dated Nov. 29. 2021)

date of the complaint and shall not exceed (i) single depositions lasting no more than one day each of no more than one individual per side who are directly involved and (ii) a single, reasonable request for directly relevant documents (except to the extent that any information revealed by documents produced requires one additional request); (x) any hearing that may be held shall take place within thirty (30) days after completion of discovery; (y) any written briefs submitted to such arbitrator shall not exceed a total of twenty-five (25) pages prior to such hearing and fifteen (15) pages subsequently, in each case excluding exhibits; and (z) the decision shall be a "standard award" and be issued in writing within fifteen (15) days after the closing of the hearing. Notwithstanding the foregoing, each Member shall be able to receive additional requests for documentation and the extension of any time limitation provided for herein, upon a determination of the arbitral tribunal, in its sole discretion, that the other Member has either acted in bad faith or has provided insufficient documentation.

Section 13.04 <u>Governing Law</u>.   All issues and questions concerning the application, construction, validity, interpretation and enforcement of this agreement and the exhibits and schedules to this Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Nevada or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada.

Section 13.05 <u>No Action for Partition</u>.  No Member shall have any right to maintain any action for partition with respect to the property of the Company.

Section 13.06 <u>Amendments</u>.  Except as otherwise expressly set forth in this Agreement, and subject to compliance with the Certificate of Formation, this Agreement may be amended or restated, and any provision therein or herein may be waived, only upon the written consent of all Members; and any such amendment, restatement or waiver to which such written consent is obtained shall be binding upon the Company and each Member.

Section 13.07 <u>Binding Effect</u>.   Except as otherwise provided to the contrary in this Agreement, this Agreement shall be binding upon and inure to the benefit of the Members, their distributees, heirs, legal representatives, executors, administrators, successors and permitted assigns.

Section 13.08 <u>Counterparts; Facsimile</u>.   This Agreement may be executed in multiple counterparts (and may be transmitted via facsimile or other electronic means), each of which shall be deemed to be an original and shall be binding upon the Member who executed the same, and all of such counterparts shall constitute one and the same agreement.

Section 13.09 <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

Section 13.10 <u>Remedies</u>.  Each of the parties to this Agreement shall be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable

\4842-5277-7983

Ex. B
(SLA dated Nov. 29. 2021)

attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor. The Members agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

Section 13.11  <u>Judicial Proceedings</u>.  Except as provided in Section 13.03, in any judicial proceeding involving any dispute, controversy or claim arising out of or relating to this Agreement or the Company or its operations, each of the Members and the Company unconditionally accepts the non-exclusive jurisdiction and venue of any United States District Court located in the State of Nevada, and the appellate courts to which orders and judgments thereof may be appealed. In any such judicial proceeding, the Members agree that in addition to any method for the service of process permitted or required by such courts, to the fullest extent permitted by law, service of process may be made by delivery provided pursuant to the directions in. EACH PARTY TO THIS AGREEMENT HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF.

Section 13.12  <u>No Strict Construction</u>.  The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties to this Agreement, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

Section 13.13  <u>Entire Agreement and Incorporation by Reference</u>.  Except as otherwise expressly set forth in this Agreement this Agreement and any agreement or instrument relating thereto and incorporated herein embodies the complete agreement and understanding among the parties to this Agreement with respect to the subject matter of this Agreement and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way.

Section 13.14  <u>Parties in Interest</u>.  Nothing herein shall be construed to be for the benefit of or enforceable by any third party including, but not limited to, any creditor of the Company or the Members.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

\4842-5277-7983

Exhibit 1B - 000095

Ex. B
(SLA dated Nov. 29. 2021)

     **IN WITNESS WHEREOF**, the undersigned have executed this Amended and Restated Operating Agreement of RYZE RENEWABLES NEVADA, LLC as of the date first written above.

**RYZE RENEWABLES HOLDINGS, LLC**

By: _____
Name: Matthew G. Pearson
Title: Manager

By: _____
Name: Kevin McDonough
Title: Manager

**LV RENEWABLES A, LLC**

By: _____
Name: Sung Hee Han
Title: Treasurer

31

Exhibit 1B - 000096

Ex. B
(SLA dated Nov. 29. 2021)

## Exhibit A

### MEMBER SCHEDULE

| Name and Address of Member | Number of Units | Percentage Interest | Capital Contributions |
|---|---|---|---|
| **Ryze Renewables Holdings, LLC** | **400,000,000** | **96.2%** | **100% Percentage Interest in Ryze Renewables II, LLC** |
| **LV Renewables A, LLC** | **15,800,416** | **3.8%** | **Additional consideration for a loan** |
| **Totals** | **415,800,416** | **100%** | **N/A** |

\4842-5277-7983

Exhibit 1B - 000097

**EXHIBIT D**
**Option Agreement**
**[See attached.]**

78454552.11
4838-9883-6219.21

## OPTION AGREEMENT

THIS OPTION AGREEMENT (this "<u>Agreement</u>"), is made and entered as of November 29, 2021, by and between Ryze Renewables Nevada, LLC, a Delaware limited liability company ("<u>Ryze Nevada</u>") and LV Renewables A, LLC, a Nevada limited liability company ("<u>LV Renewables</u>") and acknowledged and agreed to by the Ryze Entities, as hereinafter defined.

WHEREAS, this Agreement is being executed in connection with the closing of the transactions contemplated by that certain Loan Agreement, dated as of November 29, 2021 (the "<u>Loan Agreement</u>"), entered into by and among Ryze Nevada, Ryze Renewables Las Vegas, LLC, a Delaware limited liability company ("<u>Ryze Las Vegas</u>"), Mirae Asset Securities Co., Ltd., an entity organized under the laws of the Republic of Korea ("<u>Mirae</u>"), and LV Renewables, the Commitment to Grant of Equity (the "<u>Equity Grant</u>") whereby Ryze Nevada issued to LV Renewables 15,800,416 Membership Units in Ryze Nevada which constitutes 3.8% of the issued and outstanding Membership Units in Ryze Nevada (the "LV Renewables Units") and the execution of the Amended and Restated Operating Agreement of Ryze Nevada dated as of even date herewith between Ryze Renewables Holdings LLC, a Delaware limited liability company ("<u>Ryze Holdings</u>") and LV Renewables (the "<u>Amended Operating Agreement</u>");

WHEREAS, LV Renewables desires to have the right to sell the LV Renewables Units to Ryze Nevada, and Ryze Nevada desires to grant such right to LV Renewables, and to obtain a right to repurchase the LV Renewables Units, pursuant to the terms and conditions set forth herein; and

WHEREAS, capitalized terms used but not defined in this Agreement shall have the meanings assigned to such terms in the Amended Operating Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.      **LV Renewables Put Options**.

(a)      At any time prior to the date which is twenty four (24) months after the date hereof, upon the occurrence of (i) the filing of a registration statement in connection with an initial public offering ("<u>IPO</u>") pursuant to a registration filed with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "<u>Securities Act</u>") involving Ryze Las Vegas, Ryze Holdings, Ryze Renewables II, LLC, a Delaware limited liability company ("<u>Ryze II</u>" and together with Ryze Nevada, Ryze Las Vegas, Ryze Holdings, and any successors thereof, collectively, the "Ryze Entities") or (ii) the execution of a binding agreement or the public announcement of a sale of assets to or merger with a special purpose acquisition company ("<u>SPAC Transaction</u>") involving any of the Ryze Entities, LV Renewables shall have the right, in its sole and absolute discretion, by providing written notice to Ryze Nevada of LV Renewables' election to exercise the First LV Renewables Put Option (such notice, the "<u>First LV Renewables Put Option Exercise Notice</u>"), at or before the closing of such IPO or SPAC Transaction (the "<u>First Exercise Period</u>") to cause Ryze Nevada to purchase the entire LV Renewables Units from LV Renewables (such right, the "<u>First LV Renewables Put Option</u>"), for the First LV Renewables Put Option Purchase Price (as hereinafter defined).  Ryze Nevada will be obligated to promptly notify LV Renewables of an event occurring that would provide LV Renewables with the First LV

Renewables Put Option within two (2) Business Days of such event occurring.  Upon delivery of the First LV Renewables Put Option Exercise Notice, Ryze Nevada shall be irrevocably obligated to purchase from LV Renewables, and LV Renewables shall be irrevocably obligated to sell to Ryze Nevada,  all of the LV Renewables Units on the terms and conditions set forth in this <u>Section 1</u>.  Anything herein to the contrary notwithstanding, LV Renewables shall have the right to deliver a First LV Renewables Put Option Exercise Notice during the First Exercise Period if, and only if, Ryze Nevada has not previously provided to LV Renewables the First Ryze Nevada Call Option Exercise Notice in accordance with <u>Section 2(a)</u> during such period.

(b)     Following the exercise of the First LV Renewables Put Option in accordance with <u>Section 1(a)</u>, the closing of the LV Renewables Put Option (the "<u>First LV Renewables Put Option Closing</u>") shall take place at the closing of the IPO or SPAC Transaction, as applicable.  The First LV Renewables Put Option Closing shall take place remotely via the electronic exchange of counterpart signature pages, or at such other location as LV Renewables and Ryze Nevada may mutually determine.  At the First LV Renewables Put Option Closing, (i) LV Renewables shall transfer all of the LV Renewables Units to Ryze Nevada, free and clear of any liens or encumbrances, (ii) Ryze Nevada shall deliver to LV Renewables the First LV Renewables Put Option Purchase Price; and (iii) LV Renewables shall deliver to Ryze Nevada the items specified in <u>Section 3</u> and such other instruments of conveyance as Ryze Nevada reasonably requests; provided, however, in connection with the IPO or SPAC Transaction, the First LV Renewables Put Option Closing may be extended, without penalty, for any delays related to SEC filings or other regulatory requirements that are outside the control of Ryze Nevada.

(c)     The aggregate amount payable by Ryze Nevada to LV Renewables at the First LV Renewables Put Option Closing in accordance with <u>Section 1(b)</u>, shall be in an amount (the "<u>First LV Renewables Put Option Purchase Price</u>") equal to Fifty Seven Million Dollars ($57,000,000), increased by any accrued but unpaid interest and any other amounts outstanding on the Note (as that term is defined in the Loan Agreement) (excluding principal,  prepayment penalty, or expense) through the First LV Renewables Put Option Closing Date and decreased by any distribution made with respect to the LV Renewables Units through the First LV Renewables Put Option Closing Date. For the avoidance of doubt, there shall be no prepayment premium or any other penalty added to the First LV Renewables Put Option Purchase Price. The First LV Renewables Put Option Purchase Price shall be paid as follows, at Ryze Nevada's election:

(i)     in shares of the stock of the public company resulting from an IPO or SPAC Transaction involving one or more of the Ryze Entities with a value equal to such amount based on (A) offering price per share with respect to any IPO or (B) the offering price per share of the surviving entity of the merger related to such SPAC Transaction; or

(ii)     in shares of the acquiring company's stock or successor company's stock, as applicable, in the event of an acquisition or merger involving one or more of the Ryze Entities, with a value equal to such amount based on the offering price per share of the surviving entity of the merger related to such SPAC Transaction.

Upon payment in full of the First LV Renewables Put Option Purchase Price, the Loan (as defined in the Loan Agreement), will be deemed paid in full and no further amounts will be due from Ryze Nevada to LV Renewables in connection with this Agreement or the Loan Documents, and Ryze

Nevada will be the owner of the LV Renewables Units, free from any liens or encumbrances.  In connection with any SPAC Transaction, Ryze Nevada and the Ryze Entities hereby agree to cause the other party or parties thereto to agree to accept and assume the obligations with respect to this Agreement.

(d)     Subject to the conditions set forth in this Agreement, on a date which is in the thirty sixth (36th) month after the Funding Date (the "Second Exercise Period"), LV Renewables shall have the right, in its sole and absolute discretion, by providing written notice to Ryze Nevada of LV Renewables' election to exercise the Second LV Renewables Put Option (such notice, the "Second LV Renewables Put Option Exercise Notice"), to cause Ryze Nevada to purchase all of the LV Renewables Units from LV Renewables (such right, the "Second LV Renewables Put Option"), for the Second LV Renewables Put Option Purchase Price.  Upon delivery of the Second LV Renewables Put Option Exercise Notice, Ryze Nevada shall be irrevocably obligated to purchase from LV Renewables, and LV Renewables shall be irrevocably obligated to sell to Ryze Nevada, all of the LV Renewables Units on the terms and conditions set forth in this Section 1.

(e)     Following the exercise of the Second LV Renewables Put Option in accordance with Section 1(d), Ryze Nevada shall deliver to LV Renewables a written notice specifying a date (the "Second LV Renewables Put Option Closing Date") at least thirty (30) days following the date of such delivery (but not more than ninety (90) days following Ryze Nevada' receipt of the Second LV Renewables Put Option Exercise Notice) on which the closing of the LV Renewables Put Option (the "Second LV Renewables Put Option Closing") shall take place.  The Second LV Renewables Put Option Closing shall take place remotely via the electronic exchange of counterpart signature pages, or at such other location as LV Renewables and Ryze Nevada may mutually determine.  At the Second LV Renewables Put Option Closing, (i) LV Renewables shall transfer all of the LV Renewables Units to Ryze Nevada, free and clear of any liens or encumbrances, (ii) Ryze Nevada shall deliver to LV Renewables the Second LV Renewables Put Option Purchase Price; and (iii) LV Renewables shall deliver to Ryze Nevada the items specified in Section 3 and such other instruments of conveyance as Ryze Nevada reasonably requests.

