# EXHIBIT 1B –

Second Loan Agreement, dated November 29, 2021

(Exhibit B to Ryze Renewable Holdings, LLC's Demand for Arbitration)

# Exhibit B

*Second Loan Agreement ("SLA"),*
*dated November 29, 2021*

Ex. B
(SLA dated Nov. 29. 2021)

LOAN AGREEMENT
Dated as of November 29, 2021
Between
RYZE RENEWABLES NEVADA, LLC,
as Borrower
And
LV RENEWABLES A, LLC,
as Lender

78454552.11
4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

# TABLE OF CONTENTS

**Page**


1. DEFINITIONS; PRINCIPLES OF CONSTRUCTION .... 1
   - 1.1 Specific Definitions .... 1
   - 1.2 Principles of Construction .... 10
2. GENERAL LOAN TERMS .... 10
   - 2.1 The Loan .... 10
   - 2.2 Interest .... 12
     - 2.2.1 Generally .... 12
     - 2.2.2 Default Rate .... 12
     - 2.2.3 Taxes .... 12
     - 2.2.4 Requirements of Law .... 14
   - 2.3 Loan Repayment .... 15
     - 2.3.1 Optional Prepayments .... 15
   - 2.4 Release of Property .... 15
   - 2.5 Payments and Computations .... 15
     - 2.5.1 Making of Payments .... 15
     - 2.5.2 Computations .... 16
   - 2.6 Fees .... 16
     - 2.6.1 [Intentionally omitted.] .... 16
     - 2.6.2 [Intentionally omitted.] .... 16
     - 2.6.3 Reallocations .... 16
3. DEBT SERVICE RESERVE ACCOUNT .... 16
4. REPRESENTATIONS AND WARRANTIES .... 16
   - 4.1 Title .... 16
   - 4.2 Physical Condition .... 16
   - 4.3 Survey/Boundaries .... 17
   - 4.4 Separate Lots .... 17
   - 4.5 Easements; Utilities and Public Access .... 17
   - 4.6 Assessments .... 17
   - 4.7 Purchase Options .... 17
   - 4.8 Condemnation .... 17
   - 4.9 Compliance .... 17




4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

## TABLE OF CONTENTS
(continued)

**Page**


4.10 Valid and Second Lien ........ 18
4.11 Filing, Recording and Other Taxes ........ 18
4.12 Tax Filings ........ 19
4.13 Proceedings; Enforceability ........ 19
4.14 No Conflicts ........ 19
4.15 Organization; Special Purpose ........ 20
4.16 Other Debt ........ 20
4.17 Ownership ........ 20
4.18 Name; Principal Place of Business ........ 21
4.19 No Bankruptcy Filing ........ 21
4.20 Fraudulent Transfer ........ 21
4.21 ERISA; No Plan Assets; WARN Act ........ 21
4.22 Litigation ........ 21
4.23 Agreements ........ 22
4.24 Full and Accurate Disclosure ........ 22
4.25 Leases ........ 22
4.26 Contracts; Major Contracts ........ 22
4.27 Critical Technologies and Infrastructure ........ 23
4.28 Operations Agreements ........ 23
4.29 Hazardous Substances ........ 23
4.30 Embargoed Person ........ 24
4.31 Anti-Money Laundering ........ 24
4.32 Federal Reserve Regulations; Investment Company Act; Bank Holding Company ........ 24
4.33 Union Contracts ........ 24
4.34 Lender's Knowledge of Breach ........ 25
5. COVENANTS ........ 25
5.1 Warranty of Title ........ 25
5.2 Existence ........ 25
5.3 Dissolution ........ 25




4838-9883-6219.21

Ex. B
(SLA dated Nov. 29. 2021)

**TABLE OF CONTENTS**
(continued)

**Page**


5.4 Change of Name, Identity or Structure ..... 25
5.5 Principal Place of Business ..... 26
5.6 Additional Debt; Material Change ..... 26
5.7 [Intentionally omitted.] ..... 26
5.8 Change in Business or Operation of Property ..... 26
5.9 Prohibited Transfers ..... 26
5.10 Liens ..... 27
5.11 Taxes and Other Charges ..... 27
5.12 No Joint Assessment ..... 27
5.13 Repairs; Maintenance and Compliance; Alterations Repairs; Maintenance and Compliance ..... 27
5.13.1 Alterations ..... 28
5.14 Access to Property ..... 29
5.15 Environmental Matters ..... 29
5.15.1 Hazardous Substances ..... 29
5.15.2 Environmental Monitoring ..... 29
5.15.3 O & M Program ..... 30
5.16 Leases ..... 30
5.17 Approval of Major Contracts; Change Order Contract ..... 30
5.18 Zoning ..... 30
5.19 Licenses ..... 31
5.20 Compliance with Restrictive Covenants, Etc ..... 31
5.21 Performance of Other Agreements ..... 31
5.22 ERISA ..... 31
5.23 Expenses ..... 32
5.24 Indemnity ..... 32
5.25 Cooperate in Legal Proceedings ..... 33
5.26 Further Assurances ..... 33
5.27 Patriot Act; Embargoed Person ..... 33
5.28 Anti-Money Laundering ..... 33

Ex. B
(SLA dated Nov. 29. 2021)

**TABLE OF CONTENTS**
(continued)

**Page**


5.29 Cash Flow Sweep ... 33
6. NOTICES AND REPORTING ... 34
6.1 Notices ... 34
6.2 Borrower Notices and Deliveries ... 35
6.3 Financial Reporting ... 35
6.3.1 Bookkeeping ... 35
6.3.2 Annual Reports ... 35
6.3.3 Monthly/Quarterly Reports ... 36
6.3.4 Other Financial Information ... 36
6.3.5 Annual Budget and Fair Market Value Report ... 36
6.3.6 Breach ... 37
6.4 Estoppel Statements ... 37
7. INSURANCE; CASUALTY; AND CONDEMNATION ... 37
7.1 Insurance Coverage ... 37
7.1.1 Policies ... 37
7.1.2 Transfers ... 38
7.2 Casualty Notice; Restoration ... 38
7.2.1 Settlement of Proceeds ... 39
7.2.2 Condemnation ... 39
7.2.3 Collection of Award ... 39
7.2.4 Application to Debt ... 39
8. DEFAULTS ... 39
8.1 Events of Default ... 39
8.2 Remedies ... 42
8.2.1 Remedies Cumulative ... 42
8.2.2 Severance/Partial Foreclosure ... 42
8.2.3 Delay ... 43
8.2.4 Lender's Right to Perform ... 43
9. [INTENTIONALLY OMITTED.] ... 43
10. MISCELLANEOUS ... 43

Ex. B
(SLA dated Nov. 29. 2021)

**TABLE OF CONTENTS**
(continued)


| | | Page |
|---|---|---|
| 10.1 | [Intentionally omitted.] | 43 |
| 10.2 | Brokers and Advisors | 44 |
| 10.3 | Survival | 45 |
| 10.4 | Governing Law | 45 |
| 10.5 | Arbitration | 45 |
| 10.6 | Modification, Waiver in Writing | 46 |
| 10.7 | Headings/Schedules | 46 |
| 10.8 | Severability | 46 |
| 10.9 | Prior Agreements | 46 |
| 10.10 | Preferences | 46 |
| 10.11 | [Intentionally omitted.] | 47 |
| 10.12 | [Intentionally omitted.] | 47 |
| 10.13 | Publicity | 47 |
| 10.14 | No Usury | 47 |
| 10.15 | Conflict; Construction of Documents; Reliance | 47 |
| 10.16 | No Joint Venture or Partnership; No Third Party Beneficiaries | 48 |
| 10.17 | [Intentionally omitted.] | 48 |
| 10.18 | Assignment | 49 |
| 10.19 | Counterparts | 49 |
| 10.20 | Additional Funds | 49 |

Ex. B
(SLA dated Nov. 29. 2021)

# LOAN AGREEMENT

**LOAN AGREEMENT** dated as of November 29, 2021 (as the same may be modified, supplemented, amended or otherwise changed, this "**Agreement**") between **RYZE RENEWABLES NEVADA, LLC**, a Delaware limited liability company (together with its permitted successors and assigns, "**Borrower**"), and **LV RENEWABLES A, LLC**, a Nevada limited liability company (together with its successors and assigns, "**Lender**") with acknowledgement and agreement by **RYZE RENEWABLES LAS VEGAS, LLC**, a Delaware limited liability company, solely with respect to certain representations and warranties in Article 4 hereof and certain covenants made herein in furtherance of its obligations with respect to the Security Instrument (as hereinafter defined) and with acknowledgement and agreement by **MIRAE ASSET SECURITIES CO., LTD.**, an entity organized under the laws of the Republic of Korea ("**Mirae**"), solely with respect to the indemnity set forth in Section 13.2 hereof.

## 1. DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**1.1 Specific Definitions**. The following terms have the meanings set forth below:

**Affiliate**: as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

**Bankruptcy Code**: Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

**Business Day**: any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York and/or Los Angeles, California are authorized or required to close.

**Capital Expenses**: expenses that are capital in nature or required under GAAP to be capitalized.

**Change Order Contract**: "Change Order Contract: the Engineering, Procurement and Construction Services Contract to be entered into by and between Borrower and MMC, Inc. to modify and amend that certain Engineering, Procurement and Construction Services Contract by and between Borrower and MMC, Inc. dated as of January 23, 2018 (the "**General Contract**") to include an Alfa Laval feedstock pretreatment unit, pretreatment infrastructure upgrades and a change of hydrotreating technology to Haldor Topsoe HydroFlex consistent with submissions to the United States Department of Agriculture (as to the scope of the changes but not as to the source or amount of the payment, cost or expense) prior to the date hereof.

**Code**: the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

**Commonly Controlled Entity**: an entity, whether or not incorporated, that is under common control with Borrower within the meaning of Section 4001(a)(14) of ERISA or is part of a group that includes Borrower and that is treated as a single employer under Section 414(b) or (c) of the Code.

**Control**: with respect to any Person, either (i) ownership directly or indirectly of fifty percent (50%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise, and the terms Controlled, Controlling and common Control shall have correlative meanings.

**Debt**: the unpaid Principal, all interest accrued and unpaid thereon, all other sums then due to Lender in respect of the Loan pursuant to the Loan Documents.

**Debt Service**: with respect to any particular period, the scheduled principal and interest payments due under the Note in such period.

**Default**: the occurrence of any breach of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

**Default Rate**: a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law or (ii) two percent (2%) above the Interest Rate, compounded monthly.

**ERISA**: the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

**ERISA Affiliate**: all members of a controlled group of corporations and all trades and business (whether or not incorporated) under common control and all other entities which, together with Borrower, are treated as a single employer under any or all of Section 414(b), (c), (m) or (o) of the Code.

**Excluded Taxes**: any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of (a) Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (b) a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or any Loan Document), (ii) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in the Loan pursuant to a law in effect on the date on which Lender acquires such interest in the Loan, except to the extent that, pursuant to Section 2.2.3 hereof, amounts with respect to such Taxes were payable to such Lender's assignor immediately before such Lender became a party hereto, (iii) Taxes attributable to Lender's failure to comply with Section 2.2.3(b) hereof, (iv) any U.S. federal withholding Taxes imposed under FATCA and (v)

any interest, additions to taxes and penalties with respect to any taxes described in clauses (i) through (iv) of this definition.

**FATCA**: Sections 1471 through 1474 of the Code, as of the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

**Funding Date**: the date on which all of the conditions set forth in Section 2.1 hereof have been satisfied, but in no event later than December 15, 2021 on which the Loan proceeds are disbursed by Lender.

**GAAP**: generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

**Governmental Authority**: any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) now or hereafter in existence.

**Guarantor**: Ryze Renewables Holdings, LLC, a Delaware limited liability company, or any other Person that now or hereafter guarantees any of Borrower's obligations hereunder or any other Loan Document.

**Indemnified Taxes**: (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (ii) to the extent not otherwise described in clause (i), Other Taxes.

**Intercreditor Agreement**: that certain Intercreditor and Subordination Agreement dated as of the date hereof between Lender and Senior Lender.

**Improvements**: has the meaning set forth in the Security Instrument.

**Interest Rate**: twelve percent (12%) per annum.

**Lease or Leases**: as applicable, all leases and other agreements or arrangements entered into (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use, enjoy or occupy all or any portion of any space at the Property (i.e. the collateral for the Loan) or the Improvements, including any guarantees, extensions, renewals, modifications or amendments thereof.

**Legal Requirements**: statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities (including those regarding fire, health, handicapped access, sanitation, ecological, historic, zoning, environmental protection, wetlands and building laws and the Americans with Disabilities Act of 1990, Pub. L. No. 89-670, 104 Stat. 327 (1990), as amended, and all regulations promulgated pursuant thereto) affecting Borrower, any Loan Document or all or part of the Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto.

**Lien**: any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct or indirect interest in Borrower or Majority Member, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

**Loan Documents**: this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or executed by Borrower and/or Guarantor and delivered to Lender in connection with the Loan, including, but not limited to, the following, each of which is dated as of the date hereof: (i) the Promissory Note made by Borrower to Lender (the "**Promissory Note**" or the "**Note**"), (ii) the Construction/Term Loan Deed of Trust, Security Agreement, Assignment of Leases and Rents, and Fixture Filing made by OpCo to a trustee in favor of Lender (the "**Security Instrument**"), (iii) the Security Agreement between Borrower and Lender (the "**Security Agreement**"), (iv) the Pledge of Membership Interest executed by Majority Member encumbering its membership interests in the Borrower (the "**Pledge**"), and (v) the Guaranty Agreement made by Guarantor (the "**Guaranty**"), as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, supplemented or otherwise modified from time to time.

**Major Contract**: (i) each contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Property of a material nature (materiality for these purposes to include, any contract which has a term that extends beyond one year (unless cancelable on thirty (30) days or less notice without requiring the payment of termination fees or payments of any kind), or requires payments by Borrower greater than $250,000 per year), (ii) relates solely or primarily to environmental remediation or other environmental matters, or (iii) is with an Affiliate of Borrower, OpCo or Guarantor.

**Majority Member**: Ryze Renewables Holdings, LLC, a Delaware limited liability company, previously the sole member of Borrower.

**Material Adverse Effect**: a material adverse effect on (i) the use, value or condition or ownership of the Property, (ii) the business, profits, prospects, management, operations or condition (financial or otherwise) of Borrower or the Property, (iii) the enforceability, validity, perfection or priority of the lien of the Security Instrument or the other Loan Documents, or (iv) the ability of Borrower to timely perform its obligations under this Agreement or the other Loan Documents.

**Material Alteration**: any (i) individual alteration affecting (A) structural elements of the Property, (B) a roof of the Property or (C) any alteration that otherwise requires Lender's consent pursuant to Section 5.17, or (ii) non-structural alteration the cost of which exceeds $250,000 and for which there are not undisbursed Loan proceeds budgeted to pay for such alterations; provided, however, that in no event shall any of the following constitute a Material Alteration: (a) any alteration described in (i) or (ii) above that is made in accordance with the

Change Order Contract scope of work, (b) any Required Repairs (c) alterations performed as part of a Restoration, or (d) any alteration paid for with the Additional Funds, as approved by the Person providing such Additional Funds except the extent the same requires Lender's consent pursuant to Section 5.17 as the result of a Change Order Alteration (as hereinafter defined).

**Maturity Date**: the date on which the final payment of Principal becomes due and payable pursuant to the Note or this Agreement, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

**Officer's Certificate**: a certificate delivered to Lender which is signed by an authorized senior officer, manager or authorized representative of the Person on behalf of whom the certificate is delivered, which officer, manager or representative is most knowledgeable with respect to the subject matter set forth in the applicable Officer's Certificate.

**Operations Agreements**: any covenants, restrictions, easements, declarations or agreements of record relating to the construction, operation or use of the Property, together with all amendments, modifications or supplements thereto.

**Other Charges**: all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

**Other Taxes**: all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

**Patriot Act**: collectively, all laws relating to terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), as the same was restored and amended by Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act (USA FREEDOM Act) of 2015 and as the same may be further amended, extended, replaced or otherwise modified from time to time, and any corresponding provisions of future laws.

**Patriot Act Offense**: (i) any violation of the laws of the United States of America or of any of the several states, or any act or omission that would constitute a violation of such laws if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or money laundering, including any offense under (a) the laws against terrorism; (b) the laws against money laundering, (c) the Bank Secrecy Act, as amended, (d) the Money Laundering Control Act of 1986, as amended, or (e) the Patriot Act, or (ii) the conspiracy to commit, or aiding and abetting another to commit, any violation of any such laws.

**Permitted Easements**: easements, rights of way and other similar encumbrances and construction access agreements in connection with the development, renovation or operation of the Property entered into by Borrower in the ordinary course of business for use, access, water

and sewer, telephone or electric lines, or other utilities or for other similar purposes, provided that such easement or other similar encumbrance shall neither secure any monetary obligations nor have a Material Adverse Effect on the Property or Borrower.

**Permitted Encumbrances**: shall mean, collectively, (i) the Liens created by the Loan Documents, (ii) all Liens and other matters disclosed in the Title Insurance Policy, (iii) Liens, if any, for Taxes or Other Charges not yet due or delinquent or are being contested in accordance with the terms of the Loan Documents, (iv) Permitted Easements, (v) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within twenty (20) days after Borrower first receives notice of such Lien, (vi) such other title and survey exceptions as Lender approves in writing in Lender's sole and absolute discretion, (vii) the Senior Loan Liens and (viii) Liens associated with the Additional Funds from the Second Priority Lender.

**Permitted Indebtedness**: shall mean the Senior Loan, any amount owed to the Second Priority Lender, or other indebtedness associated with the Permitted Encumbrances.

**Permitted Transfers**:

(i) a Permitted Encumbrance;

(ii) any Transfer in respect of, or of a direct or indirect interest in, any Person listed on a nationally or internationally recognized stock exchange or stock quotation system;

(iii) any direct or indirect Transfer of membership interests in Borrower to the Second Priority Lender in connection with the raising of Additional Funds; and

(iv) any direct or indirect Transfer of membership interests in Borrower among the members of Borrower or any parent company of Borrower.

**Person**: any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

**Plan**: (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is subject to Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

**Prepayment Premium**: with respect to any prepayment of Principal (or acceleration of the Loan) an amount equal to six percent (6%) of the Principal to be prepaid.

**Principal**: the outstanding principal balance of the Loan at any given time with a maximum principal amount of $21,000,000.

**Project**: a renewable diesel refinery plant to be situated wholly on the Property and capable of producing no less than 100 million gallons per year of renewable diesel fuel.

**Property**: the parcel of real property and Improvements thereon owned by OpCo and encumbered by the Security Instrument; together with all rights pertaining to such real property and Improvements, and all other collateral for the Loan as more particularly described in the Security Instrument.

**Property Taxes**: all (i) real estate Taxes, assessments, water rates or sewer rents, maintenance charges, impositions, mortgage recording taxes, vault charges and license fees ("**Real Estate Taxes**"), or (ii) personal property Taxes, in each case, now or hereafter levied or assessed or imposed against all or part of the Property.

**Regulatory Change**: any change effective after the date of this Agreement in any statute, treaty, rule, regulation, ordinance, executive order or administrative or judicial precedents or authorities (including without limitation, Regulation D of the Board of Governors of the Federal Reserve System of the United States (or any successor)) or the adoption or making after such date of any interpretation, directive or request applying to a class of banks, including any Lender, of or under any statute, treaty, rule, regulation, ordinance, executive order or administrative or judicial precedents or authorities (whether or not having the force of law and whether or not failure to comply therewith would be unlawful) by any Governmental Authority or monetary authority charged with the interpretation or administration thereof or compliance by Lender with any request or directive regarding capital adequacy. Notwithstanding anything herein to the contrary, (a) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (b) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "**Regulatory Change**", regardless of the date enacted, adopted or issued.

**Rents**: all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, economic stimulus, incentive or other similar payments received directly or indirectly from any Governmental Authority or quasi-Governmental Authority, whether in the form of aide, money, relief, or another compensation scheme (including any of the foregoing initiated in connection with the COVID-19 virus or any other pandemic or epidemic), deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of OpCo or any of its agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including receipts, deposits, accounts receivable and other receivables and benefits from the operation of the Project on the Property and all other income of every nature of and from the Property and otherwise, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of any sale, lease, sublease, license, concession or other grant of the right of the possession, use or occupancy of all or any portion of the Property, or personalty located thereon, or rendering of services by OpCo, Borrower or any operator or manager of the Project or acquired from others including, without limitation, from the provision or sale of other goods and services, service charges, from business interruption

or other loss of income insurance relating to the use, enjoyment or occupancy of the Property, and any other items of revenue, receipts or other income related to the use or occupancy of the Property.

**Sanctions**: means any sanctions administered by (a) the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC") or the U.S. Department of State, (b) the United Nations Security Council, the European Union or its Member States or Her Majesty's Treasury of the United Kingdom or (c) any other Governmental Authority with jurisdiction over any of the parties hereto.

**Second Priority Lender**: a bona fide third-party lender who makes a loan or equity contribution of the Additional Funds within 150 days from the Funding Date on terms and conditions acceptable to the Board of Managers of Borrower.

**Senior Lender**: Georgia's Own Credit Union, and any subsequent holder of the Senior Loan to whom the Senior Loan has been assigned pursuant to the terms of the Intercreditor Agreement.

**Senior Loan**: that certain senior loan in the original principal amount of up to $198,000,000 made on or about June 25, 2018 by Senior Lender to Borrower and evidenced and secured by the Senior Loan Documents.

**Senior Loan Documents**: (i) that certain Loan Agreement (the "**Senior Loan Agreement**") dated as of June 25, 2018 between Senior Lender and Senior Loan Borrower, (ii) those certain promissory notes in the original principal amount of the Senior Loan made by Senior Loan Borrower and payable to Senior Lender, (iii) any other "Loan Document", as defined in the Senior Loan Agreement referred to in clause (i) above, as each of the foregoing may be modified, amended and restated from time to time in accordance with the terms and provisions of the Intercreditor Agreement.

**Senior Loan Liens**: the Liens in favor of Senior Lender created pursuant to the Senior Loan Documents.

**State**: the state in which the Property is located.

**Stated Maturity Date**: November 30, 2023.

**Survey**: a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

**Taxes**: all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

**Term**: the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

**Title Insurance Policy**: the ALTA mortgagee title insurance policy in the form acceptable to Lender issued with respect to the Property and insuring the Lien of the Security Instrument.

**Transfer**: (i) any direct or indirect sale, conveyance, transfer, encumbrance, pledge, lease, or assignment, or the entry into any agreement to sell, convey, transfer, encumber, pledge, lease or assign (other than an agreement for which Borrower has provided at least thirty (30) days' prior written notice to Lender, to sell the Property that will result in payment in full of the Debt in accordance with this Agreement), whether voluntary or involuntary by law or otherwise, whether or not for consideration or of record, of, on, in or affecting (a) all or part of the Property (including any legal or beneficial direct or indirect interest therein) or (b) any direct or indirect interest in Borrower, OpCo or Ryze II (including any profit interest), at any tier of ownership, (ii) with respect to Borrower, OpCo, Ryze II or any Person that has a direct or indirect interest in Borrower, OpCo, or Ryze II, the division of any assets and liabilities of such entity amongst one or more new or existing entities, or (iii) any change of Control of Borrower, OpCo or Ryze II.

**UCC**: the Uniform Commercial Code as in effect in the State, or any other State applicable to any collateral for the Loan, as the case may be.

**Working Capital**: Funds used to pay general operating expenditures and other amounts for general company purposes of Borrower or distributed to the Majority Member for such purposes so long as such expenditures were set forth in the Operating Budget attached hereto as Exhibit A.

**1.2 Principles of Construction**. Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP.

## 2. GENERAL LOAN TERMS

**2.1 The Loan**. Subject to and upon the terms and conditions of this Agreement, Lender agrees to make a loan to Borrower (the "Loan") in the maximum principal amount of up to $21,000,000. On the Funding Date, Lender will disburse the full amount of the Loan proceeds to be used (i) to pay $4,000,000 of Working Capital expenses set forth in the Operating Budget attached hereto as Exhibit A, and $3,000,000 of such Working Capital will be deposited into a bank account which will be subject to a deposit account control agreement with the depository institution for the benefit of Lender (the "**DACA**") and the remaining $1,000,000 will be used to pay for the items described in Exhibit A-1 within ninety (90) days of the Funding Date (ii) to provide $10,000,000 to Senior Lender to replenish its debt service reserve for the Senior Loan, (iv) to pay the fees set forth in Section 2.6 hereof in the amount of $7,000,000 and certain expenses of Lender so long as:

(a) Lender shall have received an ALTA extended coverage Lender's Title Insurance Policy, at Lender's sole cost and expense;

(b) there is no Default or Event of Default as confirmed in a Bring Down Certificate in the form attached hereto as Exhibit B (the "**Bring Down Certificate**");

(c) Lender will have received an updated valuation from Stancil & Co. showing a valuation for the Property and the Project upon completion of the Project of not less than $1,250,000,000. Lender acknowledges the receipt of the valuation prior to the date hereof and satisfaction of this requirement.

(d) Lender will have received Borrower's updated pro forma model. Lender acknowledges the receipt of the pro forma model and satisfaction of this requirement.

(e) Lender will have performed lien searches perform within 48 hours of the Funding Date verifying that Borrower, OpCo, and Ryze Renewables II, LLC, a Delaware limited liability company ("**Ryze II**") are unencumbered other than the Senior Loan Liens and that there is no default under any debts owed by Borrower, OpCo, or Ryze II.

(f) Receipt of a fully executed Intercreditor Agreement.

(g) Receipt by Lender, Borrower and OpCo of all necessary and appropriate approvals of any governmental or quasi-governmental bodies with respect to the transactions contemplated herein and in the other Loan Documents. As of the date hereof, Lender does not anticipate the need for any such approvals subject to such approvals that may be required as a result of a change in law, regulations, rule or facts from those existing on the date hereof.

(h) All of the representations and warranties contained herein remain true and correct in all material respects.

(i) The Board of Managers of Borrower will be expanded to include three (3) members with one of the voting members appointed by Mirae Asset Securities Co., Ltd. subject to the background check and insurance provisions consistent with the operating agreement in the form attached hereto as Exhibit C (the "**Operating Agreement**"). Mirae Asset Securities Co., Ltd. has appointed Seung-Hwan Oh to the Board of Managers, and Junghan Kim to an observer seat on the Board of Managers (as provided in the Operating Agreement), which appointments are undergoing approval as provided in the preceding sentence.

(j) Lender's receipt of the fully executed Operating Agreement.

(k) Receipt of the fully executed Loan Documents, evidence of the due authority of Lender, Borrower, Guarantor and OpCo to enter into the Loan Documents, the fully executed Option Agreement in the form attached hereto as Exhibit D and the fully executed Grant of Membership Interests attached hereto as Exhibit E.

(l) Lender shall have received the monthly construction report from Stancil & Co. for September 2021. Lender acknowledges the receipt of the construction report and satisfaction of this requirement.

(m) Lender shall have received confirmation that any amounts required to be held by OpCo for any retainage required pursuant to the Senior Loan Documents and/or the General Contract are held in segregated accounts for such purpose pursuant to the Bring Down Certificate confirming no changes from the financial statements provided to Lender by Borrower for the period ending September 30, 2021; provided that interest on the Senior Loan, for the months of May and June of 2021, in the amount of $2,415,600, was paid out of such retainage pursuant to the Senior Lender's rights of Set Off. Borrower warrants that all necessary consents were obtained for the foregoing offset and there is no ongoing default in any contract as a result thereof.

