**EXHIBIT 1:**

Complaint

*Ryze Renewables Holdings, LLC v. Snell & Wilmer, LLP, et al.*

Case No. A-23-863908-B, District Court, Clark County, Nevada

Electronically Filed
1/12/2023 3:39 PM
Steven D. Grierson
CLERK OF THE COURT

**COMP**

G. Mark Albright, Esq. #001394
Daniel R. Ormsby, Esq. #014595
**Albright, Stoddard, Warnick & Albright**
801 South Rancho Drive, Ste. D-4
Las Vegas, Nevada 89106
Telephone: (702) 384-7111
Facsimile: (702) 384-0605
gma@albrightstoddard.com
dormsby@albrightstoddard.com

**Edgar Law Firm LLC**

John M. Edgar, Esq. (*PHV app. forthcoming)*
John F. Edgar, Esq. (*PHV app. forthcoming)*
Michael R. Owens, Esq. (*PHV app. forthcoming)*
2600 Grand Boulevard, Ste. 440
Kansas City, Missouri 64108
Telephone: (816) 531-0033
jme@edgarlawfirm.com
jfe@edgarlawfirm.com
mro@edgarlawfirm.com

*Attorneys for Plaintiff Ryze Renewables Holdings, LLC*

AS Albright Stoddard Warnick & Albright

CASE NO: A-23-863908-B
Department 27

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| RYZE RENEWABLES HOLDINGS, LLC., a Delaware, limited liability company, registered in Nevada,<br><br>Plaintiffs,<br><br>v.<br><br>SNELL & WILMER, LLP., a foreign limited liability partnership, registered in Nevada; VICTOR J. ROEHM III; STEVEN T. GRAHAM; and CHARLES E. GIANELLONI,<br><br>Defendants. | Case No.:<br>Dept. No.:<br><br>**COMPLAINT**<br>**Request for Business Court Asgmt.**<br>[EDCR 1.61(a)(2)(ii)]<br>**Exempt from Arbitration**<br>[N.A.R. 3 (Amount in Controversy)]<br>**Jury Demand**<br>[NRCP 38(b)] |

Plaintiff RYZE RENEWABLES HOLDINGS, LLC, ("**Ryze**"), a Delaware limited liability corporation registered to do business in Nevada, brings this action against Defendants SNELL & WILMER LLP ("Snell"), a foreign limited liability partnership registered to do business in Nevada, VICTOR J. ROEHM III ("**Roehm**"), STEVEN T. GRAHAM ("**Graham**"), and CHARLES E. GIANELLONI (collectively, "**Defendants**") for abuse of process, professional negligence, fraud, and tortious interference with contract. In support of the same, Ryze states and alleges the following:

## INTRODUCTION

1. Ryze brings this action to recover damages it sustained as a result of the misrepresentations, deceptive omissions, and other bad-faith and tortious conduct undertaken by Defendants as principals, conspirators, abettors, and beneficiaries of a brazen loan fraud. The scheme principally involved an onslaught of threats, misrepresentations, and deceptive conduct pertaining to the capacity and/or willingness of Snell's supposed client, Korea-based Mirae Asset Securities Co., Ltd. ("**Mirae**"), to fund its loan agreements with Ryze.

2. To thwart Ryze's efforts to finalize a loan commitment to enable the construction of a renewable diesel plant in Las Vegas—one capable of producing over 100 million gallons per year of renewable diesel fuel (the "**Project**")—and to enrich themselves and their "client," Defendants misrepresented the identity of their client (purportedly Mirae Asset Securities Co., Ltd., a prominent South Korea-based asset management firm) as well as the client's capacity to fund the loan deal the parties spent precious months negotiating. Defendants even went so far as to file an entirely unfounded and malicious Nevada lawsuit in this Court on July 23, 2021 (the "**July 23 Lawsuit**"), the purpose of which—by Defendants' own *admission*—was to scare off any alternative funding sources and, tie up Ryze for an additional six (6) months, and thereby coerce Ryze into accepting extortionate terms for a plainly inadequate loan commitment (approximately 10% of the amount originally negotiated).

3. As it turns out, the global asset management firm Defendants claimed to represent (and in whose name Defendants filed their extortionate lawsuit) was unable to fund even this significantly more modest commitment, despite the unconscionably lender-friendly terms that Defendants extorted Ryze into accepting.

AS Albright Stoddard Warnick & Albright

4. The magnitude of the financial loss that the Defendants' conduct has visited upon Ryze is staggering. It has caused, among other losses:

a) the ongoing (and potentially permanent) suspension of Ryze's construction of a renewable diesel facility in Las Vegas, Nevada, and lost profits resulting from this delay or abandonment of the Project;

b) Ryze's default on a $198,000,000 loan guaranteed by the United States Department of Agriculture under a program for emerging renewable energy technologies guaranteed (the "**USDA Guaranteed Loan**") and its inability to source alternative funding;

c) Increased construction, materials, and interest costs.

5. While Ryze is making every effort to secure new funding for the Project, it is now in a workout with the lender under USDA Guaranteed Loan, which makes the search for new funding very difficult.

6. The entire Project and, indeed, Ryze itself now teeter on the brink of total collapse.

AS Albright Stoddard Warnick & Albright

**PARTIES**

7. Plaintiff Ryze Renewables Holdings, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 6600 Amelia Earhart Court, Suite A, Las Vegas, Nevada 89119.

8. Defendant Snell & Wilmer LLP is a limited liability partnership, organized and existing under the laws of the State of Arizona, an Arizona limited liability partnership, registered in Nevada, with its principal place of business located in Nevada at 3883 Howard Hughes Parkway, #1100, Las Vegas, Nevada and in Arizona at One Arizona Center, Suite 1900, Phoenix, Arizona 85004.

9. Defendant Steven T. Graham is an individual and a citizen of the State of California who principally resides in Orange County, California. At all times relevant to the allegations herein, Defendant Graham was and/or held himself out to be an attorney practicing with Snell & Wilmer LLP. Upon information and belief, Defendant Graham is a business associate or close friend of Jeff Hall (owner of Paragon Construction Consulting, Inc., Plaintiff's broker and representative), and

served as lead litigation counsel July 23 Lawsuit filed in Nevada against Ryze to undermine its efforts to secure alternative funding and to coerce Ryze into accepting an onerous (and ultimately illusory) funding deal.

10. Defendant Victor J. Roehm III is an individual and a citizen of the State of Oregon who principally resides in Multnomah County, Oregon. At all times relevant to the allegations herein, Defendant Roehm was and/or held himself out to be an attorney practicing with Snell & Wilmer LLP. Roehm served as "transactional counsel" in connection with the loan agreement Defendants coerced Ryze into accepting the via July 23 Lawsuit and directly participated in the misrepresentations and other tortious conduct described herein.

