# EXHIBIT B

Transcript of Proceedings, DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT; SPECIAL MOTION TO DISMISS UNDER NRS 41.660 (ANTI-SLAPP), held on March 25, 2025, in *Ryze Renewables Holdings, LLC, et al. v. Snell & Wilmer, LLP, et al.*, District Court, Clark County Nevada, Case No. A-23-863908-B

Electronically Filed
3/28/2025 10:00 AM
Steven D. Grierson
CLERK OF THE COURT

TRAN

DISTRICT COURT

CLARK COUNTY, NEVADA

* * * * *

| | | |
|---|---|---|
| RYZE RENEWABLES HOLDINGS, LLC, RYZE RENEWABLES NEVADA, LLC, | ) | CASE NO. A-23-863908-B |
| Plaintiffs, | ) | DEPT. NO. XV |
| vs. | ) | |
| SNELL & WILMER, LLP, ET AL., | ) | **Transcript of Proceedings** |
| Defendants. | ) | |

BEFORE THE HONORABLE JOE HARDY, DISTRICT COURT JUDGE

**DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT; SPECIAL MOTION TO DISMISS UNDER NRS 41.660 (ANTI-SLAPP)**

TUESDAY, MARCH 25, 2025

APPEARANCES:

For the Plaintiffs: MICHAEL R. OWENS, ESQ.
DANIEL R. ORMSBY, ESQ. [Via Zoom]
JOHN MAURICE EDGAR, ESQ.

For the Defendants: AMY ABDO, ESQ.
JESSICA L. POST, ESQ.
J. COLBY WILLIAMS, ESQ.

For Mirae: TAMARA BEATTY PETERSON, ESQ.

RECORDED BY: MATTHEW YARBROUGH, DISTRICT COURT
TRANSCRIBED BY: KRISTEN LUNKWITZ

Proceedings recorded by audio-visual recording; transcript produced by transcription service.

TUESDAY, MARCH 25, 2025, AT 10:47 A.M.

THE CLERK: *Ryze Renewable Holdings, LLC, versus Snell & Wilmer, LLP.*

THE COURT: Okay. Go ahead and state your appearances. My left to my right, I guess.

MS. PETERSON: Very good. Good morning, Your Honor. Tammy Peterson, bar number 5218, representing third party defendant Mirae Asset.

THE COURT: Okay. Good morning.

MR. OWENS: Michael Owens, representing plaintiff Ryze Renewables Holdings and Ryze Renewables, LLC. I'm here with John F. Edgar, of the same firm, Edgar Law Firm, and Daniel Ormsby, of Albright Stoddard, is on the Zoom line as our Nevada counsel.

THE COURT: Okay.

MR. WILLIAMS: Good morning, Your Honor. Colby Williams, Campbell and Williams, on behalf of the defendants.

THE COURT: Good morning.

MS. POST: Jessica Post, of Fennemore Craig, on behalf of the defendants, also.

THE COURT: Good morning.

MS. ABDO: Good morning, Your Honor. Amy Abdo, of Fennemore Craig, on behalf of the defendants.

THE COURT: Good morning.

Okay. So, we've got Defendants' Motion to Dismiss Second Amended Complaint. I reviewed that and related briefing to that. We also have Defendants' Special Motion to Dismiss Under NRS 41.660. I do have a limited amount of time today, because after you all, I also have pretrial status checks and an actual trial.

So, I'll tell you what I'm inclined to do. I think we do the Motion to Dismiss the Second Amended Complaint first. That was filed first. Also, depending on how I rule, it may moot the Special Motion. So, that's the order I'm inclined to do. But, in terms of the ruling, I'm inclined to grant the Motion to Dismiss the Second Amended Complaint based on the absolute litigation privilege.

Alternatively, based on those failure to state a claim type of -- standard type of arguments, on the -- which, you know, if that's granted, it would moot the Special Motion.

On the Special Motion, if we were to get to that, which I'm not sure we will, but I'd be inclined to deny that in part and grant it in part. I think the *Newport* case out of the Supreme Court of California is pretty instructive.

I admit there is no controlling Nevada Supreme Court case directly on point, but *Newport's* well-reasoned.

