# EXHIBIT DP27

# 10/8/2025 Excerpts from the deposition of Matthew Pearson

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

MIRAE ASSET SECURITIES CO., LTD., ) Case No. 2:23-cv-01492-APG-NJK
a Republic of Korea company, )
)
Plaintiff, )
)
v. ) Volume I
)
RYZE RENEWABLES HOLDINGS, LLC, a )
Nevada limited liability company, )
and RYZE RENEWABLES NEVADA, LLC, a )
Nevada limited liability company, )
)
Defendants. )
)
)
RYZE RENEWABLES HOLDINGS, LLC, a )
Nevada limited liability company, )
and RYZE RENEWABLES NEVADA, LLC, a )
Nevada limited liability company, )
)
Counter-Claimants, )
)
v. )
)
MIRAE ASSET SECURITIES CO., LTD., )
a Republic of Korea company, )
)
Counter-Defendant. )
)

VIDEO-RECORDED AND VIDEOCONFERENCE DEPOSITION OF MATTHEW G. PEARSON

Taken on behalf of the plaintiff and counter-defendant, MIRAE ASSET SECURITIES CO., LTD., at the offices of Regus, 400 S. 4th Street, 3rd Floor, Las Vegas, Nevada 89101, commencing at 9:04 a.m., on Wednesday, October 8, 2025, pursuant to Notice.

REPORTED BY: PAIGE M. CHRISTIAN, CCR #955
Registered Merit Reporter
Certified Realtime Reporter
Certified Realtime Captioner

APPEARANCES:

For Plaintiff and Counter-Defendant Mirae Asset Securities Co., Ltd.:

DANIEL PRINCE, ESQ. (Pro Hac Vice)
BRIAN S. KAEWERT, ESQ. (Pro Hac Vice)
PAUL HASTINGS, LLP
515 South Flower Street
25th Floor
Los Angeles, CA 90071
(213) 683-6279
E-mail: danielprince@paulhastings.com
briankaewert@paulhastings.com

For Defendants and Counter-Claimants Ryze Renewables Holdings, LLC and Ryze Renewables Nevada, LLC:

JOHN M. EDGAR, ESQ. (Pro Hac Vice)
JOHN F. EDGAR, ESQ. (Pro Hac Vice)
MICHAEL R. OWENS, ESQ. (Pro Hac Vice)
EDGAR LAW FIRM LLC
2600 Grand Boulevard
Suite 440
Kansas City, Missouri 64108
(816) 531-0033
E-mail: jme@edgarlawfirm.com
jfe@edgarlawfirm.com
mro@edgarlawfirm.com

ALSO PRESENT:
Matthew Kwan, Videographer;

ALSO PRESENT VIA VIDEOCONFERENCE:
Max Lee, Representative, Mirae Asset Securities

for Ryze Renewables Nevada?

**A. Since its inception in 2020.**

Q. Is there a core business or function of Ryze Renewables Nevada?

**A. No. It was -- it was set up to be a holding company of an operating -- or, sorry, of another hold co in -- in Las Vegas, which would be Ryze Renewables II, LLC.**

Q. What about Ryze Renewables Holdings? Is there a core business or function that it serves?

**A. It acts as a holding company of all assets and investments of the company.**

Q. What company?

**A. Of Ryze Renewables Holdings.**

Q. What's the relationship between RRH and RRN?

**A. RRH is the 100 percent owner of RRN.**

Q. Can you tell me which of these entities owned the project that's at issue in this litigation?

**A. Well, I would say both, but the direct owner was Ryze Renewables II, LLC, which has an ultimate -- ultimate beneficial owner of Ryze Renewables Nevada, LLC, which, again, flows upward to Ryze Renewables Holdings, LLC.**

