# UNSEALED COPY OF EXHIBIT DP1

# 1/27/2021 Convertible Loan Agreement Page

PENGAD 800-631-6989 EXHIBIT PC 10/08/2025 13 M. PEARSON

---

CONVERTIBLE LOAN AGREEMENT

dated as of January 27, 2021,

among

RYZE RENEWABLES NEVADA, LLC
as Borrower,

MIRAE ASSET DAEWOO CO., LTD.
AND THE OTHER LENDERS PARTY HERETO FROM TIME TO TIME,

and

RYZE RENEWABLES HOLDINGS, LLC
as Guarantor

---

# TABLE OF CONTENTS


| Section | | Page |
|---|---|---|
| | **ARTICLE I** | |
| | **DEFINITIONS** | |
| SECTION 1.01 | Defined Terms. | 1 |
| SECTION 1.02 | Terms Generally. | 17 |
| SECTION 1.03 | Accounting Terms; GAAP. | 17 |
| SECTION 1.04 | Resolution of Drafting Ambiguities. | 17 |
| | **ARTICLE II** | |
| | **THE CREDITS** | |
| SECTION 2.01 | Loan. | 17 |
| SECTION 2.02 | Borrowing Procedure. | 18 |
| SECTION 2.03 | Evidence of Debt; Repayment of Loan. | 18 |
| SECTION 2.04 | Interest on Loan. | 19 |
| SECTION 2.05 | Termination of Commitment. | 19 |
| SECTION 2.06 | Optional Prepayments of Loan. | 19 |
| SECTION 2.07 | Mandatory Prepayments of Loan. | 20 |
| SECTION 2.08 | Conversion Option. | 21 |
| SECTION 2.09 | Taxes. | 24 |
| | **ARTICLE III** | |
| | **REPRESENTATIONS AND WARRANTIES** | |
| SECTION 3.01 | Organization; Powers. | 30 |
| SECTION 3.02 | Authorization; Enforceability. | 31 |
| SECTION 3.03 | No Conflicts. | 31 |
| SECTION 3.04 | Financial Statements. | 31 |
| SECTION 3.05 | Properties. | 31 |
| SECTION 3.06 | Equity Interests and Subsidiaries. | 31 |
| SECTION 3.07 | Environmental Matters. | 32 |
| SECTION 3.08 | Litigation. | 32 |
| SECTION 3.09 | Investment Company Act. | 33 |
| SECTION 3.10 | Use of Proceeds. | 33 |
| SECTION 3.11 | Permits. | 33 |




CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

SECTION 3.12 Taxes. 33
SECTION 3.13 No Material Misstatements. 33
SECTION 3.14 Insurance. 34
SECTION 3.15 Material Contracts. 34
SECTION 3.16 Security Documents. 35
SECTION 3.17 Sanctions, Etc. 35
SECTION 3.18 TID Business; CFIUS Filing. 35
SECTION 3.19 HSR Act. 36
SECTION 3.20 Credit Rating Report. 36
SECTION 3.21 Project Company Debt Documents. 36

ARTICLE IV

CONDITIONS TO THE EFFECTIVE DATE AND THE FUNDING DATE

SECTION 4.01 Conditions to Effectiveness of this Agreement. 37
SECTION 4.02 Conditions to Funding of the Loan. 37

ARTICLE V

AFFIRMATIVE COVENANTS

SECTION 5.01 Financial Statements, Reports, etc. 38
SECTION 5.02 Financial Covenants. 39
SECTION 5.03 Rating. 40
SECTION 5.04 Progress Update 40
SECTION 5.05 Litigation and Other Notices. 41
SECTION 5.06 Existence. 41
SECTION 5.07 Insurance. 41
SECTION 5.08 Obligations and Taxes. 41
SECTION 5.09 Maintaining Records; Access to Properties and Inspections. 42
SECTION 5.10 Completion Certificate. 42
SECTION 5.11 Use of Proceeds. 42
SECTION 5.12 CFIUS. 42
SECTION 5.13 Off-Take Agreement. 42
SECTION 5.14 Executive Team. 42
SECTION 5.15 Additional Collateral. 43
SECTION 5.16 Payment and Performance Bonds. 43

ARTICLE VI

NEGATIVE COVENANTS

SECTION 6.01 Indebtedness. 45
SECTION 6.02 Liens. 45

SECTION 6.03 Investment, Loan, Advances and Acquisition. 45
SECTION 6.04 Mergers and Consolidations; Fundamental Changes. 46
SECTION 6.05 Business Activities. 46
SECTION 6.06 Asset Sales. 46
SECTION 6.07 Dividends / Distributions. 46
SECTION 6.08 Transactions with Affiliates. 46
SECTION 6.09 Modifications of Organizational Documents and Material Agreements. 47
SECTION 6.10 Limitation on Changes to Holding Company Status. 47
SECTION 6.11 Limitations on Budget Management. 48
SECTION 6.12 Sanctions, Etc. 48

ARTICLE VII

ACCOUNTS

SECTION 7.01 Creation of Accounts. 49
SECTION 7.02 Collections Account. 50
SECTION 7.04 Funding Date Interest Reserve Account. 51
SECTION 7.05 Interest Payment Account. 51
SECTION 7.06 Debt Service Reserve Account. 51
SECTION 7.07 Cash Reserve Account. 52
SECTION 7.08 Principal Reserve Account. 52
SECTION 7.09 EPC Retention Account. 53
SECTION 7.10 Working Capital Reserve Account. 53
SECTION 7.11 Conditional Distributions Account. 54

ARTICLE VIII

EVENTS OF DEFAULT

SECTION 8.01 Events of Default. 55
SECTION 8.02 Application of Proceeds. 57
SECTION 8.03 Project Company Debt Documents Refinancing. 57

ARTICLE IX

SECTION 9.01 Appointment and Authority. 57
SECTION 9.02 Rights as a Lender. 58
SECTION 9.03 Exculpatory Provisions. 58
SECTION 9.04 Reliance by Administrative Agent 59
SECTION 9.05 Delegation of Duties. 59
SECTION 9.06 Resignation of Administrative Agent. 59
SECTION 9.07 Non-Reliance on Administrative Agent and other Lenders 60
SECTION 9.08 No Other Duties, Etc 60
SECTION 9.09 Administrative Agent May File Proofs of Claim 60
SECTION 9.10 Collateral and Guaranty Matters 61

ARTICLE X

MISCELLANEOUS


| | | |
|---|---|---|
| SECTION 10.01 | Notices | 62 |
| SECTION 10.02 | Waivers; Amendment | 62 |
| SECTION 10.03 | Expenses | 63 |
| SECTION 10.04 | Successors and Assigns | 63 |
| SECTION 10.05 | Counterparts; Integration; Effectiveness | 64 |
| SECTION 10.06 | Severability | 64 |
| SECTION 10.07 | Guarantee of Holdings | 64 |
| SECTION 10.08 | Arbitration | 65 |
| SECTION 10.09 | Governing Law | 65 |
| SECTION 10.10 | Specific Performance | 65 |
| SECTION 10.11 | Headings | 65 |
| SECTION 10.12 | Treatment of Certain Information; Confidentiality | 67 |
| SECTION 10.13 | Interest Rate Limitation | 67 |


<u>SCHEDULES</u>


| | |
|---|---|
| Schedule 1.01 | Commitments |
| Schedule 3.01 | Organizational Structure |
| Schedule 3.06 | Equity Interests and Subsidiaries |
| Schedule 3.07(b) | Environmental Permits |
| Schedule 3.08 | Litigation |
| Schedule 3.11 | Permits |
| Schedule 3.14 | Insurance |
| Schedule 3.15 | Material Contracts |
| Schedule 4.02A | Conditions to Funding Date (Items to be completed prior to Funding Date) |
| Schedule 4.02B | Conditions to Funding Date (Items to be completed on the Funding Date) |


<u>EXHIBITS</u>


| | |
|---|---|
| Exhibit A | Form of Borrowing Request |
| Exhibit B | Form of Note |
| Exhibit C | Form of Security Agreement |
| Exhibit D | Sources and Uses |
| Exhibit E | Form of Borrower Operating Agreement |
| Exhibit F-1 | Form of U.S. Tax Compliance Certificate |
| Exhibit F-2 | Form of U.S. Tax Compliance Certificate |
| Exhibit F-3 | Form of U.S. Tax Compliance Certificate |
| Exhibit F-4 | Form of U.S. Tax Compliance Certificate |
| Exhibit G | Form of Account Control Agreement |
| Exhibit H | Form of Prepayment Notice |




CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

# CONVERTIBLE LOAN AGREEMENT

This CONVERTIBLE LOAN AGREEMENT (this "**Agreement**") dated as of January 27th, 2021, among Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "**Borrower**"), Mirae Asset Daewoo Co., Ltd., an entity organized under the laws of the Republic of Korea ("**Mirae**"), and Ryze Renewables Holdings, LLC, a Delaware limited liability company ("**Holdings**"), solely for the limited purposes set forth in Sections 2.08 and 9.07 hereof.

## WITNESSETH:

WHEREAS, the Borrower has requested the Lenders to extend credit in the form of a Loan to be made on the Funding Date, in an aggregate principal amount equal to two hundred and ten million dollars ($210,000,000).

WHEREAS, the proceeds of the Loan are to be used in accordance with Section 3.10.

NOW, THEREFORE, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

**SECTION 1.01** Defined Terms.

As used in this Agreement, the following terms shall have the meanings specified below:

"**Accounts**" shall have the meaning assigned to such term in Section 7.01.

"**Account Control Agreement**" shall mean the agreement, substantially in the form and substance attached hereto as Exhibit G.

"**Ad Hoc FMV Report**" shall have the meaning assigned to such term in Section 5.01(e)(ii).

"**Administrative Agent**" shall have the meaning assigned to such term in Section 9.01.

"**Affiliate**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by, or is under common Control with the person specified.

"**Agreement**" shall have the meaning assigned to such term in the preamble hereto.

"**Annual FMV Report**" shall have the meaning assigned to such term in Section 5.01(a)(i).

"**Approved Budget**" shall have the meaning assigned to such term in Section 5.01(a)(iv).

"**Asset Sale**" shall mean any conveyance, sale, lease, sublease, swap, liquidation, assignment, transfer or other disposition (including by way of merger or consolidation and including any Sale and Leaseback Transaction) of any property excluding sales of inventory and dispositions of cash and cash equivalents, in each case, in the ordinary course of business, by the Borrower or any of its Subsidiaries.

"**Bi-Weekly Report**" shall have the meaning assigned to such term in Section 5.04(b).

"**Borrower**" shall have the meaning assigned to such term in the preamble hereto.

"**Borrower Operating Agreement**" shall mean the Amended and Restated Operating Agreement of the Borrower, to be dated and as in effect on or about the Funding Date in the form of Exhibit E, and as may be further amended, amended and restated, supplemented or otherwise modified from time to time.

"**Borrowing Request**" shall mean a request by the Borrower in accordance with the terms of Section 2.02 and substantially in the form of Exhibit A, or such other form as shall be approved by the Administrative Agent.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City and Seoul are authorized or required by law to close.

"**Cash Equivalents**" shall mean, as to any person, (a) securities issued, or directly, unconditionally and fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such person; (b) time deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500.0 million and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such person; (c) repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid and perfected security interest in the underlying securities; (d) commercial paper issued by any person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Group or at least P-1 or the equivalent thereof by Moody's Investors Service Inc., and in each case maturing not more than one year after the date of acquisition by such person; (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above; and (f) demand deposit accounts maintained in the ordinary course of business.

"**Cash Reserve Account**" shall have the meaning assigned to such term in Section 7.01.

"**Cash Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.07.

"**Change in Control**" shall mean the occurrence or consummation of any transaction or series of related transactions (including without limitation any sale, transfer, merger or consolidation) which results in either of the following: (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), in each case other than by any Permitted Investor of Equity Interests representing more than 50% of the aggregate voting power represented by the issued and outstanding Equity Interests of Holdings, (b) Holdings (together with the Permitted Investors and the Lenders (or their respective permitted successors and assigns)) ceases to directly own, beneficially or of record, Equity Interests representing 100% of the aggregate voting power represented by the issued and outstanding Equity Interests of the Borrower, (c) the Borrower ceases to directly own, beneficially or of record, Equity Interests representing 100% of the aggregate voting power represented by the issued and outstanding Equity Interests of the Project Company Holdco or (d) the Project

Company Holdco ceases to directly own, beneficially or of record, Equity Interests representing 100% of the aggregate voting power represented by the issued and outstanding Equity Interests of the Project Company (excluding for purposes of this clause (d), the New-Com Warrant).

"**Change Order EPC Contract**" shall mean the Engineering, Procurement and Construction Services Contract, by and between the Project Company and Sys-Con, LLC, dated as of October 14, 2020, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Charges**" shall have the meaning assigned to such term in Section 10.11.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"**CFIUS**" shall mean the Committee on Foreign Investment in the United States.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" shall mean, collectively, all of the Security Agreement Collateral and all other property of whatever kind and nature subject or purported to be subject from time to time to a Lien under any Security Document.

"**Collections Account**" shall have the meaning assigned to such term in Section 7.01.

"**Commercial Operation Date**" shall mean the last day of the first full month after the Completion Date in which an independent third-party engineering contractor has certified that the Project Company is operating and has achieved full production.

"**Commitment**" shall mean each of the Lender's commitments to make a Loan hereunder in the aggregate principal amount not to exceed the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule 1.01. The aggregate principal amount of Commitments on the Effective Date is two hundred and ten million dollars ($210,000,000).

"**Completion Certificate**" shall have the meaning assigned to such term in Section 5.10.

"**Completion Date**" shall mean the date of delivery of the Completion Certificate by the Borrower to the Administrative Agent.

"**Common Membership Units**" shall mean Common Membership Units of the Borrower, as defined in the Borrower Operating Agreement.

"**Conditional Distributions Account**" shall have the meaning assigned to such term in Section 7.01.

"**Contracts**" shall mean all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Contract Party**" shall have the meaning assigned to such term in Section 3.15(a).

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Conversion Date**" shall have the meaning assigned to such term in Section 2.08(c).

"**Conversion Option**" shall have the meaning assigned to such term in Section 2.08(a).

"**Conversion Shares**" shall have the meaning assigned to such term in Section 2.08(a).

"**Debtor Relief Laws**" shall mean Title 11 of the United States Code, as now and hereafter in effect, or any successor statute, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**Debt Service**" shall mean, with respect to any period, the sum of (a) all cash interest and principal payments made or required to be made by the Project Company to the Project Company Lender pursuant to the Project Company Loan Agreement during such period plus (b) all cash interest paid or required to be paid by the Borrower to the Lenders pursuant to this Agreement for such period.

"**Debt Service Coverage Ratio**" shall mean, with respect to any period, the ratio of (a) EBITDA of the Project Company for such period to (b) Debt Service for such period.

"**Debt Service Reserve Account**" shall have the meaning assigned to such term in Section 7.01.

"**Debt Service Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.06(c).

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Defaulting Lender**" shall mean any Lender that:

(a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent, and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any Lender any other amount required to be paid by it hereunder within two Business Days of the date when due,

(b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied),

(c) has failed, within three Business Days after written request by the Administrative Agent, or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply

with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower) or

(d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each Lender.

"**Depository Bank**" shall means for a particular Account, the depository bank named pursuant to the related Account Control Agreement from time to time.

"**Disqualified Institution**" means, on any date, (a) any person designated by the Borrower as a "Disqualified Institution" by written notice to the Administrative Agent on or prior to the date hereof and (b) any other person that is a competitor of the Borrower or any of its Subsidiaries that is designated by the Borrower as a "Disqualified Institution" at any time, but no later than five (5) Business Days after written notice is provided to the Administrative Agent and the Borrower by any Lender of its intent to transfer all or any portion of, or a participation in, its interest in the Loan to any person duly designated as such competitor; provided that any person that the Borrower designates as no longer being a "Disqualified Institution" by written notice to the Administrative Agent from time to time shall be excluded from such definition.

"**Distributions Condition**" shall mean, as of any date of determination, that (i) the Borrower has complied with each of the financial covenants set forth in Sections 5.02(a) and 5.02(b) for the twelve month period ending as of the fiscal month most recently ended prior to such date, (ii) the Borrower has complied with the covenant set forth in Section 5.03 on or prior to such date, (iii) the Borrower has complied with all of the provisions of Sections 7.01, 7.02, 7.03, 7.04, 7.05, 7.06, 7.07, 7.08, 7.09 and 7.10 as of such date (including, for the avoidance of doubt, satisfaction of the Interest Payment Account Requirement, the Debt Service Reserve Account Requirement, any then applicable Cash Reserve Account Requirement, the Principal Reserve Account Requirement and the Working Capital Reserve Account Requirement, in each case, as of such date) and (iv) no Default or Event of Default shall have occurred that is continuing as of such date (or would result as a result of any Dividend or other distribution to be made by the Borrower on such date).

"**Dividend**" with respect to any person shall mean that such person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property or cash to the holders of its or any of its parent companies' Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such person or any of its parent companies with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes. Without limiting the foregoing, "Dividends" with respect to any person shall also

include all payments made or required to be made by such person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**dollars**" or "**$**" shall mean lawful money of the United States.

"**EBITDA**" shall mean, with respect to any period, for the Project Company, the sum of, in each case, determined in accordance with GAAP, (a) the net income (or loss) for such period, plus (b) the sum (in each case without duplication and to the extent the respective amounts described in this clause (b) otherwise reduced such net income for the respective period for which EBITDA is being determined): (i) any provision for (less any benefit, including income tax credits, from) federal, state, local or other income and franchise taxes, and other foreign, provincial and excise taxes, foreign withholding taxes and foreign unreimbursed value added taxes (including penalties and interest related to any such tax or arising from any tax examination); (ii) interest expense (and to the extent not included in interest expense, costs of surety bonds in connection with financing activities and any bank and letter of credit, letter of guaranty, ratings agency and bankers' acceptance fees (including amounts charged as expense to interest rate hedging obligations) for such period (net of interest income for such period to the extent included in the calculation of net income for such period); (iii) depreciation and amortization costs or expenses for such period; (iv) any expenses or charges (other than depreciation or amortization expense as described in the preceding clause (iii)) paid or accrued related to the transactions contemplated by the Project Company Loan Agreement; (v) any other non-cash losses, expenses and charges and impairment charges; provided, that for purposes of this subclause (v) of this clause (b), any non-cash charges or losses shall be treated as cash charges or losses in any subsequent period during which cash disbursements attributable thereto are made (but excluding, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period); and (vi) any extraordinary, unusual or non-recurring cash expenses; minus (c) the sum of (without duplication and to the extent the amounts described in this clause (c) increased net income for the respective period for which EBITDA is being determined), non-cash items increasing net income for such period (but excluding the recognition of deferred revenue or any such items (A) in respect of which cash was received in a prior period or will be received in a future period or (B) which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period).

"**Effective Date**" shall have the meaning assigned to such term in Section 4.01.

"**Electing Lender**" shall have the meaning assigned to such term in Section 2.08(a).

"**Eligible Assignee**" shall have the meaning assigned to such term in Section 10.04.

"**Environmental Claim**" shall mean any action, suit, claim, investigation or other legal proceeding by any person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable law, and any order of a Governmental Authority or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production,

disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Notice**" shall mean any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" shall mean any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**EPC Contract**" shall mean the Engineering, Procurement and Construction Services Contract, by and between the Project Company and MMC, Inc., dated as of January 23, 2018, as may be amended, amended and restated, supplemented or otherwise modified from time to time, and

"**EPC Retention Account**" shall have the meaning assigned to such term in Section 7.01.

"**Equity Interest**" shall mean, with respect to any person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such person, including, if such person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued after the Effective Date, but excluding warrants or debt securities convertible or exchangeable into such equity.

"**Event of Default**" shall have the meaning assigned to such term in Section 8.01.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, any U.S. federal withholding Taxes imposed pursuant to a law in effect on the date on which such Lender acquires an interest in the Loan or Commitment or changes its Lending Office, except in each case to the extent that, pursuant to Section 2.09(a), additional amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.09(a)(vii) and (d) any Taxes imposed under FATCA.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury Regulations or official administrative interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code (or any amended or successor version described above), any intergovernmental agreement, treaty or convention among Governmental Authorities implementing the foregoing and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreement, treaty or convention.

"**FCPA**" shall have the meaning assigned to such term in Section 3.17.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Final Mirae Committee Approval**" shall have the meaning assigned to such term in Section 4.01.

"**First Cash Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.07.

"**First Test Date**" shall have the meaning assigned to such term in Section 5.02(a).

"**Fourth Cash Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.07.

"**Funding Date**" shall have the meaning assigned to such term in Section 4.02.

"**Funding Date Interest Reserve Account**" shall have the meaning assigned to such term in Section 7.01.

"**GAAP**" shall mean generally accepted accounting principles in the United States applied on a consistent basis.

"**Guarantor**" shall have the meaning assigned to such term in Section 10.07.

"**Governing Board**" shall mean, with respect to any person, (i) in the case of any corporation, the board of directors of such person, (ii) in the case of any limited liability company, the board of managers or governors of such person or if there is none, the board of directors of the managing member of such person, (iii) in the case of any partnership, the board of directors of the general partner of such person and (iv) in any other case, the functional equivalent of the foregoing.

"**Governmental Authority**" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union, the European Central Bank or the Organisation for Economic Co-operation and Development).

