# EXHIBIT S114

*Excerpts of the Deposition of Steven T. Graham*
*(Sept. 30, 2025)*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| MIRAE ASSET SECURITIES CO., LTD., a Republic of Korea company,<br><br>Plaintiff,<br><br>RYZE RENEWABLES HOLDINGS, LLC, a Nevada limited liability company, and RYZE RENEWABLES NEVADA, LLC, a Nevada limited liability company,<br><br>Defendants.<br><br>RYZE RENEWABLES HOLDINGS, LLC, a Delaware limited liability company, registered in Nevada, and RYZE RENEWABLES NEVADA, LLC, a Delaware limited liability company,<br><br>Counter-Claimants,<br><br>vs.<br><br>MIRAE ASSET SECURITIES CO., LTD., a Republic of Korea company,<br><br>Counter-Defendant. | Case No.: C:23-cv-01492-APG-NJK |

VIDEOTAPED DEPOSITION OF STEVEN T. GRAHAM

September 30, 2025
Phoenix, Arizona

Reported by: Cathy A. Miccolis, RPR/CRR
Certified Reporter, No. 50068
Job No. 10171943

in that space. And so I just did a lot of that work.

And over the course of my commercial litigation, I have had a -- not a high percentage, but a fair amount of experience in dealing with clients that are outside the jurisdiction of the United States with their primary business and representing them. And I have had a much more limited litigation with those foreign clients that were not my client that were adverse to my clients from other countries.

BY MR. PRINCE:

**Q. Do you have experience specifically representing Korean clients?**

A. I have had, yes.

**Q. Can you tell me about those?**

A. Without identifying the name, I have represented clients that are in South Korea that manufacture products that are delivered into the United States that have resulted in claims being made against that client, and so through that representation I have represented Korean-based clients. When I say Korean, it's always South Korea, obviously.

**Q. Understood. In June of 2021, Paragon and Jeff Hall were clients of your law firm; is that correct?**

A. I can't remember if it was Paragon also, but I mean, Jeff Hall was a client of the firm as of June of

**in order to receive the retainer payment?**

MS. ABDO: Form.

THE WITNESS: I wouldn't say an excessive amount, but it required follow-up.

BY MR. PRINCE:

**Q. Several repeated attempts for the retainer payment to be made; is that correct?**

MS. ABDO: Form, foundation.

THE WITNESS: I would say the documents, they speak for themselves, and I do recall having to follow up to get the retainer paid.

BY MR. PRINCE:

**Q. Were you concerned at some point that the retainer payment would not be made?**

A. That was not my concern, no.

**Q. When you finally received the retainer payment who made it?**

MS. ABDO: Form, foundation.

THE WITNESS: I believe it was made by Mirae.

BY MR. PRINCE:

**Q. What's your basis for that understanding?**

A. Because I entered into a contract on behalf of the firm for Mirae to advance $50,000 to cover a retainer, and $50,000 was received.

**Q. I'm going to introduce Exhibit 7 bearing the**

**that you had incurred presumably on behalf of Mirae Asset?**

MS. ABDO: Form and foundation.

THE WITNESS: What -- you say -- I agree with that, except presumably on behalf of Mirae Asset. Everything we did was on behalf of Mirae Asset. So I don't agree with the notion that that was presumably done. We worked for Mirae Asset and did work for Mirae Asset and applied money received to help pay for the fees incurred on behalf of Mirae Asset.

BY MR. PRINCE:

**Q. I understand your position on that. I don't know that we need to get into that deep dive now, but I do want to confirm that this $50,000 payment from Mr. Yutronich was applied to the billings that you had incurred in connection with what you believed to be your representation of Mirae Asset; is that fair?**

MS. ABDO: Form and foundation.

THE WITNESS: You've done it again. I don't agree that this is a payment from Jared Yutronich. I believe it was, from what I have seen, a payment made on behalf of Mirae for the benefit of paying down a Mirae bill. Whether that was authorized by him or otherwise, I don't know. So I will not accept your characterization of it based upon a narrative by the administrative person.

BY MR. PRINCE:

**allocation of credit slash compensation and more about this litigation; right? That's what -- I'm trying to understand the latter, not the prior. Does that make sense?**

A. I -- I -- I don't know. If you have a question to ask me to follow up, that would help me.

**Q. Would it have been unusual, assuming that the payment associated with Mr. Jared Yutronich had actually come from Mr. Yutronich, would that have been unusual to you?**

MS. ABDO: Form and foundation.

THE WITNESS: Just calls for speculation, but the answer is payments that come in on behalf of a client, it's just not that unusual. I mean, it's just -- you know, from a company, a CPA, a broker, there's different arrangements.

