# EXHIBIT S119

*Excerpts of the Deposition of Michael J. Tobak III (Sept. 25, 2025)*

# Transcript of the Testimony of

# MICHAEL J. TOBAK III

September 25, 2025

Mirae Asset Securities Co. vs. Ryze Renewables Holdings

BAMFORD REPORTING SERVICE INC.
4105 N. 20th Street
Suite 135
Phoenix, AZ 85016
602.265.5974
brs@bamfordreporting.com

A. I have not.

MR. CARLTON: Objection. Sorry. Objection; vague as to form. Go ahead, Mr. Tobak.

THE WITNESS: Oh, I have not. I have never seen it.

BY MR. MILLER:

Q. We can take Exhibit 3 down, Kyla, and put up Exhibit 4 just briefly. Sorry. We can put Exhibit 2 down and put up Exhibit 3. My apologies.

Mr. Tobak, Exhibit 3 is just a PDF printout of the Arizona State Bar member directory, with your profile. Do you see that?

A. I do.

Q. Is the information provided there correct from your perspective?

A. It is.

Q. We can take Exhibit 3 down, Kyla.

Mr. Tobak, you represented Mirae previously; correct?

MR. CARLTON: Objection. Excuse me. Objection; vague as to time.

THE WITNESS: Just my only representation of Mirae or our firm's only representation of Mirae was in connection with the subject transaction.

BY MR. MILLER:

Q. Understood. And when did your firm represent Mirae?

A. We were engaged -- only engaged by Mirae in October of 2020.

Q. The subject transaction that you mentioned, was that the Convertible Loan Agreement that was entered into between Mirae and Ryze?

A. That's correct.

MR. CARLTON: Objection; assumes facts not in evidence. Go ahead, Mr. Tobak.

THE WITNESS: Yes, that is correct.

BY MR. MILLER:

Q. Who from Mirae retained your firm?

A. There was a gentleman by the name of Mr. Lee, and he was the individual who actually signed our engagement letter for this transaction.

Q. As part of advising Mirae on the transaction, did you interact with other personnel from Mirae?

A. We during the course of the transaction, all of our interactions with Mirae -- most of our interactions with Mirae were by email, and on those emails, almost in all cases there would be a number of parties on them, including a number of representatives of Mirae with the Mirae email address, as well as a number of Mirae's advisors, which I can't recall specifically, but there

were at least two or three advisors for Mirae on the transaction that would also be on the email. Other interactions would be -- the only other interactions we had with Mirae were when there was a working -- transaction working group conference call, which there were not many, five, six, seven, possibly, if I recall. And we, meaning my firm, were never -- that I can recall were not -- it was never on a phone call with just the Mirae team and Kutak. So that's -- that's basically the high level of our interaction with Mirae during the transaction.

Q. Understood. And I'll mark as Exhibit 4 the Plaintiff and Counterdefendant Mirae Asset Security Company Limited objections and responses to Ryze's request for admission.

And Kyla, if you could skip ahead to page 13 of this document. If you could scroll up to Request For Admission No. 7. Thank you, Kyla.

Mr. Tobak, do you see that Request For Admission No. 7 reads: "Admit that Michael J. Tobak, III acted as Mirae's attorney in connection with the CLA"?

A. Yes.

Q. And if we can go back just quickly. If you scroll up, Kyla -- actually, we can go back. Apologies. The CLA refers to the Convertible Loan Agreement, and CLA

with obtaining those licensing and permits or any of the things of that nature in the transaction. However, as part of our work for Mirae that we were being requested to do, we were asked to produce for them, i.e., obtain from Ryze the various licensing and permits that were obtained by Ryze in connection with the transaction.

So our role -- I don't know if that can be characterized as due diligence, but we -- we -- we requested a list, a long list of various types of licensing permits and other information relating to the project. We were asked by Mirae to obtain those, to assist them in obtaining those from Ryze, which we did.

Q. Understood. Was there ever any information that you requested of Ryze that you did not receive?

A. As I recall, the only reason why we would not have received it is because it was in the process of being obtained by Ryze. I do not recall an instance requesting information of Ryze, the request coming from Mirae, that Ryze did not respond to and provide the requested information.

Q. And would it be fair to say that you and Kutak Rock or other attorneys at Kutak Rock acted as Mirae's attorneys in connection with the CLA?

A. Yes, we were Mirae's counsel in the transaction; correct.

there were closing deliverables or conditions being requested of Mirae of Ryze, those requests were made, and I was not aware of any of those requests not being fulfilled by Ryze. So at the point of the -- of the time of this letter I was not aware of any conditions that Ryze had not performed as a condition to Mirae's funding.

Q. Understood. We can set aside Exhibit 14.1.

I'll mark as Exhibit 15 a document that's been produced at the Bates No. SW040822. Do you see Exhibit 15, Mr. Tobak?

A. I do.

Q. This is an email from a Victor Roehm to yourself with various individuals copied; correct?

A. Correct.

Q. The email, which is dated September 13, 2021, informs you that Snell & Wilmer is representing Mirae. Do you see that?

A. I do.

Q. Is that consistent with your understanding that Snell & Wilmer was representing Mirae?

MR. CARLTON: Objection to form, lacks foundation.

THE WITNESS: That was my understanding based on my receipt of this email.

BY MR. MILLER:

Q. And the email refers to a CFIUS analysis that was conducted as part of Kutak's representation of Mirae; is that fair?

A. Yes.

Q. Did Ryze provide all the necessary information from your perspective to conduct the CFIUS analysis?

A. I will start by saying that I was not the lawyer in our firm who led that analysis. But what I can say is that I was a part of the emails and the communications to Ryze requesting the necessary information to conduct the analysis. It was my understanding that our firm had received everything that it needed to conduct that analysis, which analysis we ultimately provided to Mirae.

Q. Were you aware of his reason that the CFIUS analysis needed to be redone?

A. Not from our firm's perspective. I was under the understanding that once we provided our CFIUS advice to Mirae, that the issue was closed.

Q. Understood. In your experience when you receive an email of this type from another lawyer such as Mr. Roehm, is it reasonable to assume the lawyer is representing the client that they say they are?

A. Yes.

Q. We can set Exhibit 15 aside.

response. Is that essentially what you believe?

A. Yes. So again, just based on my review of my emails around that time, I found my first inquiry when, as I mentioned, in March is when communications on the transaction had essentially ceased as far as we were concerned. So on April 23, 2021, is the first email requesting an update I sent given the amount of time that had passed since we hadn't heard anything on the transaction.

Q. Do you have any recollection was the last time that you communicated with Mirae other than sending out an email that wasn't being responded to?

A. That was -- that's probably the -- after this, after the June 22nd, 2021, request for an update, I can't seem to recall. The only emails that are jumping out at me that I would have sent, and again, they were produced or shown here as exhibits, was the email where we reached out to the parties saying that we understand a closing of the transaction was imminent and that we expected payment. This was based on information that we had received. I can't specifically recall from whom.

But at that point we were no longer Mirae's counsel in the transaction. That is when they engaged Snell & Wilmer. But given that we understood there to be a closing and a funding coming up, we requested payment.