# EXHIBIT S122

*Excerpts of the Deposition of Lisa Fuller (Dec. 3, 2024)*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

MIRAE ASSET SECURITIES CO. LTD., a Republic of Korea company,

Plaintiff,

vs.

RYZE RENEWABLES HOLDINGS, LLC, a Nevada limited liability company, and RYZE RENEWABLES NEVADA, LLC, a Nevada limited liability company,

Defendants.

Case No. 2:23-cv-01492-APG-NJK

RYZE RENEWABLES HOLDINGS, LLC, a Nevada limited liability company, and RYZE RENEWABLES NEVADA, LLC, a Nevada limited liability company,

Counter-Claimants,

vs.

MIRAE ASSET SECURITIES CO. LTD., a Republic of Korea company,

Counter-Defendant.

JOB NO. 10153774

VIDEOTAPED DEPOSITION OF LISA FULLER

Pensacola, Florida

Tuesday, December 3, 2024

Snell & Wilmer, who is a big, reputable law firm, that I wanted to talk to someone at Mirae besides Mr. Lee.

**Q. Yeah.**

A. They -- I don't know if you've seen those communications -- but in very aggressive ways, told me to shut up and sit down and do as I was told. And --

**Q. Do you know who was paying Snell & Wilmer's fees?**

MR. OWENS: Finish your answer.

MR. TSAO: It's -- look, by --

THE WITNESS: Snell & Wilmer told us that Mirae was paying their fees. Snell & Wilmer told us that Mirae was their client. Snell & Wilmer told us that Mirae was fully aware of the lawsuit and these negotiations. Snell & Wilmer told us that they had an engagement letter with Mirae.

Snell & Wilmer told us that we could not speak to anyone other than Mr. Lee, which is also what Kutak Rock told us, which is also what Lee & Ko told us, which I wouldn't be surprised if you also told us. Would not surprise me at all.

BY MR. TSAO:

**Q. Okay.**

when you're being extorted? I don't know. The police? I don't know.

**Q. Yeah, just to be clear, you're -- you're kidding?**

A. I'm --

**Q. No? Yes?**

A. I wanted to pursue all avenues to -- I thought what was happening to them was very bad.

**Q. Okay.**

A. But I didn't know what avenues we had. I wanted to pursue any avenue other than this.

**Q. But Ryze confirmed that --**

A. Because they're practical, and they said, okay, well, let's play that out. What if we fight the lawsuit? What happens then? Okay. Well, we fight the lawsuit. We win the lawsuit. Four years from now, we'll be bankrupt, and so --

**Q. Did it ever dawn on you, people at Ryze, that Lee and Han were not who they represented themselves to be after all of this? We're going to go through a lot more emails in the time that we have.**

A. That's why --

MR. OWENS: Objection. Assumes facts not in evidence.

MR. TSAO: She's told me it was a nightmare.

THE WITNESS: It was a nightmare. And I just told you all the things we did. And once we have a written authorization with the formal stamp and a national law firm saying it is Mirae doing this, and the thing says Lee is authorized to negotiate this deal, and so I have now official documents that it is Mirae, that Mr. Lee is who I'm supposed to talk to, and that a national law firm is being paid by Mirae, is Mirae's attorney, and they're telling me this is Mirae. And, I mean, I don't know how much more diligence --

BY MR. TSAO:

**Q. From the same person who you're saying is extorting you, though; right? Right?**

A. They were saying they were just negotiating a deal. So they were rejecting that. They were rejecting that.

(Exhibit Number 11, Loan Agreement, dated 11/29/21, Bates-stamped RYZE0003873 - 3876, was marked for identification.)

BY MR. TSAO:

**Q. I want to direct your attention to the second email in the first page. This is a March 12,**

doing was egregious covered the whole thing. I thought Mirae was a horrible company. I -- I -- at that point, Snell & Wilmer had convinced me that they fully understood what was happening here and had signed off on it.

And so I thought they were terrible. I thought Mr. Lee was terrible. I thought Han was terrible. I thought what was happening to Ryze was terrible. I thought what this was going to do to all of them was terrible.

But what are you going to do? Spend four years, five years in litigation and you're bankrupt anyway. So there were no good alternatives for Ryze.

**Q. Except for getting in touch with someone at Mirae. And I know you said you tried.**

A. At this point --

**Q. You tried; right?**

A. At this point, we were told that Snell & Wilmer had been in touch with other people at Mirae. Mirae's general counsel and whoever had signed that chairman's chop letter that came down telling us that Mr. Lee had authority.

So I was told that Snell & Wilmer, a national, very reputable law firm, had done all of

that, because they specifically told me that.

**Q. Did you think that it was rational what they were doing, to withdraw from the CLA and then seek specific performance work? Did that make sense to you?**

A. Obviously not.

**Q. Okay. Yeah. So that didn't make any sense. And the question before -- I don't think you actually answered it -- was, did you -- did you have concerns about their unwillingness to provide you with the name of the lender so you could provide KYC?**

A. Yes.

**Q. Yes. Okay. And could you understand why it was that they would not give you the name of the -- of the lending entity so that you could perform KYC?**

A. Well, I did answer that question. We were concerned because we thought when we got the KYC we would learn that Han was getting a big chunk of it.

**Q. I missed that. Okay.**

A. So that's why we were concerned, and that's why I was pursuing that KYC so aggressively is because I believed that Han had negotiated some big chunk of those profits.