(f)     The aggregate amount payable by Ryze Nevada to LV Renewables at the Second LV Renewables Put Option Closing in accordance with Section 1(e), shall be in an amount (the "Second LV Renewables Put Option Purchase Price") equal to Forty-Five Million Dollars ($45,000,000) reduced by any distribution made with respect to the LV Renewables Units through the Second LV Renewables Put Option Closing Date; provided, however, that to the extent Ryze Nevada does not have sufficient funds to pay the Second LV Renewables Put Option Purchase Price, Ryze Nevada may provide LV Renewables with a promissory note in the form attached hereto as Exhibit A with respect to the difference between the Second LV Renewables Put Option Purchase Price and the cash payment made on the Second LV Renewables Put Option Closing Date (the "Second LV Renewables Put Option Deferred Amount").

2.     **Ryze Nevada Call Options**.

(a)     Subject to the conditions set forth in this Agreement, at any time prior to the date which is twenty-one (21) months after the date hereof, Ryze Nevada shall have the right, in its sole and absolute discretion, by providing written notice to LV Renewables of Ryze Nevada's

3

Ex. B
(SLA dated Nov. 29. 2021)

election to exercise the First Ryze Nevada Call Option (such notice, the "First Ryze Nevada Call Option Exercise Notice"), to cause LV Renewables to sell all of the LV Renewables Units held by LV Renewables (such right, the "First Ryze Nevada Call Option"), for the First Ryze Nevada Call Option Purchase Price (as hereinafter defined).  Upon delivery of the First Ryze Nevada Call Option Exercise Notice, Ryze Nevada shall be irrevocably obligated to purchase from LV Renewables, and LV Renewables shall be irrevocably obligated to sell to Ryze Nevada, all of the LV Renewables Units on the terms and conditions set forth in this Section 2.  Anything herein to the contrary notwithstanding, Ryze Nevada shall have the right to deliver the First Ryze Nevada Call Option Exercise Notice during the First Exercise Period, if, and only if, LV Renewables has not previously provided to Ryze Nevada the First LV Renewables Put Option Exercise Notice in accordance with Section 1(a) during such period.

      **(b)**      Following the exercise of the First Ryze Nevada Call Option in accordance with Section 2(a), Ryze Nevada shall deliver to LV Renewables advanced written notice specifying a date (the "First Ryze Nevada Call Option Closing Date") which shall occur at least thirty (30) days following the date of such notice with respect to a First Ryze Nevada Call Option Purchase Price to be paid in cash not more than ninety (90) days following Ryze Nevada's delivery of the First Ryze Nevada Call Option Exercise Notice on which the closing of the First Ryze Nevada Call Option shall occur (the "First Ryze Nevada Call Option Closing"); provided that, in the case of an IPO or SPAC Transaction involving any of the Ryze Entities, the date specified shall only be an estimated closing date and the First Ryze Nevada Call Option Closing Date shall be the closing date of such IPO or SPAC Transaction, as applicable.  The First Ryze Nevada Call Option Closing shall take place remotely via the electronic exchange of counterpart signature pages, or at such other location as LV Renewables and Ryze Nevada may mutually determine.  At the First Ryze Nevada Call Option Closing, (i) LV Renewables shall transfer all of the LV Renewables Units to Ryze Nevada, free and clear of any liens or encumbrances, (ii) Ryze Nevada shall deliver to LV Renewables the First Ryze Nevada Call Option Purchase Price, and (iii) LV Renewables shall deliver to Ryze Nevada the items specified in Section 3 and such other instruments of conveyance as Ryze Nevada reasonably requests; provided, however, in the case of an IPO or SPAC Transaction, the First Ryze Nevada Call Option Closing may be extended, without penalty, for any delays related to SEC filings or other regulatory requirements that are outside the control of Ryze Nevada.

      **(c)**      The aggregate amount payable by Ryze Nevada to LV Renewables in accordance with Section 2(b), shall be an amount (the "First Ryze Nevada Call Option Purchase Price") equal to Fifty-Seven Million Dollars ($57,000,000), increased by any accrued but unpaid interest (excluding any prepayment penalty or any other penalty or expense) through the First Ryze Nevada Call Option Closing Date and decreased by any distribution made with respect to the LV Renewables Units through the First Ryze Nevada Call Option Closing Date.  For the avoidance of doubt, there shall be no prepayment premium or any other penalty added to the First Ryze Nevada Call Option Purchase Price.  The First Ryze Nevada Call Option Purchase Price shall be paid as follows, at Ryze Nevada's election:

            **(i)**      by cash or wire transfer of immediately available funds in United States Dollars; or

4825-8487-0654.10

     **(ii)**     in shares of the stock of the public company resulting from an IPO or SPAC Transaction involving one or more of the Ryze Entities with a value equal to such amount based on (A) the offering price per share with respect to any IPO or (B) the offering price per share of the surviving entity of the merger related to such SPAC Transaction; or

     **(iii)**     in shares of the acquiring company's stock or successor company's stock, as applicable, in the event of an acquisition or merger involving one or more of the Ryze Entities, with a value equal to such amount based on the offering price per share of the surviving entity of the merger related to such SPAC Transaction.

If Ryze Nevada chooses to purchase the LV Renewables Units for cash or wire transfer, Ryze Nevada or the Ryze Entities will provide LV Renewables with the option to purchase shares in a publicly traded company resulting from an IPO of one of the Ryze Entities or a SPAC Transaction involving one of the Ryze Entities that occurs within twenty-four (24) months of the date hereof at the offering price per share with respect to any IPO or the offering price per share of the surviving entity of the merger related to such SPAC Transaction in an amount up to the First Ryze Nevada Call Option Purchase Price by providing written notice to Ryze Nevada no later than the closing date of such IPO or SPAC Transaction.  Upon payment in full of the First Ryze Nevada Call Option Purchase Price, the principal amount of the Loan, as defined in the Loan Agreement, will be deemed paid and the Loan will be deemed paid in full upon payment of all accrued interest and other amount outstanding pursuant to the Loan Documents (as defined in the Loan Agreement), and Ryze Nevada will be the owner of LV Renewables Units, free from any liens or encumbrances.

     **(d)**     Subject to the conditions set forth in this Agreement, in the month immediately following the Second Exercise Period (the "Ryze Second Exercise Period"), Ryze Nevada shall have the right, in its sole and absolute discretion, by providing written notice to LV Renewables of Ryze Nevada's election to exercise the Second Ryze Nevada Call Option (such notice, the "Second Ryze Nevada Call Option Exercise Notice"), to cause LV Renewables to sell all of the LV Renewables Units to Ryze Nevada (such right, the "Second Ryze Nevada Call Option"), for the Second Ryze Nevada Call Option Purchase Price.  Upon delivery of the Second Ryze Nevada Call Option Exercise Notice, Ryze Nevada shall be irrevocably obligated to purchase from LV Renewables, and LV Renewables shall be irrevocably obligated to sell to Ryze Nevada, all of the LV Renewables Units on the terms and conditions set forth in this Section 2.  Anything herein to the contrary notwithstanding, Ryze Nevada shall have the right to deliver the Second Ryze Nevada Call Option Exercise Notice during the Ryze Second Exercise Period, if, and only if, LV Renewables has not previously provided to Ryze Nevada the Second LV Renewables Put Option Exercise Notice in accordance with Section 1(d) during the Second Exercise Period.

     **(e)**     Following the exercise of the Second Ryze Nevada Call Option in accordance with Section 2(e), Ryze Nevada shall deliver to LV Renewables a written notice specifying a date (the "Second Ryze Nevada Call Option Closing Date") at least thirty (30) days following the date of such delivery but not more than ninety (90) days following Ryze Nevada's delivery of the Second Ryze Nevada Call Option Exercise Notice on which the closing of the Second Ryze Nevada Call Option (the "Second Ryze Nevada Call Option Closing") shall take place.  The Second Ryze Nevada Call Option Closing shall take place remotely via the electronic exchange of counterpart signature pages, or at such other location as LV Renewables and Ryze

4825-8487-0654.10

Ex. B
(SLA dated Nov. 29. 2021)

Nevada may mutually determine.  At the Second Ryze Nevada Call Option Closing, (i) LV Renewables shall transfer all of the LV Renewables Units to Ryze Nevada, free and clear of any liens or encumbrances, (ii) Ryze Nevada shall deliver to LV Renewables the Second Ryze Nevada Call Option Purchase Price, and (iii) LV Renewables shall deliver to Ryze Nevada the items specified in <u>Section 3</u> and such other instruments of conveyance as Ryze Nevada reasonably requests.

(f)     The aggregate amount payable by Ryze Nevada to LV Renewables in accordance with <u>Section 2(f)</u>, shall be an amount (the "<u>Second Ryze Nevada Call Option Purchase Price</u>") equal to Forty-Five Million Dollars ($45,000,000), reduced by any distribution made with respect to the LV Renewables Units through the Second Ryze Nevada Call Option Closing Date, by cash or wire transfer of immediately available funds in United States Dollars. If Ryze Nevada does not have sufficient funds to pay the Second Ryze Nevada Call Option Purchase Price, Ryze Nevada may not exercise the Second Ryze Nevada Call Option.

## 3.     <u>Closing Conditions</u>.

(g)     The obligations of each party to consummate the transactions contemplated by <u>Section 1</u> or <u>Section 2</u> of this Agreement, as applicable, shall be subject to the fulfillment, at or prior to any of the LV Renewables Put Option Closings or any of the Ryze Nevada Call Option Closings, as applicable, of each of the following conditions:

(i)     No Governmental Authority (as defined in the Loan Agreement) shall have enacted, issued, promulgated, enforced or entered any Legal Requirement (as defined in the Loan Agreement) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(h)     The obligations of LV Renewables to consummate the transactions contemplated by <u>Section 2</u> of this Agreement, shall be subject to the fulfillment or LV Renewables' waiver, at or prior to each of the Ryze Nevada Call Option Closings, as applicable, of each of the following conditions:

(i)     There is no Event of Default (as defined in the Loan Agreement) pursuant to the Loan Agreement.

(ii)     All of the representations and warranties of OpCo (as defined in the Loan Agreement) and Ryze Nevada in the Loan Agreement remain true and correct.

(iii)     Ryze Nevada and OpCo shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by the Loan Agreement and each of the Loan Documents (as defined therein) to be performed or complied with by it prior to or on the date of each of the Ryze Nevada Call Option Closings, as applicable.

Notwithstanding the foregoing, in the event that the Ryze Nevada Call Option Closings take place after or result in or occur concurrently with the repayment of all amounts due under the Loan

4825-8487-0654.10

Agreement, LV Renewables shall be obligated to consummate the transactions contemplated by Section 2 of this Agreement regardless of the fulfillment of any of the above conditions.

(i)     The obligations of Ryze Nevada to consummate the transactions contemplated by Section 1 of this Agreement, shall be subject to the fulfillment or Ryze Nevada's waiver, at or prior to each of the LV Renewables Put Option Closings, as applicable, of each of the following conditions:

(i)     All of the representations and warranties of LV Renewables in the Loan Agreement remain true and correct.

(ii)     LV Renewables shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by the Loan Agreement and each of the Loan Documents (as defined therein) to be performed or complied with by it prior to or on the date of each of the LV Renewables Put Option Closings, as applicable.

Notwithstanding the foregoing, in the event that the LV Renewables Put Option Closings take place after the repayment, in full, of the Loan, Ryze Nevada shall be obligated to consummate the transactions contemplated by Section 2 of this Agreement regardless of the fulfillment of any of the above conditions.

4.     **Notices**.   All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) on first attempted delivery to addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or email (in portable document format (PDF)) (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.   Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 4):

| | |
|---|---|
| if to LV Renewables: | c/o Mirae Asset Securities Co. Ltd.<br>26, Eulji-ro 5 gil<br>Jung-gu<br>Seoul, South Korea<br>Attention:  Kyunghyun Lee |
| with a copy (which shall not constitute valid notice to LV Renewables) to: | Snell & Wilmer L.L.P.<br>1455 SW Broadway<br>Suite 1750<br>Portland, Oregon 97201<br>Facsimile: (6503) 624.6888<br>Email:  vroehm@swlaw.com<br>Attention:  Victor J. Roehm III |

7

Exhibit 1B - 000105

If to Ryze Nevada:                       Ryze Renewables Nevada, LLC
                                         6600 Amelia Earhart Court
                                         Suite A
                                         Las Vegas, Nevada. 89119
                                         Attention: Matthew G. Pearson

    **5.**     **Entire Agreement**.  This Agreement (together with the Loan Agreement and the Amended Operating Agreement) constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

    **6.**     **Successor and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.  However, neither this Agreement nor any of the rights of the parties hereunder may be transferred or assigned by any party hereto without the prior written consent of the other party. Any attempted transfer or assignment in violation of this <u>Section 6</u> shall be void.