(n) Borrower has provided appropriate notice regarding any errors in the USDA consent letter dated as of September 29, 2021 to the Senior Loan's servicer and Senior Lender as evidenced by the Bring Down Certificate.

(o) Lender's receipt of the fully-executed Waiver of Right of First Refusal in form and substance mutually agreed between Lender and P66 (the "**P66 Subordination**").

(p) Borrower's receipt of deferral for the debt service payment due November 25, 2021 on the Senior Loan through December 15, 2021 or a forbearance agreement from Senior Lender through December 15, 2021.

(q) Lender's receipt of a fully-executed original of the DACA.

No amount repaid in respect of the Loan may be reborrowed. The Loan shall mature on the Stated Maturity Date. Any excess proceeds may be used for any lawful purpose.

**2.2 Interest**.

**2.2.1 Generally**. From and after the date hereof, interest on the outstanding Principal shall accrue at the Interest Rate. All accrued and unpaid interest and principal, shall be due and payable on the Maturity Date.

**2.2.2 Default Rate**. After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, calculated from the date such payment was due or such underlying Default shall have occurred without regard to any grace or cure periods contained herein, and shall be payable upon demand from time to time, to the extent permitted by applicable law.

**2.2.3 Taxes**. (a) Any and all payments by or on account of any obligation of Borrower hereunder and under the other Loan Documents shall be made free and clear of, and without deduction or withholding for, any Taxes, except as required by applicable law. If Borrower shall be required by applicable law (as determined in good faith discretion by Borrower or Lender) to deduct or withhold any Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply: (i) if such Tax is an Indemnified Tax, the sum payable shall be increased as may be necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.2.3), Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made; (ii) Borrower shall make such deduction or withholding; and (iii) Borrower shall timely pay the full amount deducted or withheld to the relevant Governmental

Authority in accordance with applicable law. Borrower shall pay to Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.2.3) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error. As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority pursuant to this Section 2.2.3, Borrower shall deliver to Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(b) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrower, at the time or times reasonably requested by Borrower, such properly completed and executed documentation reasonably requested by Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation shall not be required if in Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. Without limiting the generality of the foregoing, (i) any Lender that is a "United States Person" (as defined in Section 7701(a)(30) of the Code) shall deliver to Borrower on or prior to the date on which such Lender becomes a Lender under this Agreement, executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax and (ii) any Lender that is not a "United States Person" (as defined in Section 7701(a)(30) of the Code) shall, to the extent it is legally entitled to do so, deliver to Borrower on or prior to the date on which such Lender becomes a Lender under this Agreement, executed copies of whichever of the following is applicable: IRS Form W-8BEN, IRS Form W-8BEN-E, IRS Form W-8ECI, IRS Form W-8EXP, and IRS Form W-8IMY, and, in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, a certificate to the effect that such Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code.

(c) If a payment made to Lender under any Loan Document would be subject to Tax imposed by FATCA if Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Sections 1471(b) or 1472(b) of the Code, as applicable), Lender shall deliver to Borrower at the time or times prescribed by applicable Law and at such time or times reasonably requested by Borrower such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with its obligations under FATCA and to determine that Lender has complied with

Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph, the term "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

**2.2.4 Requirements of Law**. (a) If any Regulatory Change or change in the interpretation or application of any requirement of law, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority:

(i) shall subject Lender to any tax of any kind whatsoever with respect to this Agreement, the Note or the Loan (excluding net income taxes) or change the basis of taxation of payments to Lender in respect thereof;

(ii) shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances or other extensions of credit by, or any other acquisition of funds by, any office of Lender;

(iii) shall impose on Lender any other condition;

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender deems to be material, of making or maintaining the Loan or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall, from time to time, upon receipt of prior written notice of not less than ten (10) Business Days of such fact and a reasonably detailed description of the circumstances, promptly pay Lender such additional amount or amounts as will compensate Lender for such increased cost or reduced amount receivable (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally and are not prohibited by such Regulatory Change to be charged back to Borrower); provided that no cost or expense related to any requirement for Lender to engage any clerical, administrative, supervisory, asset manager or other third party cost or expense shall be charged to Borrower in connection with the foregoing.

(b) If Lender shall have determined that any Regulatory Change regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on Lender's or such corporation's capital as a consequence of its obligations hereunder by an amount deemed by Lender to be material (taking into consideration Lender's or such corporation's policies with respect to capital adequacy), then from time to time, Borrower shall within ten (10) Business Days after written notice from Lender, pay to Lender such additional amount or amounts as will compensate Lender for such reduction (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally and are not prohibited by such Regulatory Change to be charged back to Borrower).

If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.4, it shall promptly notify Borrower of the event by reason of which it has become so entitled. A certificate

as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error or the provision of irrefutable proof by Borrower to the contrary.

**2.3 Loan Repayment**. Borrower shall repay the Principal in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents. Except during the continuance of an Event of Default, all proceeds of any repayment, including any prepayments of the Loan, shall be applied by Lender as follows in the following order of priority: *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal; and *Third*, to any other amounts then due and owing under the Loan Documents, including the Prepayment Premium, if any. During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on the Property (whether through foreclosure, deed-in-lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's sole and absolute discretion.

**2.3.1 Optional Prepayments**. Borrower shall have the right to prepay all or any portion of the Principal on any Business Day provided that Borrower gives Lender at least thirty (30) days prior written notice thereof, and such prepayment is accompanied by the Prepayment Premium applicable thereto. Borrower may modify, revoke or cancel any such prepayment notice so long as Borrower pays all out-of-pocket costs and expenses actually incurred by Lender as a result of the original notice of prepayments and as a result of such revocation, cancellation or modification.

**2.4 Release of Property**. Lender shall, upon the written request of Borrower, upon payment in full of the Debt in accordance herewith, release or, if requested by Borrower, assign to Borrower's designee (without any representation or warranty by and without any recourse against Lender whatsoever) the Lien of the Loan Documents if not theretofore released. In connection with the release of the Lien, Borrower shall submit to Lender, not less than fifteen (15) days prior to the date of repayment (or such shorter time as is acceptable to Lender in its sole discretion), a release of Lien, in a form appropriate in the jurisdiction in which the Property is located (and related Loan Documents) for execution by Lender substantially concurrent with the repayment of the Loan.

**2.5 Payments and Computations**.

**2.5.1 Making of Payments**. Each payment by Borrower shall be made to Lender not later than 4:00 p.m., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or at such other place as Lender shall from time to time designate, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. All such payments shall be made irrespective of, and without any deduction, set-off or counterclaim whatsoever, and with all costs and charges incurred in the collection or enforcement thereof, including attorneys' fees and court costs.

**2.5.2 Computations**. Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over the actual number of days in the year.

**2.6 Fees**. On the Funding Date, Borrower shall pay to Lender (i) a facility fee, (ii) a lender fee and (iii) an advisor arrangement fee to be disbursed to its advisors and consultants from Loan proceeds in a total amount of $7,000,000 to be allocated in the sole and absolute discretion of Lender. The foregoing fees will be fully earned on the Funding Date.

**2.6.1 Reallocations**. Amounts may be reallocated within line items of the budget for the Project so long as (1) the total amount of such budget does not exceed the amount of the General Contract as modified by the Change Order Contract unless there are other funds sufficient to cover the unpaid portions of such budget, provided that (i) such reallocation is not in contravention of the provisions of any Applicable Law, the documents related to the Senior Loan, and (ii) no Event of Default shall then exist hereunder.

**3. DEBT SERVICE RESERVE ACCOUNT**. On the Funding Date, Lender will advance a portion of the Loan proceeds to Senior Lender to be held by Senior Lender to pay interest on the Senior Loan in the amount of $10,000,000.

**4. REPRESENTATIONS AND WARRANTIES**. Borrower represents and warrants to Lender (or with respect to Section 4.15(b), Section 4.17(b), Section 4.33, Lender represents and warrants to Borrower) as of the date hereof that, except to the extent (if any) disclosed on Schedule 3 with reference to a specific Section of this Article 4:

**4.1 Title**. OpCo has good, marketable and insurable fee simple title in fee to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances.

**4.2 Physical Condition**. To the Borrower and OpCo's best knowledge the Property, including all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects, and there exists no structural or other material defects or damages to the Property, whether latent or otherwise. Neither OpCo nor Borrower has received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or any termination or threatened termination of any policy of insurance or bond. No portion of the Property is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards, or, if so located, the flood insurance required pursuant to Section 7.1.1 hereof is in full force and effect with respect to that portion of the Property. The Improvements have suffered no material casualty or damage which has not been fully repaired and the cost thereof fully paid.

**4.3 Survey/Boundaries**. To Borrower's and OpCo's knowledge, the Survey does not fail to reflect any material matter affecting the Property or the title thereto. To Borrower's and OpCo's knowledge, all of the Improvements which were included in determining the appraised

value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property, except those which are set forth on the Survey and insured against by the Title Insurance Policy.

4.4 **Separate Lots**. Each parcel comprising the Property is a separate tax lot and is not a portion of any other tax lot that is not a part of the Property.

4.5 **Easements; Utilities and Public Access**. All easements, cross easements, licenses, air rights and rights-of-way or other similar property interests (collectively, "**Easements**"), if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are described in the Title Insurance Policy and, to Borrower's and OpCo's knowledge, are in full force and effect without default thereunder. The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service it for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid easement. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

4.6 **Assessments**. Other than as set forth on Schedule 3, there are no pending or, to Borrower's and OpCo's knowledge, proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

4.7 **Purchase Options**. Except for the rights of Phillips 66 Company, a Delaware corporation ("**P66**") pursuant to the Supply and Offtake Agreement between P66 and OpCo dated as of June 15, 2017 as modified and amended by certain addenda including, but not limited to that certain Addendum 4 dated as of January 29, 2021, the Property nor any part thereof is subject to any purchase options, rights of first refusal, rights of first offer or other similar rights in favor of third parties.

4.8 **Condemnation**. No Condemnation or other proceeding has been commenced or, to Borrower's and OpCo's best knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

4.9 **Compliance**. To Borrower's and OpCo's knowledge, Borrower and the Property (including the Improvements) and the use thereof comply in all material respects with all applicable Legal Requirements (including with respect to parking, building and applicable zoning and land use laws, codes, regulations and ordinances) and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower or OpCo, at any time in force affecting all or any portion of the Property. Neither Borrower nor OpCo received any written notice of any default or violation by Borrower or OpCo of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might have a Material Adverse Effect, and neither Borrower nor OpCo is otherwise aware of any such default or violation. Neither Borrower nor OpCo has committed any act which may give any

Governmental Authority the right to cause OpCo to forfeit the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. The Property is used exclusively for construction and operation of the Project and other appurtenant and related uses. All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits, and all rights to all trademark, trade names, patents and fictitious names required of Borrower and OpCo for the legal use, occupancy and operation of the Property and the Project, upon completion thereof (collectively, the "**Licenses**"), have been or will be obtained and in full force and effect prior to the commencement of operation of the Project. The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property. In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits. To Borrower's and OpCo's knowledge, no legal proceedings are pending or, to the knowledge of Borrower and OpCo, threatened with respect to the zoning of the Property. Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property, except for utilities and provided that Borrower represents and warrants that it has or will have all necessary public utility service for operation of the Project.

**4.10** **Valid and Second Lien**. The Security Instrument when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (i) a valid and perfected second priority lien on OpCo's interest in the Property and (ii) valid and perfected second priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances. There are no mechanics', materialman's or other similar Liens or claims which have been filed for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal or coordinate priority with, the Liens created by the Loan Documents. The Permitted Encumbrances, individually or in the aggregate, do not (a) materially interfere with the benefits of the security intended to be provided by the Security Instrument and this Agreement, (b) materially and adversely affect the value, operation or use of the Property, or (c) impair Borrower's ability to repay the Loan.

**4.11** **Filing, Recording and Other Taxes**. All transfer Taxes, deed stamps, intangible Taxes or other amounts in the nature of transfer Taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to OpCo have been paid or are being paid simultaneously herewith. All mortgage, mortgage recording, stamp, intangible or other similar Taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid or are being paid simultaneously herewith. All Taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the Title Insurance Policy, or are being contested in accordance with Section 5.11.

**4.12** **Tax Filings**. To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state, commonwealth, district and local Tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state, commonwealth, district and local Taxes, charges and assessments payable by Borrower. Borrower's Tax returns (if any) properly reflect the income and Taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable Tax authority upon audit.

**4.13** **Proceedings; Enforceability**. Borrower has the power and authority to execute, deliver and perform its obligations under the Loan Documents to which it is a party and all the transactions contemplated thereby. OpCo has the power and authority to execute, deliver and perform its obligations under the Loan Documents to which it is a party and all the transactions contemplated thereby. The Loan Documents to which Borrower and/or OpCo is a party have been duly authorized, executed and delivered by Borrower and/or OpCo and constitute legal, valid and binding obligations of Borrower and/or OpCo, as applicable, enforceable against Borrower and/or OpCo in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower, OpCo or Guarantor including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and none of Borrower, OpCo or Guarantor have asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

**4.14** **No Conflicts**. The execution, delivery and performance of the Loan Documents by Borrower and/or OpCo and the transactions contemplated hereby will not conflict with any provision of any law or regulation to which Borrower and OpCo are subject, or conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower or OpCo pursuant to the terms of, any agreement or instrument or organizational document to which Borrower or OpCo is a party or by which it or its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower, OpCo or any of their properties. Borrower's or OpCo's rights under the Licenses will not be adversely affected by the execution and delivery of the Loan Documents, Borrower's and OpCo's performance thereunder, the recordation of the Security Instrument, or the exercise of any remedies by Lender. Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority or any other Person required for the execution, delivery and performance by Borrower and OpCo of, or compliance by Borrower and OpCo with, the Loan Documents or the consummation of the transactions contemplated hereby, including, but not limited to, any consent from Senior Lender or the United States Department of Agriculture, has been obtained and is in full force and effect.

**4.15** **Organization; Special Purpose**.

(a) With Respect to Borrower. Each of Borrower, OpCo and Guarantor has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged or proposes to be engaged in upon completion of the Project. Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations.

(b) With Respect to Lender. Lender has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to make the Loan. Lender is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations.

**4.16** **Other Debt**. There is no indebtedness with respect to the Property or any indebtedness secured by excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

**4.17** **Ownership**.

(a) **Of Borrower; Borrower's Indirect Ownership of OpCo**. Borrower's exact legal name is: Ryze Renewables Nevada, LLC. Borrower is of the following organizational type (e.g., corporation, limited liability company): a limited liability company, and the jurisdiction in which Borrower is organized is: Delaware. Borrower's U.S. federal tax I.D. number is 84-5006058 and Borrower's Delaware Organizational I.D. number is 7852527. Prior to the date hereof, Majority Member was Borrower's sole member. Except as otherwise stated in Schedule 4.17, the membership interests in Majority Member, Borrower and Ryze II and OpCo, are owned free and clear of all Liens, warrants, options and rights to purchase. Borrower has no obligation to any Person to purchase, repurchase or issue any ownership interest in it. At all times that the Loan is outstanding, Borrower will hold 100% of the ownership interests in Ryze II and Ryze II will hold 100% of the ownership interests in OpCo. Except as otherwise stated in Schedule 4.17, neither Ryze II nor OpCo have an obligation to any Person to purchase, repurchase or issue any ownership interest in it. The organizational chart attached hereto as Schedule 4a is complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Borrower on the date of this Agreement; provided that Borrower will update Schedule 4a prior to the Funding Date if there are any changes.

(b) **Of Lender; Affiliation with Mirae**. Lender's exact legal name is: LV Renewables A, LLC, a Nevada limited liability company. Lender is of the following organizational type (e.g., corporation, limited liability company): a limited liability company, and the jurisdiction in which Lender is organized is: Nevada. Lender's Nevada Organizational I.D. number is NV20212270771. The organizational structure described in Schedule 4b is complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Lender on the date of this Agreement; provided that Lender will update Schedule 4b prior to the Funding Date if there are any changes.

**4.18** **Name; Principal Place of Business**. Borrower does not use and will not use any trade name and has not done and will not do business under any name other than its actual name set forth herein. The principal place of business of Borrower is its primary address for notices as set forth in Section 6.1, and Borrower has no other place of business, other than the Property.

**4.19** **No Bankruptcy Filing**. None of Borrower, OpCo, Guarantor, Majority Member nor any Person that directly or indirectly Controls Borrower is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of Borrower's assets or properties (a "**Bankruptcy Proceeding**"), and Borrower has no actual knowledge of any Person contemplating the filing of any such petition against it, Ryze II, OpCo or any constituent Persons.

**4.20** **Fraudulent Transfer**. Neither Borrower nor OpCo entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents.

**4.21** **ERISA; No Plan Assets; WARN Act**.

(a) As of the date hereof and throughout the Term (i) neither Borrower, Guarantor nor any of the Commonly Controlled Entities sponsor, are obligated to contribute to, or are themselves an "employee benefit plan," as defined in Section 3(3) of ERISA or a "plan" as defined in Section 4975 of the Code, (ii) none of the assets of Borrower or Guarantor constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, as modified in operation by Section 3(42) of ERISA, (iii) neither Borrower nor Guarantor is or will be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with Borrower or Guarantor are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans. As of the date hereof, none of Borrower, Guarantor nor any ERISA Affiliate maintains, sponsors or contributes to or has any obligation with respect to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA). Neither Borrower nor Guarantor has engaged in any transaction in connection with which it could be subject to either a civil penalty assessed pursuant to the provisions of Section 502 of ERISA or a Tax imposed under the provisions of Section 4975 of the Code, in either case, that could reasonably be expected to result in a Material Adverse Effect.

(a) Neither Borrower nor an Affiliate has effectuated or will (without any and all necessary notices and disclosures) effectuate a "plant closing" (as defined in the Worker Adjustment and Retraining Notification Act, or any similar state or local law (the "**WARN Act**")) or a "mass layoff" (as defined in the WARN Act) involving employees working at the Property or on the Project that could reasonably be expected to result in a Material Adverse Effect.

**4.22** **Litigation**. There are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or, to Borrower's knowledge, threatened against or affecting Borrower, Majority Member, OpCo, Guarantor, the Project or the Property, which, if adversely determined, might have a Material Adverse Effect or otherwise prevent Borrower from performing the transactions contemplated herein. An action that is dismissed without prejudice is not considered to be "pending" or "threatened against or affecting" Borrower.

**4.23 Agreements**. Borrower is not a party to any agreement or instrument or subject to any restriction which might have a Material Adverse Effect. Neither Borrower nor OpCo is in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default might have consequences that would have a Material Adverse Effect. OpCo is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound, and to Borrower's and OpCo's knowledge, there are no material defaults under any such agreement by any other party thereto. OpCo has received certain extensions related to the Senior Loan, which have been provided to the Lender.

**4.24 Full and Accurate Disclosure**. No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading. There is no material fact presently known to Borrower or OpCo that has not been disclosed to Lender which adversely affects, or, as far as Borrower can foresee, might have a Material Adverse Effect. All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower, OpCo, Guarantor, the Project and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower, OpCo, Guarantor, the Project and the Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP (or such other accounting basis consistently applied and reasonably acceptable to Lender) throughout the periods covered, except as disclosed therein. Borrower has no contingent liabilities, liabilities for Taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower, OpCo, Guarantor, the Project or the Property from that set forth in said financial statements.

**4.25 Leases**. The Property is not subject to any Leases. The parties hereto acknowledge and agree that Borrower may lease certain pieces of equipment located on the Property that are necessary for the construction or operation of the Project.

**4.26 Contracts; Major Contracts**.

(a) There are no service, maintenance or repair contracts affecting the Property that are not terminable on one month's notice or less without cause and without penalty or premium except as set forth in Schedule 4.25 hereof. Except as otherwise disclosed to Lender on Schedule 3 hereof, all service, maintenance, construction or repair contracts affecting the Property have been entered into an arms-length in the ordinary course of Borrower's and/or OpCo's business. Each of such agreements is in full force and effect, there are no monetary or other material defaults by Borrower or OpCo, as appropriate, thereunder and, to the best knowledge of Borrower and OpCo, there are no monetary or other material defaults thereunder by any other party thereto. No agreement or instrument to which Borrower or OpCo is a party or is subject, or to which the Property is subject, provides any Person with the right to obtain, a Lien on the Property superior to the Lien of the Security Instrument other than the Senior Loan Liens on the Property, or upon the receipt of the Additional Funds, the liens of the Second Priority Lender.

(b) Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender. Borrower has not entered into, and is not bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender. None of Borrower or any other Person acting on Borrower's behalf has given or received any notice of default under any Major Contract that remains uncured or in dispute. Except as disclosed to Lender prior to the Funding Date, no Major Contract has as a party an Affiliate of Borrower.

**4.27** **Critical Technologies and Infrastructure**. None of Borrower, OpCo, or Guarantor is considered, nor has Borrower or Guarantor at any point owned, managed or possessed critical technologies, critical infrastructure or personal data that could reasonably be expected to classify Borrower or Guarantor or any of their Affiliates a "TID U.S. Business" as that term is defined in 31 CFR Section 800 or as such term is interpreted and/or applied by the Committee on Foreign Investment in the United States.

**4.28** **Operations Agreements**. Each Operations Agreement is in full force and effect and none of Borrower, OpCo, or, to Borrower's and OpCo's knowledge, any other party to any Operations Agreement, is in default thereunder, and to the best of Borrower's and OpCo's knowledge, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder.

**4.29** **Hazardous Substances**. (i) To OpCo's knowledge, except as otherwise disclosed by the Phase I environmental report with respect to the Property delivered to Lender and OpCo in connection with origination of the Loan, the Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right-to-Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any state super-lien and environmental clean-up statutes, any local law requiring related permits and licenses, any common law relating to Hazardous Substances, and all amendments to and regulations in respect of the foregoing laws (collectively, "**Environmental Laws**"); (ii) to OpCo's knowledge, the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic and/or dangerous substances, or any other substances or materials which are included under or regulated by Environmental Laws (collectively, "**Hazardous Substances**"); (iii) to the best of OpCo's knowledge, no Hazardous Substances are or have been (including the period prior to OpCo's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) to the best of OpCo's knowledge, no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; (v) to the best of OpCo's knowledge, no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vi) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of OpCo which have not been provided to Lender.

**4.30** **Embargoed Person**. None of the funds or assets of Guarantor, OpCo or of Borrower constitute property of, or are beneficially owned directly or, to Borrower's best knowledge, indirectly, by any Embargoed Person (as hereinafter defined), (b) no Embargoed Person has any direct interest, and to Borrower's best knowledge, as of the date hereof, based upon reasonable inquiry by Borrower, indirect interest, of any nature whatsoever in Borrower, OpCo or Guarantor, as applicable, with the result that the investment in Borrower, OpCo or Guarantor, as applicable (whether directly or indirectly), is prohibited by any Legal Requirement or the Loan is in violation of any Legal Requirement and (c) none of Borrower, OpCo or any constituent member of Borrower or OpCo has been previously indicted for or convicted of any Patriot Act Offense, or is currently under investigation by any Governmental Authority with respect to any alleged Patriot Act Offense.

**4.31** **Anti-Money Laundering**. None of the funds of Borrower, OpCo, Majority Member or Guarantor, as applicable, that are used to consummate this transaction or to operate the Property are derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, OpCo, Majority Member or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure. Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower (other than the Loan) and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

**4.32** **Federal Reserve Regulations; Investment Company Act; Bank Holding Company**. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (ii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money. Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**4.33** **Union Contracts**. Except as set forth on Schedule 3, there are no: (i) collective bargaining agreements and/or other labor agreements to which Borrower or the Property, or any portion thereof, is a party or by which either is or may be bound; (ii) employment, profit sharing, deferred compensation, bonus, stock option, stock purchase, pension, retainer, consulting, retirement, health, welfare, or incentive plans and/or contracts to which Borrower or the Property, or any portion thereof is a party, or by which either is or may be bound; or (iii) plans and/or agreements under which "fringe benefits" (including, but not limited to, vacation plans or programs, and related or similar dental or medical plans or programs, and related or similar benefits) are afforded to employees of Borrower or the Property, or any portion thereof. Borrower has not violated any applicable laws, rules and regulations relating to the employment of labor, including those relating to wages, hours, collective bargaining and the payment and withholding of taxes and other sums as required by appropriate Governmental Authorities.

**4.34** **Lender's Knowledge of Breach**. Except as set forth on Schedule 4.33, Lender has no actual knowledge of any breach of Borrower's representations and warranties as of the date hereof. Lender has disclosed on Schedule 4.33 all information in Lender's possession related to any suspected breach of Borrower's representations and warranties. Lender's actual knowledge is limited to the knowledge of Sung Hee Han, Kyunghyun Lee, and any attorneys from Snell & Wilmer L.L.P. who have worked on this Loan or any preceding litigation between Mirae Asset Securities Co. Ltd. Lender has no current intention to declare an Event of Default or exercise remedies pursuant to the Loan Documents.

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender except to the extent of Lender's actual knowledge of any breach of representations and warranties as of the date hereof as set forth on Schedule 4.33, provided, however, that the representations, warranties and covenants set forth in Section 4.29 shall survive in perpetuity.

## 5. COVENANTS

Until the end of the Term, Borrower (and, where designated, Lender) hereby covenants and agrees that:

**5.1** **Warranty of Title**. Borrower will cause OpCo to warrant and defend the title to the Property, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, against the claims of all Persons.

**5.2** **Existence**. Each of Borrower, OpCo, Majority Member and Guarantor shall (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises; (ii) continue to engage in the business presently conducted by it; (iii) obtain and maintain all Licenses and all applicable governmental authorizations including, but not limited to, those necessary to construct and operate the Project; and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Property and the Project.

**5.3** **Dissolution**. Borrower shall not (i) engage in any dissolution, liquidation or consolidation, division or merger with or into any one or more other business entities or (ii) cause, permit or suffer Majority Member, OpCo or Guarantor to dissolve, divide, wind up or liquidate or take any action, or omit to take any action, as a result of which Majority Member, OpCo or Guarantor would be dissolved, divided, wound up or liquidated in whole or in part; provided that Borrower or Guarantor may engage in a special purchase acquisition company ("**SPAC**") transaction that would result in a merger of Borrower into the SPAC so long as such transaction would satisfy any requirements of the Option Agreement and Lender agrees to cooperate with Borrower in concluding such transaction, if possible, at no expense to Lender.

**5.4** **Change of Name, Identity or Structure**. Borrower shall not change its name, identity (including its trade name or names) or Borrower's corporate, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective

date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender, which consent may be conditioned upon receipt of opinions of counsel reasonably requested by Lender, including an updated substantive non-consolidation opinion (if Lender determines in its reasonable discretion that the same is necessary as a result of Borrower's new structure). Borrower hereby authorizes Lender to file, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement amendment required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower or OpCo intends to operate the Property and the Project, and representing and warranting that Borrower and OpCo do business under no other trade names with respect to the Property and/or the Project. Borrower shall and shall cause OpCo at all times maintain, preserve and protect all trade names.

**5.5** **Principal Place of Business**. Borrower shall not change its principal place of business or chief executive office without first giving Lender thirty (30) days' prior notice.