11. Defendant Charles E. Gianelloni is an individual and a citizen of the State of Nevada who resides in Clark County, Nevada. At all times relevant to the allegations herein, Defendant Graham was and/or held himself out to be an attorney practicing with Snell & Wilmer LLP. Mr. Gianelloni is licensed to practice law by the State Bar of Nevada and served as counsel of record in the July 23 Lawsuit described herein.

12. Non-party Mirae Asset Securities Co., Ltd., ("**Mirae**") is a South Korea-based asset management and investment banking firm that, along with its global affiliates, controls some $550 billion in total assets.

13. Non-parties Jeff Hall ("**Hall**"), Sung Hee Han ("**Han**"), and Kyunghyun Lee ("**Lee**") were Defendants' principal collaborators in the fraud. Hall owned a company called Paragon Construction Consulting, Inc. ("**Paragon**") that was working to raise the additional funding for Ryze. Han worked for Paragon. Lee was an employee of Mirae, who represented that he had the sole authority to bind Mirae. Lee did not speak English so all communication with Lee was translated through Han.

14. Hall and Han were supposed to be working for and representing Ryze and stood to earn significant fees if Mirae provided the additional funding. Han and Hall were also subject to confidentiality provisions in the Paragon agreement and separate nondisclosure agreement. (Although Han asserted that he never represented Ryze, that claim is demonstrably false. In fact, Hall (who was described by Roehm as "a close friend of [Snell]") and Han switched sides without

AS Albright Stoddard Warnick & Albright

AS Albright Stoddard Warnick & Albright

informing Ryze and concocted the scheme with Defendants to extort millions from Ryze or ruin them, or both.)

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action because it arises under Nevada law and seeks the recovery of money in excess of $15,000.00.

16. This Court has personal jurisdiction over the parties because Defendants, and each of them, engaged in intentional conduct expressly directed at and calculated to cause harm to Ryze, a Nevada resident, because Defendants knew that the effects of their wrongful conduct would be felt in and would be unique to Nevada, and/or because Defendants utilized this Court (albeit wrongfully) in furtherance of their tortious conduct described herein.

17. Venue is appropriate in this Court pursuant to NRS 13.040 because, among other reasons, Ryze is headquartered in Clark County, Nevada as of the commencement of the action.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### I. Ryze's Ongoing Efforts to Construct a State-of-the-Art Renewable Diesel Facility in Las Vegas

18. Ryze is in the process of constructing a renewable diesel facility in Las Vegas, Nevada.

19. The Project aims to convert an existing biodiesel refinery facility into a renewable diesel facility equipped to utilize state-of-the-art technology and proprietary refining methods.

20. By leveraging these cutting-edge technologies, the facility was reasonably expected to achieve a production capacity in excess of 100 million gallons of renewable diesel output per year.

#### A. The Project's Profitability is Ensured by a Lucrative 15-Year Supply and Offtake Contract with Phillips 66 Co.

21. On top of ensuring the facility's competitiveness technologically, Ryze has secured input and purchase commitments that effectively ensure the Project's profitability once the facility is completed and operational.

...

22. Specifically, Ryze managed to secure a 15-year supply and offtake agreement with Phillips 66—an arrangement that provides for a continuous and stable feedstock supply, guaranteed sales, and transportation of offtake under an industry-unique netting arrangement.

23. In other words, the procurement of input for the facility and the profitable sale of its output are both guaranteed by enforceable contractual commitments with one of the largest energy companies in the world.

B. Ryze Seeks to Procure Additional Financing to Fund its Pivot to a New Refining Technology

24. Ryze obtained initial funding for the Project through a $198 million loan from Georgia's Own Credit Union ("**Georgia's Own**").

25. The loan was approved and partially guaranteed by the USDA as part of an initiative to promote emerging environmental technologies.

26. The original loan guidelines, and the USDA Guaranty Program, encouraged borrowers to license non-commercially deployed technology.

27. After construction commenced, development plans with the USDA were amended for the use of previously deployed and proven technology. Ryze immediately began working on the possible mid-construction transition to commercially proven technology.

28. This was a major undertaking by Ryze, but it did not threaten the viability of the Project. Determined to see the Project through, Ryze promptly devised a workable plan to reconstitute the Project around a proven technology. Still, the additional funding required for this technological pivot would be considerable.

29. Ryze thus began looking to secure additional funding for the Project in late 2019, and early 2020.

**II. Ryze is Induced to Abandon its Pending Bond Issuance in Favor of a Sham Funding Deal Purportedly Backed by Mirae**

30. Unsurprisingly, the prospect of financing the Project drew the interest of several potential funders. Ryze was moving toward the closing of a bond issuance, when Mirae entered the scene as a potential bond purchaser. In the end, Mirae persuaded Ryze to abandon the bond issuance



AS Albright Stoddard Warnick & Albright

AS Albright Stoddard Warnick & Albright

and convinced Ryze that it was the best-suited alternative out of the many interested funders for Ryze's immediate needs and, most critically, that it could—and would—fund all amounts needed by Ryze within 8 weeks of signing an Offering Memorandum on April 22, 2020. The COVID-19 shutdowns were well underway at this point in time, and Mirae assured Ryze that they could close without any COVID-19 related delays that the bond issuance could experience.

A. The Parties' Negotiations of the $210 Million CLA

31. On or about April 22, 2020, the parties executed an Offering Memorandum. Among other provisions, the Memorandum incorporated Mirae's assurance that it will "fund [the] Transaction within Eight Weeks of executing this Offering Memorandum"—*i.e.*, by June 17, 2020.

32. Instead of cooperating to advance the due diligence process and position the parties to close the loan in accordance with the agreed-upon timeframe, Han, purportedly on behalf of Mirae, instead lobbed endless demands to change previously agreed-upon terms (especially demands related to rates and fees Ryze was to pay Mirae and its advisors) and to delay the funding deadline.

33. This process played out month after month. The "prompt" funding assurances—the ones responsible for Ryze's decision to deal with Mirae in the first place (and thus Ryze's abandonment of its pending bond issuance as well) had already proven false by a wide margin.

34. Nevertheless, nearly one whole year after Mirae first represented to Ryze that Mirae could deliver the additional Project funding within 6-8 weeks—and some 7 months following the expiration of the June 17th funding deadline agreed to in the Offering Memorandum—the parties finally reached agreement on terms of a Convertible Loan Agreement (the "**CLA**"). The CLA was executed by all parties on January 27, 2021.