Nevada often will -- not always, but will often follow California in terms of anti-SLAPP. The *Newport* case, under that, my read -- and I did spend a lot of time on all of this, but the original claims that were in the original and/or, quote/unquote, First Amended Complaint, I'd deny because, you know, those could have been filed in response to the original, and there's no good cause for the delay.

Now, there may be a distinction between defendants, perhaps, but the -- those original claims would be abuse of process, fraud, tortious interference with prospective economic advantage, tortious interference with contractual relationships. I wouldn't deny those under the Special Motion. I'd deny the other ones, though, because those are the ones are, quote/unquote, new claims.

There's -- and, again, on the denial, there's no good cause for the delay demonstrated by the Snell folks. But, again, that might be all moot, given the other Motion.

So, let's talk about the first Motion to Dismiss filed on February 11th. If you're okay with my initial, you can save for rebuttal.

MS. POST: That's what I would like to do, Your Honor.

THE COURT: Okay.

MS. POST: Thank you.

THE COURT: Okay.

MS. OWENS: Good morning, Your Honor. Michael Owens for plaintiff, Ryze. And I'm going to focus my time on the abuse of process claim. I'm certainly happy to address the other points more generally.
But, in this case -- and specifically the relationship between that and the litigation privilege.

In this case, we have what's a paradigmatic abuse of process. I'll direct you to Exhibit 3, which is Exhibit -- same exhibit numbering for both Motions, the e-mail from Snell litigator Steve Graham.

THE COURT: So, your 3 or their 3?

MS. OWENS: I'm sorry. Their 3 to their Motion.

THE COURT: Okay.

MS. OWENS: Yeah. Which we have no objection to considering on a Motion to Dismiss.

THE COURT: Sure. Okay.

MS. OWENS: And the tort of abuse of process, as formulated by the Nevada Supreme Court and generally recognized throughout every state, is when process is subverted to achieve a purpose other than that which it was designed to achieve. And, so, in this case, the background, which we've had occasion to recite it at various points, is that Ryze and Mirae had gone around for about a year negotiating this convertible loan transaction.

The terms of the agreement --

THE COURT: For a good portion of that, if not all, Snell was not involved.

MS. OWENS: I'm sorry?

THE COURT: A good portion of that year or so, or all of it, Snell was not involved.

MS. OWENS: Correct.

THE COURT: Okay.

MS. OWENS: One hundred percent correct. Yeah. So, nothing Snell did -- none of the conduct alleged that's actionable here arose during that time period.

But the background was that agreement was terminated by Mirae and also expired by its own terms. Ryze was, you know, begging Mirae to fund this loan agreement. We needed the deal. The company was in peril if it didn't get done. It needed this funding. So, they wanted to perform this agreement. Snell -- well, Mirae wanted to renegotiate a new deal, change the terms and renegotiate a new deal.

So, as laid out in this Exhibit 3, Graham conceives this strategy where they are going to file a lawsuit in this Court, Clark County District Court, to interfere with the other funding that Ryze had negotiated after Mirae didn't come through with the original funding.

And the whole point of this was -- Graham disavows any intention to actually seek judicial relief. We don't

want to enforce this agreement. We want to go tell the other funder that there’s litigation pending and, hey, this is a risky transaction, and shut that funding down so that Ryze’s financial desperation causes it to renegotiate with Mirae, essentially shrink this to a universe where the only other funding partner Ryze can speak with is Mirae, and use that pressure to extort a new deal, which they do. It goes from a $210,000 -- or, a $210 million deal, to a 21, with the same fee allocations. It’s entirely nonmarket.

And, as part of this scheme, the lawsuit was used as a, quote, tool, and you’ll see that in the formulations of abuse of process in other jurisdictions that it’s -- the tort -- the nature of the tort is to misuse process to achieve -- as a tool to achieve a collateral end. So, collateral end is generally defined as obtaining some sort of benefit that you -- that’s outside the purview of the relief you could have obtained in a lawsuit.

So, sure, there’s a coercive outcome sometimes in litigation if the Court orders a party to do something, but it’s on the menu of potential remedies that a Judge or a Court can give. What's not on the menu is: Go renegotiate a new deal. We’re going to use the mere filing of this as a way to renegotiate a new deal.