Q. And when you say that it was the owner, do you mean the real estate itself, or you mean the

improvements on the real estate?
A. **Neither.**
Q. Neither?
A. **(Witness nods head up and down.)**
Q. Please explain.
A. **Can you be more specific?**
Q. Ryze Renewables II, LLC?
A. **Yes.**
Q. Actually, let me come at this a different direction.
What are the assets of Ryze Renewables II, LLC?
A. **Ryze Renewables Las Vegas, LLC.**
Q. And what are the assets of Ryze Renewables Las Vegas, LLC?
A. **The real estate and all appurtenances thereto.**
Q. What real estate?
A. **Well, during its ownership, 5233 East El Campo Grande Boulevard (sic) as well as 5225 East El Campo Grande Boulevard (sic). That's the -- those are the real property addresses of the property owned by that company plus all improvements therein -- or thereon.**
Q. And those improvements would be what?
A. **The leftover remnant of a biodiesel refinery**

that existed, which would include a large tank farm, a number of buildings, infrastructure, like water, power, sewer, gas, electric -- excuse me. Electric is power. Sorry. A rail facility -- a robust rail facility, a lot of equipment, pumps, as I mentioned, a tank farm, a 4.4 million gallon tank farm. So it had quite a bit of assets.

Q. And when you say there was a biodiesel facility that existed, that facility was never completed, right?

A. It was completed and operational at one time. Yes.

Q. It was completed and operational?

A. Yes, sir.

Q. At what point was that?

A. I think, from 2000 -- I -- I don't really know, to be honest with you, but I know it was operational. I know that they -- I'd seen some information about the amount of production they had -- they had done at that biodiesel facility prior to owner -- our acquisition of it.

Q. As a Ryze facility, is your contention that it was operational?

A. No. I'm sure you'll ask me, though.

Q. Ah, there's the clarification, right?


(702) 799-9218 | info@worldwidelit.com
Worldwide Litigation Services - Firm #104F

As a Ryze facility, was it ever operational?
**A. It was not.**
Q. So your contention is that before there was some affiliation with a Ryze entity, there was a operating facility on those parcels of real estate?
**A. That's correct.**
Q. The two entities here, RRN and RRH, those entities are seeking damages on behalf of those -- just those two entities; is that correct?
**A. I don't think I understand your question.**
Q. What relief are these two entities seeking by way of your counterclaims in this case?
**A. They're seeking the loss of the -- the enterprise value of an -- of an operation that was under construction scheduled for completion in 12 months or so after -- after closing of a loan facility.**
Q. Any other form of damages that are being sought here?
**A. Yes. There are a number of miscellaneous other damages included, like interest expense during a period of time in which we were under exclusivity with Mirae, almost 22 months, and we are seeking recovery of enterprise interest and, I believe, other trouble damages associated with the loss caused by the Mirae**

that correct?

**A. Ryze did -- did pay a $75,000 retainer fee to Kutak Rock.**

Q. You spoke with Mr. Tobak of Kutak Rock during the course of the diligence phase of this transaction; is that right?

**A. At times.**

Q. Did you give Mr. Tobak any directions about what he should be doing?

**A. I -- I don't think so.**

Q. So you testified that you signed an engagement letter and that you paid Mr. Tobak for his services rendered, but your testimony is that you did not give him instruction on what task to carry out?

**A. I -- I would say that's accurate. Yes.**

Q. So what was the purpose of you paying him?

**A. The purpose of me paying him was because Mirae requested that we, the borrower, pay an advance fee to a law firm that they -- of their choosing, our introduction but their choosing, and that they would -- that's what their request was, for a United States law firm to represent them.**

Q. Who did that request come from?

**A. It came through Mr. Lee and -- and Han.**

Q. Did Mr. Lee relate that request in Korean?

A. I don't recall.

Q. Do you recall whether Mr. Lee had apparently relayed that request in any language other than English?

A. In any language other than English.

I believe the topic came up during one of our weekly update calls, and it was affirmed by Mr. Lee that he was hopeful we would consider hiring a firm on Mirae's behalf or -- or paying an advance fee on Mirae's behalf to start them in their work on the document package for the loan closing.

Q. What I'm trying to understand is how you came to know that.

Were the -- was that Mr. Han who told you that Mr. Lee said something, or did you understand the Korean that Mr. Lee was speaking?