"**Hazardous Materials**" shall mean: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or man-made, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Holdings**" shall mean Ryze Renewables Holdings, LLC, a Delaware limited liability company, which, as of immediately prior to the Effective Date, is the owner, beneficially and of record, of 100% of the Equity Interests of the Borrower.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Indebtedness**" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money; (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such person under conditional sale or other title retention agreements relating to property purchased by such person to the extent of the value of such property if the rights and remedies of seller or lender under such agreement in the event of default are limited solely to repossession or sale of such property (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business); and (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than ninety (90) days or that are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided for on the books of such person). The Indebtedness of any person shall include the Indebtedness of any other entity (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such person is not liable therefor.

"**Indemnified Taxes**" means (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), all Other Taxes.

"**Intellectual Property**" means any and all intellectual property, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how, and processes, all rights therein, and all rights to sue at law or in equity for any past, present, or future infringement, violation, misuse, misappropriation, or other impairment thereof, whether arising under United States, multinational, or foreign laws, or otherwise, including the right to receive injunctive relief and all proceeds and damages therefrom.

"**Interest Payment Account**" shall have the meaning assigned to such term in Section 7.01.

"**Interest Payment Account Requirement**" shall have the meaning assigned to such term in Section 7.05.

"**Interest Payment Date**" shall mean the last day of the applicable Interest Period.

"**Interest Period**" shall mean each quarterly period during which the Loan is outstanding, it being understood and agreed that the first such Interest Period hereunder shall commence on the Funding Date and end on the numerically corresponding day (or, if there is no numerically corresponding day, on the last

day) in the calendar month that is three months from the Funding Date (and, for iterative example, the second Interest Period hereunder shall commence on the last day of the first such Interest Period and end on the numerically corresponding day in the calendar month that is three months therefrom); *provided* that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day (unless such next following Business Day is in a different calendar month, in which case such Interest Period shall end on the preceding Business Day) and the following Interest Period shall begin on the last day of the preceding Interest Period. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"**Interest Rate**" shall have the meaning assigned to such term in Section 2.04(a).

"**Interest Payment Account**" shall have the meaning assigned to such term in Section 7.01.

"**Investments**" shall have the meaning assigned to such term in Section 6.03.

"**Lenders**" shall mean Mirae and any other banks and financial institutions or entities from time to time who become lenders hereunder through assignment or otherwise.

"**Lending Office**" means, as to any Lender, the office or offices or branch of such Lender or any of its Affiliates as a Lender or any of its Affiliates may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, claim, charge, assignment, hypothecation, security interest or encumbrance of any kind or any arrangement to provide priority or preference or any filing of any financing statement under the UCC or any other similar notice of lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan**" shall have the meaning assigned to such term in Section 2.01.

"**Loan Documents**" shall mean this Agreement, the Notes (if any) and the Security Documents.

"**Loan Parties**" shall mean Holdings and the Borrower.

"**Management Services Agreement**" shall mean that certain Management Services Agreement, dated as of the Effective Date, by and between the Borrower and Holdings, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on the business, properties, operations or financial condition of the Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the ability of Borrower to fully and timely perform any of its obligations under any Loan Document; (c) a material impairment of the rights of or benefits or remedies available to the Administrative Agent or the Lenders under any Loan Document; or (d) a material adverse effect on the Collateral or the Liens (including the priority thereof) in favor of the Administrative Agent acting on behalf of itself and the Lenders on the Collateral.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

"**Material Contracts**" shall have the meaning assigned to such term in Section 3.15(a).

"**Maturity Date**" shall mean the earliest to occur of (a) the Scheduled Maturity Date or (b) the date on which the Commitment is terminated and the Loan becomes due in accordance with Section 8.01, and in each case, if such date is not a Business Day, the first Business Day thereafter.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.11.

"**Minimum Operating Amount**" shall have the meaning assigned to such term in Section 7.02(a).

"**Minimum Percentage**" shall mean a percentage equal to: (i) the sum of (a) twenty-three and 86/100 percent (23.86%) and (b) the product of the PIK Interest that has been added to the principal amount of the Loan multiplied by 0.000000113636, *minus* (ii) the product of (x) the aggregate principal amount of all Voluntary Prepayments, the Specified Prepayments and the amount of the mandatory prepayments made pursuant to Section 2.07(a) multiplied by (y) 0.000000113636.

"**Mirae**" shall mean Mirae Asset Daewoo Co., Ltd., organized under the Laws of the Republic of Korea.

"**New-Com Warrant**" shall mean that certain Warrant, dated February 20, 2018, by the Project Company in favor of New-Com, Inc., or its registered assigns, as the holder.

"**Non-Consenting Lender**" shall have the meaning assigned to such term in Section 2.09(d).

"**Non-U.S. Lender**" means a lender that is not a U.S. person.

"**Notes**" shall mean any notes evidencing the Loan issued pursuant to this Agreement substantially in the form of Exhibit B.

"**Obligations**" shall mean obligations of Borrower from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any proceeding commenced under any Debtor Relief Law, regardless of whether allowed or allowable in such proceeding) on the Loan, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any proceeding commenced under any Debtor Relief Law, regardless of whether allowed or allowable in such proceeding), of Borrower under this Agreement and the other Loan Documents.

"**OFAC**" shall have the meaning assigned to such term in Section 3.17.

"**Off-Take Agreement**" shall mean that certain Supply and Offtake Agreement between Ryze Renewables Las Vegas, LLC and Phillips 66 Company dated June 15, 2017, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Organizational Documents**" shall mean, with respect to any person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (iv) in the case of any general



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER RYZE0006788

partnership, the partnership agreement (or similar document) of such person and (v) in any other case, the functional equivalent of the foregoing.

"**Other Connection Taxes**" shall mean, with respect to the Administrative Agent and the Lenders or any other recipient of any payment to be made by or on account of any obligation of Borrower hereunder, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" shall mean all present or future stamp or documentary Taxes or any other property or similar Taxes, charges or levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Parent**" shall mean any direct or indirect parent company of Holdings.

"**Participant**" shall have the meaning assigned to such term in Section 10.04.

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04.

"**Permits**" shall mean all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Permitted Indebtedness**" shall mean, collectively:

(a) in the case of the Borrower, Indebtedness incurred under this Agreement and the other Loan Documents;

(b) in the case of the Project Company, (i) "Permitted Indebtedness" as such term is defined in the Project Company Loan Agreement (as in effect on the date hereof) and any Permitted Refinancing thereof and (ii) to the extent constituting Indebtedness, amounts owing by the Project Company to the Borrower as a result of proceeds of the Loans made by the Lenders to the Borrower under this Agreement having been contributed, or otherwise provided to, the Project Company in an aggregate principal amount not to exceed $115,000,000, which is identified in Exhibit D; and

(c) in the case of the Project Company Holdco, a guarantee of the Indebtedness described in clause (b) of this definition.

"**Permitted Investors**" shall mean (i) the members of Borrower and/or Holdings as of the Effective Date, (ii) advisory board members of the Borrower and/or Holdings as of the Effective Date, (iii) key employees of the Borrower and Holdings and (iv) trusts for the benefit of any of the foregoing.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Permitted Refinancing**" means Indebtedness ("**Refinancing Indebtedness**") issued or incurred (including by means of the extension or renewal of existing Indebtedness) to refinance, refund, extend, renew or replace Indebtedness existing at any time ("**Refinanced Indebtedness**"); provided that (a) the

principal amount of such Refinancing Indebtedness is not greater than the principal amount of such Refinanced Indebtedness plus the amount of any premiums or penalties and accrued, capitalized or unpaid interest paid thereon and reasonable fees and expenses, in each case associated with such Refinancing Indebtedness, (b) the obligors in respect of such Refinanced Indebtedness immediately prior to such refinancing, refunding, extending, renewing or replacing are the only obligors on such Refinancing Indebtedness and (c) such Refinancing Indebtedness shall not be secured by any Collateral except that such Refinancing Indebtedness may be secured with the same (or less) assets, if any, that constituted collateral for the applicable Refinanced Indebtedness immediately prior to such refinancing, refunding, extending, renewing or replacing.

"**person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**PIK Interest**" shall have the meaning assigned to such term in Section 2.04(c).

"**Prepayment Amount**" shall mean, (i) with respect to any prepayment date occurring on or after the 24-month anniversary of the Funding Date but prior to the 36-month anniversary of the Funding Date, the amount equal to six percent (6%) of the amount of the Loan repaid or prepaid, (ii) with respect to any prepayment date occurring on or after the 36-month anniversary of the Funding Date but prior to the 48-month anniversary of the Funding Date, the amount equal to four percent (4%) of the amount of the Loan repaid or prepaid and (iii) with respect to any prepayment date occurring thereafter and prior to the Maturity Date, the amount equal to two percent (2%) of the amount of the Loan repaid or prepaid.

**"Prepayment Notice"** shall have the meaning assigned to such term in Section 2.06(f).

"**Principal Reserve Account**" shall have the meaning assigned to such term in Section 7.01.

"**Principal Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.08.

"**Project**" shall have the meaning assigned to such term in the Project Company Loan Agreement (as in effect on the date hereof).

"**property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property.

"**Project Company**" shall mean Ryze Renewables Las Vegas, LLC.

"**Project Company Debt Documents**" shall mean the Project Company Loan Agreement and the "Loan Documents" (as defined the Project Company Loan Agreement), in each case, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Project Company Holdco**" shall mean Ryze Renewables II, LLC.

"**Project Company Holdco Operating Agreement**" shall mean the Operating Agreement of the Project Company Holdco, dated September 8, 2017 and as in effect on the Effective Date, and as may be further amended, amended and restated, supplemented or otherwise modified from time to time.

"**Project Company Lender**" shall mean Georgia's Own Credit Union.

"**Project Company Loan Agreement**" shall mean that certain Loan Agreement dated as of June 25, 2018 among the Project Company Lender, Project Company and Project Company Holdco, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Project Company Operating Agreement**" shall mean the Operating Agreement of the Project Company, dated September 8, 2017 and as in effect on the Effective Date, and as may be further amended, amended and restated, supplemented or otherwise modified from time to time.

"**Recipient**" means the Administrative Agent and any Lender.

"**Release**" shall mean any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Register**" shall have the meaning assigned to such term in Section 10.04.

"**Replaceable Lender**" shall have the meaning assigned to such term in Section 2.09(d).

"**Required Lenders**" shall mean, at any time, all Lenders (other than any Defaulting Lender at such time).

"**Requirements of Law**" shall mean, collectively, any and all applicable requirements of any Governmental Authority including any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes or case law.

"**Resignation Effective Date**" shall have the meaning assigned to such term in Section 10.06.

"**Sale and Leaseback Transaction**" shall mean any arrangement, whether entered into directly or indirectly, whereby a person sells or transfers any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rents or leases such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"**Sanctions**" shall have the meaning assigned to such term in Section 3.17.

"**Scheduled Maturity Date**" shall mean the date that is sixty (60) months following the Funding Date.

"**Second Cash Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.07.

"**Securities Act**" shall mean the Securities Act of 1933.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

"**Security Agreement**" shall mean the Pledge and Security Agreement substantially in the form of Exhibit C among the Borrower, Holdings and the Administrative Agent acting on behalf of itself and the Lenders.

"**Security Agreement Collateral**" shall mean all property pledged or granted as collateral pursuant to the Security Agreement.

"**Security Documents**" shall mean the Security Agreement and each other security document or pledge agreement required to be delivered hereunder in accordance with applicable local or foreign law to grant a valid, perfected security interest in the Collateral and any other such security document or pledge agreement to be filed with respect to the security interests in property and any other document or instrument utilized to pledge or grant or purport to pledge or grant a security interest or Lien on the Collateral.

"**Solvent**" shall mean, with respect to the subject person where such person: (i) owns property, real, personal, and mixed, whose aggregate fair saleable value is greater than the amount required to pay all of such person's Indebtedness (including contingent debt (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability)); ii) is able to pay all of its Indebtedness as such Indebtedness matures; and (iii) has capital sufficient to carry on its business and transactions and all business and transactions in which it is about to engage..

"**Sources and Uses**" shall mean the "Sources and Uses" attached hereto as Exhibit D.

"**Specified Conversion Date**" shall have the meaning assigned to such term in Section 2.08(i).

"**Specified Converted Shares**" shall have the meaning assigned to such term in Section 2.08(i).

"**Specified Prepayment**" shall have the meaning assigned to such term in Section 2.06(c).

"**Subsidiary**" shall mean, with respect to any person (the "**parent**") at any date, (i) any person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date and (ii) any other corporation, limited liability company, partnership, association or other business entity of which securities or other ownership interests representing more than fifty percent (50%) of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Governing Board thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent.

"**Subsequent Test Date**" shall have the meaning assigned to such term in Section 5.02(a).

"**Sys-Con Contract**" shall mean, collectively the (i) Standard Form of Agreement Between Owner and Contractor where the basis of payment is the Firm Fixed Price between Sys-Con, LLC and Ryze Renewables Las Vegas, LLC and (ii) General Conditions of the Contract for Construction for the Ryze Renewables Pre-Treatment Facility between Sys-Con, LLC and Ryze Renewables Las Vegas, LLC.

"**Tax Distributions**" shall mean, for any calendar year or portion thereof during which the Borrower is a pass-through entity for U.S. federal income tax purposes, payments, directly or indirectly, to any direct or indirect equity holder of the Borrower, on or prior to each estimated tax payment date as well as each other applicable due date, in an amount up to the product of (i) the total aggregate taxable income of the Borrower and its Subsidiaries (or estimates thereof) which is allocable to the direct or indirect equity

holders of the Borrower during the relevant period multiplied by (ii) the highest combined marginal federal, state and local income tax rates applicable to any direct or indirect equity holder of the Borrower determined by taking into account the character of the income and loss allocable to the direct or indirect equity holders of the Borrower as it affects the applicable tax rate; provided that, for the avoidance of doubt, taxable income of the Borrower and its Subsidiaries for any period shall include any increases thereto as a result of any tax examination, audit or adjustment, whether for taxable periods ending prior to or after the date of this Agreement.

"**Tax Return**" shall mean all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Third Cash Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.07.

"**Total Credit Exposure**" shall mean, as to any Lender at any time, the unused Commitment and outstanding Loan of such Lender at such time.

"**Transfer Date**" shall have the meaning assigned to such term in Section 7.02.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"**United States**" shall mean the United States of America.

"**Unlimited Distributions Condition**" shall mean, as of any date of determination, that (i) the sum of all amounts on deposit in the Accounts is not less than the aggregate outstanding amount of the Obligations (other than contingent indemnification obligations for which no claim has been made) as of such date, determined on a pro forma basis after giving effect to any Dividends or other distributions that are made by the Borrower on such date and (ii) the Distributions Condition shall have been satisfied as of such date.

"**U.S. Person**" means any person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"**Voluntary Prepayment**" shall have the meaning assigned to such term in Section 2.06(b).

"**Withholding Agent**" means any Loan Party and the Administrative Agent.

"**Working Capital Reserve Account**" shall have the meaning assigned to such term in Section 7.01.

"**Working Capital Reserve Account Requirement**" shall have the meaning assigned to such term in Section 7.10(b).



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

**SECTION 1.02** Terms Generally.

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.

(b) Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(c) The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

(d) The word "will" shall be construed to have the same meaning and effect as the word "shall."

(e) Unless the context requires otherwise (i) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in the other Loan Documents), (ii) any reference herein to any person shall be construed to include such person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (v) any reference to any law or regulation herein shall refer to such law or regulation as amended, amended and restated, supplemented or otherwise modified from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**SECTION 1.03** Accounting Terms; GAAP.

Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the date hereof unless otherwise agreed to by the Borrower and the Administrative Agent.

**SECTION 1.04** Resolution of Drafting Ambiguities.

The Borrower acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

## ARTICLE II

## THE CREDITS

**SECTION 2.01** Loan.

(a) Subject to the terms and conditions hereof and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make a term loan (the "**Loan**")

to the Borrower on the Funding Date in an aggregate principal amount equal its Commitment on the Effective Date. Once borrowed, amounts repaid or prepaid in respect of the Loan may not be reborrowed.

(b) The Borrower shall pay to each Lender a non-refundable facility fee in an amount equal to 2% of such Lender's respective principal amount funded by such Lender (the "**Facility Fee**"), which shall be due and payable in full on the Funding Date (and netted from the proceeds of the Loan).

(c) The Borrower shall, in addition to the fees payable to each Lender set out in paragraph (b) above, pay a fee to Mirae in a separate letter agreement to be executed between the Borrower and Mirae.

**SECTION 2.02** <u>Borrowing Procedure</u>.

(a) To request the Loan, the Borrower shall deliver, by hand delivery, e-mail through a "pdf" copy or telecopier, a duly completed and executed Borrowing Request to the Administrative Agent not later than 11:00 a.m., New York City time, on the Funding Date. The Borrowing Request shall specify the following information:

(i) the aggregate amount of the proposed Loan;

(ii) the loan disbursement instructions; and

(iii) that the conditions set forth in <u>Section 4.02</u> have been satisfied as of the date of the notice.

(b) Upon satisfaction (or waiver by the Required Lenders) of the conditions set forth in Section 4.02, each Lender shall make its portion of the Loan available to the Administrative Agent not later than 12:00 p.m. (New York City time) on the applicable borrowing date by wire transfer of same day funds in Dollars, at the principal office designated by the Administrative Agent. The Administrative Agent shall make the proceeds of the Loan available to the Borrower on the Funding Date by causing an amount of same day funds in Dollars equal to the proceeds of the Loan received by Administrative Agent from the Lenders in accordance with clause (c) below.

(c) The Borrower hereby authorizes the Administrative Agent to disburse the proceeds of the Loan as specified in the Borrowing Request by wire transfer of immediately available funds in accordance with the wire transaction instructions included in the Borrowing Request. The Borrower acknowledges and agrees that the Administrative Agent may rely solely on any bank routing number or identifying bank account number or name provided by the Borrower to effect a wire or funds transfer even if the information provided by the Borrower identifies a different bank or account holder than named by the Borrower. The Administrative Agent is not obligated or required in any way to take any actions to detect errors in information provided by the Borrower.

**SECTION 2.03** <u>Evidence of Debt; Repayment of Loan</u>.

(a) <u>Promise to Repay</u>. The Borrower hereby unconditionally promises to pay to the Lenders the aggregate unpaid principal amount of the Loan, together with all accrued and unpaid interest and all other amounts payable under this Agreement on the Maturity Date, subject only to Lenders' Conversion Option.

(b) <u>Promissory Note</u>. The Loan may be evidenced by one or more promissory notes. If requested by a Lender, the Borrower shall prepare, execute and deliver to such Lender a promissory note

payable to such Lender (or its registered assigns) in the form of Exhibit B evidencing the aggregate principal amount of such Lender's Loan due hereunder. Thereafter, the Loan evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more promissory notes in such form payable to the payee named therein (or its registered assigns).

**SECTION 2.04** Interest on Loan.

(a) Interest. Subject to the provisions of Section 2.04(b), the Loan shall bear interest from the date made at a rate per annum equal to 14% (the "**Interest Rate**").

(b) Default Rate. Notwithstanding the foregoing, if there is an Event of Default or if any principal of or interest on the Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, the Administrative Agent at the request of the Required Lenders may elect, by written notice delivered to the Borrower, that the Obligations, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a rate per annum equal to two percent (2%) *plus* the Interest Rate.

(c) Interest Payment Dates. Accrued interest on the Loan shall be payable in arrears on each Interest Payment Date; *provided* that (i) for each Interest Payment Date occurring after the Funding Date through and including the date that is the 15-month anniversary of the Funding Date, (x) 50% of the accrued interest in respect of the Loan shall be paid in cash from the proceeds of the Funding Date Interest Reserve Account, and (y) 50% of the accrued interest in respect of the Loan payable on such Interest Payment Date, shall, in lieu of cash, automatically and without any action by the Borrower or any other person, be paid-in-kind (the "**PIK Interest**") and all such PIK Interest shall (A) be capitalized on each such applicable Interest Payment Date, (B) be added to the then outstanding principal amount of the Loan and (C) constitute outstanding principal in respect of the Loan thereafter for all purposes hereof (including the accrual of interest thereon), (ii) for each Interest Payment Date occurring after the 15-month anniversary of the Funding Date, 100% of the accrued interest in respect of the Loan shall be paid in cash and shall be payable *first*, from cash available in the Interest Payment Account (if available), *second*, from cash available in the Debt Service Reserve Account (if available), *third*, from cash available in the Cash Reserve Account (if available), *fourth*, from cash available in the Principal Reserve Account (if available), *fifth*, from cash available in the Working Capital Reserve Account (if available), *sixth*, from cash available in the Conditional Distributions Account (if available) and *finally*, from any other source available to the Borrower, (iii) interest accrued pursuant to Section 2.04(b) shall be payable on demand and, (iv) in the event of any repayment or prepayment of any principal amount of the Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d) Interest Calculation. All interest hereunder shall be computed on the basis of a year of three hundred sixty (360) days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

**SECTION 2.05** Termination of Commitment.

The Commitment of each Lender shall automatically terminate upon the funding by each Lender of its portion of the Loan on the Funding Date.