And so what is clear is that there is one client, and that is Mirae. And it is Mirae that has the obligation to make that payment occur. And if Mirae chooses to do it in a certain way to accommodate a situation, that's a decision that Mirae makes. But I never -- I never had another client besides Mirae with the primary representative Director Lee. That never changed. So no, I don't find it to be that unusual.

BY MR. PRINCE:

A. In my impression, documents that would bind Mirae were to be signed by Director Lee.

**Q. What did you do to independently confirm whether or not Mr. Lee had the capacity to sign documents to bind Mirae Asset?**

MS. ABDO: Form.

THE WITNESS: I'm not sure if you asked something like that before, but it's a series of, I'll call it, information points, discussions. I thought I went through that, but I can do it again kind of in generalities.

In reviewing -- when I was first introduced to the project, I was introduced to it by Jeff Hall. I spoke to Han, both of whom described the role that had been demonstrated by Director Lee in the earlier CLA. So I relied upon the fact that I was having the two individuals introducing me to the situation describing that.

I then saw that BRG was one of the entities that had been involved in working with Director Lee in his capacity as, you know, the senior person on this, on this matter for Mirae.

I then -- in the engagement letter that I had, I wanted to make sure that the entity that signed -- the entity that bound itself to the original CLA was the same entity that was listed in the engagement letter that was

the same entity that would be named as the party plaintiff in the complaint.

And so in going through that exercise, which occurred over a period of time, I also noted at the time that the signature appeared to be the same, but my goal was to make sure I named the right entity in the complaint. And I do the best of my ability to get the right entity or the one close to it in the engagement letter.

That in combination -- before getting the actual file itself in looking at that file, I saw nothing that would cause me to even question the authority of Director Lee to sign and bind on behalf of Mirae. And I never saw one communication that was inconsistent with that, one email that was inconsistent with that. And then the fact they'd actually signed it and everyone acted upon it.

It was at a time that Mirae was represented by Kutak Rock. It was at a time that Ryze was represented by Latham and Watkins. So it made an impression upon me, I have got some good counsel out there, and they have been involved in this transaction. And I also recognized that Matt Pearson and Michael Brown have dealt with these people for what I understood to be a year.

So again, I had no concern about the authority

issue. And as we went through, I confirmed it. I confirmed the attorney-client relationship was my goal in the second engagement letter, but I also made sure it was in writing what I had been told by the parties. And in earlier communications -- I don't recall the dates -- I specifically focused upon making sure who is within the attorney-client privilege, which does not include Jeff Hall, but it includes Han as the one who was the communicator.

And so I -- no matter what I looked at along the way, it never caused me to even think about the issue of authority. As I'm thinking even toward the end there, I think there was maybe an audit request from the source of the request. It was a request that there be an authorization, some kind of certificate prepared for this next iteration of the deal. And in that certification, that appeared to me and as reported by Victor Roehm and those that relied upon it, as being satisfactory.

So I have got Lisa Fuller who in that instance was seeking to say, you know, "We want to make sure this person has authority. Show us that thing." And that was requested. It was obtained and given to Lisa Fuller and seemed to satisfy her because I never heard any objection to it afterwards.

So everything that I saw in this from the

original CLA, I saw it after the CLA what was not performed. I think it was like in or about, you know, May, May -- May of 2020 -- May of 2021.

And then I saw ongoing email exchanges with Matt Pearson with Director Lee talking to themselves, continuing on with what I -- what I read -- read that as only being these are the two primary decision-makers. And so all those emails were consistent. I saw Jeff Hall and Han treating them as the ones that need to be persuaded. I heard Michael Brown in emails described as, "Hey, I'm here to make things happen, but I have got to get Matt to agree to this."

So I just -- I have been through this file again, not even looking at the issue before. I can't find anything that would suggest anything other than we had been given the authority, that Mirae had given the authority to Director Lee.

And like Todd Bice, he had the authority to terminate this thing. I'm not sure it was a termination, but he had the authority to bind, the authority to terminate, and I believed continued to have the authority to do all the things that he did.

And during the course of exercising that authority there were additional emails that included other people at MiraeAsset.com. And so to me it would have been

the most masterful, as I look back on it here, of saying he doesn't have authority, yet you're including people that have a MiraeAsset.com email address? That made no sense to me.

So there is nothing in this that I have yet seen. I'm waiting for people to show me something, but I'm -- frankly I'm more than satisfied that he had the authority. We confirmed the authority. We acted as if he had the authority. Matt Pearson acted as if he had the authority. Latham and Watkins, Kutak Rock and us. And so --

BY MR. PRINCE:

**Q. What other email addresses for Mirae Asset did you see on communications?**

A. I saw in some of the communications midway -- midway through the negotiations during the season of the binding term sheet there was another gentleman whose last name was Lee -- I'm sorry, Kim, Kim, and then there was one Sooji, I believe. But there were just -- that's upon going back through the file as part of my depo prep here.