    **7.**     **No Third-Party Beneficiaries**.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

    **8.**     **Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

    **9.**     **Amendment and Modification; Waiver**.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving.  Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

    **10.**     **Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

    **11.**     **Governing Law; Submission to Jurisdiction**.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Nevada without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada or any other

Ex. B
(SLA dated Nov. 29. 2021)

jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Nevada.  Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the state courts located in the County of Clark, State of Nevada and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.  Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court.  The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

     **12.**   **Waiver of Jury Trial**.  Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.  Each party to this Agreement certifies and acknowledges that (a) no representative of any other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such party has considered the implications of this waiver; (c) such party makes this waiver voluntarily; and (d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this <u>Section 12</u>.

     **13.**   **No Strict Construction**.  The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

     **14.**   **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall together be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[SIGNATURE PAGE FOLLOWS]*

4825-8487-0654.10

Ex. B
(SLA dated Nov. 29. 2021)

IN WITNESS WHEREOF, the parties hereto have executed this Option Agreement on the date first written above.

**LV RENEWABLES:**

LV RENEWABLES A, LLC,
a Nevada limited liability company

By:  Mirae Asset Securities Co., Ltd., an entity
     organized under the laws of the Republic of
     Korea, its Manager

By:_____
     Kyunghyun Lee, Director

**RYZE NEVADA:**

RYZE RENEWABLES NEVADA, LLC,
a Delaware limited liability company

By:_____
     Matthew G. Pearson, Manager

**RYZE HOLDINGS:**

RYZE RENEWABLES HOLDINGS, LLC
A Delaware limited liability company

By:_____
     Matthew G. Pearson, Manager

**RYZE II:**
RYZE RENEWABLES II, LLC,
a Delaware limited liability company

By:_____
     Matthew G. Pearson, Manager

**RYZE NEVADA:**

RYZE RENEWABLES NEVADA, LLC,
a Delaware limited liability company

By:_____
    Matthew G. Pearson, Manager

11

Exhibit 1B - 000109

Exhibit A

[Promissory Note]

[See attached.]

## PROMISSORY NOTE

Original Principal Amount                                                    Las Vegas, NV
$21,000,000.00                                                               November 29, 2021

       **1.**    <u>**Promise to Pay**</u>.  For value received, **RYZE RENEWABLES NEVADA, LLC**, a Delaware limited liability company ("<u>Maker</u>") promise to pay to the order of **LV RENEWABLES A, LLC**, a Nevada limited liability company ("<u>Payee</u>"), at such address as the holder of this Note provides at any time, initially to be 30048 Knoll View Drive, Rancho Palos Verdes, CA 90275 ("<u>Holder</u>") may designate by written notice to Maker, in lawful money of the United States of America, the then unpaid principal balance of the indebtedness evidenced by this Note, together with all then accrued and unpaid interest and other amounts that are Maker's obligations under this Note and the other Loan Documents.  The proceeds of the credit accommodations evidenced by this Note shall be advanced pursuant to the provisions of that certain Loan Agreement of approximately even date herewith by and between Maker and Payee (the "<u>Loan Agreement</u>").  All capitalized terms used in this Note shall have the meanings provided for those terms by the relevant definitions in the Loan Agreement unless otherwise defined herein or by reference herein to another document.

       **2.**    <u>**Computation of Interest**</u>.  Interest shall accrue on the outstanding balance of this Note from time to time at twelve percent (12.00%) per annum (the "<u>Applicable Rate</u>").  Interest is computed on the basis of the actual number of days elapsed over the actual number of days in the year.  All interest payable under this Note is computed using this method.

       **3.**    <u>**Required Payments**</u>.  If not earlier due and payable, all unpaid principal, accrued but unpaid interest and other amounts payable under the provisions of this Note, the Loan Agreement and/or the Loan Documents shall become due and payable in full on November 30, 2023 (the "<u>Maturity Date</u>").

       **4.**    <u>**Application of Payments**</u>.  Except during the continuance of an Event of Default, all payments and other credits shall be applied (a) first, to accrued and unpaid interest, (d) second, to principal and (c) third, to any other amounts then due and owing under the Loan Documents, including the Prepayment Premium, if any.  Any payments made by Maker must be received by Payee in immediately available funds no later than 4:00 p.m. New York City time in order to receive same day credit. No prepayments shall reduce or constitute a credit against the next scheduled monthly installments under this Note but instead shall be applied to the balance due on the Maturity Date.

       **5.**    <u>**Dishonored Item Fee**</u>.  Holder may charge any actual charges assessed by the financial institution of the holder, payee or assignee of the holder or payee as a result of the dishonored instrument.  Nothing in this Note shall be construed as an obligation on the part of Holder to accept, at any time, less than the full amount then due hereunder, or as a waiver or limitation of Holder's right to compel prompt performance.

**6.**     **Collection Costs.**  If suit or other legal proceeding or any nonjudicial foreclosure proceeding is instituted or any other action is taken by Holder to collect all or any part of the indebtedness evidenced hereby or to proceed against any collateral for any portion of such indebtedness or against any guarantor of the payment of any portion of the indebtedness, Maker promises to pay Holder's reasonable attorneys' fees and other costs (to be determined by the court and not by jury in the case of litigation) incurred thereby.  Such fees and costs shall be included in any judgment award obtained by Holder, shall be secured by the Security Documents, shall bear interest at the Default Rate (defined in <u>paragraph 10</u> below), and shall be guaranteed by any guaranty relating to any portion of the indebtedness evidenced hereby.

**7.**     **Optional Prepayments.**  Maker shall have the right to prepay all or any portion of the principal on any Payment Date provided that Maker gives Holder at least thirty (30) days prior written notice thereof, and such prepayment, in addition to all accrued and unpaid interest on the principal prepaid and all other amounts, other than principal or interest, then due under this Note is accompanied by the Prepayment Premium applicable thereto.  The Prepayment Premium will also apply upon acceleration of the amounts due pursuant hereto. As used herein "<u>Prepayment Premium</u>" means with respect to any prepayment of principal (or acceleration of the Loan) after the Permitted Prepayment Date or as a result of acceleration an amount equal to six percent (6%) of the principal to be prepaid.

**8.**     **Waivers and Acknowledgments.**  Maker agrees that makers, endorsers, guarantors and sureties may be added or released without notice and without affecting Maker's liability hereunder. The liability of Maker shall not be affected by the failure of Holder to perfect or otherwise obtain or maintain the priority or validity of any security interest in any collateral. The liability of Maker shall be absolute and unconditional and without regard to the liability of any other party hereto.

**9.**     **Acceleration.**  Upon the occurrence of any Event of Default and the expiration of any cure period available to Maker under the Loan Agreement (if any), then, at the option of Holder, Holder may exercise any one or more of the remedies described in the Loan Documents or otherwise available, including, without limitation, declaring the total then unpaid indebtedness evidenced by this Note to be immediately due and payable.

**10.**     **Default Interest.**  After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, calculated from the date such payment was due or such underlying Default shall have occurred without regard to any grace or cure periods contained herein, and shall be payable upon demand from time to time, to the extent permitted by applicable law. The Default Rate is a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law or (ii) two percent (2%) above the interest rate set forth in Section 2 hereof, compounded monthly.

**11.**     **Remedies/Right of Setoff.**  The indebtedness evidenced by this Note is: (a) secured by the Security Instrument, and may be secured by other collateral, and (b) guaranteed by Guarantor.  Upon the occurrence of any Event of Default, Holder may proceed against the property encumbered by the Security Instrument and/or any other collateral, Maker or

Guarantor in such order and manner as Holder in its sole discretion may determine, provided that Holder shall not be obligated to proceed against any of such collateral, Maker or Guarantor.

**12.**     **No Waiver by Holder.**   Failure of Holder to exercise any option hereunder shall not constitute a waiver of the right to exercise the same in the event of any subsequent default or in the event of continuance of any existing default after demand for strict performance hereof.

**13.**     **Time of Essence.**  Time is of the essence of this Note.

**14.**     **Notices.**  All notices required or permitted in connection with this Note shall be given at the place and in the manner provided in the Loan Agreement.

**15.**     **Governing Law and Venue.**   This Note is delivered in and shall be governed by and construed according to the substantive laws and judicial decisions of, the State of Nevada and applicable federal laws, rules and regulations. Subject to the arbitration provisions of the Loan Agreement, any action brought to enforce this Note may be commenced and maintained, at Holder's option, in any state or federal district court in Nevada, or in any other court having personal jurisdiction over Maker or any guarantor.  Maker irrevocably consents to jurisdiction and venue in such court for such purposes and agrees not to seek transfer or removal of any action commenced in accordance with the terms of this paragraph 15.  Maker also waives the right to protest the domestication or collection of any judgment obtained against Maker with respect to this Note or the loan evidenced hereby in any jurisdiction where Maker may now or hereafter maintain assets.

*[Remainder of the page intentionally left blank.]*

4860-7643-0848

Exhibit 1B - 000113

Ex. B
(SLA dated Nov. 29. 2021)

IN WITNESS WHEREOF, this Note has been executed as of the date first written above.

**Maker:**

**RYZE RENEWABLES NEVADA, LLC**,
a Delaware limited liability company,


By:     _____
Name:   Matthew G. Pearson
Title:   Manager

Signature Page to Promissory Note

Exhibit 1B - 000114

**EXHIBIT E**
**Grant of Membership Interests**
**[See attached.]**

78454552.11
4838-9883-6219.21

Exhibit 1B - 000115

Ex. B
(SLA dated Nov. 29. 2021)

## RYZE RENEWABLES NEVADA, LLC
6600 Amelia Earhart Court, Suite A
Las Vegas, Nevada 89119

November 29, 2021

THE MEMBERSHIP UNITS ISSUED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND THE TRANSFERABILITY OF SUCH MEMBERSHIP UNITS IS RESTRICTED.  SUCH MEMBERSHIP UNITS MAY NOT BE SOLD, ASSIGNED, GIFTED, TRANSFERRED OR OTHERWISE DISPOSED, NOR WILL THE VENDEE, ASSIGNEE, BENEFICIARY, OR TRANSFEREE BE RECOGNIZED AS HAVING ACQUIRED SUCH MEMBERSHIP UNITS FOR ANY PURPOSES, UNLESS A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), WITH RESPECT TO SUCH MEMBERSHIP UNITS IS IN EFFECT AND SUCH HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS.

THE UNITS REPRESENTED BY THIS DOCUMENT ARE ALSO SUBJECT TO FURTHER RESTRICTION AS TO THEIR SALE, TRANSFER, HYPOTHECATION, OR ASSIGNMENT AS SET FORTH IN THE AMENDED AND RESTATED OPERATING AGREEMENT OF THE COMPNAY (DEFINED BELOW) AND AGREED TO BY EACH MEMBER AND UNIT HOLDER.

LV Renewables A, LLC
c/o Mirae Asset Securities Co. Ltd.
26, Eulji-ro 5 gil
Jung-gu
Seoul, South Korea
Attention:  Kyunghyun Lee
Email: kyunghyun.lee@miraeasset.com

### Re: Grant Letter and Grant of Units in Ryze Renewables Nevada, LLC

Dear Sung Hee Han:

In connection with and as additional consideration for the loan made pursuant to that certain loan agreement of event date hereof (the "***Loan Agreement***") between Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "***Company***") and LV Renewables A, LLC, a Nevada limited liability company ("***Grantee***"), the Company is hereby granting Units in the Company to Grantee on the terms and conditions set forth in this letter and agreement ("***Grant Letter***") as follows:

1.      **Grant of Units**. As additional consideration for the loan made pursuant to the Loan Agreement and in accordance with the Company's Amended and Restated Operating Agreement dated as of even date herewith (as further amended from time to time, the "***Operating Agreement***"), the Company has approved of the issuance and granting  of, and Grantee is hereby granted,  15,800,416 Membership Units (as defined and described in the Operating Agreement) to Grantee which equals, as of the date hereof, a total of 3.8% of the equity of the Company ("***Equity***"). This Grant Letter sets forth the terms and conditions of the grant of the Equity by the Company to Grantee and by signing this Grant Letter and the Operating Agreement (or a joinder agreement respecting the Operating Agreement) Grantee hereby

November 29, 2021
Page **2** of **5**

acknowledges and agrees to be bound by the terms and conditions hereof and thereof.  Capitalized terms used but not defined in this Grant Letter shall have the meaning set forth in the Operating Agreement.

      a.    <u>Conditions to Grant.</u>  This grant of Units to Grantee is conditioned upon the execution of (i) this Grant Letter, (ii) a counterpart signature page of the Operating Agreement and (iii) the funding of the Initial Advance as defined the Loan Agreement.  Grantee should carefully review this Grant Letter and the Operating Agreement, and consult your legal, financial, and tax advisors before signing this Grant Letter and the Operating Agreement.

      b.    <u>Company Operating Agreement and Option Agreement</u>. The Equity will be subject to all of the terms and conditions of the Operating Agreement, including, without limitation, the restrictions on transfer to be set forth therein, and including automatic redemption and repurchase. The Equity will also be subject to all the terms and conditions of that certain Option Agreement of event date hereof between the Company and Grantee (the "***Option Agreement***").

      c.    <u>Vesting</u>. The Equity issued pursuant to this Grant Letter will vest immediately.

      d.    <u>Forfeiture and Repurchase</u>. The Membership Units are subject to forfeiture and repurchase rights of the Company as set forth in the Operating Agreement and the Option Agreement.

      e.    <u>General</u>.  Subject to the terms and conditions set forth in this Grant Letter, the Operating Agreement and the Option Agreement, as a holder of the Membership Units, Grantee is subject to the same obligations and liabilities, as those that apply to any other holders of Membership Units.

      f.    <u>Restricted Securities</u>.  The Membership Units are restricted securities under the Securities Act and may not be resold or transferred unless (a) a registration statement under the Securities Act with respect to the Membership Units is in effect and has been qualified under all applicable state securities laws, or (b) the availability of an exemption from such registration.