**5.6** **Additional Debt; Material Change**. None of Borrower, Ryze II nor OpCo will incur additional indebtedness without the consent of Borrower's Board of Managers. All such additional indebtedness, except with respect to the Additional Funds, will be subordinate to the Loan. No material change to the Project or the Property will be made without the consent of the Board of Managers. Unless the Borrower's Board of Managers agrees in writing from and after the date hereof, none of Borrower, Ryze II nor OpCo will participate in any joint venture, disposition, divestitures, dissolution, carve-out, transfers, creation of liens, pledges or other encumbrances or swaps of any assets or shares of Borrower, Ryze II or OpCo.

**5.7** **[Intentionally omitted.].**

**5.8** **Change in Business or Operation of Property**. Borrower shall not and Borrower shall not cause or permit OpCo to (i) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower and/or OpCo except to the extent expressly permitted by the Loan Documents or (ii) make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business, or the operation of the Project upon its completion or otherwise cease to construct or operate the Project or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property contemplated herein) or pending the receipt of the Additional Funds.

**5.9** **Prohibited Transfers**. Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer. Borrower shall provide Lender with copies of all organizational documents (if any) relating to any Permitted Transfer. Borrower shall pay on demand all of the reasonable costs and expenses incurred by Lender, including reasonable attorneys' fees and expenses in connection with considering any proposed Transfer, whether or not the same is permitted or occurs.

**5.10** **Liens**. Without Lender's prior written consent, which may be withheld, granted or conditioned in the sole and absolute discretion of Lender, OpCo shall not create, incur, assume,

permit or suffer to exist any Lien on all or any portion of the Property or any direct or indirect legal or beneficial ownership interest in Borrower, Ryze II or OpCo, except Liens in favor of Lender or Second Priority Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien.

**5.11 Taxes and Other Charges**. Except as provided in this Section, Borrower shall pay or cause OpCo to pay all Property Taxes and Other Charges as the same become due and payable, and to the extent requested by Lender, deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Property Taxes and the Other Charges have been so paid before they would be delinquent if not paid. Borrower shall promptly pay or cause OpCo to pay, for all utility services provided to the Property. After prior notice to Lender, OpCo, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Property Taxes or Other Charges, provided that (i) no Event of Default has occurred and is continuing, (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances, (iii) such proceeding shall suspend the collection of the Property Taxes or such Other Charges, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or OpCo is subject and shall not constitute a default thereunder, (v) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost, (vi) OpCo shall have furnished such security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure the payment of any such Property Taxes or Other Charges, together with all interest and penalties thereon, which shall not be less than one hundred percent (100%) of the Property Taxes and Other Charges being contested, (vii) Borrower shall promptly upon final determination thereof cause OpCo to pay the amount of such Property Taxes or Other Charges, together with all costs, interest and penalties, (viii) such contest shall not affect the ownership, use or occupancy of the Property, and (ix) Borrower shall, upon request by Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth in clauses (i) through (viii) of this Section 5.11. Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

**5.12 No Joint Assessment**. Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, or (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

**5.13 Repairs; Maintenance and Compliance; Alterations Repairs; Maintenance and Compliance**. Borrower shall or shall cause OpCo to: (i) keep the Project and all its properties, including, without limitation, the Property, in good repair and in good working order and condition, reasonable wear and tear excepted, and from time to time make all needed and proper repairs, renewals, replacements, additions, and improvements thereto; (ii) comply with the provisions of all leases to which OpCo is a party or under which it occupies property so as to prevent any loss or forfeiture thereof or thereunder; and (iii) preserve and maintain all licenses,

trademarks, privileges, permits, franchises, certificates and the like necessary for the operation of the Project at nameplate capacity. Borrower shall and shall cause OpCo to promptly comply with all Legal Requirements and promptly cure any violation of a Legal Requirement. Borrower shall notify Lender and shall cause OpCo to notify Lender in writing within three Business Days after Borrower and/or OpCo first receives notice of any such non-compliance.

**5.13.1** **Alterations**. Borrower and/or OpCo may, without Lender's consent, perform alterations to the Improvements and Equipment other than the construction of the Project in accordance with plans and specifications approved by Lender prior to the date hereof, which (i) do not constitute a Material Alteration, (ii) do not materially and adversely affect Borrower's or OpCo's financial condition or the value or net operating income of the Property and (iii) are in the ordinary course of Borrower's and/or OpCo's business. Neither Borrower nor OpCo shall perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed; provided, that it will not be unreasonable to withhold consent if Borrower does not provide evidence of the availability of necessary funds to complete such Material Alteration. Lender may, as a condition to giving its consent to a Material Alteration, unless such Material Alteration is funded with the Additional Funds or funds deposited with Second Priority Lender, require that Borrower deliver or cause to be delivered to Lender security for payment of the cost of such Material Alteration in an amount equal to one hundred percent (100%) of the cost of the Material Alteration as estimated by Lender, which amount shall periodically be disbursed to Borrower during the course of such Material Alteration subject to commercially reasonable construction draw procedures. Upon substantial completion of the Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in accordance with applicable Legal Requirements and substantially in accordance with the plans and specifications approved by Lender, if applicable; (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of lien; and (iii) all material Licenses necessary for the use, operation and occupancy of the portion of the Property that is the subject of the Material Alteration have been issued. Borrower shall reimburse Lender upon demand for all out-of-pocket costs and expenses (including the reasonable fees of any construction consultant and any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.13.2. Lender shall provide a response to any request to perform a Material Alteration within ten (10) Business Days or such request shall be deemed approved.

**5.14** **Access to Property**. Borrower shall permit agents, representatives, consultants and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice to Borrower and such party being bound by the provisions of Section 10.15 hereof.

**5.15** **Environmental Matters**.

**5.15.1** **Hazardous Substances**. So long as OpCo owns or is in possession of the Property, Borrower shall cause OpCo to (i) use commercially reasonable efforts to keep the Property free from Hazardous Substances (except where such Hazardous Substances are contained in accordance with Environmental Laws and in such quantities permitted by Environmental Laws

and otherwise in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower or OpCo shall become aware that (A) any Hazardous Substance is on or near the Property, (B) the Property is in violation of any Environmental Laws or (C) any condition on or near the Property shall pose a threat to the health, safety or welfare of humans and (iii) as required by law, remove such Hazardous Substances and/or cure such violations and/or remove such threats, as applicable, promptly after Borrower or OpCo becomes aware of same, at Borrower's sole expense.

**5.15.2 Environmental Monitoring.**

(a) Borrower shall give prompt written notice to Lender of (i) any proceeding or written inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened in writing by any third party (including any Governmental Authority) against Borrower, OpCo or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's or OpCo's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could reasonably be expected to cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law. Borrower shall permit or cause OpCo to permit Lender to join and participate in, as a party if Lender so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance.

(b) If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law ("**Remedial Work**"), Borrower shall commence or cause OpCo to commence all such Remedial Work within thirty (30) days after becoming aware of the same (including by way of notice from Lender) and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law. If OpCo does not timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense. Notwithstanding the foregoing, OpCo shall not be required to commence such Remedial Work within the above specified time period: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in OpCo or such Remedial Work violating any Environmental Law, or (z) if OpCo, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work. OpCo shall have the right to contest the need to perform such Remedial Work, provided that, (1) OpCo is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, and (2) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited or lost if OpCo fails to promptly perform the Remedial Work being contested, and if OpCo fails to prevail in such contest, OpCo would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of civil liability, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien unless Borrower provides any commercially reasonable security.

5.15.3 **O & M Program**. In the event any environmental report delivered to Lender in connection with the Loan (including in connection with any inspection or audit provided pursuant to Section 5.15.2) recommends the development of or continued compliance with an operation and maintenance program for the Property (including with respect to the presence of asbestos and/or lead-based paint) ("**O & M Program**"), Borrower or OpCo shall develop (or continue to comply with, as the case may be) such O & M Program and shall, during the Term, comply in all material respects with the terms and conditions of the O & M Program.

**5.16 Leases**. Upon request, Borrower shall furnish or cause OpCo to furnish Lender with executed copies of all Leases then in effect. OpCo shall not enter into any new Lease or a proposed renewal, extension or modification of an existing Lease without the prior written consent of Lender, which may be withheld or conditioned in Lender's sole and absolute discretion.

**5.17 Approval of Major Contracts; Change Order Contract**. Neither Borrower nor OpCo, without Lender's prior consent, which consent is provided in writing by Lender's manager or another officer of Lender, which consent shall not be unreasonably delayed or withheld: (a) enter into, surrender or terminate any Major Contract to which it is a party or to which Borrower, OpCo or the Property is subject (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Major Contract to which it is a party or to which Borrower, OpCo or the Property is subject, except as provided therein or on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Major Contract to which it is a party or to which Borrower, OpCo or the Property is subject in any material respect, except on an arm's-length basis and commercially reasonable terms. Once the same is executed, neither Borrower nor OpCo will modify, amend, supplement, restate, replace or terminate the Change Order Contract or enter into any other agreement with respect to the construction of the Project that would require the consent of the Senior Lender or the United States Department of Agriculture or that materially modifies the plans and specifications of the Project from those provided to Lender on or before the date hereof (the foregoing constituting a "**Change Order Alteration**") without the written consent of Lender, in its sole and absolute discretion. For purposes of this paragraph, Lender shall respond to any request for consent no later than ten (10) Business Days from the date of such request.

**5.18 Zoning**. OpCo shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender. For purposes of this paragraph, Lender shall respond to any request for consent no later than ten (10) Business Days from the date of such request.

**5.19 Licenses**. Borrower shall not cause or permit OpCo to Transfer any License required for the construction or operation of the Property or the Project.

**5.20 Compliance with Restrictive Covenants, Etc.** Borrower and OpCo shall at all times comply in all material respects with all Operations Agreements. Neither Borrower nor OpCo will enter into, modify, waive in any material respect or release any Easements, Operations

Agreements or other Permitted Encumbrances, or suffer, consent to or permit the foregoing, without Lender's prior written consent in its commercially reasonable discretion. For purposes of this paragraph, Lender shall respond to any request for consent no later than ten (10) Business Days from the date of such request.

**5.21 Performance of Other Agreements**. Borrower and OpCo shall observe and perform each and every material term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property sufficient to prevent any liens on the Property.

**5.22 ERISA**.

(a) Neither Borrower nor Guarantor shall engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender or any assignee of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code.

(b) Borrower's and Guarantor's covenant in clause (a) above is based on the assumption that no portion of the assets used by Lender in connection with the transactions contemplated under this Agreement and the other Loan Documents constitutes assets of a "benefit plan investor" as defined in Section 3(42) of ERISA and with respect to which Borrower or Guarantor is a party in interest (as defined in Section 3(14) of ERISA) or a disqualified person (as defined in Section 4975 of the Code) unless the conditions of an available prohibited transaction exemption are satisfied.

(c) Neither Borrower nor Guarantor shall maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or permit the assets of Borrower or Guarantor to become "plan assets," within the meaning of 29 C.F.R. 2510.3-101, as modified in application by Section 3(42) of ERISA.

(d) Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender, that: (i) Borrower and Guarantors are in compliance with ERISA; and (ii) neither the assets of Borrower nor Guarantor constitute "plan assets" within the meaning of 29 C.F.R. Section 2510.3-101, as modified in application by Section 3(42) of ERISA of any "benefit plan investor" as defined in Section 3(42) of ERISA.

**5.23 Expenses**. Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Borrower or required of Borrower under the terms of any Loan Document; (ii) Borrower's intangibles Taxes and personal property Taxes and, upon an during the continuance an Event of Default, appraisals (iii) the protection of Lender's Liens in the Property; (iv) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any

action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan; and (v) enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Property or in connection with any refinancing or restructuring of the Loan in the nature of a "work-out", or any insolvency or bankruptcy proceedings to the extent such fees exceed $5,000 in the aggregate. The obligations and liabilities of Borrower under this Section 5.22 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure. Notwithstanding the foregoing, Borrower shall have no obligation to pay or reimburse Lender for any costs or expenses to the extent such costs or expenses arose due to any breach, or misconduct of Lender.

**5.24** **Indemnity**. Borrower shall defend, indemnify and hold harmless Lender (and for purposes of this Section 5.23, Lender shall include Lender, its Affiliates, successors and assigns, and their respective officers and directors) and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "**Indemnified Party**"), from and against any and all actual out-of-pocket liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "**Indemnified Liabilities**" provided that Indemnified Liabilities shall not include any consequential damages, punitive damages or other special or exemplary damages, unless actually paid by Lender to a third party) in any manner, relating to or arising out of or by reason of the Property (or any part thereof), the Loan, the Loan Documents or any of the rights and remedies granted to Lender under the Loan Documents, limited to: (i) the use or intended use of the proceeds of the Loan; (ii) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (iii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (iv) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (v) any lawsuit brought or threatened, settlement reached, or governmental order relating to such Hazardous Substance; (vi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work (vii) any failure of Borrower or the Property to comply with any Legal Requirement; and (viii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof other than related to this Loan or the transactions contemplated in this Agreement, or any liability asserted against Lender with respect thereto and any claims of Doonbeg Partners LLC related to its fee equal to 1% of the Loan amount due from Borrower. Any amounts payable to any Indemnified Party by reason of the application of this paragraph shall be payable within ten (10) Business Days after written notice and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid. The obligations and

liabilities of Borrower under this Section 5.24 shall survive the Term, the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure and the termination of the Loan Documents. This Section 5.24 shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

**5.25 Cooperate in Legal Proceedings**. Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which may in any way affect the rights of Lender under any Loan Document at Lender's sole cost and expense.

**5.26 Further Assurances**. Borrower shall, at Lender's sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or appropriate, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Debt and/or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may require in its reasonable discretion from time to time; (ii) provide all such information as Lender may require in its reasonable discretion to ensure Borrower's ongoing compliance with Sections 5.9, 5.27 and 5.28, including ensuring compliance with all "know your customer" procedures necessary or appropriate to apply with applicable law. Lender shall provide all such information as Borrower may require in its reasonable discretion to ensure compliance with all "know your customer" procedures of Senior Lender or otherwise as required to comply with applicable law, including information related to any party Lender nominates to serve as a Manager of Borrower.

**5.27 Patriot Act; Embargoed Person**. Lender hereby notifies the Borrower that pursuant to the requirements of the U.S.A. PATRIOT Act and similar legislation (including applicable anti-money laundering laws and 31 C.F.R. § 1010.230 (the "**Beneficial Ownership Regulation**")), as applicable, it is required to obtain, verify and record information that identifies the Borrower and certain related entities, which information includes the name and address of the Borrower and other information that will allow the Lenders to identify such person in accordance with such legislation and the Beneficial Ownership Regulation. Each of the Borrower, OpCo and Guarantor agrees to furnish such information promptly upon request of a Lender.

**5.28 Anti-Money Laundering**. No proceeds of the Loan will be used by the Borrower or any subsidiary of Borrower directly or, to the knowledge of the Borrower, indirectly, for the purpose of financing activities of or with any Person, or in any country, that, at the time of such financing, is the subject of any Sanctions, except to the extent licensed or otherwise approved by OFAC.

**5.29 Cash Flow Sweep**. At all times through the Term, on the twenty-fifth day of each March, June, September and December, Borrower will cause OpCo to distribute all of its remaining funds, less a reserve amount necessary to maintain a balance sufficient to cover two months of operating expenses, to Ryze II and Ryze II shall thereafter disburse such amount to Borrower, after payment of all amounts then due and owing pursuant to Senior Loan Documents and to fulfill all other payment requirements and reserve requirements set forth therein, and payments, if any to the Second Priority Lender.

**5.30** **CFIUS**. Each of Lender, Borrower and their Affiliates, as necessary, shall use their best efforts to make a voluntary filing with Committee on Foreign Investment in the United States ("**CFIUS**") within ninety (90) days following the Funding Date, relating to the transactions contemplated by this Agreement, and promptly take all actions and steps necessary to obtain any clearance or approval from CFIUS that the Lender or its counsel deems necessary or advisable, at Lender's sole cost and expense.

**5.31** **Covenants Related to Additional Funds**. Prior to obtaining the Additional Funds, Borrower will provide Lender with:

(a) an updated technical report from Stancil & Co. including an assessment on the commercial operations date on which the Project is estimated to be operating and capable of achieving full production (the "**COD**") with and without the completion of the pretreatment facility component of the Project (the "**Pretreatment Facility**");

(b) a construction schedule for the Project with and without the Pretreatment Facility; and

(c) verification from Stancil & Co. that MMC, Inc. is credit worthy for purposes of the Senior Loan and as further evidenced by the existence of payment and performance bonds for the construction work related to the Senior Loan and the Additional Funds

## 6. NOTICES AND REPORTING

**6.1** **Notices**. All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "**Notice**") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by written notice to the other party):

If to Lender:

LV Renewables A, LLC
c/o Mirae Asset Securities Co. Ltd.
26, Eulji-ro 5 gil
Jung-gu
Seoul, South Korea
Attention: Kyunghyun Lee

with a copy to:

Snell & Wilmer L.L.P.
City National 2CAL
350 South Grand Avenue
Suite 3100

Los Angeles, CA 90071-3420
Attention: Victor J. Roehm III

If to Borrower:

Ryze Renewables Nevada, LLC
6600 Amelia Earhart Court
Suite A
Las Vegas, Nevada. 89119
Attention: Matthew G. Pearson

A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or in the case of overnight delivery, upon the first attempted delivery on a Business Day.

**6.2 Borrower Notices and Deliveries**. Borrower shall (a) give prompt written notice to Lender of: (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower or an Guarantor which might materially adversely affect Borrower's, OpCo's or Guarantor's condition (financial or otherwise) or business or the Property or the Project; (ii) any material adverse change in Borrower's, OpCo's or Guarantor's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and provide to Lender: (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, OpCo, Guarantor, or any Affiliate of any of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, in Borrower's or OpCo's possession or control, reasonably requested, from time to time, by Lender in its reasonable discretion.

**6.3 Financial Reporting**.

**6.3.1 Bookkeeping**. Borrower shall keep on a calendar year basis, in accordance with GAAP, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property, whether such income or expense is realized by Borrower, or any Affiliate of Borrower. Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall desire. After an Event of Default, Borrower shall pay any costs actually incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

**6.3.2 Annual Reports**. Borrower shall furnish to Lender annually, (i) within ninety (90) days after each calendar year, unaudited financial statements of Borrower and OpCo, and (ii) within one hundred twenty (120) days after (A) calendar year 2021, a complete copy of Borrower and OpCo's consolidated annual financial statements audited by DesRoches promptly

when available and (B) each calendar year during the Term commencing with calendar year 2022, a complete copy of Borrower and OpCo's audited consolidated annual financial statements for the period ending on December 31 of such calendar year, certified by Deloitte and Touche, in each instance certified as true and correct in all material respects as of the date of such financial statements by the officer responsible for the preparation of such financial statements, each in accordance with GAAP (or such other accounting basis consistently applied) and containing balance sheets and statements of profit and loss for Borrower and the Property in such detail as Lender may request. Borrower shall furnish audited consolidated annual financial statements for Borrower and OpCo certified by Deloitte and Touche, for the calendar year ending December 31, 2021 as soon as such financial statements are available and Borrower will diligently proceed at all times to cause such audited financial statements to be completed, and will certify that such statements are true and correct. Each such statement (x) shall be in form and substance compliant with GAAP and, after the initial audited financial statements are prepared, consistent with past practices, (y) shall set forth the financial condition and the income and expenses for the Property for the immediately preceding calendar year, including statements of annual net operating income and (z) shall be accompanied by an Officer's Certificate certifying that such statement is true, correct, complete and accurate and presents fairly the financial condition of the Property and has been prepared in accordance with GAAP (or such other recognized accounting basis consistently applied).

**6.3.3 Monthly/Quarterly Reports**. Borrower shall furnish to Lender within thirty (30) days after the end of each calendar month for review by an asset manager approved by Lender the following items: (i) monthly and year-to-date operating statements, noting net operating income and other information necessary and sufficient under GAAP to fairly represent the financial position and results of operation of Borrower, OpCo, the Property and the Project during such calendar month, all in form satisfactory to Lender; (ii) a balance sheet for such calendar month; (iii) a comparison of the budgeted income and expenses of Borrower and OpCo (including expenses related to the completion of the Project prior to COD) and the actual income and expenses for each month and year-to-date for the Property, together with a detailed explanation of any variances of ten percent (10%) or more between budgeted and actual amounts for such period and year-to-date; (iv) a statement of the actual Capital Expenses made by OpCo and Borrower during each calendar quarter as of the last day of such calendar quarter; (v) a statement that neither OpCo nor Borrower has incurred any indebtedness other than Permitted Indebtedness; (vi) an aged receivables report; (vii) monthly capital expenditure reports for the Property; (viii) a technical advisory report in form and substance satisfactory to Lender prior to COD. Each such statement shall be accompanied by an Officer's Certificate certifying (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower, OpCo and the Property in accordance with GAAP, (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it and (3) that as of the date of such Officer's Certificate, no litigation exists involving Borrower or the Property in which the amount involved is $100,000 (in the aggregate) or more or in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taking in relation thereto. Lender's asset manager will review the financial and operating reports.

**6.3.4 Other Financial Information**. Borrower shall furnish to Lender, within ten (10) Business Days after request or such longer period as may be reasonably required, such

further detailed information with respect to the operation of the Property, the construction of the Project and the financial affairs of Borrower, OpCo, or Ryze II as may be reasonably requested by Lender (i) so long as such information is readily available to Borrower or (ii) which can reasonably be prepared by or for Borrower at a cost of less than $5,000 in the aggregate upon the occurrence and during the continuance of an Event of Default. Notwithstanding the foregoing, Borrower shall only be required to furnish further detailed information of the financial affairs of Majority Member during the occurrence of an Event of Default (i) so long as such information is readily available to Majority Member or (ii) can reasonably be prepared at a cost of less than $5,000 in the aggregate.

**6.3.5** **Annual Budget and Fair Market Value Report**. Borrower shall prepare and submit to Lender by December 1st of each year beginning in 2022 during the Term (i) a proposed pro forma operating expense budget for the Property for the succeeding calendar year showing, on a month-by-month basis, in reasonable detail, each line item of anticipated operating income and operating expenses (on a cash and accrual basis), including amounts required to establish, maintain and/or increase any monthly payments required hereunder and (ii) promptly after preparation thereof, any revisions to such annual operating budget. Each annual operating budget submitted by Borrower shall have been approved by Borrower's Board of Managers and Borrower will cause such operating budget to be approved by the manager(s) of OpCo. Borrower will provide an annual report from Stancil & Co. or a third party reasonably satisfactory to Lender and Borrower confirming the fair market value of the Property and the Project.

**6.3.6** **Breach**. If Borrower or Guarantor fails to provide to Lender any of the financial statements, certificates, reports or information (the "**Required Records**") required by this Article 6 (with respect to Borrower) or the Guaranty (with respect to Guarantor) within fifteen (15) days after the date upon which such Required Record is due, Lender shall have the option, to gain access to Borrower's or Guarantor's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower or Guarantor.

**6.4** **Estoppel Statements**. After request by Lender (which request shall not be made more than twice in any twelve (12) month period, other than if an Event of Default is continuing), Borrower shall within ten days furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal, (ii) the Interest Rate, (iii) the date installments of interest and/or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, (v) whether there exists a Default or Event of Default, and (vi) reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes and (vii) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

## 7. INSURANCE; CASUALTY; AND CONDEMNATION

**7.1** **Insurance Coverage**. Borrower shall obtain and maintain or cause OpCo to obtain and maintain, for the mutual benefit of Borrower, Senior Lender, Lender and Second Priority Lender, if applicable, during the Term the following policies of insurance: (a) Commercial liability insurance, to be written on an occurrence basis with deductible or self-insured retention less than $50,000 on the general liability in the amounts reasonably comparable to those usually

carried by similar entities and individuals and sufficient to avoid the application of any co-insurance provisions.

(b) Worker's compensation and disability insurance with respect to any employees of Borrower, as required by any Legal Requirement.

(c) Such insurance as required by the Security Instrument.

(d) Such other insurance, higher limits, replacements or substitutions thereof (including environmental liability insurance, pollution liability insurance, sinkhole, mine subsidence, and earthquake insurance) in the amounts and types reasonably comparable to those usually carried by similar entities and individuals.

**7.1.1** **Policies**. Unless otherwise approved by Lender in writing in advance of placement, all policies of insurance (the "**Policies**") required pursuant to Section 7.1.1 above shall (i) name Lender and its successors and/or assigns as their interest may appear as the mortgagee and lender's loss payable (in the case of property insurance and in the case of business personal property/business interruption/loss of rents coverage) and an additional insured (in the case of liability insurance); (ii) contain (in the case of property insurance) a Non-Contributory Standard Mortgagee Clause and a Lender's Loss Payable Endorsement, or their equivalents, naming Lender as the person to which all payments made by such insurance company shall be paid; (iii) contain a waiver of subrogation on both the Property and Public Liability Policies in favor of Lender; (v) be assigned and the carrier-certified copies thereof delivered to Lender; (vi) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer under the Policies, (B) that Lender shall receive at least ten (10) days' prior written notice of cancellation and ten (10) days' notice for nonpayment of premium) of any of the property Policies. Such notice shall also be provided for, liability policies when available from the carrier (provided, however, that if such notice provisions are not available in any of the liability Policies, Borrower shall provide the required notice to Lender) (C) an agreement whereby the insurer waives any right to claim any premiums and commissions against Lender, provided that the policy need not waive the requirement that the premium be paid in order for a claim to be paid to the insured and (D) providing that Lender is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums; (vii) in the event any insurance policy (except for general public and other liability and workers compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (viii) be in form and substance as to amounts, form, risk coverage, deductibles, loss payees and insureds comparable to those usually carried by similar entities and individuals. Borrower shall pay the premiums for such Policies (the "**Insurance Premiums**") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Lender pursuant to Section 3.3 hereof) receipts for or other evidence of the payment of the Insurance Premiums satisfactory to Lender in its reasonable discretion. If Borrower

does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate. Borrower shall deliver to Lender a certified copy of each Policy within thirty (30) days after its effective date. Within forty-five (45) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be requested by Lender in its reasonable discretion, such that the coverage remains comparable to those usually carried by similar entities and individuals.

**7.1.2** **<u>Transfers</u>**. In the event of foreclosure of the Security Instrument or other transfer of title to the Property and Improvements in extinguishment in whole or in part of the Debt, and regardless of whether Lender shall have sought a deficiency judgment with respect thereto, all right, title and interest of Borrower or OpCo, as appropriate, in and to the Policies that are not blanket policies then in force concerning the Property and Improvements and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or its designee in the event of such other transfer of title.

7.2 **<u>Casualty Notice; Restoration</u>**. If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice thereof to Lender. Following the occurrence of a Casualty, Borrower, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

**7.2.1** **<u>Settlement of Proceeds</u>**. If an Event of Default has occurred and is continuing, Lender may, in its sole discretion, settle and adjust any insurance claim related to a Casualty without the consent of Borrower and agree with the insurer(s) on the amount to be paid on the loss, and the proceeds shall be due and payable solely to Lender and held by Lender to be applied to the Loan or to restore the Property, in its sole and absolute discretion, except to the extent of any prior claim of the Senior Lender or Second Priority Lender, if any. The expenses incurred by Lender in the settlement, adjustment and collection of the insurance proceeds shall become part of the Debt and shall be reimbursed by Borrower to Lender upon demand.