35. On a phone call conducted March 1, 2021, Mirae informed Ryze that it had obtained final committee approval for the CLA. This approval triggered Mirae's obligation to fund the CLA "no later than ten (10) days" thereafter. Mirae thus was required to provide funding no later than March 11, 2021.

…

…

AS Albright Stoddard Warnick & Albright

### B. Hall, Han, and Lee Ignore the CLA's Terms and Attempt to Renegotiate the Transaction

36. What followed in the ensuing weeks and months defied reasonable—or innocent—explanation. Hall, Han, and Lee began attempting to renegotiate the terms, treating the CLA as though it were merely a non-binding offering memorandum, rather than an enforceable contract obligation of Mirae.

37. Ultimately, Mirae decided to "withdraw" from the deal. In an email dated May 20, it stated "As Ryze isn't willing to accept our new solution, we will now officially withdraw and terminate. We hope your future is prosperous and wish you good luck." Five days later, Mr. Lee added that: "we have restructured our deal with our investment committee and our co-investors, thus previous 210MM CLA won't be viable for us. We have decided to withdraw from the Ryze so that Ryze can move forward and succeed without our participation."

38. Yet, in the very same communication, Lee proposes a new financing transaction between Ryze and Mirae, essentially inviting Ryze to scrap the CLA and start negotiations anew.

39. By this time, however, Ryze has determined that Mirae—or whomever it was Ryze had spent the past year-plus negotiating with—would never fund a loan. Ryze decided then to cut its losses to save the Project by returning to the market to raise the required funding from a different source.

40. Ryze promptly succeeded in locating an interested funding source (the "Substitute Funder"), and thereafter executed a term sheet with the Substitute Funder that included a proposed closing date of July 30, 2021 (the "**July 2021 Funding**").

41. Hall and Han, for their part, were desperate to bring Ryze back to the table to negotiate a new deal with Mirae. They somehow learned about Ryze's new funding source and threatened that Mirae might "do something crazy" if Ryze walked away from the CLA. Having received an email from Lee (Ryze's sole contact at Mirae), specifically terminating the CLA and wishing Ryze good luck, Ryze disregarded these threats.

42. At this point, however, Ryze was well on track to securing the funding necessary to incorporate the proven refining technology into the Project with a different lender. It now had a clear

path toward completing the construction of the Project and making it an operational and profit-generating facility.

43. That trajectory would change abruptly, however, when Snell & Wilmer LLP and attorneys Steven Graham, Victor Roehm, and Charles Gianelloni got involved. As detailed below, Snell successfully thwarted the substitute financing arranged by Ryze via a series of bad-faith acts—including egregiously misusing this Court in service of unlawful and collateral objectives designed to enrich themselves and their coconspirators.

### III. Defendants File a Baseless, Bad-Faith Lawsuit to Thwart Ryze's Deal with the Alternative Lender and Force it to Resume Loan Negotiations with Mirae

44. Unbeknownst to Ryze, Hall and Han had sought out Graham (a close friend of Hall) to concoct a plan to force Ryze to negotiate with Mirae.

45. Han and Hall, without Ryze's knowledge or consent, provided Defendants with all of the confidential information they had received from Ryze and used it to file suit against Ryze, despite the fact that such information was protected under the terms of a non-disclosure agreement and the fact the Han and Hall were supposed to be Ryze's representatives.

46. Defendants filed suit against Ryze in Clark, County Nevada on July 23, 2021 (the "**July 23 Lawsuit**") to stop the July 2021 Funding from closing and force Ryze to re-engage negotiations with Mirae.

47. The July 23 Lawsuit purported to assert claims for specific performance and monetary damages premised on Ryze's supposed breach of the CLA.

48. In reality, the suit was a transparent tool to thwart the deal in progress with the Substitute Funder (or any other potential alternative financing), force Ryze to resume negotiations with Mirae, and extort Ryze into accepting wildly non-market terms for a $21 million financing deal (the "Second Loan" or "SLA"). This amount was a mere 1/10 the funding commitment originally contemplated under the CLA. Ryze immediately informed the Substitute Funder of the July 23 Lawsuit, and the Substitute Funder, predictably, stopped all work related to the July 2021 Funding pending resolution of the July 23 Lawsuit.

…





AS Albright Stoddard Warnick & Albright

AS Albright Stoddard Warnick & Albright

A. The Baseless and Incoherent Allegations in Defendants' Lawsuit

49. The allegations in the July 23 Lawsuit contained a myriad of known misrepresentations—the falsity of which was known to Snell (or which unquestionably would have been discovered had they conducted anything resembling the good-faith merits investigation required by Nev. R. Civ. P. 11).

50. Such provably baseless allegations included, among others, the following factual assertions:

a) *that Ryze misrepresented the Project to be in its "final stages."* In fact, Ryze provided Mirae with direct access to the independent engineer reports tracking construction progress. Further, Mirae demanded that, upon funding, Ryze remove its current construction company, MMC, and hire Sys-Con, LLC, a Korean company with strong ties to Mirae, Lee and/or Han instead. Prior to executing the CLA, Sys-Con, LLC was provided unfettered access to the Project and provided its analysis of the status directly to Mirae. In short, Mirae—at its own insistence—reasonably made its own determination about the status of the Project prior to executing the CLA.

b) *that Ryze misrepresented that the estimated cost of completion of the pretreatment facility was $95 Million.* In fact, Ryze's representation, when made, was entirely true. While Sys-Con, LLC may have told Mirae that its cost for completion was in excess of $95 Million, MMC (Ryze's construction company) agreed to complete this work for $95 Million. Later, due to COVID and delays specifically caused by Defendants and Mirae, the cost increased significantly, mainly due to supply chain issues and the increase in costs of materials—costs increases that largely could have been avoided if Mirae had met its promises to close the transaction on an expedited basis. Nonetheless, when the CLA was executed, Ryze had a bid for this work from MMC at $95 Million. Ryze's strong preference was to move forward with MMC but Mirae challenged this, which may be the result of a close, undisclosed relationships between Sys-Con/Mirae/Han.

c) *that Ryze failed to disclose that NC Industries, Inc. (whose $26,435,048 note would be retired upon Mirae's funding the CLA) is MMC, the EPC contractor who had performed on the Project up to the time of the CLA.* In fact, Ryze provided Mirae with the NC Industries, Inc. loan documents and did disclose that Greg Paulk was the owner of NC Industries, Inc. and MMC. This disclosure was the initial driver leading to Mirae's demand that its closely affiliated Korean-owned construction company perform the construction instead. Changing the EPC contractor would have created significant complications and expense, but Ryze (after much coercion and additional threats from Han and Mirae) agreed that it would hire Sys-Con, LLC upon Mirae's funding of the CLA. There were some conversations about trying to delay repayment of the NC Industries, Inc. loan in order to retain MMC at a much-reduced cost for completion of the project. The claim that Mirae was not aware of Greg Paulk's ownership of both entities is entirely baseless and untrue.