Now, is mere filing enough? No. It’s not. But you also need an irregular act, under the Nevada Supreme

Court's formulation, an irregular -- excuse me. A willful act that's not regular in the normal course of proceedings. So, we have that here. We have Mr. Graham using the lawsuit as a tool to get Ryze back to the negotiating table.

And, then, all sorts of strange stuff happening after that. For example, this mediation, which, by the way, I think is important point on the litigation privilege issue, that this was not a mediation. All -- the parties recall this event as a mediation because it was initially discussed as a mediation, but, ultimately, there was no mediator present. Graham specifically disallowed any discussion of the lawsuit at the mediation and threatened to terminate it if there was any discussion of the lawsuit.

So, one of the elements on litigation privilege is that the communications at issue must relate to an item under consideration in litigation. Well, Graham set the parameters so that, by definition, the only thing that can be discussed was doing this entirely new deal so that -- and not any discussion of the merits of the case itself. He specifically forbid that.

So, this is not a situation where, you know, you have parties settling. And I understand many mediations they don't, you know, argue the merits back and forth, but they might endeavor to educate each other about, hey, this

is where we think we're strong. We understand that this is an obstacle for you. You might need this ruling because you think you're strong at that point.

And that allows them to come to an agreement on some compromised relief, which generally is, you know, money damages, because money damages are relief that you get in a lawsuit, but does not allow them to fold their arms and say, we're not talking about the lawsuit. The only path forward is if, you know, we are able to browbeat you into agreeing to this collateral deal that, by the way, is not the one we're trying to enforce. You know?

The enforcement of that lawsuit, which we wanted anyway, we would have said, yes, we'll specifically perform that agreement all day, was not the -- an item that was under discussion in the mediation. So, highly irregular mediation conduct that's designed to, you know, extort something different.

And, then, you have this open question in this case about whether Snell & Wilmer actually represented Mirae Asset. Mirae appeared in this case on Thursday night and filed a Motion to Dismiss, and it reiterated their denial that they ever actually had a client.

So, at this point, we have a open question about whether the petitioning or the statements that Snell made surrounding this litigation is -- I hate to say related to

because they didn't relate to litigation, but whether that's even done on behalf of a bona fide client.

So, I would strongly push back on your tentative ruling at that point because we have a, you know, an alternatively pleaded claims and alternatively pleaded factual theories, based on, you know, Snell actually having a client or not having a client. I don't think the Nevada Supreme Court has ever said that foundation can exist for litigation privilege immunity prior to establishing the fact that an attorney was actually representing a bona fide client in the case.

And, by the way, I mean, these remarks in that Exhibit 3 e-mail about the coercive purpose of the litigation are not some, you know, unique thing. It's throughout the proceedings that Snell & Wilmer is telling -- some of their counsel are telling their client, or future client, they're telling attorneys at other firms, they're telling their compensation committee and summarizing their year in work, that we filed this lawsuit to, quote, force a deal, force a deal, over, and over, and over.

When they say force a deal, they're not talking about getting the relief that's pleaded for in the lawsuit. They're talking about something entirely collateral to it.

So, to link this back to the Nevada Supreme Court precedent on this point, Nevada recognizes the tort of

abuse of process. The *Bull* case, which was, you know, I think cited in the '80s, and then subsequent unpublished decisions since then recognized that, look, if you invoke process and use it as a coercive leverage against something you couldn't get in the proceeding, that's an abuse of process.

And it would be remarkable to conclude that Nevada essentially abolished that -- abolished tort liability for that classic case of abuse of process, which, without understanding as much if it was accomplished by some creeping expansion of litigation privilege and unpublished decisions.

So, the other point on litigation privilege is that the Nevada Supreme Court has not applied it to these extortion situations. The litigation privilege grew up in case law regarding slander, defamation, other instances of injurious falsehood, where the injury is -- the injury that plaintiff is claiming is that you said something that was not true to me, and -- or, about me, and by communicating that, you caused me some sort of reputational harm or other special damage. That's not the case here.

Extortionate communications have never enjoyed any sort of First Amendment type protection because the injury that extortionate communications cause is wholly independent of their truth or falsity. If I say, hey, you

know, nice family you got there, Senator, it'd be a real shame if the pictures got out. It's true that --

THE COURT: So, I'm going to chime in here just --

MS. OWENS: Sure.