A. I've already testified that I didn't understand the Korean that Mr. Lee was speaking.

Q. So, your understanding, then, would be formed by a translation provided by someone, and I'm trying to figure out who that someone was.

Can you tell me?

A. I think I've told you already. It was Mr. Han.

Q. Thank you.

**A. And then there were follow-up e-mails to confirm and discuss that.**

Q. Okay. For Samchully Asset, you mentioned Justin Choi.

Do you recall that?

**A. I did.**

Q. Did Mr. Choi speak English?

**A. He did.**

Q. What about for KPMG Korea? Did they have a representative that spoke English?

**A. I don't think we ever spoke with anyone. All that was done via e-mail. And all of their questions were sent to us in English.**

Q. So with respect to Exhibit 4, your testimony is that you never took a -- a bonus or a salary; is that correct?

**A. From Ryze Renewables Nevada, that's correct.**

Q. But you were paid by Ryze Capital Partners for work that you would have performed on behalf of Ryze Renewables Nevada; is that correct or incorrect?

**A. I think that's a fair characterization.**

Q. Why were you paid by Ryze Capital Partners instead of Ryze Renewables Nevada?

**A. Answered that already, but happy to tell it again. Because Ryze capital Partners were set up to**

lunch, we were starting to talk about, you know, some of the issues that Mr. Christodoulou had flagged, including with respect to -- to Georgia's Own.

Do you recall that testimony?

**A. I think you're -- I don't agree with the characterization of the way you said that. We were talking about a memo from James, and then we were talking about notes. I don't remember you saying anything about Georgia's Own, but -- except for the loan amount.**

Q. Fair enough.

Mr. Christodoulou had flagged, I think, a number of issues in his report. Some of those had to do with notes. Some of them had to do with some other issues.

I recall that you had also testified that you spoke with Chrissy Wilson following her deposition with respect to Mr. Christodoulou's testimony; is that correct?

**A. That's correct.**

Q. Did Ms. Wilson tell you during that phone call that she was worried about her own criminal exposure following the issuance of the Christodoulou report?

**A. No.**

Q. At any other time, did Ms. Wilson tell you

that she was concerned about her own criminal exposure?
A. No.
Q. Did you have a conversation -- or are you aware that Ms. Fuller had been concerned about the exposure of her law license?
A. No.
Q. Are you aware of any federal government investigation into the construction of the Las Vegas facility?
A. As you state it, no, not the way you just stated that question.
Q. Are you aware of any investigation by the federal government with respect to the Las Vegas facility?
A. Yes.
Q. What's the basis of your understanding?
A. I believe there was a -- a known false information act claim filed by someone.
Q. Do you know who?
A. I don't.
Q. How did you hear about it?
A. I received a request for information from the Department of Justice.
Q. When?
A. In, I think, maybe January of 2025.

Q. January of this year?

**A. Correct.**

Q. Did you provide information in connection with that?

**A. I did.**

Q. Do you recall when you provided information?

**A. I think it was in March, but I'd have to verify that.**

Q. March of this year?

**A. March of this year.**

Q. Do you recall the documents that you provided?

**A. I -- I don't offhand.**

Q. Do you recall to whom you provided those documents?

**A. Yes. To -- to my attorney.**

Q. Did you sit for an interview or deposition with respect to that investigation?

**A. I did not.**

Q. Are you in the process of scheduling one?

**A. My counsel is in the process of scheduling one. Yes.**

(Whereupon, Mr. John F. Edgar rejoins the deposition.)

///

Q. But, the Snell defendants were only claiming to represent Mirae, right?

**A. That's -- that's our -- that's one of our claims. Yes.**

Q. Okay. Let's look at paragraph 4.

**A. (Witness complies.)**

Q. The sentence reads, "The magnitude of the financial loss that the Defendants' conduct has visited upon Ryze is staggering."

I read that correctly?