**SECTION 2.06** Optional Prepayments of Loan.

(a) Prohibited Prepayments. Except as otherwise set forth in Section 2.06(c), the Borrower may not, without the prior written consent of the Lenders, prepay or repay the Loan on or before the 24-month anniversary of the Funding Date. For the avoidance of doubt, the terms of this Section 2.06 shall

not apply to any mandatory prepayment of the Loan pursuant to Section 2.07 or to any prepayment of the Loan of any Replaceable Lender pursuant to Section 2.09(d).

(b) Permissible Prepayments. Following the 24-month anniversary of the Funding Date and absent the exercise by the Lenders of its Conversion Option, the Borrower may prepay all or any portion of the Loan at any time (each, a "**Voluntary Prepayment**") upon the terms set forth in this Section 2.06. Any Voluntary Prepayment shall be made together with the Prepayment Amount.

(c) Specified Prepayments. Solely to the extent there is available cash in the Collections Account in accordance with the distribution waterfall contained in Section 7.03, no earlier than (i) the first Transfer Date to occur after the Funding Date and (ii) if applicable, any Transfer Date thereafter, the Borrower may, but shall not be obligated to, make additional prepayments of the Loan in an aggregate principal amount for all such prepayments under this clause (c) not to exceed $10,000,000, in each case solely to the extent of cash on deposit in the Collection Account on any Transfer Date after giving effect to the payments and transfers required pursuant to clauses (a), (b), (c) and (d) of Section 7.03 on such Transfer Date (each, a "**Specified Prepayment**"). Notwithstanding anything to the contrary contained herein, in no event shall any Prepayment Amount or any other fee or premium be required to be paid by the Borrower or any other person with respect to any Specified Prepayment.

(d) Application of Prepayments. Any prepayments of the Loan pursuant to Section 2.06 shall be applied in accordance with Section 8.02.

(e) Interest. Any Voluntary Prepayments shall be accompanied by accrued interest to the extent required by Section 2.04(c)(iv).

(f) Prepayment Notice. In the event of any prepayment by the Borrower contemplated by Section 2.06(b), the Borrower shall submit a prepayment notice, to the Administrative Agent ("**Prepayment Notice**"), the form of which is attached here as Exhibit H. Each Lender shall have up to ninety (90) days from receipt of the Prepayment Notice to exercise its Conversion Option. Upon the earlier of (i) receipt of written notice from all Lenders of their decision as to whether or not they will exercise their Conversion Option, or (ii) the expiration of the ninety (90) day period, Borrower shall have up to ninety (90) days to make such Voluntary Prepayment together with the Prepayment Amount. In any event, making of such Voluntary Prepayment shall require at least thirty (30) days' prior written notice to the Administrative Agent before the date on which such Voluntary Prepayment is made.

**SECTION 2.07** Mandatory Prepayments of Loan.

(a) No later than the fifth (5th) Business Days following (i) the first Transfer Date to occur after the Funding Date and (ii) if applicable, any Transfer Date thereafter, the Borrower shall make a partial prepayment of the principal amount of the Loan in an aggregate amount for all such prepayments under this clause (a) equal to the PIK Interest which was capitalized and added to the principal amount of the Loan on each of the first five (5) Interest Payment Dates occurring after the Funding Date, in each case, solely to the extent of available funds in the Funding Date Interest Reserve Account; it being understood and agreed that no prepayment of principal under this Section 2.07(a) shall be required in excess of the amount of PIK Interest which was capitalized and added to the principal amount of the Loan in accordance with Section 2.04(c). Notwithstanding anything to the contrary contained herein, in no event shall any Prepayment Amount or any other fee or premium be required to be paid by the Borrower or any other person with respect to any prepayment made pursuant to this Section 2.07(a).

(b) The Borrower shall repay the Loan in full to the extent required by Section 8.03. Notwithstanding anything to the contrary contained herein, in no event shall any Prepayment Amount or

any other fee or premium be required to be paid by the Borrower or any other person with respect to any prepayment made pursuant to this Section 2.07(b).

(c) The Borrower shall prepay the Loan in full to the extent required by Section 5.03. If the Borrower is required to repay the Loan pursuant to Section 5.03 at any time prior to the Maturity Date, such repayment shall be accompanied by a repayment premium that is equal to fourteen percent (14%) of the amount of the Loan repaid, and the Prepayment Amount shall not apply in such circumstance.

(d) Any prepayments pursuant to this Section 2.07 shall be accompanied by accrued interest to the extent required by Section 2.04(c)(iv).

**SECTION 2.08** Conversion Option.

(a) Conversion Option. Each Lender shall have the option but not the obligation (the "**Conversion Option**", and any such electing Lender, the "**Electing Lender**"), exercisable after the Funding Date and prior to the date of repayment or prepayment of the Loan in full as described below, to convert the then outstanding amount of the Loan owing to such Electing Lender, in whole or in part, into Common Membership Units (the "**Conversion Shares**"). For purposes of this Section 2.08, all references to the Loan shall include any portion of the Loan that constitutes PIK Interest.

(b) Conversion Rate. The conversion rate shall be two dollars and twenty cents ($2.20) per Common Membership Unit, such that the Borrower shall issue one Common Membership Unit to the Electing Lender for every two dollars and twenty cents ($2.20) of the Loan then owing to the Electing Lender hereunder that is converted pursuant the Conversion Option, subject, in any event, to the requirements of Section 2.08(j).

(c) Exercise of Conversion Rights. To exercise its right to convert the Loan into Common Membership Units, the Electing Lender shall give written notice to each of Holdings and the Borrower (i) in the event no Prepayment Notice has been provided by the Borrower, not fewer than three (3) Business Days prior to the date on which such Electing Lender elects to effect such conversion, (ii) in the event a Prepayment Notice has been provided by the Borrower, not more than ninety (90) days following the delivery of Borrower's Prepayment Notice to the Administrative Agent, or (iii) in the event of any Mandatory Prepayment pursuant to Section 2.07(c), at least ninety (90) days prior to any required repayment, in each case setting forth (1) the portion of the then outstanding amount of the Loan owing to such Lender to be converted into Common Membership Units and (2) the effective date of such conversion (the "**Conversion Date**"). Once such written notice is delivered, the Electing Lender's conversion election is final.

(d) Delivery of Conversion Shares Upon Conversion. Upon any Electing Lender's election to convert any portion of the then outstanding amount of the Loan owing to such Electing Lender into Conversion Shares as provided above the Borrower shall deliver to such Electing Lender an amendment to the Borrower Operating Agreement, designating such Electing Lender as a member and owner of the Conversion Shares and a conversion agreement, with customary representations and warranties and transfer restrictions. Upon such Electing Lender's acceptance of and execution of such amendment, such Electing Lender shall be a member of the Borrower, with all the rights and protections associated therewith. The Borrower shall not be obligated to issue any Conversion Shares to such Electing Lender unless any relevant Note that has been issued to such Electing Lender is delivered to the Borrower or such Electing Lender notifies the Borrower that the Note has been lost, stolen or destroyed and executes an agreement satisfactory to the Borrower to indemnify the Borrower from any loss incurred by it in connection with such Note.

(e) Obligation of Borrower to Deliver Conversion Shares. The Borrower will, as soon as practicable after the Conversion Date but in no event later than ten (10) Business Days after the Conversion Date, issue and deliver to the Electing Lender, at the office of the Electing Lender set forth in Section 4.2 below, a certificate for the number of Conversion Shares to which such Electing Lender is entitled upon conversion of the Loan. The Electing Lender shall be deemed to be the holder of record of the Conversion Shares issuable upon any conversion described above, and, unless the Borrower defaults on its obligations under this Section 2.08, all rights of such Electing Lender with respect to the portion of the Loan under this Agreement that are being so converted shall forthwith terminate, except the right of the Electing Lender to receive the Conversion Shares or other securities, cash or other assets, as herein provided, in respect of such conversion. The Borrower's obligation to issue and deliver the Conversion Shares to such Electing Lender shall be absolute and unconditional, irrespective of the absence of any action by such Electing Lender to enforce the same.

(f) Holdings. Substantially concurrent with any conversion of the Loan into Conversion Shares as provided above and the issuance and delivery by the Borrower of a certificate to the Electing Lender in respect of such Conversion Shares, Holdings, subject in all cases to Section 2.08(j), shall either (i) enter into an assignment or other transfer agreement with the Electing Lender, reasonably acceptable to the Electing Lender and without payment of any additional consideration by the Electing Lender, evidencing the assignment or other transfer, free and clear of all Liens, of an amount of Common Membership Units held by Holdings that is equal to the amount of the Loan so converted into Conversion Shares, or (ii) enter into an agreement with the Borrower, reasonably acceptable to the Electing Lender, in respect of the cancellation of an amount of Common Membership Units held by Holdings that is equal to the amount of the Loan so converted into Conversion Shares and issuable to the Electing Lender. For the avoidance of doubt, Holdings shall have the sole and absolute discretion to elect which of the foregoing clauses (i) or (ii) in the immediately preceding sentence to comply with.

(g) No Fractional Units. No fractional units shall be issued upon exercise of the Conversion Option. In lieu of such fractional units, the Electing Lender shall pay to the Borrower in cash the amount equal to the fraction of a Common Membership Unit that is not so converted at $2.20 per Common Membership Unit.

(h) No Member Rights. Except to the extent provided herein, this Agreement shall not confer upon any Electing Lender any rights as a member of the Borrower, including, without limitation, the right to vote, consent or receive notice as a member in respect of actions or meetings of members, or the right to receive distributions, until the Conversion Date.

(i) Accounts. For the avoidance of doubt, to the extent all or any portion of the Loan are converted into Conversion Shares on a Conversion Date (any such date, a "**Specified Conversion Date**" and any such converted portion as of such Specified Conversion Date, the "**Specified Converted Shares**"), the Electing Lender, solely in its capacity as a member of the Borrower in respect of such Specified Converted Shares (and not, for the avoidance of doubt, the Electing Lender in respect of any Conversion Shares that are held by the Electing Lender immediately prior to such Specified Conversion Date), shall have no rights of distribution from, or otherwise any interest in, any cash, monies or other property contained in the Accounts or any other depositary, collection, securities and/or other accounts of the Borrower, the Project Company Holdco or the Project Company as of such Specified Conversion Date (it being understood and agreed that such amounts shall inure to the pro rata benefit of the holders of the Common Membership Units (including, for the avoidance of doubt, the Electing Lender in respect of any Conversion Shares held by it prior to such Specified Conversion Date) immediately prior to giving effect to the exercise of the applicable Conversion Option on such Specified Conversion Date).

(j) Minimum Equity Interest Percentage. Notwithstanding anything in this Agreement to the contrary, if a Lender fully exercises the Conversion Option in respect of the Loan owing to such Lender (i.e. electing to convert the entirety of its pro rata share of the then outstanding amount of the Loan), such Lender shall be entitled to receive the greater of (i) the number of Common Membership Units equal to its pro rata share of the Minimum Percentage of the Equity Interests of the Borrower and (ii) in the event there are less than 400,000,000 Common Membership Units then issued and outstanding, the number of Common Membership Units equal to the quotient of (x) the Loan then outstanding owing to such Lender divided by (y) $2.20.

(k) Representations and Warranties of the Lenders. Each Lender hereby represents and warrants to the Borrower that:

(i) Purchase Entirely for Own Account. The Conversion Shares to be acquired by such Lender will be acquired for investment for such Lender's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and such Lender has no present intention of selling, granting any participation in, or otherwise distributing the same.

(ii) Knowledge. Such Lender is aware of the Borrower's business affairs and financial condition and has acquired sufficient information about the Borrower to reach an informed and knowledgeable decision to acquire the Conversion Shares.

(iii) Restricted Securities. Such Lender understands that the Conversion Shares have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Lender's representations as expressed herein. Such Lender understands that the Conversion Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, such Lender must hold the Conversion Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Such Lender further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Conversion Shares, and on requirements relating to the Borrower which are outside of such Lender's control, and which the Borrower is under no obligation and may not be able to satisfy.

(iv) No Public Market. Such Lender understands that no public market now exists for any of the securities issued by the Borrower and that the Borrower has made no assurances that a public market will ever exist for the Conversion Shares.

(v) Legends. Such Lender understands that the Conversion Shares, and any securities issued in respect thereof or exchange therefor, may bear one or all of the following legends (if certificated):

1. "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."

2. Any legend required by the Blue-Sky laws of any state to the extent such laws are applicable to the securities so legended.

(vi) Accredited Investor. Such Lender is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(vii) Foreign Investors. Such Lender has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Conversion Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Conversion Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Conversion Shares. Such Lender's subscription and payment for, and such Lender's continued beneficial ownership of the Conversion Shares, will not violate any applicable securities or other laws of the Lender's jurisdiction.

**SECTION 2.09** Taxes; Increased Costs Protection; Illegality.

(a) Taxes.

(i) Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from or in respect of any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, the sum payable by the applicable Loan Party shall be increased as necessary so that after all such deductions or withholdings for Indemnified Taxes have been made (including such deductions and withholdings for Indemnified Taxes applicable to additional sums payable under this Section 2.09(a)) the Administrative Agent (for amounts paid to the Administrative Agent in its own right) or Lender receives an amount equal to the sum it would have received had no such deduction or withholding for Indemnified Taxes been made.

(ii) Without duplication of Section 2.09(a)(i), the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(iii) Without duplication of amounts paid pursuant to Section 2.09(a)(i) or Section 2.09(a)(ii), the Loan Parties shall jointly and severally indemnify each Recipient, within 30 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.09(a)) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. The relevant Recipient shall notify the Borrower of the imposition of any Indemnified Tax reasonably promptly after becoming aware of the imposition of such Tax. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(iv) Each Lender shall severally indemnify the Administrative Agent, within ten days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only

to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.04 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this clause (iv).

(v) Within 30 days after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.09(a), such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(vi) If any Recipient determines, in its sole reasonable discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.09(a) (including by the payment of additional amounts pursuant to this Section 2.09(a)), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.09(a) with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall promptly repay to such indemnified party the amount paid over pursuant to this clause (vi) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Such indemnified party shall, at the indemnifying party's request, provide such indemnifying party with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Government Authority (provided that such Recipient may delete any information therein that such Recipient deems confidential). Notwithstanding anything to the contrary in this clause (vi), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this clause (vi) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This clause (vi) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other person.

(vii) --

(A) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to any payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made

without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.09(a)(vii)(B)(1), 2.09(a)(vii)(B)(2), 2.09(a)(vii)(B)(4) and 2.09(a)(vii)(B)(5) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(B) Without limiting the generality of the foregoing,

(1) any Lender that is a U.S. person shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) copies of a properly completed and duly executed IRS Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding;

(2) any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(a) in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party, (x) with respect to payments of interest under any Loan Document, copies of a properly completed and duly executed IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, copies of a properly completed and duly executed IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(b) copies of a properly completed and duly executed IRS Form W-8ECI (or any successor form);

(c) in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and that no payments in connection with any Loan Document are effectively connected with such Lender's conduct of a U.S. trade or business and (y) copies of a properly

completed and duly executed IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or any successor form); or

(d) to the extent a Non-U.S. Lender is not the beneficial owner (*e.g.*, where the Non-U.S. Lender is a partnership or a participating Lender), copies of a properly completed and duly executed IRS Form W-8IMY, accompanied by a properly completed and duly executed IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Non-U.S. Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender shall provide a certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(3) any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), properly completed and duly executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

(4) each Recipient shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to (i) comply with their obligations under FATCA and (ii) determine whether such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (4), "FATCA" shall include any amendments made to FATCA after the date of this Agreement; and

(5) the Administrative Agent, and any successor or supplemental Administrative Agent, shall deliver to the Borrower (in such number of copies as shall be requested by the recipient) on or prior to the date on which the Administrative Agent becomes the administrative agent hereunder or under any other Loan Document (and from time to time thereafter upon the reasonable request of the Borrower) properly completed and duly executed copies of either (i) if it is a U.S. person IRS Form W-9 (or any successor form) or (ii) if it is not a U.S. person a U.S. branch withholding certificate on IRS Form W-8IMY (or any successor form), together with required accompanying documentation, evidencing its agreement with the Borrower to be treated as a U.S. person (with respect to amounts received on account of any Lender) and IRS Form W-8ECI (with respect to amounts received on its own account), together with required accompanying documentation, with the effect that, in either case, the

Borrower will be entitled to make payments hereunder to the Administrative Agent without withholding or deduction on account of U.S. federal withholding Tax.

Each Recipient agrees that if any documentation it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall promptly update and deliver such form or certification to the Borrower and the Administrative Agent or promptly notify the Borrower and the Administrative Agent in writing of its legal ineligibility to do so.

Each Lender hereby authorizes the Administrative Agent to deliver to the Loan Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to Section 2.09(a)(vii).

(C) The agreements in this Section 2.09(a) shall survive the resignation of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

(D) For the avoidance of doubt, the term "applicable law" includes FATCA.

(b) Increased Cost and Reduced Return; Capital Adequacy and Liquidity Requirements.

(i) If any Lender reasonably determines that the introduction of any law regarding capital adequacy and liquidity requirements or any change therein or in the interpretation thereof, in each case after the date hereof, or compliance by such Lender therewith, has the effect of materially reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and liquidity and such Lender's desired return on capital), then within 15 days after demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 2.09(c)), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction.

(ii) For purposes of this Section 2.09(b), (A) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, guidelines or directives thereunder or issued in connection therewith and (B) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities (other than foreign regulatory authorities in Switzerland), in each case pursuant to Basel III, shall, in each case, be deemed to have gone into effect after the date hereof, regardless of the date enacted, adopted or issued.

(iii) This Section 2.09(b) shall not apply to Indemnified Taxes or Excluded Taxes.

(c) Matters Applicable to All Requests for Compensation.

(i) A certificate of the Administrative Agent or any Lender claiming compensation under this Section 2.09 and setting forth in reasonable detail a calculation of the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of

manifest error. In determining such amount, the Administrative Agent or such Lender may use any reasonable averaging and attribution methods. With respect to any Recipient's claim for compensation under Section 2.09(b), the Loan Parties shall not be required to compensate such Recipient for any amount incurred more than 180 days prior to the date that such Recipient notifies the Borrower of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(ii) If any Lender requests compensation under Section 2.09(b), or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.09(a), then such Lender will, if requested by the Borrower and at the Borrower's expense, use commercially reasonable efforts to designate another Lending Office for any Loan affected by such event; *provided* that such efforts (A) would eliminate or reduce amounts payable pursuant to Section 2.09(a) or Section 2.09(b), as applicable, in the future and (B) would not, in the reasonable judgment of such Lender be disadvantageous in any material legal, economic or regulatory respect to such Lender or its Lending Office. The provisions of this clause (ii) shall not affect or postpone any Obligations of the Borrower or rights of such Lender pursuant to Sections 2.09(a) and Section 2.09(b).

(iii) A Lender shall not be entitled to any compensation pursuant to the foregoing sections to the extent such Lender is not imposing such charges or requesting such compensation from borrowers (similarly situated to the Borrower hereunder) under comparable syndicated credit facilities.

(d) Replacement of Lenders Under Certain Circumstances.

(i) If at any time (A) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 2.09(a) or Section 2.09(b) as a result of any condition described in such Sections, (B) any Lender becomes a Defaulting Lender or (C) any Lender becomes a Non-Consenting Lender (as defined below in this Section 2.09(d)) (collectively, a "**Replaceable Lender**"), then the Borrower may, on three Business Days' prior written notice from the Borrower to the Administrative Agent and such Lender (for the avoidance of doubt, such notice shall be deemed provided on the same day that an amendment or waiver is posted to the Lenders for consent), either (x) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.04 all of its rights and obligations under this Agreement to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such person or (y) so long as no Default or Event of Default shall have occurred and be continuing and notwithstanding anything in this Agreement to the contrary (including Section 2.06 of this Agreement), terminate the Commitment of such Lender and repay all Obligations of the Borrower owing (and the amount of all accrued interest in respect thereof) to such Lender relating to the Loans and participations held by such Lender as of such termination date at par and without payment of any Prepayment Amount, other prepayment premium or other similar amounts, if any, that would otherwise be due and payable under this Agreement as a result of any such repayment; *provided* that (I) in the case of any such replacement of, or termination of Commitments with respect to a Non-Consenting Lender such replacement or termination shall be sufficient (together with all other consenting Lenders including any other replacement Lender) to cause the adoption of the applicable modification, waiver or amendment of the Loan Documents and (II) in the case of any such replacement as a result of the Borrower having become obligated to pay amounts described in Section 2.09(a) or Section 2.09(b), such replacement would eliminate or reduce payments pursuant to Section 2.09(a) or Section 2.09(b), as applicable, in the future. Any Lender

being replaced pursuant to this Section 2.09(d)(i) shall (x) execute and deliver an assignment agreement with respect to such Lender's Commitment and outstanding Loans and (y) deliver any Notes evidencing such Loans to the Borrower or the Administrative Agent (for return to the Borrower). Pursuant to such assignment agreement, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitment and outstanding Loans, (B) all Obligations relating to the Loans and participations (and the amount of all accrued interest in respect thereof) so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with the effectiveness of such assignment agreement and (C) upon such payment and, if so requested by the assignee Lender, the assigning Lender shall deliver to the assignee Lender the applicable Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender. In connection with any such replacement, if any such Replaceable Lender does not execute and deliver to the Administrative Agent and the Borrower a duly executed assignment agreement reflecting such replacement within two (2) Business Days of the date on which the assignee Lender executes and delivers such assignment agreement to such Replaceable Lender, then such Replaceable Lender shall be deemed to have executed and delivered such assignment agreement without any action on the part of the Replaceable Lender.