**Q. Sure. At the time as in 2021, what other Mirae Asset email addresses did you see in correspondence?**

A. Those are the only ones that I recall was those two in addition to Director Lee. You mentioned in addition that offering memorandum. There has been a lot

of offering memorandums, head of terms as they called them going back and forth. But I -- when you mention that person's name, I know I recognize him. My original due diligence, there was an individual that signed one of the initial term sheets or offering memorandum, and that was not Director Lee.

**Q. Correct.**

A. Yet the person who was authorized to sign on behalf of the entity when it came to the final definitive document was Director Lee. So that communicates to me a decision made by Mirae as to who has authority to do that.

**Q. What was that communication?**

A. What's that?

**Q. What communication was that?**

A. What was communicated to me, as I said, was saying that Director Lee has every indicia of authority by Mirae to do the things that he did to expend funds, to do all those things were consistent to what I have described as him having authority.

**Q. Did you endeavor to find out who -- you mentioned Kim and Sooji. Did you endeavor to find out who they were?**

A. I don't even remember -- the answer is no, I have not done so.

**Q. With respect to the offering memorandum that we**

from Director Lee being sent at 13:52 and the earlier one is 1:58.

BY MR. OWENS:

**Q. And if you take a look at Exhibit 18.1, and do you understand Exhibit 18.1 to be the attachment bearing the file name "Revise Letter of Notice - Project Ryze (Mirae) signed.PDF" that's referenced in the attachment line on Exhibit 18?**

MR. PRINCE: Form, foundation.

MS. ABDO: Join.

THE WITNESS: Based upon correctly pointing out that it says "Revise" in there, I really have nothing to add about what exactly was attached given that those could be a number of different documents. So I mean, to be honest with you, while I was trying to be helpful in suggesting this is something I presume I received, I don't know that because of the lack of sequencing of Snell & Wilmer, which may be explained for other reasons, but this is something that Victor Roehm would be able to answer and, frankly, I don't -- yeah...

BY MR. OWENS:

**Q. I'll direct your attention to the second to last paragraph in 18.1, the one that begins "We are writing this letter." Let me know when you see that.**

A. I see that.

**Q. And I'll read the paragraph for you in full. "We are writing this letter to certify that Kyunghyun Lee, as a Director Lee of Mirae Asset Securities Company, Limited, is authorized BRG Asset Management to negotiate and execute the commencement of transaction of Project Ryze on behalf of Mirae Asset Securities Company, Limited." Did I read that correctly?**

A. Counsel, you know, I didn't read it as you were saying that to critique your reading skills. Do you have a question?

**Q. Yeah. I asked for confirmation that I read that correctly?**

A. (No oral response.)

**Q. If you need to read it again, you can, or how about we'll do it this way: Can you read that second to last paragraph in Exhibit 18.1 for me?**

A. I have just read it right now.

**Q. Can you read it out loud for me?**

A. Why is that, Counsel?

**Q. Because I want to have the paragraph in the record before I proceed to ask additional questions for you.**

A. Okay. "We are writing this letter to certify that Kyunghyun Lee, as a Director of Mirae Asset Securities Co., Limited, is authorized BRG Asset

Management to negotiate and execute the commencement of transaction of Project Ryze on behalf of Mirae Asset Securities Co., Ltd."

**Q. Thank you. Whether or not you read this email, if you're presented with a document bearing that paragraph, does that cause you to believe that Mr. Lee is authorized to execute contracts on behalf of Mirae?**

MS. ABDO: Form.

MR. PRINCE: Form, foundation.

MS. ABDO: Foundation.

MR. PRINCE: Calls for a legal conclusion.

THE WITNESS: Well, as I said, I don't believe I read it at the time. Reading that right now, that is consistent with what I have testified to extensively already, Counsel.

BY MR. OWENS:

**Q. I'll direct your attention to the signature further towards the bottom right of Exhibit 18.1 that reads "Choi, Hyun Man," and then the next line "Chief Executive Officer," with a stamp on the right side. Did I read that correctly or describe that correctly?**

A. I -- I'm reading what you are -- I'm listening and looking at what you just read. I don't know if that's the correct pronunciation, but I see what you're referring to.

**Q. And would a signature line of an individual identified as the chief executive officer of a company bolster your belief that this -- that Lee was authorized to execute these contracts?**

MR. PRINCE: Form.

MS. ABDO: Form.