2.    **Representations of Company**.  Unless provided otherwise, the Company represents and warrants to Grantee that the statements contained in this Section are true and correct as of the date hereof.

      a.    All representations, warranties, and covenants made by the Company in the Loan Agreement are true, complete, and correct.

      b.    The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has full limited liability company power and authority to enter into this Grant Letter to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by the Company of this Grant Letter, the performance by the Company of its obligations hereunder, and the consummation by the Company of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of the Company. This Grant Letter has been duly executed and delivered by the Company, and constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

      c.    The execution, delivery and performance by the Company of this Grant Letter and the Option Agreement, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the Certificate of Formation of the Company; (b) conflict with or result in a violation

November 29, 2021
Page **3** of **5**

or breach of any provision of any applicable law or court order applicable to the Company; (c) require the consent, notice or other action by any Person under; or (d) result in the creation or imposition of any lien or encumbrance on any properties or assets of the Company except as expressly set forth in the Option Agreement.

    d.    The Equity constitutes 3.8% of the total issued and outstanding membership interests in the Company. The Equity has been duly authorized and is validly issued, fully paid and non-assessable. Upon consummation of the transactions contemplated by this Grant Letter, Grantee shall own all of the Equity free and clear of all encumbrances. The Equity was issued in compliance with applicable laws. The Equity was not issued in violation of the organizational documents of the Company or any other agreement, arrangement, or commitment to which the Company is a party and are not subject to or in violation of any preemptive or similar rights of any person. There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to any membership interests in the Company or obligating the Company to issue or sell any membership interests (including the Equity), or any other interest, in the Company. Other than the organizational documents, Operating Agreement and Option Agreement, there are no voting trusts, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Equity

    3.    **Representations of Grantee.**  Unless provided otherwise, the Grantee represents and warrants to Company that the statements contained in this Section are true and correct as of the date hereof.

    a.    All representations, warranties, and covenants made by the Grantee in the Loan Agreement are true, complete, and correct.

    b.    The Grantee is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada. The Company has full limited liability company power and authority to enter into this Grant Letter to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by the Grantee of this Grant Letter, the performance by the Grantee of its obligations hereunder, and the consummation by the Grantee of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of the Grantee. This Grant Letter has been duly executed and delivered by the Grantee, and constitutes a legal, valid and binding obligation of the Grantee enforceable against the Grantee in accordance with its terms.

    c.    The execution, delivery and performance by the Grantee of this Grant Letter and the Option Agreement, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the Articles of Organization of the Grantee; (b) conflict with or result in a violation or breach of any provision of any applicable law or court order applicable to the Grantee; (c) require the consent, notice or other action by any Person under; or (d) result in the creation or imposition of any lien or encumbrance on any properties or assets of the Grantee.

    d.    The organizational chart attached hereto as Schedule A is complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Grantee on the date of this Agreement.  Grantee shall not make any direct or indirect (through upstream entities or otherwise) assignment of the Equity, except as specifically permitted by the Operating Agreement.

    4.    **Entire Agreement**.  This Grant Letter, the Loan Agreement, the Option Agreement, and the Operating Agreement when signed shall constitute the entire agreements and understanding between

November 29, 2021
Page **4** of **5**

Grantee and the Company in relation to the grant of the Equity and the terms and conditions of Grantee's ownership of the Equity.

5.    **Notices**.  Any notice to be given under the terms of this Grant Letter shall be given in accordance with the Loan Agreement.

6.    **Survival**.  The obligations contained in this Grant Letter shall survive for a period of one (1) year after the execution of this Grant Letter.

7.    **Further Assurances**.  Each of the parties hereto shall use its diligent and reasonable best efforts to proceed promptly with the transactions contemplated herein, to fulfill the conditions precedent for such party's benefit or to cause the same to be fulfilled, and to execute such further documents and other papers and perform such further acts as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated herein.

8.    **Modifications, Amendments and Waivers**.  This Grant Letter may not be amended, modified, or altered except by a written instrument executed by both parties hereto.

9.    **Governing Law**.  This Grant Letter and any disputes hereunder shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

10.    **Binding Effect**.  This Grant Letter and the rights, covenants, conditions and obligations of the respective parties hereto and any instrument or agreement executed pursuant hereto shall be binding upon the parties and their respective successors, assigns and legal representatives.

11.    **Counterparts**.  This Grant Letter may be executed and delivered by facsimile signature and in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any signature pages of this Grant Letter transmitted by telecopier or portable document format (PDF) transmission shall have the same legal effect as an original executed signature page.

12.    **Severability**.  If any provision of this Grant Letter is determined to be invalid, illegal or unenforceable, the remaining provisions of this Grant Letter, to the extent permitted by applicable law, shall remain in full force and effect, provided that the essential terms and conditions of this Grant Letter for both parties remain valid, binding and enforceable.

*[Signature page follows]*

4822-8681-7535

Ex. B
(SLA dated Nov. 29. 2021)

If this Grant Letter accurately reflects our understanding and agreement with respect to the matters contained herein, please execute this Grant Letter where indicated below.

Sincerely,

**RYZE RENEWABLES NEVADA, LLC**,
a Delaware limited liability company


By: _____
Name: Matthew G. Pearson
Title: Manager


ACKNOWLEDGED AND AGREED:

**LV RENEWABLES A, LLC**
a Nevada limited liability company


By:_____
    Sung Hee Han, Treasurer

Date Acknowledged: _____, 2021

## EXHIBIT F
## [Intentionally omitted.]

Ex. B
(SLA dated Nov. 29. 2021)

## EXHIBIT G
### [Intentionally omitted.]

78454552.11
4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

**<u>Schedule 1</u>**
**<u>[Intentionally omitted.]</u>**

Exhibit 1B - 000123

Ex. B
(SLA dated Nov. 29. 2021)

**<u>Schedule 2</u>**
**[Intentionally omitted.]**

Schedule 2-1

Ex. B
(SLA dated Nov. 29. 2021)

**Schedule 3**
**Exceptions to Representations and Warranties**

Employment Agreements entered into by Borrower and Retention Agreements assumed by Borrower, previously provided to Lender's counsel, provide for deferred compensation, affiliate loans, and fringe benefits.  Such Agreements further provide for penalties if terminated without cause.

The Commitment for Title Insurance with a commitment date of October 5, 2021 issued by Fidelity National Title Group shows two SID's (Special Improvement District charges) on the Property.

4838-9883-6219.21

Exhibit 1B - 000125

**<u>Schedule 4</u>**
**[Organization of Borrower]**

Schedule 4-1

78454552.11
4838-9883-6219.21

Exhibit 1B - 000126

Ex. B
(SLA dated Nov. 29. 2021)



## Ryze Entities
### *As Of 7/1/21*

Ex. B
(SLA dated Nov. 29. 2021)

**Schedule 4a**
**[Persons with Interests in Borrower]**

RYZE RENEWABLES HOLDING, LLC is owned as set forth below and is managed by Mathew G. Pearson and Kevin McDonough

| Name of Member | Preferred Units | Number of Common Units | Authorized but Unissued Common Units | Percentage Interest |
|---|---|---|---|---|
| The Ryze Corporation | 0 | 6,000,000 | | 1.50% |
| MKP 2001 Irrevocable Trust | 0 | 297,331,013 | | 74.3328% |
| RQNMK,LLC | 671,500 | 12,700,000 | | 3.175% |
| ADK Advisors LLC | 0 | 3,354,430 | | 0.8386% |
| The Daniel Brown 2018 Family Trust | 0 | 35,214,557 | | 8.8036% |
| The Chris Dancy 2018 Family Trust | 0 | 40,000,000 | | 10.00% |
| The LAK Exempt Family Trust | 0 | 2,000,000 | | 0.50% |
| Nemo Perera | 0 | 1,000,000 | | 0.25% |
| Darshaun Oyston | 0 | 400,000 | | 0.10% |
| USVEN, LLC | 0 | 1,800,000 | | 0.45% |
| Steven Fink GST | 0 | 200,000 | | 0.05% |
| Authorized but Unissued Shares | | | 200,000,000 | |
| Totals | 671,500 | 400,000,000 | 200,000,000 | 100.00% |

Schedule 4a-1

78454552.11
4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

### Schedule 4b
### [Persons with Interests in Lender]

LV RENEWABLES A, LLC is owned 100% by LV RENEWABLES B, INC., a Nevada corporation ("Lender's Sole Member") and is managed solely by Mirae Asset Securities Co., Ltd.

Lender's Sole Member is wholly-owned by Paragon BRG Korea Co., Ltd., an entity organized under the laws of the Republic of Korea ("PBRGK"), which is wholly owned by Lee Hack-Pyo, a Korean national.  The Co-Presidents/Co-CEOs of PBRGK are Oh Seung-Hwan and Lee Hack-Pyo.

78454552.11
4838-9883-6219.21

Exhibit 1B - 000129

Ex. B
(SLA dated Nov. 29. 2021)

**Schedule 4.17**

**[Warrant, Grants or Pledges of Interests]**

1. Warrant issued by Ryze Renewables Las Vegas, LLC to New-Com, Inc. dated January 20, 2018

2. Operating Agreements of all Ryze Entities have tag along, drag along and rights of first refusal.

3. Phillips 66 Supply and Offtake Agreement contains certain rights of first refusal.

4. The Olds Family 2002 Trust u/d/t June 3, 2002 has a pledge of Membership Units in Ryze Renewables Holdings, LLC to secure certain notes.

5. NC Industries, LLC has a pledge of Membership Units in Ryze Renewables Holdings, LLC to secure certain notes.

6.  RQMNK, LLC has a pledge of Daniel Brown 2018 Family Trust's Membership Units in Ryze Renewables Holdings, LLC to secure certain notes.

78454552.11
4838-9883-6219.21

Exhibit 1B - 000130

Ex. B
(SLA dated Nov. 29. 2021)

## Schedule 4.25
## [Major Contracts]

1.   Employment Agreements entered into by Borrower and Retention Agreements assumed by Borrower, previously provided to Lender's counsel, provide for deferred compensation, affiliate loans, and fringe benefits.  Such Agreements further provide for penalties if terminated without cause.

**2.**   Engineering, Procurement and Construction Services Contract, by and between Ryze Renewables Las Vegas, LLC and MMC, Inc. dated January 23, 2018

**3.**   Engineering Services and Equipment Agreement, by and between Plant Process Equipment, Inc. and Ryze Renewables Las Vegas, LLC for a Natural Gas to Hydrogen Production Facility dated August 8, 2018

**4.**   Change Order to Plant Process Equipment, Inc. Engineering Services and Equipment Agreement dated December 7, 2018

**5.**   Engineering Services and Equipment Agreement, by and between Plant Process Equipment, Inc. and Ryze Renewables Las Vegas, LLC for a7500 BPSD Renewable Diesel Hydrotreater and Isomerization Unit dated as of September 20, 2018

**6.**   Management Services Agreement, to be entered into by and between Ryze Renewables Holdings, LLC and Ryze Renewables Las Vegas, LLC

**7.**   Operation and Maintenance Agreement, entered into by and between Plant Process Operating, LLC and Ryze Renewables Las Vegas, LLC dated as of September 11, 2020

**8.**   Supply and Offtake Agreement, by and between Ryze Renewables Las Vegas, LLC and Phillips 66 Company, dated as of June 15, 2017, as modified

**9.**   License Agreement by and between Ryze Renewables Las Vegas, LLC and Haldor Topsoe A/S dated October 4, 2019

**10.**   Engineering Agreement between Haldor Topsoe, Inc. and Ryze Renewables Las Vegas, LLC dated as of October 4, 2019

**11.**   Guarantee Agreement between Haldor Topsoe A/S and Ryze Renewables Las Vegas, LLC dated as of October 4, 2019

**12.**   Catalyst Supply Agreement between Haldor Topsoe, Inc. and Ryze Renewables Las Vegas, LLC dated as of May 13, 2020

**13.**   Intellectual Property License Agreement between Ryze Renewables Holdings, LLC and Ryze Renewables Las Vegas LLC dated October 29, 2020

Schedule 4.25-1

Exhibit 1B - 000131

**<u>Schedule 4.33</u>**
**[Breaches Known to Lender]**

None.