**7.2.2** **<u>Condemnation. Notice; Restoration</u>**. Borrower shall cause OpCo to promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "**Condemnation**") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation. Following the occurrence of a Condemnation, Borrower will cause OpCo to promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character and utility as contemplated herein to operate the Project.

**7.2.3** **<u>Collection of Award</u>**. After payments to the Senior Lender in accordance with the Senior Loan Documents and the Second Priority Lender in accordance with the documentation of the Additional Funds, any remaining portions of an award or payment in respect

of a Condemnation (an "**Award**"), shall be paid to Lender, up to the balance of the Loan, and thereafter to Borrower, to be held and disbursed in accordance with the terms hereof.

**7.2.4 Application to Debt**. Upon the occurrence and during the continuance of any Event of Default, any insurance proceeds and/or Award will be applied first to amounts owed to the Senior Lender, second to amounts owed to the Second Priority Lender and third to the payment of the Debt and subject to the payment of Prepayment Premium.

## 8. DEFAULTS

**8.1 Events of Default**. An "**Event of Default**" shall exist with respect to the Loan if any of the following shall occur:

(a) any portion of the Debt is not paid within ten (10) Business Days of the date on which such payment is due or Borrower shall fail to pay when due (including extensions and accommodations) any payment required hereunder other than Property Taxes;

(b) any of the Property Taxes are not paid when due (including extensions and accommodations), subject to OpCo's right to contest Property Taxes in accordance with Section 5.11 hereof

(c) the Policies are not kept in full force and effect, or are not delivered to Lender upon request, and Borrower fails to correct such failure to deliver the Policies within ten (10) Business Days of a notice from Lender;

(d) a Transfer other than a Permitted Transfer occurs;

(e) any certification, representation or warranty made by Borrower or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower, OpCo or Guarantor in connection with any Loan Document, shall be knowingly false or misleading in any material respect as of the date the representation or warranty was made, and to the extent Borrower becomes aware of such false or misleading statement Borrower shall promptly inform Lender;

(f) Borrower, OpCo or Guarantor shall make an assignment for the benefit of creditors, or shall generally not be paying its debts as they become due (including extension and accommodations);

(g) a receiver, liquidator or trustee shall be appointed for Borrower, or Guarantor; or Borrower or Guarantor shall be adjudicated as bankrupt or insolvent; or any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Guarantor, as the case may be; or any proceeding for the dissolution or liquidation of Borrower or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within 60 days;

(h) Borrower or OpCo breaches any covenant contained in Sections 5.3, 5.8, or 5.22; provided, however, any such breach shall not constitute an Event of Default (i) if such breach was inadvertent, immaterial and non-recurring, and (ii) if such breach is curable, Borrower cures such breach within ten (10) Business Days of written notice from Lender;

(i) except as expressly permitted hereunder, the alteration, improvement, demolition or removal of all or any portion of the Improvements without the prior written consent of Lender;

(j) a default (beyond applicable notice and cure periods) under any agreement creating a Lien or encumbrance on the Property (including any reciprocal easement agreement or other covenants, restrictions, easements, declarations or agreements of record relating to the construction, operation or use of the Property);

(k) the forfeiture of the Property, or any portion thereof;

(l) there shall have been rendered against Borrower a final non-appealable judgment and order for the payment of money in an aggregate amount exceeding $500,000 (to the extent not paid or covered by insurance or indemnities as to which the insurer or indemnifying party has not denied coverage thereof), and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of ninety-three (93) consecutive days;

(m) an Event of Default (beyond all applicable notice and cure periods) or Default as defined or described elsewhere in any other Loan Document occurs;

(n) [Intentionally omitted.]

(o) any breach, default or event of default occurs, and is continuing, with respect to the Senior Loan Documents after giving effect to any cure or grace periods provided therein; provided that, to the extent any such defaults or events of default are cured or otherwise waived or extended, such defaults or events of default shall automatically cure any Event of Default arising under this clause (o) as a result of such default or event of default;

(p) any breach, default or event of default occurs, and is continuing, with respect to any loan documents related to the Additional Funds after giving effect to any cure or grace periods provided therein; provided that, to the extent any such defaults or events of default are cured or otherwise waived or extended, such defaults or events of default shall automatically cure any Event of Default arising under this clause (p) as a result of such default or event of default;

(q) Borrower fails to secure a loan for the Additional Funds from a Second Priority Lender on or before the date that is 150 days after the Funding Date; provided the Lender and Lender's appointment to the Board of Managers worked in good faith to accommodate and facilitate the Borrower in securing the Additional Funds. If Borrower fails to satisfy the foregoing sentence, Borrower and OpCo will seek approval from the United States Department of Agriculture and Senior Lender as necessary to confirm that the Project may be completed without necessity of the Change Order Contract in accordance with the terms of the General Contract, if

requested by Lender based on Lender's determination that the Project may be completed without necessity of the Change Order;

(r) COD does not occur on the date that is twenty-five (25) months after the Funding Date; provided the Lender and Lender's appointment to the Board of Managers Of Borrower worked in good faith to accommodate and facilitate the Borrower in securing the Additional Funds; and

(s) a default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this Section 8.1, for ten (10) Business Days after notice to Borrower (and OpCo or Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default; provided, however, that if such non-monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period, and Borrower (or OpCo or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for an additional period of time as is reasonably necessary for Borrower (or OpCo or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed ninety -three (93) days.

Notwithstanding anything to the contrary herein, Lender may not commence remedies with respect to any Event of Default prior to the Funding Date. If an Event of Default exists that would cause the Funding Date to occur on a date after December 15, 2021 Lender or Borrower may terminate this Agreement in its sole and absolute discretion and if funding does not occur for any reason on or before December 15, 2021, Borrower may terminate this Agreement. If the Funding Date does not occur on or before December 15, 2021 other than as the result of an Event of Default or other failure of the conditions set forth in Section 2.1, Mirae will dismiss with prejudice Case No. A-21-838382-B in the District Court of Clark County. Nevada.

**8.2 Remedies. Acceleration**. Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in paragraph (f) or (g) of Section 8.1) and at any time and from time to time thereafter during the continuance of such Event of Default, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, upon notice of an Event of Default (after expiration of grace and cure periods) to Borrower, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property; including declaring the Debt to be immediately due and payable (including unpaid interest, Default Rate interest, Prepayment Premium, and any other amounts owing by Borrower); and upon any Event of Default described in paragraph (f) or (g) of Section 8.1, the Debt (including unpaid interest, Default Rate interest, Prepayment Premium, and any other amounts owing by Borrower) shall immediately and automatically become due and payable, in accordance with the Note subject to Borrower's applicable cure rights at law.

**8.2.1 Remedies Cumulative**. Upon the occurrence and continuation of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law, equity or contract may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared,

or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole and absolute discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Security Instrument has been foreclosed, the Property has been sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full. To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its sole and absolute discretion.

**8.2.2 Severance/Partial Foreclosure.**

(a) During the continuance of an Event of Default: (i) Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (and, in connection therewith, to bifurcate or otherwise modify the nature of the collateral that secures such notes) in such denominations and priorities of payment and liens as Lender shall determine in its sole and absolute discretion for purposes of evidencing and enforcing its rights and remedies; and (ii) Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance satisfactory to Lender (provided that this clause (ii) shall not obligate Borrower to provide additional collateral to secure obligations under the Note and the other Loan Documents). Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance provided for in the immediately preceding sentence, Borrower ratifying all that such attorney shall do by virtue thereof.

(b) During the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender, including the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of Principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments; or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of the sums secured by the Security Instrument and not previously recovered.

**8.2.3** **Delay**. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed necessary or advisable by Lender. A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power arising from or related thereto. Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Security Instrument to the extent necessary to foreclose on all or any portion of the Property, or any other collateral.

**8.2.4** **Lender's Right to Perform**. If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of ten (10) Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Security Instrument and other Loan Documents) and shall bear interest thereafter at the Default Rate.

## 9. [INTENTIONALLY OMITTED.]

## 10. MISCELLANEOUS

**10.1** **[Intentionally omitted.].**

**10.2** **Brokers and Advisors**. Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loan other than (i) Mirae Asset Daewoo Co., Ltd., or its successors, (ii) Paragon Construction Consulting, Inc., including Jeff Hall and Sung Hee Han, (iii) Doonbeg Partners LLC and (iv) Sung Hee Han ("**Borrower Brokers**"). Lender hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loan other than Sung Hee Han ("**Lender Broker**"). Each of Borrower and Lender represents and warrants that no other third party is being paid in connection with this Loan. Except for a fee equal to 1% of the loan amount to be paid by Borrower to Doonbeg Partners LLC, the full amount of Borrower's fee to be paid to Doonbeg Partners LLC, all of Borrower Brokers and Lender Broker shall be paid by Lender out of the amounts allocated to the fees set forth in Section 2.6; provided that if any of Borrower Brokers other than Doonbeg Partners LLC refuses payment of such fees or contests the amount of such fees or makes any other claims against a Lender Indemnified Party (defined below), Lender will thereafter indemnify Borrower as set forth herein. Lender shall provide Borrower with a statement setting forth an allocation of fees under this Section disclosing all United States Persons receiving any portion of the fees set forth in Section 2.6, directly or indirectly through payments from, by or under the direction of Lender Broker. Lender and Mirae Asset Securities Co., Ltd. hereby agree to indemnify and hold harmless Borrower and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners,

members, shareholders, participants, employees, professionals and agents of any of the foregoing and each other Person, if any, who Controls Borrower, its Affiliates or any of the foregoing (each, an "**Lender Indemnified Party**"), from and against any and all actual out-of-pocket liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "**Lender Indemnified Liabilities**") with respect to (A) any amounts owed to Borrower Brokers or Lender Broker other than Borrower's 1% fee payable by Borrower to Doonbeg Partners LLC and (B) any breach by Lender of its obligations pursuant hereto and the other Loan Documents. So long as Lender is defending all actions and paying all Lender Indemnified Liabilities on behalf of each Lender Indemnified Party, Borrower will not enter into any settlement agreement with any Borrower Brokers or Lender Broker or stipulate as to judgement in a brought by Borrower Brokers or Lender Broker without the consent of Lender and to the extent Borrower does so notwithstanding this sentence, Lender will have no obligation hereunder with respect to the amounts set forth in such settlement or related to such judgement. Any amounts payable to any Lender Indemnified Party by reason of the application of this paragraph shall be payable within ten (10) Business Days after written notice and shall bear interest at the Default Rate from the date loss or damage is sustained by any Lender Indemnified Party until paid. The provisions of this Section 10.2 shall survive the expiration and termination of this Agreement and the repayment of the Debt. At Borrower's sole option, in the event Lender does not pay amounts due under this paragraph within the ten (10) Business Day period, Borrower may use such amounts to offset amounts due under the Loan, without any application of a prepayment penalty.

**10.3** **Survival**. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement. All Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

**10.4** **Governing Law**. THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEVADA, AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEVADA, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEVADA, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS

CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED ACCORDING TO, THE LAW OF THE STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, THE LAW OF THE STATE OF NEVADA SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND THE DEBT. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA.

**10.5** **Arbitration**. Any dispute, claim or controversy, including tort claims, arising out of or relating to this Agreement or to the breach, termination, enforcement, interpretation or validity hereof, including the determination of the scope or applicability of this arbitration provision, shall be determined by arbitration in accordance with the JAMS Comprehensive Arbitration Rules and Procedures (the "**Rules**"). In the event of a conflict between such Rules and this Agreement, the provisions of this Agreement will control. The tribunal will consist of one arbitrator. The place of arbitration will be Las Vegas, Nevada. The language to be used in the arbitral proceedings will be English. The arbitrator shall be appointed pursuant to the Rules. The arbitrator shall, in the award, allocate all the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party or parties. The result of the arbitration will be final and binding on the parties, and judgment upon any award rendered by the arbitrator may be entered by any court having jurisdiction. The parties hereby agree not to appeal the result of the arbitration. The procedures set forth herein shall not preclude a party from seeking injunctive relief or other provisional remedies in aid of arbitration from a court of appropriate jurisdiction. The interpretation and enforceability of this section shall be governed exclusively by the Federal Arbitration Act, 9 U.S.C. Section 1, et seq.

**10.6** **Modification, Waiver in Writing**. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances. Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount. Lender shall have the right to

waive or reduce any time periods that Lender is entitled to under the Loan Documents in its sole and absolute discretion.

**10.7 Headings/Schedules**. The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. The Schedules attached hereto, are hereby incorporated by reference as a part of this Agreement with the same force and effect as if set forth in the body hereof.

**10.8 Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**10.9 Prior Agreements**. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**10.10 Preferences**. Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Debt. To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or in part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender. This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**10.11 [Intentionally omitted.]**

**10.12 [Intentionally omitted.]**

**10.13 Publicity**. All news releases, publicity or advertising through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender or any member of the Lender Group, or a Loan purchaser, shall be subject to the prior written approval of Borrower and Lender except to the extent disclosure is required to comply with applicable laws.

**10.14 No Usury**. Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 10.17 shall control every other agreement in the Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or

any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**10.15** **Conflict; Construction of Documents; Reliance**. In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation, drafting, execution and delivery of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan, without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or affiliate of Lender of any equity interest any of them may acquire in Borrower. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates. Lender agrees, on behalf of itself, its brokers, employees, advisors, managers or others it has shared Confidential Information with (including but not limited to, specifically Sung Hee Han), to maintain the confidentiality of all information and documentation related to Borrower or the Project that constitutes Confidential Information and that such information will not be used or disclosed by Lender except in connection with (A) enforcement of Lender's rights and remedies hereunder and pursuant to the Loan Documents, (B) permitted participation or assignments of Lender's interest in the Loan, (C) disclosures to Mirae Asset Securities Co., Ltd. or an Affiliate thereof (subject to such party agreeing to similar confidentiality provisions as set forth in this Section), or (D) disclosures to third parties to the extent required by law or order of a court of competent jurisdiction, provided that Borrower shall be given immediate notice and an opportunity to contest such disclosure, unless prohibited by law. "Confidential Information" means any and all information that is disclosed to, or learned by, the Lender, from or pursuant to discussions with management or employees of, or advisors to, the Borrower in connection with this Agreement and the Loan Documents that relates to the technology, assets, financial condition and prospects of the Borrower. Confidential Information includes financial statements, designs, drawings, prototypes, techniques, systems, formulae, research, research developments, inventions, discoveries,

engineering concepts, methods, trade secrets and processes, as well as technical, operating, cost, know-how, financial information, and all record-bearing media disclosing such information and techniques. Confidential Information does not include information that Lender can demonstrate (i) is or becomes publicly available through no wrongful act or breach of obligation of confidentiality by Lender; (ii) that was known by Lender prior to disclosure in connection with the Loan Documents; (iii) was developed by Lender independent of the disclosure made, and without breach by the Lender of its obligations, under this Section; or (iv) was rightfully received by Lender, without restriction on disclosure, from a third party that represents that it has a lawful right to disclose such information. Lender's duty of confidentiality shall survive termination of this Agreement.

**10.16 No Joint Venture or Partnership; No Third Party Beneficiaries**.

(a) Borrower and Lender intend that the relationships created under the Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b) The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than the Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**10.17 [Intentionally omitted.].**

**10.18 Assignment**. The Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may be pledged or participated by Lender and any of its successors and assigns to any Person without Borrower's or Guarantor's consent at any time in its discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise. The Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may not be assigned (other than with respect to the pledge described in the preceding sentence) or syndicated without Borrower's consent, which consent may not be unreasonably withheld or delayed; provided however the Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may be wholly-assigned to Mirae Asset Securities Co., Ltd., an entity organized under the laws of the Republic of Korea or any subsidiary thereof without the consent of Borrower or Guarantor. Upon any assignment consented to or otherwise permitted by this Section, all references to Lender in this Loan Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender. Borrower may not assign and/or delegate, as applicable, its rights, title, interests or obligations under this Loan Agreement or under any of the Loan Documents.

**10.19 Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

**10.20 Additional Funds**. Borrower and Lender acknowledge that the Loan constitutes bridge financing and that additional funding will be necessary to fully complete the Project. Lender will cooperate with all commercially reasonable requests to assist Borrower in obtaining the Additional Funds from third parties, including providing a reasonable, accurate and truthful estoppel regarding the Loan, at no cost or expense to Lender. Lender further agrees to consider, in a commercially reasonable manner, requests of the Second Priority Lender in the negotiation of the Additional Funds, including amendments to the terms of the Loan (including, but not limited to the terms of the subordination set forth below) and related agreements in connection with the receipt of the Additional Funds provided that such amendments do not change the financial return, tax consequences, collateral, or other material terms of the Loan; provided, however, that Lender will subordinate its liens to those of Second Priority Lender upon funding of the loan for the Additional Funds and will enter into an intercreditor agreement in form and substance reasonably acceptable to Lender, in connection therewith. Lender's subordination is subject to the following terms with respect to a loan of the Additional Funds:

(1) Maximum principal amount of $200,000,000;

(2) Maximum interest rate of 16%; and

(3) Minimum repayment term of 5 years from the funding date.

Borrower will use commercially reasonable efforts to cause Second Priority Lender to syndicate or assign a portion of the loan of the Additional Funds to Lender, Mirae Asset Securities Co., Ltd. or an Affiliate thereof in an amount not less than $20,000,000.

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

Ex. B
(SLA dated Nov. 29. 2021)

**IN WITNESS WHEREOF**, the parties hereto have caused this Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**
**RYZE RENEWABLES NEVADA, LLC**,
a Delaware limited liability company,

By: ______________________________
Name: Matthew G. Pearson
Title: Manager

Acknowledged and agreed:

**OPCO:**
**RYZE RENEWABLES LAS VEGAS, LLC**,
a Delaware limited liability company,

By: ______________________________
Name: Matthew G. Pearson
Title: Manager

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

Ex. B
(SLA dated Nov. 29. 2021)

**LENDER:**

**LV RENEWABLES A, LLC,**
a Nevada limited liability company

By: Mirae Asset Securities Co., Ltd.,
an entity organized under the laws of the
Republic of Korea, its Manager

By:______________________________ 1 December, 21
Kyunghyun Lee, Director

Acknowledged and agreed solely with respect to the indemnity set forth in Section 13.2 hereof:

**MIRAE ASSET SECURITIES CO., LTD.,**
an entity organized under the laws of the Republic
of Korea

By:______________________________ 1 December, 21
Kyunghyun Lee, Director



[illegible] 투자개발2본부 투자개발2팀/ 2021-12-01 [illegible]

**EXHIBIT A**
**Operating Budget**

[See attached.]

Ex. B
(SLA dated Nov. 29. 2021)

# 2022 Projected Operating Budget

| | | 2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | | | Q2 | | | Q3 | | | Q4 | | |
| | | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Dec-22 |
| 1. | All Staff Salaries | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) | (77,917) |
| 2. | All Staff Health Insurance and Benefits | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) | (15,583) |
| 3. | All Staff 401K | - | - | - | - | - | - | - | - | - | - | - | - |
| 4. | Rent / Utilities | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) | (15,417) |
| 5. | Other Overhead | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) | (11,250) |
| 6. | Ryze Normal T&E | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) |
| 7. | Normal Legal Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| 8. | Normal Accounting/Audit | (35,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| 9. | Deloitte Audit | (118,333) | (118,333) | (118,333) | - | - | - | - | - | - | - | - | - |
| 10. | Stancil Report | (65,000) | - | - | - | - | - | - | - | - | - | - | - |
| 11. | Legal Fees Lender B | (83,333) | (83,333) | (83,333) | - | - | - | - | - | - | - | - | - |
| 12. | SPAC/IPO Legal Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| 13. | Normal Consulting Fees | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) | (31,667) |
| 14. | Engineering Consulting Fees | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) | (8,500) |
| 15. | Other Transaction Consulting Fees | (228,000) | - | - | - | - | - | - | - | - | - | - | - |
| 16. | Board Fees | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) |
| 17. | D&O Insurance | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) | (20,833) |
| 18. | Filing Fees / Local Taxes etc. | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) | (19,333) |
| 19. | Accounts Payable Paydown | (80,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) | (45,125) |
| 20. | General Insurance | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) | (8,333) |
| 21. | Plant Maintenance / Repairs | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) | (17,333) |
| | **TOTAL** | **(848,458)** | **(490,458)** | **(490,458)** | **(288,792)** | **(288,792)** | **(288,792)** | **(288,792)** | **(288,792)** | **(288,792)** | **(288,792)** | **(288,792)** | **(288,792)** |

**NOTES:**

Note 1: Item 10 on the budget (Stancil Report) is subject to requests for information by the Senior Lender. If the Senior Lender requests additional reports or information from Stancil, the Senior Lender's independent engineer, this budget item shall be adjusted accordingly to cover any related cost or expense.

Note 2: Item 19 on the budget (Accounts Payable Paydown) relates to various accounts payable owed by the Company. The Company is in discussions regarding the reduction and/or extension of amounts due. This entry is subject to such discussions and the deferal shown above has not been approved. The largest payable includes $1,083,000 owed to Latham & Watkins. If Latham & Watkins will not agree to the proposed reduction / extension of amounts due, this budget item shall be adjusted.

Note 3: The loan agreement contains various obligations for the Company to make payments, maintain property, acquire insurance, and cover certain other costs and expenses. To the extent not already accounted for in the above, the budget shall be adjusted to cover such payments, costs and expenses as and when they arise.

Ex. B
(SLA dated Nov. 29. 2021)

# Exhibit A-1

| | Jan-22 | Feb-22 | Mar-22 | Total |
|---|---|---|---|---|
| | | | | |
| Rent / Utilities | (15,417) | (15,417) | (15,417) | (46,250) |
| Other Overhead | (11,250) | (11,250) | (11,250) | (33,750) |
| Ryze Normal T&E | (8,333) | (8,333) | (8,333) | (25,000) |
| Normal Accounting/Audit | (35,000) | (5,000) | (5,000) | (45,000) |
| Deloitte Audit | (118,333) | (118,333) | (118,333) | (355,000) |
| Legal Fees Lender B | (83,333) | (83,333) | (83,333) | (250,000) |
| Accounts Payable Paydown | (80,125) | (45,125) | (45,125) | (170,375) |
| General Insurance | (8,333) | (8,333) | (8,333) | (25,000) |
| Plant Maintenance / Repairs | (17,333) | (17,333) | (14,958) | (49,625) |
| TOTAL | (377,458) | (312,458) | (310,083) | (1,000,000) |

# EXHIBIT B
## Bring Down Certificate

## MANAGER CERTIFICATE
## OF
## RYZE RENEWABLES NEVADA, LLC

The undersigned, being all of the members of the Board of Managers (the "Board") of Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "Company"), hereby consent to, authorize, and approve, the following resolutions, effective as of the _____ day of December, 2021:

**WHEREAS,** a Loan Agreement in the aggregate principal amount of $21,000,000, by and between the Company (as the borrower) LV Renewables A, LLC, a Nevada limited liability company (as the lender), Ryze Renewables Las Vegas, LLC, a Delaware limited liability company and Mirae Asset Securities Co., Ltd., an entity organized under the laws of the Republic of Korea (the "Loan Agreement"), was executed on November 29, 2021. All capitalized but undefined terms used herein shall have the meaning given in the Loan Agreement.

**WHEREAS**, the Loan Agreement requires a manager of the Company to provide a certificate, dated the Funding Date, confirming that (i) no Default or Event of Default shall have occurred and be continuing on such date, (ii) there has been no change from the financial statements provided to Lender by the Company for the period ending September 30, 2021, and (iii) the Company has provided appropriate notice regarding any errors in the USDA consent letter dated as of September 29, 2021 to the Senior Loan's servicer and Senior Lender.

**WHEREAS**, the Funding Date under the Loan Agreement is December ____, 2021.

**NOW, THEREFORE, BE IT RESOLVED**, that, Matthew G. Pearson, the sole member of the Board of Managers as of the Funding Date, solely in his capacity as manager, hereby certifies (i) no Default or Event of Default shall have occurred and be continuing on such date, (ii) there has been no change from the financial statements provided to Lender by the Company for the period ending September 30, 2021, and (iii) the Company has provided appropriate notice regarding any errors in the USDA consent letter dated as of September 29, 2021 to the Senior Loan's servicer and Senior Lender..

[Remainder of Page Intentionally Blank]

**IN WITNESS WHEREOF**, the undersigned have executed this Manager Certificate as of the date first written above.

**MANAGER:**

By: ________________________________
Name: Matthew G. Pearson
Title: Manager

**EXHIBIT C**
**Operating Agreement**
**[See attached.]**

Ex. B
(SLA dated Nov. 29. 2021)

**AMENDED AND RESTATED**

**OPERATING AGREEMENT**

**OF**

**RYZE RENEWABLES NEVADA, LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

**Dated as of November 29, 2021**

---

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

---

Ex. B
(SLA dated Nov. 29. 2021)

**AMENDED AND RESTATED**
**OPERATING AGREEMENT**
**OF**
**RYZE RENEWABLES NEVADA, LLC**

THIS AMENDED AND RESTATED OPERATING AGREEMENT (as it may be amended and/or restated from time to time, this "Agreement") of RYZE RENEWABLES NEVADA, LLC, a Delaware limited liability company (the "Company"), is entered into and made effective as of January 1, 2021 (the "Effective Date") by and among the Company, and each of the undersigned members (the "Members"), each of whom owns a membership interest denominated in units in the proportions and representing a percentage interest in the Company as reflected on **Exhibit A** attached hereto and incorporated by reference herein.

Recitals

WHEREAS, on February 14, 2020, the Company was formed as a limited liability company under the Delaware Limited Liability Company Act, 6 Del. C. Section 18-101, et seq. (as amended from time to time, the "Delaware Act" or "Act") by filing a Certificate of Formation with respect thereto with the Secretary of State of the State of Delaware (the "Certificate of Formation"); and

WHEREAS, the Members desire to enter into this Agreement to state and restate the terms and conditions governing the relationship among the Members and the Company as set forth herein. and this Agreement amends, restates and replaces the Company's prior operating agreement dated January 1, 2021.

Agreement

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein made and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Members and the Company hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01 Definitions. The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided in this Agreement):

"Additional Funds" means an amount not less than $97,000,000.00 raised from one or more bona fide third party lenders (collectively, the "Second Priority Lender"), whether such funds come in the form of debt or equity.

"Affiliate" of a specified Person means any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person. For purposes of this definition, "control" (and its derivatives) means the possession,



\4842-5277-7983

directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of equity interests, contract or otherwise.

"Available Cash" shall means, with respect to any fiscal period, the amount of cash or marketable securities on hand, less a reserve amount necessary to maintain a balance sufficient to cover one calendar quarter of operating expenses of Borrower.

"Bankruptcy" means, with respect to a Member, that (i) such Member has (A) made an assignment for the benefit of creditors; (B) filed a voluntary petition in bankruptcy; (C) been adjudged bankrupt or insolvent, or had entered against such Member an order of relief in any bankruptcy or insolvency proceeding; (D) filed a petition or an answer seeking for such. Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation or filed an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Member in any proceeding of such nature; or (E) sought, consented to, or acquiesced in the appointment of a trustee, receiver or liquidator of such Member or of all or any substantial part of such Member's properties; (ii) one hundred twenty (120) days have elapsed after the commencement of any proceeding against such Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation and such proceeding has not been dismissed; or (iii) ninety (90) days have elapsed since the appointment without such Member's consent or acquiescence of a trustee, receiver or liquidator of such Member or of all or any substantial part of such Member's properties and such appointment has not been vacated or stayed or the appointment is not vacated within ninety (90) days after the expiration of such stay. A Member shall be deemed to be Bankrupt upon the occurrence of any of the foregoing events as to its parent or ultimate parent enterprise or its controlling person or persons.