AS Albright Stoddard Warnick & Albright

d) *that Ryze failed to disclose that they "were the subject of litigation, and continued to be the subject of a threatened claims, particularly those made by RB Products, Inc., regarding the original technology that Ryze was planning on abandoning for the Project, in favor of the commercially deployed technology, at the time of the negotiations and then the execution of the CLA.*" In fact, the Ryze Defendants settled all claims by RB Products, Inc. Snell represented RB Products in the case so was fully aware of the settlement. Even though this case was completely frivolous, Ryze paid to settle it so that the Mirae closing could move forward. All claims against Ryze were dismissed months prior to the execution of the CLA.

e) *that Ryze concealed that Ryze is "controlled and dominated and potentially owned by Brown, whose control, dominion and ownership has been apparently concealed because of Brown's prior serious legal problem with the Internal Revenue Service.*" Entirely untrue: Brown has no ownership or control over Ryze. Brown was an outside consultant with a significant engineering background. Brown introduced Paragon to Ryze and had a close relationship with Paragon, regularly golfing and socializing with Hall. Because of this relationship, Brown took the lead on many of the discussions with Paragon/Mirae. However, Brown has no ownership or authority to bind the company. This was relayed to Paragon many times as they regularly tried to (and continue to try to this day) go around Pearson and negotiate with Brown, who was much more willing to engage in Mirae's constant renegotiation than Pearson. However, it was always Pearson who made the final decision. There is no evidence of any direct or indirect, past or present ownership of Brown in Ryze.

f) *that Sections 4.01, 4.02 and Schedule 4.02A of the CLA provided for a "Due Diligence Period" and that Ryze refused to comply with Mirae's requests for due diligence during this period.* This claim—which formed the main basis for Defendants' stated claims for relief—is completely fabricated. In fact, Nowhere in Sections 4.01, 4.02 or Schedule 4.02A of the CLA is there any mention of due diligence or any requirement for Ryze to provide any due diligence. Schedule 4.02A of the CLA sets forth a list of 14 distinct and objective deliverables, each of which was provided by Ryze prior to the funding date. Mirae acknowledged in an email that each item was received. Even if that were not the case, the CLA expressly excludes each of the referenced Sections as a basis to sue ("each party hereby waives, releases and discharges the other party and agrees not to sue in connection with . . . [the] conditions precedent set forth on Schedule 4.02A or Schedule 4.02B"). The actual terms in the CLA were of no consequence to Defendants, who seemed all too eager to join Han and Mirae in their extortionist scheme.

51. Notably, the CLA that formed the basis for Defendants' claims also mandated that any disputes at law be resolved exclusively in arbitration. Private arbitration, however, would not serve Defendants' primary goal of publicly damaging Ryze in the eyes of prospective funders as effectively as a court proceeding, so they simply disregarded the arbitration clause. Defendants' demanded specific performance of the CLA to avoid the arbitration clause, but Defendants' first

AS Albright Stoddard Warnick & Albright

statement to Ryze after the filing was that the terms of the CLA were no longer on the table and a new deal (one that would not provide the necessary funds to Ryze, but would still provide the egregious fees that Defendants would have received under the $210,000,000 original CLA) was to be negotiated if Ryze wanted to survive. If Ryze refused, Defendants threatened to tie the Project up in litigation for years.

B. Defendants Use the CLA Suit (and Ryze's Attempts to Mediate it) to Coerce Ryze's Agreement to a Collateral and More Onerous Loan Agreement

52. In an effort to expeditiously resolve the dispute and salvage the additional funding from the Substitute Funder, Ryze arranged for the parties to conduct a mediation.

53. The mediation took place on August 12, 2021, at Snell's office in Orange Co., California.

54. The ordinary purpose of mediation is to explore potential resolutions of the dispute underlying the litigation.

55. The typical case, however, assumes the underlying lawsuit was initiated as a good-faith resort to civil process to resolve a *bona fide* dispute. That was plainly not the case here.

56. Instead, Graham, Roehm, and Han used the mediation opportunity to threaten Ryze into accepting their latest slate of renegotiated and extortionate terms.

57. Defendants refused to discuss the lawsuit they filed, stating that if Ryze's counsel even attempted to discuss its merits, the mediation would be terminated. Defendants also and admitted that they had no intention of funding the loan pursuant to the CLA—despite having filed a lawsuit some 20 days prior that requested a declaration that "the CLA has not automatically terminated" and demanding equitable relief requiring the Ryze Defendants to "specifically perform" the very same CLA.

58. To be clear, Ryze *wanted* Mirae to fund under the terms of the CLA and repeatedly advised Mirae of this fact in the months before and after the lawsuit.

59. Graham and Han, for their part, did not even bother to pretend that the Lawsuit served any lawful or legitimate ends. Graham's client was entirely candid (if vulgar) in summarizing their …

AS Albright Stoddard Warnick & Albright

side's expectations for the mediation: Ryze, in their view, should just "*bend over and take it in the a[**].*"

60. Indeed, Defendants expressly acknowledged that the transaction was unfavorable to Ryze but insisted that Ryze's only option was to pay the amounts demanded or go bankrupt.

61. Defendants told Ryze in no uncertain terms, that if they did not sign a deal with Mirae by midnight that there would be an even bigger lawsuit against Ryze—this time by Clifford Chance, supposedly, which would ensure Ryze's destruction. Having endured for some 18 months of Mirae's and Han's seemingly endless capacity for malicious, unscrupulous, and extortionate conduct, Ryze had every reason to take Graham and Roehm at their word when they threatened to "destroy" Ryze through "years" of vexatious litigation if they did not sign the deal at the mediation.

62. Snell's threats were effective because they contained an element of truth: protracted litigation, even meritless litigation, was virtually certain to bankrupt Ryze, by scaring off potential funders and destroying Ryze's ability to access the financing required to complete the Project.

C. <u>Left with No Other Choice, Ryze Acquiesces to Mirae's Threats and Executes the SLA</u>

63. As the mediation dragged on into the early morning hours of August 13, 2021, Ryze concluded it had no choice but to acquiesce to Defendants' relentless extortion if it were to have any chance of avoiding imminent default on the USDA Guaranteed Loan.