THE COURT: -- not really related to the example that you're giving, but somewhat in terms of time. So, you've got two more minutes.

MS. OWENS: Okay. Appreciate that. Yeah.

Or, hey, nice business you got there, it'd be a shame if anything happened to it. It could be 100 percent true if it's indeed a nice business, and indeed it would be a shame if anything happened to it, and indeed wouldn't you be better off if you just paid the extortion tax?

This is not a situation where, you know, we're compromising someone's ability to speak freely in the litigation setting so that, you know, the litigation process can better perform some truth finding function. It doesn't depend on the truth or falsity, it depends on whether you have invoked process to cause pain on another person, financial or otherwise, which is clearly what Snell & Wilmer did with this lawsuit. There's no evidence or allegation to the contrary. And, you know, the documented evidence is overwhelming that this was the purpose of it, and then offer to let the victim, you know, make the pain stop for the victim, if they agree to come extortionate --

to compromise the extortion and comply with the demands.

And, so, in that sense, I guess, you know, it's always going to look like some sort of settlement because there's this essential bargain, hey, we'll make the pain stop if you do what we say, but the tort of abuse of process in the most common instance is one that involves precisely that set of -- that type of bargain, and one where the -- what's on the table is a demand that you do something that I cannot compel you to do via the litigation I've invoked.

THE COURT: All right. Thank you very much.

Any rebuttal?

MS. POST: I'll just be brief, Your Honor.

THE COURT: Okay.

MS. POST: I'll just focus on abuse of process, since that's what Mr. Owens focused on as well. But, as our Motion lays out, there's really two elements to it, and one is an ulterior motive and the other is process. They admit the filing of a Complaint cannot be an abuse of process claim, so that's out. They really don't have other process. The other process is the dismissal without prejudice, and then the dismissal with prejudice. There's no abuse that's tied to those. So, that's out for that reason.

Separately, litigation privilege, as you know from

our briefs, covers the filing of a Complaint and covers the allegations in the Complaint. To file a Complaint so that the parties go into negotiations on a deal for which they've been negotiating for a year is all part and parcel of the same thing. Whenever a party files a lawsuit, the goal is, frequently, right, the Judges say, hey, have you guys had negotiations yet? Have you had a settlement discussion? Have you had a mediation? That's what happened here.

And what Mr. Owens and Ryze is asking for is like, hey, now we're unhappy that we signed this agreement, and then all these other things happened, and blah, blah, blah, blah, blah, blah, that's separate from an abuse of process claim. They had a lawyer; they had a lawyer representing them at all times. And they haven't established an ulterior motive, and then they haven't tied it to process.

And, then, with respect to Mr. Graham's e-mail, I mean, how lucky are they that they have our whole file? I mean, that is extremely unusual. But Mr. Graham provided a e-mail, you've read it, it's not how they describe it. It's an e-mail that, frankly, lots of lawyers send before they file a Complaint that says, hey, this is what we're going to do, this is what we're proposing, there's some pluses, there's some risks to it.

He states twice that he believes it has merit.

That's never mentioned here. He believes that there's reliance damages. So, even if the Court says no to specific performance, they have reliance damages.

So, although they get up here and they keep saying, oh, we wanted the deal, we wanted the 210, that wasn't what the lawsuit was. When you read the allegations, the specific performance was to force due diligence, so that the parties could then decide whether they wanted to go forward with that deal or a similar deal. That's an accurate representation of the Complaint.

So, ultimately, those are the things that I just wanted to respond to from what Mr. Owens said. But abuse of process, covered by litigation privilege, can't be based on a Complaint, it has to have ulterior motive, which they don't have. And, separately, there needs to be a process, which they don't have.

THE COURT: Would you agree with me that if I do grant this Motion to Dismiss, the Special Motion then is moot?

MR. WILLIAMS: Your Honor?

MS. POST: Yes. I'll let --

THE COURT: Okay. Whoever wants to answer that question is fine.

MR. WILLIAMS: I'm not looking to tag team. I'm sensitive about the Court's time, and so I don't want to

get up here and reargue an anti-SLAPP motion. I don't know that I agree that it's moot, obviously because there are different rights that flow from the granting or denial of an anti-SLAPP motion.