**A. Yes.**

Q. Again, here, you're referring to Snell & Wilmer, not Mirae Asset, correct?

**A. In this case, that's correct.**

Q. Let's go to paragraph 13.

**A. (Witness complies.)**

Q. Plaintiffs allege that, (as read): "Non-parties Jeff Hall, Sung Hee Han, Kyunghyun Lee were Defendants' principal collaborators in the fraud. Hall owned a company called Paragon Construction Consulting, Inc., that was working to raise the additional funding for Ryze. Han worked for Paragon. Lee was an employee of Mirae, who represented that he had the sole authority to bind Mirae. Lee did not speak English so all communication with Lee was

translated through Han."

Did I read that correctly?

**A. You did.**

Q. The sentence that says (as read): "Lee was an employee of Mirae, who represented he had the sole authority to bind Mirae," you see that?

**A. I do.**

Q. The next sentence is that Lee did not speak English, so all of his communications were translated through Han, correct?

**A. That's what this says.**

Q. Presumably would have had some factual basis at the time it was written, correct?

**A. I didn't write this sentence, so I can't really comment on that. But it's -- as I testified previously, he didn't speak English very well, and so I think that it's safe to say that most of the translation came from Han to Mr. Lee.**

Q. This -- but this paragraph doesn't say most. It says all communication was translated through Han, right?

**A. It also says "so." But, I mean, if we're going to -- if we're going to pick apart every word, yeah, I see that, "all communication." Yes, sir.**

Q. All means all, not most, right?

A. It does say that there. Yes.
Q. And someone on the Ryze side would have approved this, correct?
A. I think -- yes. Did I -- yes. I -- I have to say yes.
Q. Did you ever bring your own translator to any meetings with Mr. Han?
A. No, I didn't bring any -- any translator to meetings with Mr. Han.
Q. Bring any translators to any meetings with Mr. Lee?
A. I had a translator -- I had translators on phone calls where Mr. Lee participated. Yes.
Q. And those translators, do they read back to you the -- the items that were stated during those meetings?
A. No. I think I testified previously that they were listening for the conversation to make sure that everything was being translated correctly, and typically, the -- the answer was yes.
Q. Did those translators ever tell you that -- that they questioned whether Mr. Han was translating appropriately?
A. Did the translators tell me this?
Q. Yeah. Did your translators ever tell you

they had reason to question translation by Mr. Han?

**A. I don't believe so.**

Q. Paragraph 14, "Hall and Han were supposed to be working for and representing Ryze and stood to earn significant fees if Mirae provided additional funding."

Do you see that?

**A. Yes, sir.**

Q. Han and Hall were supposed to be representing Ryze, correct?

**A. That is correct.**

Q. In fact, Han and Hall did represent Ryze, correct?

**A. During the CLA process, yes.**

Q. What are the dates that Jeff Hall represented Ryze? What time frame?

**A. I believe it was February of 2020 through May 2021.**

Q. That would be from the beginning of any discussions with Mirae Asset --

**A. Through the nonfunding of the CLA by Mirae. Yes.**

Q. Even through what you claim to be the signing of the CLA, correct?

**A. The signing of the CLA was in -- was in late January, so yes. That would include that.**

Q. How much did you agree to pay him?

**A. I don't recall if it was a 1 percent fee or a 2 percent success fee. It was a 1 or 2 percent success fee. I just don't recall.**

Q. Off the back of the loan?

**A. As -- yes. On the -- on the total loan size, he would be paid a 1 or 2 percent fee, and I apologize. I don't remember exactly what that was.**

Q. And he had a binding agreement with Ryze, correct?

**A. I -- I would call it a binding agreement. Yes.**

Q. Do you recall which Ryze entity that Mr. Hall had an agreement with?

**A. I believe it was Ryze Renewables Holdings.**

Q. Was the agreement with Paragon, or was it with Mr. Hall?

**A. It was with Paragon.**

Q. And Paragon has what relationship to Mr. Hall?

**A. From what I understand now, they were -- they employed Mr. Han.**

Q. I'm sorry. Mr. Hall.

**A. Could you -- oh, what did Paragon -- I'm sorry --**

Q. What was Paragon's relationship with Jeff Hall?

**A. Jeff Hall, from what I understood, was the president and, I thought, owner of Paragon.**

Q. How'd you come to know Jeff Hall?

**A. He was introduced to me by Michael Brown.**

Q. This paragraph here also says that Sunghee Han was supposed to be working for and representing Ryze, correct?

**A. Yes.**

Q. So Sunghee Han was Ryze's agent, right?

**A. That's a really good question from an agency's perspective. I don't -- I don't know if I'm qualified to answer that.**