(ii) In the event that (A) the Borrower or the Administrative Agent has requested the Lenders to consent to a waiver of any provisions of the Loan Documents or to agree to any amendment or other modification thereto, (B) the waiver, amendment or modification in question requires the agreement of all Lenders and (C) Lenders in the aggregate having Total Credit Exposure representing more than 50% of the Total Credit Exposures of all Lenders (excluding for purposes of this calculation all Defaulting Lenders) have agreed to such waiver, amendment or modification, then any Lender who does not agree to such waiver, amendment or modification, in each case, shall be deemed a "**Non-Consenting Lender**".

(iii) All of the Loan Parties' obligations under this Section 2.09 shall survive termination of the Commitments and repayment of all other Obligations hereunder, any assignment by or replacement of a Lender and any resignation of the Administrative Agent.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders that, as of the Effective Date:

### SECTION 3.01 Organization; Powers.

The Borrower (i) is duly organized and validly existing under the laws of the jurisdiction of its organization, (ii) has all requisite power and authority to carry on its business as now conducted and to own and lease its property and (iii) is qualified and in good standing to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. There is no existing default under any of its Organizational Documents or any event which, with the giving of notice or passage of time or both, would constitute a default by any party thereunder. Schedule 3.01 sets forth the organizational structure of the Borrower, its parent and each of its Subsidiaries as of the date of this Agreement.

**SECTION 3.02** Authorization; Enforceability.

The execution, delivery and performance of this Agreement by the Borrower are within its powers and have been duly authorized by all necessary action on the part of the Borrower. This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document to which the Borrower is to be a party, when executed and delivered by the Borrower, will constitute, a legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**SECTION 3.03** No Conflicts.

The execution, delivery and performance of this Agreement (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect and (ii) filings necessary to perfect Liens created by the Loan Documents, (b) do not require any consent or approvals under the Project Company Debt Documents which have not been made or obtained, (c) will not violate the Organizational Documents of the Borrower, (d) will not violate any Requirements of Law, (e) will not violate or result in a default or require any consent or approval under any indenture, contract, agreement or other instrument binding upon any of Holdings, the Borrower, any Subsidiary thereof or any of their respective property, or give rise to a right thereunder to require any payment to be made by the Borrower and (f) will not result in the creation or imposition of any Lien on any property of the Borrower or any direct or indirect subsidiary thereof, except Permitted Liens.

**SECTION 3.04** Financial Statements.

The Borrower has furnished to the Administrative Agent (i) its consolidated balance sheet and statements of income, members equity and cash flows as of (and for the portion of such year through) September 30, 2020; (ii) audited consolidated financial statements of the Project Company Holdco from inception to the year ended December 31, 2019; (iii) separate unaudited monthly, quarterly and annual financial statements of the Borrower and each of the Borrower's Subsidiaries from inception to the fiscal quarter ended September 30, 2020; and (iv) a statement of cash flows of the Borrower as of the date of this Agreement. Such financial statements have been prepared in accordance with GAAP and present fairly and accurately in all material respects the financial condition and results of operations and cash flows of the Borrower and each of the Borrower's Subsidiaries on a consolidated basis, as of the dates and for the periods to which they relate, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in this Section 3.04.

**SECTION 3.05** Properties.

The Borrower and its Subsidiaries, to the extent they own any property, have good title to, or valid leasehold interests in, all their respective properties, free and clear of all Liens except for, Permitted Liens and minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere with their ability to conduct its business as currently conducted or to utilize such property for its intended purpose.

**SECTION 3.06** Equity Interests and Subsidiaries.

(a) Set forth on Schedule 3.06 is a list for the Borrower of (i) its jurisdiction of organization, (ii) each person holding ownership interest in the Borrower, and (iii) the nature and percentage of such

ownership interest. Schedule 3.06 also sets forth a complete and correct list of all Subsidiaries of the Borrower as of the date hereof.

(b) The Borrower has as of the date hereof, and shall have as of the Effective Date, 400,000,000 Common Membership Units. There are no other Equity Interests of the Borrower outstanding and no person has the right to acquire, or could upon election or the occurrence of any event acquire or obtain the right to acquire, any Equity Interests of Borrower. There are no subscriptions, warrants, options, calls, commitments, rights or agreements by which the Borrower or any of its Affiliates is bound relating to the issuance, transfer, voting or redemption of shares of Equity Interests of the Borrower or any pre-emptive rights held by any person with respect to the Equity Interests of the Borrower. The Borrower has not issued any securities convertible into or exchangeable for shares of its Equity Interests or any options, warrants or other rights to acquire such shares or securities convertible into or exchangeable for such Equity Interests.

**SECTION 3.07** Environmental Matters.

(a) The Borrower and each of its Subsidiaries is in compliance with all Environmental Laws and has not received from any person any (i) Environmental Notice or Environmental Claim, or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements.

(b) The Borrower and each of its Subsidiaries have obtained and is in material compliance with all Environmental Permits (each of which is disclosed in Schedule 3.07(b)) necessary for the ownership, lease, operation or use of the business or assets of the Company as of the date hereof.

(c) No real property currently owned, operated or leased by the Borrower or any of its Subsidiaries is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d) There has been no Release of Hazardous Materials in contravention of Environmental Laws with respect to the business or assets of the Borrower or any of its Subsidiaries or any Real Property currently owned, operated or leased by the Borrower or any of its Subsidiaries, and neither the Borrower nor any Subsidiary has received an Environmental Notice that any Real Property currently owned, operated or leased in connection with the business of the Borrower or any Subsidiary (including soils, groundwater, surface water, buildings and other structure located on any such real property) has been contaminated with any Hazardous Material which would reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Laws or term of any Environmental Permit by, the Borrower or any of its Subsidiaries.

(e) The Borrower has previously delivered to the Administrative Agent any and all environmental reports, studies, audits, records, sampling data, site assessments and other similar documents with respect to the business or assets of the Borrower and each of its Subsidiaries or any currently owned, operated or leased Real Property which are in the possession or control of the Borrower or any of its Subsidiaries.

**SECTION 3.08** Litigation.

Except as set forth on Schedule 3.08, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any of its Subsidiaries or any business, property or rights of the

Borrower or any of its Subsidiaries (i) that involve any Loan Document or (ii) that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

**SECTION 3.09** Investment Company Act.

The Borrower is not an "investment company" or a company "controlled" by an "investment company," as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

**SECTION 3.10** Use of Proceeds.

The Borrower will use the proceeds of the Loan solely as set forth in the Sources and Uses attached hereto as Exhibit D.

**SECTION 3.11** Permits.

(a) The Borrower and each of its Subsidiaries has complied, and is now complying, in all material respects with all laws applicable to it or its business, properties or assets.

(b) All Permits required for the Borrower and each of its Subsidiaries to conduct its business in the manner conducted as of the date hereof have been obtained by it and are valid and in full force and effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full. Schedule 3.11 lists all current Permits issued to the Borrower and each of its Subsidiaries. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in Schedule 3.11.

**SECTION 3.12** Taxes.

The Borrower and each of its Subsidiaries timely filed or caused to be timely filed all federal Tax Returns and all material state, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, and (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes due and payable. The Borrower is not aware of any proposed or pending tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.

**SECTION 3.13** No Material Misstatements.

No information, report (including those studies, reports or documents specified in Section 3.26), financial statement, certificate, Borrowing Request, exhibit or schedule furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Borrower represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

**SECTION 3.14** Insurance.

Schedule 3.14 sets forth a true, complete and correct description of all insurance maintained by, or which it is an insured under, the Borrower as of the Effective Date (which, for the avoidance of doubt, includes customary course of construction insurance that will continue until construction of the Project has been completed at which time it will automatically convert at such time into a customary operating stage policy, including business interruption insurance). All insurance maintained by the Borrower is in full force and effect, all premiums have been duly paid, and the Borrower has not received notice of violation or cancellation thereof. The Borrower has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

**SECTION 3.15** Material Contracts.

(a) Schedule 3.15 sets forth each of the following Contracts (such contracts, being "**Material Contracts**") of the Borrower, Project Company Holdco, and the Project Company (each, a "**Contract Party**," and collectively, the "**Contract Parties**"):

(i) each Contract involving aggregate consideration in excess of $10,000 and which, in each case, cannot be cancelled by a Contract Party without penalty or without more than 90 days' notice;

(ii) all Contracts that provide for the indemnification by a Contract Party of any person or the assumption of any Taxes, environmental or other liability of any person;

(iii) all Contracts that relate to the acquisition or disposition of any business, a material amount of stock or assets of any other person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(iv) all employment Contracts with independent contractors or consultants (or similar arrangements) to which a Contract Party is a party and which are not cancellable without material penalty or without more than 90 days' notice;

(v) except for Contracts relating to trade receivables, all Contracts relating to Indebtedness (including, without limitation, guarantees) of a Contract Party;

(vi) all Contracts with any Governmental Authority to which a Contract Party is a party;

(vii) all Contracts that limit or purport to limit the ability of the Project Company to compete in any line of business or with any person or in any geographic area or during any period of time;

(viii) any Contracts to which the Project Company is a party that provide for any joint venture, partnership or similar arrangement by the Project Company; and

(ix) any other Contract that is material to the Project Company and not otherwise described in clauses (i) through (viii) above.

(c) Each Material Contract is valid and binding on the respective Contract Party in accordance with its terms and is in full force and effect. No Contract Party nor, to the knowledge of any Contract Party,



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER RYZE0006811

any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Material Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any material right or obligation or the loss of any material benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to the Administrative Agent.

(d) Off-Take Agreement. As of the date hereof, the Commencement Date Deadline (as defined in the Off-Take Agreement) is the same date as the guaranteed commercial operation date as set forth in the EPC Contract.

**SECTION 3.16** Security Documents.

The Security Agreement is effective to create, in favor of the Administrative Agent acting on behalf of itself and each of the Lenders, a legal, valid and enforceable Lien on and security interest in all of the Collateral purported to be covered thereby. In the case of (i) any pledged Equity Interests represented by certificates, when such certificates are delivered to the Administrative Agent acting on behalf of itself and each of the Lenders and (ii) in the case of any other Collateral described in the Security Agreement, when all necessary recordings and filings have been made (or arrangements satisfactory to the Administrative Agent to make any necessary recordings or filings on or immediately following the Funding Date have been made) in all necessary public offices, and all other necessary and appropriate action has been taken, the security interest created by the Security Agreement shall constitute a perfected Lien on and security interest in all right, title and interest of the Borrower in the Collateral purported to be covered thereby and that can be perfected by filing, possession or control (but, with respect to any and all Accounts, subject in all respects to Section 7.01), prior and superior to all other Liens. The descriptions of the Collateral set forth in each Security Document are true, complete, and correct in all material respects and are adequate for the purpose of creating, attaching and perfecting the Liens in the Collateral granted or purported to be granted in favor of the Administrative Agent acting on behalf of itself and each of the Lenders.

**SECTION 3.17** Sanctions, Etc.

None of the Borrower, any of its Subsidiaries or, to the knowledge of the Borrower, any director, officer, employee, agent, or affiliate of the Borrower or any of its Subsidiaries is an individual or entity that is, or is owned or controlled by persons that are: (i) the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of State, or other relevant sanctions authority (collectively, "**Sanctions**"), or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions. The Borrower, its Subsidiaries and their respective directors, officers and employees and, to the knowledge of the Borrower, the agents of the Borrower and its Subsidiaries, are in compliance, in all material respects, with all applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "**FCPA**") and any other applicable anti-corruption law. The Borrower and its Subsidiaries have instituted and maintain policies and procedures designed to promote and achieve continued compliance with applicable Sanctions, the FCPA and any other applicable anti-corruption laws.

**SECTION 3.18** TID Business; CFIUS Filing.

Neither the Borrower nor any of its Affiliates is considered, nor has Borrower or any of its Affiliates at any point owned, managed or possessed any critical technologies, critical infrastructure or personal data that could reasonably be expected to classify Borrower or its Affiliates as a "TID U.S. Business," as such term is defined in 31 CFR § 800 or as such term is interpreted and/or applied by CFIUS. The transactions



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

contemplated by the Loan Documents will not trigger a mandatory filing by Borrower and/or any Lender with CFIUS.

**SECTION 3.19** HSR Act.

The Project does not constitute a "turnkey" facility within the meaning of 16 CFR §802.2, and neither any Lender nor the Borrower is required to provide any pre-merger notification filing with or to any Governmental Authority regarding the transactions contemplated by this Agreement.

**SECTION 3.20** Credit Rating Report.

The Borrower has delivered a ratings report from Egan-Jones Ratings Company with a rating of the Loan of BBB+.

**SECTION 3.21** Intellectual Property.

The Borrower (and each of its Subsidiaries) owns or has the right to use all Intellectual Property rights which are necessary for the ownership and operation of the Project, in each case, except where the failure of the Borrower (or such Subsidiary) to so own or have the right to use would reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrower, no material product, process, method, substance, part, or other material presently contemplated, as of the date hereof, to be sold or used by the Borrower (or any of its Subsidiaries) in connection with its ownership and operation of the Project infringes any Intellectual Property right owned by any other person in a manner that, in each case, could reasonably be expected to have a Material Adverse Effect.

**SECTION 3.22** No Material Adverse Effect; No Event of Default.

There has been no occurrence, development, change, event, or loss which has resulted in or would reasonably be expected to result in, individually or in the aggregate, any Material Adverse Effect. No Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**SECTION 3.23** Senior Ranking.

The payment obligations under each of the Loan Documents rank and will at all times rank first in right and priority of payment, in each case, with all other present and future secured and unsubordinated indebtedness (actual or contingent) of such Loan Parties, except for Permitted Liens, which by operation of law would rank senior in right of priority.

**SECTION 3.24** Indebtedness and Other Liabilities.

None of the Loan Parties has any Indebtedness or other obligations or liabilities, direct, or contingent (other than (i) obligations arising under the Loan Documents, (ii) liabilities incurred in the

ordinary course of business, and (iii) liabilities disclosed in the financial statements delivered pursuant to Section 3.04).

**SECTION 3.25** Solvency.

Each Loan Party is, and after giving effect to the incurrence of all Indebtedness and Obligations incurred in connection herewith will be, Solvent.

**SECTION 3.26** Project Company Debt Documents.

As of the date hereof, the Project Company Debt Documents are in full force and effect.

## ARTICLE IV

## CONDITIONS TO THE EFFECTIVE DATE AND THE FUNDING DATE

**SECTION 4.01** Conditions to Effectiveness of this Agreement.

This Agreement shall become effective and binding on the parties hereto on the date that each of the Borrower and Mirae shall have executed this Agreement (such date the "**Effective Date**"). Notwithstanding anything to the contrary contained in this Agreement, if Mirae does not, for any reason, obtain the final approval from its internal committee (such final approval, hereinafter referred to as the "**Final Mirae Committee Approval**") by the fourteenth (14th) Business Day set forth in Section 4.02, then this Agreement shall be automatically terminated on the earlier of such failure to obtain the Final Mirae Committee Approval, or the expiration of the fourteen (14) Business Day period without the occurrence of the Final Mirae Committee Approval, in either case with immediate effect. No party hereto shall be liable to any other party hereto as a result of a termination of this Agreement by reason of Mirae not having been able to obtain the Final Mirae Committee Approval or Ryze failing to complete the conditions precedent set forth on Schedule 4.02A or Schedule 4.02B and each party hereby waives, releases and discharges the other party and agrees not to sue in connection with, any liabilities and claims however arising (including, without limitation, those arising from any special, indirect, incidental, consequential, punitive, or any potentially acknowledgeable legal damages suffered or incurred in connection with, arising out of, or in any way related to, terminations and matters in connection with the Final Mirae Committee Approval or conditions precedent set forth on Schedule 4.02A or Schedule 4.02B).

**SECTION 4.02** Conditions to Funding of the Loan.

The obligation of the Lenders to fund the Loan requested to be made on the Funding Date shall be subject to the satisfaction (or waiver) of each of the conditions precedent set forth on Schedule 4.02A (Items to be Completed prior to the Funding Date) and Schedule 4.02B (Items to be Completed on the Funding Date). The Lenders hereby agree that the Funding Date shall occur no later than ten (10) days (or such later date as may be mutually agreed to in writing by the Borrower and the Lenders) following the date of the Final Mirae Committee Approval (the "**Funding Date**"). Each condition precedent set forth on Schedule 4.02A (other than the Final Mirae Committee Approval) shall be completed and satisfied (or waived) no more than forty-five (45) days from the Signing Date, failing which this Agreement shall automatically be terminated with immediate effect, as set forth in Section 4.01. Upon completion and satisfaction (or waiver) of such condition precedents set forth on Schedule 4.02A, Mirae shall, within fourteen (14) Business Days therefrom, hold its final internal committee meeting whether to approve or disapprove its participation in the Loan contemplated in this Agreement. If Mirae does not, for any reason, obtain the Final Mirae

Committee Approval within such fourteen (14) Business Day period, this Agreement shall be automatically terminated with immediate effect, as set forth in Section 4.01.

## ARTICLE V

## AFFIRMATIVE COVENANTS

The Borrower warrants, covenants and agrees that so long as this Agreement shall remain in effect and until the Commitment has been terminated and the principal of and interest on the Loan and all other expenses or amounts payable under any Loan Document shall have been paid in full (other than contingent indemnification obligations for which no claim has been made) unless the Required Lenders shall otherwise consent in writing, the Borrower shall and shall cause its Subsidiaries to:

**SECTION 5.01** Financial Statements, Reports, etc.

Furnish to the Administrative Agent:

(a) Financial Statements; Annual Budget.

(i) As soon as available, but in any event within one hundred and twenty (120) days after the end of each fiscal year of the Borrower, a copy of the annual audit report of the Project Company for such year and unaudited financial statements of Holdings, the Borrower and its Subsidiaries as of the end of and for such fiscal year. Such statements shall be accompanied by (A) a fair market value report for the Project Company (the "**Annual FMV Report**") by Stancil & Company, or such other third party independent appraiser selected by the Borrower (at the sole cost and expense of the Borrower), approved by the Administrative Agent, (B) an insurance summary prepared by an independent third-party insurance company selected by the Borrower and approved by the Lender (such approval not to be unreasonably withheld, conditioned or delayed) and (C) a report of the results of penalties and incentives arising under the Off-Take Agreement, O&M Agreement or any other applicable Material Contract.

(ii) As soon as available, but in any event within thirty (30) days after the last day of June of each calendar year, unaudited financial statements of Holdings as of the end of June of such calendar year and for the six (6) month period ending on such date.

(iii) As soon as available, but in any event within thirty (30) days after the last day of each month of each calendar year, unaudited financial statement of the Borrower and unaudited consolidated financial statement of the Project Company Holdco and the Project Company, as of the end of such fiscal month and for the period of the calendar year ending as of the last day of such fiscal month.

(iv) As soon as available, but in any event within thirty (30) days after the beginning of each fiscal year of the Borrower (commencing with the fiscal year ending December 31, 2022), an annual business plan or budget of the Borrower, the Project Company Holdco and the Project Company, for such fiscal year that has been approved by the Governing Body of the Borrower (together with the initial annual plan or budget delivered to the Lenders prior to the Effective Date, each an "**Approved Budget**").

(v) Together with the delivery of the financial statements referred to in clause (iii) above for the month ending on the First Test Date and each month thereafter ending on a Subsequent Test Date, a certificate of an officer of the Borrower certifying and demonstrating compliance with the financial covenants set forth in Section 5.02(a) and Section 5.02(b).

(b) Organizational Documents. Promptly, copies of any Organizational Documents of the Borrower or any of its Subsidiaries that have been amended or modified in accordance with the terms hereof and deliver a copy of any notice of default given or received by the Borrower or any Subsidiary under any of its Organizational Document within ten (10) Business Days after the Borrower or such Subsidiary gives or receives such notice.

(c) Material Contract Notices. Promptly, upon receipt of the same, copies of all notices, correspondence, communications, requests and other documents received by the Borrower or any of its Subsidiaries relating to an Event of Default under any Project Company Debt Document.

(d) Project Company Reports. No later than five (5) Business Days after delivery of the same by the Borrower or the Project Company to the Project Company Lender, each report, notice or other item required to be delivered by the Project Company to the Project Company Lender pursuant to Sections 4.1(b), 4.1(h) and 4.4 of the Project Company Loan Agreement.

(e) Other Information; Ad Hoc Fair Market Reports. Promptly, from time to time, following request therefor:

(i) such other information regarding the operations, business affairs and financial condition of the Borrower, or compliance with the terms of any Loan Document, as the Lenders may reasonably request or information and documentation reasonably requested by the Lenders for purposes of compliance with applicable "know your customer" requirements under applicable anti-money laundering laws; and

(ii) to the extent requested by the Administrative Agent, fair market value reports (which shall be in addition to the fair market value reports referred to in Section 5.01(a)(i) above) from two third party independent appraisers selected by the Borrower (each, an "**Ad Hoc FMV Report**"); provided that the Administrative Agent shall not request delivery of (and the Borrower shall not be required to deliver) Ad Hoc FMV Reports more than one time during the term of this Agreement.

**SECTION 5.02** Financial Covenants.

(a) Commencing no later than the last day of the fifteenth full fiscal month ending after the Commercial Operation Date (the "**First Test Date**") and on the last day of each three consecutive fiscal month period ending after the First Test Date (a "**Subsequent Test Date**"), Borrower shall achieve a Debt Service Coverage Ratio of not less than 1.50:1.00 (in each case, determined for the period of twelve months then ended).