MR. PRINCE: Foundation. Calls for a legal conclusion.

BY MR. OWENS:

**Q. Let me put it a different way. Does the existence of a signature from the chief executive officer of Mirae cause this to be a more potent certification of Lee's authority?**

MS. ABDO: Form.

MR. PRINCE: Form, foundation, legal conclusion.

THE WITNESS: Honestly, Counsel, I'm not trying to fight you. I don't know how to answer that. Does it enhance, bolster or otherwise? I didn't review it at the time. And if you're asking for my opinion right now, I'm not qualified to talk about a stamp that was utilized between Ryze and Lisa Fuller and Victor Roehm and on behalf of Mirae. So I'm just -- as I said, I didn't read it, but if -- I'm just kind of agnostic. I have testified and will reiterate. I thought they had authority for all

the reasons, that Director Lee had authority for all the reasons I testified to. I'll let a trier of fact determine based upon expert testimony or Victor Roehm's conclusions as to whether this bolsters that or not.

BY MR. OWENS:

**Q. Receiving a letter that is signed by the chief executive officer does not move the needle one way or the other about your belief as to Mr. Lee's authority. Is that your testimony?**

MR. PRINCE: Same objection.

THE WITNESS: As far as moving the needle, I'm at 100 percent, if that's what you want to hear. I mean, I'll make it very clear. I'm at 100 percent that they had authority to bind the company, and this doesn't move the needle for that reason.

BY MR. OWENS:

**Q. We'll put that aside for now. I'll ask the court reporter to mark Exhibit 19, and I'll also ask you to get Exhibit 5 handy, if you would.**

(Exhibit 19 marked.)

**Q. Mr. Graham, do you recognize Exhibit 19?**

A. Yes, I do, Counsel.

**Q. And can you tell me whether Exhibit 19 appears to be the same email that's at the very bottom of the email chain in Exhibit 5?**

entries.

BY MR. OWENS:

**Q. Fair enough. You can put that to the side. I just have a couple concluding questions.**

**In your view was it reasonable for Ryze to deal with you as -- under the assumption that you were Mirae's counsel?**

MR. PRINCE: Form, foundation.

THE WITNESS: Yes.

BY MR. OWENS:

**Q. Do you think Ryze should have gone around Snell & Wilmer's representation and attempted to contact Mirae directly?**

A. No.

MR. PRINCE: Form and foundation.

BY MR. OWENS:

**Q. Do you understand me to be counsel for Ryze?**

MR. PRINCE: Form, foundation.

THE WITNESS: I mean, frankly, I had forgotten who represented who until -- I'm just here to tell the story. I even at frankly points of the -- if you say you're counsel for Ryze in this, I'm aware by certain pleadings that there's a firm representing Ryze on this that has entered an appearance in that regard.

BY MR. OWENS:

**Q. And that's what I'm getting at. Is it reasonable in your experience to rely on an attorney's identification of themselves as a party's counsel in assuming that that attorney is in fact that party's counsel?**

MS. ABDO: Form.

MR. PRINCE: Form, foundation, legal conclusion.

THE WITNESS: I can only speak for myself, but I think that is a reasonable thing to assume that if I see a law firm on a pleading or a letter from Todd Bice saying he represents that party, that I accept that as an officer of the court that what he's stating is accurate and true. And I don't go beyond that.

BY MR. OWENS:

**Q. And last, over the course of the representation of Mirae that we have discussed today here in this deposition, were you at all times acting on behalf of Mirae?**

MR. PRINCE: Same objections.

THE WITNESS: You mean in a legal capacity in providing -- I believe so from the initial connection in mid-June all the way through the litigation, all the way through the mediation, to me it was just one -- one lengthy relationship that dealt with one project and the

same parties. So having said that, yes, right up through, as I recall, and maybe even into a little bit of early January of 2022.

BY MR. OWENS:

**Q. Were you acting for any other purpose besides advancing the interests of Mirae?**

MR. PRINCE: Same objections.

THE WITNESS: I believe I was acting with the sole purpose of advancing the interests of my clients and protecting the rights that they had under the law in the manner that we did, both in terms of investigation, litigation, settlement practices, and then assembling the team we did for the documentation of a very complex deal.

BY MR. OWENS:

**Q. And your client in this instance, just to be clear, was Mirae Asset Securities Company?**

MR. PRINCE: Same objections; form, foundation, legal conclusion.

THE WITNESS: It's just so commonly referred to as Mirae. Everyone has done that, but I believe the name of the entity that we have represented was the one utilized on the CLA, in the engagement letter that we sent and then the complaint. And so -- and I believe the final SLA also had that same entity. So that's my understanding.