Exhibit 1B - 000132

**EXHIBIT 2 –**

First Amended Complaint

*Ryze Renewables Holdings, LLC et al. v. Snell & Wilmer, LLP, et al.*, Case No. A-23-863908-B, filed in Clark County, NV

Electronically Filed
7/10/2023 6:10 PM
Steven D. Grierson
CLERK OF THE COURT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ACOM**
G. Mark Albright, Esq. #001394
Daniel R. Ormsby, Esq. #014595
**Albright, Stoddard, Warnick & Albright**
801 South Rancho Drive, Ste. D-4
Las Vegas, Nevada 89106
Telephone: (702) 384-7111
Facsimile: (702) 384-0605
gma@albrightstoddard.com
dormsby@albrightstoddard.com

**Edgar Law Firm LLC**

John M. Edgar, Esq. (*admitted pro hac vice*)
John F. Edgar, Esq. (*admitted pro hac vice*)
Michael R. Owens, Esq. (*admitted pro hac vice*)
2600 Grand Boulevard, Ste. 440
Kansas City, Missouri 64108
Telephone: (816) 531-0033
jme@edgarlawfirm.com
jfe@edgarlawfirm.com
mro@edgarlawfirm.com

*Attorneys for Plaintiffs Ryze*
*Renewables Holdings, LLC and*
*Ryze Renewables Nevada, LLC*

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| RYZE RENEWABLES HOLDINGS, LLC., a Delaware, limited liability company, registered in Nevada, and RYZE RENEWABLES NEVADA, LLC, a Delaware limited liability company,<br><br>        Plaintiffs,<br><br>v.<br><br>SNELL & WILMER, LLP., a foreign limited liability partnership, registered in Nevada; VICTOR J. ROEHM III; STEVEN T. GRAHAM; and CHARLES E. GIANELLONI,<br><br>        Defendants. | Case No.: A-23-863908-B<br>Dept. No.: 27<br><br><br>**FIRST AMENDED COMPLAINT**<br>**Request for Business Court Asgmt.**<br>[EDCR 1.61(a)(2)(ii)]<br>**Exempt from Arbitration**<br>[N.A.R. 3 (Amount in Controversy)]<br>**Jury Demand**<br>[NRCP 38(b)] |

*(vertical left margin)* **Albright Stoddard Warnick & Albright**

Case Number: A-23-863908-B

Exhibit 2 - 000001

Plaintiffs RYZE RENEWABLES HOLDINGS, LLC, a Delaware limited liability company registered to do business in Nevada, and RYZE RENEWABLES NEVADA, LLC, a Delaware limited liability company (collectively, **"Ryze"**) brings this action against Defendants SNELL & WILMER LLP ("Snell"), a foreign limited liability partnership registered to do business in Nevada, VICTOR J. ROEHM III (**"Roehm"**), STEVEN T. GRAHAM (**"Graham"**), and CHARLES E. GIANELLONI (collectively, **"Defendants"**) for abuse of process, professional negligence, and tortious interference with contract. In support of the same, Ryze states and alleges the following:

## INTRODUCTION

1.     Ryze brings this action to recover damages it sustained as a result of the misrepresentations, deceptive omissions, and other bad-faith and tortious conduct undertaken by Defendants as principals, conspirators, abettors, and beneficiaries of a brazen loan fraud. The scheme principally involved an onslaught of threats, misrepresentations, and deceptive conduct pertaining to the capacity and/or willingness of Snell's supposed client, Korea-based Mirae Asset Securities Co., Ltd. (**"Mirae"**), to fund its loan agreements with Ryze.

2.     To thwart Ryze's efforts to finalize a loan commitment to enable the construction of a renewable diesel plant in Las Vegas—one capable of producing over 100 million gallons per year of renewable diesel fuel (the **"Project"**)—and to enrich themselves and their "client," Defendants misrepresented the identity of their client (purportedly Mirae Asset Securities Co., Ltd., a prominent South Korea-based asset management firm) as well as the client's capacity to fund the loan deal the parties spent precious months negotiating. Defendants even went so far as to file an entirely unfounded and malicious Nevada lawsuit in this Court on July 23, 2021 (the **"July 23 Lawsuit"**), the purpose of which—by Defendants' own *admission*—was to scare off any alternative funding sources and, tie up Ryze for an additional six (6) months, and thereby coerce Ryze into accepting extortionate terms for a plainly inadequate loan commitment (approximately 10% of the amount originally negotiated).

3.     As it turns out, the global asset management firm Defendants claimed to represent (and in whose name Defendants filed their extortionate lawsuit) was unable to fund even this

///

- 2 -

Exhibit 2 - 000002

significantly more modest commitment, despite the unconscionably lender-friendly terms that Defendants extorted Ryze into accepting.

4.    The magnitude of the financial loss that the Defendants' conduct has visited upon Ryze is staggering. It has caused, among other losses:

a)   the ongoing (and potentially permanent) suspension of Ryze's construction of a renewable diesel facility in Las Vegas, Nevada, and lost profits resulting from this delay or abandonment of the Project;

b)   Ryze's default on a $198,000,000 loan guaranteed by the United States Department of Agriculture under a program for emerging renewable energy technologies guaranteed (the "**USDA Guaranteed Loan**") and its inability to source alternative funding;

c)   Increased construction, materials, and interest costs.

5.    While Ryze is making every effort to secure new funding for the Project, it is now in a workout with the lender under USDA Guaranteed Loan, which makes the search for new funding very difficult.

6.    The entire Project and, indeed, Ryze itself now teeter on the brink of total collapse.

## PARTIES

7.    Plaintiff Ryze Renewables Holdings, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 11280 Granite Ridge Drive, Suite 1102, Las Vegas, Nevada 89135.

7.1   Plaintiff Ryze Renewables Nevada, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 11280 Granite Ridge Drive, Suite 1102, Las Vegas, Nevada 89135. Ryze Renewables Nevada, LLC is a wholly owned subsidiary of Plaintiff Ryze Renewables Holdings, LLC.

8.    Defendant Snell & Wilmer LLP is a limited liability partnership, organized and existing under the laws of the State of Arizona, registered in Nevada, with its principal place of business located in Nevada at 3883 Howard Hughes Parkway, #1100, Las Vegas, Nevada and in Arizona at One Arizona Center, Suite 1900, Phoenix, Arizona 85004.

- 3 -

Exhibit 2 - 000003

9.      Defendant Steven T. Graham is an individual and a citizen of the State of California who principally resides in Orange County, California. At all times relevant to the allegations herein, Defendant Graham was and/or held himself out to be an attorney practicing with Snell & Wilmer LLP.  Upon information and belief, Defendant Graham is a business associate or close friend of Jeff Hall (owner of Paragon Construction Consulting, Inc., Plaintiff's broker and representative), and served as lead litigation counsel July 23 Lawsuit filed in Nevada against Ryze to undermine its efforts to secure alternative funding and to coerce Ryze into accepting an onerous (and ultimately illusory) funding deal.

10.     Defendant Victor J. Roehm III is an individual and a citizen of the State of Oregon who principally resides in Multnomah County, Oregon. At all times relevant to the allegations herein, Defendant Roehm was and/or held himself out to be an attorney practicing with Snell & Wilmer LLP. Roehm served as "transactional counsel" in connection with the loan agreement Defendants coerced Ryze into accepting the via July 23 Lawsuit and directly participated in the misrepresentations and other tortious conduct described herein.

11.     Defendant Charles E. Gianelloni is an individual and a citizen of the State of Nevada who resides in Clark County, Nevada. At all times relevant to the allegations herein, Defendant Graham was and/or held himself out to be an attorney practicing with Snell & Wilmer LLP. Mr. Gianelloni is licensed to practice law by the State Bar of Nevada and served as counsel of record in the July 23 Lawsuit described herein.

12.     Non-party Mirae Asset Securities Co., Ltd., ("**Mirae**") is a South Korea-based asset management and investment banking firm that, along with its global affiliates, controls some $550 billion in total assets.

13.     Non-parties Jeff Hall ("**Hall**"), Sung Hee Han ("**Han**"), and Kyunghyun Lee ("**Lee**") were Defendants' principal collaborators in the fraud. Hall owned a company called Paragon Construction Consulting, Inc. ("**Paragon**") that was working to raise the additional funding for Ryze. Han worked for Paragon. Lee was an employee of Mirae, who represented that he had the sole authority to bind Mirae. Lee did not speak English so all communication with Lee was translated through Han.

- 4 -

Exhibit 2 - 000004

14.     Hall and Han were supposed to be working for and representing Ryze and stood to earn significant fees if Mirae provided the additional funding. Han and Hall were also subject to confidentiality provisions in the Paragon agreement and separate nondisclosure agreement. (Although Han asserted that he never represented Ryze, that claim is demonstrably false. In fact, Hall (who was described by Roehm as "a close friend of [Snell]") and Han switched sides without informing Ryze and concocted the scheme with Defendants to extort millions from Ryze or ruin them, or both.)

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action because it arises under Nevada law and seeks the recovery of money in excess of $15,000.00.

16.     This Court has personal jurisdiction over the parties because Defendants, and each of them, engaged in intentional conduct expressly directed at and calculated to cause harm to Ryze, a Nevada resident, because Defendants knew that the effects of their wrongful conduct would be felt in and would be unique to Nevada, and/or because Defendants utilized this Court (albeit wrongfully) in furtherance of their tortious conduct described herein.

17.     Venue is appropriate in this Court pursuant to NRS 13.040 because, among other reasons, Ryze is headquartered in Clark County, Nevada as of the commencement of the action.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**I.      Ryze's Ongoing Efforts to Construct a State-of-the-Art Renewable Diesel Facility in Las Vegas**

18.     Ryze is in the process of constructing a renewable diesel facility in Las Vegas, Nevada.

19.     The Project aims to convert an existing biodiesel refinery facility into a renewable diesel facility equipped to utilize state-of-the-art technology and proprietary refining methods.

20.     By leveraging these cutting-edge technologies, the facility was reasonably expected to achieve a production capacity in excess of 100 million gallons of renewable diesel output per year.

///

- 5 -

Exhibit 2 - 000005

**A.** <u>The Project's Profitability is Ensured by a Lucrative 15-Year Supply and Offtake Contract with Phillips 66 Co.</u>

21.     On top of ensuring the facility's competitiveness technologically, Ryze has secured input and purchase commitments that effectively ensure the Project's profitability once the facility is completed and operational.

22.     Specifically, Ryze managed to secure a 15-year supply and offtake agreement with Phillips 66—an arrangement that provides for a continuous and stable feedstock supply, guaranteed sales, and transportation of offtake under an industry-unique netting arrangement.

23.     In other words, the procurement of input for the facility and the profitable sale of its output are both guaranteed by enforceable contractual commitments with one of the largest energy companies in the world.

**B.** <u>Ryze Seeks to Procure Additional Financing to Fund its Pivot to a New Refining Technology</u>

24.     Ryze obtained initial funding for the Project through a $198 million loan from Georgia's Own Credit Union (**"Georgia's Own"**).

25.     The loan was approved and partially guaranteed by the USDA as part of an initiative to promote emerging environmental technologies.

26.     The original loan guidelines, and the USDA Guaranty Program, encouraged borrowers to license non-commercially deployed technology.

27.     After construction commenced, development plans with the USDA were amended for the use of previously deployed and proven technology. Ryze immediately began working on the possible mid-construction transition to commercially proven technology.

28.     This was a major undertaking by Ryze, but it did not threaten the viability of the Project. Determined to see the Project through, Ryze promptly devised a workable plan to reconstitute the Project around a proven technology. Still, the additional funding required for this technological pivot would be considerable.

29.     Ryze thus began looking to secure additional funding for the Project in late 2019, and early 2020.

- 6 -

Exhibit 2 - 000006

**II.    Ryze is Induced to Abandon its Pending Bond Issuance in Favor of a Sham Funding Deal Purportedly Backed by Mirae**

30.    Unsurprisingly, the prospect of financing the Project drew the interest of several potential funders. Ryze was moving toward the closing of a bond issuance, when Mirae entered the scene as a potential bond purchaser. In the end, Mirae persuaded Ryze to abandon the bond issuance and convinced Ryze that it was the best-suited alternative out of the many interested funders for Ryze's immediate needs and, most critically, that it could—and would—fund all amounts needed by Ryze within 8 weeks of signing an Offering Memorandum on April 22, 2020. The COVID-19 shutdowns were well underway at this point in time, and Mirae assured Ryze that they could close without any COVID-19 related delays that the bond issuance could experience.

A.    The Parties' Negotiations of the $210 Million CLA

31.    On or about April 22, 2020, the parties executed an Offering Memorandum. Among other provisions, the Memorandum incorporated Mirae's assurance that it will "fund [the] Transaction within Eight Weeks of executing this Offering Memorandum"—*i.e.*, by June 17, 2020.

32.    Instead of cooperating to advance the due diligence process and position the parties to close the loan in accordance with the agreed-upon timeframe, Han, purportedly on behalf of Mirae, instead lobbed endless demands to change previously agreed-upon terms (especially demands related to rates and fees Ryze was to pay Mirae and its advisors) and to delay the funding deadline.

33.    This process played out month after month. The "prompt" funding assurances—the ones responsible for Ryze's decision to deal with Mirae in the first place (and thus Ryze's abandonment of its pending bond issuance as well) had already proven false by a wide margin.

34.    Nevertheless, nearly one whole year after Mirae first represented to Ryze that Mirae could deliver the additional Project funding within 6-8 weeks—and some 7 months following the expiration of the June 17th funding deadline agreed to in the Offering Memorandum—the parties finally reached agreement on terms of a Convertible Loan Agreement (the "**CLA**"). The CLA was executed by all parties on January 27, 2021.