"Board of Managers" or "Board" means the Board of Managers of the Company, organized and acting pursuant to Article IV.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks in Las Vegas, Nevada are closed.

"Capital Contributions" shall mean for any Member at the particular time in question the aggregate of the dollar amounts of any cash, or the Fair Market Value of any property, contributed to the capital of the Company, or, if the context in which such term is used so indicates, the dollar amounts of cash or the Fair Market Value of any property agreed to be contributed, or requested to be contributed, by such Member to the capital of the Company, including those made prior to the date hereof and as reflected as Initial Capital on Exhibit A.

"Cause" shall mean any of the following, as reasonably determined by the Board of Managers: (i) the prosecution via indictment of, or if a Manager has waived any requirement of prosecution by indictment, the charge of, a Manager for a felony; (ii) the theft, conversion, embezzlement or misappropriation by a Manager of funds or other assets of the Company or any of its Affiliates or any other act of fraud with respect to the Company or any of its Affiliates (including acceptance of any bribes or kickbacks or other acts of self-dealing); (iii) the violation by a Manager of any law regarding employment discrimination or sexual harassment; provided,

that any determination under this clause (iii) may only be made after a reasonable investigation of the alleged violation, which shall include an interview of such Manager; (iv) the failure by a Manager to comply with any material written policy generally applicable to the employees of the Company and its Affiliates, which failure, if reasonably susceptible to cure, is not cured within 30 days after written notice to such Manager; (v) the repeated failure by a Manager to follow the express directives the Board of Managers, which failure, if reasonably susceptible to cure, is not cured within 30 days after written notice to such Manager; or (vi) the Company's discovery that, prior to a Manager's employment with the Company or any of its Affiliates, such Manager engaged in conduct of the type described in clauses (i) through (iii) above. Notwithstanding the foregoing, with respect to clauses (iv) and (v), the Board of Managers shall not be obligated to provide more than one notice and opportunity to cure with respect to repeated or substantially similar circumstances. Notwithstanding the foregoing, if the Manager is party to an employment, severance-benefit, change in control or similar agreement with the Company or Affiliate of the Company that contains a definition of "Cause" (or a similar term), such definition will apply in lieu of the definition set forth above for so long as such agreement remains in effect.

"Chief Executive Officer" means the chief executive officer of the Company (or other person acting in such capacity) as appointed by the Board of Managers from time to time.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time, or the successor law of similar import in effect from time to time.

"Dispute" means any disagreement between the Members relating to this Agreement or the Company which they are unable to resolve through good faith efforts to reach a resolution lasting no less than ten (10) days following commencement of such dispute.

"Fair Market Value" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's-length transaction, as determined in good faith by the Board of Managers based on such factors as the Board of Managers, in the exercise of its reasonable business judgment, considers relevant.

"Fiscal Year" means the Company's Taxable Year.

"Loan Agreement" has the meaning set forth in Section 4.07(n).

"LV Renewables" has the meaning set forth in Section 4.01(b).

"Manager" means a voting member of the Board of Managers as described in Section 4.01.

"Majority Vote of the Managers" means the approval of more than fifty percent (50%) of the Managers.

"Majority Vote of the Members" means the approval of Members holding more than fifty percent (50%) of the then outstanding Membership Units.

"Member" means each Person identified on Exhibit A hereto as of the Effective Date who is a party to or is otherwise bound by this Agreement and each Person who may hereafter be admitted as a Member in accordance with the terms of this Agreement. The Members shall constitute the "members" of the Company.

"Membership Unit" means a unit representing a limited liability company interest in the Company, including the right of the holder thereof to any and all benefits to which a Member may be entitled pursuant to this Agreement (based on the class and/or series of such Membership Unit), together with the obligations of a Member to comply with all of the terms and provisions of this Agreement.

"Mirae Manager" has the meaning set forth in Section 4.01(b).

"Net Income or Net Loss" means, for any taxable year or month of the Company, the taxable income or loss, respectively, of the Company for Federal income tax purposes, except that (i) any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing taxable income or loss shall be added to such taxable income or subtracted from such loss, (ii) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treas. Reg. Section 1.704-l(b)(2)(iv)(i) and not otherwise taken into account under this definition shall be subtracted from such taxable income or added to such loss, (iii) any amount of gain or loss that would have been recognized by the Company if property distributed by the Company to the Members had instead been sold in a taxable disposition for its Fair Market Value at the time of distribution shall be taken into account, and (iv) items of income, gain, loss, and deduction (including depreciation, cost recovery, and amortization deductions) relating to property contributed to the Company by a Member, shall be computed in the manner prescribed by Treasury Regulation Section 1.704-1(b)(2)(iv)(g)(3). Except as otherwise provided in the regulations issued under Section 704(b) of the Code, such amounts shall be computed without regard to any basis adjustment for federal income tax purposes under Sections 732, 734 and 743 of the Code resulting from an election under Section 754 of the Code.

"Percentage Interest" means the percentage of the Membership Units held by a Member over the Membership Units held by all the Members.

"Permitted Transferee" means (i) any Person who is a Member of the Company, and any member, shareholder, officer, director, employee, trustee, beneficiary or other Affiliate of such Person, (ii) a consultant, employee or group of employees or Manager of the Company, (iii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company, (iv) an entity owned directly or indirectly by the Members of the Company in substantially the same proportion as their interests in the Company, or (v) any transferee of a Member for estate planning purposes.

"Person" means any individual, corporation, partnership, limited liability company, trust, joint venture, governmental entity or other unincorporated entity, association or group.

"Second Priority Lender" the bona fide third party lender that provides the Additional Funds.

"Super Majority Vote of the Managers" means the approval of at least seventy- five percent (75%) of the Managers.

"Taxable Year" means the Company's taxable year ending on December 31 (or part thereof in the case of the Company's first and last taxable year), or such other year as is required by section 706 of the Code or (ii) determined by the Board of Managers (if no year is so required by section 706 of the Code). The Board of Managers shall provide notice to each Member of any change to the Company's Taxable Year.

"Transfer" means any direct or indirect sale, transfer, conveyance, assignment, pledge, hypothecation, gift, delivery or other disposition.

"Treasury Regulations" means the final or temporary regulations that have been issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

Section 1.02 Interpretation. In construing this Agreement: (a) general words shall not be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words; (b) words importing the singular include the plural and vice versa, words importing a gender include every gender and references to persons include bodies corporate or unincorporated; (c) unless the context shall otherwise require, words using the singular or plural number shall also include the plural or singular number, respectively; (d) the words "include," "includes," "including" and words of similar import shall be deemed to be followed by the phrase "without limitation"; (e) unless the context shall otherwise require, any reference herein to any agreement or other instrument or statute or regulation is to such agreement, instrument, statute or regulation as amended and supplemented from time to time (and, in the case of a statute or regulation, to any successor provision); (f) unless the context otherwise provides, all pronouns used herein shall be deemed to refer to the masculine, feminine or neuter gender as the context requires; (g) all references in this Agreement to Section or Exhibit (or similar references) shall be deemed to be references to sections of, or exhibits to, this Agreement unless the context otherwise requires; and (h) the table of contents and the captions and other headings contained in this Agreement have been included for convenience of reference only and shall not, in any way, be construed as part of this Agreement or as limitations on the scope of the particular sections, clauses, paragraphs or other subdivisions to which they refer and shall not affect the interpretation or meaning of this Agreement.

## ARTICLE II

## ORGANIZATION OF THE COMPANY

Section 2.01 Formation.

(a) The Certificate of Formation was prepared, executed and filed with the Secretary of State of the State of Delaware on February 14, 2020, all of which is hereby authorized and ratified in all

respects. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision under the Delaware Act, this Agreement shall, to the extent permitted by the Delaware Act, control.

(b) The Company shall, to the extent permissible, elect to be treated as a partnership for United States federal, state and local income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Company shall not be deemed a partnership or joint venture for any other purpose.

Section 2.02 Name. The name of the Company is "RYZE RENEWABLES NEVADA, LLC" or such other name or names as the Board of Managers may from time to time designate; provided that the name shall always contain the words "Limited Liability Company," "LLC" or "L.L.C."

Section 2.03 Registered Office and Registered Agent; Places of Business.

(a) The Company shall maintain a registered office in the State of Delaware at Cogency Global, Inc., 850 New Burton Road, Suite 201, Dover, Delaware 19904, or such other office within the State of Delaware as determined by the Board of Managers. The Company's registered agent at such address shall be Cogency Global, Inc. or such other agent as determined by the Board of Managers.

(b) The Company shall maintain an office and principal place of business at such place inside or outside the State of Delaware as may from time to time be determined by the Board of Managers. The Company may also conduct business at such other places as the Board of Managers may from time to time determine to be required by the operations of the Company.

Section 2.04 Term. The term of existence of the Company shall be perpetual from the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware, unless the Company is dissolved, wound up and terminated in accordance with the provisions of this Agreement.

## ARTICLE III

## PURPOSE AND POWERS OF THE COMPANY

Section 3.01 Purpose and Powers of the Company.

(a) The Company is formed for the purpose of, and the nature of the business to be conducted by the Company is, any lawful business activity whatsoever (except the insurance or banking business), and engaging in any activities necessary, appropriate, desirable, advisable, ancillary, convenient or incidental thereto.

(b) In furtherance of its purposes, the Company shall have all powers necessary, suitable or convenient for the accomplishment of its purposes, alone or with others, including the ability to incur and guaranty indebtedness.

(c) The Company shall comply with any and all governmental requirements applicable to it, including the making of any and all necessary or advisable governmental registrations. No Member shall take, or cause any of its Affiliates to take, any action that would, or otherwise cause the Company to, violate any governmental requirements or registrations applicable to the Company.

(d) Upon a breach of this Agreement by, or the Bankruptcy of, a Member, or in the case of any indebtedness of any Member to the Company, the Company shall, subject to applicable law, have the right to set off the amount that such Member owes to the Company under this Agreement or otherwise and the amount of any losses, cost or expenses incurred or projected to be incurred by the Company in connection with a breach or Bankruptcy (including, without limitation, attorneys' fees and expenses and any diminution in value of any Company asset and including in each case both monetary obligations and the Fair Market Value of any non-cash item and amounts not yet due or incurred) against any amounts that it owes to such Member under this Agreement or otherwise, or to reduce the distributions (quarterly or otherwise) of such Member by any such amount.

## ARTICLE IV

## MANAGEMENT AND OPERATION OF THE COMPANY

Section 4.01 Board of Managers.

(a) The business and affairs of the Company shall be managed by or under the direction of the Board of Managers. Each member of the Board of Managers shall be deemed to be a "manager" for purposes of the Delaware Act and the Board of Managers shall take all actions for and on behalf of the Company not otherwise provided for elsewhere in this Agreement. No Member shall have any rights or powers beyond the rights and powers granted to such Member in this Agreement. Members need not be residents of the State of Delaware.

(b) The Board of Managers from and after the date hereof shall consist of three (3) managers to be appointed by a Majority Vote of the Members. Notwithstanding the foregoing, so long as any amounts are due and outstanding under the Loan Agreement , Mirae Asset Securities Co., Ltd., an entity organized under the laws of Republic of Korea ("Mirae Manager"), the manager of LV Renewables A, LLC, a Nevada limited liability company (together with its permitted successors and assigns pursuant to the Loan Agreement, "Mirae") shall have the right to appoint one (1) manager to the Board and the right to appoint an individual who is permitted to attend and participate in meetings of the Board and who shall receive information provided to the Board, but such individual is not entitled to vote on matters submitted to the Board for a vote (an "Observer"); provided, that as soon as the Additional Funds are contributed (as debt or equity), the Second Priority Lender shall have the right to remove and replace the Manager appointed by Mirae Manager, or if the Second Priority Lender fails to exercise this right, a Majority Vote of the Members shall have the right to remove and replace the Manager appointed by Mirae Manager. The number of Managers serving on the Board of Managers may be increased at any time by a unanimous vote of the Members and such positions may be filled by a Majority Vote of the Members. Each Manager shall serve until a replacement Manager is elected. The initial Board of Managers shall be:

| Name | Appointment |
|---|---|
| Matthew G. Pearson | Manager appointed by Ryze Holdings |

| | |
|---|---|
| Kevin McDonough | Manager appointed by Ryze Holdings |
| Seung-Hwan Oh (subject to completion of background check as provided in (c) below) | Manager appointed by Mirae Manager |
| Junghan Kim (subject to completion of background check as provided in (c) below) | Observer Seat Appointed by Mirae Manager |

(c) Each Manager may be removed and replaced by the party responsible for appointing such Manager or by a Majority Vote of the Members for Cause; provided that upon payment of all amounts due and outstanding under the Loan Agreement, the Manager and Observer appointed by Mirae Manager may be removed by a Majority Vote of the Members without Cause. Any Manager may resign from his or her position on the Board of Managers at any time by notice to the Board of Managers. Such resignation shall be effective as set forth in such notice, but not earlier than the date of delivery of such notice. The successor to any resigning Manager shall be named by the party who appointed such resigning Manager; provided that after payment of all amounts due and outstanding under the Loan Agreement, such successor shall be appointed by a Majority Vote of the Members. Any replacement Manager or Observer must (A) submit to a background check by a qualified and reputable background check company to confirm that such replacement has not previously committed an act that would constitute Cause under subsection (i) of the definition thereof or an action in connection with a prior employment or managerial position that would constitute Cause if it had been done while managing or employed by the Company and (B) otherwise not be rejected for coverage by the Company's insurance provider with respect to the Company's directors and officers insurance policy, to ensure the replacement Manager/Observer is qualified to serve and does not pose a risk to the business of the Company.

(d) Chairman of the Board of Managers. A Chairman of the Board of Managers (the "Chairman") may be appointed by the Board of Managers. The Chairman may be removed from his/her position as Chairman by vote of the Board of Managers. The Chairman shall preside at all meetings of the Board of Managers and at all meetings of the Members at which he/she is present.

(e) Fiduciary Duties and Liability of Managers. No Manager, in his capacity as such, shall owe any fiduciary duty to the Company or its Members (other than any duty to act as specified in the following sentence of this Section 4.0l(f)). Managers shall owe a duty of care and loyalty to the Company to the limited extent that no Manager may undertake any action that would be willfully intended to damage the business or assets of the Company, engage in bad faith in connection with the Company's efforts to secure the Additional Funds, or without the approval of the Super Majority of the Managers, that involves self-dealing that is not in the best interest of the Company and intended to effect a benefit not ratably shared among the Members as contemplated herein as to any assets or business of the Company.

Section 4.02 Meetings of the Board of Managers.

(a) Time and Place; Notice. Regular meetings of the Board of Managers shall be held at such times and places as shall be agreed by the Board of Managers. Notice of and agendas for all regular meetings shall be provided to all members of the Board of Managers at least three (3) Business Days prior to the date of such meetings. Special meetings of the Board of Managers may be called at such times and places, and in such manner and for such purpose, as

any two (2) Managers deem necessary by notice to all remaining Managers of the date, location, purpose and agenda for such meeting at least three (3) Business Days prior to the date of such meeting, unless circumstances warrant shorter notice being given; provided that all meetings will provide an option for Managers to participate via teleconference or equivalent means as set forth in Section 4.02(c) hereof to the extent such Manager cannot appear in person. In the event that one of the members of the Board of Managers is not able to attend a regular meeting or special meeting of the Board of Managers, such member may designate a representative to attend such meeting on his/her behalf, who, for the purpose of such meeting and such meeting only, shall act solely as an observer with respect to the proceedings of such meeting. For a meeting called for the purpose of discussing additional capital contributions to the Company, the notice of such meeting shall state that it is being called for that purpose.

(b) Quorum. A majority of the Managers then in office shall constitute a quorum for purposes of transacting business at any meeting of the Board of Managers. If, however, such quorum shall not be present at any meeting of the Board of Managers, the Managers present at such meeting shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.

(c) Electronic Communications. Managers may participate in any meeting of the Board of Managers by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other and such participation in a meeting shall constitute presence in person at the meeting.

(d) Action by Written Consent. Any action required or permitted to be taken at a meeting of the Board of Managers may be taken without a meeting if a consent in writing, setting forth the action so taken, shall have first been sent to all Managers in advance for review and is thereafter signed by all of the Managers then in office.

Section 4.03 Manner of Acting; Power to Bind the Company. Except as required by the Delaware Act or as otherwise required by this Agreement, all actions of the Board of Managers shall require the Majority Vote of the Managers unless such action requires a Super Majority Vote of the Managers or unanimous vote of the Managers as specifically set forth in this Agreement. Each Manager shall be entitled to one (1) vote on all matters submitted to the Board of Managers. Except as otherwise required by this Agreement, no Manager (acting in his capacity as such) shall have any authority to bind the Company to any third party with respect to any matter, except pursuant to a resolution expressly authorizing such action, which resolution is duly adopted by the Board of Managers by the affirmative vote of the majority of the Managers then in office.

Section 4.04 Officers of the Company.

(a) Appointment of Officers. The Board of Managers may appoint individuals as officers ("officers") of the Company, which may include a Chief Executive Officer and such other officers as the Board of Managers deems advisable. No officer need be a Member. An individual may be appointed to more than one office. No officer of the Company shall have any rights or powers beyond the rights and powers granted to such officer in this Agreement or by resolution of the Board of Managers adopted in accordance with this Agreement.

(b) Duties of Officers Generally. The Board of Manager by resolution may delegate to the officers the power to manage and control and make all decisions affecting the day-to-day business, operations and affairs of the Company to take all such actions as they deem necessary or appropriate to accomplish the foregoing; provided, however, that unless such power is specifically delegated to the officer in question either for a specific transaction or generally, no such officer shall have the power to lease or acquire real property, to borrow money, to issue notes, debentures, securities, equity or other interests of or in the Company, to make investments in (other than the investment of surplus cash in the ordinary course of business) or to acquire securities of any Person, to give guarantees or indemnities, to merge, liquidate or dissolve the Company, to sell or lease all or any substantial portion of the assets of the Company, to contractually commit the Company to financial commitments that are material to the Company or to establish or to adopt the annual budget and operating plan of the Company and provided further that no such delegation by the Board of Managers will cause the Persons constituting the Board of Managers to cease to be a "manager" of the Company within the meaning of the Act. In addition, the officers shall have such other powers and duties as may be prescribed by the Board of Managers from time to time or by this Agreement.

(c) Authority of Officers. Subject to Section 4.04(b), any officer of the Company shall have the right, power and authority to transact business in the name of the Company or to act for or on behalf of or to bind the Company. With respect to all matters within the ordinary course of business of the Company, third parties dealing with the Company may rely conclusively upon any certificate of a Manager (other than the officer in question) to the effect that such officer is acting on behalf of the Company.

(d) Removal, Resignation and Filling of Vacancy of Officers. The Board of Managers may remove any officer, for any reason or for no reason, at any time. Any officer may resign at any time by giving written notice to the Board of Managers, and such resignation shall take effect at the date of the receipt of that notice or any later time specified in that notice; provided that unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. A vacancy in any office because of death, resignation, removal or otherwise shall be filled in the manner prescribed in this Agreement for regular appointments to that office.

(e) Chief Executive Officer Powers and Duties. The Chief Executive Officer, if one is elected, shall have general supervision over the day-to-day business, operations and affairs of the Company and shall perform such duties and exercise such powers, and shall have such duties to the Company, as are incident to the office of chief executive officer of a corporation organized under the General Corporation Law of the State of Delaware; provided, that the Chief Executive Officer may not take, or authorize any officer to take, any action that conflicts with this Agreement or any resolution of the Board of Managers or requires the vote of a Super Majority of the Board of Managers or unanimous vote of the Board of Managers. The Chief Executive Officer shall have such other powers and perform such other duties as may from time to time be prescribed by the Board of Managers. The Chief Executive Officer shall devote sufficient time to carry out the management and the affairs of the Company. If there is no Chief Executive Officer, these powers described in this paragraph shall be exercised by the Board of Managers. The Chief Executive Officer of the Company as of the date hereof is Matthew G. Pearson.

(f) Other Officers. All other officers of the Company shall have such powers and perform such duties and shall have such duties to the Company as may from time to time be prescribed by the Board of Managers and such other officers shall be entitled to receive compensation from the Company as determined by the Board of Managers; provided, that no such officer may take, or authorize any other officer to take, any action that conflicts with this Agreement or any resolution of the Board of Managers or requires the vote of a Super Majority of the Board of Managers or unanimous vote of the Board of Managers.

Section 4.05 Performance of Duties: Liability of Managers and Officers. In performing his duties, each of the Managers and the officers shall be entitled to rely in good faith on the provisions of this Agreement and on information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Company or any facts pertinent to the existence and amount of assets from which distributions to Members may properly be paid), of the following other Persons or groups: (a) one or more officers or employees of the Company; (b) any attorney, independent accountant, or other Person employed or engaged by the Company; or (c) any other Person who has been selected with reasonable care by or on behalf of the Company, in each case, as to matters which the Company reasonably believes to be within such Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Delaware Act. Except in the case of fraud, gross negligence or willful misconduct, no individual who is a Manager or an officer of the Company, shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise, solely by reason of being a Manager or an officer of the Company, as applicable.

Section 4.06 Actions Requiring a Super Majority Vote of the Managers. Each of the actions set forth below shall require a Super Majority Vote of the Managers.

(a) To merge or consolidate the Company with any Person, agree to an exchange of interests with any other Person or cause the Company to make any other fundamental change, subject to any tag along rights contained herein;

(b) To issue additional Membership Units or admit new or substitute Members of the Company;

(c) To approve a Transfer of Membership Units, other than to a Permitted Transferee;

(d) To borrow or loan any amounts in excess of $10,000,000.00 except as specifically otherwise provided herein; or

(e) To cause the Company to dissolve or liquidate.

Section 4.07 Actions Requiring the Consent of all of the Managers. Each of the actions set forth below shall require the consent of all of the Managers.

(a) To amend or modify this Agreement of the Company, including any such amendment or modification that would (i) increase any obligations or liabilities of any Member,

(ii) expand or reduce the rights of any Member thereunder, (iii) alter the voting and approval mechanics and thresholds set forth therein or (iv) remove the new unit issuance right of first offer in favor of existing Members.

(b) To approve or otherwise reject any action that involves self-dealing

(c) To enter into any transaction with a Member or Affiliate of a Member;

(d) To make any distribution to a Member not in accordance with Section 8.01.

(e) To amend or modify the Certificate of Formation or change the name of the Company.

(f) To approve the sale of Membership Interests without offering each Member a right of first refusal.

(g) To approve a sale of the majority of Membership Interests without offering each Member tag along rights.

(h) To approve a sale of all of the Membership Interests or substantially all of the assets of the Company of any of its Affiliates including, but not limited to Ryze Renewables II, LLC, a Delaware limited liability company and Ryze Renewables Las Vegas, LLC, a Delaware limited liability company.

(i) To amend the liquidation or dissolution proceedings of the Company.

(j) To change the Governing Law, or the purpose and powers, of the Company.

(k) To guarantee indebtedness of another Person.

(l) To approve a subsidiary (including but not limited to Ryze Renewables II, LLC, a Delaware limited liability company ("Ryze II") and Ryze Renewables Las Vegas, LLC, a Delaware limited liability company ("Ryze LV")) to obtain a loan, except as permitted in subparagraph (p), below.

(m) To approve the Operating Budget (as that term is defined in that certain Loan Agreement between the Company and LV Renewables (the "Loan Agreement")).

(n) To approve any material change to the Project (as that term is defined in the Loan Agreement).

(o) To approve any change orders with respect to the Project, additional indebtedness, or liens (on the assets of the Company or the assets of the Company's subsidiaries); provided, that the Managers agree that the Additional Funds are required to be obtained through a loan or otherwise and the Managers shall seek the loan that is best for the Company in the business judgement of the Managers. In the event Mirae or any Affiliate of Mirae Manager seeks to make a loan of the Additional Funds, the Manager appointed by Mirae Manager shall not have the ability to vote on the approval of such loan due to conflicts of interest and a vote of the remaining

Managers will be sufficient to approve such loan. If the Manager appointed by Mirae Manager acts in bad faith with respect to requests for Manager to consent to a loan or loans of the Additional Funds, such Manager may be removed from the Board of Managers by a Majority Vote of the Members; provided, that until Mirae Manager replaces such Manager as provided herein any subsequent vote regarding a loan of the Additional Funds will require a vote of the Observer as if the Observer were appointed as Manager by Mirae Manager. If the Observer appointed by Mirae Manager acts in bad faith with respect to requests for Observer to consent to a loan or loans of the Additional Funds, such Observer may be removed from the Board of Managers by a Majority Vote of the Members, and, if a replacement Mirae Manager has not been approved within ten (10) Business Days after notice of such removal, the remaining Managers may approve such loan or loans of the Additional Funds.

(p) To change the Tax Matters Member.

Section 4.08 4.08 Actions Requiring a Majority Vote of the Managers. Each of the actions set forth below shall require a Majority Vote of the Managers.

(a) All actions not specifically requiring a Super-Majority Vote of the Managers or the unanimous vote of the Managers, including but not limited to each of the following:

(i) To appoint and replace Managers of the Board of Managers who resigned and were not replace by the appointing party, if applicable and if an only if, such appointing party has not replaced a Manager within sixty (60) days after such Manager's date of resignation.

(ii) To appoint the Chairman of the Board.

(iii) To appoint and remove officer of the Company and delegate day-to-day decision making of such persons.

Section 4.09 Outside Investments and Activities. No member of the Board of Managers may engage or invest in other businesses or activities that violate or infringe on any intellectual property licensed by the Company. Nothing contained herein shall restrict any member of the Board of Managers from engaging in outside activities; provided that any such activities do not detract from the member's duty owed to the Company or cause any damage or harm to the Company's name and reputation.

## ARTICLE V

## MEMBERS; VOTING RIGHTS

Section 5.01 Meetings of the Members.

(a) Generally. Meetings of the Members may be called by any Member. All meetings of the Members shall be held telephonically or in person at the principal office of the Company or at such other place as may be determined by the Member calling the meeting and set

forth in the respective notice of such meeting. A record shall be maintained by the Company of each meeting of the Members.

(b) Notice of Meetings of the Members. Notice of meetings of the Members briefly stating the purpose, time and place of the meeting shall be delivered not less than fourteen (14) days, but not more than sixty (60) days, before the date of the meeting to each Member (with a copy to the Company) by or at the direction of the Member calling the meeting. Any Member may waive such notice requirement as to itself. Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. All Members meetings will provide an option for Members to participate via teleconference or equivalent means as set forth in Section 5.01(f) hereof to the extent such Manager cannot appear in person

(c) Quorum. Except as otherwise provided herein or by applicable law, at any time, the presence of all Members, represented in person or by proxy, shall constitute a quorum at a meeting of the Members for purposes of conducting business. Once a quorum is present at the meeting of the Members, the subsequent withdrawal from the meeting of any Member prior to adjournment or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting. If, however, such quorum shall not be present at any meeting of the Members, the Members entitled to vote at such meeting shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. Any adjourned meeting may be reconvened with at least five (5) Business Days' notice to the Members. Except as otherwise required by applicable law, resolutions of the Members at any meeting of Members shall be adopted by the affirmative vote of the majority of the Members.