64. Shortly before 2:00 a.m. on August 14, 2021, Ryze signed a binding term sheet, which eventually led to the execution of the SLA.

65. The binding term sheet provided, in part, for the following:

a) Ryze would receive a $52 million loan from Mirae to be allocated:

1. $28 million for construction
2. $2 million for working capital
3. $1 million for project contingency
4. $10 million for interest reserve for the USDA Guaranteed Loan
5. $4.5 million for Mirae's interest reserve
6. *$6.5 million for Fees payable to Han, Mirae and Defendants.*

b) Mirae would receive:

1. 20% of all outstanding membership interests in Ryze (the "**Equity Award**"). Ryze would have a call option on the Equity Award for $150 million. Mirae would have a put option for the Equity Award in certain limited circumstances for $150 million.
2. 12% interest
3. repayment of principal and accrued interest after 5 years
4. two (2) seats on the 5 member board of directors
5. $6.5 million in Fees payable to Han, Mirae and Defendants.

66. The term sheet further provided that the parties would execute the definitive agreements within 80 calendar days from the date the term sheet was executed (the "**Estimated Execution Date**"). Mirae was required to fund within 10 days of the Estimated Execution Date. The Estimated Execution Date was November 4, 2021. If definitive agreements were not executed by the Estimated Execution Date, the binding term sheet would be terminated and the July 23 Lawsuit would be dismissed with prejudice; provided, that Mirae could extend the Estimated Execution Date for an additional 30 days by paying a penalty to Ryze of $50,000 per day (the "**November 4 Penalty**").

67. The binding term sheet contained very specific deliverables from Ryze (similar to those under the CLA) and made no mention of any additional due diligence.

68. In an effort to avoid prior experiences with Mirae, Ryze included a provision that, if Mirae attempted to renegotiate the binding term sheet, Ryze could terminate the transaction and Mirae would have to dismiss the July 23 Lawsuit with prejudice.

D. <u>Mirae Changes the Deal Yet Again and Ignores the Requirements of the Binding Term Sheet</u>

69. Nevertheless, Defendants began making demands for additional due diligence. Ryze strongly resisted re-opening diligence with Mirae, after months of intensive diligence in connection with the CLA and assurances that no additional diligence would be required for the second loan outside of what was specifically set forth in the binding term sheet.

AS Albright Stoddard Warnick & Albright

70. However, in the end, Ryze provided all of the requested due diligence anyway to ensure that its own good faith during the process could not reasonably be doubted.

71. In addition to re-starting the due diligence process, Mirae was running into other issues. During the Term Sheet negotiations, Ryze informed Defendants that the senior lender could have issues with the new ownership and changes to the management structure. Defendants told Ryze that they would cooperate with any requirements of the senior lender, including "know your customer" requirements. Ryze was trying to facilitate the process, but Defendants refused to tell Ryze who the actual loan counter party or new 20% member would be. Ryze informed the senior lender that some yet to be formed Mirae entity was joining the board of managers of Ryze and acquiring 20% of the membership interests. Defendants refusal to provide basic ownership and lender information continued throughout the term of the negotiation of definitive documents, despite continuous and numerous requests by Ryze as to who their lender and co-owner would be.

72. Mirae was informed that a transfer of 20% of the ownership would require that Mirae provide a guarantee for the entire $198 million USDA Guaranteed Loan. However, Mirae was not willing to provide such a guarantee. This led to an entire re-negotiation of the Binding Term Sheet. Ryze tried to terminate because the change in terms by Mirae resulted in termination, but as usual, Defendants threatened Ryze back to the table.

73. The Estimated Execution Date came and went. On November 14, 2021, Ryze made a written demand for the November 4 Penalty, or in the alternative a termination of the Term Sheet and dismissal of the July 23 Lawsuit, but Defendants refused to even discuss the payment of the November 4 Penalty.

74. In the end, the SLA was finalized and provided the following terms:

a) Ryze would receive a $21 million loan from a "to be determined lender" (a newly formed Mirae entity) to be allocated:

1. $3 million for working capital to be held by Mirae in a controlled account
2. $1 million for specific expenses, including salaries of Borrower
3. $10 million for interest reserve for the USDA Guaranteed Loan
4. $7 million for Fees payable to Han, Mirae and Defendants

b) Mirae would receive:

1. 3.8% of all outstanding membership interests in Ryze ("Equity Award") to avoid any guarantee by Mirae. Despite the much lower percentage ownership, Defendants demanded a much broader put option that the loan holder could exercise to force Ryze to repurchase the Equity Award for an additional $45,000,0000. Ryze would also have a call option on the Equity Award for $45 million. Under certain circumstances, the put and call options could be exercised at an earlier date for slightly better economics, but it was unlikely such funds would be available so quickly.
2. 12% interest
3. repayment of principal and accrued interest after 2 years
4. one (1) seat on the 3-member board of directors
5. $7 million in Fees payable to Han, Mirae and Defendants

75. Unbelievably, Defendants insisted that, despite the loan amount being reduced by more than 50%, the fees to Han, Mirae, and Defendants must be *increased.*

76. The parties did finally execute the SLA on November 29, 2021, and Ryze quickly started working on the closing conditions.

E. Mirae Fails to Fund the SLA that Defendants Coerced Ryze into Accepting; Defendants Cease All Communications with Ryze

77. As it turns out, the precise terms of the SLA wound up mattering little in the end. Just as had occurred in January of 2021, the December 15, 2021, funding deadline agreed to in the SLA came and passed. The loan was never funded, and—predictably—Ryze defaulted on the USDA Guaranteed Loan.

78. The excuses for Mirae's inability to fund were wide-ranging, but Defendants primarily blamed Korean regulators, whom Defendants claimed were reviewing the transaction. Defendants advised Ryze that the loan would only be funded upon approval by the Korean regulators.

...



AS Albright Stoddard Warnick & Albright

AS Albright Stoddard Warnick & Albright

79. Defendants further insisted that regulatory approval in Korea would only be given if Ryze substantially cut employee salaries and redirected them into blocked accounts to be controlled by Han. Ryze asked to speak with these alleged regulators, but the Defendants refused to allow it.

80. Ryze's counsel requested copies of the regulations in question, in English or Korean, but Defendants would not provide any information at all related to the "regulatory issues."

81. Ryze also questioned why there was no regulatory approval required for the $210 million CLA, but was required for the $21 million SLA, Defendants mocked them saying they did not understand how such transactions worked.