And I think what it may hinge on is the dismissal -- and I'm not asking the Court to help me here, but the dismissal on the 12(b)(5), if that is in fact what the Court is still inclined to rule, is that going to be with prejudice as it relates to a Complaint against Snell?

Because what I don't want to foreclose is if we get the chance to amend, I obviously think it should be with prejudice. This would be their third shot. But if they got another chance, I wouldn't want to be foreclosed and filing an anti-SLAPP motion in response to that, depending on what it said.

And, lastly, I'll respectfully disagree with the Court on the *Newport Harbor* case and the timeliness issue. In fact, Judge, three of the cases that we --

THE COURT: That's a super long answer to a fairly -- you know, if you were a witness, I'd probably have to tell you, yeah, just answer the question.

MR. WILLIAMS: So, the question is, it depends on what the ultimate ruling is on the 12(b)(5) motion, and whether it's with or without prejudice.

THE COURT: Thank you.

So, I'm going to do what I was inclined to do. And, to clarify, I probably should have said this in the beginning, given the lawyerly answer to my last question, but I'm going -- and this was even before I asked that question and got that answer, was to grant the Motion to Dismiss the Second Amended Complaint with prejudice. I know I didn't say that in the initial inclination. It's my fault because my note's right here saying with prejudice.

So, primarily, based on the absolute litigation privilege, accepting -- you know, and accepting all the facts as pleaded even under the standard, the absolute litigation privilege does bar all these claims.

Additionally, and/or alternatively, getting to, like I said, the standard 12(b)(5) types of motion arguments, additionally and/or alternatively, the Court also grants the Motion because Ryze's claim for abuse of process fails as a matter of law.

Two, Ryze's claim for negligent misrepresentation fails as a matter of law. I agree with the arguments in that section 2, except I do not agree with the arguments in subsection a or e under 2, but I agree with b, c, and d.

You're going to do a very detailed Order.

MS. POST: You are?

THE COURT: No. You.

MS. POST: That's what I was like, what?

THE COURT: You, as in you, Ms. Post, --

MS. POST: Okay.

THE COURT: -- and/or whomever else on your team. I'm not going to read through, obviously, you know, everything, but incorporate all these into the Order.

Additionally, alternatively, Ryze's claim for fraud fails as a matter of law. It's not plead with particularity. Reliance, even assuming everything is true, is not reasonably justified.

Four, Ryze's claim for wrongful use in civil proceedings fails as a matter of law.

Five, claim for unauthorized filings fails as a matter of law. In your judiciary law section, 487 fails as a matter of law on all the aiding and abetting claims. Also fails as a matter of law as to the civil conspiracy claim.

Again, primarily, the absolute litigation privilege, but, additionally and alternatively, those other arguments, the Court agrees.

And it is with prejudice, again, primarily based on the absolute litigation privilege. Additionally, and/or alternatively, we're now on, you know, the Second Amended Complaint, and, you know, two years or a little less than two years maybe, into litigation as well.

As to the Special Motion, with that Order, the

Special Motion becomes moot. The Court does not then go to the merits of the Special -- bless you -- Special Motion. Again, procedurally speaking, you know, when we got the Motion to Dismiss Second Amended Complaint first, and then a Special Motion to Dismiss after that. So, it's appropriate, I think, to consider the normal Motion to Dismiss first, which now does moot the Special Motion. Put that in the Order, too.

MS. POST: Okay. I'll --

THE COURT: Make it detailed, like I said.

MS. POST: Okay.

THE COURT: It's going to be super long. And submit it to counsel for review and approval.

MS. POST: Okay. Thank you, Your Honor.

MS. ABDO: Thank you, Your Honor.

THE CLERK: Counsel, what was your name again?

MR. WILLIAMS: Colby Williams.

THE CLERK: Okay. Thank you.

MR. WILLIAMS: The one that gave the long, lawyerly answer.

THE COURT: For the record.

PROCEEDING CONCLUDED AT 11:14 A.M.

* * * * *

## CERTIFICATION

I certify that the foregoing is a correct transcript from the audio-visual recording of the proceedings in the above-entitled matter.

## AFFIRMATION

I affirm that this transcript does not contain the social security or tax identification number of any person or entity.

Kristen Lunkwitz

KRISTEN LUNKWITZ
INDEPENDENT TRANSCRIBER