**I -- I think he was, but he was -- he was employed by a person we had a contractual relationship with. Jeff Hall insisted he was covered under his Paragon engagement, and -- but he never informed us of his employment status there, so I -- I don't know if that's a legal question that needs, you know, someone more qualified to answer, but I felt that Han was working on behalf of Ryze -- for Ryze.**

**So I guess you could call that an agent, but I didn't have an agency relation -- or agreement with Han. I had it with Jeff Hall, who employed Han in some**

manner to work on that transaction.

Q. But your understanding was that Sunghee Han was representing Ryze, correct?

A. Yes.

Q. And you did not have a direct contract with Mr. Han; is that right?

A. That's correct.

Q. You had a contract with Paragon, and Paragon presumably had an agreement with Mr. Han, right?

A. I assume so. Yes.

Q. For how long did Sunghee Han represent Ryze? What -- what's the time frame?

A. I would say, from the point shortly after we signed the engagement with Paragon --

Q. Uh-huh.

A. -- we were introduced to Han. So I would say that was in March of -- maybe -- maybe February of 2020.

Q. Okay.

A. Until the agreements were obviously cancelled after the nonfunding of the Mirae loan in May of 2021, I believe.

Q. So your testimony on behalf of plaintiffs is that Mr. Han and Mr. Hall were Ryze representatives from about February of 2020 through May of 2021,

correct?

A. **Yes.**

Q. Later in the paragraph, it says (as read): "In fact, Hall, who was described by Roehm as a close friend of Snell, and Han switched sides without informing Ryze and concoct- -- concocted the scheme with Defendants to extort millions from Ryze or ruin them or both."

Did I read that correctly?

A. **You did.**

Q. The contention that Mr. Han and Mr. Hall switched sides, do you recall when they switched sides?

A. **I think it became apparent later to us, but after the lawsuit was filed by Mirae --**

Q. Or by someone claiming to be Mirae, right? That's what your --

A. **Well, it wasn't filed by someone claiming. It was filed in Mirae's name. So when you say that it's -- I mean, I don't know if there's a distinction or a difference in that, but Mirae Asset Security is the -- is the name and the -- and the litigant -- or the plaintiff against Ryze in that lawsuit.**

**So I think we got the impression after that point that -- that Hall had -- had discussions with Snell & Wilmer. We certainly saw -- I saw discovery later on**

Q. Your contention is that Ryze satisfied the conditions precedent in what's referred to as the CLA; is that true or not true?

**A. That word "contention."**

**What's the definition of contention? I'm sorry.**

Q. Is it your claim that Ryze satisfied all the conditions precedent in the document known as the CLA?

**A. It is.**

Q. Timely satisfied?

**A. As -- as quickly as humanly possible.**

Q. Did you ever speak with anyone on the Mirae Asset -- the investment committee?

**A. No, nor have I ever, in any loan or deal I've ever been involved with as a borrower, been able or allowed to speak to the investment committee ever.**

Q. So the answer is you never spoke with anyone on the Mirae Asset investment committee, did you?

**A. Not them or any other investment committee for any other lender ever.**

Q. Let's look at paragraph 35.

On a phone call conducted on March 1 of 2021, Mirae informed Ryze that it had obtained final committee approval for the CLA.

See that?