(b) Commencing on the First Test Date and on each Subsequent Test Date thereafter, Borrower shall ensure that the Project Company achieves EBITDA of not less than $75,000,000 (in each case, determined for the period of twelve months then ended).

(c) The Borrower shall cause the Project Company to comply with each Financial Covenant (as defined in the Project Company Loan Agreement) as and when required under and pursuant to the Project Company Loan Agreement (in each case, after giving effect to any grace period, cures, waivers and/or consents applicable thereto).

**SECTION 5.03** Rating.

No later than the date that is nine (9) months after the Commercial Operation Date, Borrower shall obtain a ratings report from Standard & Poor's, Moody's Investors Service, or Fitch Ratings with an expected rating of BBB+ or higher (in the case of Standard & Poor and Fitch Ratings) and Baa1 (in the case of Moody's Investors Service); provided that such nine (9) month period shall be automatically extended without any required consents hereunder if any such rating agency requires longer operating history to provide such rating (in which case, the obtaining of such rating shall be required no later than ninety (90) days after the date of delivery of the latest dated financial operating history deliverable so-required); provided further that, in the event the Borrower fails to procure "Investment Grade" rating from one of the aforementioned agencies, then the Borrower will refinance the Project to pay off the Loan within ninety (90) days following the end of such nine (9) month period from the Commercial Operation Date (as such nine (9) month period may be extended in accordance with the immediately preceding proviso).

**SECTION 5.04** Progress Update.

(a) While the Loan remains outstanding, within fifteen (15) days of the end of each month, the Borrower shall deliver to the Administrative Agent a written progress report (the "**Monthly Report**") with respect to the Project for such month. The Monthly Report shall include the following items:

(i) Variance report of financial and, after the Completion Date, commercial operation;

(ii) Cash balance separated by accounts;

(iii) Construction, commissioning and test status results;

(iv) Cost management updates;

(v) Construction update and progress/schedule management related thereto;

(vi) Technical/engineering results;

(vii) Health, safety & environmental review results and environmental, social & governance review results;

(viii) Summary of required insurance renewals, extensions and updates;

(ix) Organizational structure and staffing updates;

(x) Material revisions to or variances in Approved Budget;

(xi) Results of penalties and incentives arising under, and the status of any activities under, the Off-Take Agreement, O&M Agreement or any other applicable Material Contract; and

(xii) Following the Completion Date, feedstock, logistics and end-product management updates.

(b) While the Loan remains outstanding, within thirty (30) days of the beginning of each month occurring prior to the Completion Date, the Borrower shall deliver to the Administrative Agent a written progress report (the "**Bi-Weekly Report**") with respect to the Project for the first two weeks of such month. The Bi-Weekly Report shall include the items described in clauses (a)(i) through (a)(x) above.

(c) While the Loan remains outstanding, the Borrower shall deliver to the Administrative Agent evidence of all required insurance renewals, extensions and updates promptly following the date that the Borrower receives such renewals, extensions and updates.

**SECTION 5.05** Litigation and Other Notices.

Furnish to the Administrative Agent written notice of the following promptly (and, in any event, within five (5) Business Days of the occurrence thereof):

(a) any Default or Event of Default;

(b) the filing or commencement of, or any threat or notice of intention of any person to assert a claim against the Borrower or any of its Subsidiaries or to file or commence, any action, suit, litigation claim or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against the Borrower or any of its Subsidiaries that could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document;

(c) any development that has resulted in, or could reasonably be expected to result in a Material Adverse Effect; and

(d) (i) the incurrence of any material Lien (other than Permitted Liens) on, or claim asserted against any of the Collateral or (ii) the occurrence of any other event which could materially affect the value of the Collateral.

**SECTION 5.06** Existence.

Do or cause to be done all things necessary to preserve, renew and maintain in full force and effect the legal existence of the Borrower and its Subsidiaries.

**SECTION 5.07** Insurance.

Keep its insurable property adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations in such amounts as is customary in the case of similar businesses operating in the same or similar locations.

**SECTION 5.08** Obligations and Taxes.

(a) Payment of Obligations. Pay its Indebtedness and other obligations promptly and in accordance with their terms and pay and discharge promptly when due all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default; *provided* that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as (x)(i) the validity or amount thereof shall be contested in good faith by appropriate proceedings timely instituted and diligently conducted and the Borrower shall have set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP and (ii) such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien or (y) the failure to pay could not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.

(b) Filing of Returns. Timely and correctly file all material Tax Returns required to be filed by it and withhold, collect and remit all Taxes that it is required to collect, withhold or remit.

**SECTION 5.09** Maintaining Records; Access to Properties and Inspections.

Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law are made of all dealings and transactions in relation to its business and activities. The Borrower will permit any representatives designated by the Administrative Agent to visit and inspect the financial records and the property of the Borrower and its Subsidiaries at reasonable times and upon prior reasonable notice and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent to discuss the affairs, finances, accounts and condition of the Borrower and its Subsidiaries with the officers and employees thereof and advisors therefor (including independent accountants); *provided* that the Administrative Agent and the Lenders shall not exercise such right to visit and inspect the financial records and the property of the Borrower and its Subsidiaries more than two (2) times during any calendar year other than during the continuation of an Event of Default.

**SECTION 5.10** Completion Certificate.

The Borrower shall deliver to the Administrative Agent a certificate signed by an authorized officer of the Borrower, stating that the (i) construction of the Project has been completed in accordance with the requirements of the Project Company Debt Documents and (ii) startup of the Project has occurred (the "**Completion Certificate**").

**SECTION 5.11** Use of Proceeds.

Use the proceeds of the Loan only for the purposes set forth or referenced in Section 3.10.

**SECTION 5.12** CFIUS.

At the election of the Administrative Agent at the direction of the Required Lenders, each of the Lenders and the Borrower, and each party's Affiliates as necessary, shall use their reasonable best efforts to make a voluntary filing with CFIUS within ninety (90) days following the Funding Date, relating to the transactions contemplated by this Agreement, and promptly take all actions and steps necessary to obtain any clearance or approval from CFIUS that the Lenders or its counsel deems necessary or advisable.

**SECTION 5.13** Off-Take Agreement.

At all times while the Loan remains outstanding, the Borrower shall cause the Project Company, either directly or indirectly, to comply with commercially reasonable market practices with respect to the Project Company's feedstock procurement and supply price setting mechanisms.

**SECTION 5.14** Executive Team.

The Borrower shall appoint a Chief Executive Officer and Chief Operating Officer of the Borrower no later four (4) months after the Funding Date, the identity of which has been consented to by the Administrative Agent (such consent not be unreasonably withheld, conditioned or delayed).

**SECTION 5.15** Additional Collateral.

Following payment in full of the Project Company's obligations under the Project Company Debt Documents, upon the request of the Administrative Agent (acting at the direction of the Required Lenders), the Borrower shall cause the Project Company to take such actions as the Administrative Agent may reasonably request in order to create, grant and perfect Liens over the Project Company's properties, assets, rights and interests that are encumbered by the Project Company Debt Documents as of the date hereof. For the avoidance of doubt, a Permitted Refinancing of the Project Company's obligations under the Project Company Debt Documents shall not constitute payment in full of the Project Company's obligations under the Project Company Debt Documents for purposes of this Section 5.15.

**SECTION 5.16** Payment and Performance Bonds.

No later than the date that is thirty (30) days following the Funding Date, the Borrower shall deliver or cause to be delivered to the Administrative Agent a fully executed copy of the payment and performance bonds that are to be issued to the Borrower by Liberty Mutual in connection with the Change Order EPC Contract, together with an endorsement or assignment thereof in favor of the Administrative Agent as an additional insured or loss payee, the amounts of which bonds shall be equal to or greater than 100% of the contract amount of the Sys-Con Contract.

**SECTION 5.17** Environmental Matters.

The Borrower will reasonably promptly notify the Administrative Agent in writing of any (i) threatened action, investigation, notice of potential responsibility (including potentially responsible party notices), or other inquiry by any Governmental Authority, (ii) threatened demand or lawsuit by any person against the Borrower (or any of its Subsidiaries) or their real property of which the Loan Parties have knowledge, or (iii) material Release of Hazardous Material as a result of the Loan Parties' operations, and in each case of (i), (ii), and (iii) in connection with any Environmental Laws and if the Loan Parties reasonably anticipate that such action is reasonably likely to result in a Material Adverse Effect.

**SECTION 5.18** Compliance with Laws.

The Borrower shall comply with all laws, rules, regulations and orders of any Governmental Authority (including Environmental Laws) applicable to it or its property (owned or leased), except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

**SECTION 5.19** Maintenance of Corporate Separateness.

The Borrower shall (and shall cause its Subsidiaries to) satisfy customary corporate formalities, including the holding of regular board of directors' and shareholders' or members', managers' or partners' meetings, if applicable, and the maintenance of corporate or company offices and records. Neither the Borrower (nor any of its Subsidiaries) shall take any action, or conduct their affairs in a manner, which is likely to result in the separate existence of a Loan Party from any non-Loan Party being ignored by any court of competent jurisdiction. The Borrower (and shall cause its Subsidiaries to) comply in all material respects with the covenants set forth in its Organizational Documents to maintain its separate and distinct existence from any other person.

**SECTION 5.20** Material Contracts.

The Borrower shall, and shall cause the Project Holdco and the Project Company to, perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, maintain each Material Contract in full force and effect, enforce each such Material Contract in accordance with its terms.

**SECTION 5.21** Further Assurances.

From time to time, at the reasonable request of the Administrative Agent, the Borrower shall execute and deliver to the Administrative Agent such documents and take such other action as the Administrative Agent may reasonably request in order to consummate the transactions contemplated hereby.

**SECTION 5.22** Distribution by the Project Company

The Borrower shall, on or prior to each Transfer Date, cause the Project Company to make distributions to the Borrower of all available cash to extent not prohibited under the Project Company Loan Agreement.

(a) Industrial Waste Water Discharge Permit;

(b) NOI Confirmation Letters and receipt/evidence of payment of the annual Stormwater Permit fees;

(c) evidence that SWPPP has been updated;

(d) evidence that current Air Quality Synthetic Minor Permit is in place;

(e) evidence of the payment of the annual fee for Weights and Measures Permit;

(f) evidence that the Stationary Source Permit has been obtained from the Clark County Department of Air Quality;

(g) evidence that a Permit to Operate Solid Waste Management Facility has been obtained from the Southern Nevada Health District;

(h) evidence that the Spill Prevention Control and Countermeasure Plan is in place and has been updated;

(i) evidence that MSDS reporting and related requirements are current under the Emergency Planning and Community Right-to-Know Act;

(j) evidence confirming appropriate permitting has been obtained for the RCRA *Hazardous Waste Generator*; *and*

(k) all sub-contractors of Sys-Con Contract, including the Alfa Laval contract including, inter alia, performance bonds, insurances.

## ARTICLE VI

## NEGATIVE COVENANTS

The Borrower warrants, covenants and agrees that, so long as this Agreement shall remain in effect and until the Commitment has been terminated and the principal of and interest on each Loan and all other expenses or amounts payable under any Loan Document have been paid in full (other than contingent indemnification obligations for which no claim has been made), unless the Required Lenders shall otherwise consent in writing, neither the Borrower nor any of its Subsidiaries will:

**SECTION 6.01** Indebtedness.

Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness other than Permitted Indebtedness.

**SECTION 6.02** Liens.

Create, incur, assume or permit to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it, or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a) inchoate Liens for Taxes, assessments or governmental charges or levies not yet due and payable or delinquent and Liens for Taxes, assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(b) Liens granted pursuant to the Security Documents to secure the Obligations;

(c) (i) Liens that are contractual or common law right of set-off relating to (A) the establishment of depository relations in the ordinary course of business with banks not give in connection with the issuance of Indebtedness or (B) pooled deposit or sweep accounts of the Borrower and any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business and (ii) other Liens securing cash management obligations (not constituting Indebtedness for borrowed money) in the ordinary course; and

(d) in the case of the Project Company, any Liens granted pursuant to or permitted by the Project Company Debt Documents or the definitive documents in respect of any Permitted Refinancing thereof.

**SECTION 6.03** Investment. Loan. Advances and Acquisition.

Directly or indirectly, lend money or credit (by way of guarantee or otherwise) or make advances to any other person, or purchase or acquire any Equity Interests, bonds, notes, margin stock, debentures, guarantees or other obligations or securities of, or any other interest in, or make any capital contribution to, any other person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or purchase or acquire (in one transaction or a series of transactions) any assets (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a) the Borrower and its Subsidiaries may invest in, acquire and hold cash and Cash Equivalents;

(b) purchases and other acquisitions of materials, equipment and tangible property in the ordinary course of business;

(c) Investments made by the Borrower, directly or indirectly, in the Project Company with the proceeds of the Loan in accordance with Exhibit D;

(d) in the case of the Project Company, Investments permitted under the Project Company Loan Agreement (as in effect on the date hereof); and

(e) to the extent constituting an Investment, any of the activities permitted by Section 6.10.

**SECTION 6.04** Mergers and Consolidations; Fundamental Changes.

Wind up, liquidate or dissolve its affairs or enter into any transaction of merger, amalgamation or consolidation (or agree to do any of the foregoing at any future time), spin-off or fundamentally alter the character of the business of the Loan Parties from the business conducted by, contemplated to be conducted by, or proposed to be conducted by, the Loan Parties as of the date hereof.

**SECTION 6.05** Business Activities.

Directly or indirectly, use the proceeds of the Loan, or lend, contribute or otherwise make available such proceeds available for the purpose of investing in any joint venture.

**SECTION 6.06** Asset Sales.

Effect any Asset Sale, or agree to effect any Asset Sale, except (i) dispositions of used, worn out, obsolete or surplus property by the Borrower in the ordinary course of business and (ii) in the case of the Project Company, Asset Sales permitted under Section 4.2(d) of the Project Company Loan Agreement (as in effect on the date hereof); provided, however, in the case of clause (ii), the Borrower shall first obtain prior written consent from the Required Lenders.

**SECTION 6.07** Dividends / Distributions.

Authorize, declare or pay, directly or indirectly, any Dividends or make any other distributions from the Borrower, the Project Company Holdco or the Project Company except (i) with respect to the Borrower, to make Tax Distributions and other payments (including payment of compensation to employees of the Parent, Holdings and the Borrower and its Subsidiaries) (provided that the aggregate amount of such other payments shall not exceed $500,000, in any fiscal year), (ii) Dividends or other distributions permitted under Section 7.11 hereof, (iii) with respect to the Project Company Holdco, to the extent required pursuant to the terms of the Project Company Holdco Operating Agreement (in each case to the extent otherwise in compliance with this Agreement) and (iv) with respect to the Project Company, distributions to the Borrower of all available cash to extent not prohibited under the Project Company Loan Agreement.

**SECTION 6.08** Transactions with Affiliates.

Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of Borrower or its Subsidiaries, other than (i) pursuant

to the Management Services Agreement or (ii) upon the prior approval of the Super Majority of the Board of Managers (as such term is defined in the Borrower Operating Agreement), any transaction or series of related transactions in the ordinary course of business on terms and conditions at least as favorable to the Borrower and its Subsidiaries as would reasonably be obtained by the Borrower and its Subsidiaries at that time in a comparable arm's-length transaction with a person other than an Affiliate of Borrower or its Subsidiaries.

**SECTION 6.09** Modifications of Organizational Documents and Material Agreements.

Directly or indirectly terminate, amend or modify any of its Organizational Documents (which shall, for the avoidance of doubt, include the Borrower Operating Agreement) or any agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement) or any other material agreement, or enter into any new agreement with respect to its Equity Interests.

**SECTION 6.10** Limitation on Changes to Holding Company Status.

(a) In the case of the Project Company Holdco, engage in any business or activity other than:

(i) the ownership of all outstanding Equity Interests in the Project Company;

(ii) maintaining its existence;

(iii) participating in tax, accounting and other administrative activities as the parent of the Project Company;

(iv) the performance of obligations under the Loan Documents or the Project Company Debt Documents to which it is a party;

(v) the making and receipt of payments, Dividends and other distributions to the extent permitted under Section 7.03 or the Project Company Holdco Operating Agreement;

(vi) maintaining accounts and monies on deposit therein; and

(vii) activities incidental to the businesses or activities described in subsections (a)(i) through (a)(vi) above.

(b) In the case of the Borrower, engage in any business or activity other than:

(i) the ownership of all outstanding Equity Interests in the Project Company Holdco;

(ii) maintaining its existence;

(iii) participating in tax, accounting and other administrative activities as the parent of the Project Company Holdco and the Project Company (including payment of compensation to employees of the Parent, Holdings and the Borrower and its Subsidiaries);

(iv) the performance of obligations under the Loan Documents to which it is a party;

(v) the making of Tax Distributions and the making and receipt of payments, Dividends and other distributions to the extent permitted under Section 7.03 hereof or the Borrower Operating Agreement;

(vi) maintaining accounts (including the Accounts) and monies on deposit therein; and

(vii) activities incidental to the businesses or activities described in subsections (b)(i) through (b)(vi) above.

**SECTION 6.11** Limitations on Budget Management.

Except as otherwise contemplated under Section 3.10 or pursuant to any Material Contract, in the case of the Borrower, approve, authorize or effect any of the following without prior written consent from the Required Lenders:

(i) Any employee or management bonus, incentive, or other compensation based, in part, upon the satisfaction of specified criteria or performance metrics;

(ii) Any management service fee equal to or greater than, individually or in the aggregate, (A) prior to the Completion Date, $100,000 per month and (B) from and after the Completion Date, $250,000 per month;

(iii) Any travel or travel related expenses equal to or greater than, individually or in the aggregate, $100,000 per year;

(iv) Any entertainment, hospitality or similar expenses equal to or greater than, individually or in the aggregate, $100,000 per year;

(v) Any miscellaneous selling, general or administrative expenses equal to or greater than, individually or in the aggregate, $100,000 per year; or

(vi) Any expenditures variance in any fiscal year in respect of the items set forth under the heading "Non-COGS Expenditures" in the Approved Budget for such fiscal year that, when taken together in the aggregate for all expenditures in respect of such items for such fiscal year, is greater than 5% of the aggregate expenditures amount in respect of the items set forth under the heading "Non-COGS Expenditures" in the Approved Budget for such fiscal year unless such expenditures variance is funded with proceeds that have been distributed from the Conditional Distributions Account in accordance with Section 7.11.

**SECTION 6.12** Sanctions, Etc.

Directly or indirectly, use the proceeds of the Loan, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person, (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any person in violation of the FCPA or any other applicable anti-corruption law, or (ii) (A) to fund any activities or business of or with any person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (B) in any other manner that would result in a violation of Sanctions by any person.

**SECTION 6.13** Accounting and Budget Changes.

Make any (i) change (and the Borrower shall cause its Subsidiaries to not make any change) in accounting policies or reporting policies, except as required by GAAP, or (ii) change of its fiscal year, or (iii) without prior written consent from the Administrative Agent, which shall not be unreasonably withheld, materially vary or revise any Approved Budget.

**SECTION 6.14** Subsidiaries.

Create any Subsidiary or cause, in any manner, any person to become its Subsidiary other than those Subsidiaries held by the Borrower as of the date hereof.

**SECTION 6.15** Disregarded Entity.

Without the written consent of the Required Lenders, take any action, nor permit any other person to take any action on the Borrower's behalf, that would have the effect of causing the Borrower to be treated as other than an entity whose separate existence is disregarded from that of its sole regarded owner for U.S. federal income tax purposes.

**SECTION 6.16** Material Contracts.

Directly or indirectly terminate, amend or modify the financial terms, schedule, or any other material terms of any of the Material Contracts unless agreed to by the Lenders or Administrative Agent, not to be unreasonably withheld. Lenders agree that as a normal course of business, minor, non-material administrative changes may be made without the consent of the Lenders from time to time, to properly manage the completion of construction and/or the day to day operations of the completed Project.

## ARTICLE VII

## ACCOUNTS

**SECTION 7.01** Creation of Accounts. The Borrower shall create and establish and maintain the following separate and segregated accounts in each case with a Depository Bank:

(a) the Collections Account (the "**Collections Account**");

(b) the Funding Date Interest Reserve Account (the "**Funding Date Interest Reserve Account**");

(c) the Interest Payment Account (the "**Interest Payment Account**");

(d) the Debt Service Reserve Account (the "**Debt Service Reserve Account**");

(e) the Cash Reserve Account (the "**Cash Reserve Account**");

(f) the Principal Reserve Account (the "**Principal Reserve Account**");

(g) the EPC Retention Account (the "**EPC Retention Account**");

(h) the Working Capital Reserve Account (the "**Working Capital Reserve Account**"); and

(i) the Conditional Distributions Account (the "**Conditional Distributions Account**", together with the Collections Account, the Funding Date Interest Reserve Account, the Interest Payment Account, the Debt Service Reserve Account, the Cash Reserve Account, the Principal Reserve Account, the EPC Retention Account and the Working Capital Reserve Account, the "**Accounts**").

Each Account shall be maintained by the applicable Depository Bank as a separate and distinct fund to be held, managed, invested, disbursed and administered as provided in this Agreement and subject to an Account Control Agreement. All moneys deposited in the Accounts shall be used solely for the purposes set forth in this Agreement.