///

- 7 -

Exhibit 2 - 000007

35.     On a phone call conducted March 1, 2021, Mirae informed Ryze that it had obtained final committee approval for the CLA. This approval triggered Mirae's obligation to fund the CLA "no later than ten (10) days" thereafter. Mirae thus was required to provide funding no later than March 11, 2021.

**B. Hall, Han, and Lee Ignore the CLA's Terms and Attempt to Renegotiate the Transaction**

36.     What followed in the ensuing weeks and months defied reasonable—or innocent— explanation. Hall, Han, and Lee began attempting to renegotiate the terms, treating the CLA as though it were merely a non-binding offering memorandum, rather than an enforceable contract obligation of Mirae.

37.     Ultimately, Mirae decided to "withdraw" from the deal. In an email dated May 20, it stated "As Ryze isn't willing to accept our new solution, we will now officially withdraw and terminate. We hope your future is prosperous and wish you good luck." Five days later, Mr. Lee added that: "we have restructured our deal with our investment committee and our co-investors, thus previous 210MM CLA won't be viable for us. We have decided to withdraw from the Ryze so that Ryze can move forward and succeed without our participation."

38.     Yet, in the very same communication, Lee proposes a new financing transaction between Ryze and Mirae, essentially inviting Ryze to scrap the CLA and start negotiations anew.

39.     By this time, however, Ryze has determined that Mirae—or whomever it was Ryze had spent the past year-plus negotiating with—would never fund a loan. Ryze decided then to cut its losses to save the Project by returning to the market to raise the required funding from a different source.

40.     Ryze promptly succeeded in locating an interested funding source (the "Substitute Funder"), and thereafter executed a term sheet with the Substitute Funder that included a proposed closing date of July 30, 2021 (the "**July 2021 Funding**").

41.     Hall and Han, for their part, were desperate to bring Ryze back to the table to negotiate a new deal with Mirae. They somehow learned about Ryze's new funding source and threatened that Mirae might "do something crazy" if Ryze walked away from the CLA. Having

- 8 -

Exhibit 2 - 000008

received an email from Lee (Ryze's sole contact at Mirae), specifically terminating the CLA and wishing Ryze good luck, Ryze disregarded these threats.

42.     At this point, however, Ryze was well on track to securing the funding necessary to incorporate the proven refining technology into the Project with a different lender. It now had a clear path toward completing the construction of the Project and making it an operational and profit-generating facility.

43.     That trajectory would change abruptly, however, when Snell & Wilmer LLP and attorneys Steven Graham, Victor Roehm, and Charles Gianelloni got involved. As detailed below, Snell successfully thwarted the substitute financing arranged by Ryze via a series of bad-faith acts—including egregiously misusing this Court in service of unlawful and collateral objectives designed to enrich themselves and their coconspirators.

### III.     Defendants File a Baseless, Bad-Faith Lawsuit to Thwart Ryze's Deal with the Alternative Lender and Force it to Resume Loan Negotiations with Mirae

44.     Unbeknownst to Ryze, Hall and Han had sought out Graham (a close friend of Hall) to concoct a plan to force Ryze to negotiate with Mirae.

45.     Han and Hall, without Ryze's knowledge or consent, provided Defendants with all of the confidential information they had received from Ryze and used it to file suit against Ryze, despite the fact that such information was protected under the terms of a non-disclosure agreement and the fact the Han and Hall were supposed to be Ryze's representatives.

46.     Defendants filed suit against Ryze in Clark, County Nevada on July 23, 2021 (the "**July 23 Lawsuit**") to stop the July 2021 Funding from closing and force Ryze to re-engage negotiations with Mirae.

47.     The July 23 Lawsuit purported to assert claims for specific performance and monetary damages premised on Ryze's supposed breach of the CLA.

48.     In reality, the suit was a transparent tool to thwart the deal in progress with the Substitute Funder (or any other potential alternative financing), force Ryze to resume negotiations with Mirae, and extort Ryze into accepting wildly non-market terms for a $21 million financing deal (the "Second Loan" or "SLA"). This amount was a mere 1/10 the funding commitment originally

Exhibit 2 - 000009

contemplated under the CLA.   Ryze immediately informed the Substitute Funder of the July 23 Lawsuit, and the Substitute Funder, predictably, stopped all work related to the July 2021 Funding pending resolution of the July 23 Lawsuit.

A. <u>The Baseless and Incoherent Allegations in Defendants' Lawsuit</u>

49.     The allegations in the July 23 Lawsuit contained a myriad of known misrepresentations—the falsity of which was known to Snell (or which unquestionably would have been discovered had they conducted anything resembling the good-faith merits investigation required by Nev. R. Civ. P. 11).

50.     Such provably baseless allegations included, among others, the following factual assertions:

a) *that Ryze misrepresented the Project to be in its "final stages."* In fact, Ryze provided Mirae with direct access to the independent engineer reports tracking construction progress. Further, Mirae demanded that, upon funding, Ryze remove its current construction company, MMC, and hire Sys-Con, LLC, a Korean company with strong ties to Mirae, Lee and/or Han instead. Prior to executing the CLA, Sys-Con, LLC was provided unfettered access to the Project and provided its analysis of the status directly to Mirae. In short, Mirae—at its own insistence—reasonably made its own determination about the status of the Project prior to executing the CLA.

b) *that Ryze misrepresented that the estimated cost of completion of the pretreatment facility was $95 Million.* In fact, Ryze's representation, when made, was entirely true. While Sys-Con, LLC may have told Mirae that its cost for completion was in excess of $95 Million, MMC (Ryze's construction company) agreed to complete this work for $95 Million. Later, due to COVID and delays specifically caused by Defendants and Mirae, the cost increased significantly, mainly due to supply chain issues and the increase in costs of materials—costs increases that largely could have been avoided if Mirae had met its promises to close the transaction on an expedited basis. Nonetheless, when the CLA was executed, Ryze had a bid for this work from MMC at $95 Million. Ryze's strong preference was to move forward with MMC but Mirae challenged this, which may be the result of a close, undisclosed relationships between Sys-Con/Mirae/Han.

c) *that Ryze failed to disclose that NC Industries, Inc. (whose $26,435,048 note would be retired upon Mirae's funding the CLA) is MMC, the EPC contractor who had performed on the Project up to the time of the CLA.* In fact, Ryze provided Mirae with the NC Industries, Inc. loan documents and did disclose that Greg Paulk was the owner of NC Industries, Inc. and MMC. This disclosure was the initial driver leading to Mirae's demand that its closely affiliated Korean-owned construction company perform the construction instead. Changing the EPC contractor would have created significant complications and expense, but Ryze (after much coercion and additional threats from Han and Mirae) agreed that it would hire Sys-Con, LLC upon

- 10 -

Exhibit 2 - 000010

Albright Stoddard
Warnick & Albright

Mirae's funding of the CLA. There were some conversations about trying to delay repayment of the NC Industries, Inc. loan in order to retain MMC at a much-reduced cost for completion of the project. The claim that Mirae was not aware of Greg Paulk's ownership of both entities is entirely baseless and untrue.

d) *that Ryze failed to disclose that they "were the subject of litigation, and continued to be the subject of a threatened claims, particularly those made by RB Products, Inc., regarding the original technology that Ryze was planning on abandoning for the Project, in favor of the commercially deployed technology, at the time of the negotiations and then the execution of the CLA."* In fact, the Ryze Defendants settled all claims by RB Products, Inc. Snell represented RB Products in the case so was fully aware of the settlement. Even though this case was completely frivolous, Ryze paid to settle it so that the Mirae closing could move forward. All claims against Ryze were dismissed months prior to the execution of the CLA.

e) *that Ryze concealed that Ryze is "controlled and dominated and potentially owned by Brown, whose control, dominion and ownership has been apparently concealed because of Brown's prior serious legal problem with the Internal Revenue Service."* Entirely untrue: Brown has no ownership or control over Ryze. Brown was an outside consultant with a significant engineering background. Brown introduced Paragon to Ryze and had a close relationship with Paragon, regularly golfing and socializing with Hall. Because of this relationship, Brown took the lead on many of the discussions with Paragon/Mirae. However, Brown has no ownership or authority to bind the company. This was relayed to Paragon many times as they regularly tried to (and continue to try to this day) go around Pearson and negotiate with Brown, who was much more willing to engage in Mirae's constant renegotiation than Pearson. However, it was always Pearson who made the final decision. There is no evidence of any direct or indirect, past or present ownership of Brown in Ryze.

f) *that Sections 4.01, 4.02 and Schedule 4.02A of the CLA provided for a "Due Diligence Period" and that Ryze refused to comply with Mirae's requests for due diligence during this period.* This claim—which formed the main basis for Defendants' stated claims for relief—is completely fabricated. In fact, Nowhere in Sections 4.01, 4.02 or Schedule 4.02A of the CLA is there any mention of due diligence or any requirement for Ryze to provide any due diligence. Schedule 4.02A of the CLA sets forth a list of 14 distinct and objective deliverables, each of which was provided by Ryze prior to the funding date. Mirae acknowledged in an email that each item was received. Even if that were not the case, the CLA expressly excludes each of the referenced Sections as a basis to sue ("each party hereby waives, releases and discharges the other party and agrees not to sue in connection with . . . [the] conditions precedent set forth on Schedule 4.02A or Schedule 4.02B"). The actual terms in the CLA were of no consequence to Defendants, who seemed all too eager to join Han and Mirae in their extortionist scheme.

51.     Notably, the CLA that formed the basis for Defendants' claims also mandated that any disputes at law be resolved exclusively in arbitration. Private arbitration, however, would not serve Defendants' primary goal of publicly damaging Ryze in the eyes of prospective funders as

- 11 -

Exhibit 2 - 000011

1   effectively as a court proceeding, so they simply disregarded the arbitration clause. Defendants'

2   demanded specific performance of the CLA to avoid the arbitration clause, but Defendants' first

3   statement to Ryze after the filing was that the terms of the CLA were no longer on the table and a

4   new deal (one that would not provide the necessary funds to Ryze, but would still provide the

5   egregious fees that Defendants would have received under the $210,000,000 original CLA) was to

6   be negotiated if Ryze wanted to survive. If Ryze refused, Defendants threatened to tie the Project

7   up in litigation for years.

8           **B.  Defendants Use the CLA Suit (and Ryze's Attempts to Mediate it) to Coerce

9   Ryze's Agreement to a Collateral and More Onerous Loan Agreement**

10       52.    In an effort to expeditiously resolve the dispute and salvage the additional funding

11   from the Substitute Funder, Ryze arranged for the parties to conduct a mediation.

12       53.    The mediation took place on August 12, 2021, at Snell's office in Orange Co.,

13   California.

14       54.    The ordinary purpose of mediation is to explore potential resolutions of the dispute

15   underlying the litigation.

16       55.    The typical case, however, assumes the underlying lawsuit was initiated as a good-

17   faith resort to civil process to resolve a *bona fide* dispute. That was plainly not the case here.

18       56.    Instead, Graham, Roehm, and Han used the mediation opportunity to threaten Ryze

19   into accepting their latest slate of renegotiated and extortionate terms.

20       57.    Defendants refused to discuss the lawsuit they filed, stating that if Ryze's counsel

21   even attempted to discuss its merits, the mediation would be terminated. Defendants also and

22   admitted that they had no intention of funding the loan pursuant to the CLA—despite having filed

23   a lawsuit some 20 days prior that requested a declaration that "the CLA has not automatically

24   terminated" and demanding equitable relief requiring the Ryze Defendants to "specifically perform"

25   the very same CLA.

26       58.    To be clear, Ryze *wanted* Mirae to fund under the terms of the CLA and repeatedly

27   advised Mirae of this fact in the months before and after the lawsuit.

28   ///

- 12 -

Exhibit 2 - 000012

59.   Graham and Han, for their part, did not even bother to pretend that the Lawsuit served any lawful or legitimate ends. Graham's client was entirely candid (if vulgar) in summarizing their side's expectations for the mediation: Ryze, in their view, should just "*bend over and take it in the a[\*\*].*"

60.   Indeed, Defendants expressly acknowledged that the transaction was unfavorable to Ryze but insisted that Ryze's only option was to pay the amounts demanded or go bankrupt.

61.   Defendants told Ryze in no uncertain terms, that if they did not sign a deal with Mirae by midnight that there would be an even bigger lawsuit against Ryze—this time by Clifford Chance, supposedly, which would ensure Ryze's destruction. Having endured for some 18 months of Mirae's and Han's seemingly endless capacity for malicious, unscrupulous, and extortionate conduct, Ryze had every reason to take Graham and Roehm at their word when they threatened to "destroy" Ryze through "years" of vexatious litigation if they did not sign the deal at the mediation.

62.   Snell's threats were effective because they contained an element of truth: protracted litigation, even meritless litigation, was virtually certain to bankrupt Ryze, by scaring off potential funders and destroying Ryze's ability to access the financing required to complete the Project.

C.   Left with No Other Choice, Ryze Acquiesces to Mirae's Threats and Executes the SLA

63.   As the mediation dragged on into the early morning hours of August 13, 2021, Ryze concluded it had no choice but to acquiesce to Defendants' relentless extortion if it were to have any chance of avoiding imminent default on the USDA Guaranteed Loan.

64.   Shortly before 2:00 a.m. on August 14, 2021, Ryze signed a binding term sheet, which eventually led to the execution of the SLA.