(d) Actions without a Meeting. Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting and without a vote if a consent or consents in writing (including by email), setting forth the action so taken, shall be signed by those Members able to approve such action if the vote were taken at a meeting of the Members; provided, that for such purposes an electronic signature shall be valid. A record shall be maintained by the Company of each such action taken by written consent of the Members.

(e) Voting. Each Member shall have the right to vote its Membership Units at regular or special meetings of the Members and to give written consent with respect to such Membership Units, in each case, in accordance with the provisions of this Agreement, including the provisions for establishing the Board of Managers and electing Managers, with each Membership Unit entitled to one (1) vote.

(f) Electronic Communications. Members may participate in any meeting of the Members by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other and such participation in a meeting shall constitute presence in person at the meeting

Section 5.02 Registered Members. The Company shall be entitled to treat the owner of record of any Membership Units as the owner in fact of such Membership Unit for all purposes,

and accordingly shall not be bound to (although it may if it chooses to do so) recognize any equitable or other claim to or interest in such Membership Unit on the part of any other Person, whether or not it shall have notice of such claim or interest, except as expressly provided by this Agreement or the laws of the State of Delaware.

Section 5.03 Limitation of Liability. No Member shall be obligated personally for any debt, obligation or liability of the Company or other Members by reason of being a Member, whether arising in contract, tort or otherwise. Except as otherwise provided in the Delaware Act, by applicable law or in this Agreement, no Member shall have any fiduciary or other duty to another Member with respect to the business and affairs of the Company. No Member shall have any responsibility to contribute to or in respect of the liabilities or obligations of the Company or return distributions made by the Company.

Section 5.04 Withdrawal; Resignation. No Member may withdraw or resign from the Company. A Member shall cease to be a member of the Company as a result of a permitted Transfer of all of such Member's Membership Units in accordance with this Agreement and the transferee(s) of such Membership Units being admitted to the Company as substituted Members. Following such cessation, a Member shall, except as expressly provided in this Agreement, have no rights or obligations under this Agreement.

Section 5.05 Authority. Except as otherwise provided in this Agreement, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind the Company.

Section 5.06 Outside Investments and Activities. No Member may engage or invest in other businesses or activities that violate or infringe on any intellectual property licensed by the Company. Nothing contained herein shall restrict any Member from engaging in any outside activities; provided that any such activities do not cause any damage or harm to the Company's name and reputation.

Section 5.07 Confidentiality.

(a) Each Member recognizes that Confidential Information has been and shall be disclosed to such Member by the Company and its Affiliates. Each Member agrees not to (whether or not at the time, a Member of the Company or providing services to the Company and/or any of its subsidiaries) (i) disclose such Confidential Information to any third party without the prior written consent of the Company except as, and to the extent, required by applicable laws and regulations and (ii) use such Confidential Information other than for the purpose of the Company's business or evaluating and monitoring such Member's affiliation with, or investment in, the Company or in connection with the discharge of any duties to the Company or to any of its Affiliates such Member may have in its capacity as such; provided, however, that Ryze LV licenses certain intellectual property from Ryze Holdings and nothing contained herein shall restrict Ryze Holdings' ability to use such intellectual property. Notwithstanding any other provision herein to the contrary, each Member agrees that money damages may not be a sufficient remedy for any breach of this Section 5.07 by such Member, and that in addition to all other remedies, the Company shall be entitled to seek injunctive or other equitable relief as a remedy for any such breach. Each Member agrees to waive any requirement for the securing or posting of any bond in connection with such remedy. As used herein "Confidential Information" means all information,

knowledge, systems or data relating to the business, operations, clients or finances of the Company or any of its subsidiaries including any of the terms of this Agreement or similar document obtained from the Company or any person acting on behalf of the Company, except for information which at the time of disclosure was in the public domain, unless such information was placed into the public domain by such Member in violation of any non-disclosure obligation owed to the Company, including this Section 5.07, information that was known to or developed by the party independent of his association with the Company, or information that was known by or in the possession of the party prior to such information being received from the Company.

(b) In the event that any third party requests Confidential Information from a Member (whether during the period he, she or it is a Member or during the one-year period following the date that such Member ceases for any reason to be a Member) regarding any matter related to such Member's affiliation with the Company or with respect to his, her or its role as a Member, he, she or it shall, to the extent permitted by applicable Law, contact and notify the Company before providing any such Confidential Information, so that the Company may take appropriate action to protect its interest. However, a Member shall have no obligation to contact and notify the Company prior to any such discussions between the Member and such Member's legal counsel or his or her certified public accountant. Notwithstanding anything to the contrary contained herein, a Member may, without notice to or consent from the Company, any of its Affiliates or any Member disclose (i) such information if requested by any governmental, regulatory or self-regulatory agency or authority having jurisdiction over the Member or any of its Affiliates, and (ii) the legal and economic terms of the Member's affiliation with the Company, provided that the recipient is a current or potential advisor, investment banker, investor, joint venture partner, lender, equity owner or managerial employee or director, officer or manager of the Member that is under a contractual or other obligation of confidentiality to the Member.

In the event that a Member is subpoenaed, or asked, to testify as a witness or to produce documents in any legal or administrative or other proceeding related to the Company (whether during the period he, she or it is a Member or during the one-year period following the date that such Member ceases for any reason to be a Member), he, she or it shall, to the extent permitted by applicable Law, notify the Company of such subpoena or request.

## ARTICLE VI

## MEMBERSHIP UNITS; MEMBERSHIP

Section 6.01 Membership Units Generally. The limited liability membership interests of the Members shall be represented by issued and outstanding Membership Units.

Notwithstanding the foregoing, no additional members are contemplated to be admitted to the Company and any additional membership interests shall only be created by the Board of Managers, subject to the restrictions set forth herein. As of the date hereof, the Company shall have one class of Membership Units outstanding, all of which are issued to the Members in the denominations set forth on Exhibit A. The Company shall maintain a schedule of all Members from time to time, their respective mailing addresses and the Membership Units held by them (the "Member Schedule"), a copy of which as of the date hereof is attached hereto as Exhibit A. The Board of Managers shall update the Member Schedule as required by the Delaware Act and ensure

that it accurately reflects the information to be provided for therein. Any amendment or revision to the Member Schedule made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Any reference to the Member Schedule shall be deemed to be a reference to the Member Schedule as amended and in effect from time to time. Ownership of a Membership Unit (or fraction thereof) shall not entitle a Member to call for a partition or division of any property of the Company or for any accounting.

Section 6.02 Authorization and Issuance of Membership Units. The Company is hereby authorized to issue up to a maximum of 500,000,000 Membership Units, of which 415,800,416 Membership Units shall be and hereby are issued to those Members, in those numbers and in exchange for those Capital Contributions set forth opposite each Member's name on the Member Schedule attached hereto as Exhibit A (as in effect on the Effective Date). The Membership Units are voting units.

Section 6.03 Authorization and Issuance of Other Membership Units. No other membership units are authorized unless such authority is unanimously approved by the Board of Managers, in which case this Agreement shall be amended to authorize such units and to designate the rights, preferences and obligations associated with such additional membership interests.

Section 6.04 Issuance of Additional Membership Units. Subject to the limitations contained in this Article VI and Section 12.05(a), the Company with the approval of a Super Majority Vote of the Board of Managers shall have the right to issue any authorized, but unissued Membership Units; provided, that the Company shall not issue any Membership Units to any Person unless such Person has executed and delivered to the Company the document described in Section 6.05, and provided further that no additional Membership Units may be issued with voting rights unless this Agreement is amended to accommodate the additional voting rights. Moreover, no Membership Units may be issued unless the subject Membership Units are first offered to all Members, pro rata in proportion to their relative Percentage Interest, on the terms proposed for issuance to any third party or other Member, and the Members have at least ten (10) Business Days to accept and pay for said Membership Units on the same terms.

Section 6.05 New Members from the Issuance of Membership Units. In order for a Person to be admitted as a Member of the Company pursuant to the issuance of Membership Units to such Person, such Person shall have executed and delivered to the Company a written undertaking to be bound by the terms and conditions of this Agreement substantially in the form approved by the Managers. Upon the amendment of the Member Schedule by an officer of the Company and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Membership Units, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his or its Membership Units.

Section 6.06 Certification of Membership Units. The Company may but is not required to issue certificates to the Members representing the Membership Units held by any such Member.

## ARTICLE VII

## CAPITAL CONTRIBUTIONS

Section 7.01 Capital Contributions.

(a) The Members have made Capital Contributions to the Company in exchange for the issuance by the Company of the number of Membership Units set forth on Exhibit A opposite their respective names. The Members shall not be required at any time to make additional Capital Contributions to the Company; provided, however, that the Members hereby acknowledge that the Company may offer additional membership interests for sale and the failure of a Member to purchase and pay for additional Membership Interests, whether pursuant to the terms of Section 6.04 of this Agreement, or otherwise, may result in the dilution of the Member's Percentage Interest.

(b) The provisions of this Section 7.01 are not for the benefit of any creditor or other Person other than the Company and the Members, and no creditor or other Person shall obtain any rights under this Section 7.01 or by reason of this Section 7.01, or shall be able to make any claim in respect of any debts, liabilities or obligations against the Company or any Member.

Section 7.02 Loans from Members. The amount of any loans by Members to the Company shall not be considered Capital Contributions.

Section 7.03 Status of Capital Contributions.

(a) No Member shall receive any interest, salary or drawing with respect to its Capital Contributions, except as otherwise specifically provided in this Agreement.

(b) Except as otherwise provided herein, no Member shall be required to lend any funds to the Company or to make any additional Capital Contributions to the Company, and no Member shall have any personal liability for the repayment of any Capital Contribution of any other Member.

## ARTICLE VIII

## DISTRIBUTIONS

Section 8.01 Generally.

(a) No Member shall be entitled to receive any distributions from the Company except as expressly provided in this Agreement.

(b) Notwithstanding anything herein to the contrary, the Board of Managers shall cause the Company to make annual tax distributions to the Members based upon Net Income for the Taxable Year and an assumed tax rate equal to the maximum marginal combined federal and State income tax rate (calculated taking into account the deductibility of state and local taxes for Federal income tax purposes). Such distributions shall be made to all of the Members simultaneously and in proportion to their relative shares of taxable income for such period.

(c) Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distributions to Members if such distributions would violate the Delaware Act or other applicable law.

Section 8.02 Mandatory Distributions. Subject to distributions pursuant to Section 8.0l(b) above, Available Cash shall be distributed in the following order:

(a) First, to pay debt service or other amounts due and payable to the Second Priority Lender in connection with the Additional Funds;

(b) Second, to pay debt service due with respect to the Loan (as that term is defined in the Loan Agreement) and to pay all other amounts to be paid in accordance with the Loan Documents (as defined in the Loan Agreement) .

(c) Third, to pay any Second LV Renewables Put Option Deferred Amount (as that term is defined in the Option Agreement);

(d) Fourth, the remaining amounts of Available Cash shall be reserved or distributed at such times and in such amounts as the Board of Managers determines in its sole discretion, to the Members, pro rata in proportion to their relative Percentage Interest.

Section 8.03 Indemnification and Reimbursement for Payments on Behalf of a Member.

(a) Except as otherwise provided in this Agreement, if the Company is required by law (as determined by the Board of Managers based on the advice of legal or tax counsel to the Company) to make any payment on behalf of a Member in its capacity as such (including in respect of withholding taxes, personal property taxes, and unincorporated business taxes, etc.), then such Member (the "Indemnifying Member") shall indemnify the Company in full for the entire amount paid, including interest, penalties and expenses associated with such payment. At the option of the Board of Managers:

(i) promptly upon notification of an obligation to indemnify the Company, the Indemnifying Member shall make a cash payment to the Company in an amount equal to the full amount to be indemnified, or

(ii) the Company shall reduce distributions which would otherwise be made to the Indemnifying Member until the Company has recovered the amount to be indemnified.

(b) A Member's obligation to make payments to the Company under this Section 8.03 shall survive the termination, dissolution, liquidation and winding up of the Company, and for purposes of this Section 8.03, the Company shall be treated as continuing in existence. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 8.03, including instituting a lawsuit to collect such contribution with interest calculated at a rate equal to the Company's and its subsidiaries' effective cost of borrowed funds.

## ARTICLE IX

## ALLOCATIONS

Section 9.01 Tax Provisions. The allocation and capital account maintenance provisions of Treasury Regulations under section 704 of the Code are hereby incorporated by reference, including a "qualified income offset" within the meaning of Treasury Regulations section I. 704-1(b)(2)(ii)(d), the rules regarding allocation of "partner nonrecourse deductions" under Treasury Regulations section I. 704-2(i)(1 ), "minimum gain chargeback" under Treasury Regulations section 1.704-2(±), and "partner nonrecourse debt minimum gain chargeback" under Treasury Regulations section 1.704-2(i)(4), and the limitation on allocation of losses to any Member that would cause a deficit capital account in excess of such Member's capital contribution obligations and share of minimum gain and partner nonrecourse debt minimum gain under Treasury Regulations section 1.704-1(b)(2)(ii)(d) as modified by Treasury Regulation sections 1.704-2(g)(l) and 1.704-2(i)(5). Notwithstanding the above, nothing in this Section 9.01 shall apply to override the economic terms of this Agreement as reflected in Section 9.03.

Section 9.02 Contributed Property. To the extent contributed property has a Fair Market Value at the time of contribution that differs from the contributing Member's basis in the property, and to the extent the carrying value of property of the Company for capital account purposes otherwise differs from the Company's basis in such property, depreciation, gain and loss for capital account purposes shall be computed by reference to such carrying value rather than such tax basis. In accordance with section 704(c) of the Code, income, gain, loss, and deduction with respect to such property shall, solely for United States federal income tax purposes, be shared among the Members so as to take account of the variation between the basis of the property to the Company and its Fair Market Value at the time of contribution, or at the time that the carrying value of such prope1iy is adjusted under Treasury Regulations section 1.704-1(b)(2)(iv)(f), as the case may be.

Section 9.03 Profits and Losses. At all times while there is more than one Member, items of income, gain, loss, deduction and credit shall be allocated to the holders of Membership Units, pro rata based on their respective Percentage Interest, except as otherwise provided in Sections 9.01 and 9.02; provided, that,

(a) Except as provided in clause (b) below, no losses shall be allocated to a Member with a negative balance in its capital account or to the extent that such allocation would cause a partner to have a negative balance in its capital account;

(b) If there is no Member with a positive balance in its capital account, all losses shall be allocated to the Members in accordance with the Percentage Interests.

## ARTICLE X

## ELECTIONS AND REPORTS

Section 10.01 Books of Account.

(a) Complete and accurate records and books of account shall be kept by the Company at the principal office of the Company, including all books and records necessary to

provide any information, lists and copies of documents required to be provided pursuant to Section 10.02. The books of account shall be kept for tax and accounting purposes on either a cash or accrual basis as the Company, in consultation with the Company's accountants, shall determine. The determination of the Company with respect to the treatment of any item or its allocation for United States federal, state or local tax purposes shall be binding upon all Members so long as that determination is not inconsistent with any express provision of this Agreement.

(b) All books of account and records maintained by the Company hereunder shall be the property of the Company, and shall be made available for inspection by the Members (including employees of the respective Members and the legal counsel and the independent auditors for the respective Members) at such reasonable times as the Company shall determine.

Section 10.02 Reports. The Company shall deliver or cause to be delivered, by March 31 of each year, to each Person who was a Member at any time during the previous Taxable Year, all information necessary for the preparation of such person's United States federal income tax returns and any state, local and foreign income tax returns that such Person is required to file as a result of the Company being engaged in a trade or business within such state, local or foreign jurisdiction, including a statement showing such Person's share of income, gains, losses, deductions and credits for such year for United States federal income tax purposes (and, if applicable, state, local or foreign income tax purposes).

Section 10.03 Tax Matters Member.

(a) Ryze Holdings shall be the "tax matters partner" of the Company for United States federal income tax purposes (the "Tax Matters Member").

(b) The Tax Matters Member shall, at the request of any Member, cause the Company to elect, pursuant to section 754 of the Code, to adjust the basis of the Company's property.

(c) Notwithstanding anything herein to the contrary, the Tax Matters Member shall reasonably consult with the Members and their representatives (including their legal counsel and accountants) with respect to all tax matters. The Tax Matters Member shall keep the Members fully advised of the progress of any audit or other tax proceeding and shall, within five (5) Business Days of receipt, supply the Members with copies of any written communications and notice of any oral communications received from the Internal Revenue Service, or other taxing authority, and shall, at least five (5) Business Days prior to submitting any materials to the Internal Revenue Service, or other taxing authority, provide such materials to the Members for their approval, which approval shall not be unreasonably withheld. The Tax Matters Member shall also give notice to the Members of its intention to meet with any representative of the Internal Revenue Service at least ten (I 0) days prior to such meeting (or promptly upon arranging such meeting if such meeting is arranged fewer than ten (10) days prior to such meeting), and shall provide the Members or their agents, legal counsel, employees or accountants with an opportunity to participate in such meeting (and shall inform any Members who do not participate in the meeting of the results of the meeting within five (5) Business Days after such meeting). Nothing in this Section 10.03 shall be construed to restrict or otherwise limit the other Members' rights to participate in any administrative or judicial proceeding in connection with any tax matters relating to the Company.

## ARTICLE XI

## DISSOLUTION AND LIQUIDATION

Section 11.01 Dissolution.

(a) The Company shall be dissolved and its affairs wound up only upon the happening of any of the following events:

(i) upon the election to dissolve the Company by the consent of a Super Majority of the Board of Managers;

(ii) upon the election to dissolve the Company by the consent of all of the Members; or

(iii) the entry of a decree of judicial dissolution under the Delaware Act.

(b) Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 11.02 and the Certificate of Formation shall have been canceled.

Section 11.02 Liquidation.

(a) The Liquidator. Upon dissolution of the Company, the Board of Managers (or in the event of a judicial dissolution and the failure of the Board of Managers to appoint a liquidator, then upon the terms set forth in the court's orders) shall appoint a non-adverse party within the meaning of section 672 of the Code to act as the "Liquidator," and such person shall act as the Liquidator unless and until a successor Liquidator is appointed as provided in this Section 11.02. The Liquidator shall agree not to resign at any time without thirty (30) days' prior written notice to the Board of Managers. The Liquidator may be removed at any time, with or without cause, by notice of removal and appointment of a successor Liquidator approved by the Board of Managers. Any successor Liquidator shall succeed to all rights, powers and duties of the former Liquidator. The right to appoint a successor or substitute Liquidator in the manner provided in this Section 11.02 shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions of this Agreement, and every reference in this Agreement to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided in this Section 11.02. The Liquidator shall receive as compensation for its services (i) no additional compensation, if the Liquidator is an employee of the Company or any of its subsidiaries, or (ii) if the Liquidator is not such an employee, such compensation as the Board of Managers may approve, plus, in either case, reimbursement of the Liquidator's reasonable out-of-pocket expenses incurred in performing its duties.

(b) Liquidating Actions. The Liquidator shall liquidate the assets of the Company and apply and distribute the proceeds of such liquidation, in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

(i) First, to the payment of the Company's debts and obligations to its creditors (including Members), including sales commissions and other expenses incident to any sale of the assets of the Company, in order of the priority provided by law.

(ii) Second to the payment of the Company's unexpired obligations pursuant to the Option Agreement as if the Second Option Triggering Event has occurred.

(iii) Third, to the establishment of and additions to such reserves as the Board of Managers deem necessary or appropriate.

(iv) Fourth, to the Members pro rata in accordance with Section 8.02.

(c) Reserves. The reserves established pursuant to Section 11.02(b)(ii) above shall be paid over by the Liquidator to a bank or other financial institution, to be held in escrow for the purpose of paying any contingent or unforeseen liabilities or obligations and, at the expiration of such period as the Board of Managers deems advisable, any such reserves that have not been paid in pursuant to Section 11.02(b)(i) shall be distributed to the Members in accordance with Section 8.02 in the manner provided in Section 11.02(b).

(d) Distribution in Kind. Notwithstanding the provisions of Section 11.02(b) which require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 11.02(b), if upon dissolution of the Company the Board of Managers determines by Super Majority Vote of the Managers that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Board of Managers by Super Majority Vote of the Managers may, in its sole discretion, defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may by Super Majority Vote of the Managers, in its absolute discretion, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 11.02(b), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such distribution, any property to be distributed shall be valued at its Fair Market Value.

(e) Reasonable Time for Winding Up. A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to Section 11.02(b) in order to minimize any losses otherwise attendant upon such winding up. Distributions upon liquidation of the Company (or any Member's interest in the Company) and related adjustments shall be made by the end of the Fiscal Year of the liquidation (or, if later, within ninety (90) days after the date of such liquidation) or as otherwise permitted by Treasury Regulations section 1.704-1(b)(2)(ii)(b).

(f) Termination. Upon completion of the distribution of the assets of the Company as provided in Section 11.02(b), the Company shall be terminated and the Liquidator shall cause the cancellation of the Certificate of Formation in the State of Delaware and of all qualifications and registrations of the Company as a foreign limited liability company in

jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE XII

## TRANSFER OF MEMBERSHIP UNITS

Section 12.01 General Transfer Restrictions. No Member, nor any representative or agent of any Member, may Transfer, directly or indirectly through the transfer of interests in such Member or other upstream entity, to any Person (other than a Permitted Transferee), all or any portion of such Member's Membership Units except as specifically provided below. In the case of a Transfer, other than a sale or a Transfer to a Permitted Transferee, such Transfer must be approved by the Super Majority Vote of the Managers in advance, which approval may not be unreasonably withheld, delayed and conditioned and which consent will be deemed to have been given if not denied, in writing, within 10 Business Days after notice thereof is provided to the Board of Managers. In the case of a Transfer that is a sale, such Transfer must comply with the right of first refusal and tag along rights described below. Any attempted Transfer in violation of this Section 12.01 shall be deemed null and void for all purposes, and the Company shall not record any such Transfer on its books or treat any purported transferee as the owner of such Membership Units for any purpose. Notwithstanding anything contained herein to the contrary, no Transfer shall be permitted if it would be reasonably likely to cause the Company to become a "publicly traded partnership," as such term is defined in section 7704(b) of the Code

Section 12.02 Conditions to Transfer Membership Units.

(a) Notwithstanding anything to the contrary in this Agreement, no otherwise authorized transferee of any Membership Unit(s) received pursuant to a Transfer (but excluding transferees that were Members immediately prior to such a Transfer, who shall automatically become a Member with respect to any additional Membership Units they so acquire) shall become a Member in respect of or be deemed to have any ownership rights in the Membership Unit(s) so Transferred unless the purported transferee is admitted as a Member as set forth in Section 12.03.

(b) Following a Transfer of any Membership Unit(s) that is permitted under this Article XII, the transferee of such Membership Unit(s) shall receive allocations and distributions under Articles VII, VIII, IX and XI in respect of such Membership Unit(s) if such Membership Unit(s) so Transferred are entitled to allocations and distributions.

(c) Notwithstanding anything in this Agreement to the contrary, no issuance or Transfer of Membership Units otherwise permitted or required by this Agreement shall be made unless issuance or Transfer is in compliance with United States and other federal, foreign, state or provincial securities or other similar laws, including the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder, and the Delaware Act.

Section 12.03 Procedures for Transfer. Subject in all events to the general restrictions on Transfers contained in Sections 12.01, 12.02, 12.05, 12.06 and 12.07, no Transfer of Membership Unit(s) may be completed until the prospective transferee is admitted as a Member of the Company by executing and delivering to the Company a written undertaking to be bound by the terms and

conditions of this Agreement. Upon the execution and delivery of such a written undertaking, the Member Schedule shall be automatically amended and such prospective transferee shall be admitted as a Member and deemed listed as such on the books and records of the Company. The provisions of this Section 12.03 shall not apply with respect to the Transfer of any Membership Unit(s) to a transferee that is a Member immediately prior to such Transfer.

Section 12.04 Legend. Any certificates or instruments representing the Membership Units, if any, shall bear the following legend:

> "THE MEMBER'S MEMBERSHIP UNITS REPRESENTED BY THIS CERTIFICATE OR INSTRUMENT MAY NOT BE SOLD, ASSIGNED OR OTHERWISE TRANSFERRED EXCEPT AS PROVIDED IN THE OPERATING AGREEMENT OF THE COMPANY, COPIES OF WHICH ARE ON FILE IN THE PRINCIPAL OFFICE OF THE COMPANY AND WILL BE FURNISHED UPON REQUEST AND WITHOUT CHARGE TO ANY HOLDER OF THIS CERTIFICATE OF MEMBERSHIP UNITS."

Section 12.05 Right of First Refusal.

(a) Each Member shall have the right to purchase on a pro-rata basis up to its Percentage Interest any Membership Units offered by the Company in any subsequent offering (the "Follow-On Financing") upon the same terms as offered to all other offerees. The Members shall be given not less than ten (10) Business Days prior written notice (the "Notice of Sale") of any proposed Follow-On Financing and shall have the right during the ten (10) Business Days following receipt of the Notice of Sale to purchase the Membership Units offered in the Follow-On Financing.

(b) If any one or more Members (the "Selling Members") desires to sell all or any part of their respective Membership Units, to any Person other than a Permitted Transferee, such Selling Member(s) shall first deliver to each other Member (collectively, the "Non-Selling Members") at the same time a written notice of the proposed sale (the "Sale Notice"), the Membership Units proposed to be sold (the "Sold Membership Units"), setting forth the name and address of the proposed purchaser, the purchase price (which must be an amount specified in dollars, but which may be paid either in a lump sum or in installments over an extended period of time), and all other material terms of the proposed sale. Each Non-Selling Member shall be entitled to purchase a percentage of the Sold Membership Units equal to the percentage that such Non-Selling Member's Percentage Interest represents to all the Non-Selling Member's Percentage Interests on substantially the same terms and conditions as are included in the proposed sale. A Non-Selling Member shall exercise his right to purchase such Sold Membership Units by delivering to the Selling Member a written notice of exercise no later than twenty (20) days after delivery of the Sale Notice to such Non-Selling Member. A Non-Selling Member may also indicate in such notice, if he so elects, his desire to purchase any additional Sold Membership Units owned by the Selling Members if any other Non-Selling Member does not exercise his right to purchase his part of the Sold Membership Units. If more than one Non- Selling Member so elects, the additional Sold Membership Units shall be allocated pro rata to such electing Non-Selling Members based upon the Percentage Interests of such electing Non- Selling Members. If the Non-

Selling Members do not exercise such right during such twenty (20) day period to purchase all of the Sold Membership Units available for purchase after taking into account any other rights of first refusal related to such interests, the Selling Members may sell the entire amount of the Sold Membership Units to the person named as purchaser in the Sale Notice substantially upon the terms and conditions set forth in the Sale Notice and the purchaser shall be admitted as a Member, with all the rights associated with the Membership Units being sold by the Selling Members, without the consent of any other Member. If the Selling Members fail to sell the Sold Membership Units substantially upon the terms and conditions set forth in the Sale Notice within ninety (90) days after delivery of the Sale Notice, the right shall terminate, and the Member shall not thereafter sell any Membership Units without again complying with the foregoing procedure. Notwithstanding anything to the contrary set forth in this Agreement, any purchaser of Membership Units in connection with a sale effected in compliance with this Section 12.05(b) shall be admitted as a Member (and this Agreement shall (and may) be amended by the Selling Member to effect such admission and the sale of the Sold Membership Units, with all the rights associated with the Membership Units being sold by the Selling Member, without the consent of any other Member.