82. This was, of course, just another lie, and the loan was never funded.

83. Han and Lee stopped returning Ryze's calls entirely and Roehm was slow to respond. When all deadlines under the SLA were expired, Ryze demanded that Defendants dismiss the July 23 Lawsuit, with prejudice.

84. Ryze was initially met with some resistance and Defendants demanded that Ryze provide releases. Ultimately, however, the Defendants did file the dismissal without any agreements, release, or other concessions by Ryze.

85. Needless to say, Defendants never followed up with Ryze regarding the status of the loan's approval by the "Korean regulators."

F. <u>Ryze Raises Questions about the True Identity of Snell's Client</u>

86. Serious questions arose during Ryze's negotiations with Defendants about the true identity of Snell's client and whether Mirae—or a front runner claiming to be affiliated with Mirae—was actually involved in the deal.

87. For example, Ryze began requesting Know Your Customer ("KYC")[2] information on the Mirae entity that would be making the loan. Defendants mocked such requests, stating that it was not customary to provide such information until much later in the loan process.

---

[2] "KYC" refers to a set of financial services guidelines pertaining to the verification of, among other things, the *identity* of counterparties to a financial transaction.

88. Ryze pleaded with Defendants to speak with (i) Mirae's in house counsel, (ii) the alleged Korean regulators, or (iii) *any* English-speaking Mirae employee. Defendants would not permit these direct communications.

89. Despite repeated requests, it was not revealed to Ryze the until the November 4, 2021, funding deadline that, in fact, *Mirae would not be the lender under the SLA*.

90. On October 21, 2021 (2 weeks before the deadline to execute definitive documents), Ryze was first informed that Mirae would not be the lender due to "CFIUS and US tax issues" but that Roehm wanted to be "100% crystal clear" that Mirae will have a collateral assignment for the loan.

91. Defendants continued to ignore requests for information on who was behind the loan. Eventually, on October 23, 2021, Ryze sent an email to Defendants and included the senior lender's legal counsel pleading for information, stating that:

> In terms of KYC, I cannot emphasize enough the importance of knowing who is on the other side of this transaction. For weeks now, Ryze has been asking for (i) evidence that Mirae Asset Securities Co., Ltd., an entity organized under the laws of the Republic of Korea ("Mirae") or an affiliate of Mirae, will be the party making this loan (as set forth in the binding term sheet), (ii) evidence that Mirae, or a special purpose vehicle formed by Mirae, will be the party receiving membership interests in Ryze (as set forth in the binding term sheet), and (iii) information about the party that will be appointed to the board of managers so that Ryze may perform a background check to ensure such party is qualified to serve. Ryze has not received any information and has been informed today that Mirae does not intend to provide such information, other than what is actually required by Georgia's Own. This is entirely unreasonable and, as Victor says, making Borrower "very nervous", particularly given the circumstances surrounding this loan. I have never been involved in a transaction where basic KYC is such a point of contention and, while I am certainly anticipating that it is all fine, Mirae's refusal to provide verification is beyond concerning. Mirae's rights under the binding term sheet are not assignable and Ryze has every right to seek this verification. While Mirae may be structuring the "lender" and equity holder in a way to avoid FinCEN, or certain foreign reporting requirements, Ryze still needs to know (i) that the structure is legal, and (ii) that Mirae (either directly or through a US affiliate or special purpose vehicle) is the party making this loan and joining the company as a member. Ryze needs to run background checks and seriously vet any nominee to the board of managers. This is in addition to whatever KYC Georgia's Own requires.

92. Ryze never received full diligence on who was behind this loan, but it was eventually disclosed the lender would be a newly formed entity owned by unknown individuals living in Korea

Albright Stoddard Warnick & Albright

AS Albright Stoddard Warnick & Albright

who are not affiliated with Mirae. Ryze requested Defendants to arrange a call so that Ryze could speak with these individuals, but no call was ever permitted.

93. According to Defendants, the involvement of this unknown Korean entity and the unknown Korean individuals was for tax and "other reasons" that, also according to Defendants, were too complex for them to explain or for Ryze to understand. Defendants assured Ryze that the funding was still coming from Mirae.

94. Once the November 4 deadline passed, Han mostly stopped taking calls from Ryze and Ryze was relying entirely on Defendants for information. Defendants would not allow Ryze any specifics on issues with the Korean regulators or Mirae's in-house counsel, who also allegedly had issues with the transaction.

95. Defendants would not permit Ryze any access to these people or provide any reference to the regulations that were supposedly creating new roadblocks to the transaction.

96. Instead, Ryze was forced to entirely rely on Defendants to manage these gate-keeping issues and was told that Mirae had all the money and was ready to fund as soon as these issues were resolved. Roehm also advised that, even if the regulator issues could not be resolved, there was a "work around" and the funding would still occur.

97. Of course, no information about the "work around" would be shared with Ryze. It appears that the Defendants were really driving the scheme for their own benefit and, as a result, knowingly or carelessly overlooked the fact that their purported client was not a representative of Mirae, had no capacity to bind Mirae, and did not otherwise intend to comply with the loan commitments that Defendants enriched themselves in negotiating, drafting, and fraudulently litigating.

## IV. Damages Resulting from Defendants' Scheme

98. The damages Ryze has sustained by reason of Defendants' scheme are difficult to overstate. They include, without limitation, lost profits, potentially for the expected operational life of the renewable diesel facility; increased materials cost and other construction expenses associated with the delayed construction of the Project; interest on the USDA Guaranteed Loan; due diligence

…

AS Albright Stoddard Warnick & Albright

expenses, including costs for appraisals, reports, consultants, and attorneys; the November 4 Penalty; and other such items of damages as may be identified during the course of this litigation.

99. At the time Defendants filed the July 23 Lawsuit, Ryze had a significant valuation backed by credible third-party appraisals—ones that Defendants themselves endorsed as credible.

100. Ryze is now at serious risk of foreclosure. Whether Ryze can remain viable as an enterprise at all following Defendants' unconscionable and destructive scheme remains very much in doubt.

**FIRST CLAIM FOR RELIEF**

**Abuse of Process (*Against all Defendants)***

101. Ryze incorporates all prior allegations of this Complaint by reference as if set forth fully herein.

102. Defendants abused legal process for wrongful purposes when they filed and commenced the July 23 Lawsuit against Ryze in the District Court of Clark County, Nevada.

103. The Lawsuit, while purporting to seek specific performance and damages for breaches of the CLA executed on January 27, 2021, in fact, was motivated by and intended to further ulterior purposes and/or motives of Defendants.