**A. I do.**

Q. Who informed Ryze that there was final committee approval for the CLA?

**A. Mr. Lee himself.**

Q. Speaking in Korean?

**A. No. Speaking in clear English.**

Q. Mr. Lee spoke in English?

**A. One -- something I've testified to that I thought he knew how to speak. I thought he 100 percent understood English. Said that before. And he said -- when I asked him, Have we cleared investment committee approval? he said, Yes, we did, quote/unquote.**

Q. So in paragraph 13, where it states, "Lee did not speak English, so all communication with Lee was translated through Han" --

**A. Yeah. I think, in general, he didn't speak English. He didn't speak to other people in English, typically. But he 100 percent said, "Yes, we did," while we were on that phone call --**

Q. Okay. So --

**A. -- and I remember it, literally, like it was yesterday.**

Q. So in paragraph 13, where it says, "He did not speak English, and all communication was translated through Han," that's just a falsehood.

Is that your testimony?

A. I think it's a -- I think it's a generalization of the fact that he didn't speak very much English.

Q. Who else was on this phone call?

A. I believe, at the time, it was a pretty large group of people from our team. It was Lisa Fuller. I think Chris Dancy and Daniel Brown were both there.

These were -- these were scheduled phone calls that we had with Mr. Lee on a fairly routine basis. And I -- I believe, on the call -- I think Jeff Hall was -- was there on the call, and I -- and I'm sure Han was there on the call.

Q. What else was explained on that call?

A. It was a short call. We got fantastic news, and I said we'll -- we'll immediately start working on the -- on the deliverables in -- I think it's 4.2A of our agreement, and -- and we -- we cut it pretty short.

Q. In paragraph 39, there's a reference to Mirae or, quote, whomever it was Ryze had spent the past year negotiating with, end quote.

Do you see that?

A. I don't see quotes, but I see the statement. Yes.

I mean, are those lines considered quotes? Sorry.

Q. Well, I was reading from it, so I just wanted

to accurately --

A. Okay. I want to make sure I'm being --

Q. All right.

A. You're going word by word over things, so I want to make sure I'm being accurate, as well --

Q. That's fine.

A. -- fair enough?

Q. No issue.

A. Okay.

Q. So there was concerns that Ryze was not truly negotiating with Mirae Asset, right?

A. I'd have to read this in conjunction with the timing. I think -- I think these depositions have had the tendency to really convolute the timeline, so I -- ultimately to withdraw from the deal in the e-mail dated May 20th -- yeah. I think -- I think after we -- not I think.

After we provided the 4.02A and then B, I think there were a total of 15 deliverables. And after we did that and -- and we confirmed that they had received those and that they were satisfactory, which they did in an e-mail, Mirae did, Mr. Lee, that getting to May was an indication that they -- something was going on, and they weren't funding the loan, because no funds had been received.

MR. OWENS: I think so.

MR. PRINCE: We can go off the record, please.

THE VIDEOGRAPHER: This now adjourns the videotaped deposition of Matt Pearson on October 8, 2025. We're now going off the record. The time is 5:31.

THE REPORTER: Counsel, may I just reconfirm your orders?

Both sides want the rough drafts by Monday, and expedited finals as soon as possible --

MR. OWENS: Yes. Rough draft in the normal course -- by Monday is fine, and the finals expedited.

MR. PRINCE: Yes. Monday for the roughs is fine and expedited finals.

THE REPORTER: Thank you, Counsel.

(Proceedings adjourned at 5:31 p.m.)

--o0o--

# C E R T I F I C A T E

STATE OF NEVADA )
) ss:
COUNTY OF CLARK )

I, Paige M. Christian, CCR #955, Registered Merit Reporter, Certified Realtime Reporter, Certified Realtime Captioner, in and for the State of Nevada, do hereby certify:

That on Wednesday, October 8, 2025, at 9:04 a.m., appeared before me MATTHEW G. PEARSON, the witness whose video-recorded deposition is contained herein; that prior to being examined, he was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my direction and supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter;

That a request for an opportunity to review and make changes to this transcript:

was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

X was not made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

was waived.

I further certify that I am not an attorney for, nor related to, any of the parties hereto, nor in any way interested in the outcome of the cause.

In witness whereof, I have hereunto subscribed my name.

Dated this 20th day of October, 2025, in Clark County, Nevada.

Paige M. Christian, CCR #955
Registered Merit Reporter
Certified Realtime Reporter
Certified Realtime Captioner