**SECTION 7.02** Collections Account.

(a) The Borrower shall establish and maintain a Collections Account with a Depository Bank and enter into an Account Control Agreement with respect thereto in accordance with Section 7.01. Upon the occurrence of the Completion Date, the Borrower shall deposit or cause to be deposited in the Collections Account no later than the fifth Business Day after receipt of any distributions (net of any required tax payments required to be made by the Borrower on account of its ownership interest in the Project Company or the Project Company Holdco, as applicable) received by the Borrower from the Project Company and/or the Project Company Holdco, in each case, to the extent such distribution (i) was required to be distributed to the Borrower pursuant to the terms of the Project Company Operating Agreement or the Project Company Holdco Operating Agreement, as applicable, and (ii) was distributed to the Borrower in compliance with the Project Company Loan Agreement.

(b) The Borrower shall cause all amounts that remain on deposit in the Collections Account on any Transfer Date to be applied in accordance with the distribution instructions set forth in Section 7.03 on the 15th day of each fiscal month of the Borrower, commencing with the first full fiscal month ending after the Commercial Operation Date (each such date, a "**Transfer Date**").

(c) The Borrower may at its option at any time designate a new Depository Bank with which it shall maintain the Collections Account, provided (i) such new Depository Bank is a bank the deposits of which are insured by the Federal Deposit Insurance Corporation and (ii) such new Depository Bank has entered into an Account Control Agreement with the Administrative Agent acting on behalf of itself and the Lenders in substantially the same form as the previous Account Control Agreement or in such other form as may be approved by the Administrative Agent in its reasonable discretion (such consent not to be unreasonably withheld, conditioned or delayed).

**SECTION 7.03** Application of Proceeds. On each Transfer Date, the Borrower shall apply amounts on deposit in the Collections Account, if and to the extent available, as follows (in the following order of priority):

(a) *First*, to make Tax Distributions;

(b) *Second*, to the Interest Payment Account in an amount (if any) sufficient to comply with the Interest Payment Account Requirement;

(c) *Third*, to the Debt Service Reserve Account in an amount (if any) sufficient to comply with the Debt Service Reserve Account Requirement;

(d) *Fourth*, to the payment in cash of the principal amount of the Loan in accordance with Section 2.07(a) up to an amount equal to the capitalized PIK Interest;



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER RYZE0006827

(e) *Fifth*, at the option of the Borrower, to the payment in cash of the principal amount of the Loan in accordance with Section 2.06(b) in an aggregate amount not to exceed, for all such payments, $10,000,000;

(f) *Sixth*, to the Cash Reserve Account in an amount (if any) sufficient to comply with the Cash Reserve Account Requirement;

(g) *Seventh*, to the Principle Reserve Account in an amount (if any) sufficient to comply with the applicable Principal Reserve Account Requirement;

(h) *Eighth*, to the Working Capital Reserve Account in an amount (if any) sufficient to comply with the Working Capital Reserve Account Requirement or, at the election of the Borrower, such greater amount as it may deem appropriate in its sole discretion;

(i) *Ninth*, to the Conditional Distributions Account; and

(j) *Tenth*, the balance, if any, to the person or persons lawfully entitled thereto (including the Borrower or its successors or assigns).

**SECTION 7.04** Funding Date Interest Reserve Account. On the Funding Date, an aggregate amount of cash equal to $15,305,520 shall be funded from the net proceeds of the Loans into the Funding Date Interest Reserve Account, which amount shall be applied by the Borrower to make cash interest payments on the Loan with respect to the first five (5) Interest Periods hereunder occurring after the Funding Date in accordance with Section 2.04(c).

**SECTION 7.05** Interest Payment Account. On each Transfer Date, solely to the extent of available cash in the Collections Account, the Borrower shall cause to be deposited into the Interest Payment Account an amount sufficient to fund any accrued but unpaid cash interest on such date and any additional interest required to be paid on the immediately succeeding Interest Payment Date (the "**Interest Payment Account Requirement**"); provided that there shall be no such Interest Payment Account Requirement for any Transfer Date occurring prior to the one year anniversary of the Funding Date. Amounts on deposit in the Interest Payment Account shall be applied by the Borrower on each Interest Payment Date in accordance with Section 2.04(c) to pay accrued interest that is due and payable on the Loan on such Interest Payment Date. If on any Interest Payment Date, the amount in the Interest Payment Account is greater than the amount required to be paid on such date pursuant to Section 2.04(c), such excess may be transferred to the Collections Account for further application pursuant to Section 7.03.

**SECTION 7.06** Debt Service Reserve Account.

(a) On the Funding Date, an aggregate amount of cash equal to $3,865,578.10 shall be funded from the net proceeds of the Loans into the Debt Service Reserve Account.

(b) In the event insufficient funds exist in the Interest Payment Account to fund any required interest payment on any Interest Payment Date, such interest payment (to the extent of unavailability in the Interest Payment Account) shall be made with funds contained in the Debt Service Reserve Account.

(c) In the event that, as of any Transfer Date the amount on deposit in the Debt Service Reserve Account is less than $15,000,000 as a result of cash being withdrawn from the Debt Service Reserve Account to fund interest payments in accordance with Section 2.04(c) or otherwise, the Borrower shall deposit or cause to be deposited cash on such Transfer Date into the Debt Service Reserve Account (solely to the extent available pursuant to the distribution waterfall in Section 7.03), in an amount equal to the

amount necessary to return the amount on deposit in the Debt Service Reserve Account to $15,000,000 (the "**Debt Service Reserve Account Requirement**").

(d) For the avoidance of doubt, the final balance of the Debt Service Reserve Account on the first Transfer Date occurring after the twelve month anniversary of the Commercial Operation Date shall be required to be $15,000,000. A failure by the Borrower to satisfy such minimum amount requirement shall be an Event of Default.

(e) Upon the occurrence of an Event of Default, the Administrative Agent at the instruction of the Required Lenders may apply proceeds of the Debt Service Reserve Account to payment of the Obligations in accordance with Section 8.02.

**SECTION 7.07** Cash Reserve Account.

(a) On each Transfer Date, solely to the extent required by this Section 7.07 and solely to the extent in accordance with the distribution waterfall contained in Section 7.03, the Borrower shall transfer cash from the Collections Account to the Cash Reserve Account (i) in an aggregate amount not to exceed $5,000,000 on or prior to the 12-month anniversary of the Commercial Operation Date (the "**First Cash Reserve Account Requirement**"), (ii) in an additional aggregate amount not to exceed $5,000,000 after the 12-month anniversary of the Commercial Operation Date and on or prior to the 24-month anniversary of the Commercial Operation Date (the "**Second Cash Reserve Account Requirement**"), (iii) in an additional aggregate amount not to exceed $5,000,000 after the 24-month anniversary of the Commercial Operation Date and on or prior to the 36-month anniversary of the Commercial Operation Date (the "**Third Cash Reserve Account Requirement**") and (iv) in an additional aggregate amount not to exceed $5,000,000 after the 36-month anniversary of the Commercial Operation Date and on or prior to the 48-month anniversary of the Commercial Operation Date (the "**Fourth Cash Reserve Account Requirement**," together with the First Cash Reserve Account Requirement, the Second Cash Reserve Account Requirement and the Third Cash Reserve Account Requirement, the "**Cash Reserve Account Requirement**"); it being understood and agreed that once the applicable Cash Reserve Account Requirement is met in the applicable period described above, no additional amounts shall be required or otherwise permitted to be deposited by the Borrower into such account during such period.

(b) In the event insufficient funds exist in the Interest Payment Account and/or the Debt Service Reserve Account to fund any required interest payment on any Interest Payment Date, such interest payment (to the extent of unavailability in the Interest Payment Account and the Debt Service Reserve Account and solely to the extent available pursuant to the distribution waterfall in Section 7.03) shall be made with funds contained in the Cash Reserve Account.

(c) Upon the occurrence of an Event of Default, the Administrative Agent at the instruction of the Required Lenders may apply proceeds of the Cash Reserve Account to payment of the Obligations in accordance with Section 8.02.

**SECTION 7.08** Principal Reserve Account.

(a) On each Transfer Date, solely to the extent required pursuant to this Section 7.08 and solely to the extent in accordance with the distribution waterfall contained in Section 7.03, the Borrower shall transfer cash from the Collections Account to the Principal Reserve Account such that an amount equal to $2,500,000 *multiplied* by the number of quarterly anniversaries, commencing with the first quarterly anniversary of the Funding Date, that has occurred after the Funding Date and on or prior to such Transfer Date (the "**Principal Reserve Account Requirement**") is maintained in such account; it being understood and agreed that the failure to meet the Principal Reserve Account Requirement on any Transfer Date shall

not constitute a default for any purposes hereunder or under any other Loan Document unless specifically in violation of this Section 7.08 after giving effect to Section 7.03 (i.e., the Borrower shall only be required to satisfy the Principal Account Reserve Requirement on any applicable Transfer Date to the extent sufficient cash exists to satisfy such requirement after giving effect to all required distributions pursuant to Section 7.03).

(b) For the avoidance of doubt, the final balance of the Principal Reserve Account on the first Transfer Date occurring after the twentieth-quarterly anniversary of the Funding Date shall be required to be $50,000,000. A failure by the Borrower to satisfy such minimum amount requirement shall be an Event of Default.

(c) In the event insufficient funds exist in the Interest Payment Account, the Debt Service Reserve Account and/or the Cash Reserve Account to fund any required interest payment on any Interest Payment Date, such interest payment (to the extent of unavailability in the Interest Payment Account, the Debt Service Reserve Account and the Cash Reserve Account and solely to the extent available pursuant to the distribution waterfall in Section 7.03) shall be made with funds contained in the Principal Reserve Account.

(d) Upon the occurrence of an Event of Default, the Administrative Agent acting at the instruction of the Required Lenders may apply proceeds of the Principal Reserve Account to payment of the Obligations in accordance with Section 8.02.

**SECTION 7.09** EPC Retention Account.

(a) On the Funding Date, an aggregate amount of cash equal to $14,250,000 shall be funded from the net proceeds of the Loan into the EPC Retention Account.

(b) Upon delivery by the Borrower of a certificate to the Administrative Agent certifying that Project Completion (as defined in the EPC Contract) has occurred, all funds contained in the EPC Retention Account may be distributed by the Borrower, directly or indirectly, to the Project Company.

(c) Upon the occurrence of an Event of Default, the Administrative Agent acting at the instruction of the Required Lenders may apply proceeds of the EPC Retention Account to payment of the Obligations in accordance with Section 8.02.

**SECTION 7.10** Working Capital Reserve Account.

(a) On the Funding Date, an aggregate amount of cash equal to $15,445,038.69 shall be funded from the net proceeds of the Loan into the Working Capital Reserve Account.

(b) On each Transfer Date, solely to the extent in accordance with the distribution waterfall contained in Section 7.03, the Borrower shall transfer cash from the Collections Account to the Working Capital Reserve Account such that an amount not less than $1,000,000 is maintained in such account as of such Transfer Date (the "**Working Capital Reserve Account Requirement**"); it being understood and agreed that the failure to meet the Working Capital Account Reserve Requirement on any Transfer Date shall not constitute a default for any purposes hereunder or under any other Loan Document unless specifically in violation of this Section 7.10 after giving effect to Section 7.03 (i.e., the Borrower shall only be required to satisfy the Working Capital Reserve Account Requirement on any applicable Transfer Date to the extent sufficient cash exists to satisfy such requirement after giving effect to all required distributions pursuant to Section 7.03).

(c) The Borrower shall be permitted to withdraw and use funds on deposit in the Working Capital Reserve Account at any time for purposes of paying ordinary course operating expenses of the Borrower and its Subsidiaries and for other purposes not prohibited by the terms of this Agreement to the extent in compliance with the limitations set forth in this Agreement (including Sections 3.10 and 6.10).

(d) In the event insufficient funds exist in the Interest Payment Account, the Debt Service Reserve Account, the Cash Reserve Account and/or the Principal Reserve Account to fund any required interest payment on any Interest Payment Date, such interest payment (to the extent of unavailability in the Interest Payment Account, the Debt Service Reserve Account, the Cash Reserve Account and the Principal Reserve Account and solely to the extent available pursuant to the distribution waterfall in Section 7.03) shall be made with funds contained in the Working Capital Reserve Account up to an amount such that the Working Capital Reserve Account Requirement remains satisfied after giving effect to such payment.

(e) Upon the occurrence of an Event of Default, the Administrative Agent acting at the instruction of the Required Lenders may apply proceeds of the Working Capital Reserve Account to payment of the Obligations in accordance with Section 8.02.

**SECTION 7.11** Conditional Distributions Account.

(a) On each Transfer Date, subject to (i) full compliance with the distribution waterfall contained in Section 7.03, (ii) satisfaction of the financial covenant set forth in Section 5.02, (iii) procurement of the credit rating in accordance with Section 5.03, and (iv) no Event of Default having occurred or would occur as a result of making any such Conditional Distribution transfer, the Borrower shall transfer all remaining cash from the Collections Account to the Conditional Distributions Account.

(b) The Borrower shall be permitted to withdraw and use funds on deposit in the Conditional Distributions Account on any Transfer Date for purposes of funding Dividends and/or other distributions from the Borrower:

(i) in an aggregate amount not to exceed $22,000,000 (which shall, for the avoidance of doubt, include all bonuses and incentives) in any twelve month period, when taken together with all other Dividends and other distributions by the Borrower that have been funded from proceeds in the Conditional Distributions Account in such twelve month period, so long as (x) EBITDA (determined for the twelve month period ending as of the fiscal month most recently ended prior to such Transfer Date) is greater than or equal to $100,000,000 but less than $150,000,000, (y) the Debt Service Coverage Ratio (determined for the twelve month period ending as of the fiscal month most recently ended prior to such Transfer Date) is greater than or equal to 2.00:1.00 but less than 3.00:1.00 and (z) the Distributions Condition has been satisfied as of such date;

(ii) in an aggregate amount not to exceed $34,000,000 (which shall, for the avoidance of doubt, include all bonuses and incentives) in any twelve month period, when taken together with all other Dividends and other distributions by the Borrower that have been funded from proceeds in the Conditional Distributions Account in such twelve month period, so long as (x) EBITDA (determined for the twelve month period ending as of the fiscal month most recently ended prior to such Transfer Date) is greater than or equal to $150,000,000 but less than $200,000,000, (y) the Debt Service Coverage Ratio (determined for the twelve month period ending as of the fiscal month most recently ended prior to such Transfer Date) is greater than or equal to 3.00:1.00 but less than 4.00:1.00 and (z) the Distributions Condition has been satisfied as of such date;

(iii) in an aggregate amount not to exceed $58,000,000 (which shall, for the avoidance of doubt, include all bonuses and incentives) in any twelve month period, when taken together with

all other Dividends and other distributions by the Borrower that have been funded from proceeds in the Conditional Distributions Account in such twelve month period, so long as (x) EBITDA (determined for the twelve month period ending as of the fiscal month most recently ended prior to such Transfer Date) is greater than or equal to $200,000,000, (y) the Debt Service Coverage Ratio (determined for the twelve month period ending as of the fiscal month most recently ended prior to such Transfer Date) is greater than or equal to 4.00:1.00 and (z) the Distributions Condition has been satisfied as of such date; and

(iv) in an unlimited amount if the Unlimited Distributions Condition has been satisfied as of such date.

(c) In the event insufficient funds exist in the Interest Payment Account, the Debt Service Reserve Account, the Cash Reserve Account, the Principal Reserve Account and/or the Working Capital Reserve Account (after giving effect to the minimum amount restrictions set forth in Section 7.10) to fund any required interest payment on any Interest Payment Date, such interest payment (to the extent of unavailability in the Interest Payment Account, the Debt Service Reserve Account, the Cash Reserve Account, the Principal Reserve Account and the Working Capital Reserve Account (after giving effect to the minimum amount restrictions set forth in Section 7.10) and solely to the extent available pursuant to the distribution waterfall in Section 7.03) shall be made with funds contained in the Conditional Distributions Account.

(d) Upon the occurrence of an Event of Default, the Administrative Agent acting at the instruction of the Required Lenders may apply proceeds of the Conditional Distributions Account to payment of the Obligations in accordance with Section 8.02.

## ARTICLE VIII

## EVENTS OF DEFAULT

### SECTION 8.01 Events of Default.

Upon the occurrence and during the continuance of the following events ("**Events of Default**"):

(a) default shall be made in the payment of (i) any principal of the Loan when and as the same shall become due and payable, or (ii) any interest on the Loan or any other amount due under any Loan Document, in each case when and as the same shall become due and payable, and such default shall continue for a period of five (5) days;

(b) default shall be made in the due observance or performance by the Borrower of any material covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a) above or otherwise specifically excluded or provided for in this Agreement) and such default shall continue unremedied or shall not be waived for a period of thirty (30) days after written notice thereof from the Administrative Agent to the Borrower;

(c) a failure to perform the covenants set forth or referred to in Section 5.02;

(d) an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of the Borrower, or of a substantial part of the property of the Borrower or any its Subsidiaries, under any Debtor Relief Law; (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any of the Borrower or any its Subsidiaries or for a substantial part of the property of the Borrower; and such proceeding or petition shall

continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered;

(e) any Event of Default (as such term is defined in the Project Company Loan Agreement) occurs under the Project Company Loan Agreement (after expiration of any available grace or cure periods), if the effect of such event is to entitle the Project Company Lender to accelerate the obligations thereunder;

(f) the Borrower or any its Subsidiaries shall (i) voluntarily commence any proceeding or file any petition seeking relief under any Debtor Relief Law; (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (c) above; (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any its Subsidiaries or for a substantial part of the property of the Borrower or any its Subsidiaries; (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding; (v) make a general assignment for the benefit of creditors; or (vi) take any action for the purpose of effecting any of the foregoing;

(g) (i) any security interest and Lien purported to be created by any Security Document shall cease to be in full force and effect (other than in accordance with its terms), or shall cease to give the Administrative Agent (acting on behalf of itself and the Lenders), the Liens, rights, powers and privileges purported to be created and granted under such Security Document in favor of the Administrative Agent (acting on behalf of itself and the Lenders), in each case, for any reason other than (x) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or (y) as a result of the Administrative Agent's failure to maintain possession of any stock certificates or other instruments delivered to it under the Security Documents or (ii) shall be asserted by Borrower not to be a valid, perfected, first priority (except as otherwise expressly provided in this Agreement, or such Security Document) security interest in or Lien on the Collateral covered thereby and such default shall continue unremedied or shall not be waived for a period of thirty (30) days after the occurrence thereof;

(h) any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or Borrower shall repudiate or deny any material portion of its liability or obligation for the Obligations;

(i) any Material Contract, including but not limited to the Off-Take Agreement, is terminated and such Material Contract is not replaced within a period of 90 days in such a manner to allow the Project Company to attain the Completion Date as required in this Agreement or to continue operations;

(j) any Change in Control occurs;

(k) the Completion Date is not achieved on or prior to the fifteen month anniversary of the Funding Date;

(l) any judgment or order for the payment of money, individually, or in the aggregate, in excess of $10,000,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover such judgment or order) or for injunctive relief that could reasonably be expected to result in a Material Adverse Effect shall be rendered against the Borrower (or any of its Subsidiaries) and such judgment shall not have been vacated or discharged or stayed or bonded pending appeal within 60 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order; or

(m) any failure to pay any principal or interest when due in respect of any Indebtedness (other than Indebtedness outstanding under this Agreement), which exceeds in the aggregate $10,000,000, and

such failure continues after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness;

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent, at the request of the Required Lenders, may, by notice to Borrower, take either or both of the following actions, at the same or different times: (i) terminate forthwith the Commitment and (ii) declare the Loan then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loan so declared to be due and payable, together with accrued interest thereon and all other Obligations of Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrower.

**SECTION 8.02** Application of Proceeds.

The proceeds received by the Administrative Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Administrative Agent (at the request of the Lender) of its remedies shall be applied, in full or in part, together with any other sums then held by the Administrative Agent pursuant to this Agreement, promptly by the Administrative Agent as follows, and in the case of clauses (b) and (c), for the application pro rata among Lenders according to the amounts of the Obligations then due and owing and remaining unpaid to each such Lender:

(a) *First*, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent and its agents and counsel;

(b) *Second*, to the indefeasible payment in full in cash of interest on the Loan and any interest accrued thereon;

(c) *Third*, to the indefeasible payment in full in cash of principal amount of the Loan; and

(d) *Fourth*, the balance, if any, to the person lawfully entitled thereto (including the Borrower or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (d) of this Section 8.02, the Borrower shall remain liable for any deficiency.

**SECTION 8.03** Project Company Debt Documents Refinancing.

The Borrower shall provide prior written notice to the Administrative Agent of any refinancing, restructuring, recapitalization or early repayment of the Project Company Debt Documents, and the Administrative Agent, acting at the direction of the Required Lenders, shall have the right to cause the Loan to be refinanced, restructured, recapitalized or repaid at the same time.

## ARTICLE IX

## ADMINISTRATIVE AGENT

**SECTION 9.01** Appointment and Authority.

The Lenders shall appoint an administrative agent to act on its behalf hereunder and under the other Loan Documents (the "**Administrative Agent**") prior to the Funding Date, with the consent of the



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

Borrower, not to be unreasonably withheld. Prior to the appointment of the Administrative Agent, any deliverables or approvals, including the items Schedule 4.02A, shall instead be delivered to and made by Mirae or their designee, if any. The Lenders authorize the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX (other than as expressly provided herein) are solely for the benefit of the Administrative Agent and the Lenders and neither the Borrower nor Holdings or any other person shall have any rights as a third-party beneficiary of any such provisions (other than as expressly provided herein). It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable requirements of law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**SECTION 9.02** Rights as a Lender.