65.   The binding term sheet provided, in part, for the following:

   a)   Ryze would receive a $52 million loan from Mirae to be allocated:

      1.   $28 million for construction

      2.   $2 million for working capital

      3.   $1 million for project contingency

      4.   $10 million for interest reserve for the USDA Guaranteed Loan

- 13 -

Exhibit 2 - 000013

5. $4.5 million for Mirae's interest reserve

6. *$6.5 million for Fees payable to Han, Mirae and Defendants.*

b) Mirae would receive:

1. 20% of all outstanding membership interests in Ryze (the "**Equity Award**"). Ryze would have a call option on the Equity Award for $150 million. Mirae would have a put option for the Equity Award in certain limited circumstances for $150 million.

2. 12% interest

3. repayment of principal and accrued interest after 5 years

4. two (2) seats on the 5 member board of directors

5. $6.5 million in Fees payable to Han, Mirae and Defendants.

66.     The term sheet further provided that the parties would execute the definitive agreements within 80 calendar days from the date the term sheet was executed (the "**Estimated Execution Date**"). Mirae was required to fund within 10 days of the Estimated Execution Date. The Estimated Execution Date was November 4, 2021. If definitive agreements were not executed by the Estimated Execution Date, the binding term sheet would be terminated and the July 23 Lawsuit would be dismissed with prejudice; provided, that Mirae could extend the Estimated Execution Date for an additional 30 days by paying a penalty to Ryze of $50,000 per day (the "**November 4 Penalty**").

67.     The binding term sheet contained very specific deliverables from Ryze (similar to those under the CLA) and made no mention of any additional due diligence.

68.     In an effort to avoid prior experiences with Mirae, Ryze included a provision that, if Mirae attempted to renegotiate the binding term sheet, Ryze could terminate the transaction and Mirae would have to dismiss the July 23 Lawsuit with prejudice.

D.     Mirae Changes the Deal Yet Again and Ignores the Requirements of the Binding Term Sheet

69.     Nevertheless, Defendants began making demands for additional due diligence. Ryze strongly resisted re-opening diligence with Mirae, after months of intensive diligence in connection

- 14 -

Exhibit 2 - 000014

with the CLA and assurances that no additional diligence would be required for the second loan outside of what was specifically set forth in the binding term sheet.

70.     However, in the end, Ryze provided all of the requested due diligence anyway to ensure that its own good faith during the process could not reasonably be doubted.

71.     In addition to re-starting the due diligence process, Mirae was running into other issues. During the Term Sheet negotiations, Ryze informed Defendants that the senior lender could have issues with the new ownership and changes to the management structure. Defendants told Ryze that they would cooperate with any requirements of the senior lender, including "know your customer" requirements. Ryze was trying to facilitate the process, but Defendants refused to tell Ryze who the actual loan counter party or new 20% member would be. Ryze informed the senior lender that some yet to be formed Mirae entity was joining the board of managers of Ryze and acquiring 20% of the membership interests. Defendants refusal to provide basic ownership and lender information continued throughout the term of the negotiation of definitive documents, despite continuous and numerous requests by Ryze as to who their lender and co-owner would be.

72.     Mirae was informed that a transfer of 20% of the ownership would require that Mirae provide a guarantee for the entire $198 million USDA Guaranteed Loan. However, Mirae was not willing to provide such a guarantee. This led to an entire re-negotiation of the Binding Term Sheet. Ryze tried to terminate because the change in terms by Mirae resulted in termination, but as usual, Defendants threatened Ryze back to the table.

73.     The Estimated Execution Date came and went. On November 14, 2021, Ryze made a written demand for the November 4 Penalty, or in the alternative a termination of the Term Sheet and dismissal of the July 23 Lawsuit, but Defendants refused to even discuss the payment of the November 4 Penalty.

74.     In the end, the SLA was finalized and provided the following terms:

     a) Ryze would receive a $21 million loan from a "to be determined lender" (a newly formed Mirae entity) to be allocated:

          1. $3 million for working capital to be held by Mirae in a controlled account

          2. $1 million for specific expenses, including salaries of Borrower

- 15 -

Exhibit 2 - 000015

1               3. $10 million for interest reserve for the USDA Guaranteed Loan

2               4. $7 million for Fees payable to Han, Mirae and Defendants

3       b)  Mirae would receive:

4               1. 3.8% of all outstanding membership interests in Ryze ("Equity Award")

5                  to avoid any guarantee by Mirae. Despite the much lower percentage

6                  ownership, Defendants demanded a much broader put option that the loan

7                  holder could exercise to force Ryze to repurchase the Equity Award for

8                  an additional $45,000,0000. Ryze would also have a call option on the

9                  Equity Award for $45 million. Under certain circumstances, the put and

10                call options could be exercised at an earlier date for slightly better

11                economics, but it was unlikely such funds would be available so quickly.

12               2. 12% interest

13               3. repayment of principal and accrued interest after 2 years

14               4. one (1) seat on the 3-member board of directors

15               5. $7 million in Fees payable to Han, Mirae and Defendants

16     75.    Unbelievably, Defendants insisted that, despite the loan amount being reduced by

17  more than 50%, the fees to Han, Mirae, and Defendants must be *increased*.

18     76.    The parties did finally execute the SLA on November 29, 2021, and Ryze quickly

19  started working on the closing conditions.

20        E.  Mirae Fails to Fund the SLA that Defendants Coerced Ryze into Accepting;
              Defendants Cease All Communications with Ryze
21

22     77.    As it turns out, the precise terms of the SLA wound up mattering little in the end.

23  Just as had occurred in January of 2021, the December 15, 2021, funding deadline agreed to in the

24  SLA came and passed. The loan was never funded, and—predictably—Ryze defaulted on the USDA

25  Guaranteed Loan.

26     78.    The excuses for Mirae's inability to fund were wide-ranging, but Defendants

27  primarily blamed Korean regulators, whom Defendants claimed were reviewing the transaction.

28  ///

- 16 -

Exhibit 2 - 000016

Defendants advised Ryze that the loan would only be funded upon approval by the Korean regulators.

79.     Defendants further insisted that regulatory approval in Korea would only be given if Ryze substantially cut employee salaries and redirected them into blocked accounts to be controlled by Han. Ryze asked to speak with these alleged regulators, but the Defendants refused to allow it.

80.     Ryze's counsel requested copies of the regulations in question, in English or Korean, but Defendants would not provide any information at all related to the "regulatory issues."

81.     Ryze also questioned why there was no regulatory approval required for the $210 million CLA, but was required for the $21 million SLA, Defendants mocked them saying they did not understand how such transactions worked.

82.     This was, of course, just another lie, and the loan was never funded.

83.     Han and Lee stopped returning Ryze's calls entirely and Roehm was slow to respond. When all deadlines under the SLA were expired, Ryze demanded that Defendants dismiss the July 23 Lawsuit, with prejudice.

84.     Ryze was initially met with some resistance and Defendants demanded that Ryze provide releases. Ultimately, however, the Defendants did file the dismissal without any agreements, release, or other concessions by Ryze.

85.     Needless to say, Defendants never followed up with Ryze regarding the status of the loan's approval by the "Korean regulators."

F.   Ryze Raises Questions about the True Identity of Snell's Client

86.     Serious questions arose during Ryze's negotiations with Defendants about the true identity of Snell's client and whether Mirae—or a front runner claiming to be affiliated with Mirae—was actually involved in the deal.

87.     For example, Ryze began requesting Know Your Customer ("KYC")[2] information on the Mirae entity that would be making the loan. Defendants mocked such requests, stating that it was not customary to provide such information until much later in the loan process.

---

[2] "KYC" refers to a set of financial services guidelines pertaining to the verification of, among other things, the *identity* of counterparties to a financial transaction.

- 17 -

Exhibit 2 - 000017

88.     Ryze pleaded with Defendants to speak with (i) Mirae's in house counsel, (ii) the alleged Korean regulators, or (iii) *any* English-speaking Mirae employee. Defendants would not permit these direct communications.

89.     Despite repeated requests, it was not revealed to Ryze the until the November 4, 2021, funding deadline that, in fact, *Mirae would not be the lender under the SLA.*

90.     On October 21, 2021 (2 weeks before the deadline to execute definitive documents), Ryze was first informed that Mirae would not be the lender due to "CFIUS and US tax issues" but that Roehm wanted to be "100% crystal clear" that Mirae will have a collateral assignment for the loan.

91.     Defendants continued to ignore requests for information on who was behind the loan. Eventually, on October 23, 2021, Ryze sent an email to Defendants and included the senior lender's legal counsel pleading for information, stating that:

> In terms of KYC, I cannot emphasize enough the importance of knowing who is on the other side of this transaction. For weeks now, Ryze has been asking for (i) evidence that Mirae Asset Securities Co., Ltd., an entity organized under the laws of the Republic of Korea ("Mirae") or an affiliate of Mirae, will be the party making this loan (as set forth in the binding term sheet), (ii) evidence that Mirae, or a special purpose vehicle formed by Mirae, will be the party receiving membership interests in Ryze (as set forth in the binding term sheet), and (iii) information about the party that will be appointed to the board of managers so that Ryze may perform a background check to ensure such party is qualified to serve. Ryze has not received any information and has been informed today that Mirae does not intend to provide such information, other than what is actually required by Georgia's Own. This is entirely unreasonable and, as Victor says, making Borrower "very nervous", particularly given the circumstances surrounding this loan. I have never been involved in a transaction where basic KYC is such a point of contention and, while I am certainly anticipating that it is all fine, Mirae's refusal to provide verification is beyond concerning. Mirae's rights under the binding term sheet are not assignable and Ryze has every right to seek this verification. While Mirae may be structuring the "lender" and equity holder in a way to avoid FinCEN, or certain foreign reporting requirements, Ryze still needs to know (i) that the structure is legal, and (ii) that Mirae (either directly or through a US affiliate or special purpose vehicle) is the party making this loan and joining the company as a member. Ryze needs to run background checks and seriously vet any nominee to the board of managers. This is in addition to whatever KYC Georgia's Own requires.

92.     Ryze never received full diligence on who was behind this loan, but it was eventually disclosed the lender would be a newly formed entity owned by unknown individuals living in Korea

- 18 -

Exhibit 2 - 000018

1   who are not affiliated with Mirae. Ryze requested Defendants to arrange a call so that Ryze could
2   speak with these individuals, but no call was ever permitted.

3       93.     According to Defendants, the involvement of this unknown Korean entity and the
4   unknown Korean individuals was for tax and "other reasons" that, also according to Defendants,
5   were too complex for them to explain or for Ryze to understand. Defendants assured Ryze that the
6   funding was still coming from Mirae.

7       94.     Once the November 4 deadline passed, Han mostly stopped taking calls from Ryze
8   and Ryze was relying entirely on Defendants for information. Defendants would not allow Ryze any
9   specifics on issues with the Korean regulators or Mirae's in-house counsel, who also allegedly had
10  issues with the transaction.

11      95.     Defendants would not permit Ryze any access to these people or provide any
12  reference to the regulations that were supposedly creating new roadblocks to the transaction.

13      96.     Instead, Ryze was forced to entirely rely on Defendants to manage these gate-keeping
14  issues and was told that Mirae had all the money and was ready to fund as soon as these issues were
15  resolved. Roehm also advised that, even if the regulator issues could not be resolved, there was a
16  "work around" and the funding would still occur.

17      97.     Of course, no information about the "work around" would be shared with Ryze. It
18  appears that the Defendants were really driving the scheme for their own benefit and, as a result,
19  knowingly or carelessly overlooked the fact that their purported client was not a representative of
20  Mirae, had no capacity to bind Mirae, and did not otherwise intend to comply with the loan
21  commitments that Defendants enriched themselves in negotiating, drafting, and fraudulently
22  litigating.

23  **IV.    Damages Resulting from Defendants' Scheme**

24      98.     The damages Ryze has sustained by reason of Defendants' scheme are difficult to
25  overstate. They include, without limitation, lost profits for the expected operational life of the
26  renewable diesel facility; increased materials cost and other construction expenses associated with
27  the delayed construction of the Project; interest on the USDA Guaranteed Loan; due diligence
28  ///

- 19 -

Exhibit 2 - 000019

1    expenses, including costs for appraisals, reports, consultants, and attorneys; the November 4

2    Penalty; and other such items of damages as may be identified during the course of this litigation.

3        99.    At the time Defendants filed the July 23 Lawsuit, Ryze had a significant valuation

4    backed by credible third-party appraisals—ones that Defendants themselves endorsed as credible.

5        100.   Now, Ryze has sustained a complete enterprise loss. The USDA Guaranteed Loan is

6    in default. Ryze's collateral-holding subsidiaries are the subject of pending Chapter 11 proceedings

7    in Delaware.[3] And the renewable diesel facility was sold at auction to a third party on June 13, 2023.

8    In the end, Defendants' unconscionable and destructive conduct proved fatal to project.

9                           **FIRST CLAIM FOR RELIEF**

10                     **Abuse of Process (*Against all Defendants*)**

11       101.    Ryze incorporates all prior allegations of this Complaint by reference as if set forth

12   fully herein.

13       102.    Defendants abused legal process for wrongful purposes when they filed and

14   commenced the July 23 Lawsuit against Ryze in the District Court of Clark County, Nevada.