Section 12.06 Tag Along Rights. In addition to the right of first refusal granted above, in the event 50% or more of the Membership Units (the "Majority Shares") are being sold in a single or series of related sales, the holders of any remaining shares shall have the right to join in such transaction and sell such minority interests in the Company on a pro rata basis and on the same terms as the sale of the Majority Shares.

Section 12.07 Drag Along Rights. In addition to the tag along rights described in Section 12.06, in the event a sale of all of the Membership Units of the Company is approved by a unanimous vote of the Managers, all Members shall be required to join in the sale of the Company and shall receive a pro- rata share of any sale proceeds, without any discount or differing terms for minority ownership.

Section 12.08 Limitations.

(a) In order to permit the Company to qualify for the benefit of a "safe harbor" under Code section 7704, notwithstanding anything to the contrary in this Agreement, no Transfer of any Membership Unit shall be permitted or recognized by the Company (within the meaning of Treasury Regulations section 1.7704-1(d)) and the Company shall not issue any Membership Units if and to the extent that such Transfer or issuance would cause the Company to have more than one hundred (I 00) partners (within the meaning of Treasury Regulations section 1.7704-1(h), including the look-through rule in Treasury Regulations section 1.7704-1(h)(3)).

(b) Notwithstanding anything to the contrary in this Agreement, no Membership Unit may be Transferred and the Company may not issue any Membership Unit unless (i) such Transfer or issuance, as the case may be, shall not affect the Company's existence or qualification as a limited liability company under the Delaware Act, (ii) such Transfer or issuance, as the case may be, shall not cause the Company to be classified other than as a partnership for United States federal income tax purposes, and (iii) such Transfer or issuance, as the case may be, shall not result in a termination of the Company under Code section 708, unless

the Board of Managers determines that any such termination will not have a material adverse impact on the Members.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

Section 13.01 Expenses. All fees and expenses incurred by any Member in connection with the negotiations of this Agreement and the formation of the Company shall be paid by the Member incurring such fees or expenses.

Section 13.02 Notices.

(a) All notices, requests and other communications hereunder must be in writing and shall be deemed to have been duly given only if delivered personally or by facsimile transmission or mailed by internationally recognized overnight courier prepaid or by e- mail communication, to (i) any Member, at such Member's address set forth on the Member Schedule, and (ii) the Company, at the Company's principal place of business (or in any case to such other address as the addressee may from time to time designate in writing to the sender).

(b) All such notices, requests and other communications shall (i) if delivered personally to the address as provided in Section 13.02(a), be deemed given upon delivery, (ii) if delivered by facsimile transmission to the facsimile number as provided for in Section 13.02(a), be deemed given upon facsimile confirmation, (iii) if delivered by such internationally recognized overnight courier to the address as provided in Section 13.02(a), be deemed given on the earlier of the first Business Day following the date sent by such overnight courier or upon receipt and (iv) if sent to an e-mail address as provided for in Section 13.02(a), be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient (in each case, regardless of whether such notice, request or other communication is received by any other Person to whom a copy of such notice is to be delivered pursuant to this Section 13.02).

Section 13.03 Dispute Resolution.

(a) Any Dispute arising hereunder shall be resolved by the Members according to this Section 13.03. Prior to taking any other action, the Members shall try to resolve any Dispute through a formal mediation process. The mediation shall be led by a qualified mediator experienced in mediating the kind of Dispute at issue. The mediator shall be paid by the Company.

(b) In the event a Dispute is not resolved through mediation, such Dispute shall be resolved through binding arbitration administered by and in accordance with the General Commercial Rules of the American Arbitration Association (the "AAA"). Any Member may submit a Dispute for resolution by arbitration pursuant to the procedures provided herein, and to the extent not provided herein, pursuant to the General Commercial Rules of the AAA.

(c) The arbitral tribunal that shall decide such a submitted Dispute shall be composed of one (1) arbitrator selected by agreement of the Members, or in the absence of such agreement, the AAA shall appoint an arbitrator within thirty (30) days after either Party submits such Dispute for arbitration. The arbitrator shall be generally familiar with operating agreements for commercial enterprises. The arbitrator shall have the absolute power and authority to resolve the Dispute and all other issues between the Members relating to or arising out of the Dispute or this Agreement. The arbitration shall be conducted in Las Vegas, Nevada. Each Member shall present its case, witnesses and evidence, if any, in the presence of the other Member. The arbitrator shall determine any Dispute in accordance with the laws of the State of Nevada and federal statutes governing copyright and other intellectual property rights, without giving effect to any conflict of law rules or other rules that might render such law inapplicable or unavailable, and shall apply this Agreement according to its terms.

(d) The Members shall be bound by any award or order resulting from any arbitration conducted hereunder and hereby agree that: (x) any monetary award shall include pre-award interest, to the extent appropriate, and shall be made and payable in dollars through a bank selected by the recipient of such award, free of any withholding tax or other deduction, together with interest thereon at 0.75% per month, from the date the award is granted to the date it is paid in full; (y) in the context of an attempt by either Member to enforce an arbitral award or order, the Members waive any defenses relating to such Member's capacity or the validity of this Agreement or any related agreement under any law; and (z) judgment on any award or order resulting from an arbitration conducted under this Section 13.03 may be entered and enforced in any court and in any country having jurisdiction thereof or having jurisdiction over the Members or any of their assets.

(e) Except as expressly permitted by this Agreement, neither Member shall commence or voluntarily participate in any court action or proceeding concerning a Dispute except for enforcement of any award or order issued pursuant to this provision or for equitable relief as provided in Section 13.03(e). For purposes of the foregoing or enforcement of any undisputed obligation, each of the Members hereby irrevocably submits to the exclusive jurisdiction of any Nevada State or Federal court sitting in the County of Washoe and any appellate court from any thereof.

(f) In addition to the authority otherwise conferred on the arbitral tribunal, such tribunal hereunder shall have the authority to make such orders for interim relief, including, without limitation, injunctive relief and specific performance, as it may deem just and equitable. If such tribunal shall not have been appointed, either Member may seek such interim relief from a court having jurisdiction.

(g) The prevailing Member in any arbitration conducted under this Section 13.03 shall recover from the other Member (as part of the arbitral award or order) such prevailing Member's reasonable attorneys' fees and the other costs of the arbitration.

(h) Insofar as it is within the control of each of the Members, and notwithstanding anything to the contrary in the applicable arbitration rules: (v) the arbitrator of a Dispute shall be selected within thirty (30) days after such Dispute is submitted to arbitration hereunder; (w) any discovery that may be permitted shall be completed ,within 120 days from the

date of the complaint and shall not exceed (i) single depositions lasting no more than one day each of no more than one individual per side who are directly involved and (ii) a single, reasonable request for directly relevant documents (except to the extent that any information revealed by documents produced requires one additional request); (x) any hearing that may be held shall take place within thirty (30) days after completion of discovery; (y) any written briefs submitted to such arbitrator shall not exceed a total of twenty-five (25) pages prior to such hearing and fifteen (15) pages subsequently, in each case excluding exhibits; and (z) the decision shall be a "standard award" and be issued in writing within fifteen (15) days after the closing of the hearing. Notwithstanding the foregoing, each Member shall be able to receive additional requests for documentation and the extension of any time limitation provided for herein, upon a determination of the arbitral tribunal, in its sole discretion, that the other Member has either acted in bad faith or has provided insufficient documentation.

Section 13.04 Governing Law. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this agreement and the exhibits and schedules to this Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Nevada or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada.

Section 13.05 No Action for Partition. No Member shall have any right to maintain any action for partition with respect to the property of the Company.

Section 13.06 Amendments. Except as otherwise expressly set forth in this Agreement, and subject to compliance with the Certificate of Formation, this Agreement may be amended or restated, and any provision therein or herein may be waived, only upon the written consent of all Members; and any such amendment, restatement or waiver to which such written consent is obtained shall be binding upon the Company and each Member.

Section 13.07 Binding Effect. Except as otherwise provided to the contrary in this Agreement, this Agreement shall be binding upon and inure to the benefit of the Members, their distributees, heirs, legal representatives, executors, administrators, successors and permitted assigns.

Section 13.08 Counterparts; Facsimile. This Agreement may be executed in multiple counterparts (and may be transmitted via facsimile or other electronic means), each of which shall be deemed to be an original and shall be binding upon the Member who executed the same, and all of such counterparts shall constitute one and the same agreement.

Section 13.09 Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

Section 13.10 Remedies. Each of the parties to this Agreement shall be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable

attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor. The Members agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

Section 13.11 Judicial Proceedings. Except as provided in Section 13.03, in any judicial proceeding involving any dispute, controversy or claim arising out of or relating to this Agreement or the Company or its operations, each of the Members and the Company unconditionally accepts the non-exclusive jurisdiction and venue of any United States District Court located in the State of Nevada, and the appellate courts to which orders and judgments thereof may be appealed. In any such judicial proceeding, the Members agree that in addition to any method for the service of process permitted or required by such courts, to the fullest extent permitted by law, service of process may be made by delivery provided pursuant to the directions in. EACH PARTY TO THIS AGREEMENT HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF.

Section 13.12 No Strict Construction. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties to this Agreement, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

Section 13.13 Entire Agreement and Incorporation by Reference. Except as otherwise expressly set forth in this Agreement this Agreement and any agreement or instrument relating thereto and incorporated herein embodies the complete agreement and understanding among the parties to this Agreement with respect to the subject matter of this Agreement and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way.

Section 13.14 Parties in Interest. Nothing herein shall be construed to be for the benefit of or enforceable by any third party including, but not limited to, any creditor of the Company or the Members.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the undersigned have executed this Amended and Restated Operating Agreement of RYZE RENEWABLES NEVADA, LLC as of the date first written above.

**RYZE RENEWABLES HOLDINGS, LLC**

By: ________________________________
Name: Matthew G. Pearson
Title: Manager

By: ________________________________
Name: Kevin McDonough
Title: Manager

**LV RENEWABLES A, LLC**

By: ________________________________
Name: Sung Hee Han
Title: Treasurer

Ex. B
(SLA dated Nov. 29. 2021)

# **Exhibit A**

## MEMBER SCHEDULE

| Name and Address of Member | Number of Units | Percentage Interest | Capital Contributions |
|---|---|---|---|
| Ryze Renewables Holdings, LLC | 400,000,000 | 96.2% | 100% Percentage Interest in Ryze Renewables II, LLC |
| LV Renewables A, LLC | 15,800,416 | 3.8% | Additional consideration for a loan |
| Totals | 415,800,416 | 100% | N/A |

**EXHIBIT D**
**Option Agreement**
**[See attached.]**

Ex. B
(SLA dated Nov. 29. 2021)

# OPTION AGREEMENT

THIS OPTION AGREEMENT (this "Agreement"), is made and entered as of November 29, 2021, by and between Ryze Renewables Nevada, LLC, a Delaware limited liability company ("Ryze Nevada") and LV Renewables A, LLC, a Nevada limited liability company ("LV Renewables") and acknowledged and agreed to by the Ryze Entities, as hereinafter defined.

WHEREAS, this Agreement is being executed in connection with the closing of the transactions contemplated by that certain Loan Agreement, dated as of November 29, 2021 (the "Loan Agreement"), entered into by and among Ryze Nevada, Ryze Renewables Las Vegas, LLC, a Delaware limited liability company ("Ryze Las Vegas"), Mirae Asset Securities Co., Ltd., an entity organized under the laws of the Republic of Korea ("Mirae"), and LV Renewables, the Commitment to Grant of Equity (the "Equity Grant") whereby Ryze Nevada issued to LV Renewables 15,800,416 Membership Units in Ryze Nevada which constitutes 3.8% of the issued and outstanding Membership Units in Ryze Nevada (the "LV Renewables Units") and the execution of the Amended and Restated Operating Agreement of Ryze Nevada dated as of even date herewith between Ryze Renewables Holdings LLC, a Delaware limited liability company ("Ryze Holdings") and LV Renewables (the "Amended Operating Agreement");

WHEREAS, LV Renewables desires to have the right to sell the LV Renewables Units to Ryze Nevada, and Ryze Nevada desires to grant such right to LV Renewables, and to obtain a right to repurchase the LV Renewables Units, pursuant to the terms and conditions set forth herein; and

WHEREAS, capitalized terms used but not defined in this Agreement shall have the meanings assigned to such terms in the Amended Operating Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

**1. LV Renewables Put Options.**

**(a)** At any time prior to the date which is twenty four (24) months after the date hereof, upon the occurrence of (i) the filing of a registration statement in connection with an initial public offering ("IPO") pursuant to a registration filed with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "Securities Act") involving Ryze Las Vegas, Ryze Holdings, Ryze Renewables II, LLC, a Delaware limited liability company ("Ryze II" and together with Ryze Nevada, Ryze Las Vegas, Ryze Holdings, and any successors thereof, collectively, the "Ryze Entities") or (ii) the execution of a binding agreement or the public announcement of a sale of assets to or merger with a special purpose acquisition company ("SPAC Transaction") involving any of the Ryze Entities, LV Renewables shall have the right, in its sole and absolute discretion, by providing written notice to Ryze Nevada of LV Renewables' election to exercise the First LV Renewables Put Option (such notice, the "First LV Renewables Put Option Exercise Notice"), at or before the closing of such IPO or SPAC Transaction (the "First Exercise Period") to cause Ryze Nevada to purchase the entire LV Renewables Units from LV Renewables (such right, the "First LV Renewables Put Option"), for the First LV Renewables Put Option Purchase Price (as hereinafter defined). Ryze Nevada will be obligated to promptly notify LV Renewables of an event occurring that would provide LV Renewables with the First LV

Renewables Put Option within two (2) Business Days of such event occurring. Upon delivery of the First LV Renewables Put Option Exercise Notice, Ryze Nevada shall be irrevocably obligated to purchase from LV Renewables, and LV Renewables shall be irrevocably obligated to sell to Ryze Nevada, all of the LV Renewables Units on the terms and conditions set forth in this Section 1. Anything herein to the contrary notwithstanding, LV Renewables shall have the right to deliver a First LV Renewables Put Option Exercise Notice during the First Exercise Period if, and only if, Ryze Nevada has not previously provided to LV Renewables the First Ryze Nevada Call Option Exercise Notice in accordance with Section 2(a) during such period.

**(b)** Following the exercise of the First LV Renewables Put Option in accordance with Section 1(a), the closing of the LV Renewables Put Option (the "First LV Renewables Put Option Closing") shall take place at the closing of the IPO or SPAC Transaction, as applicable. The First LV Renewables Put Option Closing shall take place remotely via the electronic exchange of counterpart signature pages, or at such other location as LV Renewables and Ryze Nevada may mutually determine. At the First LV Renewables Put Option Closing, (i) LV Renewables shall transfer all of the LV Renewables Units to Ryze Nevada, free and clear of any liens or encumbrances, (ii) Ryze Nevada shall deliver to LV Renewables the First LV Renewables Put Option Purchase Price; and (iii) LV Renewables shall deliver to Ryze Nevada the items specified in Section 3 and such other instruments of conveyance as Ryze Nevada reasonably requests; provided, however, in connection with the IPO or SPAC Transaction, the First LV Renewables Put Option Closing may be extended, without penalty, for any delays related to SEC filings or other regulatory requirements that are outside the control of Ryze Nevada.

**(c)** The aggregate amount payable by Ryze Nevada to LV Renewables at the First LV Renewables Put Option Closing in accordance with Section 1(b), shall be in an amount (the "First LV Renewables Put Option Purchase Price") equal to Fifty Seven Million Dollars ($57,000,000), increased by any accrued but unpaid interest and any other amounts outstanding on the Note (as that term is defined in the Loan Agreement) (excluding principal, prepayment penalty, or expense) through the First LV Renewables Put Option Closing Date and decreased by any distribution made with respect to the LV Renewables Units through the First LV Renewables Put Option Closing Date. For the avoidance of doubt, there shall be no prepayment premium or any other penalty added to the First LV Renewables Put Option Purchase Price. The First LV Renewables Put Option Purchase Price shall be paid as follows, at Ryze Nevada's election:

**(i)** in shares of the stock of the public company resulting from an IPO or SPAC Transaction involving one or more of the Ryze Entities with a value equal to such amount based on (A) offering price per share with respect to any IPO or (B) the offering price per share of the surviving entity of the merger related to such SPAC Transaction; or

**(ii)** in shares of the acquiring company's stock or successor company's stock, as applicable, in the event of an acquisition or merger involving one or more of the Ryze Entities, with a value equal to such amount based on the offering price per share of the surviving entity of the merger related to such SPAC Transaction.

Upon payment in full of the First LV Renewables Put Option Purchase Price, the Loan (as defined in the Loan Agreement), will be deemed paid in full and no further amounts will be due from Ryze Nevada to LV Renewables in connection with this Agreement or the Loan Documents, and Ryze

Nevada will be the owner of the LV Renewables Units, free from any liens or encumbrances. In connection with any SPAC Transaction, Ryze Nevada and the Ryze Entities hereby agree to cause the other party or parties thereto to agree to accept and assume the obligations with respect to this Agreement.

**(d)** Subject to the conditions set forth in this Agreement, on a date which is in the thirty sixth (36th) month after the Funding Date (the "Second Exercise Period"), LV Renewables shall have the right, in its sole and absolute discretion, by providing written notice to Ryze Nevada of LV Renewables' election to exercise the Second LV Renewables Put Option (such notice, the "Second LV Renewables Put Option Exercise Notice"), to cause Ryze Nevada to purchase all of the LV Renewables Units from LV Renewables (such right, the "Second LV Renewables Put Option"), for the Second LV Renewables Put Option Purchase Price. Upon delivery of the Second LV Renewables Put Option Exercise Notice, Ryze Nevada shall be irrevocably obligated to purchase from LV Renewables, and LV Renewables shall be irrevocably obligated to sell to Ryze Nevada, all of the LV Renewables Units on the terms and conditions set forth in this Section 1.

**(e)** Following the exercise of the Second LV Renewables Put Option in accordance with Section 1(d), Ryze Nevada shall deliver to LV Renewables a written notice specifying a date (the "Second LV Renewables Put Option Closing Date") at least thirty (30) days following the date of such delivery (but not more than ninety (90) days following Ryze Nevada' receipt of the Second LV Renewables Put Option Exercise Notice) on which the closing of the LV Renewables Put Option (the "Second LV Renewables Put Option Closing") shall take place. The Second LV Renewables Put Option Closing shall take place remotely via the electronic exchange of counterpart signature pages, or at such other location as LV Renewables and Ryze Nevada may mutually determine. At the Second LV Renewables Put Option Closing, (i) LV Renewables shall transfer all of the LV Renewables Units to Ryze Nevada, free and clear of any liens or encumbrances, (ii) Ryze Nevada shall deliver to LV Renewables the Second LV Renewables Put Option Purchase Price; and (iii) LV Renewables shall deliver to Ryze Nevada the items specified in Section 3 and such other instruments of conveyance as Ryze Nevada reasonably requests.

**(f)** The aggregate amount payable by Ryze Nevada to LV Renewables at the Second LV Renewables Put Option Closing in accordance with Section 1(e), shall be in an amount (the "Second LV Renewables Put Option Purchase Price") equal to Forty-Five Million Dollars ($45,000,000) reduced by any distribution made with respect to the LV Renewables Units through the Second LV Renewables Put Option Closing Date; provided, however, that to the extent Ryze Nevada does not have sufficient funds to pay the Second LV Renewables Put Option Purchase Price, Ryze Nevada may provide LV Renewables with a promissory note in the form attached hereto as Exhibit A with respect to the difference between the Second LV Renewables Put Option Purchase Price and the cash payment made on the Second LV Renewables Put Option Closing Date (the "Second LV Renewables Put Option Deferred Amount").

**2. Ryze Nevada Call Options.**

**(a)** Subject to the conditions set forth in this Agreement, at any time prior to the date which is twenty-one (21) months after the date hereof, Ryze Nevada shall have the right, in its sole and absolute discretion, by providing written notice to LV Renewables of Ryze Nevada's

election to exercise the First Ryze Nevada Call Option (such notice, the "First Ryze Nevada Call Option Exercise Notice"), to cause LV Renewables to sell all of the LV Renewables Units held by LV Renewables (such right, the "First Ryze Nevada Call Option"), for the First Ryze Nevada Call Option Purchase Price (as hereinafter defined). Upon delivery of the First Ryze Nevada Call Option Exercise Notice, Ryze Nevada shall be irrevocably obligated to purchase from LV Renewables, and LV Renewables shall be irrevocably obligated to sell to Ryze Nevada, all of the LV Renewables Units on the terms and conditions set forth in this Section 2. Anything herein to the contrary notwithstanding, Ryze Nevada shall have the right to deliver the First Ryze Nevada Call Option Exercise Notice during the First Exercise Period, if, and only if, LV Renewables has not previously provided to Ryze Nevada the First LV Renewables Put Option Exercise Notice in accordance with Section 1(a) during such period.

**(b)** Following the exercise of the First Ryze Nevada Call Option in accordance with Section 2(a), Ryze Nevada shall deliver to LV Renewables advanced written notice specifying a date (the "First Ryze Nevada Call Option Closing Date") which shall occur at least thirty (30) days following the date of such notice with respect to a First Ryze Nevada Call Option Purchase Price to be paid in cash not more than ninety (90) days following Ryze Nevada's delivery of the First Ryze Nevada Call Option Exercise Notice on which the closing of the First Ryze Nevada Call Option shall occur (the "First Ryze Nevada Call Option Closing"); provided that, in the case of an IPO or SPAC Transaction involving any of the Ryze Entities, the date specified shall only be an estimated closing date and the First Ryze Nevada Call Option Closing Date shall be the closing date of such IPO or SPAC Transaction, as applicable. The First Ryze Nevada Call Option Closing shall take place remotely via the electronic exchange of counterpart signature pages, or at such other location as LV Renewables and Ryze Nevada may mutually determine. At the First Ryze Nevada Call Option Closing, (i) LV Renewables shall transfer all of the LV Renewables Units to Ryze Nevada, free and clear of any liens or encumbrances, (ii) Ryze Nevada shall deliver to LV Renewables the First Ryze Nevada Call Option Purchase Price, and (iii) LV Renewables shall deliver to Ryze Nevada the items specified in Section 3 and such other instruments of conveyance as Ryze Nevada reasonably requests; provided, however, in the case of an IPO or SPAC Transaction, the First Ryze Nevada Call Option Closing may be extended, without penalty, for any delays related to SEC filings or other regulatory requirements that are outside the control of Ryze Nevada.

**(c)** The aggregate amount payable by Ryze Nevada to LV Renewables in accordance with Section 2(b), shall be an amount (the "First Ryze Nevada Call Option Purchase Price") equal to Fifty-Seven Million Dollars ($57,000,000), increased by any accrued but unpaid interest (excluding any prepayment penalty or any other penalty or expense) through the First Ryze Nevada Call Option Closing Date and decreased by any distribution made with respect to the LV Renewables Units through the First Ryze Nevada Call Option Closing Date. For the avoidance of doubt, there shall be no prepayment premium or any other penalty added to the First Ryze Nevada Call Option Purchase Price. The First Ryze Nevada Call Option Purchase Price shall be paid as follows, at Ryze Nevada's election:

**(i)** by cash or wire transfer of immediately available funds in United States Dollars; or

**(ii)** in shares of the stock of the public company resulting from an IPO or SPAC Transaction involving one or more of the Ryze Entities with a value equal to such amount based on (A) the offering price per share with respect to any IPO or (B) the offering price per share of the surviving entity of the merger related to such SPAC Transaction; or

**(iii)** in shares of the acquiring company's stock or successor company's stock, as applicable, in the event of an acquisition or merger involving one or more of the Ryze Entities, with a value equal to such amount based on the offering price per share of the surviving entity of the merger related to such SPAC Transaction.

If Ryze Nevada chooses to purchase the LV Renewables Units for cash or wire transfer, Ryze Nevada or the Ryze Entities will provide LV Renewables with the option to purchase shares in a publicly traded company resulting from an IPO of one of the Ryze Entities or a SPAC Transaction involving one of the Ryze Entities that occurs within twenty-four (24) months of the date hereof at the offering price per share with respect to any IPO or the offering price per share of the surviving entity of the merger related to such SPAC Transaction in an amount up to the First Ryze Nevada Call Option Purchase Price by providing written notice to Ryze Nevada no later than the closing date of such IPO or SPAC Transaction. Upon payment in full of the First Ryze Nevada Call Option Purchase Price, the principal amount of the Loan, as defined in the Loan Agreement, will be deemed paid and the Loan will be deemed paid in full upon payment of all accrued interest and other amount outstanding pursuant to the Loan Documents (as defined in the Loan Agreement), and Ryze Nevada will be the owner of LV Renewables Units, free from any liens or encumbrances.

**(d)** Subject to the conditions set forth in this Agreement, in the month immediately following the Second Exercise Period (the "Ryze Second Exercise Period"), Ryze Nevada shall have the right, in its sole and absolute discretion, by providing written notice to LV Renewables of Ryze Nevada's election to exercise the Second Ryze Nevada Call Option (such notice, the "Second Ryze Nevada Call Option Exercise Notice"), to cause LV Renewables to sell all of the LV Renewables Units to Ryze Nevada (such right, the "Second Ryze Nevada Call Option"), for the Second Ryze Nevada Call Option Purchase Price. Upon delivery of the Second Ryze Nevada Call Option Exercise Notice, Ryze Nevada shall be irrevocably obligated to purchase from LV Renewables, and LV Renewables shall be irrevocably obligated to sell to Ryze Nevada, all of the LV Renewables Units on the terms and conditions set forth in this Section 2. Anything herein to the contrary notwithstanding, Ryze Nevada shall have the right to deliver the Second Ryze Nevada Call Option Exercise Notice during the Ryze Second Exercise Period, if, and only if, LV Renewables has not previously provided to Ryze Nevada the Second LV Renewables Put Option Exercise Notice in accordance with Section 1(d) during the Second Exercise Period.

**(e)** Following the exercise of the Second Ryze Nevada Call Option in accordance with Section 2(e), Ryze Nevada shall deliver to LV Renewables a written notice specifying a date (the "Second Ryze Nevada Call Option Closing Date") at least thirty (30) days following the date of such delivery but not more than ninety (90) days following Ryze Nevada's delivery of the Second Ryze Nevada Call Option Exercise Notice on which the closing of the Second Ryze Nevada Call Option (the "Second Ryze Nevada Call Option Closing") shall take place. The Second Ryze Nevada Call Option Closing shall take place remotely via the electronic exchange of counterpart signature pages, or at such other location as LV Renewables and Ryze

Nevada may mutually determine. At the Second Ryze Nevada Call Option Closing, (i) LV Renewables shall transfer all of the LV Renewables Units to Ryze Nevada, free and clear of any liens or encumbrances, (ii) Ryze Nevada shall deliver to LV Renewables the Second Ryze Nevada Call Option Purchase Price, and (iii) LV Renewables shall deliver to Ryze Nevada the items specified in Section 3 and such other instruments of conveyance as Ryze Nevada reasonably requests.