104. Defendants' ulterior purposes and/or motives include (without limitation):

a) thwarting Ryze's lawful pursuit of alternative financing, and thereby coercing Ryze's agreement to the SLA, a much smaller $21 million funding deal entirely distinct from the defunct $210 million CLA used by Defendants as pretext for their abusive and bad faith Lawsuit;

b) enriching themselves with millions of dollars in fee compensation, which was unlawfully and unethically tied to Defendants' success in extorting Ryze's agreement to the SLA;

c) coercing Ryze into accepting blatantly oppressive and non-market terms under the SLA to make the deal more marketable to third-party funders to whom Defendants' and Han intended to "flip" the loan, thereby (i) concealing their fraudulent misrepresentations about the involvement of Mirae or another funder

with the capacity and/or intention to fund the loan commitments Defendants' and Han purported to make, and (ii) enriching themselves with additional commissions and fees in the process;

d) securing Ryze's release of potential claims against Han and other participants in the scheme, the litigation of which would have revealed the nature and extent of Defendants' and Han's misrepresentations, including the misrepresentations about Mirae's actual involvement in the funding deal and/or Han, Lee, and Defendants' status as representatives of Mirae.

e) other such other ulterior purposes and motives described herein and/or that discovery may reveal.

105. The foregoing ulterior purposes are unrelated to the resolution of any legal dispute, are wholly collateral to the Lawsuit's stated purpose of enforcing the CLA and are unintended by law.

106. Defendants engaged in one or more willful acts improper in the regular conduct of the proceeding, including (without limitation):

a) orchestrating and filing a verifiably groundless, bad-faith, and fraudulent Lawsuit for the improper purposes of forcing Ryze to acquiesce to an unfavorable—and, as it turns out, illusory—loan agreement under the threat of further fraudulent litigation and imminent insolvency;

b) admitting at the outset of the supposed "mediation" of that same Lawsuit that Defendants had no intention of seeking specific performance demanded in their Lawsuit;

c) threatening Ryze that Defendants would promptly terminate the mediation and ratchet up their litigation efforts if Ryze attempted to discuss the actual merits of the Lawsuit or its subject matter;

d) threatening that Ryze's failure to agree to new loan terms by midnight of the mediation would result in the filing of an even bigger and more protracted lawsuit against it, calculated to ensure Ryze's destruction;



AS Albright Stoddard Warnick & Albright

AS Albright Stoddard Warnick & Albright

e) threatening the same result if Ryze attempted to seek the advice of outside counsel regarding the SLA's terms.

f) other such conduct that was willful and improper in the regular conduct of the proceeding that discovery may reveal.

107. As a direct and proximate result of Defendants' abuse of process, Ryze has sustained damages in an amount to be proven at trial.

108. The foregoing acts and omissions by Defendants were undertaken intentionally, maliciously, and/or recklessly, such that Ryze is entitled to an award of punitive damages sufficient to punish and deter like conduct.

109. Snell is vicariously liable for the conduct of the individual-attorney Defendants because they undertook the actions and omissions described herein in the course and scope of their employment as attorneys practicing with Snell.

## SECOND CLAIM FOR RELIEF

### Professional Negligence (*Against all Defendants)*

110. Ryze incorporates all prior allegations of this Complaint by reference as if set forth fully herein.

111. Defendants owed Ryze duties of care, competence, prudence, and diligence in connection with the opinions, advice, and/or representations it conveyed to Ryze in connection with the SLA, the Lawsuit, and other matters described herein.

112. Defendants owed the foregoing duties to Ryze by virtue of an attorney-client relationship between the parties. Such attorney-client relationship arose as a result of:

a) Defendants' representation of Ryze's agent, Han, in connection with Ryze's negotiations with Mirae—the precise subject matter of Han's agency relationship with Ryze;

b) Defendants' access to Ryze's attorney-client and business confidences through such representation;

…

…

c) Defendants' expectation of fee remuneration from Ryze for services rendered in connection with the SLA (and Ryze's agreement to pay the same under the terms of the SLA).

113. Alternatively, notwithstanding the lack of a direct attorney-client relationship, Defendants nevertheless owed Ryze the duties attendant to the attorney-client relationship in connection with the opinions, advice, and/or representations it conveyed to Ryze in connection with the SLA, the Lawsuit, and other matters described herein. Such duties arose as a result of:

a) Defendants' invitation for Ryze (and/or acquiescence to Han's invitation for Ryze) to rely on the Defendants' opinion, advice, and/or representations, and Ryze's justifiable reliance on the same, including with respect to the following: (i) Mirae's participation in and/or capacity or willingness to fund the SLA; (ii) Han's and/or Lee's status as representatives of Mirae; (iii) the liability risks, duration, and collateral financial consequences of the litigation to be commenced by Defendants and others if Ryze declined to execute the SLA; (iv) the consequences of Korean law and Korean regulatory review on Mirae's timeline for funding the loan; (v) the conditions and limitations imposed by Korean law on the amount of funding available under the SLA; (vi) the customary scope, subject matter, and pace of due diligence in high dollar debt finance deals; and/or other of Defendants' opinions, advice and/or representations described herein.

b) the balance of the following factors favoring recognition of such duties under the circumstances described herein: (i) the extent to which the transaction was intended to affect Ryze, (ii) the foreseeability that Ryze would suffer harm, (iii) the degree of certainty that Ryze suffered injury, (iv) the closeness of the connection between Defendants' conduct and the injury suffered, (v) the moral blame of Defendants' conduct, and (vi) the public policy considerations favoring preventing future harm of kind and character sustained by Ryze as described herein.

…





AS Albright Stoddard Warnick & Albright

AS Albright Stoddard Warnick & Albright

114. The foregoing duties required Defendants (i) to exercise such care, skill, competence, prudence, and diligence reasonably possessed and observed by attorneys in like circumstances; (ii) to reasonably avoid directly making and disseminating misrepresentations and omissions of material fact on which identifiable third-parties like Ryze would foreseeably and detrimentally rely; and/or (iii) to reasonably avoid rendering professional in furtherance of a known to be fraudulent and/or unlawful (or that, by the exercise of reasonable care, skill, competence, prudence, and diligence, reasonably should have been known to be fraudulent and/or unlawful).

115. Defendants breached the foregoing duties by reason of their negligence, misrepresentations, and tortious conduct described herein.

116. Ryze reasonably relied upon and acted upon such opinions, advice, and/or representations rendered by Defendants in executing the SLA, and in complying with the covenants and obligations therein, including (without limitation) by declining to seek and/or close the additional funding from alternative sources, and in such other ways as described herein.