Any person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include any person serving as the Administrative Agent hereunder in its capacity as a Lender. Such person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Subsidiary or other Affiliate thereof as if such person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**SECTION 9.03** Exculpatory Provisions.

(a) The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable requirements of law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by any person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b) The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided herein or under the other Loan Documents), or (ii) in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by the Borrower or a Lender.

(c) The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

**SECTION 9.04** Reliance by Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender , the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**SECTION 9.05** Delegation of Duties.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent or the. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that the Administrative acted with gross negligence or willful misconduct in the selection of such sub-agents as determined by a court of competent jurisdiction in a final and non-appealable judgment.

**SECTION 9.06** Resignation of Administrative Agent .

(a) The Administrative Agent may resign as Administrative Agent upon 10 days' notice to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a financial institution with an office in the United States of America, or an Affiliate of any such financial institution with an office in the United States of America. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives

notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; *provided* that in no event shall any such successor Administrative Agent be a Defaulting Lender. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b) With effect from the Resignation Effective Date (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments owed to the retiring Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Administrative Agent (other than any rights to indemnity payments owed to the retiring Administrative Agent), and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents. The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

**SECTION 9.07** Non-Reliance on Administrative Agent and other Lenders.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**SECTION 9.08** No Other Duties, Etc.

Anything herein to the contrary notwithstanding, the Administrative Agent Shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder or thereunder.

**SECTION 9.09** Administrative Agent May File Proofs of Claim.

In case of the pendency of any proceeding under any Debtor Relief Law, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 10.03) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 10.03.

**SECTION 9.10** Collateral and Guaranty Matters.

(a) Each of the Lenders irrevocably authorizes the Administrative Agent to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (x) upon payment in full of the Loans, (y) that is sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted under the Loan Documents or (z) subject to Section 10.02, if approved, authorized or ratified in writing by the Required Lenders or such other number or percentage of Lenders required hereby;

(b) The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by the Borrower in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

(c) Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent, and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Security Documents, it being understood and agreed that all powers, rights and remedies under any of the Security Documents may be exercised solely by the Administrative Agent for the benefit of itself and the Lenders in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of Title 11 of the United States Code), the Administrative Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of Title 11 of the United States Code) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Administrative Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from the Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale or other disposition.

## ARTICLE X

## MISCELLANEOUS

**SECTION 10.01** Notices.

(a) Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service or mailed by certified or registered mail as follows:

(i) if to the Borrower, to it at:

6600 Amelia Earhart Court, Suite A
Las Vegas, NV 89119
Attn: Matthew G. Pearson

(ii) if to the Administrative Agent, to it at:

Mirae Asset Center One Building
East Tower, 26, Euljiro-5-gil
Jung-gu, Seoul 100-210

with a copy to (such delivery shall not constitute notice):

Kutak Rock LLP
One South Wacker Drive, Suite 3910
Chicago, Illinois 60606-4635
Attn: Michael J. Tobak III

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).

(b) Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including electronic mail and Internet or intranet websites) at kyunghyun.lee@miraeasset.com. Notices or communications posted to an Internet or intranet website shall be deemed received upon the posting thereof and notice of such posting by electronic mail.

(c) Any party hereto may change its address or other contact information for notices and other communications hereunder by notice to the other parties hereto.

**SECTION 10.02** Waivers; Amendment.

No failure or delay by the Administrative Agent or the Lenders in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by Borrower therefrom shall be effective only in the specific instance and for the purpose for which given. Without limiting the

generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent and the Lenders may have had notice or knowledge of such Default at the time. If the Administrative Agent or Lenders' consent is requested, in writing, by the Borrower in accordance with any provision of this Agreement, such consent will be deemed given if not specifically withheld, in writing, within ten (10) Business Day of receipt of such request. This Agreement may not be waived, amended, supplemented or modified except pursuant to an agreement or agreements in writing entered into by the Borrower, the Administrative Agent and the Lenders (except for as otherwise set forth herein).

**SECTION 10.03** Expenses.

Unless separately agreed to in writing by the Borrower, each party hereto shall pay its own expenses incurred by such party (including the reasonable fees, charges and disbursements of its counsel) in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including in connection with post-closing searches to confirm that security filings and recordations have been properly made; provided that, notwithstanding the foregoing, the Borrower shall be required to pay for (i) the reasonable and documented expenses incurred by the Administrative Agent and the Lenders to obtain any Ad Hoc FMV Report that the Borrower is required to deliver pursuant to Section 5.01(e)(ii) of this Agreement, not to exceed $50,000 in the aggregate for all such expenses during the term of this Agreement, (ii) the reasonable and documented expenses of counsel to the Lenders that are incurred in connection with the exercise by such Lenders of the Conversion Option, not to exceed $50,000 in the aggregate for all such expenses during the term of this Agreement and (iii) the reasonable and documented expenses of a single independent third party engineer for the Administrative Agent and the Lenders in connection with the transactions contemplated by this Agreement, not to exceed $20,000 per fiscal month during the term of this Agreement. The Borrower shall pay the reasonable and documented expenses incurred by the Administrative Agent and the Lenders (including the reasonable and documented fees, charges and disbursements of its counsel) in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.03.

**SECTION 10.04** Successors and Assigns.

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lenders. Each Lender may assign this Agreement and its rights and obligations hereunder to any person (each of the foregoing, an "**Eligible Assignee**") other than (a) a natural person, (b) a Defaulting Lender or (c) a Disqualified Institution. Each Lender reserves the right, from and after the funding of the Loan on the Funding Date, to sell, assign, transfer, negotiate or grant participation interests in all or any part of, or any interest in such Lender's rights and benefits hereunder to any Eligible Assignee (each, a "**Participant**"); provided that a Participant shall not be entitled to receive any greater payment under Sections 2.09(a) or 2.09(b) than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except if the sale of the participation to such Participant is made with the Borrower's prior written consent. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement. The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each assignment or participation and a register for the recordation of the names and addresses of the assignees and participants, and the Commitments of, and principal amounts (and stated interest) of the Loans owing

to, each assignee and participant pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice. The applicable Lender, acting solely for this purpose as a non-fiduciary agent of the Borrower (solely for tax purposes), shall maintain a register on which it enters the name and address of each Participant, and the principal amounts (and stated interest) of each Participant's interest in such Lender's rights and/or obligations under this Agreement or any other Loan Document complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the United States Treasury Regulations (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury Regulations (or any amended or successor versions). The entries in the Participant Register shall be conclusive absent manifest error, and the Borrower and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement, notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility to maintain the Participant Register.

**SECTION 10.05** Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single Contract. This Agreement and the other Loan Documents constitute the entire Contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by each of the Borrower, the Administrative Agent and the Lenders. Delivery of an executed counterpart of a signature page of this Agreement by telecopier or other electronic transmission (i.e. a "pdf" or "tif" document) shall be effective as delivery of a manually executed counterpart of this Agreement.

**SECTION 10.06** Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**SECTION 10.07** Guarantee of Holdings.

By entering into this Agreement, Holdings (in its capacity as guarantor, the "**Guarantor**") hereby unconditionally and irrevocably guarantees the full performance by the Borrower of its obligations under this Agreement and the Security Documents, including but not limited to the full and timely payment and performance and timely payment of the Obligations. The Guarantor unconditionally waives any demand, proof or notice of nonpayment or of default by the Borrower in performing its payment obligations under this Agreement or the Security Documents. This guaranty will remain in full force and effect until payment in full of the Obligations made in accordance with the applicable terms of this Agreement and the Security Documents.

**SECTION 10.08** Arbitration.

Any dispute, claim or controversy, including tort claims, arising out of or relating to this Agreement or to the breach, termination, enforcement, interpretation or validity hereof, including the determination of the scope or applicability of this arbitration provision, shall be determined by arbitration in accordance with the JAMS Comprehensive Arbitration Rules and Procedures (the "***Rules***"). In the event of a conflict between such Rules and this Agreement, the provisions of this Agreement will control. The tribunal will consist of one arbitrator. The place of arbitration will be Las Vegas, Nevada. The language to be used in the arbitral proceedings will be English. The arbitrator shall be appointed pursuant to the Rules. The arbitrator shall, in the award, allocate all the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party or parties. The arbitrator may not award punitive, exemplary, incidental or consequential damages, and the parties hereby irrevocably waive any claim(s) to such damages in disputes that are subject to this arbitration provision. The result of the arbitration will be final and binding on the parties, and judgment upon any award rendered by the arbitrator may be entered by any court having jurisdiction. The parties hereby agree not to appeal the result of the arbitration. The procedures set forth herein shall not preclude a party from seeking injunctive relief or other provisional remedies in aid of arbitration from a court of appropriate jurisdiction. The interpretation and enforceability of this section shall be governed exclusively by the Federal Arbitration Act, 9 U.S.C. Section 1, et seq.

**SECTION 10.09** Governing Law.

This Agreement shall be governed by the Laws of the State of New York, (i) excluding choice of law principles that would require the application of the Laws of a jurisdiction other than the State of New York and (ii) excluding any change after the date hereof in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority.

**SECTION 10.10** Specific Performance.

The Parties hereby acknowledge and agree that the failure of either Party to perform its agreements and covenants hereunder will cause irreparable injury to the other Party for which monetary damages, even if available, will not be an adequate remedy. Accordingly, each Party hereby consents to the granting of equitable relief (including specific performance and injunctive relief) by any court of competent jurisdiction to enforce either Party's obligations hereunder. The Parties further agree to waive any requirement for the securing or posting of any bond in connection with the obtaining of any such equitable relief and that this Section 10.09 is without prejudice to any other rights that the Parties may have for any failure to perform this Agreement.

**SECTION 10.11** Right of Set-Off.

If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Lender to or for the credit or the account of the Loan Parties against any and all obligations of the Loan Parties, now or hereafter existing under this Agreement or any other Loan Document held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured.

**SECTION 10.12** U.S.A Patriot Act and Similar Legislation.

Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the U.S.A. PATRIOT Act and similar legislation (including applicable anti-money laundering laws), as applicable, it

is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow the Lenders to identify such person in accordance with such legislation. Each of the Loan Parties agrees to furnish such information promptly upon request of a Lender. Each Lender shall be responsible for satisfying its own requirements in respect of obtaining all such information.

**SECTION 10.13** No Fiduciary Duty.

Each Lender and the Administrative Agent and their respective Affiliates (collectively, solely for purposes of this paragraph, the "**Lenders**"), may have economic interests that conflict with those of the Borrower. The Borrower hereby agrees that subject to applicable law, nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Lenders and the Borrower, its equityholders or Affiliates. The Loan Parties hereby acknowledge and agree that (a) the transactions contemplated by the Loan Documents are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, (b) in connection therewith and with the process leading to such transaction none of the Lenders is acting as the agent or fiduciary of the Borrower, its management, equityholders, Affiliates or creditors, (c) no Lender has assumed an advisory or fiduciary responsibility in favor of the Borrower with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether any Lender or any of its Affiliates has advised or is currently advising the Borrower on other matters) or any other obligation to the Borrower except the obligations expressly set forth in the Loan Documents, (d) the Loan Parties have consulted their legal and financial advisors to the extent it has deemed appropriate and (e) the Lenders may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their Affiliates and no Lender has an obligation to disclose any such interests to the Loan Parties or their Affiliates. The Loan Parties further acknowledge and agree that they are responsible for making their own independent judgment with respect to such transactions and the process leading thereto.

**SECTION 10.14** Survival of Representation and Warranties.

All representations and warranties made by the Borrower in the Loan Documents and in the certificates delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loan and the execution and delivery of the Loan Documents, regardless of any investigation made by such persons or on their behalf, and shall continue in full force and effect until payment in full of the Obligations. Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein shall survive payment in full of the Obligations.

**SECTION 10.15** Severability.

In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby. The parties shall endeavour in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

**SECTION 10.16** Binding Effect.

This Agreement shall become effective when it shall have been executed by the Borrower and the Lenders and when the Administrative Agent shall have received copies hereof which, when taken together,

bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the Borrower and each Lender and their respective permitted successors and assigns.

**SECTION 10.17** Headings.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**SECTION 10.18** Treatment of Certain Information; Confidentiality.

Each of the Administrative Agent, the Lenders, and the Borrower agree to maintain the confidentiality of any confidential information disclosed or received by any of them in connection with this Agreement; *provided*, that, such confidential information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority or regulatory authority (including any self-regulatory authority), (c) to the extent required by applicable Requirements of Law or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 10.11, to any assignee of or participant in, or any prospective assignee of or participant in, a Lender's rights or obligations under this Agreement, (f) with the consent of the other party or (g) to the extent such information becomes publicly available other than as a result of a breach of this Section 10.11. Any person required to maintain the confidentiality of information as provided in this Section 10.11 shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such information as such person would accord to its own confidential information.

**SECTION 10.19** Interest Rate Limitation.

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loan, together with all fees, charges and other amounts which are treated as interest on the Loan under applicable Requirements of Law (collectively, the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lenders holding the Loan in accordance with applicable Requirements of Law, the rate of interest payable in respect of the Loan, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 10.12 shall be cumulated and the interest and Charges payable to the Lenders in respect of other Loan or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by the Lenders.

[Signature Pages Follow]



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

RYZE RENEWABLES NEVADA, LLC, as Borrower

By: ______________________________
Name: Matthew G. Pearson
Title: Manager

RYZE RENEWABLES HOLDINGS, LLC, as Guarantor (solely with respect to Section 10.07) and as Member of Ryze Renewables Nevada, LLC (solely with respect to Section 2.08)

By: ______________________________
Name: Matthew G. Pearson
Title: Manager

**MIRAE ASSET DAEWOO CO., LTD.**, as a Lender

By: ______________________________
Name: Kyung Hyun Lee
Title: Head of Multi Structured Finance Team

Schedule 1.01 Commitments

| Name of Lender | Commitment |
|---|---|
| Mirae Asset Daewoo Co., Ltd. | $210,000,000 |
| **Total** | **$210,000,000** |

# Schedule 3.01 Organizational Structure



Schedule 3.06 Equity Interests and Subsidiaries

| Ryze Renewables Nevada, LLC<br>Jurisdiction of Organization: Delaware | | | |
|---|---|---|---|
| Owner | Nature of Ownership | Percentage Ownership | Subsidiaries |
| Ryze Renewables Holdings, LLC | Common Ownership | 100% | Ryze Renewables II, LLC |
| | | | Ryze Renewables Las Vegas, LLC |
| | | | |

Schedule 3.07(b) Environmental Permits

| | Permit | Date of Issuance | Description |
|---|---|---|---|
| 1 | USDA Environmental Impact "Findings of No Significant Impact" Approval | | Environmental Impact per National Environmental Quality Regulations |
| 2 | Synthetic Minor Source (Air Quality) Permit | | Clark County Department of Air Quality Approval |
| 3 | Southern Nevada Health District ("SNHD") Permit to Operate a Solid Waste Management Facility | | Storage of Hazardous Materials |
| 4 | Stormwater Industrial (Multi-Sector) Permit | | Storm Water Pollution Prevention Plan |
| 5 | USDOT Hazardous Materials Certificate of Registration No. 071420550096C | | Per U.S. Department of Transportation regulations, the Project (HM Company ID: 149489) holds its Certificate of Registration |
| 6 | Dust Control Operating Permit for Construction Activities | | |

Schedule 3.08 Litigation

None

Schedule 3.11 Permits

| | Permit | Date of Issuance | Description |
|---|---|---|---|
| 1 | Zoning | | M2, General Industrial |
| 2 | Land Use | | Heavy Industrial |
| 3 | Special Use Permit | | Storage of Hazardous Materials |
| 4 | Special Use Permit | | Expanded Hazardous Materials Storage |
| 5 | Annex 117 | | Property was annexed into the C of NLV from Clark County |
| 6 | Nevada State Business License | | Ryze is a properly registered entity, is current with its filings, and exhibits certain information per the Nevada Secretary of State website |
| 7 | City of North Las Vegas Business Licenses | | Junkyard License |
| 8 | Special Use Permit | | Gross Sales – Miscellaneous Sale/Service License |
| 9 | Department of Agriculture Consumer Equitability – Weights and Measures | | Per Nevada statute, Ryze pays an annual licensing fee to maintain its on-site commercial truck weighing and measuring devices |
| 10 | Nevada Department of Motor Vehicles Fuel Supplier License | | Allows Ryze to manufacture and resell its Renewable Diesel fuel within the State of Nevada |
| 11 | Fire Protection Review Approval | | |
| 12 | Onsite Grading Construction Permit | | Allows for on-site grading to commence |
| 13 | Onsite Civil Permit | | This permit allowed for onsite sewer, water, fire lines and storm drain construction to begin. |
| 14 | Electrical Permit | | For the demolition of the existing transformer and installation of new wiring and a new transformer |
| 15 | Building Permit | | This permit allowed for constructing exterior foundations for the Project's future manufacturing equipment. |

| | | | |
|---|---|---|---|
| 16 | Stormwater Construction General Permit | | Per Nevada Division of Environmental Protection-Bureau of Water Pollution Control, while under construction an annual permit is required to be in place. |
| 17 | FAA Determination of No Hazard to Air Navigation (and Extension) | | Due to the Project Property's location adjacent to Nellis Air Force Base, applications were made to the FAA to approve Project development heights, both temporary (crane usage) and permanent (equipment structures). |
| 18 | City of North Las Vegas Utility Easement | | C of NLV requirement prior to issuing construction permits executed by Ryze |
| 19 | City of North Las Vegas Drainage Easement | | C of NLV requirement prior to issuing construction permits executed by Ryze on July 1, 2019 |
| 20 | Nevada Energy Temporary Construction Easement | | Nevada Energy requirement prior to beginning temporary power construction executed by Ryze |
| 21 | State of Nevada Sales Tax Permit | | This account is also utilized to receive Sales and Use Tax Abatements on its purchases of eligible manufacturing equipment, as granted by the State of Nevada Governor's Office of Economic Development |
| 22 | Registration Under Code of Federal Regulations ("CFR") Title 40-Chapter I-Subchapter C-Part 79 | | Ryze has completed its part 79 company and facility registration for a Renewable Identification Number ("RIN") |

Schedule 3.14 Insurance

| Permit | Description | | Status |
|---|---|---|---|
| Builders Risk & Business Interruption | Loss or damage to the existing property and the property under construction – fire, lightning, collapse, collision, windstorm, flood, earthquake, etc. | Starr Surplus Lines Insurance Company<br><br>#SLSTCON11451118 | Active |
| Contingent Delay in Completion | Loss of income or incurring additional expenses that result from a delay in the completion of a construction project beyond the expected completion date as a result of covered property damage at a supplier's/ fabricator's location | Starr Surplus Lines Insurance Company<br><br>#SLSTCON11451118 | Active |
| Delay in Completion - Biz Income | Loss of income or incurring additional expenses that result from a delay in the completion of a construction project beyond the expected completion date as a result of covered property damage – impaired P&L and Cash Flow from a covered property loss. | Starr Surplus Lines Insurance Company<br><br>#SLSTCON11451118 | Active |
| Contingent Delay in Completion | Loss of income or incurring additional expenses that result from a delay in the completion of a construction project beyond the expected completion date as a result of covered property damage at a supplier's/ fabricator's location | Starr Surplus Lines Insurance Company<br><br>#SLSTCON11451118 | Active |
| General Liability | Liability claims for bodily injury & property damage arising out of premises, operations, products, and completed operations –exposures outside construction operations – claim goes thru the EPC's limits. | Westchester Surplus Lines, Inc.<br><br>#G71172818001 | Active |
| Excess Liability | Catastrophic bodily injury/property damage liability losses related to the construction operations to which all of Ryze Las Vegas' assets are at risk - Ryze to have $140M at closing and $128M at Year 1 in total assets at risk. | Liberty Insurance Underwriters<br><br>#100028938601 | Active |
| Pollution Liability | Real estate has ultimate responsibility for environmental issues – for clean-up, bodily injury/property damage on-site or off-site. | Illinois Union Insurance Company<br><br>#PPLG7117296A002 | Active |

| | | | |
|---|---|---|---|
| Office Property - General Liability | Liability claims for bodily injury & property damage arising out of premises, operations, products, and completed operations –exposures outside construction operations – claim goes thru the EPC's limits | Ohio Security Insurance Company<br><br>BZS (22) 60128411 | Active |
| Workers Comp & Employers' Liability | Project policies exclude liability claims related to office exposures, auto operations (hired & non-owned) and employees of owner – this is vehicle to address these exposures | Provided by PEO | Active |

Schedule 3.15 Material Contracts

1. Loan Agreement, among Georgia's Own Credit Union, Ryze Renewables Las Vegas, LLC and Ryze Renewables II, LLC, dated June 25, 2018 (the "**Loan Agreement**")

2. Construction Financing Rider, among Georgia's Own Credit Union, Ryze Renewables Las Vegas, and MMC, Inc., dated as of June 25, 2018

3. Loan Note Guarantees executed by the United States Department of Agriculture in favor of Georgia's Own Credit Union, dated as of June 25, 2018