15       103.    The Lawsuit, while purporting to seek specific performance and damages for

16   breaches of the CLA executed on January 27, 2021, in fact was motivated by and intended to further

17   ulterior purposes and/or motives of Defendants.

18       104.    Defendants' ulterior purposes and/or motives include (without limitation):

19           a)  thwarting Ryze's lawful pursuit of alternative financing, and thereby coercing

20               Ryze's agreement to the SLA, a much smaller $21 million funding deal entirely

21               distinct from the defunct $210 million CLA used by Defendants as pretext for

22               their abusive and bad faith Lawsuit;

23           b)  enriching themselves with millions of dollars in fee compensation, which was

24               unlawfully and unethically tied to Defendants' success in extorting Ryze's

25               agreement to the SLA;

26

27

28   _____

     [3] *See In re Ryze Renewables II, LLC*, No. 1:23-bk-10289 (Bankr. D. Del., Mar. 9, 2023); *In re Ryze Renewables Las Vegas, LLC*, No. 1:23-bk-10290 (Bankr. D. Del., Mar. 9, 2023).

                                  - 20 -

Exhibit 2 - 000020

c) coercing Ryze into accepting blatantly oppressive and non-market terms under the SLA to make the deal more marketable to third-party funders to whom Defendants' and Han intended to "flip" the loan, thereby (i) concealing their fraudulent misrepresentations about the involvement of Mirae or another funder with the capacity and/or intention to fund the loan commitments Defendants and Han purported to make, and (ii) enriching themselves with additional commissions and fees in the process;

d) securing Ryze's release of potential claims against Han and other participants in the scheme, the litigation of which would have revealed the nature and extent of Defendants' and Han's misrepresentations, including the misrepresentations about Mirae's actual involvement in the funding deal and/or Han, Lee, and Defendants' status as representatives of Mirae.

e) other such other ulterior purposes and motives described herein and/or that discovery may reveal.

105.   The foregoing ulterior purposes are unrelated to the resolution of any legal dispute, are wholly collateral to the Lawsuit's stated purpose of enforcing the CLA and are unintended by law.

106.   Defendants engaged in one or more willful acts improper in the regular conduct of the proceeding, including (without limitation):

a) orchestrating and filing a verifiably groundless, bad-faith, and fraudulent Lawsuit for the improper purposes of forcing Ryze to acquiesce to an unfavorable—and, as it turns out, illusory—loan agreement under the threat of further fraudulent litigation and imminent insolvency;

b) admitting at the outset of the supposed "mediation" of that same Lawsuit that Defendants had no intention of seeking specific performance demanded in their Lawsuit;

///
///

- 21 -

Exhibit 2 - 000021

c) threatening Ryze that Defendants would promptly terminate the mediation and ratchet up their litigation efforts if Ryze attempted to discuss the actual merits of the Lawsuit or its subject matter;

d) threatening that Ryze's failure to agree to new loan terms by midnight of the mediation would result in the filing of an even bigger and more protracted lawsuit against it, calculated to ensure Ryze's destruction;

e) threatening the same result if Ryze attempted to seek the advice of outside counsel regarding the SLA's terms.

f) other such conduct that was willful and improper in the regular conduct of the proceeding that discovery may reveal.

107.    As a direct and proximate result of Defendants' abuse of process, Ryze has sustained damages in an amount to be proven at trial.

108.    The foregoing acts and omissions by Defendants were undertaken intentionally, maliciously, and/or recklessly, such that Ryze is entitled to an award of punitive damages sufficient to punish and deter like conduct.

109.    Snell is vicariously liable for the conduct of the individual-attorney Defendants because they undertook the actions and omissions described herein in the course and scope of their employment as attorneys practicing with Snell.

### SECOND CLAIM FOR RELIEF

#### Professional Negligence (*Against all Defendants*)

110.    Ryze incorporates all prior allegations of this Complaint by reference as if set forth fully herein.

111.    Defendants owed Ryze duties of care, competence, prudence, and diligence in connection with the opinions, advice, and/or representations it conveyed to Ryze in connection with the SLA, the Lawsuit, and other matters described herein.

112.    Defendants owed the foregoing duties to Ryze by virtue of an attorney-client relationship between the parties. Such attorney-client relationship arose as a result of:

///

- 22 -

Exhibit 2 - 000022

a) Defendants' representation of Ryze's agent, Han, in connection with Ryze's negotiations with Mirae—the precise subject matter of Han's agency relationship with Ryze;

b) Defendants' access to Ryze's attorney-client and business confidences through such representation;

c) Defendants' expectation of fee remuneration from Ryze for services rendered in connection with the SLA (and Ryze's agreement to pay the same under the terms of the SLA).

113.   Alternatively, notwithstanding the lack of a direct attorney-client relationship, Defendants nevertheless owed Ryze the duties attendant to the attorney-client relationship in connection with the opinions, advice, and/or representations it conveyed to Ryze in connection with the SLA, the Lawsuit, and other matters described herein. Such duties arose as a result of:

a) Defendants' invitation for Ryze (and/or acquiescence to Han's invitation for Ryze) to rely on the Defendants' opinion, advice, and/or representations, and Ryze's justifiable reliance on the same, including with respect to the following: (i) Mirae's participation in and/or capacity or willingness to fund the SLA; (ii) Han's and/or Lee's status as representatives of Mirae; (iii) the liability risks, duration, and collateral financial consequences of the litigation to be commenced by Defendants and others if Ryze declined to execute the SLA; (iv) the consequences of Korean law and Korean regulatory review on Mirae's timeline for funding the loan; (v) the conditions and limitations imposed by Korean law on the amount of funding available under the SLA; (vi) the customary scope, subject matter, and pace of due diligence in high dollar debt finance deals; and/or other of Defendants' opinions, advice and/or representations described herein.

b) the balance of the following factors favoring recognition of such duties under the circumstances described herein: (i) the extent to which the transaction was intended to affect Ryze, (ii) the foreseeability that Ryze would suffer harm, (iii) the degree of certainty that Ryze suffered injury, (iv) the closeness of the

- 23 -

Exhibit 2 - 000023

connection between Defendants' conduct and the injury suffered, (v) the moral blame of Defendants' conduct, and (vi) the public policy considerations favoring preventing future harm of kind and character sustained by Ryze as described herein.

114.    The foregoing duties required Defendants (i) to exercise such care, skill, competence, prudence, and diligence reasonably possessed and observed by attorneys in like circumstances; (ii) to reasonably avoid directly making and disseminating misrepresentations and omissions of material fact on which identifiable third-parties like Ryze would foreseeably and detrimentally rely; and/or (iii) to reasonably avoid rendering professional assistance in furtherance of a known to be fraudulent and/or unlawful (or that, by the exercise of reasonable care, skill, competence, prudence, and diligence, reasonably should have been known to be fraudulent and/or unlawful).

115.    Defendants breached the foregoing duties by reason of their negligence, misrepresentations, and tortious conduct described herein.

116.    Ryze reasonably relied upon and acted upon such opinions, advice, and/or representations rendered by Defendants in executing the SLA, and in complying with the covenants and obligations therein, including (without limitation) by declining to seek and/or close the additional funding from alternative sources, and in such other ways as described herein.

117.    As a direct and proximate result of the foregoing, Ryze has sustained damages in an amount to be proven at trial.

118.    Snell is vicariously liable for the conduct of the attorney Defendants because they undertook took the actions and omissions described herein in the course and scope of their employment as attorneys practicing with Snell.

## THIRD CLAIM FOR RELIEF

### [Intentionally Omitted]

119 - 126.    Ryze's "Third Claim for Relief" from its original Complaint alleged fraud against all Defendants. In an Order dated June 7, 2023, the Court dismissed the fraud claim without prejudice. Ryze includes this placeholder to give notice of its intention to seek leave of Court to

///

- 24 -

Exhibit 2 - 000024

Albright Stoddard
Warnick & Albright

1  plead, if appropriate, a more detailed fraud claim (including on behalf of Ryze Renewables Nevada,

2  LLC) upon the completion of sufficient discovery.

### FOURTH CLAIM FOR RELIEF

**Tortious Interference with Prospective Economic Advantage**

*(Against all Defendants)*

127.   Ryze incorporates all prior allegations of this Complaint by reference as if set forth fully herein.

128.   Following Mirae's failure to fund the CLA, Ryze located a Substitute Funder willing to provide the Additional Financing necessary to complete construction on the Project.

129.   Ryze was likely to enter a contract with the Substitute Funder. The parties had already executed a term sheet that specified an expected closing date of July 30, 2021.

130.   The funding was on track for closing on or around July 30, 2021, when Mirae filed suit against Ryze on July 23, 2021, for the purpose of interfering with such alternative funding and forcing Ryze to re-engage with Mirae.

131.   Defendants intended to harm Ryze by preventing the funding from the Substitute Funder from going forward and/or by engaging in the predicate torts described in Count I (Abuse of Process). Alternatively, Defendants recklessly disregarded the high likelihood that its conduct would prevent such funding from moving forward.

132.   Defendants' intentional interference described herein was undertaken without legal justification or privilege.

133.   As a direct and proximate result of Defendants' tortious interference, Ryze lost the pending deal with the Substitute Funder and sustained damages in an amount to be proven at trial.

134.   The foregoing acts and omissions by Defendants were undertaken intentionally, maliciously, and/or recklessly, such that Ryze is entitled to an award of punitive damages sufficient to punish and deter like conduct.

135.   Snell is vicariously liable for the conduct of the attorney Defendants because they undertook the actions and omissions described herein in the course and scope of their employment as attorneys practicing with Snell.

- 25 -

Exhibit 2 - 000025

### FIFTH CLAIM FOR RELIEF

**Tortious Interference with Contract (*Against all Defendants*)**

136.    Ryze incorporates all prior allegations of this Complaint by reference as if set forth fully herein.

137.    Ryze has a valid contract with Phillips 66 Co. that is set to provide Ryze a continuous and stable feedstock supply, guaranteed sales, and transportation of offtake for its renewable diesel Project and reasonable expectations of entering a similar contract in the future.

138.    At all relevant times herein, Defendants had full knowledge of Ryze's Supply and Offtake Agreement with Phillips 66 Co.

139.    Defendants intentionally and without justification or privilege interfered with Ryze's ability to realize its valuable contractual expectancy of the Supply and Offtake Agreement by preventing Ryze from securing the additional funding required to complete the Project and bring the renewable diesel facility to the operational status contemplated by the Supply and Offtake Agreement, and by engaging in the predicate torts described in Count I (Abuse of Process).

140.    As a direct and proximate result of Defendants' tortious interference, Ryze has sustained damages in an amount to be proven at trial.

141.    The foregoing acts and omissions by Defendants were undertaken intentionally, maliciously, and/or recklessly, such that Ryze is entitled to an award of punitive damages sufficient to punish and deter like conduct.

142.    Snell is vicariously liable for the conduct of the attorney Defendants because they undertook took the actions and omissions described herein in the course and scope of their employment as attorneys practicing with Snell.

### PRAYER FOR RELIEF

WHEREFORE, Ryze respectfully requests that the Court find in its favor and against Defendants on each of the above Counts, and further award:

    a) damages in an amount to be determined at trial;

    b) special damages;

    c) punitive damages;

- 26 -

Exhibit 2 - 000026

d) Ryze's reasonable attorneys' fees, costs, and disbursements incurred in this action; and

e) all other relief the Court deems just and appropriate under the circumstances.

**JURY DEMAND**

Ryze demands a trial by jury on all issues so triable.

DATED this 10th day of July, 2023.

Respectfully Submitted,

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT

/s/ Daniel R. Ormsby
G. Mark Albright #001394
Daniel R. Ormsby, Esq., #014595
801 South Rancho Drive, Ste. D-4
Las Vegas, Nevada 89106
Telephone: (702) 384-7111
Facsimile: (702) 384-0605
gma@albrightstoddard.com
dormsby@albrightstoddard.com
and

EDGAR LAW FIRM LLC

John M. Edgar, Esq. (*pro hac app. forthcoming*)
John F. Edgar, Esq. (*pro hac app. forthcoming*)
Michael R. Owens, Esq. (*pro hac app. forthcoming*)
2600 Grand Boulevard, Ste. 440
Kansas City, Missouri 64108
Telephone: (816) 531-0033
Facsimile: (816) 531-3322
jme@edgarlawfirm.com
jfe@edgarlawfirm.com
mro@edgarlawfirm.com

- 27 -

Exhibit 2 - 000027

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

Pursuant to NRCP 5(b), I hereby certify that I am an employee of ALBRIGHT, STODDARD, WARNICK & ALBRIGHT and that on this 10th day of Jul, 2023, service was made by the following mode/method a true and correct copy of the foregoing

### FIRST AMENDED COMPLAINT

to the following person(s):

AMY ABDO, ESQ.
RICHARD I. DREITZER, ESQ.
FENNEMORE CRAIG, P.C.
9275 W. Russell Road, Suite 240
Las Vegas, NV 89148
amy@fennemorelaw.com
rdreitzer@fennemorelaw.com

_____ Certified Mail
__X__ Electronic Filing/Service
_____ Email
_____ Facsimile
_____ Hand Delivery
_____ Regular Mail

*/s/ Isis Crosby*
_____
An employee of Albright, Stoddard, Warnick & Albright

- 28 -

Exhibit 2 - 000028