**(f)** The aggregate amount payable by Ryze Nevada to LV Renewables in accordance with Section 2(f), shall be an amount (the "Second Ryze Nevada Call Option Purchase Price") equal to Forty-Five Million Dollars ($45,000,000), reduced by any distribution made with respect to the LV Renewables Units through the Second Ryze Nevada Call Option Closing Date, by cash or wire transfer of immediately available funds in United States Dollars. If Ryze Nevada does not have sufficient funds to pay the Second Ryze Nevada Call Option Purchase Price, Ryze Nevada may not exercise the Second Ryze Nevada Call Option.

**3. Closing Conditions.**

**(g)** The obligations of each party to consummate the transactions contemplated by Section 1 or Section 2 of this Agreement, as applicable, shall be subject to the fulfillment, at or prior to any of the LV Renewables Put Option Closings or any of the Ryze Nevada Call Option Closings, as applicable, of each of the following conditions:

**(i)** No Governmental Authority (as defined in the Loan Agreement) shall have enacted, issued, promulgated, enforced or entered any Legal Requirement (as defined in the Loan Agreement) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

**(h)** The obligations of LV Renewables to consummate the transactions contemplated by Section 2 of this Agreement, shall be subject to the fulfillment or LV Renewables' waiver, at or prior to each of the Ryze Nevada Call Option Closings, as applicable, of each of the following conditions:

**(i)** There is no Event of Default (as defined in the Loan Agreement) pursuant to the Loan Agreement.

**(ii)** All of the representations and warranties of OpCo (as defined in the Loan Agreement) and Ryze Nevada in the Loan Agreement remain true and correct.

**(iii)** Ryze Nevada and OpCo shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by the Loan Agreement and each of the Loan Documents (as defined therein) to be performed or complied with by it prior to or on the date of each of the Ryze Nevada Call Option Closings, as applicable.

Notwithstanding the foregoing, in the event that the Ryze Nevada Call Option Closings take place after or result in or occur concurrently with the repayment of all amounts due under the Loan

Agreement, LV Renewables shall be obligated to consummate the transactions contemplated by Section 2 of this Agreement regardless of the fulfillment of any of the above conditions.

**(i)** The obligations of Ryze Nevada to consummate the transactions contemplated by Section 1 of this Agreement, shall be subject to the fulfillment or Ryze Nevada's waiver, at or prior to each of the LV Renewables Put Option Closings, as applicable, of each of the following conditions:

**(i)** All of the representations and warranties of LV Renewables in the Loan Agreement remain true and correct.

**(ii)** LV Renewables shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by the Loan Agreement and each of the Loan Documents (as defined therein) to be performed or complied with by it prior to or on the date of each of the LV Renewables Put Option Closings, as applicable.

Notwithstanding the foregoing, in the event that the LV Renewables Put Option Closings take place after the repayment, in full, of the Loan, Ryze Nevada shall be obligated to consummate the transactions contemplated by Section 2 of this Agreement regardless of the fulfillment of any of the above conditions.

**4.** **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) on first attempted delivery to addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or email (in portable document format (PDF)) (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 4):

| | |
|---|---|
| if to LV Renewables: | c/o Mirae Asset Securities Co. Ltd.<br>26, Eulji-ro 5 gil<br>Jung-gu<br>Seoul, South Korea<br>Attention: Kyunghyun Lee |
| with a copy (which shall not constitute valid notice to LV Renewables) to: | Snell & Wilmer L.L.P.<br>1455 SW Broadway<br>Suite 1750<br>Portland, Oregon 97201<br>Facsimile: (6503) 624.6888<br>Email: vroehm@swlaw.com<br>Attention: Victor J. Roehm III |

If to Ryze Nevada: Ryze Renewables Nevada, LLC
6600 Amelia Earhart Court
Suite A
Las Vegas, Nevada. 89119
Attention: Matthew G. Pearson

5. **Entire Agreement**. This Agreement (together with the Loan Agreement and the Amended Operating Agreement) constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

6. **Successor and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights of the parties hereunder may be transferred or assigned by any party hereto without the prior written consent of the other party. Any attempted transfer or assignment in violation of this Section 6 shall be void.

7. **No Third-Party Beneficiaries**. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

8. **Headings**. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

9. **Amendment and Modification; Waiver**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

10. **Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

11. **Governing Law; Submission to Jurisdiction**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Nevada without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada or any other

jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Nevada. Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the state courts located in the County of Clark, State of Nevada and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

**12.** **Waiver of Jury Trial**. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (a) no representative of any other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such party has considered the implications of this waiver; (c) such party makes this waiver voluntarily; and (d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 12.

**13.** **No Strict Construction**. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**14.** **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall together be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the parties hereto have executed this Option Agreement on the date first written above.

**LV RENEWABLES:**

LV RENEWABLES A, LLC,
a Nevada limited liability company

By: Mirae Asset Securities Co., Ltd., an entity organized under the laws of the Republic of Korea, its Manager

By:______________________________
Kyunghyun Lee, Director

**RYZE NEVADA:**

RYZE RENEWABLES NEVADA, LLC,
a Delaware limited liability company

By:____________________________
Matthew G. Pearson, Manager

**RYZE HOLDINGS:**

RYZE RENEWABLES HOLDINGS, LLC
A Delaware limited liability company

By:____________________________
Matthew G. Pearson, Manager

**RYZE II:**
RYZE RENEWABLES II, LLC,
a Delaware limited liability company

By:____________________________
Matthew G. Pearson, Manager

**RYZE NEVADA:**
RYZE RENEWABLES NEVADA, LLC,
a Delaware limited liability company

By:___________________________
Matthew G. Pearson, Manager

Exhibit A

[Promissory Note]

[See attached.]

Ex. B
(SLA dated Nov. 29. 2021)

# PROMISSORY NOTE

Original Principal Amount
$21,000,000.00

Las Vegas, NV
November 29, 2021

1. **Promise to Pay.** For value received, **RYZE RENEWABLES NEVADA, LLC**, a Delaware limited liability company ("Maker") promise to pay to the order of **LV RENEWABLES A, LLC**, a Nevada limited liability company ("Payee"), at such address as the holder of this Note provides at any time, initially to be 30048 Knoll View Drive, Rancho Palos Verdes, CA 90275 ("Holder") may designate by written notice to Maker, in lawful money of the United States of America, the then unpaid principal balance of the indebtedness evidenced by this Note, together with all then accrued and unpaid interest and other amounts that are Maker's obligations under this Note and the other Loan Documents. The proceeds of the credit accommodations evidenced by this Note shall be advanced pursuant to the provisions of that certain Loan Agreement of approximately even date herewith by and between Maker and Payee (the "Loan Agreement"). All capitalized terms used in this Note shall have the meanings provided for those terms by the relevant definitions in the Loan Agreement unless otherwise defined herein or by reference herein to another document.

2. **Computation of Interest**. Interest shall accrue on the outstanding balance of this Note from time to time at twelve percent (12.00%) per annum (the "Applicable Rate"). Interest is computed on the basis of the actual number of days elapsed over the actual number of days in the year. All interest payable under this Note is computed using this method.

3. **Required Payments.** If not earlier due and payable, all unpaid principal, accrued but unpaid interest and other amounts payable under the provisions of this Note, the Loan Agreement and/or the Loan Documents shall become due and payable in full on November 30, 2023 (the "Maturity Date").

4. **Application of Payments.** Except during the continuance of an Event of Default, all payments and other credits shall be applied (a) first, to accrued and unpaid interest, (d) second, to principal and (c) third, to any other amounts then due and owing under the Loan Documents, including the Prepayment Premium, if any. Any payments made by Maker must be received by Payee in immediately available funds no later than 4:00 p.m. New York City time in order to receive same day credit. No prepayments shall reduce or constitute a credit against the next scheduled monthly installments under this Note but instead shall be applied to the balance due on the Maturity Date.

5. **Dishonored Item Fee.** Holder may charge any actual charges assessed by the financial institution of the holder, payee or assignee of the holder or payee as a result of the dishonored instrument. Nothing in this Note shall be construed as an obligation on the part of Holder to accept, at any time, less than the full amount then due hereunder, or as a waiver or limitation of Holder's right to compel prompt performance.

6. **Collection Costs.** If suit or other legal proceeding or any nonjudicial foreclosure proceeding is instituted or any other action is taken by Holder to collect all or any part of the indebtedness evidenced hereby or to proceed against any collateral for any portion of such indebtedness or against any guarantor of the payment of any portion of the indebtedness, Maker promises to pay Holder's reasonable attorneys' fees and other costs (to be determined by the court and not by jury in the case of litigation) incurred thereby. Such fees and costs shall be included in any judgment award obtained by Holder, shall be secured by the Security Documents, shall bear interest at the Default Rate (defined in paragraph 10 below), and shall be guaranteed by any guaranty relating to any portion of the indebtedness evidenced hereby.

7. **Optional Prepayments.** Maker shall have the right to prepay all or any portion of the principal on any Payment Date provided that Maker gives Holder at least thirty (30) days prior written notice thereof, and such prepayment, in addition to all accrued and unpaid interest on the principal prepaid and all other amounts, other than principal or interest, then due under this Note is accompanied by the Prepayment Premium applicable thereto. The Prepayment Premium will also apply upon acceleration of the amounts due pursuant hereto. As used herein "Prepayment Premium" means with respect to any prepayment of principal (or acceleration of the Loan) after the Permitted Prepayment Date or as a result of acceleration an amount equal to six percent (6%) of the principal to be prepaid.

8. **Waivers and Acknowledgments.** Maker agrees that makers, endorsers, guarantors and sureties may be added or released without notice and without affecting Maker's liability hereunder. The liability of Maker shall not be affected by the failure of Holder to perfect or otherwise obtain or maintain the priority or validity of any security interest in any collateral. The liability of Maker shall be absolute and unconditional and without regard to the liability of any other party hereto.

9. **Acceleration.** Upon the occurrence of any Event of Default and the expiration of any cure period available to Maker under the Loan Agreement (if any), then, at the option of Holder, Holder may exercise any one or more of the remedies described in the Loan Documents or otherwise available, including, without limitation, declaring the total then unpaid indebtedness evidenced by this Note to be immediately due and payable.

10. **Default Interest.** After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, calculated from the date such payment was due or such underlying Default shall have occurred without regard to any grace or cure periods contained herein, and shall be payable upon demand from time to time, to the extent permitted by applicable law. The Default Rate is a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law or (ii) two percent (2%) above the interest rate set forth in Section 2 hereof, compounded monthly.

11. **Remedies/Right of Setoff.** The indebtedness evidenced by this Note is: (a) secured by the Security Instrument, and may be secured by other collateral, and (b) guaranteed by Guarantor. Upon the occurrence of any Event of Default, Holder may proceed against the property encumbered by the Security Instrument and/or any other collateral, Maker or

Guarantor in such order and manner as Holder in its sole discretion may determine, provided that Holder shall not be obligated to proceed against any of such collateral, Maker or Guarantor.

**12.** **No Waiver by Holder.** Failure of Holder to exercise any option hereunder shall not constitute a waiver of the right to exercise the same in the event of any subsequent default or in the event of continuance of any existing default after demand for strict performance hereof.

**13.** **Time of Essence.** Time is of the essence of this Note.

**14.** **Notices.** All notices required or permitted in connection with this Note shall be given at the place and in the manner provided in the Loan Agreement.

**15.** **Governing Law and Venue.** This Note is delivered in and shall be governed by and construed according to the substantive laws and judicial decisions of, the State of Nevada and applicable federal laws, rules and regulations. Subject to the arbitration provisions of the Loan Agreement, any action brought to enforce this Note may be commenced and maintained, at Holder's option, in any state or federal district court in Nevada, or in any other court having personal jurisdiction over Maker or any guarantor. Maker irrevocably consents to jurisdiction and venue in such court for such purposes and agrees not to seek transfer or removal of any action commenced in accordance with the terms of this paragraph 15. Maker also waives the right to protest the domestication or collection of any judgment obtained against Maker with respect to this Note or the loan evidenced hereby in any jurisdiction where Maker may now or hereafter maintain assets.

***[Remainder of the page intentionally left blank.]***

IN WITNESS WHEREOF, this Note has been executed as of the date first written above.

**Maker:**

**RYZE RENEWABLES NEVADA, LLC**,
a Delaware limited liability company,

By: ___________________________
Name: Matthew G. Pearson
Title: Manager

**EXHIBIT E**
**Grant of Membership Interests**
**[See attached.]**

Ex. B
(SLA dated Nov. 29. 2021)

**RYZE RENEWABLES NEVADA, LLC**
6600 Amelia Earhart Court, Suite A
Las Vegas, Nevada 89119

November 29, 2021

THE MEMBERSHIP UNITS ISSUED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS AND THE TRANSFERABILITY OF SUCH MEMBERSHIP UNITS IS RESTRICTED. SUCH MEMBERSHIP UNITS MAY NOT BE SOLD, ASSIGNED, GIFTED, TRANSFERRED OR OTHERWISE DISPOSED, NOR WILL THE VENDEE, ASSIGNEE, BENEFICIARY, OR TRANSFEREE BE RECOGNIZED AS HAVING ACQUIRED SUCH MEMBERSHIP UNITS FOR ANY PURPOSES, UNLESS A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), WITH RESPECT TO SUCH MEMBERSHIP UNITS IS IN EFFECT AND SUCH HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS.

THE UNITS REPRESENTED BY THIS DOCUMENT ARE ALSO SUBJECT TO FURTHER RESTRICTION AS TO THEIR SALE, TRANSFER, HYPOTHECATION, OR ASSIGNMENT AS SET FORTH IN THE AMENDED AND RESTATED OPERATING AGREEMENT OF THE COMPNAY (DEFINED BELOW) AND AGREED TO BY EACH MEMBER AND UNIT HOLDER.

LV Renewables A, LLC
c/o Mirae Asset Securities Co. Ltd.
26, Eulji-ro 5 gil
Jung-gu
Seoul, South Korea
Attention: Kyunghyun Lee
Email: kyunghyun.lee@miraeasset.com

***Re: Grant Letter and Grant of Units in Ryze Renewables Nevada, LLC***

Dear Sung Hee Han:

In connection with and as additional consideration for the loan made pursuant to that certain loan agreement of event date hereof (the "***Loan Agreement***") between Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "***Company***") and LV Renewables A, LLC, a Nevada limited liability company ("***Grantee***"), the Company is hereby granting Units in the Company to Grantee on the terms and conditions set forth in this letter and agreement ("***Grant Letter***") as follows:

1. **Grant of Units**. As additional consideration for the loan made pursuant to the Loan Agreement and in accordance with the Company's Amended and Restated Operating Agreement dated as of even date herewith (as further amended from time to time, the "***Operating Agreement***"), the Company has approved of the issuance and granting of, and Grantee is hereby granted, 15,800,416 Membership Units (as defined and described in the Operating Agreement) to Grantee which equals, as of the date hereof, a total of 3.8% of the equity of the Company ("***Equity***"). This Grant Letter sets forth the terms and conditions of the grant of the Equity by the Company to Grantee and by signing this Grant Letter and the Operating Agreement (or a joinder agreement respecting the Operating Agreement) Grantee hereby

acknowledges and agrees to be bound by the terms and conditions hereof and thereof. Capitalized terms used but not defined in this Grant Letter shall have the meaning set forth in the Operating Agreement.

a. Conditions to Grant. This grant of Units to Grantee is conditioned upon the execution of (i) this Grant Letter, (ii) a counterpart signature page of the Operating Agreement and (iii) the funding of the Initial Advance as defined the Loan Agreement. Grantee should carefully review this Grant Letter and the Operating Agreement, and consult your legal, financial, and tax advisors before signing this Grant Letter and the Operating Agreement.

b. Company Operating Agreement and Option Agreement. The Equity will be subject to all of the terms and conditions of the Operating Agreement, including, without limitation, the restrictions on transfer to be set forth therein, and including automatic redemption and repurchase. The Equity will also be subject to all the terms and conditions of that certain Option Agreement of event date hereof between the Company and Grantee (the "***Option Agreement***").

c. Vesting. The Equity issued pursuant to this Grant Letter will vest immediately.

d. Forfeiture and Repurchase. The Membership Units are subject to forfeiture and repurchase rights of the Company as set forth in the Operating Agreement and the Option Agreement.

e. General. Subject to the terms and conditions set forth in this Grant Letter, the Operating Agreement and the Option Agreement, as a holder of the Membership Units, Grantee is subject to the same obligations and liabilities, as those that apply to any other holders of Membership Units.

f. Restricted Securities. The Membership Units are restricted securities under the Securities Act and may not be resold or transferred unless (a) a registration statement under the Securities Act with respect to the Membership Units is in effect and has been qualified under all applicable state securities laws, or (b) the availability of an exemption from such registration.

2. **Representations of Company**. Unless provided otherwise, the Company represents and warrants to Grantee that the statements contained in this Section are true and correct as of the date hereof.

a. All representations, warranties, and covenants made by the Company in the Loan Agreement are true, complete, and correct.

b. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has full limited liability company power and authority to enter into this Grant Letter to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by the Company of this Grant Letter, the performance by the Company of its obligations hereunder, and the consummation by the Company of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of the Company. This Grant Letter has been duly executed and delivered by the Company, and constitutes a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

c. The execution, delivery and performance by the Company of this Grant Letter and the Option Agreement, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the Certificate of Formation of the Company; (b) conflict with or result in a violation

or breach of any provision of any applicable law or court order applicable to the Company; (c) require the consent, notice or other action by any Person under; or (d) result in the creation or imposition of any lien or encumbrance on any properties or assets of the Company except as expressly set forth in the Option Agreement.

d. The Equity constitutes 3.8% of the total issued and outstanding membership interests in the Company. The Equity has been duly authorized and is validly issued, fully paid and non-assessable. Upon consummation of the transactions contemplated by this Grant Letter, Grantee shall own all of the Equity free and clear of all encumbrances. The Equity was issued in compliance with applicable laws. The Equity was not issued in violation of the organizational documents of the Company or any other agreement, arrangement, or commitment to which the Company is a party and are not subject to or in violation of any preemptive or similar rights of any person. There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to any membership interests in the Company or obligating the Company to issue or sell any membership interests (including the Equity), or any other interest, in the Company. Other than the organizational documents, Operating Agreement and Option Agreement, there are no voting trusts, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Equity

3. **Representations of Grantee.** Unless provided otherwise, the Grantee represents and warrants to Company that the statements contained in this Section are true and correct as of the date hereof.

a. All representations, warranties, and covenants made by the Grantee in the Loan Agreement are true, complete, and correct.

b. The Grantee is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada. The Company has full limited liability company power and authority to enter into this Grant Letter to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by the Grantee of this Grant Letter, the performance by the Grantee of its obligations hereunder, and the consummation by the Grantee of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of the Grantee. This Grant Letter has been duly executed and delivered by the Grantee, and constitutes a legal, valid and binding obligation of the Grantee enforceable against the Grantee in accordance with its terms.

c. The execution, delivery and performance by the Grantee of this Grant Letter and the Option Agreement, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the Articles of Organization of the Grantee; (b) conflict with or result in a violation or breach of any provision of any applicable law or court order applicable to the Grantee; (c) require the consent, notice or other action by any Person under; or (d) result in the creation or imposition of any lien or encumbrance on any properties or assets of the Grantee.

d. The organizational chart attached hereto as Schedule A is complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Grantee on the date of this Agreement. Grantee shall not make any direct or indirect (through upstream entities or otherwise) assignment of the Equity, except as specifically permitted by the Operating Agreement.

4. **Entire Agreement**. This Grant Letter, the Loan Agreement, the Option Agreement, and the Operating Agreement when signed shall constitute the entire agreements and understanding between

Grantee and the Company in relation to the grant of the Equity and the terms and conditions of Grantee's ownership of the Equity.

5. **Notices**. Any notice to be given under the terms of this Grant Letter shall be given in accordance with the Loan Agreement.

6. **Survival**. The obligations contained in this Grant Letter shall survive for a period of one (1) year after the execution of this Grant Letter.

7. **Further Assurances**. Each of the parties hereto shall use its diligent and reasonable best efforts to proceed promptly with the transactions contemplated herein, to fulfill the conditions precedent for such party's benefit or to cause the same to be fulfilled, and to execute such further documents and other papers and perform such further acts as may be reasonably required or desirable to carry out the provisions hereof and the transactions contemplated herein.

8. **Modifications, Amendments and Waivers**. This Grant Letter may not be amended, modified, or altered except by a written instrument executed by both parties hereto.

9. **Governing Law**. This Grant Letter and any disputes hereunder shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

10. **Binding Effect**. This Grant Letter and the rights, covenants, conditions and obligations of the respective parties hereto and any instrument or agreement executed pursuant hereto shall be binding upon the parties and their respective successors, assigns and legal representatives.

11. **Counterparts**. This Grant Letter may be executed and delivered by facsimile signature and in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any signature pages of this Grant Letter transmitted by telecopier or portable document format (PDF) transmission shall have the same legal effect as an original executed signature page.

12. **Severability**. If any provision of this Grant Letter is determined to be invalid, illegal or unenforceable, the remaining provisions of this Grant Letter, to the extent permitted by applicable law, shall remain in full force and effect, provided that the essential terms and conditions of this Grant Letter for both parties remain valid, binding and enforceable.

[*Signature page follows*]

If this Grant Letter accurately reflects our understanding and agreement with respect to the matters contained herein, please execute this Grant Letter where indicated below.

Sincerely,

**RYZE RENEWABLES NEVADA, LLC**,
a Delaware limited liability company

By: ____________________________
Name: Matthew G. Pearson
Title: Manager

ACKNOWLEDGED AND AGREED:

**LV RENEWABLES A, LLC**
a Nevada limited liability company

By:______________________________
Sung Hee Han, Treasurer

Date Acknowledged: ______________, 2021

**EXHIBIT F**
**[Intentionally omitted.]**

**EXHIBIT G**
**[Intentionally omitted.]**

**Schedule 1**
**[Intentionally omitted.]**

**Schedule 2**
**[Intentionally omitted.]**

**Schedule 3**
**Exceptions to Representations and Warranties**

Employment Agreements entered into by Borrower and Retention Agreements assumed by Borrower, previously provided to Lender's counsel, provide for deferred compensation, affiliate loans, and fringe benefits. Such Agreements further provide for penalties if terminated without cause.

The Commitment for Title Insurance with a commitment date of October 5, 2021 issued by Fidelity National Title Group shows two SID's (Special Improvement District charges) on the Property.

**Schedule 4**
**[Organization of Borrower]**

Ex. B
(SLA dated Nov. 29. 2021)

# Ryze Entities

***As Of 7/1/21***



Ex. B
(SLA dated Nov. 29. 2021)

**Schedule 4a**
**[Persons with Interests in Borrower]**

RYZE RENEWABLES HOLDING, LLC is owned as set forth below and is managed by Mathew G. Pearson and Kevin McDonough

| Name of Member | Preferred Units | Number of Common Units | Authorized but Unissued Common Units | Percentage Interest |
|---|---|---|---|---|
| The Ryze Corporation | 0 | 6,000,000 | | 1.50% |
| MKP 2001 Irrevocable Trust | 0 | 297,331,013 | | 74.3328% |
| RQNMK,LLC | 671,500 | 12,700,000 | | 3.175% |
| ADK Advisors LLC | 0 | 3,354,430 | | 0.8386% |
| The Daniel Brown 2018 Family Trust | 0 | 35,214,557 | | 8.8036% |
| The Chris Dancy 2018 Family Trust | 0 | 40,000,000 | | 10.00% |
| The LAK Exempt Family Trust | 0 | 2,000,000 | | 0.50% |
| Nemo Perera | 0 | 1,000,000 | | 0.25% |
| Darshaun Oyston | 0 | 400,000 | | 0.10% |
| USVEN, LLC | 0 | 1,800,000 | | 0.45% |
| Steven Fink GST | 0 | 200,000 | | 0.05% |
| Authorized but Unissued Shares | | | 200,000,000 | |
| Totals | 671,500 | 400,000,000 | 200,000,000 | 100.00% |

## Schedule 4b
## [Persons with Interests in Lender]

LV RENEWABLES A, LLC is owned 100% by LV RENEWABLES B, INC., a Nevada corporation ("Lender's Sole Member") and is managed solely by Mirae Asset Securities Co., Ltd.

Lender's Sole Member is wholly-owned by Paragon BRG Korea Co., Ltd., an entity organized under the laws of the Republic of Korea ("PBRGK"), which is wholly owned by Lee Hack-Pyo, a Korean national. The Co-Presidents/Co-CEOs of PBRGK are Oh Seung-Hwan and Lee Hack-Pyo.

## Schedule 4.17

## [Warrant, Grants or Pledges of Interests]

1. Warrant issued by Ryze Renewables Las Vegas, LLC to New-Com, Inc. dated January 20, 2018

2. Operating Agreements of all Ryze Entities have tag along, drag along and rights of first refusal.

3. Phillips 66 Supply and Offtake Agreement contains certain rights of first refusal.

4. The Olds Family 2002 Trust u/d/t June 3, 2002 has a pledge of Membership Units in Ryze Renewables Holdings, LLC to secure certain notes.

5. NC Industries, LLC has a pledge of Membership Units in Ryze Renewables Holdings, LLC to secure certain notes.

6. RQMNK, LLC has a pledge of Daniel Brown 2018 Family Trust's Membership Units in Ryze Renewables Holdings, LLC to secure certain notes.

## Schedule 4.25
## [Major Contracts]

1. Employment Agreements entered into by Borrower and Retention Agreements assumed by Borrower, previously provided to Lender's counsel, provide for deferred compensation, affiliate loans, and fringe benefits. Such Agreements further provide for penalties if terminated without cause.

2. Engineering, Procurement and Construction Services Contract, by and between Ryze Renewables Las Vegas, LLC and MMC, Inc. dated January 23, 2018

3. Engineering Services and Equipment Agreement, by and between Plant Process Equipment, Inc. and Ryze Renewables Las Vegas, LLC for a Natural Gas to Hydrogen Production Facility dated August 8, 2018

4. Change Order to Plant Process Equipment, Inc. Engineering Services and Equipment Agreement dated December 7, 2018

5. Engineering Services and Equipment Agreement, by and between Plant Process Equipment, Inc. and Ryze Renewables Las Vegas, LLC for a7500 BPSD Renewable Diesel Hydrotreater and Isomerization Unit dated as of September 20, 2018

6. Management Services Agreement, to be entered into by and between Ryze Renewables Holdings, LLC and Ryze Renewables Las Vegas, LLC

7. Operation and Maintenance Agreement, entered into by and between Plant Process Operating, LLC and Ryze Renewables Las Vegas, LLC dated as of September 11, 2020

8. Supply and Offtake Agreement, by and between Ryze Renewables Las Vegas, LLC and Phillips 66 Company, dated as of June 15, 2017, as modified

9. License Agreement by and between Ryze Renewables Las Vegas, LLC and Haldor Topsoe A/S dated October 4, 2019

10. Engineering Agreement between Haldor Topsoe, Inc. and Ryze Renewables Las Vegas, LLC dated as of October 4, 2019

11. Guarantee Agreement between Haldor Topsoe A/S and Ryze Renewables Las Vegas, LLC dated as of October 4, 2019

12. Catalyst Supply Agreement between Haldor Topsoe, Inc. and Ryze Renewables Las Vegas, LLC dated as of May 13, 2020

13. Intellectual Property License Agreement between Ryze Renewables Holdings, LLC and Ryze Renewables Las Vegas LLC dated October 29, 2020

**Schedule 4.33**
**[Breaches Known to Lender]**

None.