117. As a direct and proximate result of the foregoing, Ryze has sustained damages in an amount to be proven at trial.

118. Snell is vicariously liable for the conduct of the attorney Defendants because they undertook took the actions and omissions described herein in the course and scope of their employment as attorneys practicing with Snell.

**<u>THIRD CLAIM FOR RELIEF</u>**

**Fraud (*Against all Defendants*)**

119. Ryze incorporates all prior allegations of this Complaint by reference as if set forth fully herein.

120. Defendants made false statements as representations of existing and material fact as described throughout this Complaint, including (without limitation) their representations pertaining to:

a) Claims in the July 23 Lawsuit that Mirae desired specific performance of the CLA;

…

b) The involvement of Mirae or another funder with the capacity and/or intention to fund the loan commitments under the SLA;

c) Mirae's status as a client of Defendants and/or Han, Lee, and Defendants' status as representatives of Mirae; and/or

d) Other such material misrepresentations as set forth herein.

121. Defendants' misrepresentations were made with knowledge of their falsity and/or in reckless disregard of their falsity.

122. Defendants intentionally made the foregoing misrepresentations for the purpose of inducing Ryze to act upon them as described throughout this Complaint.

123. Ryze reasonably relied upon and acted upon Defendants' misrepresentations in executing the SAL, and in complying with the covenants and obligations therein, including (without limitation) by declining to seek and/or close the additional funding from alternative sources, and in such other ways as described in this Complaint.

124. As a direct and proximate result of Defendants' fraud, Ryze has sustained damages in an amount to be proven at trial.

125. The foregoing acts and omissions by Defendants were undertaken intentionally, maliciously, and/or recklessly, such that Ryze is entitled to an award of punitive damages sufficient to punish and deter like conduct.

126. Snell is vicariously liable for the conduct of the attorney Defendants because they undertook took the actions and omissions described herein in the course and scope of their employment as attorneys practicing with Snell.

**<u>FOURTH CLAIM FOR RELIEF</u>**

**Tortious Interference with Prospective Economic Advantage**
***(Against all Defendants)***

127. Ryze incorporates all prior allegations of this Complaint by reference as if set forth fully herein.

128. Following Mirae's failure to fund the CLA, Ryze located a Substitute Funder willing to provide the Additional Financing necessary to complete construction on the Project.

AS Albright Stoddard Warnick & Albright

129. Ryze was likely to enter a contract with the Substitute Funder. The parties had already executed a term sheet that specified an expected closing date of July 30, 2021.

130. The funding was on track for closing on or around July 30, 2021, when Mirae filed suit against Ryze on July 23, 2021, for the purpose of interfering with such alternative funding and forcing Ryze to re-engage with Mirae.

131. Defendants intended to harm Ryze by preventing the funding from the Substitute Funder from going forward and/or by engaging in the predicate torts described in Count I (Abuse of Process) and Count III (Fraud). Alternatively, Defendants recklessly disregarded the high likelihood that its conduct would prevent such funding from moving forward.

132. Defendants' intentional interference described herein was undertaken without legal justification or privilege.

133. As a direct and proximate result of Defendants' tortious interference, Ryze lost the pending deal with the Substitute Funder and sustained damages in an amount to be proven at trial.

134. The foregoing acts and omissions by Defendants were undertaken intentionally, maliciously, and/or recklessly, such that Ryze is entitled to an award of punitive damages sufficient to punish and deter like conduct.

135. Snell is vicariously liable for the conduct of the attorney Defendants because they undertook the actions and omissions described herein in the course and scope of their employment as attorneys practicing with Snell.

**FIFTH CLAIM FOR RELIEF**

**Tortious Interference with Contract (*Against all Defendants)***

136. Ryze incorporates all prior allegations of this Complaint by reference as if set forth fully herein.

137. Ryze has a valid contract with Phillips 66 Co. that is set to provide Ryze a continuous and stable feedstock supply, guaranteed sales, and transportation of offtake for its renewable diesel Project and reasonable expectations of entering a similar contract in the future.

138. At all relevant times herein, Defendants had full knowledge of Ryze's Supply and Offtake Agreement with Phillips 66 Co.

AS Albright Stoddard Warnick & Albright

139. Defendants intentionally and without justification or privilege interfered with Ryze's ability to realize its valuable contractual expectancy of the Supply and Offtake Agreement by preventing Ryze from securing the additional funding required to complete the Project and bring the renewable diesel facility to the operational status contemplated by the Supply and Offtake Agreement, and by engaging in the predicate torts described in Count I (Abuse of Process) and Count III (Fraud).

140. As a direct and proximate result of Defendants' tortious interference, Ryze has sustained damages in an amount to be proven at trial.

141. The foregoing acts and omissions by Defendants were undertaken intentionally, maliciously, and/or recklessly, such that Ryze is entitled to an award of punitive damages sufficient to punish and deter like conduct.

142. Snell is vicariously liable for the conduct of the attorney Defendants because they undertook took the actions and omissions described herein in the course and scope of their employment as attorneys practicing with Snell.

**PRAYER FOR RELIEF**

WHEREFORE, Ryze respectfully requests that the Court find in its favor and against Defendants on each of the above Counts, and further award:

a) damages in an amount to be determined at trial;

b) special damages;

c) punitive damages;

d) Ryze's reasonably attorneys' fees, costs, and disbursements incurred in this action; and

e) all other relief the Court deems just and appropriate under the circumstances.

…

…

…

…

…

AS Albright Stoddard Warnick & Albright

AS Albright Stoddard Warnick & Albright

**JURY DEMAND**

Ryze demands a trial by jury on all issues so triable.

DATED this 12th day of January.

Respectfully Submitted,


**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**

______________________________
G. Mark Albright #001394
Daniel R. Ormsby, Esq., #014595
801 South Rancho Drive, Ste. D-4
Las Vegas, Nevada 89106
Telephone: (702) 384-7111
Facsimile: (702) 384-0605
gma@albrightstoddard.com
dormsby@albrightstoddard.com
and

**EDGAR LAW FIRM LLC**

John M. Edgar, Esq. (*pro hac app. forthcoming)*
John F. Edgar, Esq. (*pro hac app. forthcoming)*
Michael R. Owens, Esq. (*pro hac app. forthcoming)*
2600 Grand Boulevard, Ste. 440
Kansas City, Missouri 64108
Telephone: (816) 531-0033
Facsimile: (816) 531-3322
jme@edgarlawfirm.com
jfe@edgarlawfirm.com
mro@edgarlawfirm.com


January 29, 2024

CERTIFIED COPY
ELECTRONIC SEAL (NRS 1.190(3))