4. Note 1A, Note 1B, Note 2A and Note 2B, each by Ryze Renewables Las Vegas, LLC and Ryze Renewables II, LLC in favor of Georgia's Own Credit Union, as described in the Loan Agreement dated as of June 25, 2018

5. Engineering, Procurement and Construction Services Contract, by and between Ryze Renewables Las Vegas, LLC and MMC, Inc. dated as of January 23, 2018

6. Management Services Agreement, to be entered into by and between Ryze Renewables Holdings, LLC and Ryze Renewables Nevada, LLC

7. Operation and Maintenance Agreement, entered into by and between Plant Process Operating, LLC and Ryze Renewables Las Vegas, LLC dated as of September 11, 2020

8. Supply and Offtake Agreement, by and between Ryze Renewables Las Vegas, LLC and Phillips 66 Company, dated as of June 15, 2017, as modified

9. Promissory Note by Ryze Renewables Las Vegas in favor of NC Industries, LLC in the original principal amount of $26,581,741.00, dated March 12, 2018, as amended and including any demand for payment

10. Secured Promissory Note by The Ryze Corporation in favor of The Olds Family Trust 2002 Trust u/d/t June 3, 2002 in the original principal amount of $2,000,000 dated July 11, 2018 and including any demand for payment

11. Secured Promissory Note by The Ryze Corporation in favor of The Olds Family Trust 2002 Trust u/d/t June 3, 2002 in the original principal amount of $4,300,000 dated July 11, 2018 and including any demand for payment

12. Title Commitment Report by Fidelity National Title Insurance Company (order number 42045119-420-MS6-BB1, effective date 8/4/2020) in respect of the real property commonly known as 5225 and 5233 East El Campo Grande Avenue, Las Vegas, Clark County, Nevada

13. Amended and Restated Operating Agreement of Ryze Renewables II, LLC

14. Amended and Restated Operating Agreement of Ryze Renewables Las Vegas, LLC

15. Amended and Restated Operating Agreement of Ryze Renewables Nevada, LLC

16. Tax Abatement Agreement by and between the State of Nevada Acting by and through the Nevada Governor's Office of Economic Development and Ryze Renewables Las Vegas, LLC dated June 30, 2018, as amended

17. License Agreement by and between Ryze Renewables Las Vegas, LLC and Haldor Topsoe A/S dated October 4, 2019

18. Standard Form of Agreement Between Owner and Contractor where the basis of payment is the Cost of Work Plus at a Firm Fixed Price Engineering Procurement and Construction between Sys-Con, LLC and Ryze Renewables Las Vegas, LLC

19. General Conditions of the Contract for Construction for the Ryze Renewables Pre-Treatment Facility between Sys-Con, LLC and Ryze Renewables Las Vegas, LLC

20. Engineering Agreement between Haldor Topsoe, Inc. and Ryze Renewables Las Vegas, LLC dated as of October 4, 2019

21. Guarantee Agreement between Haldor Topsoe A/S and Ryze Renewables Las Vegas, LLC dated as of October 4, 2019

22. Intellectual Property License Agreement between Ryze Renewables Holdings, LLC and Ryze Renewables Las Vegas LLC dated October 29, 2020

23. A demand for payment in respect of the Preferred Member of Ryze Renewables Holdings, LLC in the amount of $1,360,092.70

24. Ryze Renewables Las Vegas, LLC Warrant issued to New-Com, Inc. for 2.5% of the aggregate amount of shares of Ryze Renewables Las Vegas, LLC dated February 20, 2018



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

Schedule 4.02A – Conditions to Funding Date
(Items to be Completed prior to the Funding Date)

| | Deliverable | Status |
|---|---|---|
| 1 | The Account Control Agreement shall have been executed and delivered by the Borrower, the Administrative Agent and JPMorgan Chase Bank, N.A. on or prior to the Funding Date. | Form agreed; to be delivered by the Borrower prior to the Funding Date |
| 2 | The Security Agreement shall have been executed and delivered by the Borrower, Holdings and the Administrative Agent on or prior to the Funding Date. | Form agreed; to be delivered by the Borrower prior to the Funding Date |
| 3 | All authorizations, approvals, consents, waivers, filings, notices, certifications or other actions of any person or of any Governmental Authority required for the due execution and delivery by the Borrower of the Loan Documents required to be executed on the Funding Date have been obtained. | To be provided, if any. |
| 4 | Each Account described in Section 7.01 of the Agreement shall have been created pursuant to the terms thereof on or prior to the Funding Date and, substantially concurrently with the funding of the Loan on the Funding Date (from proceeds thereof) an amount not less than (i) $3,863,578.10 shall have been deposited in the Debt Service Reserve Fund, (ii) $15,305,520 shall have been deposited in the Funding Date Interest Reserve Account, (iii) $14,250,000 shall have been deposited in the EPC Retention Account and (iv) $15,445,038.69 shall have been deposited in the Working Capital Reserve Account. | All Accounts have already been created; such Accounts to be funded on the Funding Date from the proceeds of the Loan |
| 5 | The EPC Contract shall remain in full force and effect as of the Funding Date and any amendment or modification to the EPC Contract after the Effective Date but prior to the Funding Date shall have been consented to by the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed). | Agreed. |
| 6 | The Change Order EPC Contract shall remain in full force and effect as of the Funding Date and any amendment or modification to the Change Order EPC Contract after the Effective Date but prior to the Funding Date shall | Agreed. |

| | | |
|---|---|---|
| | have been consented to by the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed). | |
| 7 | All insurance maintained by, or which it is an insured under, the Borrower that is described on Schedule 3.14 to the Agreement (which, for the avoidance of doubt, includes customary course of construction insurance that will continue until construction of the Project has been completed at which time it will automatically convert at such time into a customary operating stage policy, including business interruption insurance) shall remain in full force and effect as of the Funding Date, without any modifications thereto. | Agreed. |
| 8 | A representative of Mirae shall have performed at least one (1) Project site visit subsequent to the Effective Date. If such site visit is not performed by January 31, 2021, such visit shall be performed via videoconferencing or other electronic means. | Site visit scheduled for January 2021 |
| 9 | The Administrative Agent shall have received an updated financial model from the Borrower on or prior to the Funding Date. | To be delivered by the Borrower prior to the Funding Date |
| 10 | The Administrative Agent shall have received unaudited financial statements of the Borrower and the Project Company for the fiscal month ended October 30, 2020 and the period of ten (10) months then ended on or prior to the Funding Date. | To be delivered by the Borrower prior to the Funding Date |
| 11 | The Administrative Agent shall have received (i) all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, and (ii) to the extent the Borrower qualifies as a "legal entity customer" under 31 C.F.R. § 1010.230, a customary FinCEN beneficial ownership certification in relation to the Borrower, in each case requested at least ten (10) Business Days prior to the Funding Date. | To be ordered no later than ten (10) Business Days prior to the Funding Date and delivered no later than one (3) Business Day prior to the Funding Date |
| 12 | The Borrower shall deliver to the Administrative Agent an Approved Budget of the Borrower, Project Company Holdco, and the Project Company for the year ended December 31, 2021 | To be delivered by the Borrower |

| | | |
|---|---|---|
| 13 | The Borrower shall deliver to the Administrative Agent an amendment to the Offtake Agreement evidencing the Commercial Date Deadline (as defined therein) has been extended to be equal to or beyond the date of the deadline set forth in Section 8.01(j). | To be delivered by the Borrower |
| 14 | The Administrative Agent shall have received payoff letters from Olds Family Trust in respect of the Secured Promissory Notes dated July 11, 2018 | Borrower has submitted to the virtual data room |
| 15 | The Final Mirae Committee Approval shall have been obtained. | |



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Schedule 4.02B – Conditions to Funding Date
(Items to be Completed on the Funding Date)

| | Deliverable | Status |
|---|---|---|
| 1 | All filings, registrations, recordings and other actions required to be taken by the Borrower as of the Funding Date (including filing UCC-1 financing statements), and all filing and other similar fees and all recording, stamp and Other Taxes and expenses related to such filings, registrations and recordings required to be paid, for the consummation of the transactions contemplated by the Loan Documents (or arrangements satisfactory to the Administrative Agent make any such filings, registrations, recordings or other actions or to make any such payment on or immediately following the Funding Date) shall have been taken and paid, respectively (to the extent that the obligation to make payment then exists), by the Borrower. | UCC-1 financing statements to be filed on the Funding Date |
| 2 | The Administrative Agent shall have received: a certificate of the secretary of each of Holdings and the Borrower dated the Funding Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of Holdings or the Borrower, as applicable, and with respect to the certificate of formation, certified as of a recent date by the relevant Governmental Authority, (B) that attached thereto is a true and complete copy of written consent of the Governing Board of Holdings or the Borrower, as applicable, authorizing the execution, delivery and performance by Holdings or the Borrower, as applicable, of the Loan Documents and, in the case of the Borrower, the borrowing of the Loan under the Agreement, and the granting of liens by Holdings or the Borrower, as applicable, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) as to the incumbency and specimen signature of each officer or manager executing any Loan Document or any other document delivered in connection herewith on behalf of Holdings or the Borrower, as applicable (together with a certification of a manager as to the incumbency and specimen signature of the secretary executing the certificate in this item 5) and (D) a certificate as to the good standing of Holdings or the Borrower, as applicable, in its state of organization as of a recent date, from the relevant Governmental Authority. | To be delivered by the Borrower on the Funding Date |
| 3 | The Administrative Agent shall have received a certificate, dated the Funding Date and signed by a manager of the Borrower, confirming that (i) immediately prior to and immediately after giving effect to the borrowing of the Loan and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing on such date and (ii) each of the representations and warranties made by the Borrower set forth in Article III of the Agreement or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the Funding Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date). | To be delivered by the Borrower on the Funding Date |



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 

| | | |
|---|---|---|
| 4 | The Administrative Agent shall have received a Borrowing Request as required by Section 2.02 of the Agreement on or prior to the Funding Date in the form of Exhibit A to the Agreement. | To be delivered by the Borrower on the Funding Date |
| 5 | The Administrative Agent shall have received a legal opinion (addressed to the Administrative Agent and each of the Lenders) of Latham & Watkins LLP, as special counsel to the Borrower dated as of the Funding Date. | To be delivered by the Borrower on the Funding Date |
| 6 | Mirae and the Lenders shall have received all fees payable to this Agreement and separate written agreement between the Borrower and Mirae as of the Funding Date (which fees shall be netted from the proceeds of the Loan made to the Borrower on the Funding Date). | Such amounts to be funded on the Funding Date from the proceeds of the Loan |
| 7 | The Administrative Agent shall have received a fully executed and effective copy of the Borrower Operating Agreement as of the Funding Date in the form of Exhibit E to the Agreement. | To be delivered by the Borrower on the Funding Date |
| 8 | The Administrative Agent shall have received satisfactory results of lien, tax and litigation searches with respect to Holdings, the Borrower, the Project Company Holdco and the Project Company on or prior to the Funding Date. | To be delivered by the Borrower on the Funding Date |

Exhibit A

## [FORM OF] BORROWING REQUEST

Date: [____], 2021

To: [________], organized under the Laws of [_______], as Administrative Agent

Ladies and Gentlemen:

1. Reference is made to that certain Convertible Loan Agreement dated as of January 6, 2021 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"; terms defined therein, unless otherwise defined herein, being used herein as therein defined), among Ryze Renewables Nevada, LLC, as borrower ("**Borrower**"), the several banks and other financial institution or entities from time to time parties thereto as lenders, [_______], organized under the Laws of [_______], as the Administrative Agent, and Ryze Renewables Holdings, LLC, a Delaware limited liability company, solely for the limited purposes set forth in Sections 2.08 and 9.07 thereof.

2. The undersigned hereby requests a borrowing of Loans under the Loan Agreement ("**Borrowing**") and in connection therewith specifies the following information in accordance with Section 2.02 of the Loan Agreement:

   (a) The aggregate amount of the Borrowing: $210,000,000

   (b) The date of the Borrowing: [____], 2021

   (c) The proceeds of the Borrowing shall be used for the uses specified in the Sources and Uses and disbursed as set forth in the loan disbursement instructions attached as Exhibit A hereto.

3. In connection with the Borrowing requested herein, Borrower hereby represents and warrants to the Lender that the conditions set forth in Section 4.02 of the Loan Agreement have been satisfied as of the date of this Borrowing Request.

[Signature Page Follows]

Very truly yours,

RYZE RENEWABLES NEVADA, LLC

By: ______________________________
Name:
Title:

Exhibit A to
Borrowing Request

# BORROWER PAYMENT INSTRUCTIONS

**RYZE RENEWABLES NEVADA, LLC**
**WIRE TRANSFER INSTRUCTIONS**

**Bank:** [BANK NAME]
[BANK ADDRESS]
Contact: [______]
Telephone Number: [______]

**Routing:** [______]

**For Credit to:** Ryze Renewables Nevada, LLC
6600 Amelia Earhart Court, Suite A
Las Vegas, Nevada 89119

**Account #:** [______]

Exhibit B

**[FORM OF] CONVERTIBLE NOTE**

$[______] [______], 20[__]

THIS CONVERTIBLE NOTE (THIS "**NOTE**") AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

THIS NOTE HAS BEEN ISSUED WITH "ORIGINAL ISSUE DISCOUNT" (WITHIN THE MEANING OF SECTION 1273 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED). UPON WRITTEN REQUEST, THE BORROWER WILL PROMPTLY MAKE AVAILABLE TO ANY HOLDER OF THIS NOTE THE FOLLOWING INFORMATION: (1) THE ISSUE PRICE AND ISSUE DATE OF THE NOTE, (2) THE AMOUNT OF ORIGINAL ISSUE DISCOUNT ON THE NOTE AND (3) THE YIELD TO MATURITY OF THE NOTE. HOLDERS OF THIS NOTE SHOULD CONTACT RZYE RENEWABLES NEVADA, LLC AT 6600 AMELIA EARHART COURT, SUITE A LAS VEGAS, NV 89119.

FOR VALUE RECEIVED, the undersigned, RZYE RENEWABLES NEVADA, LLC (the "**Borrower**"), hereby promises to pay to [_____] or its registered assigns (the "**Lender**") the principal amount of [______] DOLLARS ($[______]) or, if less, the aggregate unpaid principal amount of all Loans of the Lender outstanding from time to time in accordance with the provisions of the Convertible Loan Agreement, dated as of January 6, 2021, among the Borrower, the Lender, the other banks and other financial institution or entities from time to time parties thereto as lenders, [_______], organized under the Laws of [_______], as the Administrative Agent, and Ryze Renewables Holdings, LLC, a Delaware limited liability company solely for the limited purposes set forth in Sections 2.08 and 9.07 thereof (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "**Loan Agreement**"), which sum shall be due and payable in such amounts and on such dates as are set forth in the Loan Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Loan Agreement.

The Borrower promises to pay interest on the unpaid principal amount hereof, from the date hereof until paid in full, at the interest rates and at the times provided in the Loan Agreement, or the Loan is converted as provided in the Loan Agreement. The principal and accrued interest under this Note may be prepaid in accordance with Section 2.06 of the Loan Agreement and, for the avoidance of doubt, interest will cease to accrue on any prepaid principal amounts from and after the date of any such prepayment. All payments of principal and interest shall be made to the

Lender in Dollars in immediately available funds (other than as set forth in Section 2.04(c) of the Loan Agreement).

This Note and any amounts due hereunder shall be convertible into Conversion Shares in accordance with, and subject to the terms and conditions of, Section 2.08 of the Loan Agreement.

This Note is one of the Notes referred to in the Loan Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. This Note is secured by the Collateral. Upon the occurrence and continuation of any Event of Default under the Loan Agreement, all principal and all accrued interest then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided in the Loan Agreement.

The Loan made by the Lender shall be evidenced by one or more records or accounts maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Loan and all payments made on the Loan; *provided* that any failure of the Lender to make any such recordation (or any error in such recordation) or endorsement shall not affect the obligations of the Borrower under this Note or the Loan Agreement.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive diligence, presentment, demand, protest, notice of intent to accelerate, notice of acceleration, and any other notice of any kind. No failure on the part of the holder hereof to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof or a consent thereto; nor shall a single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

THIS NOTE AND THE OBLIGATIONS OF THE BORROWER HEREUNDER SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

This Note applies to, inures to the benefit of and binds the successors and assigns of the parties hereto. Notwithstanding the foregoing, any transfer of this Note may be effected only in accordance with the Loan Agreement. This Note may be transferred only upon its surrender to the Borrower for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Borrower. Thereupon, a new Note (or new Notes) for the same aggregate principal amount and interest shall be issued to, and registered in the name of, the transferee(s). Interest and principal are payable only to the registered holder of this Note. The Lender and any subsequent holder of this Note receive this Note subject to the foregoing terms and conditions, as well as all other terms and conditions contained in this Note and in the Loan Agreement, and each agrees to comply with all such terms and conditions.

[*Signature page to follow*]

IN WITNESS WHEREOF, the undersigned has caused this Note to be duly executed by its authorized officer as of the day and year first above written.

**RYZE RENEWABLES NEVADA, LLC**

By:____________________
Name:
Title:

Exhibit C

Security Agreement

[See attached]

## Exhibit D

Sources and Uses

| | | |
|---|---|---|
| Change Order EPC Contract - Progress Payments | $ | 80,750,000.00 |
| EPC Retention Account | $ | 14,250,000.00 |
| **Total Change Order EPC Budget** | **$** | **95,000,000.00** |
| | | |
| Project Company Working Capital | $ | 6,000,000.00 |
| Borrower Operating Capital | $ | 6,500,000.00 |
| Project Contingency | | $2,945,038.69 |
| **Total Operating Capital** | **$** | **15,445,038.69** |
| | | |
| NC industries, Inc. Note Payoff | $ | 26,435,048.00 |
| Olds Family Trust Note Payoff | $ | 8,202,542.25 |
| RQMNK, LLC Note Payoff | $ | 1,381,183.45 |
| **Total Private Note Repayments** | **$** | **36,018,773.70** |
| | | |
| Debt Service Reserve Account | $ | 3,863,578.10 |
| Funding Date Interest Reserve Account | $ | 15,305,520.00 |
| Replenish Project Company DSRA | $ | 10,214,744.76 |
| Project Company Debt Service Account | $ | 17,382,344.76 |
| **Total Reserves** | **$** | **46,766,187.61** |
| | | |
| Borrower Closing Costs Reimbursement | $ | 1,470,000.00 |
| Lender Closing Costs Reimbursement | $ | 600,000.00 |
| Facility Fee | $ | 4,200,000.00 |
| Lender Fee | $ | 4,200,000.00 |
| Paragon Placement Fee | $ | 6,300,000.00 |
| **Total Closing Costs** | **$** | **16,770,000.00** |
| | | |
| **Total Uses of Funds** | **$** | **210,000,000.00** |

Blackline_CLA_Mirae_01272021

Exhibit E

Form of Borrower Operating Agreement

[See attached]

Exhibit F-1

Form of Tax Compliance Certificate

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Convertible Loan Agreement, dated as of January __, 2021 (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "Borrower"), Ryze Renewables Holdings, LLC, a Delaware limited liability company solely for the limited purposes set forth in Sections 2.08 and 9.07 thereof, [_______], organized under the Laws of [_______], as the administrative agent (together with its successors and assigns in such capacity, the "Administrative Agent"), and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.09 of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF LENDER]

By:________________________________
Name:
Title:

Date: ________ __, 20[ ]

Blackline_CLA_Mirae_01272021

Exhibit F-2

Form of Tax Compliance Certificate

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Convertible Loan Agreement, dated as of January __, 2021 (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "Borrower"), Ryze Renewables Holdings, LLC, a Delaware limited liability company solely for the limited purposes set forth in Sections 2.08 and 9.07 thereof, [_______], organized under the Laws of [_______], as the administrative agent (together with its successors and assigns in such capacity, the "Administrative Agent"), and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.09 of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF PARTICIPANT]

By:______________________________
Name:
Title:

Date: ________ __, 20[ ]

Exhibit F-3

Form of Tax Compliance Certificate

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Convertible Loan Agreement, dated as of January __ 2021 (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "Borrower"), Ryze Renewables Holdings, LLC, a Delaware limited liability company solely for the limited purposes set forth in Sections 2.08 and 9.07 thereof, [_______], organized under the Laws of [_______[, as the administrative agent (together with its successors and assigns in such capacity, the "Administrative Agent"), and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.09 of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF PARTICIPANT]

By:________________________________
Name:
Title:

Date: ________ __, 20[ ]

Blackline_CLA_Mirae_01272021

Exhibit F-4

Form of Tax Compliance Certificate

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Convertible Loan Agreement, dated as of January __, 2021 (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement"), among Ryze Renewables Nevada, LLC, a Delaware limited liability company (the "Borrower"), Ryze Renewables Holdings, LLC, a Delaware limited liability company solely for the limited purposes set forth in Sections 2.08 and 9.07 thereof, [_______], organized under the Laws of [_______], as the administrative agent (together with its successors and assigns in such capacity, the "Administrative Agent"), and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.09 of the Loan Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Loan Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Loan Agreement and used herein shall have the meanings given to them in the Loan Agreement.

[NAME OF LENDER]

By:______________________________
Name:
Title:

Date: __________, 20[ ]

Blackline_CLA_Mirae_01272021

Exhibit G – Form of Account Control Agreement

Exhibit H – Form of Prepayment Notice